# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**FEDERAL TRADE COMMISSION**,

*Plaintiff*

v.

**IQVIA HOLDINGS INC. and PROPEL MEDIA, INC.**,

*Defendants*.

Case No.

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT

Plaintiff, the Federal Trade Commission ("FTC" or "Commission" or "Plaintiff"), by its designated attorneys, petitions this Court for a preliminary injunction enjoining Defendant IQVIA Holdings Inc. ("IQVIA") from consummating its proposed acquisition (the "Proposed Acquisition") of Defendant Propel Media, Inc. ("Propel" or "PMI" or "DeepIntent"). The Commission seeks this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26. A temporary restraining order enjoining the Proposed Acquisition is necessary to preserve this Court's ability to provide full and effective relief after considering the Commission's motion for a preliminary injunction. █████████████████████████████

████████████████████████████████████████████

███████████████████████

1

Plaintiff requires the aid of this Court to preserve the *status quo* and to protect competition during the pendency of an administrative trial on the merits.  The Commission initiated the administrative trial, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on July 17, 2023. Pursuant to FTC regulations, the administrative proceeding on the merits will begin on December 20, 2023. The administrative proceeding will determine the legality of the Proposed Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Proposed Acquisition.

Allowing Defendants to consummate the Proposed Acquisition and combine their operations prior to the issuance of a decision on the merits by the Commission through the administrative process would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is ultimately found unlawful.

Accordingly, pursuant to FTC Act § 13(b), Plaintiff requests (1) a preliminary injunction to protect the Commission's ability to evaluate the antitrust merits of the Proposed Acquisition and (2) a temporary restraining order to protect this Court's ability to decide the FTC's request for a preliminary injunction and order appropriate relief.  Plaintiff's request for a temporary restraining order is the subject of a separate motion, in which Plaintiff asks the Court to enter—before 11:59 p.m. Eastern Time on July 21, 2023—an order prohibiting Defendants from consummating the Proposed Acquisition until after this Court rules on the FTC's request for a preliminary injunction.

## NATURE OF THE CASE

1.      IQVIA, a Fortune 500 company and the world's largest healthcare data provider, proposes to acquire Propel, which owns DeepIntent, a leading demand-side platform ("DSP") that

targets healthcare professionals ("HCPs") and other healthcare consumers in the programmatic digital healthcare advertising industry.  Programmatic advertising is automated, instantaneous matching between buyers and sellers of advertising space.  If consummated, the Proposed Acquisition would substantially lessen competition by combining two of the top three providers of programmatic advertising targeted specifically at U.S.-based HCPs on a one-to-one basis ("HCP programmatic advertising"), resulting in increased prices, reduced choice, and diminished innovation.  The increase in market share and concentration in this HCP programmatic advertising market makes the Proposed Acquisition presumptively illegal.  The Proposed Acquisition would also provide the combined firm with the ability and greatly increased incentive to disadvantage rival DSPs to which it provides key inputs used for programmatic advertising to HCPs.

2.      The clients of healthcare DSPs are healthcare companies, such as pharmaceutical manufacturers, biotechnology companies, and their advertising agencies ("healthcare advertisers"), who inform potential consumers and HCPs about their products through digital advertising.  Healthcare digital advertising is a nearly $14 billion industry that is expected to continue growing, due in part to increasing demand for digital advertising.  While still emerging, the market for HCP programmatic advertising—a subset of the total healthcare digital advertising industry—has grown significantly in recent years, accelerated by the COVID-19 pandemic, which caused healthcare companies to shift sales activities away from traditional in-office physician detailing and toward online marketing.  To effectively target HCPs for digital advertising, customers use healthcare DSPs, such as DeepIntent and IQVIA's Lasso, to serve digital advertisements for healthcare products to specific HCPs.

3.      Healthcare DSPs enable advertisers to plan, activate, measure, and optimize their programmatic advertising campaigns, targeting HCPs and consumers in real time across a variety

of media platforms (such as connected TV, banner ads, email, audio, and more).  Healthcare DSPs facilitate programmatic advertising campaigns through automated purchases and placement of advertising inventory on media platforms.  Moreover, healthcare DSPs and their advertising clients can measure the efficacy of the digital ad campaign—in clicks, impressions, prescriptions written, or other metrics—to further optimize their operations.

4.      The HCP programmatic advertising market is highly concentrated, with ███ ████████████████████████████████████████████████████████████ ████████████████████  While there are many "generalist" DSPs that offer programmatic advertising across other verticals, healthcare DSPs exclusively serve the healthcare vertical. ████████████████████████████████████████  healthcare DSPs participate in a distinct market and possess unique characteristics and capabilities that healthcare advertising clients demand, ██████████████████████████.

5.      IQVIA is a global leader in the collection and licensing of data to the healthcare and life sciences industries.  With revenues of over $14 billion in 2022, IQVIA licenses its data assets to stakeholders across multiple segments of the healthcare industry, including for advertising purposes.  Before 2022, however, IQVIA did not have the capability to conduct programmatic advertising in-house.  Instead, it supplied data to DSPs and licensed data to healthcare advertisers for use in the DSP of their choice—primarily DeepIntent, Lasso, or ███████—for programmatic advertising campaigns.

6.      Seeking to enter the HCP programmatic advertising market, IQVIA simultaneously targeted both Lasso and DeepIntent for acquisition.  ███████████████████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Thus, should the Proposed

Acquisition be consummated, IQVIA would acquire a leading position in the HCP programmatic

advertising market in a single ███████████ swoop.

7.      Post-Acquisition, IQVIA would control approximately ████████ of sales in the

HCP programmatic advertising market.  The Proposed Acquisition would significantly increase

concentration in an already highly concentrated market, making the Proposed Acquisition

presumptively unlawful under the 2010 U.S. Department of Justice and Federal Trade Commission

Horizontal Merger Guidelines (the "Merger Guidelines") and controlling caselaw.

8.      The Proposed Acquisition would eliminate head-to-head competition between

Lasso and DeepIntent.  Today, Lasso and DeepIntent compete vigorously, ████████████

████████████████████████████████████████████

████   ████████████████████████████████

████████████████████████████████████████████

Those incentives would evaporate with DeepIntent and Lasso under one roof.  DeepIntent and

Lasso also compete on price, ███████████████████████████

████████████████████████████████████████████

████████████████████████ By eliminating competition between DeepIntent

and Lasso, the Proposed Acquisition would reduce the price, quality, and innovation competition

existing between Defendants today.

