**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

              Plaintiff,

     v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

              Defendants.

Case No.: 1:23-cv-06188-ER

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

I.     IQVIA Seeks to Control Two of the Three Leading Healthcare DSPs ............................ 2

II.    IQVIA Controls Key Data Used by Healthcare DSPs ...................................................... 4

ARGUMENT .......................................................................................................................... 6

I.     The FTC is Likely to Succeed on the Merits .................................................................... 8

    A.    U.S. HCP Programmatic Advertising Is the Relevant Market................................... 10

        1.    The Relevant Product Market ............................................................................ 10

        2.    The Relevant Geographic Market Is Worldwide ................................................. 14

    B.    The Proposed Acquisition Greatly Increases Concentration in the Relevant Market and Eliminates Head-to-Head Competition ................................................................. 14

        1.    The Proposed Acquisition Is Presumptively Illegal............................................ 14

        2.    The Proposed Acquisition Will Eliminate Frequent Head-to-Head Competition Between DeepIntent and Lasso................................................................................ 16

    C.    Defendants' Proposed Acquisition Is Also an Unlawful Vertical Merger ................ 18

        1.    The Proposed Acquisition Likely Is Unlawful under the *Brown Shoe* Factors .... 18

        2.    The Proposed Acquisition Likely Is Unlawful under the Ability and Incentive Framework ............................................................................................................... 21

    D.    Defendants Cannot Rebut the FTC's *Prima Facie* Case ........................................... 23

II.    The Equities Support a Temporary Restraining Order ..................................................... 25

CONCLUSION....................................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................................... *passim*

*Concord Associates, L.P. v. Entertainment Properties Trust*, 817 F.3d 46 (2d Cir. 2016) .......... 14

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ................................................................. 20

*Fruehauf Corp. v. FTC*, 603 F.2d 345 (2d Cir. 1979) ............................................................ 19, 20

*FTC v. Amgen, Inc.*, No. 23-cv-03053 (N.D. Ill. June 2, 2023) ...................................................... 7

*FTC v. Cardinal Health, Inc.*, 12 F. Supp.2d 34 (D.D.C. 1998) .................................................. 15

*FTC v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) .................................... 6

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) .............................................................. 8

*FTC v. Exxon Corp.*, No. 79-1975 WL 1654 (D.D.C. July 28, 1979) ............................................ 7

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................................................... 10, 25

*FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088 (S.D.N.Y. 1977) ........................ 7, 8, 25

*FTC v. Nat'l Tea Co.*, 603 F.2d 694 (8th Cir. 1979) .................................................................. 7, 9

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ........................................ 8, 9

*FTC v. Peabody Energy Corp.*, 492 F.Supp.3d 865 (E.D. Mo. 2020) ......................................... 25

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) .......................................... 26

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 121928
   (N.D. Ohio Mar. 29, 2011) ....................................................................................................... 7

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019) ................................................................. 23

*FTC v. Sysco Corp.*, 113 F. Supp.3d 1 (D.D.C. 2015) ....................................................... 7, 15, 25

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) ............................................................ 10

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) .................................................. 7

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)................................. 6, 9

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ......................... 7, 8

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018).......................... 9, 14

*FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cit. 1976) ...................................... 25

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006)................................. 14

*In re Illumina, Inc.*, FTC Docket No. 9401 (Mar. 31, 2023) ...................... 9, 19, 20, 21

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ........................... 16

*United States v. AT&T, Inc.*, 310 F.Supp.3d 161 (D.D.C. 2018)................................. 21

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019)..................................... 9

*United States v. Bertelsmann SE & Co. KGaA*, 2022 WL 16949715
  (D.D.C. 2022) .................................................................................. 16

*United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586 (1957) .................... 10

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) ......................... 10

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ............................ 9, 14, 15, 16

*United States v. Sybron Corp.*, 329 F. Supp. 919 (E.D. Pa. 1971) ........................... 19

*Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002) ................................................... 18

**Statutes**

15 U.S.C. § 18............................................................................................. 8, 9, 19

15 U.S.C. § 53............................................................................................. 2, 6, 7

16 CFR § 3.41 ................................................................................................. 10

**Other Authorities**

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* (2010) ............................ 15, 16, 23

## INTRODUCTION

Defendant IQVIA Holdings Inc. ("IQVIA"), **{the self-described "market leader" in healthcare data}**,[1] seeks to extend its dominance into programmatic advertising to healthcare professionals ("HCPs") through its proposed acquisition of DeepIntent, Inc. ("DeepIntent") (the "Proposed Acquisition").  The Proposed Acquisition, which comes on the heels of IQVIA's acquisition of Lasso Marketing, Inc. ("Lasso") in July 2022, would give IQVIA control of two of the three leading healthcare demand-side platforms ("DSPs") that deliver automated digital advertisements directly to U.S. HCPs via websites, mobile apps, and smart TVs, also known as HCP programmatic advertising.  **{Prior to the Proposed Acquisition, DeepIntent projected that it would hold a 51 percent market share of the HCP programmatic advertising market on its own.[2]  Lasso, in the view of DeepIntent's leadership, is the company's "#1 competitor"[3] and "first formidable threat."}**[4]  Further, because IQVIA already controls the top healthcare data for running effective advertising campaigns to HCPs, IQVIA will have the ability and incentive to disadvantage current and potential rivals to DeepIntent and Lasso post-Acquisition.  Likewise, the indicia of vertical harm identified by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294, 328-34 (1962) similarly show that IQVIA is likely to disadvantage Lasso's and DeepIntent's competitors post-Acquisition.  As a result, competition in this rapidly growing market will be curtailed, and healthcare companies will be forced to pay more to market their products.

