**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                Plaintiff,

       v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

                Defendants.

Case No. 1:23-cv-06188-ER

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

ARGUMENT ..............................................................................................................................3

     I.     THE FTC IS NOT ENTITLED TO AN INDEFINITE TRO ...................................4

     II.    THE FTC HAS NOT ESTABLISHED ITS ENTITLEMENT TO A TRO ............6

         A.     There Are Facially Apparent Defects in the FTC's Proposed
Market ........................................................................................................7

         B.     The FTC Has Not Proven a Prima Facie Case of Anticompetitive
Effects ......................................................................................................10

         C.     The Equities Do Not Favor an Indefinite TRO.........................................14

CONCLUSION...........................................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. HSBC Bank USA, N.A.*,
   2016 WL 8813992 (S.D.N.Y. Oct. 21, 2016) ............................................................5

*In re AMR Corp.*,
   2023 WL 2563897 (2d Cir. Mar. 20, 2023) ..............................................................10

*FTC v. Freeman Hosp.*,
   69 F.3d 260 (8th Cir. 1995) .......................................................................................7

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) .................................................................................13

*FTC v. Meta Platforms Inc.*,
   2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) ..............................................................7

*FTC v. RAG-Stiftung*,
   436 F. Supp. 3d 278 (D.D.C. 2020) ...........................................................................8

*FTC v. Tenet Health Care Corp.*,
   186 F.3d 1045 (8th Cir. 1999) .................................................................................13

*FTC v. Tronox Ltd.*,
   332 F. Supp. 3d 187 (D.D.C. 2018) .......................................................................9, 10

*FTC v. Univ. Health, Inc.*,
   938 F.2d 1206 (11th Cir. 1991) ...............................................................................13

*FTC v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) .................................................................................7

*Garcia v. Yonkers Sch. Dist.*,
   561 F.3d 97 (2d Cir. 2009)..........................................................................................5

*MPD Accessories B.V. v. Urban Outfitters, Inc.*,
   2013 WL 6869919 (S.D.N.Y. Dec. 23, 2013) ...........................................................4

*ProMedica Health Sys., Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014) ...................................................................................13

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ...................................................................................10

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   988 F.3d 690 (4th Cir. 2021) .................................................................10

*United States v. AT&T, Inc.*,
   310 F. Supp. 3d 161 (D.D.C. 2018) ........................................................12

*United States v. Baker Hughes Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ................................................................10

*United States v. Gen. Dynamics Corp.*,
   415 U.S. 486 (1974) ................................................................................11

*United States v. Siemens Corp.*,
   621 F.2d 499 (2d Cir. 1980) .....................................................................7

**Other Authorities**

Fed. R. Civ. P. 65(b)(2) ...................................................................................4

GlobeNewswire, *AdTheorent Holding Company, Inc. Reports Second Quarter
   2022 Results* (Aug. 9, 2022), https://www.globenewswire.com/news-
   release/2022/08/09/2495300/0/en/AdTheorent-Holding-Company-Inc-
   Reports-Second-Quarter-2022-Results.html; ............................................9

Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, Remarks to U.S. Chamber
   of Commerce: A SMARTER Section 5, at 17 (Sept. 25, 2015),
   https://www.ftc.gov/system/files/documents/public_statements/804511/15092
   5smartersection5.pdf .................................................................................5

Refinitive STREETEVENTS, Edited Transcript Q1 2022 Viant Technology Inc.
   Earning Call at 5 (May 3, 2022), https://investors.viantinc.com/static-
   files/e3738d8a-dac3-4d3a-bea5-5031566aad53 .......................................9

The Trade Desk, Investor Presentation for the Second Quarter of 2022 at 5 (Aug.
   9, 2022),
   https://s29.q4cdn.com/168520777/files/doc_presentation/2022/08/TheTradeD
   esk_Q222_Investor_Presentation.pdf .......................................................9

## INTRODUCTION

The FTC seeks a temporary restraining order ("TRO") of indefinite duration, in direct contravention of the Federal Rules of Civil Procedure and principles of equity.  In contrast, Defendants IQVIA Holdings Inc. ("IQVIA") and Propel Media, Inc. ("DeepIntent") are willing to stipulate to a TRO of reasonable duration—until the earlier of November 15 or after the motion for a preliminary injunction has been decided—to give the parties and the Court sufficient time to develop the record and litigate the FTC's claims and to ensure that the FTC works expeditiously with the parties to resolve the case quickly.

