**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                Plaintiff,

        v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

               Defendants.

Case No. 1:23-cv-06188-ER

**REDACTED VERSION**

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

I.   Introduction ............................................................................................................... 1

II.  Statement of Facts ..................................................................................................... 6

A.  HCP Programmatic Advertising ............................................................................... 6

B.  IQVIA Controls Key Data USED FOR HCP Programmatic Advertising............................. 7

C.  The Proposed Acquisition.......................................................................................... 9

III. Argument ................................................................................................................. 11

A.  The Commission is Likely to Succeed on the Merits ................................................ 12

1.  The Proposed Acquisition is an Illegal Horizontal Merger .................................. 13

   a.   The Proposed Acquisition is Presumptively Illegal Based on Market Shares.............. 13

     i.   The Relevant Product Market is HCP Programmatic Advertising ............................ 13

     ii.  The Relevant Geographic Market is Worldwide ................................................... 21

     iii. The Proposed Acquisition Results in Presumptively Illegal Market Shares ............. 22

   b.   The Proposed Acquisition Eliminates Substantial Competition between Lasso and DeepIntent...................................................................................................... 24

     i.   Defendants (and other Market Participants) View DeepIntent and Lasso as Direct Competitors.................................................................................................. 25

     ii.  Defendants Compete Vigorously on Price and Innovation....................................... 27

2.  The Proposed Acquisition is an Illegal Vertical Merger ........................................ 33

   a.   IQVIA Data is a Critical Input to HCP Programmatic Advertising .............................. 35

   b.   Supreme Court Brown Shoe Framework.............................................................. 39

   c.   Ability and Incentive to Disadvantage DeepIntent's Rivals......................................... 41

     i.   IQVIA's Ability to Harm DeepIntent's Rivals......................................................... 41

     ii.  IQVIA's Incentive to Harm DeepIntent's Rivals .................................................... 43

3.  Defendants Cannot Rebut the Strong *Prima Facie* Case ...................................... 44

   a.   Entry and Expansion ........................................................................................ 44

     i.   Significant Barriers to Entry and Expansion .......................................................... 44

     ii.  Market Participants Confirm Neither Entry Nor Expansion Will Be Timely, Likely, and Sufficient................................................................................................ 46

b.   Efficiencies ................................................................................................ 49

B.  The Equities Favor a Preliminary Injunction ....................................................... 49

IV. Conclusion ................................................................................................................ 50

# TABLE OF AUTHORITIES

**Cases**

*Brown Shoe v. U.S.*, 370 U.S. 294 (1962)................................................................. *passim*

*Concord Associates, L.P. v. Ent. Properties Trust*, 817 F.3d 46 (2d Cir. 2016) ......................... 21

*Consolidated Gold Fields PLC v. Minorco*, 871 F.2d 252 (2d Cir. 1989) ................................... 13

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................... 41

*Fruehauf Corp. v. FTC,* 603 F.2d 345 (2d Cir. 1979) ................................................. 5, 33, 39, 40

*FTC v. Advoc. Health Care*, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017)................................ 49

*FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34 (D.D.C. 1998) ........................................ 22, 45

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) .......................................... 49

*FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001)................................ 11

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966) .......................................................... 50

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................................... *passim*

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) .................................... 23

*FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088 (S.D.N.Y. 1977)........................ *passim*

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ..................................... 21

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020)...................................... 5

*FTC v. Penn State Hershey Med. Center*, 838 F.3d 327 (3d Cir. 2016)................................ 21, 49

*FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011)................. 49

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019)................................................... 44

*FTC v. Staples,* 190 F. Supp. 3d 100 (D.D.C. 2016) ................................................... 33

*FTC v. Staples*, 970 F. Supp. 1066 (D.D.C. 1997) ................................................ 12, 13, 25

*FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000)................................................ 13, 25

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)..........................................................5, 21, 33

*FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187 (D.D.C. 2018) ...................................................... 14, 23

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)..........................................24

*FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ........................................50

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)........................ 12, 21

*FTC. v. Food Town Stores, Inc.,* 539 F.2d 1339 (4th Cir. 1976)...........................................49

*Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219 (2d Cir. 2006)...................................21

*In re Illumina, Inc.,* No. 9401, 2023 WL 2823393 (F.T.C. Mar. 31, 2023) ............................41

*In re ProMedica Health Sys., Inc.,* No. 9346, 2012 WL 1155392

(F.T.C. Mar. 28, 2012)................................................................................................22

*Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594 (1953) ...................................................14

*U.S. Steel Corp. v. U.S.*, 426 F.2d 592 (6th Cir. 1970)........................................................40

*U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171 (D.D.C. 2017) ............................................2, 45

*U.S. v. AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018) ................................................ 12, 41

*U.S. v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990) .......................................... 12, 44

*U.S. v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1 (D.D.C. 2022)................................3, 23

*U.S. v. Citizens & S. Nat'l Bank*, 422 U.S. 86 (1975) ..........................................................24

*U.S. v. Continental Can Co.*, 378 U.S. 441 (1964).............................................................24

*U.S. v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C. 2011) ...............................................*passim*

*U.S. v. Marine Bancorp.*, 418 U.S. 602 (1974)................................................................13

*U.S. v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965)..................................2, 13, 33

*U.S. v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) .........................................................*passim*

*United States v. Aetna Inc.*, 240 F. Supp. 3d (D.D.C. 2017) ...............................................32

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................................................. 15

*United States v. Sybron Corp.*, 329 F. Supp. 919 (E.D. Pa. 1971) ........................................ 39, 42

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657

    (S.D.N.Y. 2002) ...................................................................................................... 5, 33, 42

**Statutes**

15 U.S.C. § 18 ................................................................................................................... *passim*

15 U.S.C. § 45 ............................................................................................................................ 11

15 U.S.C. § 53 ................................................................................................................. 11, 49, 50

**Other Authorities**

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010).. 2, 21, 22, 44

# I.     INTRODUCTION

█████████████████████████████████████████████

*[1]—DeepIntent senior executive*

IQVIA, in the midst of a buying spree of multiple companies in the HCP programmatic advertising industry, now seeks to acquire one of its closest direct competitors. On July 22, 2022, Defendant IQVIA (the third-largest provider of HCP programmatic advertising via its Lasso division) signed an agreement to acquire Defendant PMI (the second-largest provider of HCP programmatic advertising via DeepIntent). If consummated, the proposed acquisition would eliminate intense head-to-head competition between Lasso and DeepIntent that has benefited consumers through lower prices and innovation, and it would allow IQVIA to further entrench itself as the dominant company in the HCP programmatic advertising market.

HCP programmatic advertising involves serving individual healthcare professionals ("HCPs") with advertisements across medical (such as Medscape) and non-medical (such as ESPN.com) websites, determining when those professionals engage with an advertisement, and assessing whether they ultimately changed their prescribing behavior. For instance, a pharmaceutical company may want to raise awareness about a new drug for a certain disease by targeting specific doctors who have patients with that disease. HCP programmatic advertising offers a way for that company to target a specific HCP specialist online, time the advertisements to match with the HCP's relevant patient visits, and measure the impact of those ads by matching

---

[1] PX2571-01 (DeepIntent).

that HCP's prescription data for that drug.[2] No other form of advertising offers the same capabilities, or the same power to reach specific doctors and influence prescribing behavior.[3]

For three independent reasons, the Court should grant the FTC's motion for a preliminary injunction. *First*, the evidentiary record in this case establishes that the proposed acquisition would combine two top competitors for HCP programmatic advertising. "The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition." U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 6 (2010) [hereinafter *Horizontal Merger Guidelines*]. *See, e.g.*, *U.S. v. Anthem, Inc.*, 236 F. Supp. 3d 171, 216 (D.D.C. 2017); *U.S. v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 955 (S.D.N.Y. 1965). Defendants' executives concede that Lasso and DeepIntent are primary competitors for the sale of HCP programmatic advertising.[4]  But Lasso and DeepIntent are not just two of many competitors. Instead, as described by IQVIA as recently as June 2023, IQVIA's Lasso, DeepIntent, and ▉▉▉▉▉▉▉▉▉▉ are the ▉▉▉▉—the primary options for any healthcare advertiser seeking to target HCPs through programmatic advertising.[5] Pharmaceutical companies and their advertising agencies likewise confirm that these three firms are viewed as the primary options for HCP programmatic advertising.[6]

Document after document memorializes how Defendants have closely tracked each other, as well as how they have reduced prices and increased innovation to win business away from

---

[2] *See, e.g.*, PX5057 (Case Study, DeepIntent's Eligibility Data Increases Exposure Among HCPs Prior to Patient Visits, an Industry First, DeepIntent, https://info.deepintent.com/Case-Study-Web-Eligibility-Data (last visited Oct. 25, 2023)).
[3] *See infra* § III.A.1.a.i (discussing the relevant product market of HCP programmatic advertising).
[4] *See, e.g.*, PX5505 (Paquette (DeepIntent) IH) at 86:6-8; PX5532 (Paquette (DeepIntent) Dep.) at 30:10-16; PX5508 (DiNorscio (IQVIA) IH) at 113:23-114:13; PX5540 (DiNorscio (IQVIA) Dep.) at 81:4-82:23; PX5535 (Mangano (DeepIntent) Dep.) at 100:3-14; PX5526 (Sandler (DeepIntent) Dep.) at 151:21-24.
[5] PX1625-02 (IQVIA); PX5549 (Colarossi (IQVIA) Dep.) at 58:10-15.
[6] *See, e.g.*, PX5558 ▉▉▉▉▉▉▉▉▉ Dep.) at 35:16-22, 83:20-84:7; PX5559 ▉▉▉▉▉▉ Dep.) at 145:4-48:20); PX5555 ▉▉▉▉▉▉▉▉ Dep.) at 20:21-21:7.

each other.[7] As the DeepIntent sales team described this intense rivalry, Lasso and DeepIntent are in a "███████" for the same customers.[8] And party documents tell a consistent story from 2021 to the present: DeepIntent has described Lasso as its "██████████" (2021), "██████████" (2021), "██████████" (2022), "██████████" (2022), "██████████" (2023), "██████████ [ ]" (2023), "██████████ [ ]" (2023), and "██████████ [ ]" (2023).[9] IQVIA's Lasso has likewise identified DeepIntent as its "██████████" (2020), "██████████" (2021), "██████████ [ ]" (2022), "██████████ [ ]" (2022), and one of "██████████" (2023).[10] This relentless competition between Lasso and DeepIntent has resulted in rapid innovation and serial price reductions to win business away from each other.[11]

*Second*, even apart from the admissions by Defendants, the proposed acquisition is *presumptively* unlawful because it would result in a combined entity with nearly ███ of the market for HCP programmatic advertising.[12] 15 U.S.C. § 18; *see U.S. v. Phila. Nat'l Bank ("PNB")*, 374 U.S. 321, 363 (1963); *U.S. v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 36 (D.D.C. 2022). Here, if anything, market shares understate the competitive clash between Lasso and DeepIntent, considering IQVIA's stated intent to consolidate the market. As one IQVIA executive wrote before the public announcement of this transaction, "██████████

---

[7] *See infra* § III.A.1.b.
[8] PX2736-04 (DeepIntent); PX0526 (Sandler (DeepIntent) Dep.) at 111; *see also* PX0555 ███████ Dep.) at 21 ███████
[9] PX2571-01 (DeepIntent); PX2511-05 (DeepIntent); PX2880-01 (DeepIntent); PX2506-01 (DeepIntent); PX2843-04 (DeepIntent); PX2812 (DeepIntent) (DI-LIT-0000378223) ███████ PX2816 (DeepIntent) (DI-LIT-0000454960) ███████; PX2818 (DeepIntent) (DI-LIT-0000498267) ███████ When faced with the voluminous record evidence demonstrating the direct head-to-head competition between Defendants in this case, counsel for Defendants resorted to claiming that the record evidence was "outdated." But as the dates on these documents demonstrate, DeepIntent and IQVIA's Lasso have maintained their rivalry and price competition through this year. Third-party testimony likewise demonstrates that Lasso and DeepIntent remain close competitors today.
[10] PX1375-02 (IQVIA); PX1056-04 (IQVIA); PX1628-02 (IQVIA); PX1612 (IQVIA) (IQVIA-FTC-003038954) ███████ PX1735 (IQVIA) (IQVIA-FTC-00680528) ███████
[11] *See infra* § III.A.1.b.ii.
[12] PX6500 (Expert Report of Kostis Hatzitaskos (October 11, 2023)) ("Hatzitaskos Report") ¶¶260-263; Exhibit 14.

