**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

*Plaintiff*,

v.

IQVIA HOLDINGS, INC.; and PROPEL
MEDIA, INC.,

*Defendants.*

Case No. 1:23-cv-06188-ER

**BRIEF OF THE CHAMBER OF COMMERCE**
**OF THE UNITED STATES OF AMERICA**
**AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS AND DENIAL OF THE**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. iii

Interest of Amicus Curiae ......................................................................................................... 1

Introduction ............................................................................................................................... 2

Argument .................................................................................................................................... 2

    I.     Vertical mergers are presumptively procompetitive and beneficial to consumers, and thus lawful. ................................................................................................................. 3

    II.    The government must present real-world evidence of harm and cannot use shortcuts or mere possibilities to establish the *prima facie* case in vertical merger challenges. ............. 8

        A.    The government cannot use "shortcuts" in vertical merger cases. ........................ 10

        B.    The government cannot use mere possibilities of harm to block a vertical merger. ................................................................................................................. 12

        C.    The government must present real-world evidence of harm. ........................... 13

    III.   The government will fail to carry its burden in most vertical merger cases. ..................... 15

Conclusion ............................................................................................................................... 17

Certificate of Service .............................................................................................................. 17

# TABLE OF AUTHORITIES

## Cases

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.,*
 826 F.2d 1235 (3d Cir. 1987) ................................................................................................. 5

*Brown Shoe Co. v. United States,*
 370 U.S. 294 (1962) ........................................................................................................... 4, 5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
 429 U.S. 477 (1977) ............................................................................................................... 5

*Comcast Cable Comm'cns, LLC v. FCC,*
 717 F.3d 982 (D.C. Cir. 2013) ............................................................................................... 7

*Continental T.V., Inc. v. GTE Sylvania Inc.,*
 433 U.S. 36 (1977) ................................................................................................................. 4

*Fruehauf Corp. v. FTC,*
 603 F.2d 345 (2d Cir. 1979) ..................................................... 2, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14

*FTC v. Elders Grain, Inc.,*
 868 F.2d 901 (7th Cir. 1989) ................................................................................................. 8

*FTC v. Exxon Corp.,*
 636 F.2d 1336 (D.C. Cir. 1980) ............................................................................................. 3

*FTC v. HJ Heinz Co.,*
 246 F.3d 708 (D.C. Cir. 2001) ............................................................................................... 9

*FTC v. Microsoft, Corp.,*
 2023 WL 443412 (N.D. Cal. July 10) ........................................... 2, 6, 8, 10, 12, 13, 14, 15

*FTC v. Whole Foods Mkt., Inc.,*
 548 F.3d 1028 (D.C. Cir. 2008) ........................................................................................... 13

*In re AMR Corp.,*
 2023 WL 2563897 (2d Cir. Mar. 20) ........................................................................ 5, 11, 15

*In re Illumina,*
 2023 WL 2946896 (FTC Apr. 3) .......................................................................................... 10

*It's My Party, Inc. v. Live Nation, Inc.,*
 811 F.3d 676 (4th Cir. 2016) ......................................................................................... 7, 17

*Mercantile Tex. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.,*
 638 F.2d 1255 (5th Cir. 1981) ...................................................................................... 12, 13

*Nat'l Fuel Gas Supply Corp. v. FERC,*
 468 F.3d 831 (D.C. Cir. 2006) ............................................................................................... 5

*United States v. AT&T, Inc.,*
 310 F. Supp. 3d 161 (D.D.C. 2018) ...................................... 3, 8, 9, 10, 12, 13, 14, 15

*United States v. AT&T, Inc.,*
 916 F.3d 1029 (D.C. Cir. 2019) ................................... 2, 3, 7, 8, 9, 10, 11, 12, 14, 16

*United States v. Baker Hughes, Inc.,*
   908 F.2d 981 (D.C. Cir. 1990) ........................................................................... 9, 16

*United States v. Gen. Dynamics Corp.,*
   415 U.S. 486 (1974) ..............................................................................................15

*United States v. Phila. Nat'l Bank,*
   374 U.S. 321 (1963) ..............................................................................................17

*United States v. UnitedHealth Grp. Inc.,*
   2022 WL 4365867 (D.D.C. Sept. 21) .............................. 2, 6, 8, 9, 10, 11, 12, 14

*Winter v. NRDC,*
   555 U.S. 7 (2008) ...................................................................................................2

## Statutes

15 U.S.C. § 18 .................................................................................................................3, 8

15 U.S.C. § 53(b) ...............................................................................................................3

## Other Authorities

Areeda & Hovenkamp, *Antitrust Law* ...............................................................................10

Blair et al., *Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies*, 27 Geo. Mason L. Rev. 761 (2020) ........................................ 4, 5, 6, 9, 12, 13, 14, 16

Bork, *The Antitrust Paradox: A Policy at War With Itself* (Bork Publishing 2021) ............................ 4, 6, 11

Carl Shapiro, *Antitrust in a Time of Populism*, 61 Int'l J. Indus. Org. 714 (2018) ...........................16