9.      Besides being one of DeepIntent's primary direct competitors post-Lasso acquisition, IQVIA also controls data that are key inputs to HCP programmatic advertising. Healthcare DSPs use IQVIA data to identify and target the HCPs most likely to be receptive to a digital advertising campaign.  Healthcare DSPs also use IQVIA data to measure the success of a digital advertising campaign.

10.      Healthcare industry participants view IQVIA's data, which enables healthcare companies to market to HCPs on an individualized basis, as the "gold standard."  Two types of IQVIA HCP data are related products to HCP programmatic advertising and are particularly important in the industry: (1) identity data (i.e., data that helps identify HCPs online for programmatic advertising) and (2) prescribing data (i.e., detailed prescription and claims data that reveals prescribing behavior).

11.      Because there are few comparable alternatives to IQVIA's identity and prescribing data, the merged firm may leverage its data to disadvantage current and/or emerging rivals to DeepIntent and Lasso.  Among other things, IQVIA could (1) raise the prices of data that rivals need to attract advertising customers, (2) sell lower-quality or less comprehensive data to competitors, or (3) restrict advertisers from using IQVIA data purchased to conduct advertising campaigns with companies other than Lasso or DeepIntent.  Without access to IQVIA data, current or emerging DSP competitors would be forced to use lower quality or higher cost alternatives that would reduce those rivals' competitiveness—thus driving healthcare advertisers towards IQVIA's DSPs. ███ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████   Accordingly, post-Acquisition, IQVIA would possess the ability and a greatly increased incentive to leverage its control over certain healthcare data to

hamper Lasso's and DeepIntent's competitors.  Other recognized indicia of vertical harm similarly show that IQVIA may harm Lasso's and DeepIntent's competitors post-Acquisition.

12.     Finally, the Proposed Acquisition takes place in the context of unprecedented consolidation in healthcare programmatic advertising.  Not only is IQVIA poised to become the leader in the HCP programmatic advertising market if it acquires DeepIntent following the acquisition of Lasso, but IQVIA has also spent ███████ acquiring prominent healthcare data companies MedData Group ("MedData") in ████ and DMD Marketing Solutions ("DMD") in ████ Along with IQVIA, these four firms in combination would wield outsized power in the healthcare programmatic advertising industry.  ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████     The Proposed Acquisition would create a dominant combination wielding market power beyond even what DeepIntent envisioned.

13.     For these reasons, the Proposed Acquisition would significantly reduce competition in the HCP programmatic advertising market.  The elimination of head-to-head competition between DeepIntent and Lasso may result in increased prices.  The Proposed Acquisition also may reduce innovation and other non-price competition in the HCP programmatic advertising industry.

14.     There are no countervailing factors sufficient to offset the likelihood of competitive harm from the Proposed Acquisition.  Defendants cannot demonstrate that new entry of healthcare DSPs or data providers would be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition.

15.     Defendants will be unable to show sufficient cognizable, verifiable, or merger-specific efficiencies that would offset the likely and substantial competitive harm from the Proposed Acquisition.

16.     Allowing Defendants to consummate the Proposed Acquisition while the Commission adjudicates its merits would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is found unlawful.

## JURISDICTION AND VENUE

17.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

18.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe

(1)     that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)     that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such

action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

19.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.  DeepIntent, Inc. is headquartered in New York, New York.  IQVIA, Inc., the subsidiary of IQVIA Holdings Inc. that is acquiring Propel Media, is located in Parsippany, New Jersey.  Additionally, many other industry participants are located in and around New York City.

20.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute.  Fed. R. Civ. P. 4(k)(1)(C).  Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(c)(3), as well as under 28 U.S.C. § 1391(c)(2) and 15 U.S.C. § 53(b).

## THE PARTIES AND THE PROPOSED ACQUISITION

21.     Plaintiff, the Federal Trade Commission, is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

22.     Defendant IQVIA (formerly IMS Health) is a publicly traded Delaware corporation, headquartered in Durham, North Carolina.  IQVIA is a global provider of technology solutions, clinical research services, and analytics to the healthcare and life sciences industries. Founded in 1982, IQVIA has "one of the largest and most comprehensive collections of healthcare information in the world."   Its customers include leading pharmaceutical manufacturers,

biotechnology companies, device and diagnostic companies, and consumer health companies. Customers use IQVIA's data to "run their organizations more efficiently and make better decisions to improve their clinical, commercial and financial performance."  As of 2022, IQVIA had approximately 86,000 employees in more than 100 countries.  In 2022, IQVIA generated $14.41 billion in worldwide revenue.  IQVIA's business spans clinical research and development data and solutions, customer engagement solutions, and various healthcare data products and services.

23.     IQVIA has several business segments within the supply chain of the healthcare digital advertising industry, including MedData, DMD, and Lasso, that help deliver data and services to its customers.  All three of these segments were independent companies that IQVIA purchased in the last four years.  Lasso touts itself as the only marketing platform that allows advertisers to plan, activate, and measure their digital advertising campaigns for HCPs and consumers on all digital channels within one system.  Lasso's customers include healthcare media agencies, pharmaceutical manufacturers, and direct-to-consumer digital health brands. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

24.     Defendant Propel, a Delaware company headquartered in Jackson, Wyoming, is a holding company that owns DeepIntent.  DeepIntent, headquartered in New York, New York, is a digital advertising company that enables marketers to plan, activate, measure, and optimize their advertising campaigns, targeting HCPs and patients.  DeepIntent brands itself as "The Most Powerful Healthcare Advertising Platform."  Founded in 2016, DeepIntent's main product offering

is its healthcare DSP, which allows healthcare advertisers to target HCPs and patients in real time with advertisements across a variety of media platforms (such as connected TV, banner ads, video, email, and audio), and improve and measure campaign performance. ████████████

████████████████████████

25.   ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████

26.   On July 17, 2023, by a 3-0, the Commission found reason to believe that the Proposed Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  On July 17, 2023, the Commission commenced an administrative adjudication proceeding to determine whether the Proposed Acquisition is unlawful.  An administrative trial before an Administrative Law Judge is scheduled to begin on December 20, 2023.  The ongoing administrative trial provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  *See* 16 C.F.R § 3.41.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

### **INDUSTRY BACKGROUND**

27.   IQVIA and DeepIntent are part of the healthcare digital advertising ecosystem.  Digital advertising includes advertising on any type of digital site, including websites, applications, email, social media, and connected TV devices like Roku or Apple TV.  Just like print and legacy

television advertising, digital advertising involves placing a specific form of content in front of a target audience.