---

[1]  PX1119 **{(IQVIA-FTC-002687924) at 004 ("We continue to be the market leader in this space as determined by number of customers, brands supported, and data transactions."); PX1120 (IQVIA-FTC-000639691) at 002 ("With $13B in sales, IQVIA is the clear market leader in far-reaching categories of healthcare data….").}**

[2]  PX2572 (DI-2R-0002984914) at 001.

[3]  PX2571 (DI-2R-0001587945) at 001.

[4]  PX2511 (DI-2R-0002903374) at 005.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

I.     IQVIA Seeks to Control Two ███████████████ Healthcare DSPs ............................ 2

II.    IQVIA Controls Key Data Used by Healthcare DSPs ....................................... 4

ARGUMENT ............................................................................................................... 6

I.     The FTC is Likely to Succeed on the Merits ..................................................... 8

  A.   HCP Programmatic Advertising Is the Relevant Market ............................. 10

    1.   The Relevant Product Market Is HCP Programmatic Advertising ...................... 10

    2.   The Relevant Geographic Market Is Worldwide .................................. 14

  B.   The Proposed Acquisition Greatly Increases Concentration in the Relevant Market
       and Eliminates Head-to-Head Competition ................................................. 14

    1.   The Proposed Acquisition Is Presumptively Illegal ............................... 14

    2.   The Proposed Acquisition Will Eliminate Frequent Head-to-Head Competition
         Between DeepIntent and Lasso ............................................................ 16

  C.   Defendants' Proposed Acquisition Is Also an Unlawful Vertical Merger ............... 18

    1.   The Proposed Acquisition Likely Is Unlawful under the *Brown Shoe* Factors .... 18

    2.   The Proposed Acquisition Likely Is Unlawful under the Ability and Incentive
         Framework .......................................................................................... 21

  D.   Defendants Cannot Rebut the FTC's *Prima Facie* Case ........................................ 23

II.    The Equities Support a Temporary Restraining Order .................................... 25

CONCLUSION ........................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .......................................................... *passim*

*Concord Associates, L.P. v. Entertainment Properties Trust*, 817 F.3d 46 (2d Cir. 2016) .......... 14

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972) ................................................................. 21

*Fruehauf Corp. v. FTC*, 603 F.2d 345 (2d Cir. 1979) ............................................................ 19, 20

*FTC v. Amgen, Inc.*, No. 23-cv-03053 (N.D. Ill. June 2, 2023) ...................................................... 7

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ................................................. 15

*FTC v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) .................................... 6

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) .............................................................. 8

*FTC v. Exxon Corp.*, No. 79-1975 WL 1654 (D.D.C. July 28, 1979) ............................................ 7

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .......................................................... 10, 25

*FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088 (S.D.N.Y. 1977) .................. 7, 8, 25, 26

*FTC v. Nat'l Tea Co.*, 603 F.2d 694 (8th Cir. 1979) ................................................................... 7, 9

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ......................................... 8, 9

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ........................................ 26

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ........................................... 26

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 121928
    (N.D. Ohio Mar. 29, 2011) ...................................................................................................... 7

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019) ................................................................. 23

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ..................................................... 7, 15, 26

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) ............................................................ 10

*FTC v. University Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991) .................................................. 7

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) ................................ 6, 9

*FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ......................... 7, 8

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) ........... 9, 14

*FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976) ................................. 25

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006) ....................... 14

*In re Illumina, Inc.*, FTC Docket No. 9401 (Mar. 31, 2023) ...................... 9, 19, 20, 21

*ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014) ............................ 16

*United States v. AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018) ............................... 21

*United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019) ....................................... 9

*United States v. Bertelsmann SE & Co. KGaA*, 2022 WL 16949715
  (D.D.C. 2022) ............................................................................................................ 16

*United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586 (1957) .................... 10

*United States v. Marine Bancorporation, Inc.*, 418 U.S. 602 (1974) .......................... 10

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ............................. 9, 14, 15, 16

*United States v. Sybron Corp.*, 329 F. Supp. 919 (E.D. Pa. 1971) ............................... 19

*Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002) ...................................................................... 18

**Statutes**

15 U.S.C. § 18 ..................................................................................................... 8, 9, 14, 18

15 U.S.C. § 53 ................................................................................................................ 2, 6, 7

16 C.F.R. § 3.41 ................................................................................................................. 10

**Other Authorities**

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* (2010) .............. 15, 16, 23

## INTRODUCTION

Defendant IQVIA Holdings Inc. ("IQVIA"), ███████████████████

███████████,[1] seeks to cement a leading position in programmatic advertising to U.S.

healthcare professionals ("HCPs") through its proposed acquisition of DeepIntent, Inc.

("DeepIntent") (the "Proposed Acquisition"). The Proposed Acquisition, which comes on the

heels of IQVIA's acquisition of Lasso Marketing, Inc. ("Lasso") in ██████████ would give

IQVIA control of two of the ██████████ healthcare demand-side platforms ("DSPs") that

deliver automated digital advertisements directly to U.S. HCPs via websites, mobile apps, and

smart TVs, also known as HCP programmatic advertising. ███████████████████



Further, because IQVIA already controls the top healthcare data for running effective

advertising campaigns to HCPs, IQVIA will have the ability and incentive to disadvantage

current and potential rivals to DeepIntent and Lasso post-Acquisition. Likewise, the indicia of

vertical harm identified by the Supreme Court in *Brown Shoe Co. v. United States*, 370 U.S. 294,

328-34 (1962) similarly show that IQVIA is likely to disadvantage Lasso's and DeepIntent's

competitors post-Acquisition. As a result, competition in this rapidly growing market will be

curtailed, and healthcare companies will be forced to pay more to market their products.