IQVIA and DeepIntent entered into the proposed transaction ████████████████. ██████████████████████████████. The FTC instituted this action seeking a preliminary injunction to enjoin the merger on July 17, 2023.  The FTC simultaneously moved for a temporary restraining order, baldly pronouncing that it is "likely to succeed on the merits" of its ultimate claim.  But as in the other recent merger challenges the FTC has pursued and lost, the FTC has not substantiated its allegations with evidence or law.

There is no evidence in the record beyond what the FTC selected from its one-sided discovery in the administrative proceeding, and the FTC has offered no expert testimony.  Defendants are confident that once they have an opportunity to take discovery and present their case, the Court will agree that the FTC's challenge lacks merit.  Yet the FTC asks for an immediate TRO that would not expire until 10 days after the resolution of an as-of-yet unfiled motion for preliminary injunction in a case where there is no schedule.  The FTC has not informed the Court when it will file its motion nor on what schedule it will seek or agree to have the motion resolved, and in discussions with Defendants has been unwilling to commit to a schedule calculated to a reach a decision before the end of November. ███████████████████████████████ ████, Defendants cannot agree to the unbounded TRO that the FTC has requested.  Defendants

therefore respectfully request that the Court deny the FTC's motion. Defendants remain willing to consent to a TRO that lasts until the earlier of November 15, 2023 or one business day after a motion for preliminary injunction is decided.

## BACKGROUND

IQVIA is a global provider of services to the life sciences industry, including analytics, technology solutions, and clinical research. Compl. ¶ 1. These are IQVIA's legacy businesses. IQVIA also has recently established a limited presence in the digital advertising space—a dynamic and growing category that includes giant companies such as Google, Meta, and WebMD. ██████ ████████, IQVIA entered into digital advertising by acquiring two companies—MedData and DMD—in the business of collecting information regarding healthcare providers ("HCPs") and providing that data for use in digital advertising. *Id.* ¶ 12. At the time, IQVIA was not a competitor in digital advertising.

In ████, IQVIA set out to acquire two small companies with complementary business models that would help it offer clients additional digital advertising services. First, IQVIA acquired Lasso, a recent entrant founded in 2019 that provides an "omnichannel" operating system platform that helps advertisers plan digital advertising campaigns through multiple channels, including programmatic advertising (e.g., the automated purchase of advertising space on websites), e-mail, and social media. Compl. ¶ 57. Lasso does not itself provide the technology underlying programmatic ad buying—an automated process of ad buying that matches supply and demand in real-time—but rather partners with Xandr, a demand side platform ("DSP") owned by Microsoft that facilitates programmatic advertising services for its clients. *Id.* ██████████████ ████████ DeepIntent, which is a DSP focused on direct-to-consumer and healthcare provider programmatic advertising in the healthcare industry. ████████████████████████████

████████████████████████, out of what the complaint alleges is $14 billion in total healthcare digital advertising.  *See* Compl. ¶¶ 2, 23–24.

The FTC is not challenging IQVIA's acquisition of Lasso, but rather is challenging only its proposed acquisition of DeepIntent.  The COVID-19 pandemic and increased virtualization of the world changed the nature of healthcare marketing.  Since then, more and more companies have begun delivering programmatic advertising services to the healthcare industry.  *See* Compl. ¶ 2.  Acquiring DeepIntent would help IQVIA to meaningfully compete, both with established large competitors and with new and expanding entrants.