███████████████████████████████████████████████████████████████

████████,"[13]

*Third*, the threat to competition is magnified by the likelihood that IQVIA will use its position as a key supplier of healthcare data to strangle its rivals for HCP programmatic advertising. IQVIA controls critical inputs—detailed and comprehensive data regarding healthcare providers, claims, and prescriptions—which are necessary to offer competitive HCP programmatic advertising services. IQVIA itself boasts that "[t]he breadth of the intelligent, actionable information we provide is not comprehensively available from any other source."[14] According to an IQVIA business development manager, IQVIA is "███████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████"[15]

Nearly every firm that offers HCP programmatic advertising relies on IQVIA's data,[16] which IQVIA itself describes as the industry's "████████████"[17]

Post acquisition, the combined entity would control nearly ███ the HCP programmatic advertising market, which will give it a much greater incentive to limit or deny IQVIA data to any competitors for HCP programmatic advertising. Thus, IQVIA will possess the ability and financial incentive to increase barriers to entry or reduce competition by foreclosing or disadvantaging DeepIntent's competitors from access to a source of supply (i.e., IQVIA's data), substantially lessening competition in violation of the Clayton Act. *See Fruehauf Corp. v. FTC,*

---

[13] PX1377-01 (IQVIA).
[14] PX1137-05 (IQVIA 2022 10-K).
[15] PX1032-01 (IQVIA); *see also* PX1131-03 (IQVIA) ██████████████████████████
██████████████████████████████████████████████
[16] *See infra* § III.A.2.a.
[17] *See, e.g.,* PX4164-11 (DeepIntent); PX1740-03 (IQVIA); PX1170-05 (IQVIA); PX2788-03-04 (DeepIntent); *see also infra* n.174.

603 F.2d 345, 352 (2d Cir. 1979); *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002). Again, the Court need look no further than Defendants' own documents: DeepIntent's CEO analyzed what DeepIntent could do if it controlled IQVIA's data: "███████████████████████████████

████████████████████████████████████████████████████████████

███."[18]

On July 17, 2023, the FTC's Commissioners voted 3-0 to commence an administrative proceeding to determine whether the proposed acquisition violates the antitrust laws. The administrative trial, which will include up to 210 hours of live testimony, thousands of exhibits, and voluminous briefing, is scheduled to commence on December 20, 2023. The question before this Court is therefore limited: has the FTC shown that it has a "fair and tenable chance" of success on the merits sufficient to maintain the status quo pending a full administrative trial. *FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088, 1090-91 (S.D.N.Y. 1977). The evidence before this Court easily meets that standard. Absent preliminary relief, IQVIA can acquire and begin integrating DeepIntent. Customers would be harmed with higher prices and decreased innovation, and Defendants can "scramble the eggs"—that is, immediately merge their operations and make it extremely difficult, if not impossible, for competition to be restored to its previous state. *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (citing *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 87 (D.D.C. 2015)); *Lancaster*, 434 F. Supp. at 1096-97.

---

[18] PX2831-31 (DeepIntent); *see also* PX2576-17 (DeepIntent).

## II.    STATEMENT OF FACTS

### A.    HCP PROGRAMMATIC ADVERTISING

The goal of almost every HCP-focused advertising campaign is to change an HCP's prescribing behavior to increase the sales of the product being marketed.[19] In order to accomplish that goal, pharmaceutical marketers must identify their target audience, reach that audience, and determine whether that outreach resulted in an increase in prescriptions written—the return on investment. HCP programmatic advertising provides for the targeting of advertisements to HCPs on an individualized (1:1) basis,[20] and includes steps generally referred to as planning, activation, optimization, and measurement.[21]

At the *planning* stage, healthcare marketers will identify a list of HCPs for targeting. This list may be identified in a number of different ways, from simple to complex, from pre-existing pharmaceutical customer lists to lists created by analyzing relevant prescription and claims data.[22] An identified list will then be converted into digital identifiers that can be targeted online, then *activated* in a demand-side platform ("DSP") for the automated bidding and buying of digital advertising space for deployment to specific HCPs.[23] As a campaign runs, HCP

---

[19] *See* PX0534 (Craigmyle (DeepIntent) Dep.) at 70:11-71:12; PX0540 (DiNorscio (IQVIA) Dep.) at 28:14-19; PX0503 ▉▉▉ IH) at 31:20-32:24; PX0523 ▉▉▉ IH) at 35:6-36:24; PX0558 ▉▉▉ Dep.) at 59:1-18; PX0555 ▉▉▉ Dep.) at 14:19-15:3, 24:22-25:14; *cf.* PX0557 ▉▉▉ Dep.) at 81:8-82:1, 100:11-101:9; PX0565 ▉▉▉ Dep.) at 192:6-12; PX0576 ▉▉▉ Dep.) at 131:11-132:9.

[20] *See, e.g.,* PX0508 (DiNorscio (IQVIA) IH) at 22:8-19; PX0540 (DiNorscio (IQVIA) Dep.) at 35:4-36:11; PX0534 (Craigmyle (DeepIntent) Dep.) at 88:20-89:12; PX0549 (Colarossi (IQVIA) Dep.) at 55:24-56:5; *see also* PX0558 ▉▉▉ Dep.) at 81:24-82:17; PX0523 ▉▉▉ IH) at 21:23-22:6; PX0561 ▉▉▉ Dep.) at 34:9-22; PX0556 ▉▉▉ Dep.) at 15:6-16:1; PX0565 ▉▉▉ Dep.) at 153:11-18; PX0575 ▉▉▉ Dep.) at 101:18-102:4.

[21] *See* PX2862-05 (DeepIntent); PX0532 (Paquette (DeepIntent) Dep.) at 55:1-56:14; PX0520 (Werther (DeepIntent) IH) at 23:22-24:1; PX0534 (Craigmyle (DeepIntent) Dep.) at 58:14-20; PX5229-01-02 (The Most Powerful Healthcare Advertising Platform, DeepIntent, https://www.deepintent.com/platform/ (last visited Oct. 25, 2023)); *cf.* PX0565 ▉▉▉ Dep.) at 76:11-15 ▉▉▉, 174:15-18 ▉▉▉; PX0557 ▉▉▉ Dep.) at 100:11-101:9

[22] PX0520 (Werther (DeepIntent) IH) at 20:13-21:13, 32:9-33:16, 34:12-38:12; PX0534 (Craigmyle (DeepIntent) Dep.) at 59:13-61:11; PX0503 ▉▉▉ IH) at 23:24-24:20; PX0566 ▉▉▉ Dep.) at 26:18-28:4; PX0558 ▉▉▉ Dep.) at 67:10-17; PX0563 ▉▉▉ Dep.) at 65:17-66:23.

[23] *See* PX0520 (Werther (DeepIntent) IH) at 38:13-39:9. PX0571 ▉▉▉ at 151:17-152:2.

programmatic advertising provides insight into whether an ad campaign is actually reaching the target HCPs—a metric called physician-level data or "PLD."[24] Based on PLD reporting, an advertiser can adjust an ongoing campaign to reach the most HCPs possible—*optimization*—and later measure the results of that campaign to determine whether its investment resulted in an increase in prescriptions written—*measurement*.[25]

Lasso, DeepIntent, and ▮▮▮▮▮ constitute the ▮▮▮▮ companies that provide the vast majority of HCP programmatic advertising in the United States.[26] Although some other digital advertising firms (sometimes referred to as "Generalist DSPs") provide DSP services across a wide range of industries, the CEO of DeepIntent explained the material difference between generalist DSPs and the healthcare-focused offerings of companies like the ▮▮▮:



## B.    IQVIA CONTROLS KEY DATA USED FOR HCP PROGRAMMATIC ADVERTISING

IQVIA provides critical healthcare data used in HCP programmatic advertising: data used to identify specific HCPs online, and prescription and claims data used to build HCP audiences and measure the effectiveness of healthcare advertising. Market participants have testified to the

---

[24] PX0559 ▮▮▮▮ Dep.) at 114:7-115:5; PX0503 ▮▮▮▮ IH) at 36:9-38:6; *see also* PX0520 (Werther (DeepIntent) IH) at 58:11-59:1; PX0534 (Craigmyle (DeepIntent) Dep.) at 92:8-20; PX0565 ▮▮▮▮ Dep.) at 154:11-22.
[25] PX0565 ▮▮▮▮ Dep.) at 174:15-18 ▮▮▮▮; PX0559 ▮▮▮▮ Dep.) at 114:7-115:5; PX0503 ▮▮▮▮ IH) at 23:6-24:20; PX0520 (Werther (DeepIntent) IH) at 18:18-23, 31:20-32:2; PX0534 (Craigmyle (DeepIntent) Dep.) at 74:5-77:10; *see also* PX0558 ▮▮▮▮ Dep.) at 67:10-17, 79:8-80:18; PX0576 ▮▮▮▮ Dep.) at 109:14-110:1.
[26] *See infra* § III.A.1.a.iii.
[27] PX2964-01-03 (DeepIntent).

importance of having consistent data, and specifically IQVIA data, throughout the HCP

programmatic advertising process, in part to ensure that steps taken to optimize their campaigns

are consistent with later script lift measurement results.[28]

IQVIA is the preeminent provider of HCP identity data, which allows advertisers to link

HCPs to their online identities and digital devices.[29] IQVIA became the █████████████████

████████████████████████ █████████████████████████████████████████████████████

████████████████████████████████████.[31]  IQVIA's HCP identity data is superior

to alternative sources due to its reach, depth, accuracy, and the fact that the data is derived from

HCPs that have consented to be tracked online.[32]

IQVIA is also the leading source of HCP prescribing data—claims and prescription data

that includes detailed information on prescribing behavior by individual doctors. HCP

prescribing data is used both to plan an advertising campaign and measure its effectiveness.

According to DeepIntent's own marketing, ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████.[33] HCP prescribing data allows advertisers

---

[28] *See* PX0563 (████████████ Dep.) at 73:19-75:16; PX0558 (████████████████ Dep.) at 99:22-100:3, 102:11-
103:2; PX0520 (Werther (DeepIntent) IH) at 56:12-57:19, 59:5-60:16 (█████████████████████████████████████);
PX0503 (████████████ IH) at 39:8-44:2 (███████████████████████████████████
████████████████; *see also* PX0568 (████████████████████ Dep.) at 136:3-138:11 (██████████████████
███████████).
[29] *See infra* § III.A.2.a; *see also* PX0548 (Margolis (IQVIA) Dep.) at 176:8-18 ██████████████████████████
███████████████████); PX0576 (████████████████ Dep.) at 133:7-135:16.
[30] PX2575-01 (DeepIntent).
[31] PX0527 (Miller (IQVIA) Dep.) at 105:24-107:9, 108:13-19:6; PX1140-01 (IQVIA) ███████████████████
████████████████████████████████████████████████████████████████; PX1205-01 (IQVIA)
████████████████████████████████████████████████; *see also* PX1229-01 (IQVIA); PX1230-01
(IQVIA); PX0555 (████████████████ Dep.) at 48:25-50:23.
[32] PX1032-01 (IQVIA); PX1584-02 (IQVIA); *see also* PX1170-05 (IQVIA); PX0539 (O'Brien (IQVIA) Dep.) at
49:17-50:8; PX0549 (Colarossi (IQVIA) Dep.) at 56:17-57:4.
[33] PX2544-04 (DeepIntent).

to measure how much the HCPs they targeted (i.e., specific cardiologists) increased their prescriptions of the advertised drug (i.e., a new cholesterol medication). According to one estimate, ███████████ of pharmaceutical companies use IQVIA's data to measure campaign outcomes.[34] Due to its control of this critical data for HCP programmatic advertising, IQVIA is uniquely positioned to affect the success (or failure) of Lasso and DeepIntent's competitors.

## C.   **THE PROPOSED ACQUISITION**

The proposed acquisition is merely the latest step in IQVIA's ██████████ attempt to dominate the HCP programmatic advertising market.[35] IQVIA first purchased MDG in 2019, followed by DMD in 2021, for a ███████████.[36] According to IQVIA, these acquisitions made it "███████████████████████" and gave it "███████████ ████████████████"[37] The next year, IQVIA forged plans to acquire two of the three leading HCP programmatic advertisers: Lasso and DeepIntent.[38] In an email urging IQVIA to acquire both companies, █████████████████████████████ stated that "████████████████████████████████████████████████████████████ ████████████████"[39]

IQVIA acquired Lasso first but maintained its original plan to follow up with an acquisition of DeepIntent, originally seeking to close both acquisitions in a near contemporaneous fashion around July to August 2022.[40] The news that IQVIA was acquiring

---

[34] PX0500 (███████████ IH) at 59:25-60:10; PX0568 (███████████ Dep.) 140:11-141:13.
[35] PX1284-04 (IQVIA) ("███████████████████"); PX0541 (Escalante (IQVIA) Dep.) at 58:11-59:11 (███████████████████████████████); *see also* PX1255-01 (IQVIA) (███████████████████████████████); PX0530 (Lin (IQVIA) Dep.) at 87:10-89:17.
[36] Answer at 6, ECF No. 58.
[37] PX1140-01 (IQVIA); PX1205-01 (IQVIA).
[38] PX1296-01 (IQVIA); PX0530 (Lin (IQVIA) Dep.) at 39:15-42:17; PX1254-01 (IQVIA).
[39] PX1026-01 (IQVIA).
[40] PX1093-23 (IQVIA).