Chen & Hylton, *Procompetitive Theories of Vertical Control*, 50 Hastings L.J. 573 (1999) ............................5

DOJ, 1984 Merger Guidelines ................................................................................... 7, 10

FTC & DOJ, 2020 Vertical Merger Guidelines ...........................................................3, 8

Ginsburg et al., *The Federal Trade Commission's Hearings on Competition and Consumer Protection in the 21st Century, Vertical Mergers*, Geo. Mason Univ. (Sept. 6, 2018) ........................ 11, 16

Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67 (1991) ........7

Hoffman, *Vertical Merger Enforcement at the FTC* (Jan. 10, 2018) ........................................ 8, 12

Hovenkamp, *Competitive Harm from Vertical Mergers* (2020) ........................................... 4, 11

Keyte, *The AT&T/Time Warner Decision: More Than Meets The Eye*, 33 Antitrust 20 (Summer 2019) 6, 7

Ossorio, Note, *Drawing the Line: Refining the Baker Hughes Burden-Shifting Framework for Vertical Mergers*, 73 Fla. L. Rev. 199 (2021) ...............................................................................16

Roundtable on Vertical Mergers, *Note by the Delegation of the United States to the OECD* (Feb. 15, 2007) ........................................................................................................... 7, 17

Sokol, *Vertical Mergers and Entrepreneurial Exit*, 70 Fla. L. Rev. 1357 (2018) ...........................16

Wrobel, *Spotlight on U.S. Vertical Merger Enforcement: Burden of Proof and Revised Enforcement Guidelines*, 33 Antitrust 3 (2019) ...............................................................................16

## INTEREST OF AMICUS CURIAE[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber has a significant interest in preventing the government from adopting a novel and unlawfully aggressive approach to vertical mergers, which—if embraced by this Court—would greatly undermine countless transactions that benefit consumers. The Chamber is very familiar with the issues in this case. The Chamber has repeatedly called attention to the Federal Trade Commission's legally dubious approach to vertical mergers. *See, e.g.*, Heather, *The FTC's Objection to Microsoft-Activision Merger: A Bridge Too Far, Even for Europe*, Chamber of Com. (June 13, 2023), bit.ly/3G79Ivb; Heather, *The FTC's Latest Merger Misadventure*, Chamber of Com. (May 30, 2023) (the Amgen-Horizon Therapeutics merger), bit.ly/3QLTtJN; Heather, *Inside the FTC's Ploy to Quash a BioTech Merger*, Chamber of Com. (Sept. 10, 2021) (the Illumina-Grail merger), bit.ly/3snFSz6.

The Chamber has submitted amicus briefs in federal court cases where the FTC attempts to advance its novel view of vertical mergers. *See, e.g.*, Amicus Curiae Br. (Doc. 63), *FTC v. Microsoft Corp.* (9th Cir. Sept. 13, 2023); Amicus Curiae Br. (Doc. 118), *Illumina, Inc. v. FTC*, No. 23-60167 (5th Cir. June 12, 2023); Amicus Curiae Br. (Doc. 148-1), *FTC v. Amgen, Inc.*, No. 1:23-cv-3053 (N.D. Ill. Aug. 28, 2023). The Chamber thus has a significant interest in the proper resolution of this case.

---

[1] The Chamber certifies that no counsel for any party authored this brief in whole or in part and no entity or person, aside from the amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

The FTC has raised aggressive theories in an attempt to block the IQVIA-PMI merger. But the agency's approach to vertical mergers is deeply concerning. As a general matter, vertical mergers create efficiencies in the market and do not eliminate competitors. For those reasons, vertical mergers are presumptively procompetitive and beneficial to consumers—and thus lawful. Given their presumptively procompetitive nature, courts typically demand real-life evidence of competitive harm to block vertical mergers.

Although much of its brief is redacted, it is apparent that the FTC is relying on nothing more than shortcuts, speculation, theories, possibilities, and assumptions to block the merger. *See* FTC-Br. (Doc. 174) 39-44. This type of evidence-free approach to antitrust has long been repudiated by courts, scholars, and—until the FTC's recent about-face—enforcement agencies. *See, e.g.*, *Fruehauf Corp. v. FTC*, 603 F.2d 345 (2d Cir. 1979); *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019); *FTC v. Microsoft, Corp.*, 2023 WL 443412 (N.D. Cal. July 10), *injunction pending appeal denied* No. 23-15992 (9th Cir. July 14, 2023); *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022).

The Chamber urges this Court to deny the FTC's motion for preliminary injunction. Defendants have offered a whole host of reasons to do so. Rather than rehash the factual issues, the Chamber focuses on the broader principle at stake. Namely, this Court should demand real-world evidence of competitive harm from the FTC. That approach is consistent with the overwhelming consensus among courts, government officials, and scholars that vertical mergers are presumptively procompetitive, as well as caselaw rejecting the government's attempts to use shortcuts and mere possibilities to block vertical mergers. The FTC should not be allowed to construct and knock down straw men when seeking to block a procompetitive economic activity that benefits consumers.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy" which is "never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). The "'drastic'" nature of a preliminary injunction is

"particularly" acute "in the acquisition and merger context," because, "as a result of the short life-span of most tender offers, the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980). To obtain a preliminary injunction under the FTC Act, the FTC must make "a *proper showing* that, weighing the equities and considering the Commission's likelihood of ultimate success, [an injunction] would be in the public interest." 15 U.S.C. §53(b) (emphasis added). Here, the merits turn on the Clayton Act, which prohibits mergers "where in any line of commerce … the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. §18.