28.     Programmatic digital advertising, which is the "automation of digital media buying," revolutionized the negotiations between advertiser and publisher.  Historically, an advertiser and publisher individually contracted and agreed to execute an advertising campaign on the publisher's site (e.g., placing an advertisement in a newspaper or on a TV show) at a predetermined price over a set period of time.  Programmatic advertising, by contrast, is an automated process for digital advertising that facilitates an auction process in microseconds across many digital advertising spaces, making the transaction nearly frictionless.  At its core, programmatic digital advertising allows advertisers to set bids for placing advertisements in certain sets of media space online, including websites and connected TV.  Thus, unlike historical media advertising, today's online advertisements are bought and sold in enormous volumes in mere fractions of a second, using highly sophisticated tools and automated exchanges that more closely resemble a modern stock exchange than a bilateral contract negotiation for newspaper advertising space. ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

29.     Healthcare advertisers use DSPs to buy programmatic digital advertising.  DSPs include the algorithm that facilitates the buying of digital advertising space.  DSPs have also evolved to offer a suite of complementary services that cover an entire programmatic digital advertising campaign from start to finish. ████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

██████████████████████████████████████ DSPs often charge advertisers on a per-impression basis, typically expressed in terms of cost-per-thousand impressions.

30.     Healthcare DSPs generally target two distinct sets of audiences: individual healthcare consumers (often referred to as direct-to-consumer, or "DTC" advertising) and HCPs. Healthcare DSPs and their advertiser clients target HCP audiences because HCPs are typically the ones making prescribing decisions.  Unlike DTC advertising, which uses modeling to target groups of consumers based on demographic and other data, healthcare DSPs that compete to offer HCP programmatic advertising can target HCPs on an individual, or one-to-one ("1:1") level.

31.     HCP programmatic digital advertising campaigns generally consist of three steps: audience building, activation, and measurement.  First, the healthcare advertiser must "plan" or "build" the campaign audience (i.e., the individuals or cohort to which it wants to serve its advertisements).  A healthcare advertiser will select certain audience criteria and will then, either on its own or with help from the DSP, determine which individuals should be included in that audience.  Once it selects individuals to target (i.e., "builds the audience" based on its chosen criteria), it then targets that group.  The second step, activation, involves identifying digital devices associated with individuals within the audience category and serving those devices with an advertisement on a certain website.  Finally, the advertiser and/or DSP will measure the effect of the campaign, which involves analyzing data provided by the DSP to determine whether the audience engaged with the advertisement or prescribed more of the product.  Throughout the campaign, the advertiser may also work with the DSP to "optimize" the campaign by making changes during the campaign timeframe (e.g., altering the content or audience characteristics) based on real-time measurement to drive better outcomes.

### A. Planning and Audience Creation

32.     Initially, a healthcare advertiser must determine which HCPs to target.  When doing so, the healthcare advertiser might use prescribing data to determine which HCPs to include in the campaign, as past prescribing behavior may indicate which HCPs are likely to be receptive to a digital advertisement.   Healthcare advertisers can build these audiences in several ways, either building custom audiences or using pre-built audiences for HCP targeting based on certain criteria. Regardless of the method chosen, an advertiser and its DSP will build an audience to target before activating the campaign.  ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████

### B. Activation and Execution

33.     Once a healthcare advertiser builds an audience, it must find those HCPs on the digital sites they visit and serve them with advertisements.  To do this, the advertiser and/or its DSP will use an "identity graph," which converts the advertiser's list of HCPs (often in the form of a National Provider Identifier ("NPI") list) into a list of devices or digital identities to target. Identity data provides the critical link between professional identity (i.e., NPI number) and digital identity.  ██████████████████████████████████████████

███████████████████████████████████████████  After an HCP audience list is converted to a set of digital identities, those digital identities are then sent to the DSP, which serves those HCPs with targeted advertisements.

### C. Measurement and Optimization

34.     Once the campaign is underway, healthcare advertisers measure the efficacy of digital advertising campaigns and, if needed, make changes to campaigns to optimize performance.

As a DSP serves advertisements, it generates data about which digital identities—and thus which individual HCPs—viewed or engaged with an advertisement. This engagement data facilitates measurement of HCP programmatic advertising by distinguishing at an individual HCP level those who received the advertisement from those who did not. In pharmaceutical advertising, for example, a key performance metric is typically increased prescriptions. An advertiser can link engagement data to prescribing data (e.g., linking a doctor's prescribing behavior with their exposure to advertisements). By linking engagement data and prescribing data, the advertiser can glean insights about whether HCPs served with advertisements for a pharmaceutical product increased their prescriptions of that product.

35. 

For this reason, pharmaceutical advertisers that use IQVIA as their standard measurement data, for example, are likely to prefer the use of IQVIA prescribing data for digital advertising campaigns.

## THE RELEVANT ANTITRUST MARKET

36.     The Proposed Acquisition may substantially lessen competition in the market for HCP programmatic advertising and cause harm to DSPs, advertisers, and American consumers.

### A. HCP Programmatic Advertising Is the Relevant Product Market

37.     A relevant line of commerce in which to analyze the effects of the Proposed Acquisition is HCP programmatic advertising.

38.    HCP programmatic advertising is used primarily by pharmaceutical companies and their advertising agencies to plan, execute, and measure the results from programmatic advertising campaigns targeted to HCPs.  For these advertisers, HCPs are an essential audience, both because they select medications and write prescriptions directly, and more broadly because they play a vital role in shaping consumer brand perception.  Even though patients are the ultimate consumers of pharmaceutical products, HCPs often advise patients on which drugs to use and are thus the primary decisionmakers in the sales process.  Therefore, although pharmaceutical advertisers use DTC advertising campaigns to market their products, they also use HCP programmatic advertising to target campaigns at HCPs, who can have the most influence on sales of a drug.