---



[1] PX1119 ███████████████ ) at 004 ████████████████████████████ ; PX1120 ████████████████████ ) at 002 ████████████

[2] PX2572 ( ███████████ ) at 001.
[3] PX2571 ( ███████████ ) at 001.
[4] PX2511 ( ███████████ ) at 005.

The Federal Trade Commission ("FTC" or "Commission") has found reason to believe that the Proposed Acquisition violates the antitrust laws.  The FTC therefore (1) initiated an administrative proceeding to determine whether the Proposed Acquisition will harm competition, and (2) filed this Complaint seeking a temporary restraining order ("TRO") and preliminary injunction to preserve the status quo until the FTC has had the opportunity to adjudicate the Proposed Acquisition's legality in an administrative proceeding.  *See* 15 U.S.C. § 53(b).

The issue now before the Court is the FTC's request for a temporary restraining order to preserve the status quo for a limited time until the Court can conduct an evidentiary hearing on the FTC's request for a preliminary injunction.  For the reasons set forth below, the Court should issue a TRO preventing Defendants from consummating the Proposed Acquisition until such a hearing can be completed.

## FACTUAL BACKGROUND

**I.     IQVIA Seeks to Control Two ▮▮▮▮▮▮▮▮▮ Healthcare DSPs**

Through acquisitions of Lasso and DeepIntent, IQVIA seeks to control two ▮▮▮ ▮▮ healthcare DSPs that deliver programmatic advertisements to U.S. HCPs on a one-to-one basis ("HCP programmatic advertising").  Because HCPs are responsible for prescribing drugs, they play a vital role in pharmaceutical marketing.  Healthcare companies seek to convey clinically meaningful information to HCPs through targeted advertisements with the goal of impacting their prescribing behavior.  For example, an advertiser may wish to highlight a cancer drug's most recent clinical trial results to an audience of oncologists who have previously prescribed a competitor's product.

HCP programmatic advertising involves the automated presentation of digital advertisements to HCPs on an individualized basis.  Specifically, when a targeted HCP visits a

website with advertising space, the healthcare DSP facilitates the delivery of the digital advertisement to the user.  Using HCP programmatic advertising, healthcare companies can reach individual providers across a wide range of medical and non-medical content publishers such as WebMD, ESPN, and Netflix, determine when those providers engage with an advertisement, and assess whether those providers changed their prescribing behavior.  No other form of advertising offers the same capabilities.

HCP programmatic advertising thus differs significantly from other forms of advertising to healthcare professionals, as well as direct-to-consumer ("DTC") digital advertising.  As a result, ███████████████████████████████████████████████████████ ███████ "Companies built [healthcare DSPs] because generalist DSPs, which serve a wide range of advertising verticals, don't necessarily meet a healthcare marketer's complex needs," DeepIntent's website explains.[5]

Following Lasso's emergence in ███████ DeepIntent and Lasso have competed vigorously on price and innovation, often for the same customers.  ███████████████ ██████████████████████████████████[6]██████████████████████████████████ ██████████████████████████████████████████████████████████[7] ████████████████████████████████████ ██████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████

[5] PX2582 (Anton Yazovskiy, What Is a Healthcare DSP?, DeepIntent.com (Sept. 1, 2022)) at 001.
[6] PX1130 (███████████████) at 004.
[7] PX2573 (███████████████) at 001.



## II.     IQVIA Controls Key Data Used by Healthcare DSPs

IQVIA boasts "one of the largest and most comprehensive collections of healthcare information in the world," including more than 1.2 billion patient records, comprising approximately 60 petabytes of data sources from 150,000 data suppliers.[10]  As IQVIA stated in its most recent annual report, "[t]he breadth of the intelligent, actionable information we provide is not comprehensively available from any other source and our scope of information would be difficult and costly for another party to replicate."[11] ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆[12]

Among IQVIA's healthcare information are two related products: (1) data used to identify specific HCPs, and (2) data used to build HCP audiences and measure the effectiveness

---

[8]  PX1026 (▆▆▆▆▆▆▆▆▆▆) at 001.
PX1121 (▆▆▆▆▆▆▆▆▆) at 001.
[9]  PX2574 (▆▆▆▆▆▆▆) at 001.
[10]  PX1137 (IQVIA Holdings Inc., Annual Report (Feb. 15, 2023)) at 005.
[11]  *Id.*
[12]  PX1032 (▆▆▆▆▆▆▆▆) at 001; *see also* PX1131 (▆▆▆▆▆▆▆) at 003

of healthcare advertising.  First, IQVIA is the preeminent provider of HCP identity data: the data used to identify specific HCPs.  Because HCP campaigns typically target a specific group of individual HCPs, a campaign cannot be run effectively without detailed HCP identity data, which enables the link between HCPs and their digital devices.  The top two sources of HCP identity data—MedData Group and DMD Marketing Corp. ("DMD")—were acquired by IQVIA in ███████████████   respectively.  █████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████ 13 ████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████ 14

Second, IQVIA is also the leading source of HCP prescribing data, which is claims and prescription data that includes detailed information on prescribing behavior by individual HCPs. HCP prescribing data is used both to plan an advertising campaign and measure its effectiveness.

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████ 15   HCP prescribing data also allows advertisers to measure if the HCPs they targeted increased their prescriptions of the advertised drug—a key metric of success.  █████████████████████████████

███████████████████████████████████████████. 16

---

13 PX1032 (████████████████████) at 001; *see also id.* ██████
████████████████████████████████████████████████████████

14 PX2575 (████████████████) at 001.
15 PX2544 (████████████████) at 004.
16 PX0500 ███████████████████████████

Through its control of these key information sources, IQVIA thus possesses the ability to disadvantage existing competitors to DeepIntent and Lasso and stifle entry from others.