The same day it filed this suit, the FTC sought Defendants' consent by 3 p.m. to a TRO that would last until 10 days after the disposition of a motion for preliminary injunction.  The FTC has not filed a motion for preliminary injunction, has not indicated when it will do so, and has not proposed or stipulated to a schedule for resolving that motion.  Defendants advised the FTC they needed more than a few hours' notice to decide whether to consent to a TRO, but the FTC immediately sought a TRO from this Court.  Defendants continued discussions with the FTC, proposing a TRO that would initially last 14 days, the customary duration of a TRO in most cases, or even 30 days, which would allow the parties to consult with the Court and to agree on a schedule for the preliminary injunction hearing before determining the full duration of the TRO.  The FTC rejected those proposals out of hand.  Since then, Defendants have volunteered to stipulate to a TRO that will terminate upon the earlier of the end of day on November 15, 2023 or the business day after a motion for preliminary injunction is decided.  The FTC has not accepted that offer either.

## ARGUMENT

The FTC cannot obtain a TRO of indefinite length, as doing so is expressly prohibited by the Federal Rules of Civil Procedure and would transform a limited remedy intended to

temporarily maintain the status quo into a *de facto* preliminary injunction that would allow the FTC to obstruct the proposed merger without having any of its claims or arguments seriously tested on the merits.  To reiterate, without conceding the FTC has met its burden, Defendants are willing to stipulate to a TRO lasting until the earlier of the end of day on November 15, 2023 or one business day after a motion for preliminary injunction is decided, to allow the parties and the Court sufficient time to resolve the FTC's motion for a preliminary injunction ██████████████ ███████████.

To the extent the Court is at all inclined to consider the merits of the FTC's request on the truncated record, the FTC's application simply shows why it is premature to award the FTC the extraordinary relief it seeks.  There are myriad questions regarding the FTC's proposed market, the alleged competitive effects of the proposed merger, and countervailing benefits from the merger.  In such circumstances, it would be inequitable to enjoin the merger for an indefinite period of time while awaiting resolution of a motion that has not even yet been filed.

## I.      THE FTC IS NOT ENTITLED TO AN INDEFINITE TRO

Rather than negotiate a reasonable TRO ████████████████████████████ ███████████, the FTC unilaterally asks this Court to impose a TRO of indefinite duration.  That is prohibited by the Federal Rules of Civil Procedure and this Circuit's precedent, which limit a TRO to fourteen days unless, before that time, the Court extends it for good cause or "the adverse party consents to a longer extension."  Fed. R. Civ. P. 65(b)(2); *MPD Accessories B.V. v. Urban Outfitters, Inc.*, 2013 WL 6869919, at *5–6 (S.D.N.Y. Dec. 23, 2013) (quoting *Pan Am. World Airways, Inc. v. Flight Eng'rs Int'l Ass'n*, 306 F.2d 840, 842–43 (2d Cir. 1962)) ("[I]n this circuit, a temporary restraining order issued with notice is also subject to Rule 65(b)(2)'s time limitation, and that notice cannot be used to 'extend indefinitely beyond the period limited by the Rule the time during which a temporary restraining order remains effective.'").  For the Court to permit a

TRO to persist beyond this limit without Defendants' consent, the FTC would "in effect[] have obtained a preliminary injunction without satisfying the high standard that applies to obtaining such relief." *3M Co. v. HSBC Bank USA, N.A.*, 2016 WL 8813992, at *1–2 (S.D.N.Y. Oct. 21, 2016).

A TRO is not a substitute for a preliminary injunction and instead "serves a purpose different from that of a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009). "'The purpose of a temporary restraining order is to preserve an existing situation *in statu[s] quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.'" *Id.* (quoting *Pan Am.*, 306 F.2d at 842).

The FTC offers no endpoint for its proposed TRO, except to propose that it will expire ten business days after a motion for preliminary injunction—which the FTC has not filed and a hearing on which has not yet been scheduled—has been decided. It is thus seeking a *de facto* preliminary injunction, but without going through the ordinary rigors of party discovery, third-party discovery, expert discovery, a motion, a hearing, and full argument. At the time of this motion, Defendants do not even have access to the FTC's full investigative file. If the FTC wants to block the merger from going forward ███████████████, it must carry its burden at a preliminary injunction hearing before then, rather than through the truncated TRO process it has initiated here.