Lasso's close competitor, DeepIntent, was met with disbelief. The co-founder of Lasso texted

"███████████" to Lasso's CEO, adding "███████████████████████████████████████

███"[41] Lasso's CEO responded by ████████████████████████████████████████████████

████████████████████████████"[42] DeepIntent employees were similarly "██████████

████" and "███████████" to learn DeepIntent was being acquired by its close competitor.[43]

Shortly thereafter, IQVIA executives discussed the Lasso and DeepIntent acquisitions at

a leadership team meeting. One executive remarked: "████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

█.  "[44] Although in this context "█████████" referred to DeepIntent, IQVIA's attempt to

consolidate the HCP programmatic advertising market goes far beyond this transaction and

DeepIntent. Discovery in this litigation has revealed ███████████████████████████████

███████████████████████████████████[45] and IQVIA recently invested ████████

█████████████████████████████████████████████████████████████████

█████████████████████████████[46] IQVIA continues to evaluate, ████████████████

████████ acquisitions in any given month.[47] As two IQVIA executives concluded via a text

exchange: "█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████[48]

---

[41] PX1439-02-03 (IQVIA); PX0540 (DiNorscio (IQVIA) Dep.) at 108:12-110:14; 113:3-115:6.
[42] PX1439-03 (IQVIA); PX0538 (Field (IQVIA) Dep.) at 222:7-223:25.
[43] PX2758-04-05 (DeepIntent); PX0531 (Klein (DeepIntent) Dep.) at 25:3-9.
[44] PX1377-01 (IQVIA).
[45] PX4162 (██████) (████████████████████████████████); PX4163 (██████) (████████████████); PX4165
(██████) (████████████████████████████████████████████████).
[46] See PX1259-04 (IQVIA); PX0548 (Margolis (IQVIA) Dep.) at 139:11-140:14; PX1287-01-02 (IQVIA); PX0530
(Lin (IQVIA) Dep.) at 57:17-61:21; PX1713-21 (IQVIA); PX0541 (Escalante (IQVIA) Dep.) at 60:7-
61:16; PX0578 (████████████████ Dep.) at 81:4-9; PX4160-02 (████████).
[47] PX0525 (Sachs (IQVIA) Dep.) at 27:4-11.
[48] PX1284-04-05 (IQVIA).

### III.    ARGUMENT

Section 7 of the Clayton Act bars mergers "the effect of [which] may be substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce or . . . activity affecting commerce in any section of the country." 15 U.S.C. § 18. Section 7 of the Clayton Act is intended to arrest anticompetitive mergers "in their incipiency" and, accordingly, requires a prediction of the merger's likely impact on future competition. *PNB*, 374 U.S. at 362 (internal quotation marks omitted). On July 17, 2023, the Commission found reason to believe that the proposed acquisition violates Section 7 of the Clayton Act and Section 5 of the FTC Act. The Commission initiated proceedings before an administrative law judge ("ALJ") to determine, upon a full evidentiary record, the merger's legality. This evidentiary hearing, which will include up to 210 hours of live testimony before the ALJ, will begin on December 20, 2023.

The Commission simultaneously authorized the filing of this complaint for a preliminary injunction in this Court under Section 13(b) of the FTC Act. 15 U.S.C. § 53(b). The FTC is *not* asking this Court to permanently enjoin the proposed acquisition, only for preliminary relief to preserve the status quo and stave off consumer harm until the Commission has exercised its congressionally vested authority to hold an administrative proceeding and determine whether the proposed acquisition violates Section 7 of the antitrust laws. *See* Joint Statement Regarding Prelim. Inj. Hr'g Schedule at 2, ECF No. 88 [hereinafter "Joint Statement"]. Section 13(b) of the FTC Act "authorizes the Commission to obtain a preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (citing 15 U.S.C. § 53(b)). The FTC "meets its burden . . . if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *Lancaster*, 434 F. Supp. at 1090; *see also* Joint Statement at 12-

11

13. It is not until the administrative proceeding, which provides a forum for all parties to present plenary evidence regarding the probable effects of the merger with up to 210 hours of live testimony, 16 C.F.R. § 3.41, that the FTC will determine, upon a full evidentiary record, the merger's legality. *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713-14 (D.C. Cir. 2001). Here, multiple independent bases demonstrate the FTC more than met its burden of showing a fair and tenable chance of success on the merits in the administrative proceeding, and Defendants do not offer any equities that override the strong public equities favoring preliminary relief.

A.      <u>**THE COMMISSION IS LIKELY TO SUCCEED ON THE MERITS**</u>

Section 7 claims are analyzed under a burden-shifting framework. *See, e.g.*, *U.S. v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).[49] Under this burden-shifting framework, first, the government must establish a *prima facie* case that an acquisition is unlawful. *Baker Hughes*, 908 F.2d at 982-83. The proposed acquisition is the unusual case where the evidence supports *three independent bases* that the merger may substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. First, the proposed acquisition results in market shares and concentrations that establish a presumption that the merger is illegal, meaning that the FTC is entitled to a preliminary injunction unless Defendants can meet their burden to rebut the presumption (which they cannot). *See PNB*, 374 U.S. at 363-64; *Lancaster*, 434 F. Supp. at 1094-95, n.4 (collecting cases); *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 62-66 (D.D.C. 2018). Second, the elimination of fierce head-to-head competition between Defendants may result in a substantial lessening of competition, which is a violation in itself. *See, e.g.*, *U.S. v. H&R Block*, 833 F. Supp. 2d 36, 88-89 (D.D.C. 2011); *FTC v. Staples*, 970 F. Supp. 1066, 1082-83 (D.D.C. 1997); *Consolidated Gold Fields PLC v. Minorco*, 871 F.2d

---

[49] The same burden-shifting framework applies to both horizontal and vertical mergers. *See U.S. v. AT&T Inc.*, 310 F. Supp. 3d 161, 191 n.17 (D.D.C. 2018).

252, 258 (2d Cir. 1989); *see also Mfrs. Hanover Tr.*, 240 F. Supp. at 955. Third, the proposed

acquisition would act as a "clog on competition" by giving IQVIA—the provider of critical

healthcare data—the ability to disadvantage other competitors in the market for HCP

programmatic advertising. *Brown Shoe v. U.S.*, 370 U.S. 294, 323-24 (1962).

### 1.      The Proposed Acquisition is an Illegal Horizontal Merger

#### a.    *The Proposed Acquisition is Presumptively Illegal Based on Market Shares*

The proposed acquisition is presumptively illegal because it would significantly increase

concentration in the already concentrated HCP programmatic advertising market. In *PNB*, the

Supreme Court held that "a merger which produces a firm controlling an undue percentage share

of the relevant market, and results in a significant increase in the concentration of firms in that

market, is so inherently likely to lessen competition substantially that it must be enjoined in the

absence of evidence clearly showing that the merger is not likely to have such anticompetitive

effects." 374 U.S. at 363. Applying *PNB*, courts have held that "[b]y showing that the proposed

transaction . . . will lead to undue concentration [for a particular product], the Commission

establishes a presumption that the transaction will substantially lessen competition." *Staples*, 970

F. Supp. at 1083; *see also Heinz*, 246 F.3d at 715. Once the presumption is established, the

burden of rebutting the *prima facie* case shifts to Defendants. *See U.S. v. Marine Bancorp.*, 418

U.S. 602, 631 (1974); *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 167 (D.D.C. 2000).

#### i.    The Relevant Product Market is HCP Programmatic Advertising

███████████████████████████████████████████████████████

*– IQVIA Senior Principal, Client Success, Omnichannel Marketing*

"HCP programmatic advertising" is not a term or market invented by the FTC—it is the

precise term Defendants use to describe their offerings and is a relevant antitrust product

---

[50] PX1123-03 (IQVIA).

market.[51] The relevant product market is the "line of commerce" affected by a proposed merger. *Brown Shoe*, 370 U.S. at 324. A relevant product market's "'outer boundaries' are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 198 (D.D.C. 2018) (quoting *Brown Shoe*, 370 U.S. at 325); *Lancaster*, 434 F. Supp. at 1092. That is, "courts look at 'whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other.'" *H&R Block*, 833 F. Supp. 2d at 51 (citation omitted). Within a broad relevant market, effective competition often occurs in narrower relevant markets. *See Brown Shoe*, 370 U.S. at 325. In fact, when defining relevant markets, courts are to construe product market "narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn[.]" *Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594, 612 n.31 (1953). If a merger may substantially lessen competition in *any* relevant market, it is prohibited by the Clayton Act.[52] *See* 15 U.S.C. § 18 (prohibiting merger that may substantially lessen competition "in *any* line of commerce") (emphasis added). Here, the *Brown Shoe* practical indicia, as well as application of the "hypothetical monopolist test," show that HCP programmatic advertising is a relevant market.

**_Brown Shoe_ Test**: In *Brown Shoe*, the Supreme Court set forth "practical indicia" for defining a relevant product market. 370 U.S. at 325. Such factors, as described in *Brown Shoe* and its progeny, include "the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices," the existence of classes of customers who desire particular products, "industry or public recognition" of the market, and how Defendants'

---

[51] *See, e.g.,* PX1614-02, -05 (IQVIA); PX1745-01 (IQVIA); PX1746-02 (IQVIA); PX1747-01 (IQVIA); PX1749-01 (IQVIA); PX2862-04 (DeepIntent).

[52] *See* PX6500-97 (Hatzitaskos Report) ¶¶ 197-98 (███████████████████████████████████████████ ████████████████████████████).

documents portray the reality of the market. *Brown Shoe*, 370 U.S. at 325; *Lancaster*, 434 F.

Supp. at 1092; *see also United States v. Grinnell Corp.*, 384 U.S. 563, 572-75 (1966).

HCP programmatic advertising has peculiar characteristics and uses that distinguish it

from other types of advertising. Unlike other methods of delivering advertisements to HCPs,

such as through mail, email, social media, and direct buys with online publishers, programmatic

advertising provides advertisers with unparalleled access to content publishers, fast delivery of

performance data, flexibility, and control over advertising budgets and the frequency of

advertising placements.[53] Healthcare companies can use HCP programmatic advertising to

deliver advertisements across thousands of different publishers, determine which HCPs interact

with the advertisements, and analyze whether those HCPs changed their prescribing behavior—

all with "████████████"[54] No other form of advertising offers those combined capabilities.[55]

Other forms of advertising, such as direct-to-consumer ("DTC") programmatic advertising

(which targets cohorts of patients, rather than individuals), direct buys, and non-digital

advertising, either do not involve one-to-one targeting, do not offer the efficiency and flexibility

of HCP programmatic advertising, or are less effective at impacting prescribing behavior.[56] For

---

[53] *See, e.g.*, PX0503 (████████ IH) at 19:3-20:24; PX0558 (██████ (████ Dep.) at 70:6-74:4; PX0559 (████████) Dep.) at 107:25-115:5; PX0555 (████████) Dep.) at 15:8-16:16; *see also* PX0553 (████ Dep.) at 33:19-34:17; PX0556 (████████ Dep.) at 73:14-17; PX0576 (████████ Dep.) at 129:22-130:4.

[54] PX0503 (████████) IH) at 20:3-20:24; *see also* PX0558 (████████) Dep.) at 70:9-75:13; PX0559 (████████) Dep.) at 107:25-109:22; PX6006 ¶ 3 (████████), Decl.); PX0569 (████████) Dep.) at 95:4–97:2.

[55] *See* PX0504 (████████) IH) at 14:16-25 (describing programmatic advertising as ██████████████ ; PX0561 (████████) Dep.) at 22:18-25:11 (██████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ); PX0568 (████████ ████████) Dep.) at 178:13-180:14 ██████████████████████████████████████████████ ; *cf.* PX0558 (████████ ████) Dep.) at 74:18-76:1 (explaining ████████████████████████████ .

[56] *See, e.g.*, PX0534 (Craigmyle (DeepIntent) Dep.) at 49:8-22; PX0526 (Sandler (DeepIntent) Dep.) at 27:6-28:21; PX0564 (████████ Dep. Tr.) at 63:5–22 ("████████████"); PX0576 (████████ Dep.) at 131:11-132:9.

example, companies may still use direct email marketing, but this ███████████████
███████████████████████████████████████████████ ███ [57]

Customers of HCP programmatic advertising, including large pharmaceutical companies and their advertising agencies, provided consistent testimony regarding the unique characteristics that distinguish HCP programmatic advertising from other forms of advertising. ████, a healthcare-focused advertising agency, █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ [58] Another healthcare-focused advertising agency, █████, testified that programmatic advertising gives its clients ███████████████ due to its ██████████████████

████████████████████████████████████████████████████

███████████████████████████████ [59] Similarly, advertising agency ██████████

█████████████ explained that ████████████████████████████████████████████████

████████████████████████████████████████████████████ [60]

████, a large pharmaceutical company, stated that HCP programmatic advertising "

██████████████████████████████████████████ " because it provides the "████████

███████████████████████████████████ " and "██████████████████████████████

██████████████████████████████████████████████ "[61]

Another large pharmaceutical company, ████, described several advantages of HCP

[57] PX0569 (████████████) Dep.) at 105:9–106:13; *see also* PX0566 (████████) Dep.) at 58:5-16.
[58] PX0559 (███████) Dep.) at 121:6-24.
[59] PX0558 (███████) Dep.) at 79:8-15.
[60] PX0546 (███████) Dep.) at 79:4-80:1.
[61] PX6006 ¶ 3 (████████), Decl.).

programmatic advertising, including ████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████[62]

    Second, industry participants, including the Defendants, recognize that HCP

programmatic advertising is a distinct market.[63] In fact, DeepIntent prepared numerous analyses

of its share in this market. In early 2022, for instance, DeepIntent forecasted that █████████

████████████████████████████████████████████████████.[64] Similarly,

IQVIA predicted in December 2022 that █████████████████████████████████████

████████████████,"[65] ██████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████[66] ██████████████████████

████████████████████████████████████[67] ██████████████

████████████████████████████████[68]

    Third, HCP programmatic advertising has distinct pricing compared to other forms of

advertising. For example, it is substantially more expensive (about ███ times greater) than DTC

programmatic advertising.[69] Programmatic advertising prices typically are measured by the cost

---

[62] PX0555 (████████████) Dep.) at 15:8-16:3.