Congress never authorized the government or courts to block mergers based on a "'mere possibility'" of harm to competition, *AT&T*, 916 F.3d at 1032 (cleaned up). It is undisputed that the government "'has the ultimate burden of proving a Clayton Act violation by a preponderance of the evidence.'" *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 189 (D.D.C. 2018). "[T]he Government's 'failure of proof in any respect will mean the transaction should not be enjoined.'" *Id.* In short, "'antitrust theory and speculation cannot trump facts.'" *Id.* at 190. Real-world evidence of competitive harm is required to overcome the presumption that vertical mergers are procompetitive and lawful. This high bar is intentionally designed to ensure that only truly harmful vertical mergers can be blocked, and to protect a generally procompetitive economic activity that benefits consumers.

**I.      Vertical mergers are presumptively procompetitive and beneficial to consumers, and thus lawful.**

Vertical mergers "combine firms or assets at different stages of the same supply chain"—for instance, an upstream supplier and a downstream customer. FTC & DOJ, 2020 Vertical Merger Guidelines 2, perma.cc/7RC9-EADZ. Vertical mergers create procompetitive effects, such as reducing transaction and inventory costs, and increasing knowledge transfers. At least since the late 1970s, courts and enforcement agencies—including the FTC, until its recent and abrupt about-face— have consistently been hesitant to conclude that vertical mergers harm competition based on an

extensive body of scholarship showing that vertical mergers generally increase efficiency and benefit consumers. *See, e.g.*, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58 (1977); *Fruehauf*, 603 F.2d at 351-52.

**A.** Courts initially adopted what many have described as a "draconian" approach toward vertical mergers. Bork, *The Antitrust Paradox: A Policy at War With Itself* 231 (Bork Publishing 2021). Such "a substantial expansion of merger law" was "often" based "on rationales that did more harm than good to competition," including "exaggerated theories of harm as well as the perverse idea that mergers should be condemned because of efficiencies that served to harm rivals." Hovenkamp, *Competitive Harm from Vertical Mergers* 4 (2020), perma.cc/9LA2-YNP3.

This aggressive approach was also based on the view that "[t]he primary vice of a vertical merger" was "foreclosing the competitors of either party from a segment of the market." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323-24 (1962). The theory goes that, for example, if a car manufacturer combines with a tire manufacturer, the tire manufacturer could disadvantage the car manufacturer's rivals by refusing to sell to them or raising the prices charged to them. Or the car manufacturer could disadvantage the tire manufacturer's rivals by refusing to purchase tires from them. Courts relied on manipulable *Brown Shoe* factors, which elevated the role of market shares and trends over real-life evidence of economic harm to consumers. *See id.* at 328-32 ((1) "[T]he size of the share of the market foreclosed"; (2) "the very nature and purpose of the arrangement"; and (3) "the trend toward concentration in the industry")).

**B.** In stark contrast to this aggressive approach, courts and scholars have subsequently recognized the presumptively procompetitive nature of vertical mergers. *See* Blair et al., *Analyzing Vertical Mergers: Accounting for the Unilateral Effects Tradeoff and Thinking Holistically About Efficiencies*, 27 Geo. Mason L. Rev. 761, 768-86 (2020); *Fruehauf*, 603 F.2d at 352 (vertical mergers "may even operate to increase competition"); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir.

4

2006) ("vertical integration creates efficiencies for consumers"); *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) ("respected scholars question the anticompetitive effects of vertical mergers in general").

Since the 1970s, the Supreme Court has emphasized that antitrust law protects "'competition[,] not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe*, 370 U.S. at 320). And this time, the Supreme Court "meant it." Blair et al., *Analyzing Vertical Mergers*, at 801; *see also* Chen & Hylton, *Procompetitive Theories of Vertical Control*, 50 Hastings L.J. 573, 576 (1999) (discussing "changed conventional judicial thinking" about vertical mergers). "[T]he Supreme Court began to apply a more nuanced and text-based interpretation of [the Clayton Act], refusing to blindly equate a substantial increase in market share with a likely substantial decrease in competition." *In re AMR Corp.*, 2023 WL 2563897, at *1 (2d Cir. Mar. 20).