39.    ███████████████████████████████████████

███████████████████████████████████ Healthcare DSPs build audiences focused on U.S.-based HCPs because these are the healthcare professionals who can prescribe U.S. Food and Drug Administration-approved drugs to U.S. consumers.  Thus, HCP programmatic advertising targeted toward non-U.S. HCPs is not a substitute for HCP programmatic advertising targeted toward U.S. HCPs.  Further, healthcare DSPs targeting HCPs rely, in part, on NPIs, which are assigned to U.S. HCPs by the Centers for Medicare and Medicaid Services.  Pharmaceutical advertising targeting audiences outside the United States involves different sources of healthcare data and HCP identification information, as well as different regulatory frameworks.

40.    HCP programmatic advertising, as provided by healthcare DSPs, has unique characteristics and serves specific customer needs, including:

41.    HCP Data: HCP programmatic advertising leverages specialized datasets that contain information about HCPs.  There are two main categories of HCP data.  The first is identity

16

data, which involves professional and personal contact information, such as email addresses and demographic data.  The second is prescribing data: claims and/or prescription data that includes detailed information on individual prescribing behavior.  Healthcare DSPs and healthcare advertisers utilize these unique datasets to build, activate, and measure HCP programmatic advertising campaigns.

42.     1:1 HCP Targeting: Every U.S. HCP has a unique, publicly available NPI number, which is accessible on the Centers for Medicare and Medicaid Services website.  Healthcare advertisers can build audiences based on these NPI numbers, which, when linked to other HCP identity data such as email addresses, allow for individualized targeting of particular HCPs rather than less effective, category-based targeting.  For example, rather than simply targeting all cardiologists in a specific metropolitan area, a manufacturer of cholesterol medication can target a specific list of cardiologists (based on their NPI numbers) that it thinks could be receptive to an advertising campaign.  To accomplish this, the manufacturer might create an audience list that includes cardiologists who have published papers on cholesterol medications, are large prescribers of the manufacturer's products, prescribe competing drugs, or were recently contacted by the manufacturer's sales team.  The audience list (e.g., a list of NPIs for the targeted HCPs), when combined with a dataset that includes their personal and professional email addresses, can then be linked to the HCP's digital devices for targeted digital advertising.

43.     Focus on Prescriptions: Pharmaceutical companies build HCP audiences and measure the effectiveness of healthcare campaigns based on prescription data gathered from claims data, among other factors.  The goal of almost every HCP-focused advertising campaign is to change an HCP's prescribing behavior to increase the sales of the product being marketed.  In healthcare advertising, increased sales are typically measured as increased prescriptions ("script

lift").  To do this, healthcare DSPs, such as DeepIntent or Lasso, or the advertisers themselves, first build an HCP audience and then measure the performance of the campaign, providing script lift results from the prescription data on their platforms.  Healthcare advertisers value this degree of granularity because it allows them to assess the efficacy of a digital advertising campaign accurately.

44.    Endemic Inventory: Healthcare advertisers can target consumers and HCPs on both medical-related sites ("endemic" sites) and non-medical sites ("non-endemic" sites).  Advertising on endemic sites (such as Medscape, the WebMD equivalent for HCPs) tends to be more valuable because the audience visiting the site may be more open to considering a healthcare advertisement.  Non-endemic inventory, like the New York Times or ESPN websites, have broader overall reach, ███████████████████████████████████████████████████████████████ ████████████████.  Endemic inventory advertising is therefore priced at a significant premium compared to non-endemic inventory.  Healthcare DSPs tend to have more relationships with endemic publishers and thus offer a broader inventory of higher-value endemic advertising space to customers.

45.    Participants in the healthcare digital advertising industry, including Defendants, recognize HCP programmatic advertising as a distinct product market that is not reasonably interchangeable with other forms of advertising.  █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

46.     HCP programmatic advertising has distinct pricing.   It is substantially more expensive than both DTC programmatic advertising and general advertising. ███████████████

██████████████████████████████████████████████████████

████████████  ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████  The distinct difference in price between HCP programmatic advertising and DTC programmatic advertising shows that there is little cross-price elasticity of demand between these products.

47.     HCP programmatic advertising is performed by specialized vendors: healthcare DSPs.   DeepIntent's Chief Technology Officer addressed this topic in a blog post on the DeepIntent website:

> Not long ago, there was no such thing as a healthcare DSP.  Companies built them because generalist DSPs, which serve a wide range of advertising verticals, don't necessarily meet a healthcare marketer's complex needs. . .
>
> Working with generalist DSPs, marketers often have to plan their HCP campaigns using multiple platforms.  Connecting data from one platform to the next causes about 30% data loss.  This limits the effectiveness and efficiency of reaching HCPs, whose datasets are far more specific than their consumer behavior. . .
>
> [C]licks and impressions are not enough for healthcare marketers.  While those metrics can demonstrate the reach of a campaign, they don't represent its real-world impact. . . . A healthcare DSP should measure and optimize toward pharma-specific metrics, including [script lift, among other metrics].

48.     ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████

49.     Lastly, HCP programmatic advertising and healthcare DSPs serve a distinct set of customers: healthcare and pharmaceutical advertisers.  ████████████████████████

██████████████████████████████████████████████████

████████████████████

50.     Other types of advertising, such as DTC programmatic advertising and non-programmatic advertising, are not reasonably interchangeable with HCP programmatic advertising.  Accordingly, customer substitution to other products would be insufficient to defeat a small but significant and non-transitory increase in price ("SSNIP") imposed by a hypothetical monopolist supplier of HCP programmatic advertising.

51.     HCP programmatic advertising is therefore a line of commerce and a relevant product market within the meaning of the Clayton Act.

**B.  The Relevant Geographic Market Is Worldwide**

52.     The relevant geographic market to assess the competitive effects of the Proposed Acquisition is worldwide because HCP programmatic advertising suppliers and their customers can be located anywhere.  However, although the geographic market is worldwide, ████████████

██████████████████████████████████████████████████

████████████████████

## MARKET STRUCTURE AND THE PROPOSED ACQUISITION'S
## PRESUMPTIVE ILLEGALITY

53.     The market for HCP programmatic advertising targeting is highly concentrated and consists of three main competitors—DeepIntent, Lasso, and ███████. These three companies collectively account for the vast majority of HCP programmatic advertising sales, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

### A.  DeepIntent, Lasso, and ███████

54.     Defendants, ███████, and other market participants have described DeepIntent, Lasso, and ███████ as the three main healthcare DSPs. ████████████████████

████████████████████████████████████████████████████████

███, the primary competitors for HCP programmatic advertising are DeepIntent, Lasso, and ██████. ████████████████████████████████████████

████████████████████████████████████████

### i.  *DeepIntent*

55.     DeepIntent calls itself "The Most Powerful Healthcare Advertising Platform." DeepIntent's main product offering is its healthcare DSP, which "empowers marketers to plan, activate, measure, and optimize their HCP and patient programmatic campaigns all within a single platform" across a variety of media platforms (e.g., connected TV, banner, video, email, audio, etc.).  In addition to its healthcare DSP, DeepIntent offers an "[i]ndustry-leading identity graph" and "DeepIntent Outcomes," which is a measurement and optimization tool.