[18] Thus, IQVIA is uniquely positioned to affect the success (or failure) of healthcare DSPs, and will possess a strong incentive to protect its leading market position post-Acquisition.

## ARGUMENT

Section 13(b) of the FTC Act "authorizes the Commission to obtain a preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." *FTC v. Crescent Pub. Group, Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001). Unlike a private litigant seeking a preliminary injunction, "the FTC does not have to show irreparable harm, but the Court must (1) determine that the FTC has a fair and tenable chance of ultimate success on the merits and (2) consider the equities." *Id.*; *see also FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984) ("Section 13(b) places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard."). In weighing the equities, the interests of private parties carry "little weight" so as not to "undermine section 13(b)'s purpose of protecting 'the public-at-large, rather than individual private competitors.'" *FTC v. University*

---

[17] PX0501 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; PX0502 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[18] PX2576 ▮▮▮▮▮▮▮▮▮ at 017 (capitalization removed).

*Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 697 n.4 (8th Cir. 1979)).  Preliminary injunctions under Section 13(b) "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008) (Brown, J.).  Indeed, to the best of Plaintiff's knowledge, "[n]o court has denied relief to the FTC in a [Section] 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits." *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *60 (N.D. Ohio Mar. 29, 2011).

These same principles apply to the FTC's request for a TRO under Section 13(b), but the equities supporting the Commission's position are even stronger.  Here, the only potential harm to private interests is a modest delay in closing the Proposed Acquisition until the Court can resolve the FTC's motion for a preliminary injunction.  In contrast, public interests would permanently and irreparably suffer if IQVIA and DeepIntent merge now.  Competition would be injured, and the status quo, in which Defendants are separate, would be extremely difficult, if not impossible, to restore.  Thus, a court should grant a TRO so long as it finds that the FTC has a "fair and tenable chance of ultimate success on the merits." *FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977); *see also FTC v. Exxon Corp.*, No. 79-1975, 1979 WL 1654, at *3 n.6 (D.D.C. July 28, 1979) (noting the FTC need not "make precisely the same showing at the temporary restraining order and preliminary stages," particularly "where, as here, the factual and legal issues are massive"). [19]

---

[19]  Recent precedent is limited because merging parties commonly stipulate to a TRO to provide time for adequate development of the evidentiary record.  *See, e.g.*, Stipulated Order to Address the FTC's Request for a Temporary Restraining Order, *FTC v. Amgen, Inc.*, No. 23-cv-03053 (N.D. Ill. June 2, 2023) (ECF No. 60); Order granting Joint Motion for Entry of Stipulated Temporary Restraining Order, *FTC v. Sysco Corp.*, No. 15-cv-00256 (D.D.C. Feb. 27, 2015) (ECF No. 35).

The evidence in this case indicates the FTC has a "fair and tenable chance" of proving that the Proposed Acquisition may substantially lessen competition. *Lancaster Colony*, 434 F. Supp. at 1090. Accordingly, this Court should take a similar approach to past cases and issue a TRO to preserve this Court's ability to analyze factual questions for the limited period needed to conduct an evidentiary hearing on the FTC's motion for a preliminary injunction. The FTC is likely to ultimately succeed on the merits, and the equities weigh in favor of a TRO.

## I.      The FTC Is Likely to Succeed on the Merits

Section 7 of the Clayton Act bars mergers "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce or . . . activity affecting commerce in any section of the country." 15 U.S.C. § 18. "Congress used the words '*may be* substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1073 (N.D. Ill. 2012) (emphasis added) (quoting *Brown Shoe*, 370 U.S. at 323); *see also FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) ("A certainty, even a high probability, need not be shown."). Under this standard, at the preliminary injunction phase, the FTC "meets its burden . . . if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *Lancaster Colony*, 434 F. Supp. at 1090; *see also Whole Foods Market*, 548 F.3d at 1036 (Brown, J.)  ("[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction. One may have such doubts without knowing exactly what arguments will eventually prevail."). As the court recognized in *Lancaster Colony*, "a district court can hardly do more at so early a stage of antitrust litigation than to make a considered estimate of the FTC's apparent chances of success based upon what must necessarily be an imperfect, incomplete and fragile factual basis." 434 F. Supp. at 1091.

8

Here, the Proposed Acquisition violates Section 7 because it will consolidate two of the

████████████ competitors in the market for HCP programmatic advertising under IQVIA's

control, leading to undue concentration and eliminating direct price and innovation competition

between the merging parties.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963);

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 62-65 (D.D.C. 2018).  Separately, a

court should find a Section 7 violation if it evaluates the factors laid out in *Brown Shoe* and finds

the merger would be a "clog on competition."  *Brown Shoe*, 370 U.S. at 324.  That is the case

here.  Finally, a merger violates Section 7 if the merged firm would possess the ability and

incentive to foreclose or disadvantage competitive rivals and its ability and/or incentive increases

as a result of the acquisition.  *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1033-38 (D.C.

Cir. 2019) (affirming case analyzed under the ability and incentive framework); *In re Illumina,*

*Inc.*, FTC Docket No. 9401, at 41 (Mar. 31, 2023).  ████████████████████████████

████████████████████████████████████████████ will enable IQVIA to disadvantage

other competitors and further restrict competition.