Contrary to the FTC's indication otherwise, TRO Mot. 9–10, it is this Court's adjudication of preliminary injunctive relief, not the parallel administrative proceeding, that is likely to decide the fate of the merger. If the Court denies the FTC's motion for a preliminary injunction, decades of FTC practice indicate it will not pursue this matter further. *See* Maureen K. Ohlhausen, Comm'r, Fed. Trade Comm'n, Remarks to U.S. Chamber of Commerce: A SMARTER Section 5, at 17 (Sept. 25, 2015), https://www.ftc.gov/system/files/documents/public_statements/804511/

150925smartersection5.pdf (Commissioner Ohlhausen: "the Commission has not pursued a Part III proceeding following a PI loss in federal court for twenty years."). Accordingly, granting the FTC's request for an open-ended freeze on the transaction here would usurp the important role of this Court and the well-established role of the preliminary injunction in FTC enforcement actions.

That does not mean the merger should proceed immediately. Defendants are willing to consent to a TRO that lasts until the earlier of November 15, 2023 or the day after the Court rules on the FTC's not-yet-filed motion for a preliminary injunction. That proposal would give the Court ample time to set a schedule and adjudicate the preliminary injunction ███████████████ ██████████. It would also help ensure that the FTC works expeditiously to resolve this matter.

As the FTC recognizes, "merging parties commonly stipulate to a TRO to provide time for adequate development of the evidentiary record." TRO Mot. 7 n.19. Defendants have offered to do just that. It is the FTC that has refused Defendants' reasonable counter offers.

## II.   THE FTC HAS NOT ESTABLISHED ITS ENTITLEMENT TO A TRO

A detailed analysis of the FTC's likelihood of success on the merits and the public equities weighing for or against an injunction is premature at this stage. Although the FTC has spent nearly a year obtaining documents and testimony from Defendants and other industry participants, Defendants have not yet even received the full administrative file from the FTC, much less had an opportunity to conduct any discovery of their own. There is no expert testimony in the record at this time, the FTC's factual and legal theories for relief are underdeveloped, and there is no opportunity for this Court to undertake any meaningful assessment of the relevant facts and law. The FTC may not obtain a TRO in such circumstances simply by gesturing broadly to its desire to maintain the *status quo*.

Even if, however, the Court is inclined to examine the merits of the FTC's application in any detail, the FTC has come nowhere close to meeting the high standard for obtaining preliminary

injunctive relief pursuant to Section 13(b) of the FTC Act.  In fact, its application serves only to expose facial deficiencies in the FTC's case that certainly do not establish a likelihood of success on the merits.

At the outset, the FTC understates its burden.  The Second Circuit has held that where "the Government [is] seeking to enjoin a merger under [§] 7," it "must do *far more* than merely raise sufficiently serious questions with respect to the merits to make them a fair ground for litigation." *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) (emphasis added); *see also FTC v. Meta Platforms Inc.*, 2023 WL 2346238, at *8 (N.D. Cal. Feb. 3, 2023) (applying this standard in rejecting merger challenge brought by FTC).  Accordingly, the FTC's proffer of "some threshold evidence" of anticompetitive effects is not a license for courts to "rubber-stamp an injunction"—the court "must exercise independent judgment about the questions [the FTC Act] commits to it."  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) (quotation marks omitted).  Additionally, the FTC faces a higher burden on the merits when, as here, the equities weigh in favor of the merger.  *See id.*  As set forth below, the FTC has fallen well short of its high burden of establishing an entitlement to preliminary injunctive relief.