[63] Indeed, one executive at ██████████████████, a third-party data provider company, wrote to his colleagues that the FTC's complaint "████████████████████████████" PX4133-01 (████████████). Another ████████ executive said: "████████████████████████████████████████" PX4168-01 (████████).

[64] PX2572 (DeepIntent).

[65] PX1123-03 (IQVIA).

[66] PX2963 (DeepIntent); PX0505 (Paquette (DeepIntent) IH) at 195:15-17.

[67] PX0568 (████████████) Dep.) at 115:9-116:14; PX0570 (████████████) Dep.) at 125:23-127:18; PX0557 Proclivity depo (████████████ Dep.) at 87:5-23; PX0568 (████████████) Dep.) at 116:1-24.

[68] PX0570 (████████████) Dep.) at 91:24-92:25; PX0568 (████████████) Dep.) at 191:17-192:9.

[69] PX6500 (Hatzitaskos Report) ¶ 233; *see also* PX0527 (Miller (IQVIA) Dep.) at 50:2-22; PX1261-01 (IQVIA); PX0534 (Craigmyle (DeepIntent) Dep.) at 51:20-53:2; PX0526 (Sandler (DeepIntent) Dep.) at 28:18-21; PX0553

per 1,000 advertisement impressions, known as a "CPM."[70] ████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████[71] ██████████████████████████████████

███████████████████████[72] As one IQVIA executive put it, "████████████

██████████"[73] In part, this is because the advertising space that is sold by publishers to use for

DTC advertising "████████████████████████████" after the publisher sells more premium

advertising space through direct buys.[74] By contrast, HCP programmatic advertising is

sometimes more expensive than direct buys of advertising space because of the relatively small

number of HCPs and limited amount of advertising impressions available.[75] Despite its higher

cost, pharmaceutical companies and advertising agencies continue to spend increasing amounts

on HCP programmatic advertising because, among other advantages, it affords increased

flexibility and faster turnaround times on performance data, and as advertising agency ███████

testified "████████████████████████████████████████████████████

████████████████████"[76] A senior manager at ████████████████████ testified that ███████

██████████████████████████████████████████████████████



(███████ Dep.) at 90:17–92:11; *cf.* PX0555 (████████████████) Dep.) at 32:21-33:17

████████████████████████████████; PX6007 ¶ 7 (████████ Decl.) ███████████

████████████████████████████████████).

[70] *See, e.g.,* PX0527 (Miller (IQVIA) Dep.) at 50:8-12 (████████████████████

███████████); PX0569 (████████████████) Dep.) at 61:20–62:7 (████████████████

████████████████████████); PX0548 (Margolis (IQVIA) Dep.) at 285:14-17

(████████████████████████████████████████████).

[71] PX0008-09 (IQVIA); PX0548 (Margolis (IQVIA) Dep.) at 285:21-286:18.

[72] PX0008-09 (IQVIA).

[73] PX1530-03 (IQVIA).

[74] PX0559 (████████ Dep.) at 115:6-116:15.

[75] PX0559 (████████ Dep.) at 115:6-116:15.

[76] PX0563 (████████ Dep.) at 18:8-25; *see also* PX0559 (████████ Dep.) at 117:1-15, 207:11-15; PX0576

(████████████ Dep.) at 132:10-15.

18

████████████████████████████████████████████████████████████

████████████████████████████████████████  [77]

Fourth, HCP programmatic advertising has distinct customers with specialized needs: healthcare companies and their advertising agencies. "[T]he specific needs of the healthcare marketer are more nuanced and complex than the needs of the typical marketer," explained DeepIntent's CEO.[78] HCP programmatic advertising requires the precise delivery of advertisements to the targeted healthcare professionals on an individualized, one-to-one basis[79] after matching their identities to their digital footprint.[80] Additionally, unlike more generalized advertising, healthcare advertisers expect the accurate measurement of a campaign's effectiveness by evaluating whether a specifically targeted individual has changed their prescribing behavior subsequent to viewing the ads.[81]

Finally, HCP programmatic advertising is performed by specialized vendors: healthcare DSPs. As an IQVIA Vice President noted, "████████████████████████████ ███████████"[82] The three main healthcare DSPs—DeepIntent, Lasso, and ████████— possess a variety of capabilities that make them the top choices for many HCP programmatic advertising customers. *See infra* § III.A.1.b. These capabilities include the ability to reach

---

[77] PX0555 (██████████████) Dep.) at 16:17-17:10.
[78] PX5001 (How COVID-19 Has Coronated Digital King of Healthcare Marketing, https://martechseries.com/tv-advertising/covid-19-coronated-digital-king-healthcare-marketing (last accessed Oct. 24, 2023)).
[79] PX0529 (Aalderink (IQVIA) Dep.) at 36:10-38:11; PX0539 (O'Brien (IQVIA) Dep.) at 41:12-42:13; PX0535 (Mangano (DeepIntent) Dep.) at 74:21-75:16; PX0508 (DiNorscio (IQVIA) IH) at 22:20-23:6; *see also* PX0568 (██████████████) Dep.) at 50:14-52:1 ████████████████████████████); PX0565 (████████████████████████) Dep.) at 153:11-154:22 ████████████████████████████████████
[80] PX0548 (Margolis (IQVIA) Dep.) at 196:11-15; PX0527 (Miller (IQVIA) Dep.) at 74:8-25; PX0526 (Sandler (DeepIntent) Dep.) at 112-13; PX0534 (Craigmyle (DeepIntent) Dep.) at 67:22-68:13.
[81] PX1044-27 (IQVIA) ████████████████████████████████████████████████████ ████████████████████████████; PX0565 (████████████████████) Dep.) at 152:18-153:18; PX0503 (██████████) IH) at 31:20-32:24.
[82] PX1124-02 (IQVIA).

targeted HCPs with a high match rate, use of opted-in HCP data, delivery of ads to HCPs in endemic (i.e., HCP-related content) inventory, reporting physician level data ("PLD"), facilitating measurement, and having a healthcare focus.[83] Reflecting these specialized capabilities, DeepIntent, Lasso, and ████████ are often the top competitors for various customers. *See infra* § III.A.1.b. For instance, in discussing DeepIntent's effort to win business from ████████████, a leading healthcare advertising agency, DeepIntent's CEO reported that ████████████████████████████████████████████████████████████ ████████████████████████"[84] Likewise, in an email discussing ████████████, Lasso co-founder Mike DiNorscio stated that ████████████████████████████████████████ ████████████████████████████████████"[85] Meanwhile, a ████████████ executive testified that "████████████████████████████████████████████████ ████████████████████████████████████"[86]

**Hypothetical Monopolist Test**: Courts also rely on the "hypothetical monopolist test" to define a product market. This test asks, assuming all products or services in the candidate market were controlled and sold by a monopolist, whether that hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price ("SSNIP"), typically five percent, over a product or service (if so, that is a relevant market), or whether customers switching to alternative products or services would make such a price increase unprofitable (if so, the market is too narrow). *See, e.g., FTC v. Penn State Hershey Med. Center*, 838 F.3d 327,

---

[83] *See e.g.*, PX6006 ¶¶ 6, 7 (████████████), Decl.); *see also* PX2764-02 (DeepIntent); PX2860 (DeepIntent); PX556 (████████) Dep.) at 23:17-24:7; PX538 (Field (IQVIA) Dep.) at 236:24-238:9; PX531 (Klein (DeepIntent) Dep.) at 52:12-23; PX568 (████████████) Dep.) at 117:12-118:18, 119:8-120:3; PX558 (████████████ Dep.) at 89:6-90:8; PX503 (████████████) IH) at 27:17-28:17, 29:13-30:19, 31:20-32:24.
[84] PX1125-01 (IQVIA).
[85] PX1070-02 (IQVIA).
[86] PX500 (████████████) IH) at 51:17-23; *see also* PX568 (████████████) Dep.) at 116:19-24 (████ ████████████), 177:19-178:1.

338 (3d Cir. 2016); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1075 (N.D. Ill. 2012)

(quoting *Horizontal Merger Guidelines* § 4.1.1); *H&R Block*, 833 F. Supp. 2d at 51-52.

Here, the applicable question is whether a hypothetical monopolist of *all providers of*

*HCP programmatic advertising* could profitably impose a SSNIP on at least one HCP

programmatic advertising firm (e.g., DeepIntent's). If it could, HCP programmatic advertising

constitutes a relevant product market to analyze the probable competitive effects of the proposed

acquisition. Economic expert Dr. Hatzitaskos demonstrated that ██████████████████████

██.[87] This conclusion, based on empirical economic evidence, is consistent with how customers

testified they would respond to a price increase: according to ██████, HCP programmatic

advertising ██████████████████████████████████████████████████████

██████████████████████████████████████████████████"[88]

### ii.   The Relevant Geographic Market is Worldwide

The relevant geographic market is "the 'area of effective competition' . . . in which the

seller operates and where consumers can turn, as a practical matter, for supply of the relevant

product." *Concord Associates, L.P. v. Ent. Properties Trust*, 817 F.3d 46, 53 (2d Cir. 2016)

(quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006)). Because

programmatic advertising suppliers and their customers could theoretically be located anywhere,

the relevant antitrust geographic market is global, with participants targeting U.S. HCPs.[89]

---

[87] PX6500-123 (Hatzitaskos Report) § 4.2.5. Dr. Hatzitaskos ████████████████████████████████
██: ██████████████████████████████████████████████████████████ and ██████████
██████████████████ PX6500-123 (Hatzitaskos Report) ¶ 239; *see generally* PX6500-123 (Hatzitaskos Report) ¶¶ 227-241. Courts have routinely relied on these types of empirical analyses in assessing the hypothetical monopolist test. *See, e.g.*, *Sysco*, 113 F. Supp. 3d at 34-35; *Wilhelmsen*, 341 F. Supp. 3d at 57-58.
[88] PX6006 ¶ 3 (████████████, Decl.).
[89] PX6500-123 (Hatzitaskos Report) § 4.2.2.

### iii. The Proposed Acquisition Results in Presumptively Illegal Market Shares

███████████████████████████████████████

*– DeepIntent executive, October 2022*

A merger is presumed to violate the antitrust laws if it produces a firm controlling an "undue concentration in the relevant market." *In re ProMedica Health Sys., Inc.,* No. 9346, 2012 WL 1155392, at *12 (F.T.C. Mar. 28, 2012) (citing *PNB*, 374 U.S. at 363). Traditionally, courts employ a statistical measure called the Herfindahl-Hirschman Index ("HHI") to measure market concentration. It calculates market concentration by summing the squares of the individual market share of each market participant. *See FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34, 53 (D.D.C. 1998). A merger is presumed anticompetitive if it increases the HHI by more than 200 points and results in a post-merger HHI exceeding 2,500. *Horizontal Merger Guidelines* § 5.3; *H&R Block*, 833 F. Supp. 2d at 71-72; *Heinz*, 246 F.3d at 716. Here, the proposed acquisition results in a combined market share (███) and HHIs which far exceed the established thresholds and trigger a presumption of competitive harm:



---

90 PX2570-01 (DeepIntent).
91 PX6500-123 (Hatzitaskos Report) § 3.3.2, Exhibit 13; PX6500-010 (Hatzitaskos Report) § 1.4, Exhibit 13.

These market shares result in an HHI of ███ and a delta HHI of ███,[92] both well above the thresholds that establish a presumption of illegality. *See, e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172-73 (3d Cir. 2022) (enjoining merger where post-acquisition HHI of 2,835 and HHI increase of 841); *Bertelsmann*, 646 F. Supp. 3d at 37 (enjoining merger where post-acquisition HHI of 3,111 and HHI increase of 891); *Tronox*, 332 F. Supp. 3d at 207 (enjoining merger where post-acquisition HHI of 3,046 and HHI increase of 726).