The Second Circuit also played a pivotal role in shifting away from the aggressive-enforcement approach to vertical mergers. "The FTC's loss in *Fruehauf* [before the Second Circuit] ended the era of aggressive—and sometimes economically irrational—vertical merger enforcement." Blair et al., *Analyzing Vertical Mergers*, at 810. In *Fruehauf*, the FTC sought to block a merger between a truck-trailer manufacturer (Fruehauf) and a truck-parts manufacturer (Kelsey). 603 F.2d at 349. Applying the *Brown Shoe* factors, the FTC argued that (1) the transaction foreclosed Kelsey's rivals from Fruehauf's demand and (2) if there were a parts shortage, the merger would give Fruehauf preferential treatment from Kelsey over Kelsey's other parts-customers (i.e., Fruehauf's rivals). *See id.*

The Second Circuit rejected the FTC's arguments. It recognized that "[a] vertical merger … does not eliminate a competing buyer or seller from the market," "does not, therefore, automatically have an anticompetitive effect," and "may even operate to increase competition." *Id.* at 351-52. Rejecting then-familiar assertions that vertically merged firms would cause harm by foreclosing

competitors, the Second Circuit observed, it actually "make[s] sound business sense" for companies to sell to every customer. *Id.* at 355.

*Fruehauf*'s reasoning proved prescient and is consistent with "economic literature that [subsequently] developed." Keyte, *The AT&T/Time Warner Decision: More Than Meets The Eye*, 33 Antitrust 20, 22 (Summer 2019). As it is now widely acknowledged, "[p]rofit-maximizing firms, regardless of whether they are vertically integrated, will sell to unintegrated rivals if the price paid by those rivals exceeds marginal cost and will purchase inputs from unintegrated rivals if the cost is lower than that of alternatives, including self-supply." Blair et al., *Analyzing Vertical Mergers*, at 788; Bork, *The Antitrust Paradox*, at 248 ("To the extent that the ingot monopolist integrates vertically for the purpose of blocking entry, he will incur diseconomies."). In other words, the car manufacturer is generally incentivized to purchase tires from the tire manufacturer's rivals if it is cheaper to do so. And the tire manufacturer is generally incentivized to sell to the car manufacturer's rivals if it is profitable to do so. Moreover, merging firms are aware of "'financial and reputational costs'" should they attempt to manipulate the market by using any advantages gained from vertical integration. *UnitedHealth*, 630 F. Supp. 3d at 141; *see also Fruehauf*, 603 F.2d at 355 ("If Kelsey deprived its regular customers of a proportionate share of [heavy duty wheels] in times of shortage it would risk their retaliating …, which could cause it greater economic harm."); *Microsoft*, 2023 WL 4443412, at *14 ("Microsoft anticipates irreparable reputational harm if it forecloses *Call of Duty* from [Sony's] PlayStation").

Even if some foreclosure of rivals followed, the Second Circuit was "unwilling to assume that any vertical foreclosure lessens competition." 603 F.2d at 352 n.9. "Absent very high market concentration or some other factor threatening a tangible anticompetitive effect, a vertical merger may simply realign sales pattern" without harming consumers. *Id.* After *Fruehauf*, courts now generally understand that agencies must "demonstrate that a vertical merger would cause anticompetitive effects, not merely foreclosure." Blair et al., *Analyzing Vertical Mergers*, at 810; Keyte, *The AT&T/Time*

*Warner Decision*, at 22 ("to find any foreclosure effects, harm to ultimate consumers must also be established"); *AT&T*, 916 F.3d at 1040-41.

Consistent with the Second Circuit's approach in *Fruehauf* and developments in economic theory, courts now acknowledge the procompetitive nature of vertical mergers. "[V]ertical integration and vertical contracts are *procompetitive*" because they "encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers." *Comcast Cable Comm'cns, LLC v. FCC*, 717 F.3d 982, 991 (D.C. Cir. 2013) (Kavanaugh, J, concurring) (citing Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason*, 60 Antitrust L.J. 67, 76 (1991)). Vertical mergers are less likely to cause competitive harm because a vertical merger "does not eliminate a competing buyer or seller from the market." *Fruehauf*, 603 F.2d at 351. Instead, vertical mergers involve combinations of companies in a supplier-customer relationship and, by definition, "involve 'firms that do not operate in the same market.'" *AT&T*, 310 F. Supp. 3d at 192 (quoting DOJ, 1984 Merger Guidelines 24, perma.cc/QUA9-MWZK). "A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 689 (4th Cir. 2016). Given this increase in efficiency, "it is no surprise that vertical integration has generally been permitted[.]" *Id.* At 689.

**C.** Enforcement agencies, too, have consistently taken the view that vertical mergers are less likely than others to create competitive problems. DOJ, 1984 Merger Guidelines 24. Indeed, the FTC's own staff have observed that "the overwhelming majority of vertical mergers increase efficiency." Roundtable on Vertical Mergers, *Note by the Delegation of the United States to the OECD* 7, ¶26 (Feb. 15, 2007), perma.cc/2DAM-D43P. The FTC even embraced the "broad consensus in competition policy and economic theory that the majority of vertical mergers … reduce costs and increase the intensity of Interbrand competition." Hoffman, *Vertical Merger Enforcement at the FTC* 4 (Jan. 10, 2018),

perma.cc/ET32-SFVK. In 2020, the FTC and DOJ jointly issued the Vertical Merger Guidelines, in which they acknowledged that "vertical mergers often benefit consumers through elimination of double marginalization, which tends to lessen the risks of competitive harm." FTC & DOJ, 2020 Vertical Merger Guidelines 2, perma.cc/7RC9-EADZ.[2]

## II. The government must present real-world evidence of harm and cannot use shortcuts or mere possibilities to establish the *prima facie* case in vertical merger challenges.