56.     ████████████████████████████████████████████

███ ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ DeepIntent and █████████ are the two top firms in the HCP programmatic advertising market, and Lasso is third.

      **ii.** ***Lasso***

57.    Lasso touts itself as an "omnichannel marketing and analytics platform that enables healthcare marketers to plan, activate and measure their digital advertising campaigns, all in one place."  Lasso licenses Microsoft's DSP technology ("Xandr") to deliver programmatic advertising.  As part of this partnership, Lasso combines data from its proprietary identity solution and measurement capabilities onto Xandr's programmatic technology to provide a robust healthcare platform. ████████████████████████████████████████████

█████████████████████████████████████████████

58.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

59.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

**iii.** ████████

60.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

61.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

**iv.** ████████████████

62.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

### B. The Proposed Acquisition Would Substantially Increase Concentration Levels in the HCP Programmatic Advertising Market

63.   Should the Proposed Acquisition be consummated, the number of primary competitors in the already-concentrated HCP programmatic advertising market would shrink from three to two.  Post-Acquisition, IQVIA would control ████████████████████ of the market as measured by revenue.

64.   The Merger Guidelines and courts use the Herfindahl-Hirschman Index ("HHI") to measure market concentration.  HHIs are calculated by totaling the squares of the market shares of each firm in the relevant market, both before and after the transaction.  A relevant market is

"highly concentrated" under the Merger Guidelines if it has an HHI of 2,500 or more.  Under the Merger Guidelines, transactions that may create or enhance market power are presumptively unlawful.  A transaction is presumed to create or enhance market power, and is presumptively illegal, if the post-transaction HHI exceeds 2,500 and the transaction increases the HHI by more than 200 points.

65.   The Proposed Acquisition is therefore presumptively unlawful under the Merger Guidelines and controlling caselaw.

## ANTICOMPETITIVE EFFECTS

66.     In addition to the Proposed Acquisition's presumptive unlawfulness, there is substantial competition between Defendants in the HCP programmatic advertising market that would be eliminated as a result of the transaction in violation of Section 7 of the Clayton Act. DeepIntent and Lasso compete head-to-head today;　The Proposed Acquisition will eliminate this vigorous head-to-head competition, and thus may result in increased prices and decreased quality and innovation.

67.     The Proposed Acquisition also would result in a combined firm with the ability and incentive to disadvantage rivals from using IQVIA's data in the HCP programmatic advertising market.  As a large provider of HCP identity and prescribing data, which are key inputs into HCP programmatic advertising, IQVIA could weaken or disadvantage one or more of its actual or potential rivals in the HCP programmatic advertising market post-Acquisition.  Moreover, as the

leading upstream data provider, IQVIA possesses the unique ability and incentive to wield its control of key data inputs to raise the already significant barriers to entry in the relevant market.

68.     While the horizontal and vertical effects of the Proposed Acquisition independently raise competitive concerns, the combined effect increases the likelihood that the Proposed Acquisition will cause a substantial lessening of competition in the relevant market.

### A. The Proposed Acquisition Would Eliminate Significant Head-to-Head Competition Between DeepIntent and Lasso

69.     With the Proposed Acquisition of DeepIntent, IQVIA aims to control two of the three largest healthcare DSPs.  Along with ███████, Lasso and DeepIntent are close competitors for HCP programmatic advertising campaigns planned by pharmaceutical brands.  ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Accordingly, the Proposed Acquisition would eliminate a competitive constraint on Lasso, which may result in anticompetitive price and innovation effects.

70.     ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

- ████████████████████████████████████████████ ██████████████

- ████████████████████████████████████████████ ██████████████████████████████████

- ██████████████████████████████████████████████
  ██████████████████████

- ██████████████████████████████████████████████
  ████████████████

- ██████████████████████████████████████████████
  ███████████████████

71.    █████████████████████████████   ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

72.    Customers have benefited from the vigorous competition between Defendants because it enables customers to pit Lasso and DeepIntent against each other to obtain lower prices, favorable terms, and better service.

73.    Defendants compete aggressively on price to win HCP programmatic advertising business from each other. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

74.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

75.    ████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

- ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

- ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

27

- ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████

76.   ██████████████████████████████████████
████████████████████████████████

77.   Defendants also compete aggressively on non-price terms to win HCP programmatic advertising business from each other.  For example, DeepIntent and Lasso regularly assess each other's technical innovations and increase their own innovation efforts in response.

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████

78.   DeepIntent has long touted its Outcomes offering, which measures the reach and effectiveness of advertising customers' marketing campaigns.  In May 2022, Lasso introduced its own measurement product, Vision, boasting "weekly refreshed Rx reporting, with no minimum spend required and at zero additional cost."  ████████████████████████████

██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████



79. █████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████

80.     The Proposed Acquisition would eliminate this pervasive and significant head-to-head competition.  Post-Acquisition, Lasso would face significantly less meaningful competition than it does today with DeepIntent, which is one of only two healthcare DSPs with the capabilities to rival Lasso.  Consequently, Lasso would not need to compete as aggressively on price to win business from customers, would be able to price at supra-competitive levels, and would have diminished incentive to differentiate, improve, and lower the cost of its offerings.

81.     The Proposed Acquisition would also insulate IQVIA from future competition in the HCP programmatic advertising market.  IQVIA controls key data used by advertisers for HCP audience building and campaign measurement.  By withholding or otherwise limiting access to this data from current rivals or potential entrants to the HCP programmatic advertising market,

IQVIA could weaken current rivals and raise the already-high barriers to entry to protect its leading market share.