Under the horizontal and vertical theories of harm, "[t]he Commission meets its burden if

it 'raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make

them fair ground for thorough investigation, study, deliberation and determination by the FTC in

the first instance and ultimately by the Court of Appeals.'"  *Warner Commc'ns*, 742 F.2d at 1162

(quoting *Nat'l Tea*, 603 F.2d at 698).  Because the issue is a "narrow one," the Court at this stage

"do[es] not resolve the conflicts in the evidence, compare concentration ratios and effects on

competition in other cases, or undertake an extensive analysis of the antitrust issues."  *Warner*

*Commc'ns*, 742 F.2d at 1164; *OSF Healthcare*, 852 F. Supp. 2d at 1074.  It is not until the

administrative proceeding, which will provide a forum for all parties to present plenary evidence

9

regarding the likely effects of the merger with up to 210 hours of live testimony, 16 C.F.R. §

3.41, that the FTC will exercise its congressionally vested authority to determine, upon a full

evidentiary record, the merger's legality.  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713-14 (D.C.

Cir. 2001).

### A.  HCP Programmatic Advertising Is the Relevant Market

"Determination of the relevant product and geographic markets is 'a necessary predicate'

to deciding whether a merger contravenes the Clayton Act."  *United States v. Marine*

*Bancorporation, Inc.*, 418 U.S. 602, 618 (1974) (quoting *United States v. E.I. Du Pont De*

*Nemours & Co.*, 353 U.S. 586, 593 (1957)).  The relevant product market is the "line of

commerce" affected by a proposed merger.  *Brown Shoe*, 370 U.S. at 324.  Here, a relevant

product market in which to analyze the competitive effects of the Proposed Acquisition is HCP

programmatic advertising, and the relevant geographic market is worldwide.

### 1.  The Relevant Product Market Is HCP Programmatic Advertising

A relevant product market's "'outer boundaries' are determined by the 'reasonable

interchangeability of use or the cross-elasticity of demand between the product itself and

substitutes for it.'"  *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 198 (D.D.C. 2018) (quoting *Brown*

*Shoe*, 370 U.S. at 325).  In assessing reasonable interchangeability, the Supreme Court identified

multiple "practical indicia," including "industry or public recognition of the [relevant market] as

a separate economic entity, the product's peculiar characteristics and uses, unique production

facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

vendors."  *Brown Shoe*, 370 U.S. at 325 (1962).

IQVIA (via Lasso) and DeepIntent currently compete to provide HCP programmatic

advertising services to healthcare companies and their advertising agencies.  This is the line of

commerce that will be affected by the elimination of competition between these firms as a result

of the merger.  Analysis of the *Brown Shoe* practical indicia collectively shows that HCP programmatic advertising is distinct from other methods of advertising to HCPs, as well as DTC advertising, such that there are no reasonably interchangeable substitutes.

First, HCP programmatic advertising has numerous peculiar characteristics and uses that distinguish it from other types of advertising.  Unlike other methods of delivering advertisements to HCPs, such as through mail, email, and social media, programmatic advertising provides advertisers with unparalleled inventory access, transparency, and control.[20]  Healthcare companies can use HCP programmatic advertising to deliver advertisements across thousands of different publishers, determine which providers interact with the advertisements, and analyze whether those providers changed their prescribing behavior █████████████████████.[21] No other form of HCP-focused advertising offers those combined capabilities.[22]  Although healthcare companies may also rely on DTC programmatic advertising, as well as more traditional forms of advertising, those advertisements do not involve one-to-one HCP targeting and may be less effective at impacting prescribing behavior.

Second, industry participants, █████████████████ recognize that HCP programmatic advertising is a distinct market. █████████████████



_____

[20] *See, e.g.,* PX0503 ██████████████
[21] PX0503 ██████████████
[22] PX0504 ██████████████████████
[23] PX2572 (█████████████) at 001.
[24] PX0505 ███████████



[25]

Third, HCP programmatic advertising has distinct pricing compared to other forms of advertising:

[26]

Fourth, HCP programmatic advertising has distinct customers with specialized needs: healthcare companies and their advertising agencies.  Unlike advertisers in most industries, healthcare companies and other similarly situated advertisers cannot rely solely on advertisements to end-consumers; they must instead reach those responsible for prescribing medications to increase sales.  Healthcare DSPs thus build audiences focused on U.S.-based HCPs because these are the healthcare professionals who can prescribe U.S. Food & Drug Administration-approved drugs to U.S. consumers.  "[T]he specific needs of the healthcare marketer are more nuanced and complex than the needs of the typical marketer," explained DeepIntent's CEO. [27]

---

[25] PX1123 (                    ) at 001.

[26] PX0008 (                ) at 009.

[27] PX4002 (Chris Paquette, How COVID-19 Has Coronated Digital the King of Healthcare Marketing, MarTech Series (Oct. 28, 2020) at 003.  As part of this marketing, healthcare advertisers require the identification of specific, individual HCPs in an HCP programmatic advertising campaign (a process which is often referred to as "audience building").  Further, unlike traditional advertising, which is distributed to a generalized audience, HCP programmatic advertising requires the precise delivery of advertisements to the targeted professionals on an individualized, one-to-one basis by matching their identities to their digital footprint ("activation").  Additionally, unlike more generalized advertising, healthcare advertisers require the accurate measurement of a campaign's effectiveness by evaluating whether a specifically targeted individual has changed their prescribing behavior subsequent to viewing the ads ("measurement").