A.      **There Are Facially Apparent Defects in the FTC's Proposed Market**

The FTC concedes that it must prove the relevant market in order to succeed on the merits of a Clayton Act claim.  TRO Mot. 10 (citing *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974)).  Indeed, "identification of a proper market is a 'necessary predicate' to the FTC's task of raising questions going to the merits so serious, substantial, difficult and doubtful as to warrant" preliminary injunctive relief.  *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995) (quotation marks omitted).  Accordingly, it is "essential that the FTC identify a credible relevant market before a preliminary injunction may issue," because "[w]ithout a well-defined relevant market, a particular transaction's effect on competition cannot be evaluated."  *Id.* at 268

n.12; *see also FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 300 (D.D.C. 2020) ("The FTC has the burden to prove a relevant product market when it seeks a preliminary injunction . . . .  This is so because without a relevant product market, the FTC cannot show a likelihood of ultimate success on its claim under the Clayton Act.").

The FTC has transparently drawn its proposed market—HCP programmatic advertising services provided by healthcare-specific DSPs—as narrowly as possible.  It has done so by limiting the market to one particular subset of digital advertising and one particular subset of competitors that are providing programmatic advertising:



To put into perspective, the FTC alleges in its complaint that "[h]ealthcare digital advertising is a nearly $14 billion industry that is expected to continue growing," Compl. ¶ 2, ████████████ ████████████████████████████████████████████████████████████████████ ██████████, *id.* ¶¶ 23–24.  On its face, the FTC's gerrymandered market raises serious questions on the merits that counsel strongly against the extraordinary relief of an indefinite TRO.

Probing the FTC's proposed market further reveals additional defects.  The FTC relies entirely on the market definition analysis from *Brown Shoe*, TRO Mot. 10–13, largely eliding the more central questions of "interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 198 (D.D.C. 2018) (quotation marks omitted) (cited at TRO Mot. 10).  Under the appropriate legal standard, the FTC's proposed market raises more questions than answers.

As just one example, the FTC's proposed market fails to account for the billions of dollars in healthcare advertising that flows through diversified demand-side platforms (DSPs).  By way of example only, The Trade Desk—a diversified DSP—had more than $1.2 billion in revenue from health and fitness advertising in 2021.  The Trade Desk, Investor Presentation for the Second Quarter of 2022 at 5 (Aug. 9, 2022), https://s29.q4cdn.com/168520777/files/ doc_presentation/2022/08/TheTradeDesk_Q222_Investor_Presentation.pdf.   Other diversified DSPs, including AdTheorent and Viant Technology Inc., have publicly reported healthcare advertising as a significant driver of revenue for their advertising platforms.  *See* GlobeNewswire, *AdTheorent Holding Company, Inc. Reports Second Quarter 2022 Results* (Aug. 9, 2022), https://www.globenewswire.com/news-release/2022/08/09/2495300/0/en/AdTheorent-Holding-Company-Inc-Reports-Second-Quarter-2022-Results.html; Refinitiv STREETEVENTS, Edited Transcript Q1 2022 Viant Technology Inc. Earning Call at 5 (May 3, 2022), https://investors.viantinc.com/static-files/e3738d8a-dac3-4d3a-bea5-5031566aad53.

The FTC dismisses these diversified DSPs as irrelevant because they ██████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ TRO Mot. 13. ████████████████ ████████████████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

In any event, what matters is not whether *competitors* look exactly the same as one another, but rather whether *products* are reasonably interchangeable for the same uses. *Tronox*, 332 F. Supp. 3d at 198. To the extent diversified DSPs can provide HCP programmatic advertising—and the FTC cannot and does not dispute that they do—those diversified DSPs must be considered in assessing the competitive effects of the proposed merger. The FTC entirely fails to account for that competition in defining the market or assessing competitive effect. That alone is reason to deny the FTC the open-ended TRO it seeks.

To be sure, this truncated proceeding is not the place to make a final determination regarding the appropriate relevant market. But in light of the serious questions that arise from the face of the FTC's proffered market, the FTC cannot justify a TRO of *indefinite* duration on the basis of such thin evidence.