The market share estimates calculated by Dr. Hatzitaskos are consistent with internal estimates by Defendants and other market participants. For example, Defendants' internal documents regularly identify ███████████████████████ as the three largest HCP programmatic advertising competitors,[93] and DeepIntent projected that ███████████ ████████████████████████████████████████████████[94] As recently as June 2023, ████████████████████████████████████████████ ██████████████[95] Similarly, ████████████████████ estimated in September 2022 that ████████████████████ would control "██████████████████████████."[96] And third-party market participants uniformly agree that ██████████████████████ are currently the top three providers of HCP programmatic advertising.[97]

---

[92] PX6500-125 (Hatzitaskos Report) § 3.3.2, Exhibit 15. These estimates likely understate Lasso's and DeepIntent's combined share, as Dr. Hatzitaskos ████████████████████████████████████████. PX6500-198-200 (Hatzitaskos Report) § 6.3.
[93] *See, e.g.,* PX1380-01 (IQVIA); PX2581-29-30 (DeepIntent); PX2799-01 (DeepIntent); PX1026-01 (IQVIA).
[94] PX2572-01 (DeepIntent).
[95] PX1625-02 (DeepIntent); PX0549 (Colarossi (IQVIA) Dep.) at 58:10-15.
[96] PX4072-01 (██████); *see also* PX0517 (██████████ IH) at 39:9-40:17, 77:15-78:15 (████████████ ██████████████████████████████████████████████████████████████████.
[97] *See, e.g.,* PX0503 (████████ IH) at 26:25-27:4; PX0558 (████████████ Dep.) at 83:20-84:7; PX0500 (████████ IH) at 51:17-23; PX0568 (██████████ Dep.) at 116:19-24, 177:19-178:1; PX0555 (██████████ Dep.) at 20:1-21:1; PX0514 (████████ IH) at 27:21-24; PX0542 (█████████ Dep.) at 118:22-119:5; PX0501 (██████████████ IH) at 67:24-68:8; PX0565 (█████ Dep.) at 257:12-258:4; PX0576 (██████████ Dep.) at 44:17-45:1.

b. *The Proposed Acquisition Eliminates Substantial Competition between Lasso and DeepIntent*

Having demonstrated that the proposed acquisition is presumed to be illegal based on Defendants' market shares, the burden shifts to Defendants to try to rebut the presumption by "produc[ing] evidence that 'show[s] that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition' in the relevant market," *Heinz*, 246 F.3d at 715 (quoting *U.S. v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)).[100] Defendants cannot do so. First, IQVIA's ability to disadvantage—if not eliminate—entry or expansion in HCP programmatic advertising through control of critical data buttresses the presumption of illegality and suggests that, if anything, the market shares *underestimate* IQVIA's post-acquisition market power.[101] The presumption of illegality is bolstered by existing market concentration and the history of IQVIA acquisitions in the industry. *U.S. v. Continental Can Co.*, 378 U.S. 441, 461-62 (1964) ("[W]here there has been a 'history of tendency toward concentration in the industry,' tendencies toward further concentration 'are to be curbed in their incipiency.'" (quoting *Brown Shoe*, 370 U.S. at 345)).

Second, Defendants' own documents and testimony, as well as third-party evidence, demonstrate that Lasso and DeepIntent vigorously compete for HCP programmatic advertising

---

[98] PX1062-01-02 (IQVIA).

[99] PX2804-01 (DeepIntent).

[100] At this stage, the Court need not embark upon a detailed analysis of Defendants' rebuttal arguments or resolve factual disputes. *See FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984) ("Because the issue in this action for preliminary relief is a narrow one, we do not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues") (*citing Lancaster*, 434 F. Supp. at 1094, 1096).

[101] *See infra*, § III.A.2.

business. Where the two merging parties are close competitors, the elimination of close competition is itself a basis to conclude that the merger results in competitive harm such as higher prices, reduced quality, and less innovation. *See, e.g.*, *Staples*, 970 F. Supp. at 1083 (finding competitive harm where the transaction "would eliminate significant head-to-head competition" between the merging parties); *see also H&R Block*, 833 F. Supp. 2d at 88-89 (finding "that HRB and TaxACT are head-to-head competitors, that TaxACT's competition has constrained HRB's pricing, and that, post-merger, overall prices in the DDIY products of the merged firms are likely to increase"); *Swedish Match*, 131 F. Supp. 2d at 169 ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors."). Indeed, economic expert Dr. Hatzitaskos explained that ███████████████████

████████████████████████████████████████████

███████████████████████████████.[103]

      i.    **Defendants (and other Market Participants) View DeepIntent and Lasso as Direct Competitors**

For HCP programmatic advertising customers, Lasso and DeepIntent are indisputably close competitors.



[102] PX6500-62 (Hatzitaskos Report) ¶ 123.
[103] PX6500-84 (Hatzitaskos Report) § 3.1.4.
[104] PX2571-01 (DeepIntent); PX2511-05 (DeepIntent); PX2880-01 (DeepIntent); PX2506-01 (DeepIntent); PX2843-04 (DeepIntent); PX2843-04 (DeepIntent); PX2812 (DI-LIT-0000378223) (DeepIntent) (Tab: ████); PX2816 (DI-LIT-0000454960) (DeepIntent) (Tab: ██████); PX2818 (DI-LIT-0000498267) (DeepIntent) (Tab: ████).

25



[105] Defendants' executives concede

[106] ████, the other part of the ████ testified

[107] Even fringe competitors, such as

[108]

    Advertising agencies, and their pharmaceutical customers, view Defendants as two of the primary choices for HCP programmatic advertising. For example,

[109] By June 2023, DeepIntent's Head of Agency Partnerships

[110]

[105] PX1375-02 (IQVIA); PX1056-04 (IQVIA); PX1628-02 (IQVIA); PX1612 (IQVIA-FTC-003038954) (IQVIA) (Tab: ████; PX1735 (IQVIA); *see* PX0530 (Lin (IQVIA) Dep.) at 75:19-76:25 (referencing PX1279 (IQVIA)).
[106] *See, e.g.*, PX0505 (Paquette (DeepIntent) IH) at 38:20-39:22, 86:6-87:21, 90:17-91:9; PX0508 (DiNorscio (IQVIA) IH) at 113:23-114:23; PX0524 (Sherry (DeepIntent) Dep.) at 67:3-6; PX0519 (Whiting (IQVIA) IH) at 89:3-14; PX0526 (Sandler (DeepIntent) Dep.) at 67:2-8, 74:21-76:3, 146:1-20, 149:17-150:2; PX0541(Escalante (IQVIA) Dep.) at 92:15-93:13; PX0531 (Klein (DeepIntent) Dep.) at 11:5-14; PX2880 (DeepIntent).
[107] PX0500 (████████ IH) at 51:17–23; PX0568 (████████ Dep.) at 116:19-24, 177:19-178:1, 194:19-196:16.
[108] *See, e.g.*, PX4088-03 (████████); ████████; PX0570 ████████ Dep.) at 76:21–77:5; PX6008 ¶ 4 (████████ Decl.); PX0514 (████████ IH) at 27:21-24; PX0542 (████████ Dep.) at 118:22-119:5; PX0565 (████████ Dep.) at 52:2-8.
[109] PX4042 (████████; *see* PX0526 (Sandler (DeepIntent) Dep.) at 146:1-23; PX0556 (████████ Dep.) at 35:2-36:9.
[110] PX2747-01 (DeepIntent).
[111] PX6006 ¶¶ 6, 7 (████████ Decl.).



###### ii.   Defendants Compete Vigorously on Price and Innovation

Defendants' documents are rife with examples of intense competition resulting in lower prices and innovative offerings for customers. The period from 2020 to 2023 is illustrative.

**2020.**



---

[112] PX0511 (█████████ IH) at 18:10-19:21.

[113] PX0516 (█████████████ IH) at 43:6-21; *see* PX0555 (█████████████ Dep.) at 20:21-21:7.

[114] PX0566 (█████████ Dep.) at 96:15-19; *see also* PX4171-121-124 (█████).

[115] PX1064-02 (IQVIA); PX0508 (DiNorscio (IQVIA) IH) at 113:23-114:23.

[116] PX1064-03 (IQVIA).

[117] PX1062-02 (IQVIA).

[118] PX1064-02 (IQVIA).

[119] PX1452-01 (IQVIA); PX0540 (DiNorscio (IQVIA) Dep.) at 95:8-100:18.

**2021.** Throughout 2021, the competition between Lasso and DeepIntent intensified as both firms responded with rapid innovation and price reductions. DeepIntent leadership quickly recognized that Lasso posed a serious competitive threat. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████ [121] By April 2021, DeepIntent responded by introducing innovative new measurement capabilities. █████████████████████████████

███████████████████████████████████████████████████

██████████████████████████ [122] But Lasso quickly responded with extremely aggressive pricing and its own new features, which raised alarm within DeepIntent. ██████

███████████████████████████████████████████████

███████████████████████████████ ████████████████████████

███████████████████████████████████████████████████████

██ ███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████ ████████████████████████████████████████████████

███████████████████████████████████████ [126]

[120] PX2571-01 (DeepIntent).
[121] PX2507-01 (DeepIntent).
[122] PX1063-02 (IQVIA).
[123] PX2798-01 (DeepIntent).
[124] PX2508-01 (DeepIntent).
[125] PX2512-01 (DeepIntent).
[126] PX2509-01 (DeepIntent).

Halfway through 2021, ██████████████████████████████ and

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██ [127] ████████████████████████████████████████████████████

████████████████████████████ [128] In ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ [129] Lasso

and DeepIntent ████████████████████████████████████: ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ [130]

**2022.** This competition further intensified in 2022. ██████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ [131] A ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ [132]

████████████████████████████████████████████████████████████

████████████████████████████ [133] The next month, ██████████████████

[127] PX2501-06 (DeepIntent); PX2511-05-06 (DeepIntent); PX0528 (Serfontein (DeepIntent) Dep.) at 104:2-18.
[128] PX2554-01 (DeepIntent); PX0521 (Sciorra (DeepIntent) IH) at 126:5-127:6.
[129] PX0540 (DiNorscio (IQVIA) Dep.) at 104:8-23; *see also* PX1443-01 (IQVIA).
[130] PX1117-01-02 (IQVIA) (discussing ██████████████████████████
██████); *see also* PX2535-01 (DeepIntent) (noting ████████████████████████
████████).
[131] PX2736-04 (DeepIntent); *see also* PX0524 (Sherry (DeepIntent) Dep.) at 49:11-52:18 (discussing PX2755 and ████████████████████████████████);
PX2755-01 (DeepIntent).
[132] PX2564-03-04 (DeepIntent); *see also* PX0521 (Sciorra (DeepIntent) IH) at 159:8-161:7 (discussing PX2564).
[133] PX2564-04 (DeepIntent); PX2573-01 (DeepIntent); PX2772-02-03 (DeepIntent).



[134]

[135] When

[137] A

[138] In a

[139]

In the midst of this competitive battle, IQVIA signed an agreement to acquire Lasso

and                                    IQVIA sought to acquire DeepIntent. They continued

battling for customers, however, since they could not merge during the FTC's investigation. For

[134] PX0526 (Sandler (DeepIntent) Dep.) at 72:24-73:15; *see also* PX2731-01-02 (DeepIntent).
[135] PX1433-03 (IQVIA); *see also* PX0538 (Field (IQVIA) Dep.) at 25:18-27:8.
[136] PX1606-02 (IQVIA); PX0538 (Field (IQVIA) Dep.) at 44:20-45:22.
[137] PX2804-01 (DeepIntent); *see also* PX0526 (Sandler (DeepIntent) Dep.) at 78:11-16 ▮▮▮▮▮▮
▮▮▮▮▮▮); PX0535 (Mangano
(DeepIntent) Dep.) at 32:24-33:21; PX2557-01-05 (DeepIntent); PX2749-01-05 (DeepIntent); PX2876-01-05
(DeepIntent). *See generally* PX2731-01-02 (DeepIntent) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[138] PX2578-01 (DeepIntent).
[139] PX2797-01 (DeepIntent).

example, in ██████████████████████████████████████

████████████████████████████████████.[140]

**2023.** The ███████ head-to-head competition between Defendants continued

throughout 2023.[141] In █████████████████████████████████

█████████████████████████████████████████

█████████████████████████[142] A █████████████████████

█████████████████████████████████████████

███████████████████████,[143] as does a █████████████████

███████████, which ██████████████████████████[144] The losses from DeepIntent

to Lasso continued—a ████████████████████████████████

█████████████████████████[145] When DeepIntent competed for

the business of ██████████████████████████████████████

█████████████████████████[146] When DeepIntent was ██████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████[147] In fact, when ██████████████████████████████

███████████████████ throughout 2023, ████████████████████ Lasso.[148]

---

[140] PX2822-01 (DeepIntent); *cf.* PX1307-01 (IQVIA) (████████████████████).

[141] PX2797-01 (DeepIntent).

[142] PX2771-02 (DeepIntent).

[143] *See* PX2847 (DI-2R-0002078389) (DeepIntent); PX2959 (DI-2R-0003264851) (DeepIntent).

[144] PX2538 (DI-2R-0002615531) (DeepIntent) (████████████████████); *see also* PX0521 (Sciorra (DeepIntent) IH) at 72:20-25.

[145] PX2960 (DI-LIT-0000230887) (DeepIntent); PX2961-01-02 (DeepIntent).

[146] PX2746-01 (DeepIntent).

[147] PX2838-01 (DeepIntent).