Due to the exhaustive research and scholarship showing that vertical mergers are typically procompetitive, the government rightly bears a heavy burden in any case challenging such a merger.

Section 7 of the Clayton Act prohibits mergers "where in any line of commerce or in any activity affecting commerce …, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. Despite the broad language, "the word 'may' [in § 7 of the Clayton Act] should not be taken literally, for if it were, every acquisition would be unlawful." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). And courts—including the Second Circuit—have recognized that § 7 of the Clayton Act does not authorize courts and enforcement agencies to block a merger based solely on "theor[ies]," "speculation," and "assumptions." *Fruehauf*, 603 F.2d at 354-55, 360; *see also AT&T*, 916 F.3d at 1038; *Microsoft*, 2023 WL 4443412, at *20; *UnitedHealth*, 2022 WL 4365867, at *6. Courts further recognize that "'[o]nly examination of the particular market—its structure, history[,] and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger.'" *AT&T*, 310 F. Supp. 3d at 190. Thus, a § 7 violation can be found only if there is "real-world evidence that the specific merger under review is likely to substantially lessen competition." *UnitedHealth*, 2022 WL 436587, at *6; *see also Fruehauf*, 603 F.2d at 354-55 (requiring evidence).

---

[2] In 2021, with the addition of newly appointed Commissioners, the FTC (by a 3-2 vote) pulled the rug out from under businesses by withdrawing the 2020 Vertical Merger Guidelines without any sound explanations. Because the 2020 Vertical Merger Guidelines still remain in place for the DOJ, *see* DOJ, *Justice Department Issues Statement on Vertical Mergers Guidelines* (Sept. 15, 2021), the FTC's unilateral withdrawal has created a schism—and great confusion—in antitrust law.

It is undisputed that the government bears the "ultimate burden of proving a Section 7 violation." *AT&T*, 310 F. Supp. 3d at 189. Courts generally use a burden-shifting framework. *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990); *see also AMR*, 2023 WL 2563897, at *2 (explaining the Second Circuit used a similar approach "even before *Baker Hughes*"). Although this framework was developed in other contexts, it has also been used by courts in vertical merger cases. *See, e.g.*, *AT&T*, 916 F.3d at 1032; *UnitedHealth*, 2022 WL 4365867, at *6.

Under this framework, the government bears the initial burden to "establish a *prima facie* case that the merger is likely to substantially lessen competition in the relevant market." *AT&T*, 916 F.3d at 1032. In *AT&T*, the D.C. Circuit applied this burden-shifting framework, but "stopped at the first step after finding the [government] had failed to prove that the transaction would allow the merging parties to raise rivals' costs" and thus result in anticompetitive harms. Blair et al., *Analyzing Vertical Mergers*, at 821. So did the Second Circuit in *Fruehauf. Id.*

Once the *prima facie* case is established, the burden then shifts to the defendant to rebut the *prima facie* case. *AT&T*, 916 F.3d at 1032. Upon such rebuttal, "'the burden of producing additional evidence of anticompetitive effects shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times.'" *AT&T*, 916 F.3d 1029 (quoting *Baker Hughes*, 908 F.2d at 983).

This analytical framework applies with equal force in the preliminary-injunction posture. As the D.C. Circuit observed, "[a]lthough *Baker Hughes* was decided at the merits stage as opposed to the preliminary injunctive relief stage, [courts] can nonetheless use its analytical approach in evaluating the Commission's showing of likelihood of success." *FTC v. HJ Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001). The FTC agrees. *See* FTC-Br. 12.

Defendants thoroughly explain why the FTC failed to show a likelihood of success or a serious question as to the merits. *See* Defs-Br. 35-49. Those explanations need not be repeated here; instead,

the Chamber urges this Court to apply the following overarching principles as it reviews the FTC's decision.

### A.   The government cannot use "shortcuts" in vertical merger cases.

In vertical merger cases, the government cannot use "statistics about the change in market concentration" as a "short cut" to trigger a presumption of harm because "vertical mergers produce no immediate change in the relevant market share." *AT&T*, 916 F.3d at 1032 (citing DOJ, 1984 Merger Guidelines 24); *see also Fruehauf*, 603 F.2d at 351 (rejecting a "per se" rule because vertical mergers "d[o] not eliminate a competing buyer or seller from the market."); *Microsoft*, 2023 WL 4443412, at *8 (similar).