### B. The Proposed Acquisition May Substantially Lessen Competition in the HCP Programmatic Advertising Market Through IQVIA's Control of Leading Data Inputs

82.     IQVIA's acquisition of DeepIntent may substantially lessen competition by providing the merged firm with the ability and greatly increased incentive to use its ownership of critical healthcare data to: (a) weaken the competitiveness of one or more of its rivals in the relevant market, and (b) raise barriers to entry for potential rivals in the relevant market.

#### i. As a Key Supplier of Certain Healthcare Data, IQVIA Would Have the Ability and Incentive to Disadvantage Rivals to DeepIntent and Lasso

83.     The supply of comprehensive, high-quality healthcare data is critical to a healthcare DSP's ability to compete in the HCP programmatic advertising market. ██████████████

████████████████████████████████████████████████████████████████

████████████████     Although other firms also provide certain subsets of healthcare data, none can match the scale and quality of data provided by IQVIA and its subsidiaries.

84.     DSPs can access IQVIA healthcare data both directly from IQVIA and indirectly from advertising customers. Specifically, IQVIA sells its healthcare data both directly to DSPs, as well as to pharmaceutical manufacturers, advertising agencies, and life sciences entities, through licensing arrangements. The licensing arrangements can be direct or through third-party access agreements ("TPAs"), which allow IQVIA's advertising customers to share licensed data with their DSPs. TPAs grant access under a specific set of limited conditions. ███████████

████████████████████████████████████████████████████████████████

████████████████     Thus, IQVIA has the ability to control where and how its data is used by rival DSPs.

85.     IQVIA is the leading provider of at least two key data offerings which are each related products: (1) HCP identity data (i.e., data that helps identify characteristics about individual HCPs and how to reach them online), and (2) HCP prescribing data, (i.e., prescription and claims data that reveals individual HCPs' prescribing behaviors).  Both types of data are crucial building blocks for HCP audience targeting, and HCP prescribing data is the backbone of audience building, measurement, and optimization of HCP programmatic advertising campaigns.

86.     No company has HCP prescribing data with greater depth and breadth than IQVIA, nor does any company have as comprehensive and up-to-date HCP identity data as IQVIA.  IQVIA is considered the "gold standard" data provider to pharmaceutical companies for many types of healthcare data including HCP identity and prescribing data.  These pharmaceutical companies pay for the advertising campaign and are a key stakeholder in the choice of DSP.  For these reasons, nearly all healthcare DSPs rely on IQVIA data in some capacity.  Recognizing the superiority of IQVIA data, DeepIntent markets itself as being "fully integrated with IQVIA" data:



87.     If the Proposed Acquisition is consummated, IQVIA's incentive to disadvantage competitors to DeepIntent and Lasso would increase because the value of foregone data sales to disadvantaged third-party DSPs would be more than offset by the gain in digital healthcare advertising sales captured by DeepIntent and Lasso.

### 1. **IQVIA Is the Leading Provider of HCP Identity Data**

88.     One related product, HCP identity data, consists of identity information relating to a specific HCP such as professional and personal contact information and email addresses, NPI number, email addresses, and specialties practiced. Comprehensive and current HCP identity data allows a DSP to target HCPs on an individualized (1:1) basis as opposed to relying on "cohorts," meaning groupings of HCPs with similar characteristics.

89.     ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

90.     Several factors affect the utility of HCP identity data for programmatic advertising applications. For example, the data must be comprehensive and current, with multiple data points about an HCP that are maintained and refreshed regularly to enable DSPs to reach the largest number of HCPs on the most sites. ████████████████████████████
███████████████████████████ Whether an identity dataset is "opted-in" or "consented"

is also important. DSPs and advertisers prefer, if not require, HCP identity datasets in which HCPs have consented to sharing their information for marketing purposes due to concerns about privacy and compliance with laws and regulations.

91.    IQVIA is the leading provider of opted-in HCP identity data. That position primarily derives from its ownership of MedData and DMD. IQVIA's acquisition of MedData in 2019 provided IQVIA with comprehensive demographic and contact data for HCPs tailored for programmatic advertising audiences. IQVIA's acquisition of DMD in ███ augmented MedData's HCP identity data with crucial "opted-in" HCP data. DMD owns the industry leading opted-in and privacy compliant HCP email database in the United States, which includes the email addresses of over 95 percent of the total HCP population. ████████████

████████████████████████████████████████

████████████

92.    IQVIA's HCP identity data is superior to alternative sources according to many key metrics, including HCP reach, the depth of identity information on each HCP, and the fact that the data is derived from HCPs that have consented to be tracked online. ████████████

████████████████████



93. 

94.

### 2.  IQVIA Is the Leading Provider of HCP Prescribing Data

95.     IQVIA also possesses the widest breadth and depth of claims and prescription data, another related product, which provides insight into HCP prescribing behavior.  In general, HCP prescribing data is an aggregation of prescription data from retail pharmacies, healthcare facilities, and claims data from payors such as CMS and health insurance companies.

96.     First, prescribing data is critical to building an advertising campaign's audience (i.e., to identify a set of HCPs it wants to target), because it allows pharmaceutical companies to select individuals based on actual prescribing behavior, such as targeting a group of doctors who are top prescribers of a competing drug.  For example, a campaign for a cholesterol-lowering drug could seek to target HCPs who most frequently prescribe a competing drug.  HCP prescribing data helps advertisers identify these HCPs.  From its chosen criteria, the advertiser or DSP will identify

a list of HCPs to target (i.e., "build" the audience). Then, the list of target HCP NPI numbers will be linked with their online identities through HCP identity data for targeting during the campaign.

97.     Second, HCP prescribing data is critical for measuring campaign outcomes in terms of script lift.   During and after a campaign, advertisers and DSPs will use HCP prescribing data to determine whether the HCPs receiving the advertisement increased their prescriptions of the advertised drug.  This step requires digital advertising campaign engagement data, linked back to the HCPs' NPI numbers through HCP identity data, and ultimately HCP prescribing data to measure whether the HCPs altered their prescribing behavior in the desired way.  Without the ability to measure script lift, advertisers would not be able to optimize the campaign as effectively or otherwise determine the return on investment for that marketing effort.