Finally, HCP programmatic advertising is performed by specialized vendors: healthcare

DSPs. █████████████████████████████████████████████

███████████████[28]  Reflecting this requirement, █████████████████████████

███████████████ often are the only competitors for various customers. ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████[29] ████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████[30] ██████████████████████

████████████████████████████████████████████

████████████████████████[31]

In contrast, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████.[32]  As DeepIntent's CEO explained, "[m]ost [healthcare

advertisers] have found that the capabilities of traditional programmatic DSPs like The Trade

---

[28] PX1124 (███████████████████) at 002.
[29] PX1125 (███████████████████) at 001.
[30] PX1070 (███████████████████) at 002.
[31] PX0500███████████
[32] ████████████████████████████████
████████████████████████PX2577 (███████████) at 040.█
██████████████PX0501███████████

Desk or [Google's] DV360 fall far short of the level of reporting, targeting, and publication access (such as medical journals) needed for their campaigns." [33]

### 2.  The Relevant Geographic Market Is Worldwide

The relevant geographic market is "the 'area of effective competition' . . . in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Concord Associates, L.P. v. Entertainment Properties Trust*, 817 F.3d 46, 53 (2d Cir. 2016) (quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006)). Here, the relevant geographic market is worldwide, as HCP programmatic advertising suppliers and their customers can be located anywhere.  However, although the geographic market is worldwide, ███████████████████████████████████████

███████████████████████████████████████

### B.  The Proposed Acquisition Greatly Increases Concentration in the Relevant Market and Eliminates Head-to-Head Competition

The Proposed Acquisition violates Section 7 because it may substantially lessen competition in the HCP programmatic advertising market by increasing concentration and eliminating competition between close competitors.  *See Phila. Nat'l Bank*, 374 U.S. at 363; *Wilh. Wilhelmsen*, 341 F. Supp. 3d at 62-65.

### 1.  The Proposed Acquisition Is Presumptively Illegal

Lasso and DeepIntent are two ███████████████ competitors in the HCP programmatic advertising market. ████████████████████████████████


[34]

---

[33] PX4002 (Chris Paquette, How COVID-19 Has Coronated Digital the King of Healthcare Marketing, MarTech Series (Oct. 28, 2020)) at 003.
[34] *See, e.g.,* PX0008 ████████ at 011 ██████████; PX2515 ████████████████ ██████ ) at 001 ████



[35] ████████████████████████████████████

[36] Given the highly concentrated nature of this market, it is unsurprising that Defendants' combined share of the market is approximately ██████.[37] ████████████████████████████████████████████████████████████████ *See Phila. Nat'l Bank*, 374 U.S. at 364.

In assessing market concentration, courts often employ a statistical measure known as the Herfindahl-Hirschman Index (HHI).[38] If an acquisition increases the HHI of a relevant market by more than 200 points and results in a post-acquisition HHI exceeding 2,500 points, it is "presumed to be likely to enhance market power." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 52 (D.D.C. 2015) (citing U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.3 (2010) [hereinafter *Horizontal Merger Guidelines*]).  Here, the Proposed Acquisition would cause HHI in the HCP programmatic advertising market to increase by ████ points to an overall total ████████████████████████████████████████ ████████████████.  Based on Defendants' revenues attributable to HCP programmatic advertising, they together control ██████████ the HCP programmatic advertising market: ████████████████████████████████████████████████████████████████

---

[35] PX0503 ██████████████████████████████████; PX0506 ██████████████████ ██████████████████████████
████████████████████; PX0507 ██████████████████████████████
[36] *See, e.g.*, PX0506 ████████████████
[37] ████████████████████████████████████████████████
[38] HHIs are calculated by adding the squares of each market participant's individual market share. *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 53 (D.D.C. 1998).

████████████████████████████████████████████████████████[39]

Even with a conservative estimate of market shares, the HHI increase and post-Acquisition HHI

in this case are comparable to mergers that other courts have deemed presumptively

anticompetitive.  *See, e.g.*, *United States v. Bertelsmann SE & Co. KGaA*, 2022 WL 16949715, at

*21 (D.D.C. 2022) (post-acquisition HHI of 3,111 and HHI increase of 891).

> ### 2.   The Proposed Acquisition Will Eliminate Frequent Head-to-Head Competition Between DeepIntent and Lasso

The high market shares and HHIs establish a strong presumption of illegality, and

Defendants cannot produce evidence to rebut that presumption, as they are required to do.  *Phila.*

*Nat'l Bank*, 374 U.S. at 363.  In addition, there are ████████████████████████

████████████████████████████████████████████████████████

████████████  Not only does this evidence of head-to-head competition between DeepIntent

and Lasso buttress the structural presumption of harm, but "[t]he elimination of competition

between two firms that results from their merger may alone constitute a substantial lessening of

competition." [40]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[41]████████████████

████████████████████████████████████████████[42]██████████

---

[39] ████████████████████  These estimates may understate DeepIntent's actual market share: ████████████ PX2572

(████████████) at 001.

[40] *Horizontal Merger Guidelines* § 6; *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568-70 (6th Cir. 2014), *cert. denied*, 575 U.S. 996 (2015).

[41] PX1130 (████████████) at 004.

[42] PX1070 (████████████) at 001-002.



Lasso and DeepIntent compete against each other across multiple dimensions, including on price. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████ [48]

Lasso and DeepIntent also compete against each other by innovating new solutions for their customers. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ [49]   Thus, should DeepIntent join Lasso as an IQVIA subsidiary, the two companies will cease competing on price and innovation, likely forcing advertisers to pay more for HCP programmatic advertising and reducing the quality of the products supplied by healthcare DSPs.

### C. Defendants' Proposed Acquisition Is Also an Unlawful Vertical Merger

IQVIA's healthcare identity and prescribing data are key inputs into HCP programmatic advertising. As a result, IQVIA's proposed acquisition of DeepIntent also is properly analyzed as a vertical merger. As amended, Section 7 prohibits vertical mergers that "deprive . . . rivals of a fair opportunity to compete" and "act as a clog on competition." *Brown Shoe*, 370 U.S. at 324 (quotation omitted); *Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002) (quotations omitted). The Proposed Acquisition will also combine IQVIA's ability to block other healthcare DSPs from accessing its HCP identity data and HCP prescribing data with a greatly increased incentive to do so, or



[48] PX2510 ████████████████ at 001; PX0505 ████████████ *see also* PX2509 (████████████) at 001 ████

███████████████████████████████████████████████████
███████████████████████████████████████████████████

[49] PX2512 (████████████████): *see also* PX2578 ███████ )███
███████████████████████████████████████████████████
███████████████████████████████████

otherwise disadvantage them relative to Lasso and DeepIntent, preventing them from effectively serving healthcare advertisers.