### B.     The FTC Has Not Proven a Prima Facie Case of Anticompetitive Effects

The FTC's application also fails for the FTC's inability to prove that the proposed merger is anticompetitive. In order to prove a Section 7 claim, the FTC must first make a prima facie case of anticompetitive effects in the alleged market. *See, e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703–04 (4th Cir. 2021); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990). If it can do so, the defendant can provide rebuttal evidence to discredit any presumption of anticompetitive effects or show why the transaction is unlikely to substantially lessen competition. *See generally id.*; *see also In re AMR Corp.*, 2023 WL 2563897, at *2 (2d Cir.

Mar. 20, 2023).  If the defendant does so, the burden shifts back to the FTC, which bears the ultimate burden of persuasion.

The FTC has not substantiated either of its theories of competitive harm with evidence sufficient to carry its burden to demonstrate anticompetitive effects.  We summarize here some of the key flaws on the face of the FTC's complaint, but this is by no means a complete explanation of all the flaws in the FTC's case.

*First*, for its theory of horizontal harm, the FTC relies principally on a conclusory assertion of market shares and calculation of the Herfindahl-Hirschman Index ("HHI") measure of market concentration.  TRO Mot. 14–16.  The FTC does not provide specific factual allegations supporting this HHI calculation; for example, it does not even allege the size of the relevant market that it alleges.  Moreover, it is well settled that "statistics concerning market share and concentration, while of great significance, [a]re not conclusive indicators of anticompetitive effects."  *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974).  The FTC thus cannot rest its case solely on its conclusory assertions of market shares and HHI calculations, particularly when this case is still in its nascent stages.

The only support the FTC offers for its calculations is ███████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████  This Court cannot and should not indefinitely restrain the merger without the parties having had any meaningful opportunity to examine and litigate the reliability of this conclusory basis for the FTC's theory of anticompetitive harm.

The FTC also alludes to the elimination of "head-to-head" competition between DeepIntent and Lasso regarding pricing and quality.  TRO Mot. 16–18.  The question, however, is not whether

Lasso and DeepIntent compete with each other today, but rather what competition will remain after the merger and whether the merger will significantly reduce the extent of competition.  The FTC does not and cannot contend that the merged entity will not vigorously compete with PulsePoint and others on price and product quality.

*Second*, the FTC asserts that the proposed merger might result in anticompetitive vertical effects by giving IQVIA an increased incentive and ability to discriminate against non-affiliated DSPs by depriving them of data necessary to compete with DeepIntent and Lasso following the merger.

The premise of this theory—that IQVIA's data is necessary for DSPs to compete in the healthcare space—is bare speculation.  IQVIA offers many different types of data, and the mere fact that IQVIA's data generally is widely used by pharmaceutical companies or that some of IQVIA's data might be viewed by some as the "gold standard" does not mean that IQVIA's digital advertising data is in any way necessary for other DSPs to compete.  Moreover, this theory rests on conjecture regarding what IQVIA *might* do after the merger, even though there is no evidence IQVIA will foreclose competition in the way the FTC speculates.  The FTC presumes foreclosure in analyzing the *Brown Shoe* factors, but skips the critical step of examining whether such foreclosure actually will occur.

The FTC also offers an "alternative framework" under which a court may assess whether "the combined firm will have an ability and incentive to disadvantage rivals and the transaction would increase its ability and/or incentive to disadvantage rivals."  TRO Mot. 21.  The only authority it sites for this "framework," though, is *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018), in which the court rejected the government's theory of foreclosure on the facts and thus lends no support to the FTC's claim here, *see id.* at 250–52.  The Court should have the benefit

12

of complete briefing and factual record on foreclosure before relying on this novel theory to issue open-ended injunctive relief.

*Third*, even if the FTC could establish anticompetitive effects under either of its proffered theories, Defendants could rebut the FTC's proposed evidence of competitive harm.  *See ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720–22 (D.C. Cir. 2001); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054–55 (8th Cir. 1999); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1222–24 (11th Cir. 1991).