[148] *See, e.g.*, PX2812 (DI-LIT-0000378223) (DeepIntent) (███████████ (████████████████)); PX2816-01 (DeepIntent); PX2816 (DI-LIT-0000454960) (DeepIntent) (████████████████████████); PX2818 (DI-LIT-0000498267) (DeepIntent) (████████████████████).

Lasso likewise identified DeepIntent and ███████ as its "████████████████" and "████████████" in its RFI and RFP responses.[149]

Head-to-head competition between Lasso and DeepIntent goes beyond the above examples. Economic expert Dr. Hatzitaskos performed an empirical study of ████████



      \*      \*      \*

The Court need not rely on the market shares-based analysis—the elimination of head-to-head competition is itself an independent basis to grant a preliminary injunction.[152] *See United States v. Aetna Inc.*, 240 F. Supp. 3d at 43 (D.D.C. 2017) ("The government, however, has not rested on that presumption. Instead, it has introduced evidence tending to show that the merger would substantially lessen competition. 'Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition.'") (quoting *FTC v. Staples*,

---

[149] *See, e.g.*, PX1612 (IQVIA-FTC-003038954) (IQVIA ████████████████████████ █████████████"); PX1735 (IQVIA-FTC-000680528) (IQVIA ███████████████████████ █████); PX1309 (IQVIA-FTC-000924555) (IQVIA ██████████████████████████████ ██) ("████████████████").

[150] PX6500 (Hatzitaskos Report) ¶ 17, 154.

[151] PX1743-01 (IQVIA).

[152] ████████████████████████████████████████ X6500 (Hatzitaskos Report) ¶ 15. ████████████████████████████████████ PX6500 (Hatzitaskos Report) ¶ 18. ██████ PX0559 (███████████ Dep.) at 198:15-23.

190 F. Supp. 3d at 131 (D.D.C. 2016)); *Sysco* (collecting cases); *Mfrs. Hanover Tr.*, 240 F. Supp.

at 955 ("[T]he elimination of substantial competition previously existing between the parties to

this merger in the national market itself constitutes an unreasonable restraint of trade. . . violative

of § 7 of the Clayton Act.").

### 2.    The Proposed Acquisition is an Illegal Vertical Merger



[153] *-- IQVIA Ad Tech Partnerships Lead*

In addition to the loss of head-to-head competition between Lasso and DeepIntent, the

proposed acquisition would increase IQVIA's incentive to use its control over the supply of key

inputs for HCP programmatic advertising to disadvantage competitors of Lasso and

DeepIntent. Having just acquired nearly ▮ of the market for HCP programmatic advertising,

IQVIA stands to make more money if it favors Lasso and DeepIntent over rival DSPs. In this

way, the ability and enhanced incentive of IQVIA to foreclose or otherwise disadvantage

competitors post-acquisition creates a strong barrier to entry for companies aspiring to compete

in the market for HCP programmatic advertising.

When a company acquires another company to which it provides a key input, it is

referred to as a "vertical" merger. A vertical merger violates section 7 of the Clayton Act if it

increases barriers to entry or substantially lessens competition by foreclosing or disadvantaging

competitors of the downstream firm in the merger (i.e., DeepIntent) from access to a source of

supply (i.e., IQVIA's data), or from access to supply on competitive terms. *See, e.g., Fruehauf,*

603 F.2d at 352; *Yankees Ent.*, 224 F. Supp. 2d at 673. Here, IQVIA describes itself as "▮

" and without IQVIA data, ▮

---

[153] PX1032-01 (IQVIA).

[REDACTED] [154] Due to

IQVIA's data quality and ubiquity, customers would be unlikely to use a DSP that lacked access

to IQVIA's data.[155] Therefore, under both the *Brown Shoe* and "ability and incentive" tests for

vertical mergers, the proposed acquisition is illegal. Although the legal frameworks are applied

below, the Court does not need to take the FTC's word for it—[REDACTED]

[REDACTED] and concluded that it would "[REDACTED]

[REDACTED]

[REDACTED] [156] The analysis, one slide of which

appears below, illustrates how the consolidation would make competitors [REDACTED]

[REDACTED]

[REDACTED]



---

[154] PX1303-04 (IQVIA); *see also* PX0008-16 (IQVIA).

[155] PX0500 ([REDACTED]) IH) at 63:17-65:4; PX0568 ([REDACTED]) Dep.) at 141:14-142:19, 152:1-153:11; PX0502 ([REDACTED] IH) at 37:14-39:14; PX0570 ([REDACTED]) Dep.) at 141:15-146:12; PX0569 ([REDACTED]) Dep.) at 51:6–12 [REDACTED]
[REDACTED]"); PX0576 ([REDACTED] Dep.) at 145:15-146:8.

[156] PX2576-17 (DeepIntent); *see also* PX2517-02 (DeepIntent) ([REDACTED]
[REDACTED]

PX2831-031. DeepIntent was so enamored with the prospect of owning DMD's HCP data that it offered ███████████████████████████████████████████████████

██████████████████████████.[157] ████████████████████████████████████

███████████████████████████████████████ $████████. Lasso

saw the same value in DMD: Lasso's CEO expressed his desire to be "██████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████."[158]

### a. *IQVIA Data is a Critical Input to HCP Programmatic Advertising*

IQVIA possesses critical inputs for HCP programmatic advertising that no other market participant can match in terms of breadth and quality: (1) data identifying doctors and other HCPs, and (2) data on prescribing behaviors of individual HCPs.

**HCP Identity Data.** When IQVIA acquired DMD in 2021 following its acquisition of MDG in 2019, IQVIA controlled two of the main providers of HCP identity data, a key input for HCP programmatic advertising. DeepIntent's CEO wrote that IQVIA was now ████████████

█████████████████████████ because DMD and MDG were ███████████████████

████████████████████████████████[159] HCP identity

data is critical to HCP programmatic advertising because it allows DSPs in programmatic advertising to build audiences of HCPs and link those HCPs to digital devices for targeting. Comprehensive and current HCP identity data allows a DSP to target HCPs on an individualized

---

[157] PX0551 (Yang (DeepIntent) Dep.) at 12:1-13:14.
[158] PX1127-04 (IQVIA). During negotiations with IQVIA regarding an acquisition in ███████

████████████████ PX1586-01 (IQVIA); PX0538 (Field (IQVIA) Dep.) at 88:3-89:10.
[159] PX2575-01 (DeepIntent); PX0548 (Margolis (IQVIA) Dep.) at 255:4-8 (testifying that at the time of acquisition, DMD ████████████████████████████████████████████████████); PX0544

████████████ at 30:8-31:5 (█████████████████████████████████████████████████

████████.

(1:1) basis as opposed to relying on "cohorts," meaning aggregate groupings of individuals with similar characteristics.[160]

IQVIA acknowledges that it provides the ██████████████████████ ████████████████████████████████████████████████████ █████████████████████████ and its data is in fact superior to alternatives for multiple reasons.[161] Other industry participants likewise recognize that IQVIA is ██████████ █████████████████████████████████████████[162] First, every HCP has a unique, publicly available National Provider Identification (or NPI) number which DSPs try to link to other HCP identity data such as email addresses, to allow for individualized targeting of the HCPs. While generalist and fringe DSPs may try to match HCPs with their online identities (such as email addresses) using publicly available information, Defendants' proprietary NPI databases and IQVIA's HCP identity data allow them to reach much greater percentages of HCPs.[163] Defendants estimate that the publicly available NPI Registry ██████ █████████████████████████[164] Not only is IQVIA's data more accurate, but if an NPI number is unavailable, IQVIA can use other identifying criteria such as ████████████ ████████████████████████████[165] As a result, IQVIA's DMD and MDG data allow DSPs ████████████████████████████ in contrast to

[160] PX0008-08 (IQVIA); *see* PX0540 (DiNorscio (IQVIA) Dep.) at 27:14-28:4; PX0568 ████████████ Dep.) at 125:8-126:9; PX0576 (████████████ Dep.) at 26:1-4.
[161] PX1169-01 (IQVIA); PX0548 (Margolis (IQVIA) Dep.) at 241:18-242:3); PX1750-05 (IQVIA).
[162] PX0571 ████████████ Dep.) at 127:2-19.
[163] PX0520 (Werther (DeepIntent) IH) at 74:15-19 (████████████████████████████████████; PX0534 (Craigmyle (DeepIntent) Dep.) at 62:17-63:9 (████████████████████████████████████); PX0549 (Colarossi (IQVIA) Dep.) at 52:12-54:4 (discussing ████████████ ██████████); *see also* PX1626-01 (IQVIA); PX2860-05 (DeepIntent).
[164] PX1032-03 (IQVIA); PX1351-08 (IQVIA); PX0572 ████████████ Dep.) at 87:20-25, 76:22-25.
[165] PX2965-04 (DeepIntent).

alternatives, which provide substantially lower match rates.[166] For that reason, the majority of

HCP campaigns are based on the customer's use of IQVIA client list data.[167] DSPs cannot obtain

and target a customer's HCP client list based on IQVIA data without IQVIA's approval.[168]

Second, to compete effectively in the HCP programmatic advertising market, competitors

must use "opted-in" data, or data from HCPs that have consented to be targeted.[169] IQVIA

describes its HCP identity data as ███████████████████████████████████████████

███████████████████████████████████████ [170] In comparison, IQVIA claims that

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ [171] First-party user data also enables DSPs to

---

[166] *Compare* PX2800-04 (DeepIntent) ███████████████████████████████████
████████████████████████████████ ); *and* PX2919-10 ████████████████
██████████████████████████████████ ; *and* PX0540 (DiNorscio (IQVIA) Dep.) at 155:3-19
( ██████████████████████████████████████████████████████ ) *with* PX0572 ███
████████████████████████ at 41:2-6 ███████████████████████████
███████████ ).

[167] PX0568 ███████████████████ Dep.) at 69:3-22, 148:8-149:8; PX0534 (Craigmyle (DeepIntent) Dep.) at 101:22-
103:12; PX0576 ███████████ Dep.) at 145:15-146:8.
[168] PX4108-03-04 ███████████ ; PX0533 (Fisher (IQVIA) Dep.) at 32:22-33:5; 37:3-12.
[169] *See e.g.*, PX0500 ████████████████████ at 23:10-18, 45:17-46:10); PX0568 ███████████████████████ at
123:16-124:15; PX0570 ███████████████████████ at 67:12-69:25 ███████████████████████████
███████████████████████████████ ; PX0555 ████████████████████ at 33:18-20; PX0534
(Craigmyle (DeepIntent) Dep.) at 85:5-11, 85:22-86:7; PX0576 ███████████████████ at 149:21-150:10.
[170] PX1032-01 (IQVIA); PX1584-02 (IQVIA); *see also* PX1170-05 (IQVIA); PX0539 (O'Brien (IQVIA) Dep.) at
49:17-50:8; PX0549 (Colarossi (IQVIA) Dep.) at 56:17-57:4.
[171] PX1032-01 (IQVIA); *see also* PX0548 (Margolis (IQVIA) Dep.) at 271:18-272:17 ( ███████████████████
██████████████████████ ); PX0555 ██████████████ at 33:18-24; PX0567 ███████████████
███████████ at 35:19-36:4; PX0574 ████████████████ at 106:16-107:3 ( ███████████████████
█████████████████████████ ); PX1355-01 (IQVIA) ███████████████████████████████████████
████████████████████████████ ).

"future proof" their offering. The phasing out of third-party cookies by Google and other entities will make it more difficult to link HCPs with their digital identities without first-party data.[172]

**HCP Prescribing Data.** HCP prescribing data is critical to HCP programmatic advertising campaigns because it facilitates audience building and measurement of campaign outcomes.[173] HCP prescribing data allows DSPs or advertisers to identify HCPs based on actual prescribing behavior and then link the list of target NPI numbers to their online identities through HCP identity data for targeting during the advertising campaign. IQVIA's identity and prescribing data is commonly described as the "████████,"[174] and Defendants acknowledge that IQVIA's HCP prescribing data is unmatched in depth and breadth.[175] While firms such as ██████ or ████████ provide prescription measurement data, ██████████████████ ████████████████████ (substituting projections for actual measurement) and, unlike IQVIA data, are not available in near-real-time.[176] Given these advantages of IQVIA's data over alternatives, it is unsurprising that nearly every would-be competitor has testified that they need IQVIA's data to compete effectively in HCP programmatic advertising going forward.[177] In fact,

---

[172] PX0568 ████████████ at 124:16-126:9; PX0548 ████████████ at 259:9-18; PX0008-25 (IQVIA); PX0576 ████████████ Dep.) at 115:3-21; PX1236-09 (IQVIA).▉

[173] *See, e.g.,* PX0501 ████████████ at 47:16-48:8; PX0514 ████████████ at 20:7–21:22; PX0557 ██████ at 100:11-101:20; PX0535 (Mangano (DeepIntent) Dep.) at 54:4-55:22; PX0576 ████████ Dep.) at 133:7-135:16.

[174] *See, e.g.,* PX4164-11 (DeepIntent); PX1739-02 (IQVIA); PX1740-03 (DeepIntent); PX1741-05 (IQVIA); PX1170-05 (IQVIA); PX0531 (Klein (DeepIntent) Dep.) at 29:5-20; PX2788-03 (IQVIA); PX0542 ████████ at 103:15-104:5.