Instead, "the government must make a 'fact-specific' showing that the proposed merger is 'likely to be anticompetitive.'" *AT&T*, 916 F.3d at 1032; *UnitedHealth*, 2022 WL 4365867, at *7 ("the government meets its *prima facie* burden in vertical merger cases by making a 'fact-specific showing that the proposed merger is likely to be anticompetitive'"). This principle is so well established that the DOJ in *AT&T* conceded the point without much controversy. 310 F. Supp. 3d at 192 ("The parties … agree that in this case 'there is no short-cut way to establish anticompetitive effects, as there is with horizontal mergers.'"). So did the FTC recently in *Microsoft*. 2023 WL 4443412, at *11 (quoting the FTC's expert who said: "there is no established screen or presumption of harm based on market shares or concentration for the purposes of evaluating the competitive effects of a vertical merger."). Scholars also agree. *E.g.*, Areeda & Hovenkamp, *Antitrust Law* ¶1000a.

Nevertheless, the FTC seeks to circumvent the "no-shortcuts" principle by misapplying *Brown Shoe*'s multifactor test. *See* FTC-Br. 39-41. In addition to the ability-and-incentive test, the FTC argues that it can "demonstrate the probable illegality of the proposed acquisition" under *Brown Shoe*. FTC-Br. 39. Whether the *Brown Shoe* factors remain viable is up for debate. *See, e.g., In re Illumina*, 2023 WL 2946896, at *2 (FTC Apr. 3) (Wilson, Comm'r, concurring) (explaining why *Brown Shoe* "has been

abandoned by courts and the enforcement agencies"). The FTC relies on the following factors: "share of the market foreclosure"; "nature and economic purpose of the transaction"; "degree of market power possessed by the merged firm"; and "barriers to entry." FTC-Br. 39-41. Although many of the FTC's arguments have been redacted, it is apparent that the FTC overstates the usefulness of market shares in predicting anticompetitive effects. *See id.*

Even if *Brown Shoe* remains viable, the Second Circuit has thoroughly rejected such an approach based on market shares without any "showing of some probable anticompetitive impact." *Fruehauf*, 603 F.2d at 352-53; *see also AMR*, 2023 WL 2563897, at \*1 (courts should not "blindly equate a substantial increase in market share with a likely substantial decrease in competition"); Hovenkamp, *Vertical Mergers*, at 5 ("[B]oth Harvard and Chicago School thinking pushed back at the aggressive attitudes about industrial concentration…."); Bork, *The Antitrust Paradox*, at 245 ("[I]n the absence of a *most unlikely* proved predatory power and purpose, antitrust should never object to the verticality of any merger." (emphasis added)); Defs-Br. 43-45.

Critically, the FTC's reliance on market shares and trends alone (without any other real-world evidence of competitive harm) effectively results in using a shortcut to establish a *prima facie* case, which courts cannot do for vertical mergers. *See AT&T*, 916 F.3d at 1032; *UnitedHealth*, 2022 WL 4365867, at \*7. In the vertical merger context, it is simply insufficient for the government to rely on statistical data regarding the "share of the market foreclosed" that have potentially no bearing on the real-world impact of the challenged transaction. *See AMR*, 2023 WL 2563897, at \*1 ("'statistics concerning market shares and concentration … [are] not conclusive indicators of anticompetitive effects.'"); Ginsburg et al., *The Federal Trade Commission's Hearings on Competition and Consumer Protection in the 21st Century, Vertical Mergers* 8-9, Geo. Mason Univ. (Sept. 6, 2018) ("[w]hile vertical integration can certainly foreclose rivals in theory, there is only limited empirical evidence supporting that finding in real markets"). Again, there are no shortcuts based on market shares. *See Microsoft*, 2023 WL

4443412, at *11. Yet this is precisely what the FTC's misapplication of the *Brown Shoe* factors would allow the FTC to do. *See, e.g.*, *Fruehauf*, 603 F.2d at 351; Blair et al., *Analyzing Vertical Mergers*, at 809.

**B. The government cannot use mere possibilities of harm to block a vertical merger.**

The government also cannot establish a *prima facie* case with mere possibilities of competitive harm. This principle is also well established. *See, e.g.*, *Fruehauf*, 603 F.2d at 357 ("possibility is not enough to sustain a conclusion that there is at present a reasonable probability that the merger will substantially restrain competition"); *AT&T*, 916 F.3d at 1032 ("Section 7 requires more than a 'mere possibility' of competitive harm.").

Rather, courts have interpreted the Clayton Act to require probabilities of future competitive harm. Courts have also recognized that §7 effectively requires "weighing the parties' competing visions of the future of the relevant market and the challenged merger's place within it." *AT&T*, 310 F. Supp. 3d at 165. This "'uncertain task'" requires courts to engage in "a comprehensive inquiry into the future competitive conditions in that market.'" *Id.* Because courts must reject mere possibilities of harm, they are rightly skeptical of enforcement efforts based on speculation, conjecture, or theoretical harms. *Fruehauf*, 603 F.2d at 354-55, 360. "'[A]ntitrust theory and speculation cannot trump facts.'" *AT&T*, 310 F. Supp. 3d at 190. "[T]hose theories don't generally predict harm from vertical mergers; they simply show that harm is possible under certain conditions." Hoffman, *Vertical Merger Enforcement at the FTC* 3. Instead, "prediction must be based on real-world evidence related to the 'structure, history[,] and probable future' of the relevant markets." *UnitedHealth*, 2022 WL 4365867, at *24.