98.     IQVIA offers the market leading claims and prescription data products that contain HCP prescribing information.  █████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████

99.     ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

### ii. IQVIA Has the Tools to Reduce the Competitiveness of DeepIntent and Lasso's Rivals

100.    As the leading provider of both HCP identity and HCP prescribing data, IQVIA can use its ownership of these two key inputs to disadvantage DeepIntent and Lasso's rivals by raising the price of data access, refusing to provide third-party DSPs access to data (either directly or through limitations in IQVIA's TPAs), offering more limited or degraded data to third-party DSPs, or limiting advertising customers from engaging DSPs other than DeepIntent and/or Lasso.

101.    IQVIA may disadvantage or reduce the competitiveness of DeepIntent and Lasso's rivals by making MedData or DMD data exclusive to DeepIntent and Lasso or raising the price of its data to rival DSPs. ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

102.    IQVIA can also hamper rival DSPs' ability to integrate, sync, or otherwise link to IQVIA data. ██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████. The inability for a DSP to

connect to IQVIA data would be a major disadvantage when trying to attract or retain these customers.

103.    IQVIA's TPA program could also be used to prevent data from being used by rival DSPs.  When advertising clients seek to use IQVIA data with their chosen DSPs, the advertising client must receive approval from IQVIA in the form of a TPA agreement.  Whether IQVIA approves the data sharing is entirely up to IQVIA, and third parties are beholden to IQVIA's decision.  As a result, IQVIA controls whether advertisers can plug its data into competitor DSPs.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████

104.    IQVIA's role as a data supplier provides IQVIA unique insights into the functions and capabilities of rival DSPs.  IQVIA has access to proprietary information about rival DSPs' technology and performance, which could enable IQVIA to either reengineer their innovations or use competitively sensitive information to poach customers.  ██████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████   ███████████████████████████

██████████████████████████████████

### iii.  Post-Acquisition, IQVIA Would Have an Increased Incentive to Lessen Competition in the HCP Programmatic Advertising Market by Disadvantaging Rivals of DeepIntent and Lasso

105.   The Proposed Acquisition would increase the incentive for IQVIA to disadvantage DeepIntent and Lasso's rivals because IQVIA would benefit significantly in the HCP programmatic advertising market when rivals lose sales or alter their behavior in response.  The benefits of capturing a larger share of the relevant market via the combined DeepIntent/Lasso—and stifling entry—would outweigh any lost profits from decreased data sales to advertising customers or rival DSPs.

106.   ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████

107.   ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████



108. ███████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████

109. ███████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████     ████████████
█████████████████████████████████████████████████
████████████████████████████████     ████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

███████████████████████████████████████████

███████

**C. Other Factors Confirm that the Vertical Integration Resulting from the Proposed Acquisition May Substantially Lessen Competition in the Relevant Market**

110.    Other factors confirm that the Proposed Acquisition may substantially lessen competition in the HCP programmatic advertising market due to vertical integration in violation of Section 7 of the Clayton Act.  These factors include: (1) the likelihood and degree of potential foreclosure, (2) the nature and economic purpose of the Proposed Acquisition, (3) the trend toward consolidation in the industry, (4) the market power of the combined firm, and (5) the extent to which the Proposed Acquisition raises entry barriers.

111.    <u>Degree of Market Foreclosure</u>: The likelihood and degree of potential foreclosure is significant, as referenced in paragraphs 82-109. ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████    In sum, due to IQVIA's data quality and ubiquity, should IQVIA withhold or otherwise limit access to either its HCP identity data, or its HCP prescribing data, the overwhelming majority of pharmaceutical advertisers will be forced to use either IQVIA's Lasso or DeepIntent for HCP programmatic advertising.

112.    <u>Nature and Economic Purpose of the Acquisition</u>: The nature and economic purpose of the Proposed Acquisition includes consolidating Lasso, DeepIntent, and IQVIA data into a single, integrated platform. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

113.   <u>Industry Trend Toward Consolidation</u>:  The Proposed Acquisition would further a trend toward consolidation in the HCP programmatic advertising industry.  With the acquisitions of MedData, DMD, Lasso, and now DeepIntent, IQVIA has deployed a deliberate effort to consolidate the HCP programmatic advertising industry.  ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████.  DeepIntent remains the only significant unintegrated healthcare DSP remaining in the relevant market.  Should IQVIA acquire DeepIntent, non-integrated firms may be unable to compete in HCP programmatic advertising going forward, and potential new entrants may be required to enter simultaneously at both the DSP and data supply levels to compete effectively.

114.   <u>Degree of Market Power Possessed by the Merged Firm</u>: IQVIA's post-Acquisition market power would be significant. The merged firm would be the market-leading healthcare DSP in HCP programmatic advertising.  ████████████████████████████████████

█████████████████████    █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

115.   With respect to HCP identity data and HCP prescribing data, as described in paragraphs 88-99, IQVIA is already the leading provider. ██████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ IQVIA's market power in the provision of these key HCP datasets will enhance and entrench its significant post-Acquisition market power in the downstream HCP programmatic advertising market.

116.   Through the Proposed Acquisition, the merged firm could further cement its market power downstream. ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████



117.   Entry Barriers: The Proposed Acquisition would have a deleterious effect on potential entrants.  Without access to IQVIA's HCP identity and prescribing data, entrants will struggle to offer the full suite of capabilities needed by advertisers that run HCP campaigns.

118.   The Proposed Acquisition would raise the already-high entry barriers for HCP programmatic advertising.  The vertical effects of the Proposed Acquisition may increase entry barriers in the relevant market, where IQVIA will have a market-leading position post-Acquisition.



Accordingly, the barriers to entry in the industry are naturally high, and IQVIA can further discourage entry through its control of important data inputs.

## ABSENCE OF COUNTERVAILING FACTORS

### A. Entry or Expansion

119.    Barriers to entry in the HCP programmatic advertising market are already high, and IQVIA's position as the leading upstream data provider enhances its ability to block potential rivals. Defendants cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition.

120.    There are high barriers to entry or expansion into HCP programmatic advertising, which require prospective entrants to develop specific functions and capabilities. De novo entrants must either develop a DSP or license the use of an existing DSP. In addition, the entrant must develop a platform through which advertisers can build audiences, activate digital advertising campaigns on relevant digital spaces, and measure the results. For HCP programmatic advertising, each capability must be specifically tailored to the healthcare advertiser seeking to advertise to HCPs on an individual basis and measure results in terms of prescriptions. These capabilities necessarily require access to, and integration with, key healthcare data, including HCP identity and prescribing data. A healthcare DSP must also be able to target HCPs on both endemic and non-endemic sites, which requires arrangements with endemic publishers. Entry with healthcare DSP capabilities requires significant investment of time and money.