    **1.   The Proposed Acquisition Likely Is Unlawful under the *Brown Shoe* Factors**

    The Supreme Court set forth the "standard framework" for assessing the likely competitive effects of a vertical transaction in *Brown Shoe*. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 353 (2d Cir. 1979) (internal citations omitted). Those factors include the likelihood and share of the market foreclosure, the nature and economic purpose of the transaction, barriers to entry, and the degree of market power possessed by the merged firm. *See Illumina*, FTC Docket No. 9401, at 40-47. Applying those factors demonstrates the probable illegality of the Proposed Acquisition.

    *(a) Share of the market foreclosure.* In evaluating a vertical transaction, "[i]f the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated . . . ." *Brown Shoe*, 370 U.S. at 328; *see also United States v. Sybron Corp.*, 329 F. Supp. 919, 928-29 (E.D. Pa. 1971) (observing that even when "absolute foreclosure" would not be likely, "there are many more subtle avenues available"). Having acquired both MedData Group and DMD, IQVIA is now ███████████████████████████ ████████████████████████████[50] IQVIA also controls HCP prescribing data that ████████████████████████████████████████████████ ████████████████[51] ██████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████[52] ████████████████

---

[50] PX2575 (███████████████) at 001.
[51] PX0500 ████████████████████████████████
[52] PX0503 ████████████████████████████████



[53] [REDACTED]

[54] Therefore, should IQVIA withhold or otherwise limit access to either its (a) HCP identity data, or (b) its HCP prescribing data, the overwhelming majority of pharmaceutical advertisers will be forced to use either IQVIA's Lasso or DeepIntent for HCP programmatic advertising.

*(b) Nature and economic purpose of the transaction.* [REDACTED]

[55]

*(c) Degree of market power possessed by the merged firm.* At the downstream level, IQVIA already acquired Lasso and now seeks to acquire the [REDACTED] among healthcare DSPs, [REDACTED] [56] This raises the risk that the market for HCP programmatic advertising would "cease to be competitive." *See Fruehauf*, 603 F.2d at 353.

*(d) Entry barriers.* "[T]he presence of entry barriers weighs in favor of blocking a vertical merger." *Illumina*, FTC Docket No. 9401 at 46; *see also Ford Motor Co. v. United*

---

[53] *See, e.g.,* PX1132 ([REDACTED]) at 001; PX1133 ([REDACTED]) at 005-006, 013; PX1134 ([REDACTED]) at 001.

[54] PX0500 [REDACTED]; PX0502 [REDACTED]

[55] PX1076 ([REDACTED]) at 001; PX1088 ([REDACTED] at 001-002 [REDACTED]

[56] PX2576 ([REDACTED]) at 017.

*States*, 405 U.S. 562, 568-72 (1972) (explaining that, after Ford made its vertical acquisition, "it would have every incentive to . . . maintain the virtually insurmountable barriers to entry to the aftermarket").



### 2. The Proposed Acquisition Likely Is Unlawful under the Ability and Incentive Framework

As an alternative to the *Brown Shoe* framework, some courts also have analyzed whether, post-merger, the combined firm will have an ability and incentive to disadvantage rivals and the transaction would increases its ability and/or incentive to disadvantage rivals. *See, e.g.*, *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 250-52 (D.D.C. 2018). This ability and incentive framework "interrelate[s] closely" with the *Brown Shoe* factors, *Illumina*, FTC Docket No. 9401 at 41, as the latter "provide direct insight into the ability and incentive of the merged firm to harm rivals." *Id*. Under this alternative framework, the Proposed Acquisition also is likely an unlawful vertical merger.

---

[57] PX2504 (⬛⬛⬛⬛⬛⬛⬛) at 018.
[58] PX2579 (⬛⬛⬛⬛⬛) at 003.
[59] PX0501 ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛; PX0502 ⬛⬛⬛⬛⬛⬛



IQVIA's ability to disadvantage rivals is made clear by ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████[60] ████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

█████[61] ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████[62] ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

The Proposed Acquisition would also boost IQVIA's incentive to disadvantage its rivals

by ██████████████████████████████████████████████

███████[63]  Post-Acquisition, ████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[60] PX2580 (█████████████████) at 031.
[61] PX1127 (██████████████████) at 004.
[62] PX1126 (██████████████████) at 001.
[63] ██████████████████



## D.  Defendants Cannot Rebut the FTC's *Prima Facie* Case

Defendants have not advanced rebuttal arguments at this early stage of the proceeding, so it is premature for the FTC to attempt to address them in detail, other than to observe that the recognized methods of rebutting a *prima facie* case are unavailable.

Defendants cannot demonstrate that any expansion of existing firms or entry by new firms will be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects" of the Proposed Acquisition. *FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019) (citing *Horizontal Merger Guidelines* § 9). ████████

████████████████████████████████████████████████ Further, IQVIA's unrivaled healthcare data collection "would be difficult and costly for another party to replicate," according to the company's annual report.[67] ████████████

---

[64] PX0011 ██████ at 036.
[65] PX2581 (██████████) at 024 (capitalization removed).
[66] PX1128 ██████████) at 007.
[67] PX1137 (IQVIA Holdings Inc., Annual Report (Feb. 15, 2023)) at 005.

██████████████████████████████████ [68] Thus, to the extent any new entrant could

overcome the high barriers in the market for HCP programmatic advertising, it would face the

added difficulty of accessing HCP identity data and HCP prescribing data comparable to the data

controlled by IQVIA.