The FTC asserts that Defendants cannot demonstrate the timely entry of new firms or that any anticompetitive effects will be offset by efficiencies.  TRO Mot. 22–25.  But the FTC admits that its alleged market is "rapidly growing," *id.* at 1, a reality confirmed by the fact that Lasso was started in 2019.  Thus, by the FTC's own reckoning, there is likely to be substantial growth in the future.  And the FTC's complaint admits that ████████████████████████████████ ████████████████████████████████████.  The FTC's conclusory contention that there are and will continue to be only three significant healthcare DSPs at least warrants closer scrutiny.

The FTC's contention that ████████████████████████████████████ ████████████████, *see* TRO Mot. 23–24, does not establish barriers to entry.  The fact is that diversified DSPs already offer HCP programmatic advertising, but regardless the FTC cannot say with a straight face that industry giants like Google, Yahoo, or the many other competitors are incapable of competing at the same level as a company started three years ago.  If there is a competitive opportunity for these diversified DSPs to expand following the merger, there can be little doubt they will do so.  At the very least, the FTC's contention that such companies are not viable competitors to Lasso and DeepIntent warrants closer scrutiny upon a fully developed record.

* * *

13

The point of this summary is not that the Court should decide now that the FTC's theories are defective as a matter of fact or law.  Rather, the point is that the FTC has asked this Court to indefinitely restrain the merger—in violation of the Federal Rules of Civil Procedure and this circuit's precedent—but has fallen far short at this early stage of providing the kind of robust case necessary for such relief.  In view of the numerous questions that permeate the FTC's analysis of the proposed merger's likely effect on competition, there is no cognizable basis for the kind of open-ended preliminary injunctive relief the FTC seeks.

###### C.      The Equities Do Not Favor an Indefinite TRO

Finally, the FTC urges that a TRO is necessary to prevent the supposed harm to competition arising out of the proposed merger.  TRO Mot. 25–26.  Setting aside the fact that the FTC has not offered the kind of evidence courts demand to substantiate such allegations of competitive harm, the FTC's argument suffers from the fact that it makes no effort to justify an *indefinite* TRO. Defendants have clearly expressed to the FTC, in writing, that it is willing to stipulate to a TRO that will expire the earlier of November 15 or one business day after the Court's ruling on the preliminary injunction.  That is more than sufficient to avoid all of the supposed harms the FTC urges will arise if the merger closes, ███████████████████████████████.  None of the harms the FTC identifies, however, justify the issuance of an indefinite TRO on an underdeveloped record with no meaningful opportunity for adversarial presentation of key issues in the case.

### CONCLUSION

The FTC's motion for a TRO should be denied.  Defendants remain willing to consent to a TRO that expires the earlier of November 15, 2023 or one business day after the Court's ruling on the FTC's forthcoming motion for a preliminary injunction.

Dated: July 19, 2023
   Washington, DC

WEIL, GOTSHAL & MANGES LLP

 /s/ *Chantale Fiebig*
Chantale Fiebig
Joshua M. Wesneski
2001 M Street NW, Suite 600
Washington, DC 20036
Tel:  (202) 682-7000
chantale.fiebig@weil.com
joshua.wesneski@weil.com

Robert Taylor
767 Fifth Avenue
New York, NY 10153
robert.taylor@weil.com

Sarah M. Sternlieb
700 Louisiana Street, Suite 1700
Houston, TX 77002
sarah.sternlieb@weil.com

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Kenneth Reinker
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Tel:  (202) 974-1500
kreinker@cgsh.com

Rahul Mukhi
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000
rmukhi@cgsh.com

*Attorneys for Defendant IQVIA Holdings Inc.*

MORRISON & FOERSTER LLP
Alexander P. Okuliar (*pro hac vice* pending)
2100 L Street, NW, Suite 900
Washington, DC 20037
Tel: (202) 887-1500
aokuliar@mofo.com

David J. Fioccola
Michael B. Miller
Mika M. Fitzgerald
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
dfioccola@mofo.com
mbmiller@mofo.com
mfitzgerald@mofo.com

*Attorneys for Defendant Propel Media, Inc.*