[175] PX1131-03 (IQVIA) ████████████████████████████████████████████████ ████████████████████████████████████████████████████ .

[176] PX0576 (████████████ ) Dep.) at 138:18-140:14; *see, e.g.,* PX2800-02, -04 (DeepIntent); PX0552 (Resnick (IQVIA) Dep.) at 270:22-272:18; PX0535 (Mangano (DeepIntent) Dep.) at 37:13-38:13; PX0548 (Margolis (IQVIA) Dep.) at 145:20-146:15; PX0572 (████████████ at 94:3-11; PX0569 ████████ at 82:10-83:2; PX0574 ████████████ at 108:4-20.

[177] PX0501 ████████████ at 35:23-36:3; PX0565 ████████████ at 259:3-260:6);PX0502 ████████████ at 59:22-60:12; PX0570 ████████████ at 141:15-144:20; PX0561 ████████████ at 55:3-57:7; PX0542 ████████████ at 103:15-105:21; see also PX6020 ¶ 6 (████████ Decl.).
*See* PX1592-01 (IQVIA).

even ███████ testified that if it lacked access to IQVIA data, ████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████ and estimated that it would ████████

██████████████████.[178] ████ emphasized the importance of ████████████████

████████████████████████████████████████████████████████████[179]

### b.  Supreme Court Brown Shoe Framework

The Supreme Court set forth a multifactor analysis in *Brown Shoe* for determining

whether a vertical merger may lessen competition. *Brown Shoe*, 370 U.S. at 321-22; *Fruehauf*,

603 F.2d at 353 (*Brown Shoe* factors should be assessed "as they exist for the particular merger

in issue."). Here, multiple factors demonstrate the probable illegality of the proposed acquisition.

*Share of the market foreclosure.* In evaluating a vertical merger, "[i]f the share of the

market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of

course, have been violated . . . ." *Brown Shoe*, 370 U.S. at 328; *see also United States v. Sybron

Corp.*, 329 F. Supp. 919, 928-29 (E.D. Pa. 1971) (observing that even when "absolute

foreclosure" would not be likely, "there are many more subtle avenues available"). ██████

████████████████████████████████████████████████████████████████

██ ██████████████████████████████████████████████████████████████

██████████████.[181] Nearly every would-be competitor testified that they would be unable to

---

[178] PX0500 ████████████████ at 63:17-65:4; PX0568 ████████████████████ at 141:14-142:19, 152:1-153:11.

[179] PX0563 (████████ Dep.) at 73:19-75:11; *see also supra* n.28.

[180] *See* PX0519 (Whiting (IQVIA) IH) at 71:21-72:1; PX2957-02 (PMI); PX0535 (Mangano (DeepIntent) Dep.) at 54:18-55:3; PX2958-09 (PMI); PX0568 (████████████) Dep.) at 69:3-22, 138:12-140:10, 148:21-149:8, 152:1-153:11; PX0538 (Field (IQVIA) Dep.) at 92:4-20.

[181] PX0570 (████████ Dep.) at 152:13-53:5; PX0542 (██████████ Dep.) at 104:20-105:21; PX0561 (████████████ Dep.) at 35:1-10, 57:14-61:5) PX0565 (██████████ Dep.) at 259:3-260:6; *see also* PX0010 ¶ 5 (████████) Decl.) ("████████████████████████████████ ."). Even among those DSPs who

compete effectively without this IQVIA data.[182] 

. [183]

. [184] If

IQVIA were to withhold access to its data, it could foreclose a substantial share of the market.

*Nature and economic purpose of the transaction.* As discussed *supra* § II.C, the proposed

acquisition is merely IQVIA's latest step in its ███████████████████ [185] The

purpose of acquiring DeepIntent along with Lasso is clear: ███████████████████

███████████████████"[186]

*Degree of market power possessed by the merged firm.* The Second Circuit in *Fruehauf*

identified the degree of market power that would be possessed by the merged enterprise, and the

number and strength of competing suppliers and purchasers, as factors that influence the analysis

of a vertical merger. 603 F.2d at 353. At the downstream level, IQVIA already acquired Lasso

and now seeks to acquire one of the other two remaining large players, ███████████████

███████████. This raises the risk that the market for HCP programmatic advertising would

"cease to be competitive." *See Fruehauf*, 603 F.2d at 353.

---

purchase data from multiple providers, ███████████████. PX4024
(███████████) (███████████); PX6008 ¶ 6
███).
[182] PX0501 (███████████ IH) at 35:23-36:3; PX0542 (███████████ Dep.) at 104:20-
105:21; PX0565 (███████████ IH) at 59:22-
60:12; PX0570 (███████████ Dep.) at 139:20-44:20; PX0568 (███████████ Dep) at 141:14-
142:19, 152:1-153:11, 157:15-159:21; PX0561 ███████████ Dep.) at 156:1-20;
[183] PX0500 (███████████) IH) at 63:17-65:4; PX0568 (███████████) Dep.) at 141:14-142:19, 152:1-
153:11.
[184] PX2525 (DeepIntent) (███████████); *see also* PX6500-166–67 (Hatzitaskos Report) ¶ 367c.
[185] PX1377-01 (IQVIA).
[186] PX1026-01 (IQVIA).

*Entry barriers.* The presence of entry barriers weighs in favor of blocking a vertical merger. *Fruehauf*, 605 F.2d at 353 (including capital costs and scale economies among the barriers to be considered); *U.S. Steel Corp. v. U.S.*, 426 F.2d 592, 605 (6th Cir. 1970) (barriers can include "possible reliance on suppliers from a vertically integrated firm with whom [entrants are] also competing"); *see also Ford Motor Co. v. United States*, 405 U.S. 562 at 568-71 (1972). Substantial entry barriers already exist in the HCP programmatic advertising market, *see infra* § III.A.3.a, and nearly every would-be competitor testified that they need IQVIA's data to compete in HCP programmatic advertising, *see supra* § III.A.2.a. Even combining just IQVIA's DMD data with DeepIntent would (per DeepIntent's CEO) ████████████████████

███████████████████████████████████████████████████████████████████████

████████████[187]

### c.   *Ability and Incentive to Disadvantage DeepIntent's Rivals*

Some courts have considered whether the combined firm will have an ability and incentive to disadvantage rivals as a result of the merger, a framework which "interrelate[s] closely" with the *Brown Shoe* factors, as the latter "provide direct insight into the ability and incentive of the merged firm to harm rivals." *In re Illumina, Inc.,* No. 9401, 2023 WL 2823393, at *33 (F.T.C. Mar. 31, 2023); *see also AT&T*, 310 F. Supp. 3d at 250-52.

### i.   IQVIA's Ability to Harm DeepIntent's Rivals

All three primary competitors in HCP programmatic advertising rely on IQVIA's HCP identity data and/or HCP prescribing data, as do all meaningful rivals, and the rivals have all testified that substantial business would be at risk if IQVIA foreclosed or disadvantaged their access to IQVIA's data.[188] IQVIA already has a mechanism in place to foreclose or disadvantage

---

[187] PX2579-03 (DeepIntent); *see also* PX1252-06 (IQVIA).
[188] *See supra* § III.A.2.a.

even those competitors who do not purchase HCP data directly from IQVIA. A pharmaceutical customer will often want to use IQVIA data that the customer has already licensed—and may have used to generate an initial list of target HCPs—to perform HCP programmatic advertising.[189] In these situations, the DSP must seek a license from IQVIA pursuant to its Third-Party Access ("TPA") program in order to use the customer's IQVIA data to help run the HCP programmatic advertising campaign.[190] ███████████████████████████

███████████████████████████████████████████████████████████

████████████████████[191] As one internal IQVIA discussion revealed, █████████████

████████████████████████████████████████████████████████[192]

IQVIA need not engage in total foreclosure—i.e., completely deny access to its data—in order to effectively disadvantage rivals.[193] *See Yankees Ent.*, 224 F. Supp. 2d at 673; *Sybron Corp.*, 329 F. Supp. at 928-29. For example, given that TPAs may be granted on a case-by-case basis, IQVIA could use its preexisting TPA approval process to selectively deny TPAs to competitors on specific opportunities where DeepIntent or Lasso is a front-runner (or incumbent)

---

[189] PX0568 (████████████ Dep.) at 148:21–149:8; PX0522 (Escalante (IQVIA) IH) at 117:5–118:3; *see also* PX0505 (Paquette (DeepIntent) IH) at 107:1–109:4.

[190] *See, e.g.*, PX5042-01 (IQVIA, Third-Party Access Program, https://www.iqvia.com/about-us/third-party-access-program); PX0542 (████████████████ Dep.) at 104:19–105:21; PX0533 (Fisher (IQVIA) Dep.) at 85:1–9 (acknowledging that ████████████████. Additionally, ██████████████████████████████████████████████ PX0533 (Fisher (IQVIA) Dep.) at 111:5–115:17; *see also* PX4108-03 (████████).

[191] PX1379-01 (IQVIA) (███████████████████████████████); PX0533 (Fisher (IQVIA) Dep.) at 134:1-21.

[192] PX1295-01 (IQVIA); *see also* PX1344-02 (IQVIA) ████████████████████████; PX1736 (IQVIA) ███████████████████████); PX0515 (████████████) IH) at 53:23–55:10 (████████████████████████); PX0576 (████████████ Dep.) at 176:6–180:16; PX0573 (████████ Dep.) at 25:22–26:3 (████████████).

[193] As an illustration, Dr. Hatzitaskos's report finds that the merged firm ████████████████████. For example, ██████████████████████████████████████████████. *See* PX6500 ████████████████████ (Hatzitaskos Report) § 4.3.4.

for HCP programmatic advertising business.[194] Because time-sensitive RFPs typically request information about the firm's data sources, IQVIA could thwart rivals *simply by delaying* the granting of TPAs.[195] IQVIA could also ████████████████████████████████████ ████████████, which can account for ███████████████████ of the ██████████████████ ███████████.[196] In fact, it is not uncommon for a DSP participating in a competitive RFP to ask IQVIA to lower its contracted data prices for specific opportunities to help the DSP win the business.[197] Post merger, IQVIA could thus selectively disadvantage DeepIntent's rivals by refusing to make such concessions in order to drive the business to Lasso or DeepIntent.

### ii. IQVIA's Incentive to Harm DeepIntent's Rivals

The proposed acquisition greatly increases IQVIA's incentive to disadvantage its rivals by "████████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████."[198] Empirical analysis shows that the ████████████████████████████████████████████ ████████████████ would be ████████████████████████ ████████████████████████████████████, making ██████████ ██████████.[199] Specifically, ████████████████████████████ ████████████████████████████████████████████████



[194] *See, e.g.*, PX0576 (██████████████) Dep.) at 176:6-179:9.
[195] *See, e.g.*, PX0576 (██████████████) Dep.) at 179:10-180:16.
[196] PX6500 (Hatzitaskos Report) ¶ 335; PX0565 (██████████████████ Dep.) at 197:2–202:2 (discussing PX4086 (IQVIA), where ██████████████ was seeking a ██████████████).
[197] PX2509-01 ████████████████████████████████████████████████ ████); PX2510-01 ██████████████
[198] PX6500 (Hatzitaskos Report) ¶ 361.
[199] PX6500 (Hatzitaskos Report) ¶ 360 (calculating ██████████████████████████).

████ .[200] Those figures are consistent with IQVIA's stated strategy of "████

████" of the market through the proposed acquisition.[201]

### 3. Defendants Cannot Rebut the Strong *Prima Facie* Case

Having established multiple *prima facie* bases for the illegality of the proposed

acquisition, "[t]he burden of producing evidence to rebut [the *prima facie* case] then shifts to the

defendant." *Baker Hughes*, 908 F.2d at 982. To meet their burden, Defendants must demonstrate

that expansion of existing firms or entry by new firms will be "timely, likely, and sufficient in its

magnitude, character, and scope to deter or counteract the competitive effects" of the proposed

acquisition. *FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019) (citing *Horizontal Merger*

*Guidelines* § 9). Although Defendants' burden, the FTC briefly addresses these defenses

below—the evidence is overwhelming that neither entry nor efficiencies can offset the massive

competitive harm.[202]

#### a. *Entry and Expansion*

##### i. Significant Barriers to Entry and Expansion

IQVIA is willing to spend ████████ to acquire both Lasso and DeepIntent and

gain control of ████████ HCP programmatic advertising market. If entry or expansion

were likely to threaten this market share, this ████ investment makes little sense. But

Defendants recognize that substantial barriers make successful entry into the HCP programmatic

advertising market difficult, and that fact underlies IQVIA's rationale for the acquisitions.[203]

---

[200] PX6500 (Hatzitaskos Report) ¶ 349.
[201] PX1377-01 (IQVIA).
[202] Defendants also attempt to distract from the merits by tossing together a grab-bag of constitutional challenges as affirmative defenses. *See* Def. IQVIA's Answer at 18–20 (¶¶10–15), Affirmative Defenses Nos. 10–15, ECF No. 58; Def. PMI's Answer at 28–29 (¶¶ 10–14), Affirmative Defenses Nos. 10–14, ECF No. 72. As detailed in Plaintiff's Motion to Strike, ECF No. 147, the Court need not today decide these constitutional issues, which are irrelevant to the narrow inquiry under Section 13(b) of whether to grant preliminary relief.
[203] *See, e.g.,* PX2581-24 (PMI); PX1128-12 (IQVIA).