Courts have also observed that "[a] probability signifies that an event has a better than fifty percent chance of occurring," and "[a] 'reasonable' probability"—the threshold for finding anticompetitive effect—"represents an even greater likelihood of the event's occurrence." *Mercantile Tex. Corp. v. Bd. of Governors of Fed. Rsrv. Sys.*, 638 F.2d 1255, 1258 (5th Cir. 1981). The "'reasonable' probability standard" also requires the government to "specif[y] subsidiary findings that must be

compared before the ultimate finding of a reasonable probability is made." *Mercantile Tex.*, 638 F.2d at 1268-69. Here, the FTC contends that because it invokes the FTC Act, it may obtain preliminary relief if it "'has a fair and tenable chance of ultimate success on the merits.'" FTC-Br. 11. But the FTC Act—like the Clayton Act—still requires evidence. *See, e.g., FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) (observing that courts do not "rubber stamp an injunction whenever the FTC provides some threshold evidence" but that they must "'exercise independent judgment' about the questions [the FTC Act] commits to [them]"); *Microsoft*, 2023 WL 4443412, at *8 (requiring a "rigorous analysis" of "'the FTC's case and evidence'").

Here, the FTC failed to meet this standard. For instance, the FTC's brief is riddled with speculation about what IQVIA "may" or "could" do after merger. *See, e.g.*, FTC-Br. 42 ("given that TPAs may be granted on a case-by-case basis, IQVIA could … selectively deny TPAs to competitors"); *id.* at 43 ("IQVIA could thwart rivals *simply by delaying* the granting of TPAs"); *id.* ("Post merger, IQVIA could thus selectively disadvantage DeepIntent's rivals by refusing to make such concessions."). But these arguments "res[t] upon … assumptions" and possibilities and "hav[e] no appreciable evidentiary support." *Fruehauf*, 603 F.2d at 354. Enabling the government to prove anticompetitive harms with mere theories or possibilities—even in the absence of real-world data or evidence—would mean a return to the era of over-aggressive and over-expansive interpretation of the Clayton Act (which ended with *Fruehauf*). Blair et al., *Analyzing Vertical Mergers*, at 810.

### C.  The government must present real-world evidence of harm.

The government must present real-world evidence that reflects more than mere possibilities to make a *prima facie* case in vertical merger cases. This proposition is also well established. *See, e.g., Fruehauf*, 603 F.2d at 354-55, 360; *AT&T*, 310 F. Supp. 3d at 192 ("[T]he Government concedes that … it must make a 'fact-specific' showing that the effect of the proposed merger 'is likely to be anticompetitive'"); *UnitedHealth*, 2022 WL 4365867, at *24 (similar).

Regardless of whether this Court applies the *Brown Shoe* framework or the ability-and-incentive test, it should demand real-world evidence. In demanding real-world evidence from the FTC, this Court should draw from previous vertical merger cases. In *Fruehauf*, the Second Circuit—even while applying the *Brown Shoe* factors—made it clear that the government cannot rest simply on "theor[ies]," "speculation," and "assumptions." *Fruehauf*, 603 F.2d at 354-55, 360; *see also* Defs-Br. 43-45.

In *AT&T*, which applied the ability-and-incentive test, the government argued that a vertical merger between AT&T (downstream content distributor) and Time Warner (upstream content programmer) would enable AT&T to use Time Warner's content to disadvantage its rivals, including by raising the rivals' video programming costs or driving those same rivals' customers to its subsidiary, DirecTV. 310 F. Supp. 3d at 164. The district court rejected that argument for multiple reasons, including: "unrebutted findings that similar past vertical mergers did not result in price increases"; "disbelief that the improvement to AT&T's bargaining leverage would be substantial"; "failure to account for AT&T's long-term contract offers"; and "poor quality inputs to the DOJ's expert model." Blair et al., *Analyzing Vertical Mergers*, at 786 & n.12 (citing *AT&T*, 310 F. Supp. 3d at 216, 224, 226, 239-40). In the district court's view, these flaws undermined the value of the government's purportedly real-world evidence. The D.C. Circuit agreed. *See* 916 F.3d at 1040-41; *see also* Defs-Br. 39-43.

In *Microsoft*, the court considered post-merger efficiencies, including those created by Microsoft's actual or promised contractual commitments to make its content and services available to Microsoft's rivals. *See Microsoft*, 2023 WL 4443412, at *13, *17 (factoring in Microsoft's "commitment to enter a new agreement to extend Activision's obligation to ship *Call of Duty* at parity on PlayStation" and to make it available "on Steam" and Nintendo's "Switch"). Here, the FTC incorrectly asserts that "no court has held that efficiencies claims could immunize an otherwise anticompetitive merger." FTC-Br. 49. This assertion ignores the fact that when courts assess whether a merger is anticompetitive, they also consider evidence of efficiencies. *See AMR*, 2023 WL 2563897, at *3 (finding

14

it appropriate to consider "rebuttal evidence showing why the market-share data in fact gave an inaccurate account of the merger's probable effects on competition").