███████████████████████████████████████████████████████

███████████████████████████████

121. ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████ Generalist DSP

entry is, therefore, unlikely to be timely, likely, or sufficient to offset the anticompetitive effects

of the Proposed Acquisition.

122. Consistent with the existing high barriers to entry, theoretical entrants, █████

███████████, have a limited or nonexistent presence in the HCP programmatic advertising

market and would struggle to compete without access to IQVIA's healthcare data:

- ████████████████████████████████████████████████

  ████████████████████████████████████████████████

  ████████████████████████████████████████████████

  █████████████████

- ████████████████████████████████████████████████

  ████████████████████████████████████████████████



- **MediaMath**: MediaMath filed for bankruptcy on June 30, 2023 and is ceasing operations.

123. It is unlikely that an entrant will be able to compete effectively in HCP programmatic advertising without access to IQVIA data.

124. Upstream entry or expansion by healthcare data providers is unlikely to be timely, likely, or sufficient to defeat IQVIA's post-Acquisition ability and incentive to disadvantage DSP

rivals.  Developing the ability to provide a competitive alternative to IQVIA's HCP identity data is difficult, time consuming, and costly. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

125.   Entry of a competitor that could provide a credible alternative to IQVIA's HCP prescribing data is also unlikely to be timely, likely, or sufficient to defeat IQVIA's ability to disadvantage DSP rivals.  IQVIA is one of the top providers of prescription and claims data, which contains HCP prescribing data, because its data is extensive and detailed.  In the unlikely event that an HCP prescribing data provider could match IQVIA's data quality, there is still significant demand for IQVIA's HCP prescribing data specifically because a significant number of pharmaceutical companies use IQVIA data across their organizations.  For data consistency, these customers often want to use the same data provider for HCP programmatic advertising as they do for other sales and marketing activities.  Thus, it is unlikely that any alternative HCP prescribing data provider will be a viable alternative for healthcare DSPs.

126.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

### B. Efficiencies

127.   Defendants cannot demonstrate that the Proposed Acquisition would likely generate verifiable, merger-specific efficiencies sufficient to rebut the strong structural presumption and evidence that the Proposed Acquisition would substantially lessen competition in the relevant market.

## <u>VIOLATION</u>

### COUNT 1 – ILLEGAL ACQUISITION

128.   The allegations of Paragraphs 1 through 127 above are incorporated by reference.

129.   The Proposed Acquisition, if consummated, may substantially lessen competition in interstate trade and commerce in HCP programmatic advertising throughout the country in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 5 of the FTC Act, 15 U.S.C. § 45.

## <u>LIKELIHOOD OF SUCCESS ON THE MERITS,<br>BALANCE OF EQUITIES, AND NEED FOR RELIEF</u>

130.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that an acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative trial.  In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.  Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

131.   The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition in violation of Section 7 of the Clayton

Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.  In particular, the Commission is likely to succeed in demonstrating, among other things, that:

    a.  The Proposed Acquisition would have anticompetitive effects in the HCP programmatic advertising market;

    b.  Substantial and effective entry or expansion is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition;

    c.  The efficiencies and procompetitive benefits asserted by Defendants do not justify the Proposed Acquisition.

132.    Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative trial, that the Proposed Acquisition is unlawful, reestablishing the status quo ante if the parties have consummated the Proposed Acquisition and combined their operations in the absence of preliminary relief would be extremely difficult.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim.

133.    Accordingly, the equitable relief requested here is in the public interest.  Wherefore, the Commission respectfully requests that the Court:

    a.  Enter a temporary restraining order;

    b.  Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

    c.  Retain jurisdiction and maintain the *status quo* until the administrative proceeding initiated by the Commission is concluded; and

d.   Award such other and further relief as the Court may determine is appropriate, just,

and proper.

Dated: July 17, 2023

Of counsel:

HOLLY VEDOVA
Director
Bureau of Competition

RAHUL RAO
Deputy Director
Bureau of Competition

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

NATE SODERSTROM
Acting Deputy Director
Bureau of Competition

STEPHEN MOHR
Assistant Director
Mergers I Division

JORDAN ANDREW
Deputy Assistant Director
Mergers I Division

Respectfully submitted,

ANJELICA SARMIENTO (Bar No. 5636154)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: 202-725-3429
asarmiento@ftc.gov

JENNIFER FLEURY (NY Bar No. 5053178)
Lead Counsel (*pro hac vice*)
JESSICA MOY (CA Bar. No. 272941)
(*pro hac vice*)
STEPHANIE BOVEE (VA Bar No. 46678)
(*pro hac vice*)
HABIN CHUNG (DC Bar. No. 1048514)
(*pro hac vice*)
SAMUEL FULLITON (TN Bar. No. 036802)
(*pro hac vice*)
CORY GORDON (MD Bar)
(*pro hac vice*)
WADE LIPPARD (DC Bar. No. 1616824)
(*pro hac vice*)
CHRISTINA PEREZ (TX Bar. No. 788183)
(*pro hac vice*)
MICHELLE SEO (NY Bar. No. 5007091)
(*pro hac vice*)
VARNITHA SIVA (NY Bar. No. 5337670)
(*pro hac vice*)
WILLIAM SOHN (DC Bar. No. 1017274)
(*pro hac vice*)
JAY TYMKOVICH (DC Bar. No. 241366)
(*pro hac vice*)
LILY VERBECK (DC Bar. No. 90006809)
(*pro hac vice*)

*Counsel for Plaintiff Federal Trade
Commission*

## Certificate of Service

I HEREBY CERTIFY that on July 17, 2023, I served the foregoing on the following counsel via electronic mail:

Kenneth S. Reinker
Cleary Gottlieb Steen & Hamilton, LLP
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Tel.: (202) 974-1500
Email: kreinker@cgsh.com

*Counsel for IQVIA Holdings Inc.*

Alexander Okuliar
Morrison & Foerster LLP
2100 L Street, NW
Suite 900
Washington, D.C. 20037
Tel.: (202) 887-1679
Email: aokuliar@mofo.com

*Counsel for Propel Media, Inc.*

/s/

Anjelica Sarmiento

*Counsel for Federal Trade Commission*