[68] PX1129 (████████████████) at 002 (emphasis added).
[69] PX0009 ██████████████████████████████████████
[70] PX0507 ███████████████████████████████
[71] PX0507 ████████████████████████
[72] PX0507 ███████████████
[73] PX0501 ██████████████████
[74] PX0506 ████████████████████████████████
[75] PX0501 ████████████████████████████





Defendants also cannot present proof that "the anticompetitive effects of the merger will be offset by efficiencies resulting from the union of the two companies . . . ." *Heinz*, 246 F.3d at 720. In a highly concentrated market like HCP programmatic advertising, "the high market concentration levels . . . require, in rebuttal, proof of extraordinary efficiencies . . . ." *Id.* There are no "extraordinary" efficiencies that would offset the Proposed Acquisition's horizontal and vertical anticompetitive effects, and any efficiencies that might exist likely are obtainable through a partnership between Defendants and are thus not merger specific.

## II. The Equities Support a Temporary Restraining Order

The second step in determining whether to grant preliminary relief involves "consideration of the equities and public interest." *Lancaster Colony*, 434 F. Supp. at 1096. "The equities to be weighed here are not the usual equities of private litigation but public equities." *Id.* (citing *FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339, 1344 (4th Cir. 1976)). "The principal public equity weighing in favor of issuance of preliminary [] relief is the public interest in effective enforcement of the antitrust laws." *Heinz*, 246 F.3d at 726. Closing the Proposed Acquisition would immediately harm competition. Without preliminary relief, "[i]f the acquisition is allowed to proceed but is later found to be violative of the antitrust laws,

---

[76] *See* PX0502 ████████████████████████
[77] PX0502 ████████████████████████████████████
[78] PX0010 ████████████████████████████
[79] PX0010 ████████████████

divestiture will be required.  At best, divestiture is a slow, cumbersome, difficult, disruptive and complex remedy." *Lancaster Colony*, 434 F. Supp. at 1096.[80]  Here, because IQVIA already acquired Lasso, allowing the Proposed Acquisition to proceed would also carry the very real risk of exposing all of DeepIntent's competitively sensitive information to its direct competitor—a form of harm both immediate and impossible to undo.

Therefore, the equities justify a TRO.  The loss from the elimination of substantial head-to-head competition between Lasso and DeepIntent will be difficult, if not impossible, to reverse should Defendants consummate the Proposed Acquisition before this Court conducts an evidentiary hearing regarding the FTC's request for a preliminary injunction.  In contrast, the

████████████████████████████████████████████████████████

████████████████████████████[81]  There is "no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful."  *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 353 (3d Cir. 2016).

## CONCLUSION

For the reasons stated above, the FTC respectfully requests that the Court enter a TRO before 11:59 PM Eastern Time on July 21, 2023, preventing Defendants from completing the Proposed Acquisition until the Court rules on the FTC's preliminary injunction.

---

[80]  As another court put it, "[a]llowing a transaction to proceed and then later 'unscrambling the eggs' upon a finding of illegality by the FTC is a 'daunting and potentially impossible task' . . . ."  *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (quoting *Sysco*, 113 F. Supp. 3d at 87).
[81]  PX0012 ████████████████████████████████████████████ ████████) at 014-015.

Dated: July 17, 2023

Of counsel:

HOLLY VEDOVA
Director
Bureau of Competition

RAHUL RAO
Deputy Director
Bureau of Competition

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

NATE SODERSTROM
Acting Deputy Director
Bureau of Competition

STEPHEN MOHR
Assistant Director
Mergers I Division

JORDAN ANDREW
Deputy Assistant Director
Mergers I Division

Respectfully submitted,

ANJELICA SARMIENTO (Bar No. 5636154)

Federal Trade Commission

600 Pennsylvania Avenue, NW

Washington, DC 20580

Tel: 202-725-3429

asarmiento@ftc.gov

JENNIFER FLEURY (NY Bar No. 5053178)
Lead Counsel (*pro hac vice*)

JESSICA MOY (CA Bar. No. 272941)
(*pro hac vice*)

STEPHANIE BOVEE (VA Bar No. 46678)
(*pro hac vice*)

HABIN CHUNG (DC Bar. No. 1048514)
(*pro hac vice*)

SAMUEL FULLITON (TN Bar. No. 36802)
(*pro hac vice*)

CORY GORDON (MD Bar)

(*pro hac vice*)

WADE LIPPARD (DC Bar. No. 1616824)
(*pro hac vice*)

CHRISTINA PEREZ (TX Bar. No. 788183)
(*pro hac vice*)

MICHELLE SEO (NY Bar. No. 5007091)
(*pro hac vice*)

VARNITHA SIVA (NY Bar. No. 5337670)
(*pro hac vice*)

WILLIAM SOHN (DC Bar. No. 1017274)
(*pro hac vice*)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 17, 2023, I electronically filed a true and correct copy of the foregoing document using the United States District Court for the Southern District of New York CM/ECF System.

I FURTHER CERTIFY that I served the foregoing document on the following counsel via electronic mail:

Kenneth S. Reinker
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue Northwest
Washington, DC 20037
Tel.: (202) 974-1500
Email: kreinker@cgsh.com

*Counsel for Defendant IQVIA Holdings Inc.*

Alexander Okuliar
MORRISON FOERSTER
2100 L Street NW STE 900
Washington, DC 20037
Tel.: (202) 887-1500
Email: aokuliar@mofo.com

*Counsel for Defendant Propel Media, Inc.*

*S/ Anjelica Sarmiento*
_____
ANJELICA SARMIENTO
Bar No. 5636154
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: 202-725-3429
Email: asarmiento@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*