Internal Lasso documents state that its 

[204] DeepIntent similarly observed that the ███████████████████████ [205] citing, among other factors, the ███████████ ███████████████████████████████████████. [206]

Of course, the preeminent entry barrier which will be created by the proposed acquisition is the need for any entrants to access the data of a competitor: IQVIA. *See supra* § III.A.2.a (discussing importance of IQVIA data to HCP programmatic advertising). DeepIntent reasoned that the combination of IQVIA's DMD data with DeepIntent ████████████████████████ ███████████████████████████████████████████

███████████ [207] And it is not remotely plausible for an entrant to develop its own alternative to IQVIA's data: IQVIA's unrivaled healthcare data collection "would be difficult and costly for another party to replicate," according to the company's annual report,[208] and IQVIA estimated that ███████████████████████████████████████████████ [209]

The history of failed entry into the HCP programmatic advertising market confirms the high barriers and shows why Defendants' claims regarding entry amount to no more than

[204] PX1128-12 (IQVIA); *see also* PX1584-03 (IQVIA).
[205] PX2504-18 (DeepIntent).
[206] PX2581-24 (DeepIntent).
[207] PX2696-17 (DeepIntent); *see also* PX2580-08 (DeepIntent) ███████████ ████).
[208] PX1137-05 (IQVIA 2022 10-K).
[209] PX1129-03 (IQVIA) (emphasis added); *see also* PX1583-01 (IQVIA) ███████████ ████); PX1715-01 (IQVIA) (████████████████████████████); PX0548 (Margolis (IQVIA) Dep.) at 248:4–20. ████████ testified that it has spent ████████████████ and that █████████ may cost ███████. *See* PX0515 (███████████████ ) IH) at 21:10–22:12; PX0576 (███████████ ) Dep.) at 138:18-144:5.

speculation. *See, e.g.*, *Anthem*, 236 F. Supp. 3d at 222–24 (examining the "inability of new firms

to gain traction" to assess "how difficult it is for new entrants to 'compete on the same playing

field' as the merged firm") (citations omitted); *see also Cardinal Health,* 12 F. Supp. 2d. at 57



(focusing on history of entry). ▮▮▮, a media company, spent ▮▮▮▮▮

▮▮, but ▮▮▮▮▮▮ because ▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮ [210] ▮▮▮ was a DSP that operated in the healthcare

vertical; but like ▮▮▮▮ has also exited—in its case via bankruptcy.[211]

### ii. Market Participants Confirm Neither Entry Nor Expansion Will Be Timely, Likely, and Sufficient

Testimony and documents—including from the very firms whom Defendants speculate

may enter—confirm that these firms lack the plans and/or capabilities to enter and/or expand in a

sufficient and timely manner to offset the significant competitive harm which will result from the

proposed acquisition. Aside from Lasso, DeepIntent, and ▮▮▮, other current market

participants, including "generalist" DSPs, are unlikely to enter or expand in a timely and

sufficient manner to counteract the competitive harm from the proposed acquisition.



For example, generalist DSPs, ▮▮▮▮▮

▮▮▮▮▮▮.[212] Even less likely to

enter to offer sufficiently competitive HCP programmatic advertising services are data

connectivity providers like ▮▮▮ which simply function as ▮▮▮▮

▮▮▮▮.[213]

---

[210] PX0511 (▮▮▮ IH) at 44:13–45:12.
[211] *See* PX4170 (▮▮▮▮).
[212] PX0009 ¶¶ 3–5 (▮▮▮ Decl.); PX0010 ¶¶ 2–4 (▮▮▮ Decl.); PX0007 ¶¶ 6–7 (▮▮▮▮, Decl.); PX0550 (▮▮ Dep.) at 96:21–97:4; *id.* at 91:15–92:3.
[213] PX0571 (▮▮▮ Dep.) at 123:6-14; *id.* at 152:23-154:5.

Similarly, current market participants (aside from Defendants and ███████) have inferior capabilities, minimal competitive significance, and are unlikely to expand in a timely and sufficient manner. For example, the next largest competitor, ████████████████

████████████████████████████████████████████████████████████████

███████████[214]██████████████████████████████████████████████████

██████████████████████████████████████[215] According to multiple advertising agencies, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████[216]

The next-largest market participant, ██████████████████████████████

████████████████████████████████████████████████████████████████

██[217] Despite ██████████████████████████████████████████████████

█████████[218]████████████████████████████████████████████████████

███████████████████████[219] Unlike Defendants, █████████████████████

███████████[220] and ████████████████████████████████████████████

██████████████████████████[221] Although ████████████████████████████

---

[214] PX0514 (████████ IH) at 27:13-20; PX6500 (Hatzitaskos Report) Ex. 13.
[215] *See* PX0514 (████ IH) at 17:5-7; PX0557 (████████ Dep.) at 92:11-93:4, 100:11-102:1.
[216] PX0506 (████ IH) at 29:15-31:14, 36:17-37:15; PX4047 (████); PX4044 (████████) (2022 RFP, ████████); *see also* PX2732-01 (PMI); PX4042 (████████); PX2733-01 (DeepIntent); PX2767-04 (DeepIntent); *see also* PX0524 (Sherry (DeepIntent) Dep.) at 83:5-84:15; PX0526 (Sandler (DeepIntent) Dep.) at 65:7-66:4.
[217] PX0570 (████████ Dep.) at 88:4-89:21.
[218] PX0570 (████████ Dep.) at 88:4-89:21.
[219] PX6500 (Hatzitaskos Report) Ex. 13.
[220] PX0502 (████████ IH) at 35:10-13; PX0570 (████████ Dep.) at 109:6-10.
[221] PX1431-003 (IQVIA).



[223] In fact,

[224]

Likewise, generalist DSP

[225]

[226] and in the view of one ad agency, they are

[227] The remaining fringe possess *de minimis* market shares and similarly lack key capabilities of the Defendants.[228] Given these significant differences, it is unsurprising that the pharmaceutical marketers that have evaluated fringe competitors have found them lacking in comparison and rely predominantly on Lasso, DeepIntent, and        for their HCP programmatic advertising needs.[229]

---

[222] PX6500 (Hatzitaskos Report) ¶ 467; *see also id.* at Ex. 13 (                    ).
[223] PX0542 (            Dep.) at 93:20-94:2, 101:2-102:8).
                    PX6006 ¶ 9 (                Decl.).
[224] *See* PX0507 (                    ) IH) at 14:3-11, 21:11-23:12.
[225] PX0565 (            ) Dep.) at 140:3-142:16.
[226] PX6500-200 (Hatzitaskos Report) ¶ 469.
[227] PX0506 (            ) IH) at 33:17-34:5.
[228] For example,
                        PX2808-004 (DeepIntent). In particular,
PX0506 (            ) IH) at 38:3-39:7.
                            PX6008 (            ), Decl.) ¶ 2.
            and                        . PX1260-01-02
(IQVIA).
[229] *See, e.g.,* PX0503 (            IH) at 26:25-27:4, 29:13-24; PX0558 (                ) Dep.) at 88:14-25,
91:5-16; PX0555 (            ) Dep.) at 27:7-28:13; PX6006 ¶¶ 6–7 (                ), Decl.); *see also*
PX0559 (            ) Dep.) at 130:7-135:2, 143:11-144:14.

      *b.*  *Efficiencies*

Defendants offer a blanket assertion that the proposed acquisition "will result in substantial efficiencies,"[230] but no court has held that efficiencies claims could immunize an otherwise anticompetitive merger. *See Penn State Hershey Med. Ctr.*, 838 F.3d at 347-48; *FTC v. Advoc. Health Care*, 2017 WL 1022015, at *12 (N.D. Ill. Mar. 16, 2017) (explaining that an efficiencies "defense has never been sanctioned by the Supreme Court"). Even assuming the efficiencies defense is cognizable under the Clayton Act, Defendants fall far short of demonstrating that their asserted efficiency claims are "verif[iable] by reasonable means the likelihood and magnitude of each asserted efficiency," *H&R Block*, 833 F. Supp. 2d 36 at 89, as Defendants' executives have admitted that their efficiency claims amount to little more than speculation.[231]

## B.   THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

Although the second step in determining whether to grant preliminary relief involves consideration of the equities, *Lancaster*, 434 F. Supp. at 1096, "[n]o court has denied relief to the FTC in a [Section] 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits." *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at *60 (N.D. Ohio Mar. 29, 2011). "The equities to be weighed are not, however, the usual equities of private litigation" but public equities. *FTC. v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976); *see also FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 75-76 (D.D.C. 2009) (citing

---

[230] Def. IQVIA's Answer at 18 (¶ 6), Affirmative Defense No. 6, ECF No. 58; Def. PMI's Answer at 27 (¶ 6), Affirmative Defense No. 6, ECF No. 72.

[231] PX0548 (Margolis (IQVIA) Dep.) at 48:14-50:19, 51:18-52:6, 60:11-61:24, 69:14-70:9, 88:13-90:8, 116:10-15 ▮▮▮▮▮; PX0525 (Sachs (IQVIA) Dep.) at 25:15-22) ▮▮▮▮▮; PX0530 (Lin (IQVIA) Dep.) at 170:3-8 ▮▮▮▮▮; PX0510 (Rice (IQVIA) Dep.) at 101:22-102:1 ( ▮▮▮▮▮ ).

*FTC v. Whole Foods Mkt. Inc.*, 548 F.3d at 1028, 1041 (D.C. Cir. 2008)) ("Only 'public equities' that benefit consumers can override the FTC's showing of serious questions on the merits.").

The paramount public equity favoring injunctive relief is the "public interest in effective enforcement of the antitrust laws," *Heinz*, 246 F.3d at 726, as congressional concern for antitrust enforcement was the genesis of Section 13(b). *Whole Foods*, 548 F.3d at 1035 (*citing Heinz,* 246 F.3d at 726). Allowing this merger to close before the administrative proceeding is completed would cause immediate harm. IQVIA would be free to "scramble the eggs" by integrating DeepIntent, accessing all of DeepIntent's sensitive trade secrets and business information, laying off employees, and approaching customers as a unified dominant provider. Any harm that customers suffer in the interim would be irreversible. The inherent difficulties of divesting integrated assets after a merger has been consummated also weigh in favor of injunctive relief. *Whole Foods*, 548 F.3d at 1034; *accord FTC v. Dean Foods Co.*, 384 U.S. 597, 606 n.5 (1966). Without preliminary relief, "[i]f the acquisition is allowed to proceed but is later found to be violative of the antitrust laws, divestiture will be required. At best, divestiture is a slow, cumbersome, difficult, disruptive and complex remedy." *Lancaster*, 434 F. Supp. at 1096.

In contrast, Defendants can claim only private harm from delaying consummation of the merger. But a "'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction." *Whole Foods*, 548 F.3d at 1041 (citing *Heinz*, 246 F.3d at 726). To protect interim competition and preserve the Commission's ability to order effective relief, the equities strongly favor preliminary relief.

## IV.   CONCLUSION

For the reasons described above, the Commission respectfully requests that the Court grant a preliminary injunction.

Dated: October 25, 2023              Respectfully submitted,

*/s/ Jennifer Fleury*

Jennifer Fleury
Jordan Andrew
Stephanie Bovee
Habin Chung
Lisa DeMarchi Sleigh
Yan Gao
Cory Gordon
Christopher Lamar
Wade Lippard
Jessica Moy
Christina Perez
Michelle Seo
Varnitha Siva
Anjelica Sarmiento
Jay Tymkovich
Lily Verbeck

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
jfleury@ftc.gov
Tel: (202) 326-3805

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 25, 2023, I electronically filed a true and correct copy of the foregoing document using the United States District Court for the Southern District of New York CM/ECF System.

I FURTHER CERTIFY that I served the foregoing document on the following counsel via FTP:

Chantale Fiebig
Mark A. Perry
Joshua M. Wesneski
Weil, Gotshal & Manges LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Tel: (202) 682-7200
chantale.fiebig@weil.com
mark.perry@weil.com
joshua.wesneski@weil.com

Kenneth Reinker
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Tel: (202) 974-1500
kreinker@cgsh.com

Rahul Mukhi
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000
rmukhi@cgsh.com

*Counsel for IQVIA Holdings Inc.*

Alexander P. Okuliar
Morrison & Foerster LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Tel: (202) 887-1500
aokuliar@mofo.com

David J. Fioccola
Michael B. Miller
Mika M. Fitzgerald
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
dfioccola@mofo.com
mbmiller@mofo.com
mfitzgerald@mofo.com

*Counsel for Propel Media, Inc.*

/s/ Jennifer Fleury
_____
JENNIFER FLEURY
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: 202-725-3805
Email: jfleury@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*