Severe practical difficulties would arise if courts ignored such real-life economic realities while assessing the potential anticompetitive effects of a merger (as the FTC would have this Court do). Here, again, *AT&T* is persuasive. *See* 310 F. Supp. 3d at 239-41 & n.51. In that case, DOJ's expert had built a predictive model that quantified estimated anticompetitive effects *without* accounting for Turner's "long-term affiliate agreements." *Id.* at 239. DOJ's case unraveled when it became evident that "the real-world effect of Turner's present affiliate agreements [would] be rather 'significant' [for another three years]." *Id.* at 240. For instance, DOJ's expert's estimated price increase dropped "by 'about one-third'" simply by "factoring in the presence of one such affiliate agreement." *Id.* In fact, factoring in "all … affiliate agreements" resulted in "net *benefit* to consumers rather than a net harm." *Id.* In other words, DOJ was asking the court to "'overestimat[e]'" the competitive harm (and "'how quickly'" such harm would occur) by ignoring Turner's contractual commitments. *Id.*

Again, the Clayton Act requires courts to make a predictive judgment about "'the probable anticompetitive effect of the merger'" by examining "'the particular market,'" "'its structure, history, and probable future.'" *Id.* at 190 (quoting *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974)). Consistent with this mandate, this Court should consider all real-world evidence regarding the efficiencies created by the proposed acquisition. *See Microsoft*, 2023 WL 4443412, at *13, *17, *20-21.

## III.   The government will fail to carry its burden in most vertical merger cases.

As explained above, there is a broad scholarly and judicial understanding that vertical mergers are generally procompetitive, and thus lawful. "The FTC's loss in *Fruehauf*" before the Second Circuit made "vertical merger litigation … more difficult" as the government has become "burdened by the requirement to demonstrate that a vertical merger would cause anticompetitive effects." Blair et al., *Analyzing Vertical Mergers*, at 810. The recent cases in *AT&T*, *UnitedHealth*, and *Microsoft* further prove

this point. *See, e.g.*, Sokol, *Vertical Mergers and Entrepreneurial Exit*, 70 Fla. L. Rev. 1357, 1377-78 (2018) ("Vertical mergers should be presumed … to be competitively beneficial or neutral. In terms of the burden of proof, … the government[t] should bear the burden of demonstrating a net harm to consumers."); Shapiro, *Antitrust in a Time of Populism*, 61 Int'l J. Indus. Org. 714, 740 (2018) (explaining the difficulty of proving how a vertical merger "would significantly increase concentration in a well-defined market, which is normally a key element of the government's case").

The widespread view that vertical mergers are unlikely to harm either consumers or competition explains the paucity of government enforcement seeking to block vertical mergers. The D.C. Circuit's 2019 decision in *AT&T*, 916 F.3d at 1031-32, "[was] the first litigated vertical merger case [brought by the government] in 40 years." Wrobel, *Spotlight on U.S. Vertical Merger Enforcement: Burden of Proof and Revised Enforcement Guidelines*, 33 Antitrust 3, 3 (2019); *accord* Blair et al., *Analyzing Vertical Mergers*, at 813 (noting the same). And even where a challenge is brought, "[i]n the majority of challenged merger cases, courts have approved vertical mergers because their 'anticompetitive effects are outweighed by potential efficiencies or because there are no anticompetitive effects.'" Ossorio, Note, *Drawing the Line: Refining the Baker Hughes Burden-Shifting Framework for Vertical Mergers*, 73 Fla. L. Rev. 199, 201 (2021); *see also* Ginsburg, *Hearing on Vertical Mergers*, at 8-9.

Requiring real-world evidence regarding anticompetitive harm—which will not exist in most circumstances—is consistent not only with economic and legal realities, but also with desirable policy outcomes. "[A]llocation of the burdens of proof assumes particular importance." *Baker Hughes*, 908 F.2d at 991. Leaving courts with "complex and elusive" economic data to make "a prediction [of a merger's] impact upon competitive conditions in the future" sets those courts up for failure, especially when courts are asked to act quickly in a preliminary-injunction posture. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963). Such uncertainties would also make it difficult for companies to commit to investments required for vertical mergers. "An overly aggressive enforcement posture

towards vertical mergers would run the risk of hindering the ongoing realignment of firm boundaries that is necessary to maintaining an efficient allocation of resources in a dynamic economy." OECD Note at 10, ¶37. "With advances in modern technology comes even greater potential for efficient integration…. It would be unfortunate if an overly aggressive tying doctrine were to impede that innovation." *It's My Party*, 811 F.3d at 689.

## CONCLUSION

The Court should deny the FTC's preliminary-injunction motion.

Dated: November 13, 2023

Respectfully submitted,

 */s/ Daniel M. Vitagliano*
Jeffrey M. Harris (pro hac vice pending)
Frank H. Chang (pro hac vice pending)*
Daniel M. Vitagliano (SDNY No. 5856703)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
frank@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in VA*

## CERTIFICATE OF SERVICE

I filed the foregoing via ECF, which will electronically notify all counsel of record.

Dated: November 13, 2023

 */s/ Daniel M. Vitagliano*