**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                    Plaintiff,

        v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

                  Defendants.

Case No. 1:23-cv-06188-ER

**DEFENDANTS' MEMORANDUM OF LAW**
**IN OPPOSITION TO THE FTC'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................4

    A.    Digital Healthcare Advertising Is a Dynamic Industry......................4

    B.    Programmatic Advertising Is One Means of Delivering the Right Advertisement to the Right Audience at the Right Time........................5

    C.    IQVIA Enters a Growing Industry....................................................7

    D.    Investigative and Procedural History...............................................10

ARGUMENT ..................................................................................................11

I.     THE FTC CANNOT ESTABLISH A LIKELIHOOD OF ULTIMATE SUCCESS ........12

    A.    The FTC Has Not Established a Relevant Product Market ................12

        1.    The FTC's Alleged Product Market Is Arbitrarily Narrow ......13

        2.    The FTC Has Not Adequately Supported Its Proposed Market with Reliable Econometrics ..........................................16

        3.    The *Brown Shoe* Practical Indicia Undermine, Rather than Support, the FTC's Proposed Market ..............................18

    B.    The FTC Has Not Established a Likelihood of Substantial Anticompetitive Horizontal Effects ...............................................24

        1.    The FTC Is Entitled To No Presumption.................................25

        2.    There Is No Evidence of Anticompetitive Effects Flowing from the Proposed Merger ..............................................31

    C.    The FTC Has Not Established a Likelihood of Success Under Its Vertical Theory ...........................................................................35

        1.    There Are Numerous Competitors and Alternatives to IQVIA Data ........36

        2.    IQVIA Has No Ability or Incentive to Foreclose....................39

        3.    *Brown Shoe* Refutes, Rather Than Supports, the FTC's Vertical Theory .............................................................43

    D.    Any Prima Facie Case Is Rebutted On Numerous Grounds ................45

        1.    The Market Is Experiencing Rapid Growth and Many New Entrants ..............................................................46

        2.    The Merger Promises Significant Efficiencies .........................47

II.    THE EQUITIES WEIGH AGAINST A PRELIMINARY INJUNCTION......................49

CONCLUSION..................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AD/SAT v. Associated Press*,
  920 F. Supp. 1287 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216 (2d Cir. 1999) ...............................20

*In re AMR Corp.*,
  2023 WL 2563897 (2d Cir. Mar. 20, 2023) ...........................................................................24

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ...................................................................................................................28

*Broadway Delivery Corp. v. United Parcel Serv.*,
  651 F.2d 122 (2d Cir. 1981) ..................................................................................................25

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) ....................................................................................................... *passim*

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011) .............................................................................................13, 44

*Comcast Cable Commc'ns, LLC v. FCC*,
  717 F.3d 982 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ..................................................35

*Emigra Grp., LLC v. Fragoment, Del Rey, Bernsen & Loewy, LLP*,
  612 F. Supp. 2d 330 (S.D.N.Y. 2009)....................................................................................19

*Fruehauf Corp. v. FTC*,
  603 F.2d 345 (2d Cir. 1979)............................................................................................ *passim*

*FTC v. Advocate Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) .................................................................................................17

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ..................................................................................11, 36

*FTC v. CCC Holdings Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ....................................................................................20, 31

*FTC v. Freeman Hosp.*,
  69 F.3d 260 (8th Cir. 1995) ...................................................................................................11

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ......................................................................................11, 24, 26

*FTC v. IQVIA*,
No. 23 Civ. 06188 (S.D.N.Y. Oct. 31, 2003)...........................................................................11

*FTC v. Lab. Corp. of Am.*,
2011 WL 3100372 (C.D. Cal. Mar. 11, 2011).......................................................................26

*FTC v. Microsoft Corp.*,
2023 WL 4443412 (N.D. Cal. July 10, 2023), *appeal filed*, No. 23-15992 (9th
Cir.).................................................................................................................................12, 36

*FTC v. Nat'l Tea Co.*,
603 F.2d 694 (8th Cir. 1979) ................................................................................................49

*FTC v. Staples, Inc.*,
970 F. Supp. 1066 (D.D.C. 1997) ...................................................................................11, 29

*FTC v. Swedish Match*,
131 F. Supp. 2d 151 (D.D.C. 2000) ......................................................................................29

*FTC v. Sysco Corp.*,
113 F. Supp. 3d 1 (D.D.C. 2015) ..........................................................................................11

*FTC v. Univ. Health, Inc.*,
938 F.2d 1206 (11th Cir. 1991) ............................................................................................46

*FTC v. Warner Commc'ns, Inc.*,
742 F.2d 1156 (9th Cir. 1984) ..............................................................................................11

*FTC v. Weyerhaeuser Co.*,
665 F.2d 1072 (D.C. Cir. 1981)............................................................................................49

*FTC v. Whole Foods Mkt., Inc.*,
548 F.3d 1028 (D.C. Cir. 2008)............................................................................................11

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004)..................................................................................................18

*Global Disc. Travel Servs. v. Trans World Airlines*,
960 F. Supp. 701 (S.D.N.Y. 1997)........................................................................................13

*Green Country Food Mkt., Inc. v. Bottling Grp., LLC*,
371 F.3d 1275 (10th Cir. 2004) ............................................................................................19

*Hack v. President & Fellows of Yale Coll.*,
237 F.3d 81 (2d Cir. 2000)....................................................................................................21

*IQVIA v. Veeva Sys., Inc.*,
No. 17-CV-177 (May 7, 2021) ..............................................................................................42

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ...........................................................................13

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)..........................................................................................23

*MacDermid Printing Solutions LLC v. Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)..............................................................................28

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ..........................................................................23

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) ............................................................................23

*Nat'l Fuel Gas Supply Corp. v. FERC*,
468 F.3d 831 (D.C. Cir. 2006) ..........................................................................35

*New York v. Deutsche Telekom AG*,
439 F. Supp. 3d 179 (S.D.N.Y. 2020)....................................................24, 45, 48

*New York v. Kraft Gen. Foods, Inc.*,
926 F. Supp. 321 (S.D.N.Y. 1995)...........................................................20, 27, 31

*Nimbus Therapeutics, LLC v. Celgene Corp.*,
570 F. Supp. 3d 100 (S.D.N.Y. 2021)................................................................45

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ................20

*Re-Alco Indus., Inc. v. Nat. Center for Health Educ.*,
812 F. Supp. 387 (S.D.N.Y. 1993).....................................................................12

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) ............................................................................45

*Truck-Rail Handling Inc. v. BNSF Ry. Co.*,
2005 WL 8178364 (N.D. Cal. Mar. 8, 2005)......................................................20

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
986 F.2d 589 (1st Cir. 1993).............................................................................23

*U.S. Horticultural Supply, Inc. v. Scotts Co.*,
2009 WL 89692 (E.D. Pa. Jan. 13, 2009) ..........................................................38

*United States v. Aetna Inc.*,
240 F. Supp. 3d 1 (D.D.C. 2017).......................................................................29

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S.
  Ct. 2274 (2018) ....................................................................................................16, 17, 18

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018) ........................................................35, 36, 39

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ......................................................................24, 45

*United States v. Culbro Corp.*,
  436 F. Supp. 746 (S.D.N.Y. 1977)........................................................................25

*United States v. E.I. du Pont de Nemours & Co.*,
  353 U.S. 586 (1957)..............................................................................................45

*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974)..............................................................................................25

*United States v. Google LLC*,
  1:23-cv-108 (E.D. Va. Jan. 24, 2023) ..................................................................15

*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ..........................................................25, 29, 32

*United States v. Long Island Jewish Medical Center*,
  983 F. Supp. 121 (E.D.N.Y. 1997) ...................................................12, 13, 14, 29

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974)................................................................................12, 13, 25

*United States v. Mfrs. Hanover Tr. Co.*,
  240 F. Supp. 867 (S.D.N.Y. 1965).......................................................................29

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................25, 26, 32

*United States v. Sun & Sand Imports, Ltd.*,
  725 F.2d 184 (2d Cir. 1984).................................................................................12

*United States v. Waste Mgmt., Inc.*,
  743 F.2d 976 (2d Cir. 1984).....................................................................27, 45, 47

**Statutes**

15 U.S.C. § 18...............................................................................................................24

15 U.S.C. § 53(b) ............................................................................................10, 11, 49

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp*, Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 927c (2023 cum. Supp.) ....................................................*22*

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.10[A] (4th ed. 2023 supp.).................................................................................................20

## INTRODUCTION

The ways in which healthcare companies communicate information to doctors and patients are evolving at lightning speed.  One emerging approach is digital healthcare advertising, which has rapidly grown to a $14 billion industry and is expected to swell even larger over the next several years.  Within that dynamic industry, the FTC is challenging a merger of two platforms that combined for around ███████ in digital advertising revenue in 2022.

The challenged transaction would allow IQVIA to better compete in the digital healthcare advertising industry by combining the complementary capabilities of two smaller firms—Lasso and DeepIntent—that would otherwise be unable to grow their offerings adequately to compete with large digital media companies.  Lasso is a digital interface that allows healthcare companies (and their advertising agencies) to design and manage advertising campaigns across numerous channels, including email, social media, and display ads on websites.  Lasso's principal focus is on ads that are delivered to healthcare providers ("HCPs").  DeepIntent is likewise a digital interface, but it has the backend technology for executing advertising campaigns "programmatically" (something Lasso lacks) and is focused more on ads delivered to patients ("DTC").  It is DTC advertising that drives IQVIA's strategic focus in this industry.  IQVIA acquired Lasso in July 2022, and it is seeking to finalize its merger with DeepIntent so that it can offer an integrated solution for healthcare companies seeking to advertise across numerous channels to both HCPs and, in particular, patients.

The FTC's preliminary injunction, if granted, would impede competition, deter innovation, and decrease efficiency.  The FTC's case rises and falls with its arbitrarily narrow proposed market definition of "HCP programmatic advertising."  Programmatic advertising is a methodology for purchasing advertisements, using algorithms to automatically match an advertisement with the most appropriate audience—it is just "███████████████████████████" and "█

███████████████████████████████████████.["1]   The FTC alleges that its narrow market is dominated by DeepIntent, Lasso, and one other healthcare-specific firm (WebMD's PulsePoint), dismissing the dozens of other firms that have similar capabilities to deliver the same ads to the same audiences on the same websites.   Those firms include so-called "generalist" DSPs, like Google and The Trade Desk, in part because ████████████████████████████████████████ ███████████████"[2]   Worse still, the FTC excludes *entirely* from its proposed market social media platforms (like Meta/Facebook and LinkedIn) and "endemic" medical websites (like WebMD and the New England Journal of Medicine), both of which offer programmatic advertising services for HCPs.   The competitive landscape is not nearly as circumscribed as the FTC indicates, and the FTC's failure to prove a proper product market is fatal to its entire case.

Even within its erroneous product market, the FTC's speculation that the transaction will have adverse horizontal competitive effects is unfounded.   The FTC relies almost entirely on a selection of informal emails and chats between employees, overlooking the context of those documents or the plentiful evidence that indicates widespread competition.   Like Harvard and Yale, DeepIntent and Lasso view each other as competitors, but that does not absolve the FTC of its burden to analyze what *other* competition will remain post-merger.   Accordingly, the FTC's effort to show harm to competition fails on both the law and the facts.

The FTC also offers a vertical theory of competitive effects based on IQVIA's data products.   No court has ever granted a Section 13(b) injunction on a vertical theory, and for good reason:   Vertical mergers generally are efficient, because they combine complementary capabilities and reduce costs.   That is precisely what is contemplated here.   The integration of IQVIA's data products with DeepIntent's demand-side platform capabilities can reduce costs for

---

[1] ████████████████ Dep. Tr. 24:21–25:1.
[2] *Id.* at 153:7–8.

both DeepIntent and Lasso.  The FTC's theory that IQVIA may suddenly cut off its *own* customers from its data post-merger—despite the fact that doing so would be contrary to IQVIA's economic interest and longstanding business practices—is unsupported by anything other than raw speculation from competitors with their own interests in this litigation.  And even if it could do so, some of the most significant industry participants do not currently license data directly from IQVIA at all, making any foreclosure strategy a moot point.

At bottom, the FTC's case boils down to the proposition that big is bad and integration is worse.  The evidence will show that there is no factual, legal, or economic basis for the FTC's objections to the transaction.  On the FTC's side of the ledger are ███████████████████ ████████████████████████████████, a cherry-picked set of documents taken out of context, and an economic analysis that is circular and unreliable.  On Defendants' side are ████████ ████████████████████████████████████████████████████████████████████ ███████████████████████, a mountain of documents showing fierce competition, and three experts with both economic and industry backgrounds discrediting each of the FTC's theories.  Under any standard, the weight of the facts and the law precludes a finding that the FTC is likely to successfully prove that the transaction will substantially lessen competition.

Far from enhancing competition, enjoining this transaction would distort the competitive landscape.  The digital healthcare advertising industry is changing daily, with new entrants and changing market positions even in the few months since the FTC filed its complaint.  DeepIntent needs to close this transaction to grow to scale, improve efficiency, and expand internationally. The combined tools and capabilities of DeepIntent and Lasso will help IQVIA compete against larger, more-entrenched firms while offering customers a wider array of services, an outcome the antitrust laws should champion.  The preliminary injunction should be denied.

## BACKGROUND

**A.      Digital Healthcare Advertising Is a Dynamic Industry**

Healthcare companies (sometimes called "brands") have a variety of tools to advertise their products (prescription drugs, over-the-counter medication, medical devices, etc.).   They can purchase print ads or advertising space on network television, and they can advertise digitally through search ads, display ads on websites and social media feeds, or email campaigns.[3]  In many of those channels, the brand can choose to advertise directly to patients, or to HCPs.   When designing an advertising campaign, a brand must consider the effectiveness of each advertising channel, as well as its cost and relative return on investment.[4]   Brands often partner with advertising agencies to help plan, coordinate, and execute these advertising campaigns.

Historically, the most popular channel for brands to advertise to HCPs was through in-person visits.[5]  However, in part due to the COVID-19 pandemic—which made in-person visits difficult or impossible—brands and agencies have begun to shift their advertising budgets toward digital advertising in order to reach HCPs.[6]  Digital healthcare advertising occurs through various channels, including social media (e.g., Facebook, LinkedIn), connected TV (e.g., Roku, Hulu), medical-related ("endemic") websites (e.g., WebMD's Medscape, New England Journal of Medicine), and non-medical-related ("non-endemic") websites (e.g., CNN, ESPN).[7]   Digital healthcare advertising in both HCP and DTC grew ▉▉ year-over-year in 2021 to nearly ▉▉

---

[3] ▉▉▉▉ Dep. Tr. 11:7–19; Margolis Dep. Tr. 170:20–172:10; ▉▉▉▉▉▉ Decl. ¶ 8; ▉▉▉▉ Decl. ¶ 4.
[4] Aalderink Dep. Tr. 84:6–18; ▉▉▉▉ Dep. Tr. 17:16–18:17; ▉▉▉▉ Dep. Tr. 74:6–76:15; ▉▉ ▉▉▉▉ Dep. Tr. 74:14–75:3; Margolis Dep. Tr. 169:6–170:1, 170:25–172:10; *id.* at 168:18–19 ("What agencies are thinking about is the most efficient placements of advertising.").
[5] Aalderink Dep. Tr. 18:1–12.
[6] Margolis Dep. Tr. 260:19–261:15; ▉▉▉▉ Decl. ¶ 6.
[7] ▉▉▉▉ Dep. Tr. 15:1–16:12; ▉▉▉▉ Dep. Tr. 100:2–6; ▉▉▉▉ Dep. Tr. 10:9–11:16; O'Brien Dep. Tr. 200:23–203:7; ▉▉▉▉ Decl. ¶ 4.

████ in annual spend, with projections to grow to ████ by 2024.[8]

### B.   Programmatic Advertising Is One Means of Delivering the Right Advertisement to the Right Audience at the Right Time

**1.**  The majority of digital healthcare advertising is effected through search advertisements (i.e., sponsored search engine results).[9]  Of the remainder, most is conducted through "direct" buys between brands and publishers.[10]  For example, a brand may contract with the *New York Times* to place a persistent advertisement on the *NYT* homepage, which all visitors will see.[11]  Or a brand may work with an endemic website (like Medscape) to sponsor original content relevant to the brand's product, for example, an article discussing a new breakthrough treatment for sickle cell anemia that the brand offers.[12]

Publishers also can turn to programmatic advertising.  Although there is no uniform definition, most industry participants define programmatic advertising as a means for facilitating the automated matching of advertising space to brand advertisements based on the characteristics of the audience using preset algorithms and preferences.[13]

This matching can happen in different ways.  Sometimes, programmatic advertising is accomplished via a real-time auction in which "demand-side platforms" ("DSPs") place competing bids on behalf of their customers for inventory made available through "supply-side platforms" ("SSPs").[14]  Other times, brands may engage in "direct" programmatic advertising (or

---

[8] Hochberg Rep. ¶ 23.
[9] DX0111 [eMarketer, "US Healthcare and Pharma Digital Ad Spending: Adjusting to the New Normal in Digital Engagement (Aug. 2022)].
[10] ████ Dep. Tr. 190:14–192:5; ████ Dep. Tr. 12:23–17:8; ████ Dep. Tr. 169:13–174:3; ████ Dep. Tr. 97:18–98:3; ████ Dep. Tr. 99:19–100:15.
[11] ████ Dep. Tr. 13:18–25; ████ Dep. Tr. 191:7–13.
[12] ████ Dep. Tr. 190:14–192:5; Margolis Dep. Tr. 201:19–202:7.
[13] ████ Dep. Tr. 76:10–77:5; ████ Dep. Tr. 25:3–14; ████ Dep. Tr. 21:13–22:1; Mangano Dep. Tr. 12:15–13:10; ████ Dep. Tr. 12:18–13:16.
[14] Israel Rep. ¶ 43 & fig. 1; ████ Dep. Tr. 7:18–8:5; ████ Dep. Tr. 9:4–15; 109:13–18; ████ Dep. Tr. 48:19–49:5; Sandler Dep. Tr. 21:25–22:17.

"programmatic guaranteed"), wherein the advertiser agrees directly with a publisher on a fixed price for programmatic advertising on the publisher's website or platform when space becomes available.[15]   And some social media platforms internalize the DSP and SSP functionalities and operate a "walled garden," wherein their inventory is available only by plugging directly into the social media platform.[16]   In all events, pricing is set on a "cost-per-mille" ("CPM") basis, which is the combined data, platform, and media cost for 1,000 "impressions" of an advertisement.[17]

    2.   Programmatic advertising often involves three stages:   (1) audience creation, (2) activation, and (3) measurement.[18]

    ***Audience Creation.***  Programmatic advertising leverages the brand's identification of the right *audience* for the advertisements it wants to run.[19]   Where a brand has elected to target HCPs, this means the brand or agency must first build an audience using data to identify the HCPs to whom it wants to advertise.[20]   Most of the time, brands and agencies have already built an audience using their own internal or licensed data (which they can use in a variety of contexts, such as in-person visits) and do not require additional third-party services.[21]   In a small fraction of campaigns, the advertiser builds an audience using the DSP's on-platform tools.[22]

    ***Activation.***   Once the audience is built, the brand must "activate" the programmatic advertising campaign, either through a DSP or the publisher itself.   A DSP essentially provides the technical "plumbing" for making programmatic purchases of advertising inventory based on the

---

[15] Israel Rep. ¶ 48; Sandler Dep. Tr. 21:25–22:1.
[16] Israel Rep. ¶ 88; Margolis Dep. Tr. 200:8–201:24.
[17] DiNorscio Dep. Tr. 68:16–69:25.
[18] Whiting Dep. Tr. 113:24–114:5.
[19]         Dep. Tr. 84:5–13;         Dep. Tr. 17:14–25.
[20] Margolis Dep. Tr. 185:6–186:5.
[21]         Dep. Tr. 105:7–18;         Dep. Tr. 111:1–21; Lin Dep. Tr. 101:11–15; Miller Dep. Tr. 40:3–9, 79:4–80:2; *see also*     Dep. Tr. 51:20–52:13.
[22] Paquette Dep. Tr. 66:2–14, 67:8–68:8.

audience the brand has elected to target.[23]

    ***Measurement.***   The final step is to evaluate the effectiveness of the campaign.   DSPs sometimes provide tools for reporting on the programmatic advertising campaign run on their platforms, but brands typically prefer measurement tools that analyze the effectiveness of the *entire* advertising campaign across all channels (not just HCP programmatic advertising).[24]

    **C.    IQVIA Enters a Growing Industry**

    **1.**   IQVIA provides a broad range of services to healthcare clients, including clinical trial services, clinical trial laboratory services, observational studies, technology solutions, patient support programs, scientific strategy and medical affairs services, market research services, and advanced analytics.[25]   Just a small fraction of its revenue in 2022 came from data licensed for digital healthcare advertising.[26]   Historically, IQVIA has had no significant presence in the digital healthcare advertising industry, although it has long provided various types of data to healthcare companies.[27]

    Last year, IQVIA identified two companies with complementary capabilities—DeepIntent and Lasso—whose combined synergies would help IQVIA begin competing with the industry giants currently dominating the digital advertising space, including Google, The Trade Desk, WebMD, and Meta.[28]   DeepIntent was founded in 2015, has its own DSP technology, and has a focus on DTC and the connected TV channel.[29]   Lasso (which launched in 2020) has a much smaller footprint in DTC and does *not* have its own DSP technology, and instead licenses that

---

[23] Margolis Dep. Tr. 109:13–23, 205:5–19; ███████ Dep. Tr. 129:3–22.
[24] ███████ Dep. Tr. 65:11–20; ███████ Dep. Tr. 88:4–25, 89:22–25; Lin Dep. Tr. 117:2–9; Mangano Dep. Tr. 70:17–71:20; Paquette Dep. Tr. 70:6–71:4; ███████ Decl. ¶ 6.
[25] Jena Rep. ¶ 11; Margolis Dep. Tr. 151:3–25.
[26] Margolis Dep. Tr. 216:14–217:5.
[27] *Id.* at 154:16–155:8.
[28] Escalante Dep. Tr. 19:23–20:5; Margolis Dep. Tr. 156:4–157:3, 161:17–25 (███████████████████████ ").
[29] Margolis Dep. Tr. 188:14–24, 189:6–192:11.

technology from Microsoft's Xandr DSP.[30]  Lasso is an "omnichannel" platform that allows brands and agencies to coordinate digital healthcare advertising campaigns across multiple channels, including social media, and websites.[31]  Together, the two could allow IQVIA to "███████████" the "█████████████████████" for IQVIA's customers, including (in particular) DTC advertising.[32]  Documents presented to IQVIA's Board of Directors in connection with the transaction confirm this strategy, identifying DeepIntent's and Lasso's competitors as including giant companies like Google, The Trade Desk, Meta, Twitter, and more.[33]



These documents show that the financial driver of IQVIA's acquisition of Lasso and DeepIntent was projected growth in *DTC* programmatic advertising, not HCP.[34]  HCP programmatic advertising represents a very small sliver (<10%) of the digital healthcare

---

[30] Jena Rep. ¶ 15 & n.14; Margolis Dep. Tr. 31:22–32:8; Miller Dep. Tr. 115:18–23.
[31] Jena Rep. ¶ 15 & n.14.
[32] *Id.* ¶ 66; Margolis Dep. Tr. 214:4–25.
[33] DX0082; DX0083 [4(c)-4 at 16] ███████████████████████████████████████████████████████████████████████ ).
[34] DX0081 [4(c)-2, at 9] ███████████████████████████████████████████████████████████████████ .

advertising industry.[35]

2. The FTC has focused its case only on HCP programmatic advertising, but even within that gerrymandered advertising segment, IQVIA faces stiff competition.[36] IQVIA currently offers select data offerings that facilitate the building of audiences and campaign measurement, but the field for that data is crowded.[37] There are a host of well-established and competing sources for such data, including Veeva, Symphony Health, PurpleLab, Komodo, Swoop, HealthVerity, and many others.[38]

As for activation, there are "literally dozens and dozens" of DSPs on which HCP audiences can be activated.[39] The largest healthcare-specific provider of these services by revenue is PulsePoint—a subsidiary of Internet Brands, which is owned by private equity giant KKR and in turn owns both WebMD and an HCP-specific site called Medscape—who offers clients a suite of advertising services and exclusive access to some of the most desirable endemic advertising inventory on the Internet.[40] Moreover, some of the largest and most well-capitalized companies in the world are established players in this space, including Google, The Trade Desk, and others.[41] Google's revenue from advertising in the healthcare vertical in 2022 was ███████,[42] and

---

[35] ████████ Decl. ¶¶ 7–8; DX0082, at 11 [(4(c)-3)]. The FTC asserts that ████████ ████████████████████████████████████████████, but Medicx has since been acquired by Optimize Rx Corp., "the leading provider of healthcare technology solutions helping life sciences companies reach and engage healthcare professionals (HCPs) and patients," Optimize RX Corp., *Optimize Rx Announces Agreement to Acquire Medicx Health for $95 Million to Expand its Omnichannel Reach to Consumers*, Yahoo! Finance (Oct. 12, 2013), https://tinyurl.com/yxcwe3ka. ████████████████████████████████████████████████

[36] Lin Dep. Tr. 103:19–104:2; Whiting Dep. Tr. 146:7–22.

[37] Lin Dep. Tr. 107:3–11.

[38] Jena Rep. ¶¶ 49–54; ████████████████ Dep. Tr. 45:16–46:16, 49:5–19; ████████ Dep. Tr.) 114:4–17; Margolis Dep. Tr. 172:19–173:7; ████████████ Decl. ¶ 2.

[39] *See* Margolis Dep. Tr. 205:5–10; *see also* ████████ Dep. Tr. 73:10–14 ("████████████████████████████████████████████████████ ████████").

[40] ████████ Dep. Tr. 167:16–171:4, 174:9–175:6; Resnick Dep. Tr. 61:19–62:3; DX0121 [PP00054]; PX1066; PX2786.

[41] ████████ Dep. Tr. 23:7–26:7; ████████████ Dep. Tr. 98:6–99:11; ████████████ Dep. Tr. 7:16–22, 48:10–25.

[42] DX0101 [GOOG-IQVIA-00001695].

The Trade Desk's 2022 revenue in the healthcare vertical was ███████. [43]

DeepIntent and Lasso also face competition from firms offering other ways to advertise to specified audiences of HCPs. [44]   For example, a large amount of revenue spend on HCP programmatic advertising goes through social media sites, which frequently do not make their inventory generally available on the open market but instead operate "walled gardens" that advertisers must plug into directly in order to access a site's inventory. [45]   As explained above, advertisers can also purchase programmatic advertising directly through publishers. [46]   And agencies themselves offer a variety of services in competition with DeepIntent and Lasso, [47] with some having developed their own in-house DSP services. [48]

### D.   Investigative and Procedural History

The FTC initiated its investigation into the proposed transaction in August 2022.  For the next eleven months, it collected millions of documents from the parties and conducted one-sided "investigational hearings" of third parties from which Defendants were excluded.  It brought suit in July 2023, seeking a preliminary injunction under Section 13(b) of the Federal Trade Commission Act.  *See* 15 U.S.C. § 53(b).  The parties then engaged in expedited discovery, which revealed that the FTC had collected virtually no documents or data from third parties during its investigation.  Since the complaint was filed, moreover, the FTC's own explanation of the market, the number of competitors, and its legal theories have continued to morph.

---

[43] ███████████████ Dep. Tr. 72:6–74:4.
[44] *See* ██████ ██████████ Decl. ¶¶ 9–10.
[45] Israel Rep. ¶ 88; Margolis Dep. Tr. 200:8–201:24.
[46] ██████████ Dep. Tr. 12:15–13:3.
[47] Israel Rep. ¶¶ 33–34, 131.
[48] *See* DX0114 [Seb Joseph, *"Capture what may go to outside tech providers": WPP's Mark Read Says It Will Rival Ad Tech Buyers*, Digiday (Oct. 27, 2023), https://perma.cc/HQ4F-V9H6].

## ARGUMENT

Section 13(b) of the FTC Act permits a court to preliminarily enjoin a proposed merger challenged by the FTC "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest."  15 U.S.C. § 53(b).  Appellate courts applying this standard have evaluated whether the FTC has raised "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."  *FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995) (quotation marks omitted).[49]  That is because Section 13(b) does not permit courts to "rubber-stamp" a Section 13(b) application "whenever the FTC provides some threshold evidence."  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008).  Instead, the Court must "exercise independent judgment about the questions [Section 13(b)] commits to it." *Id.* (quotation marks omitted); *see also* Opinion and Order, *FTC v. IQVIA,* No. 23 Civ. 06188 (S.D.N.Y. Oct. 31, 2003) ECF No. 184 at 10 (courts must "exercis[e] their independent judgment and evaluat[e] the FTC's case and evidence on the merits" (quotation marks omitted)).

The FTC asserts that it need show only a "fair and tenable" chance of success on the merits. PI Mot. 11 (quoting *FTC v. Lancaster Colony Corp., Inc.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977)).  To the extent the FTC invokes this standard to suggest it need show something less than a "likelihood of ultimate success" or that the Court should defer to the FTC's factual or legal assertions, that is wrong.  Indeed, numerous courts have roundly rejected this formulation of the standard.[50]   The Second Circuit has said that the "fair and tenable" standard is largely

---

[49] *See also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714–15 (D.C. Cir. 2001); *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984).
[50] *See, e.g., Freeman Hosp.*, 69 F.3d at 267; *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997).

"interchangeable" with the "serious questions" standard. *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184, 188 & n.5 (2d Cir. 1984); *see also id.* (noting that other courts have said the "serious questions" standard places "a *higher* burden on the government"). The Court should apply the "serious questions" standard here.

Regardless of how the standard is articulated, the FTC's motion should be denied because the FTC cannot establish either (1) a likelihood of ultimate success or (2) that the equities favor the extraordinary relief it seeks. This Court's adjudication of the preliminary injunction motion will effectively decide the fate of the transaction. *See FTC v. Microsoft Corp.*, 2023 WL 4443412, at *8 (N.D. Cal. July 10, 2023), *appeal filed*, No. 23-15992 (9th Cir.).

## I.   THE FTC CANNOT ESTABLISH A LIKELIHOOD OF ULTIMATE SUCCESS

The FTC challenges the merger under both a horizontal theory (i.e., effects arising from the merging of two firms competing in the same market) and a vertical theory (i.e., effects arising from the merging of a firm with an upstream supplier). All of the FTC's arguments are predicated on its proposed market for "HCP programmatic advertising." As set forth below, the FTC's market definition is arbitrary and unsupported, and the Court can and should deny the motion on that basis alone. Moreover, the FTC's theories of competitive effects fail for a host of reasons.

### A.   The FTC Has Not Established a Relevant Product Market

Market definition is a required element of the FTC's case, *see United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974), on which the FTC bears the burden of proof, *see United States v. Long Island Jewish Medical Center*, 983 F. Supp. 121, 137 (E.D.N.Y. 1997). An accurate market definition is necessary to allow the Court to "assess the anticompetitive effect of challenged practices." *Re-Alco Indus., Inc. v. Nat. Center. for Health Educ.*, 812 F. Supp. 387,

392 (S.D.N.Y. 1993).[51]  The FTC's "failure to [properly] define its market . . . is, standing alone, valid grounds for dismissal."  *Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997).

A "relevant market" consists of a product market and a geographic market.  *Marine Bancorporation*, 418 U.S. at 618; *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The Supreme Court has repeatedly held that the boundaries of a product market are determined by the "reasonable interchangeability of use or the cross-price elasticity of demand" between the product and its substitutes.  *Brown Shoe*, 370 U.S. at 325.  "A properly defined market includes potential suppliers who can readily offer consumers a suitable alternative to the defendants' services."  *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 136 (quotation marks omitted).

### 1.  The FTC's Alleged Product Market Is Arbitrarily Narrow

The FTC proposes a product market that it calls "HCP programmatic advertising," PI Mot. 13, but it narrows and qualifies this proposal in arbitrary ways.  A brand may programmatically serve the exact same advertisement to the exact same HCP on both Facebook and on CNN.com, yet the FTC would separate those offerings into two separate markets.  Indeed, a brand may show the same advertisement to the same HCP *on the same website*, and the FTC would put those offerings into separate markets if one were purchased via a healthcare-specific DSP and the other were purchased through a direct relationship with the publisher (or through Google).  But the FTC may not "gerrymander its way to an antitrust victory without due regard for market realities."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).  The FTC's overly narrow (and inconsistent) view of the market cannot form the basis for a reliable competitive analysis.

At the outset, HCP programmatic advertising is not itself an advertising channel, but rather

---

[51] *See also City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("[A] plaintiff must allege a plausible relevant market in which competition will be impaired.").

a way of purchasing advertisements across a variety of channels.[52]  That process includes audience building, campaign activation, and campaign measurement,[53] none of which are "suitable alternative[s]" for one another, *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 136.  Some firms offer several of those services in combination,[54] but for the most part, brands and agencies obtain these services by mixing and matching vendors (as well as through self-supply):  The vast majority of advertising campaigns on DeepIntent and Lasso use premade audiences built outside of those platforms, and most campaign measurement is done off-platform as well.[55]

The FTC focuses almost exclusively on firms that provide campaign activation services, *see generally* PI Mot. 6–7, 15–17, ignoring numerous forms of competition even in that segment.[56] The FTC excludes social media platforms like ████████████████, even though the FTC does not dispute that those platforms allow programmatic advertising to HCPs.[57]  And several social media platforms, including ███████████████ (Facebook and Reddit for HCPs, respectively), are focused specifically on HCPs and offer a prime programmatic advertising opportunity.[58] Moreover, despite claiming that access to endemic inventory is essential to healthcare companies who want to advertise to HCPs, PI Mot. 19, the FTC excludes "direct" programmatic advertising sold through endemic publishers like ████████████████████.[59]

The FTC also excludes several generalist DSPs from the market entirely, asserting that

---

[52] ████████ Dep. Tr. 38:1–4, 112:16–23.
[53] Israel Rep. ¶¶ 13, 130–36.
[54] *See* ████████ Dep. Tr. 23:23–24:14; ████████ Dep. Tr. 29:2–6, 79:5–12; Paquette Dep. Tr. 56:4–24.
[55] Israel Rep. fig. 9; Paquette Dep. Tr. 66:2–14.
[56] *See* Israel Rep. ¶ 85.
[57] *Id.* ¶ 88; Colarossi Dep. Tr. 66:22–67:11; ████████ Dep. Tr. 25:11–24; ████████ Dep. Tr. 15:1–17; ████████ Dep. Tr. 95:20–96:3; ████████ Dep. Tr. 39:22–25, 44:8–22; O'Brien Dep. Tr. 200:23–201:21.
[58] Israel Rep. ¶¶ 102–04; *see also* ████████ Dep. Tr. 66:1–8 ████████████████████).
[59] Israel Rep. ¶ 108; *see also* ████████ Dep. Tr. 202:25–204:2; Sandler Dep. Tr. 53:4–19; ████████ Decl. ¶¶ 2–3.

"generalist DSPs, ████████████████████████████████████████

████████████████████████████████████ " PI Mot. 46.  The FTC is wrong as to ██████

Generalist DSPs have the same capability to programmatically deliver ads to specific HCPs as

healthcare-specific DSPs.[60]  The Department of Justice, for example, currently is suing Google for

its alleged "dominance over digital advertising technologies," Compl., *United States v. Google*

*LLC*, 1:23-cv-108 (E.D. Va. Jan. 24, 2023), ¶ 4, but the FTC nonetheless excludes Google from

the  market ████████████████████████████████████████████



████████████████████████████████████████. Similarly, the FTC ignores evidence of HCP

programmatic advertising on ██████████[63] and █████████████.[64]

For other generalist DSPs, the FTC dismisses them as "fringe" competitors.  PI Mot. 26.

But that "fringe" includes ████████████, one of the largest DSPs in the country with

---

[60]
[61]  ████████████████ Dep. Tr. 186:11–23; ████████████ Decl. ¶ 7; ████████████ Decl. ¶ 6.
████████████████████████████████████████

[62] ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[63] ████████████████████████████████████████

[64] ████████████████████████████████████████



There is nothing "fringe" about it.

## 2.   The FTC Has Not Adequately Supported Its Proposed Market with Reliable Econometrics

Additionally, the FTC has failed to ground its arbitrary market on any economically sound basis. The FTC provides virtually no detail regarding the economic analysis its proposed expert—Dr. Hatzitaskos—performed. *See* PI Mot. 21 & n.87. One way courts and economists evaluate market definition in the merger context is through the "hypothetical monopolist test" ("HMT"), which asks whether a hypothetical monopolist of the proposed market "would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers." *United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018). The FTC contends that



---

65
66
67 DiNorscio Dep. Tr. 70:11–13 ("No platform that I know if is able to manipulate actual media CPM . . . .");
      Dep. Tr. 39:22–40:24.
68



If a platform loses customers on the buy-side, that will make the platform less attractive to publishers, and thus cause it to lose publisher



relationships, causing the platform to lose more buy-side customers, in a cycle.[75]  These kinds of

"indirect network effects" are a separate restraint on two-sided transaction platforms that must be

considered.  *See Am. Express Co.*, 838 F.3d at 199–200.

### 3.   The *Brown Shoe* Practical Indicia Undermine, Rather than Support, the FTC's Proposed Market

Sidestepping any rigorous economic analysis or meaningful examination of cross-elasticity

of demand, the FTC instead leans on the "practical indicia" from *Brown Shoe* to justify its market.

*See* PI Mot. 14–20.  But the Second Circuit has been clear that "[r]easonable interchangeability

sketches the boundaries of a market," and practical indicia may be used only to "clarif[y] whether

two products are in fact 'reasonable' substitutes and are therefore part of the same market."

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  As set forth

above, the FTC has ignored numerous interchangeable alternatives to the merging firms, and its

invocation of the *Brown Shoe* factors merely confirms that failure.

**Peculiar Characteristics and Uses.**   The FTC contends that HCP programmatic

advertising is unique insofar as it offers "combined capabilities."  PI Mot. 15.  But there are

numerous channels for advertising to HCPs across multiple websites on a 1:1 basis, including

social media and direct ad buying, and many of those channels allow for the programmatic

purchase of advertisements.  *See supra* pp. 13–16.[76]  The ability to track HCP reach and

engagement is not unique to the narrow set of advertising platforms to which the FTC confines its

market—███████████████████████████████████████████████████

████[77]—and such measurement in fact typically happens across *an entire campaign* (not just

---

[75] Israel Rep. ¶¶ 138–42; *see also* ██████████ Dep. Tr. 59:19–23; ████████████████ Dep. Tr. 97:3–19; Margolis Dep. Tr. 189:24–190:15.

[76] *See also* Israel Rep. ¶¶ 71–72, 100.

[77] ████████████████ Decl. ¶ 6.

for programmatic advertising).[78]  Moreover, it is demonstrably incorrect that HCP programmatic advertising is defined by brands' ability to measure changes in prescribing behavior, *see* PI Mot. 15, because some brands simply do not measure advertising campaigns' effect on prescribing behavior,[79] and many HCP programmatic advertising campaigns do not involve prescription drugs—companies also advertise for general brand awareness, over-the-counter medication, and medical devices.[80]

To the extent the FTC means to suggest that firms providing audience building, campaign activation, and measurement services together comprise a distinct market, it has not even attempted to establish such "clustering" under the established framework, which requires the plaintiff to prove that "the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately." *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004) (quotation marks omitted); *see also Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354–55 (S.D.N.Y. 2009) (no cluster market where the plaintiff failed to show higher prices for clustering). Nor could it:  Most audiences are built *outside* of advertising platforms like DeepIntent and Lasso,[81] and most campaign measurement is also done *off* platform.[82]

**Industry Recognition and Internal Documents.**  As it has done from the outset of the case, *see* Hr'g Tr. 17:17–19 (July 20, 2023), the FTC relies on outdated or out-of-context documents from the parties to try and justify its proposed market, *see* PI Mot. 17.  But while a

---

[78] ██████████ Dep. Tr. 15:4–16:4; ██████████ Dep. Tr. 33:2–35:10; ██████████ Dep. Tr. 41:12–22.

[79] ██████████ Dep. Tr. 74:6–22.

[80] ██████████ Dep. Tr. 23:16–24:15, 41:12–42:22, 78:3–21.  The FTC also suggests that other forms of advertising are less effective because they do not "██████████." PI Mot. 16.  No aspect of HCP programmatic advertising, however, "██████" audience engagement.

[81] Sandler Dep. Tr. 25:3–8; ████ Dep. Tr. 52:1–5.

[82] ██████████ Dep. Tr. 15:4–16:4; ██████████ Dep. Tr. 33:3–35:10; ██████████ Dep. Tr. 41:12–21.

firm's internal documents can be useful for assessing which other firms should be *included* within

the market, they do little to help determine which firms should be *excluded* from the market:

> [S]eparate markets are not indicated by documents within *A* firms that are
> preoccupied with other *A* firms.  After all, a given producer of *A* cannot charge
> more than other *A* firms and thus may focus entirely on them even though a
> hypothetical monopolist of product *A* would focus entirely on the price of a close
> substitute *B*.

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.10[A] (4th ed. 2023

supp.) (emphasis added); *see also FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 42 n.18 (D.D.C.

2009) (same).   This makes good sense:  Firms are most likely to focus their marketing efforts on

"brands perceived to have similar benefits and characteristics," but they "also compete by striving

constantly to introduce new products, to include consumers to try [different products], and to

change consumer preferences," all in competition with firms who provide similar services.  *New*

*York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 360 (S.D.N.Y. 1995).  Courts therefore recognize

that documents "reflect[ing] laymen's comments made in a competitive business environment"

carry little persuasive value in defining an *antitrust* market.  *AD/SAT v. Associated Press*, 920 F.

Supp. 1287, 1297 n.7 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216 (2d Cir. 1999); *see also Truck-Rail*

*Handling Inc. v. BNSF Ry. Co.*, 2005 WL 8178364, at *8 (N.D. Cal. Mar. 8, 2005) (same).[83]

The FTC is thus wrong that references to a "market" for HCP programmatic advertising in

internal (and informal) communications are sufficient to establish the relevant antitrust market or

its contours.  There is no dispute that PulsePoint, DeepInt, and Lasso are competitors in some

respects, but that does not mean they face no other competitive constraints[84]:  That Yale and

---

[83] This principle holds even if internal documents specifically refer to a supposed "market" for the firm's products.
*See AD/SAT*, 920 F. Supp. at 1297 n.7 (internal documents referencing a firm's "hope[s] to 'capture' the market" were
not probative of market definition); *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1318–19
(D. Md. 1986) ("[T]he fact that a company may refer to a 'market' does not necessarily mean that its reference will
be to a market for purposes of the Sherman Act."), *aff'd*, 831 F.2d 537 (4th Cir. 1987).
[84] Hochberg Rep. ¶¶ 74–79.

Harvard are rivals with one another does not mean they constitute their own antitrust market. *Cf. Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) (rejecting narrow market that excluded "many institutions of higher learning"). Additionally, many of the documents on which the FTC relies are from several years ago, and thus offer little insight into the competition of this rapidly evolving industry today.[85] More contemporary accounts from third parties in the industry paint a much broader picture of the competitive landscape.[86] And in any event, as detailed further below, internal documents do in fact discuss competition with ██████████████ ████████████████, such as by suggesting that ████████████████████████████ ████████████████████ *See infra* pp. 30–31.[87]

**Distinct Prices.** The FTC asserts that advertising to HCPs is more expensive than advertising to DTCs. PI Mot. 17–18. But while the underlying advertising space for an HCP ad may be more expensive on a CPM basis, that price is set by the *publisher*, independent of the price for the platform services any of Defendants or the competing firms supply.[88] Moreover, this distinct pricing at best establishes a distinction between HCP and DTC advertising—it says nothing about the many other types of HCP-focused advertising the FTC excludes from its market, such as social media, connected TV, or programmatic direct (including endemic).[89]

**Distinct Customers.** The same customers the FTC says use HCP programmatic advertising—"healthcare companies and their advertising agencies," PI Mot. 19—use a host of other advertising channels.[90] Moreover, the evidence demonstrates that non-healthcare

---

[85] *Id.* ¶¶ 75–76.
[86] ████ Dep. Tr. 76:10–77:5; ████████ Dep. Tr. 25:3–14; ████ Dep. Tr. 21:13–22:1; ████████ Dep. Tr. 12:18–13:16; ████ Dep. Tr. 76:9–77:2.
[87] *See* DX0091 [DI-2R-0002225637].
[88] Israel Rep. ¶ 86. Note that although the CPM for DTC is lower, the total spend is much higher in view of the larger audience. *See* Margolis Dep. Tr. 285:21–286:18.
[89] *See id.* ¶¶ 46–48.
[90] *Id.* ¶ 42; *see also* ████████ Decl. ¶ 4; ████ Decl. ¶¶ 4, 7.

companies—including, for example, insurance companies—also engage in HCP programmatic advertising through PulsePoint, DeepIntent, Lasso, and many other DSPs.[91]

**Specialized Vendors.**  Finally, the FTC is wrong that HCP programmatic advertising is performed only by "healthcare DSPs."  PI Mot. 19.  If that were ever true, it certainly is not the case today:  It is indisputable that many generalist DSPs—that is, DSPs that offer healthcare advertising services *and* advertising in other verticals—*do* facilitate HCP programmatic advertising, including Google, The Trade Desk, AdTheorent, and others.[92] ███████████████

████████████████████████

Implicitly acknowledging that this qualifier is inaccurate, the FTC characterizes generalist DSPs as "fringe" competitors, PI Mot. 26, 36, 48, but the evidence does not bear that out, *see supra* pp. 15–16.  Many of the FTC's "fringe" competitors are financially backed by some of the biggest investors in the world.[94]  Moreover, a categorization of a firm as "fringe" is relevant only insofar as the firm's output is limited by its capacity and costs, *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 927c (2023 cum. supp.), something that obviously is not true for technology platforms, which can expand output at minimal cost if there is an economic incentive to do so.[95]  And the FTC's narrow conception again ignores that HCP programmatic advertising can be facilitated in a wide variety of ways, including through social media and direct programmatic buys.[96]

To be sure, some firms (including the merging parties) sought to differentiate themselves

---

[91] *See* ███████████ Dep. Tr. 13:11–22 (███████████████); ███████████ Dep. Tr. 23:22–24:10 (███████████); *see also* ███████████ Dep. Tr. 17:15–23 (███████████████████████████).

[92] Escalante Dep. Tr. 41:10–18; ███████████ Dep. Tr. 17:18–23, 95:19–24; O'Brien Dep. Tr. 199:24–200:21; ███████████ Dep. Tr. 97:1–15; ███████████ Decl. ¶ 13; ███████████ Decl. ¶¶ 2–4.

[93] ████

[94] *See* Hochberg Rep. ¶¶ 62–66 & fig. 3; Margolis Dep. Tr. 183:12–184:19.

[95] Israel Rep. ¶¶ 273–77.

[96] Israel Rep. ¶ 42.

when they first entered the industry by emphasizing their healthcare focus.[97]   But product differentiation is an essential element of competition—it is the way in which firms distinguish their brands from others based on attributes other than price.   *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007).   Product differentiation "create[s] the *possibility* of separate markets, not the certainty."   *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993) (emphasis added).

The unremarkable fact that PulsePoint, DeepIntent, and Lasso (among others, including ███████) have highlighted their focus on digital healthcare advertising does not render those firms a market unto themselves.   *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489–90 (9th Cir. 1991) (product markets are not defined by "the producers' institutional associations rather than by the products' characteristics").   Customers make purchasing decisions based on a number of different criteria, including price, quality, brand recognition, and institutional relationships.[98]   The services offered by PulsePoint, DeepIntent, and Lasso compete with generalist DSPs and other firms along all of these axes today.[99]   In other words, these firms are seeking to persuade consumers to "make tradeoffs on some of the very factors the [FTC] attempt[s] to use to define [its] market," *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989), undermining the FTC's effort to confine these firms to their own competitive space.

\* \* \*

---

[97] Margolis Dep. Tr. 112:4–24; Sandler Dep. Tr. 46:10–47:2; ███ Dep. Tr. 103:9–19; ███████ Decl. ¶ 9.
[98] ███████ Dep. Tr. 17:16–18:17; ███████ Dep. Tr. 27:22–29:13; ███████ Decl. ¶ 5 ("███████████████████████████████████████████████████████ ).
[99] ███████ Dep. Tr. 128:9–129:22; Paquette Dep. Tr. 39:7–15, 40:2–18; ███ Dep. Tr. 103:9–19.

Market definition is an essential and, in this case, dispositive element of a plaintiff's antitrust case. The product market must be defined rationally and with respect to settled and reliable economic principles. The FTC has failed to demonstrate that its market definition is legally or factually defensible, and therefore cannot establish a reasonable likelihood of success. Because the FTC's entire case depends on its market definition—and because establishing the market is an element of the FTC's case—the motion should be denied on this basis alone.

### B.   The FTC Has Not Established a Likelihood of Substantial Anticompetitive Horizontal Effects

A merger is unlawful under the Clayton Act only if the FTC establishes that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly" in a relevant market. 15 U.S.C. § 18. In the context of a horizontal merger, the burden first falls to the FTC to show "that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," which establishes "a presumption that the transaction will substantially lessen competition." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990); *see also In re AMR Corp.*, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023) (citing this framework with approval). If the FTC makes a prima facie case, the defendant may rebut that case by "producing evidence to cast doubt on the accuracy of the plaintiff's evidence as predictive of future anti-competitive effects." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 199 (S.D.N.Y. 2020) (alteration omitted). If the defendant makes such a showing, "the burden of production shifts back to the plaintiff and merges with the ultimate burden of persuasion, which is incumbent on the [FTC] at all times." *Id.* (alteration omitted).

To obtain a preliminary injunction, it is the FTC's burden to show that there are "serious questions" under this framework. *H.J. Heinz Co.*, 246 F.3d at 714–15 (quotation marks omitted). The focus is on what is likely to happen *after* the transaction closes, and Section 7 "deals in

probabilities, not ephemeral possibilities." *Marine Bancorporation, Inc.*, 418 U.S. at 622–23 (citation and quotation marks omitted); *see also United States v. Culbro Corp.*, 436 F. Supp. 746, 749 (S.D.N.Y. 1977) (Section 7 concerns itself with "a showing that such effects are reasonably likely to occur."). The FTC's speculative assertions, based on snippets of evidence that ignore the broader context, actual practices, and the dynamic nature of this industry, are insufficient.

### 1.      The FTC Is Entitled To No Presumption

The FTC divides its horizontal prima facie case into two sub-theories—one based on market shares and one based on the alleged elimination of direct competition.  PI Mot. 22–33. Neither is sufficient to give rise to a presumption that the transaction will substantially lessen competition.

**a.**  The FTC first argues that its calculation of the merged firm's market share and the associated HHI is sufficient to establish a prima facie case.  PI Mot. 22–23.  But the Supreme Court has cautioned that such calculations are not dispositive and must accompany "a further examination of the particular market—its structure, history and probable future—[to] provide the appropriate setting for judging the probable anticompetitive effect of the merger," *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974), and the Second Circuit follows this "guidance," *Broadway Delivery Corp. v. United Parcel Serv.*, 651 F.2d 122, 128 (2d Cir. 1981).

The FTC attempts to support its flawed concentration calculations by pursuing a theory of *unilateral* effects, PI Mot. 25,[100] which refers to "the tendency of a horizontal merger to lead to higher prices simply by virtue of the fact that the merger will eliminate direct competition between the two merging firms."  *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1113 (N.D. Cal. 2004); *see also United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 81 (D.D.C. 2011) (similar).

---

[100] *See also* Hatzitaskos Rep. ¶ 121.

When a merger challenge is premised on alleged unilateral effects, "a strong presumption of anticompetitive effects based on market concentration is especially problematic." *Oracle*, 331 F. Supp. 2d at 1122; *see also FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *19 (C.D. Cal. Mar. 11, 2011) (similar); *cf. H.J. Heinz Co.*, 246 F.3d at 715–116 (market concentration most relevant where there is a "likelihood of interdependent anticompetitive conduct"). The FTC's reliance on market shares here is insufficient to make out its prima facie case (or give rise to any presumption).

*First*, all of the FTC's analysis in this respect depends on its erroneous market definition—which, among other things, excludes revenue from social media companies, endemic publishers, and certain generalist DSPs, among others—and is defective for that reason alone.

*Second*, the FTC's market shares rest on numerous miscalculations. For example, the FTC's expert ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ And consistent with its imprecise market definition, the FTC includes all the revenues of Lasso and DeepIntent—including for audience building, direct programmatic buys, and measurement—even though the FTC apparently excludes other firms that offer those exact same services (including ████, the undisputed market leader for programmatic campaign measurement).[103]

The defects in the FTC's market share presumptions are revealed by the fact ████████ ██████████████████████████████████████████████████

---

[101] ████████████████████

[102] ██████████████████████████████████████████████

[103] Israel Rep. ¶ 186.

██████████ ██ ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ And

there are numerous other firms involved in providing services related to HCP programmatic advertising that the FTC overlooks, including self-service DSPs that do not track how customers are using their platform (like ████, whose revenue the FTC has not even tried to ascertain).[106]

*Third*, the FTC's HHI calculations fail to account for the swell of new competitors and the likelihood of future entry. Market share must account for "any firms and production capacity that, in response to a small but significant and nontransi[t]ory price increase, are likely to be devoted rapidly to production or sale of a market product without incurring significant sunk costs of entry and exit." *Kraft Gen. Foods*, 926 F. Supp. at 360. That is particularly true in the context of the Clayton Act, which seeks to predict future competitive conditions: Even "a substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect." *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984).

The evidence indicates there are numerous such firms, which is no surprise given that "the programmatic landscape is probably more so than virtually any other industry evolving at an incredibly rapid pace."[107] For example, supply-side platforms can easily pivot to providing demand-side services if there is a competitive opportunity to do so, just as ████████████ ████████[108] Additionally, established platforms that may currently offer only cohort-based advertising to patients face few barriers in turning to offering HCP programmatic advertising as well, ██████████████████████████████████.[109]

---

[104] *Id.* ¶¶ 414–16.
[105] *Id.* ¶¶ 223–24.
[106] *See id.* ¶¶ 88, 108; ████████ Dep. Tr. 50:14–51:6.
[107] ████████ Dep. Tr. 90:2–4.
[108] ████████████ Dep. Tr. 16:12–17:3 (██████████████████████████████████).
[109] Hochberg Rep. ¶ 30.

*Finally*, the FTC claims that the market shares its expert calculates are "consistent with internal estimates by Defendants." PI Mot. 23. That is just wrong— ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ Moreover, other competitors are projecting significant growth, yet the FTC ignores this evidence.[113]

Accordingly, FTC's market share calculations do not support a presumption that the transaction will be anticompetitive; even if they do, any presumption is extraordinarily weak and easily overcome by the competitive constraints imposed by the many other participants (and potential participants) in the proposed product market, which has low barriers to entry.[114]

**b.** The FTC also appears to suggest that the purported elimination of direct competition between DeepIntent and Lasso is alone sufficient to deem the proposed transaction anticompetitive. PI Mot. 24–32. That is wrong as a matter of law. Mergers of direct competitors are "not per se illegal, and many of them withstand attack under any existing antitrust standard." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979). Thus, "the mere fact that a market has few competitors does not transform every action [] into an antitrust violation." *MacDermid Printing Solutions LLC v. Cortron Corp.*, 833 F.3d 172, 186 (2d Cir. 2016). Even if the merging parties together constitute a large market share, the court must nonetheless determine whether the merger will substantially lessen competition, i.e., "with reasonable probability, [if] the

---

110 ████████████████████████████████
111 ████████████████████████████████
112 ████████████████████████████
113 *See* Israel Rep. ¶ 187.
114 *See infra* pp. 46–47.

merged entity [will] have enough market power to enable it to profitably increase prices above competitive levels for a substantial period of time[.]" *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 142. That makes intuitive sense: Competition can come from multiple firms and on multiple levels, and consolidating two competitors does not necessarily mean prices can be raised without consequence.

None of the cases the FTC cites support its contention that the elimination of direct competition is sufficient to show that a transaction would be anticompetitive. PI Mot. 12–13, 25. In *FTC v. Staples, Inc.*, the court identified direct competition as one "factor" when analyzing anticompetitive effects. 970 F. Supp. at 1083. Likewise, the court in *H&R Block* evaluated direct competition alongside many other factors. 833 F. Supp. 2d at 81–82. The court in *FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000), did the same. *See id.* at 169–70.[115]

Moreover, although DeepIntent and Lasso compete in some respects, they also offer complementary services. Lasso is not a DSP—it licenses that technology from Microsoft's Xandr.[116] Instead, Lasso provides a user interface for coordinating digital advertising campaigns across multiple channels.[117] DeepIntent, meanwhile, has a far more robust DTC and connected TV offering,[118] and thus competes even more closely with firms like The Trade Desk.

The FTC nonetheless contends that DeepIntent and Lasso are uniquely competitive with one another, relying on cherry-picked quotes and anecdotal evidence largely plucked from

---

[115] *See also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 43 (D.D.C. 2017) ("Mergers between close competitors *might* have unilateral anticompetitive effects . . . ." (emphasis added)); *United States v. Mfrs. Hanover Tr. Co.*, 240 F. Supp. 867, 955 (S.D.N.Y. 1965) (discussing standard for Sherman Act claims and agreeing that the standard is higher for a Clayton Act claim).

[116] Sandler Dep. Tr. 65:1–6; ███████ Dep. Tr. 44:10–19.

[117] Field Dep. Tr. 176:15–177:4 ("[W]hat we do as a business is provide a series of products and services to support any level of marketing, whether that be technical sophistication, size, scope, or something else, and trigger engagement[.]").

[118] Margolis Dep. Tr. 189:24–192:8.

informal emails and chat messages.  PI Mot. 25–32.  But the full context of those documents dispels

the FTC's theory.  For example,



Looking beyond the FTC's curated selection, there are numerous documents showing

competition with other firms, including:





It is true that DeepIntent and Lasso compete with one another, but that does not mean that either firm has unique price-disciplining power.

### 2. There Is No Evidence of Anticompetitive Effects Flowing from the Proposed Merger

The FTC's focus on two aspects of the transaction (market shares and direct competition) also risks missing the forest for the trees. The ultimate question here is whether the merged firm could unilaterally, and profitably, raise prices above competitive levels. *See Kraft Gen. Foods*, 926 F. Supp. at 366. To establish a prima facie case under this theory, the FTC must show that (1) the products in the market are differentiated, (2) the products controlled by the merging firms are close substitutes within that market, (3) other products are poor substitutes for the merging firms' products, and (4) other firms are unlikely to reposition if prices increase. *CCC Holdings Inc.*, 605 F. Supp. 2d at 68; *see also H&R Block*, 833 F. Supp. 2d at 81 (same); *Oracle*, 331 F. Supp. 2d at 1117–18 (same). Even assuming product differentiation, the other factors all show that there is no likely impairment of competition post-merger.

The FTC never actually analyzes how brands and agencies would respond to a price increase from PulsePoint, DeepIntent, and Lasso, and it failed to collect revenue data from a host

127
128
129

of major competitors, including Google, Meta, and numerous endemic publishers.  With billions of dollars flowing through the digital advertising industry, the FTC focuses on the supposed elimination of direct competition of two firms with less than ▮▮▮▮▮▮ in combined revenue. And in doing so, the FTC ignores the flood of new entrants and growing competition—indeed, *all* of the firms in this industry are new entrants, including the merging parties.  The full factual record defeats the FTC's theory that the transaction would result in lessened competition.

The many remaining firms post-merger (no fewer than ▮▮▮▮, even by the FTC's count) will be more than sufficient to constrain pricing.  Advertisers allocate dollars across a variety of channels based on the likely return on those investments.  *See supra* pp. 13–16, 21–23.  Those other channels act as competitive restraints on DeepIntent and Lasso—a price increase by the merged firm would alter the value proposition of an advertising campaign with that firm and could drive volume to other channels, as third parties (including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮) testified would happen.[130]   And many of those channels are capable of advertising directly to a defined population of HCPs, just as with HCP programmatic advertising.[131]

Even focusing only on HCP programmatic advertising (as the FTC has labeled it), brands have many options.  Beyond ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, third parties identified a host of options for activating HCP programmatic advertising campaigns:



---

130 ▮▮▮▮▮▮▮▮▮▮ Decl. ¶¶ 14, 18; ▮▮▮▮▮▮▮ Decl. ¶ 10; ▮▮▮▮▮▮ Decl. ¶¶ 9–10; *see also* ▮▮▮▮▮▮
▮▮, ¶ 4.  The FTC, notably, did not solicit any testimony to the contrary.
131 ▮▮▮▮▮▮▮▮▮▮▮▮ Dep. Tr. 34:20–35:8; ▮▮▮▮▮▮ Decl. ¶ 4.
132 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



The FTC does not articulate why this panoply of competition would not be sufficient to discipline the pricing of the merged firm.  Indeed, numerous third parties ████████████████ ████████████████████████████████████████████████ ████████████████████████████ And switching costs are low—brands and agencies typically work with multiple DSPs anyway, and some have switched or indicated they could switch DSPs with only minimal effort.[137]  Nor does the FTC account for the various forms of HCP programmatic advertising it has inexplicably excluded from its market, including programmatic advertising on social media and endemic websites, and direct programmatic.[138]

 The FTC also largely ignores the possibility of reentry and repositioning.[139]  Over the past several years, there has been a flood of new entrants for healthcare programmatic advertising services—in fact, virtually all participants in the alleged market could be fairly characterized as



[137] ████████████ Decl. ¶ 5; ████████████ Decl. ¶ 14; *see also* Paquette Dep. Tr. 112:12–113:11; ████ Dep. Tr. 97:1–15.
_____ *See* ████ Dep. Tr. 200:24–201:23.
[138] *See* Israel Rep. ¶¶ 88, 108.
[139] ████████████ Dep. Tr.181:7–16.

new entrants.[140]  According to public announcements, DeepIntent announced that it offering HCP

programmatic services in 2018, PulsePoint in 2018, and Lasso in 2020.  Other new entrants include

███████████████████████████████████████, the last of which ███████████████████████████

███████████████████████████████████████████████████████.[141]



Firms that already offer products and services for HCP programmatic advertising are responding

with their own innovations, including new audience planning tools (███████), new measurement

tools (███████████████), and more comprehensive data offerings (██████████).[142]  Other firms,

including advertising agencies themselves, are developing new alternatives to DSPs for

programmatic advertising.[143]  And still other firms, including ████████ (agency) and ████████

---

[140] Paquette Dep. Tr. 38:23–39:15.
[141] Hochberg Rep. fig. 1; ███████████████. ¶¶ 1–4.
[142] Israel Rep. ¶ 240.
[143] *See, e.g.*, DX0093 [DI-2R-0002753533] (███████████████████████████████████);
Dep. Tr. 35:13–37:2 (███████████████); Tim Cross, *Magnite Circumvents DSPs with Launch of ClearLine*, VideoWeek (Apr. 17, 2023), https://perma.cc/H8ZL-5GTF (discussing new SSP tools to bypass DSPs).

(healthcare-specific DSP), have announced partnerships to offer new integrated products.[144]

The FTC does not account for any of this rapid growth in assessing horizontal effects.  That is fatal to the FTC's case, because the Clayton Act is a *forward*-looking statute that evaluates the likely competitive landscape in the future, not in the past.  The FTC thus has not made out a prima facie case on its horizontal theory.  (Alternatively, any such case is rebutted for the reasons summarized below.)  The FTC is not reasonably likely to succeed in proving that the transaction will substantially lessen competition in the proposed product market.

### C.    The FTC Has Not Established a Likelihood of Success Under Its Vertical Theory

The FTC has never once obtained a Section 13(b) preliminary injunction on a vertical merger theory.  This case should not be the first.

It is well recognized that "[v]ertical mergers often generate efficiencies and other procompetitive effects."  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018); *see also Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers."); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("[V]ertical integration creates efficiencies for consumers.").  "[T]here are no precise formulas for determining whether a vertical merger may probably lessen competition."  *Fruehauf Corp. v. FTC*, 603 F.2d 345, 353 (2d Cir. 1979).  Thus, "antitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record

---

[144] *See* Israel Rep. ¶ 209.

evidence relating to the market and its probable future." *Arch Coal.*, 329 F. Supp. 2d at 116–17.[145]

    The FTC's vertical theory is based on the allegedly anticompetitive effects that could arise if IQVIA were to acquire a second advertising platform and withhold some unspecified subsets of its healthcare data from other DSPs. PI Mot. 33–35. But as set forth below, IQVIA's data business turns on making its data widely *available* in the marketplace. In the past several years, IQVIA has expanded the availability of its digital advertising data and now makes its data available widely to DSPs.[146] It is publicly committed to an open data ecosystem where customers—not IQVIA—choose where and how they use data for programmatic advertising.



### 1. There Are Numerous Competitors and Alternatives to IQVIA Data

    The FTC's entire vertical theory flows from the flawed premise that programmatic advertising platforms cannot compete without access to certain sets of IQVIA data. That is wrong.

---

[145] The law is unsettled as to whether the three-part burden shifting approach used for horizontal mergers applies also to vertical mergers, but this debate is "somewhat academic," because the "ultimate burden of proving a Section 7 violation rests with the plaintiff." *AT&T*, 310 F. Supp. 3d at 191 n.17 (quotation marks omitted).

[146] *See, e.g.*, PX1044; Margolis Dep. Tr. 177:22–178:21, 204:14–205:4.

[147]

[148]

At the outset, the FTC conflates the different ways that IQVIA makes its data available. One of IQVIA's offerings is to license its data directly to that DSP for use in on-platform audience building, campaign activation, and on-platform measurement.[149]   Brands and agencies use on-platform audience building for only a very small percentage of campaigns.[150]  Another way in which IQVIA data may arrive on a DSP is if a brand or agency either builds its own audience in-house using IQVIA data (which the brand may have licensed for a broad array of uses) or purchases an audience from IQVIA.[151]

In both respects, IQVIA's data is not a critical input and is available from other sources.[152] For "HCP identity" data, there are several alternative data providers, including ██████████ ████████████████████████████████████████████████████████████, to name just a few.[153]  This diversity of options is not surprising, because information about HCPs can be obtained from numerous sources, including cms.gov.[154]  As for IQVIA's claims and prescription data—which the FTC says is used for "audience building and measurement of campaign outcomes," PI Mot. 38–39—████████████████████████████████████████████ ███████████████████████████████████[155] Moreover, other data providers offer similar data products, including ████████████████████████.[156]

The FTC nonetheless argues that IQVIA's data is different, because IQVIA promotes it as

---

[149] Jena Rep. ¶¶ 13–14 & n.7.
[150] ████████████████ Dep. Tr. 65:11–20; ████████ Dep. Tr. 88:4–25, 89:22–25; Paquette Dep. Tr. 66:2–14, 67:8–68:8.
[151] ████████████████ Dep. Tr. 40:11–16; O'Brien Dep. Tr. 25:6–26:21. *See, e.g.,* ████████████ Dep. Tr. 69:3–71:17; O'Brien Dep. Tr. 74:24–76:14.
[152] ████████████ Dep. Tr. 135:21–137:17; ████████████ Decl. ¶¶ 9–10.
[153] ████████████ Dep. Tr. 24:8–28:16; ████████ Decl. ¶ 4; ████████ Decl. ¶¶ 3–4; ████ Decl. ¶¶ 3–4; ████ Decl. ¶ 6; ████ Decl. ¶ 4.
[154] Israel Rep. ¶ 319; Jena Rep. ¶¶ 43, 50–52; ████████ Dep. Tr. 23:3–24; ████████ Dep. Tr. 29:8–17; Lin Dep. Tr. 139:10–23; ████████ Dep. Tr. 142:21–143:2.
[155] *See* Jena Rep. ¶¶ 37–41.
[156] *Id.* ¶ 60 & tbl. 1.

the "███████." PI Mot. 35.  But marketing documents are a poor indicator of substitutability, because firms always seek to differentiate their product as "best-in-class."  *See U.S. Horticultural Supply, Inc. v. Scotts Co.*, 2009 WL 89692, at *19 (E.D. Pa. Jan. 13, 2009) ("marketing documents" not sufficient to show lack of substitutability).   Indeed, other data providers in this industry unsurprisingly claim to offer best-in-class data,[157] confirming that it is not sound economic analysis to treat marketing claims as statements of unassailable truth.

And the facts show that IQVIA's data is not, in fact, indispensable. ██████████





[157] ████████ Dep.  Tr.  77:5–16  ("█████████");  ██████████ Dep.  Tr.  53:9–54:9 ("█████");  ████████ Decl. ¶ 3 ("█████████").

[158] ██████████

[159] ██████████

[160] ██████████

[161] ██████████

[162] ██████████

████████████████████████████████████████████████████

██████████ It is thus inaccurate that IQVIA controls a key input into HCP programmatic advertising—it is but one player among many.

### 2.    IQVIA Has No Ability or Incentive to Foreclose

Notwithstanding the variety of data providers available to healthcare companies, the FTC urges that the merger will give IQVIA the "ability" and "incentive" to foreclose competition by withholding data from competing DSPs. This theory fails: Nothing about the transaction would change IQVIA's ability or incentive to withhold data, as evidenced by the fact that IQVIA has only *expanded* access to its data both before and after acquiring Lasso.

**a.** The FTC cites no authority holding that mere "ability" and "incentive" to foreclose competition is sufficient to establish anticompetitive effects from a vertical merger—nor could it, in view of the requirement that a plaintiff show a "reasonable probability" of a lessening of competition. *Brown Shoe*, 370 U.S. at 325. The case the FTC cites (PI Mot. 41) did not endorse this theory, instead finding that the DOJ had not proven the factual predicate for the theory and ruling against the DOJ on that basis. *See AT&T*, 310 F. Supp. 3d at 243–46.

In fact, the Second Circuit has been clear that a vertical merger may not be condemned as anticompetitive merely because of the *potential* for foreclosure. In *Fruehauf*, the Second Circuit agreed with the FTC that foreclosure was "possible," 603 F.2d at 355, but nevertheless rejected this theory due to the lack of "appreciable evidentiary support," *id.* at 354. The Court pointed out that (1) there was no evidence that the acquiring company "contemplated such a stratagem when it entered the merger," (2) during past product shortages, the upstream company had "allocated its

──────────────────

████████████████████████████████████████████████████

███ ████████████████████████

production pro rata among its customers," and (3) the "risk" of "retaliati[on]" in the event of preferencing and the ensuing "economic harm" made foreclosure unlikely. *Id.* at 354–55. These considerations apply here with equal or greater force.

*First*, there is no evidence that IQVIA has ever contemplated withholding data from rival DSPs or from brands that do business with rival DSPs, and the FTC cites none. IQVIA already competes with other companies providing services to pharmacy brands in a variety of spaces, including HCP programmatic advertising, yet the FTC offers no evidence that IQVIA leadership has ever even contemplated withholding data from brands that work with those competitors.[164]

*Second*, in fact, rather than try to *withhold* data from DSPs, IQVIA has sought to increase the availability of its data.[165] IQVIA builds and pushes audiences out to numerous DSPs.[166] It has worked with dozens of DSPs to build out the infrastructure necessary to make its data freely available on their platforms.[167] And it has ████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

*Third*, like the defendant in *Fruehauf*, withholding its data from customers of rival DSPs would be affirmatively harmful to IQVIA's overall business. Digital advertising services comprise a tiny fraction of IQVIA's ██████████ revenue.[169] It would make no economic sense for IQVIA to jeopardize its overall business relationships with healthcare companies in order to gain a hypothetical advantage in the nascent digital advertising business.[170] Even a small drop in revenue

---

[164] Israel Rep. ¶¶ 307–11.
[165] *Id.* ¶¶ 329–31 & fig. 27.
[166] *See, e.g.*, PX1044; Margolis Dep. Tr. 177:22–178:21, 204:14–205:4.
[167] Margolis Dep. Tr. 176:25–177:12.
[168] ██████████ Dep. Tr. 97:14–101:19.
[169] *See* DX0112 [IQVIA FY2022 Form 10-K, p. 48]; Margolis Dep. Tr. 216:21–217:24.
[170] ██████████████ Dep. Tr. 150:6–23; Margolis Dep. Tr. 217:25–219:5; ██████████ Decl. ¶ 8.

overall would wipe out any possible benefit from foreclosing competition in the much smaller business unit for digital advertising services.[171]

The FTC nonetheless urges that ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████ are evidence that IQVIA intends to foreclose its competitors from using healthcare data.  PI Mot. 34–35. ███████████████████████████████████



███████████████████████████████ What the FTC has failed to establish, accordingly, is a reasonable "probability" that IQVIA will engage in anticompetitive foreclosure of competition following the merger.

**b.**  In any event, the FTC has established neither "ability" nor "incentive" for IQVIA to foreclose competition by withholding its data for competitive purposes.

*First*, IQVIA will have no ability to foreclose competition by withholding its data.  The FTC does not even argue under this point that IQVIA could foreclose competition by refusing to license its data *directly* to competing DSPs, *see* PI Mot. 41–42, ███████████████

███████████████████████████████████████.[174]  Nor does the FTC argue that IQVIA will have any ability to foreclose data used for measurement, likely because ███████████████

███████████████████████████████████.[175]  Instead, the FTC posits that IQVIA could harm competing DSPs by ███████████████████████████████████

---

171 Israel Rep. ¶¶ 324, 333; Margolis Dep. Tr. 177:13–21, 187:18–188:8.
172 ███████████████████████████
173 ███████████████████████████████████
174 Israel Rep. ¶¶ 307–11.
175 ███████████ Dep. Tr. 49:5–19; Mangano Dep. Tr. 71:17–20, 87:4–15; Margolis Dep. Tr. 172:19–173:7.



*Second*, IQVIA has no incentive to withhold its data from any DSPs. As set forth above, *see supra* pp. 40–41, it would be economically irrational for IQVIA to withhold data from its clients in the hope of obtaining an incremental competitive advantage in a small business segment. Indeed, ████████████████████████████████████████████ confirms that any conceivable economic advance to foreclosure would be slight, while presenting substantial risk to IQVIA of client departure or other adverse consequences of such aggressive tactics.

All of this aligns with the fundamental reality that part of IQVIA's core strategy for years



has been to make its data offerings ubiquitous—not scarce—within the healthcare industry.[182] IQVIA internally and externally promotes widespread (not restricted) use of its data for its digital advertising business, thus seeking to do the exact *opposite* of what the FTC claims IQVIA will do post-merger.[183]  That is why IQVIA ███████████████████████████████████ ████████████████████████—the concern for IQVIA at all times is protection of its intellectual property, not with obtaining a competitive edge.[184]  There is no business, economic, or commercial motivation within IQVIA to engage in the kind of foreclosure the FTC speculates.

### 3.    *Brown Shoe* Refutes, Rather Than Supports, the FTC's Vertical Theory

Even to the extent, however, that some brands or agencies might place special value on IQVIA's data, the FTC cannot establish a likely reduction in competition under either of its proffered legal theories.  The FTC returns to *Brown Shoe* and argues for application of its multifactor test to determine the likely vertical effects of the proposed merger.  PI Mot. 39–41.  But once again, the FTC has failed to square its legal theory with the facts of this case.

The Second Circuit has acknowledged that *Brown Shoe* may suggest that any "foreclosure of a numerically significant percentage of the market" would substantially lessen competition, but in the same breath rejected such an approach, saying it was "unwilling to assume that any vertical foreclosure lessens competition."  *Fruehauf*, 603 F.2d at 352 n.9.  That is because "a vertical merger may simply realign sales patterns."  *Id.*; *see also id.* (indicating that *Brown Shoe* at times "appears to encourage" an overly "simplified analysis").  The FTC's simplistic approach is inconsistent with Circuit precedent, and wrong on its own terms to boot.

---

[182] Lin Dep. Tr. 26:4–7; Margolis Dep. Tr. 176:25–177:12.
[183] Escalante Dep. Tr. 99:12–17; Lin Dep. Tr. 96:12–97:7; Whiting Dep. Tr. 12:5–13.
[184] *See* Fisher Dep. Tr. 91:1–14, 146:2–19; *see also* DX0107 [IQVIA-FTC-100608812]; Lin Dep. Tr. 112:1–15; O'Brien Dep. Tr. 52:23–53:6, 73:4–11, 195:17–196:19.

*First*, the FTC cannot establish the extent of the alleged market foreclosure.  That is in large part because the FTC has not defined or even posited a relevant market for healthcare data, identified its participants, or assigned market shares.[185]  Without a relevant market, there can be no reliable analysis of competitive effects in that market, and no analysis of how those effects might flow to any alleged downstream markets.  *See Grp. Health Inc.*, 649 F.3d at 155.  In lieu of statistical or economic evidence, the FTC cites ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  PI Mot. 8–9.  Suffice to say, that is not persuasive evidence of IQVIA's alleged "control" of "critical data."  Moreover, the FTC's analysis simply *assumes* that IQVIA will act to foreclose competition, *id.* at 39–40, but as set forth above, there is no evidence to support that assumption and longstanding IQVIA practices show the opposite, *see supra* pp. 40–43.

*Second*, nothing about the "nature and purpose of the arrangement" (i.e., the merger) suggests anticompetitive effects.  *Brown Shoe*, 370 U.S. at 329.  IQVIA is pursuing this transaction to enhance its ability to compete with the giants of the digital healthcare advertising industry, including in the DTC space.  There is no evidence to suggest that IQVIA is contemplating this merger so that it may suddenly cut off access to its data in order to recognize incremental gains in a tiny segment of its business.  *See Fruehauf*, 603 F.2d at 359 (vacating FTC divestiture order premised on vertical effects in part because there was "no suggestion, much less evidence, that the merger was motivated by a desire to restrain competition").  To the contrary, IQVIA's historic strategy has been to make its data widely available.  *See supra* pp. 36, 40–41.

*Third*, the FTC reprises its horizontal theory by arguing that the merged firm will have "a

---

[185] *See* Israel Rep. ¶ 13.

█████████ market share."  PI Mot. 40.  That is in the FTC's proposed downstream market for HCP programmatic advertising, but the FTC does not define any *upstream* market for data, let alone show that IQVIA has market power there.  This factor thus provides no support for the FTC's vertical theory.  *See United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957) (government must show "substantiality of [the defendant's] share of [a relevant] market").

*Finally*, the FTC is wrong about barriers to entry.  *Cf. Fruehauf*, 603 F.2d at 352 (considering barriers to entry under vertical theory).  As discussed in detail below, there are no significant barriers to entry for advertising platforms—DeepIntent did not provide such services until 2015, PulsePoint until 2018, and Lasso until 2020.  *See infra* pp. 46–47.  As for the "upstream" data providers, the evidence is that the only significant barrier to entry is the cost of obtaining the widely-available data,[186] an obstacle already overcome by dozens of data-focused firms.[187]

### D.    Any Prima Facie Case Is Rebutted On Numerous Grounds

Even if the FTC could make out a prima face case of anticompetitive effects—it cannot—Defendants can rebut that case through evidence "undermining the prediction of future anticompetitive effect."  *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 125 (S.D.N.Y. 2021); *see also Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703–04 (4th Cir. 2021) (explaining bases for rebutting prima facie case).  Most relevant here, a defendant can rebut a prima facie case by showing (1) the absence of significant barriers to entry, *see Waste Mgmt.*, 743 F.2d at 981–84; *Baker Hughes*, 908 F.2d at 984, and/or (2) efficiencies arising out of the merger, *see Deutsche Telekom AG*, 439 F. Supp. 3d 179, 208 (S.D.N.Y. 2020); *see also FTC v.*

---

[186] Brosso (PurpleLab) Dep. Tr. 36:14–20, 165:24–166:1; *see also* Duggasani (HealthLink) Decl. ¶ 5 (competing data provider founded in 2019 is now a "███████████████████████████████").
[187] *See supra* pp. 37–38.

*Univ. Health, Inc.*, 938 F.2d 1206, 1222 (11th Cir. 1991).  Both factors undermine any prima facie

case the FTC could possibly make out here, again undermining any likelihood of success by the

FTC on the merits.

### 1.    The Market Is Experiencing Rapid Growth and Many New Entrants

Every firm in this space is a new entrant.  There was no such thing as HCP programmatic

advertising ten years ago.[188]  Lasso did not launch until 2020; PulsePoint did not offer HCP

programmatic advertising services until 2018; and IQVIA itself had no presence in this space until

2019.[189] ██████████████████████████████ New entrants continue to

pour in and are taking increasingly larger market shares.[190] ████████████████

████████████████████████████████████

████████████████████████████.[191]  And ironically, the FTC

points to ████████████████████████████████

████████████████████████[192]  All of this is in the context

of an industry that has grown by 40% over the last four years.[193]

The FTC's focus on current market position (and aged documents) thus tells the Court

nothing about how the relevant market is likely to look in the future.  The Second Circuit has

cautioned that reliance on present-day concentration metrics are of little use in a nascent market,

because a market share analysis "restricted to existing firms competing at one moment may yield

market share statistics that are not an accurate proxy for market power when substantial potential

competition is able to respond quickly to price increases exists."  *Waste Mgmt.*, 743 F.2d at 982.

---

[188] ████████ Dep. Tr. 67:22–68:6.
[189] Margolis Dep. Tr. 154:16–155:8; ████████████ Dep. Tr. 16:12–17:3.
[190] Hochberg Rep. fig. 1.
[191] ██████████ Dep. Tr. 57:14–58:22; *see also* Israel Rep. ¶¶ 201–04, 238–39.
[192] *See* Hochberg Rep. ¶ 26 n.50.
[193] Israel Rep. ¶ 233.

That is especially true here, where the competitive landscape is constantly evolving.  Indeed, even the market presence of the merging parties is not stable:   The FTC's contention that just a few years into its existence, HCP programmatic advertising is now a closed market is not credible.  *See* PI Mot. 44.

The existing firms face competition from all sides, including from established DSP firms like Google, The Trade Desk, and Xandr.  The FTC urges that

In short, the FTC's (erroneous) description of the current market is not predictive of what competition will look like in the future.  To stunt the growth of an emerging competitor—who is seeking to challenge both the largest healthcare-specific DSP and with the influx of new firms—based on a static snapshot would be inconsistent with any disciplined antitrust theory.

### 2.    The Merger Promises Significant Efficiencies

Any presumption is also rebutted by the efficiencies that will result from the transaction.



Efficiencies are cognizable under Section 7 so long as they are both "merger-specific and verifiable." *Deutsche Telekom AG*, 439 F. Supp. 3d at 208.  Here, there are several efficiencies from the merger the FTC overlooks or erroneously discounts.

 *First*, the merger will reduce costs for the merged firm.  *See id.* at 210 (savings of "operational expenditures[]"cognizable as an efficiency).  As explained above, Lasso is not a DSP, and instead pays Xandr to provide DSP functionalities for Lasso's clients.  Combining Lasso's omnichannel advertising platform with DeepIntent's DSP technology would reduce the need for that licensing arrangement and ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

 *Second*, the merger would expand the combined firm's capabilities, benefitting customers (brands and agencies). ███████████████████████  Other firms, meanwhile, are rapidly repositioning or adapting their services to provide brands and agencies with a "one-stop-shop" for HCP and DTC programmatic advertising—which brands (███████) and agencies (███████) have testified is a preferred service.[202]  IQVIA aspires to compete with industry giants (including Google and The Trade Desk), and the merger would help IQVIA do so by combining Lasso's omnichannel marketing platform with DeepIntent's DTC capabilities, helping to satisfy growing demand for integrated advertising solutions.[203]

---



198 ███████████████
199
200
201
202 *Id.* ¶ 66; ███████████ Dep. Tr. 214:22-216:16; ███████████ Dep. Tr. 79:12-83:18.
203 *Id.* ¶¶ 64–66.

*Third*, by enhancing IQVIA's ability to offer better and lower-cost services to brands and agencies, the merger would benefit HCPs and patients.  The ultimate goal of modern digital advertising efforts is to provide patients with advertising that is relevant to them, rather than the one-size-fits-all approach that has long dominated advertising.[204]  This kind of advertising is beneficial to HCPs and patients, because it lowers the costs of finding relevant information about a needed medication or medical device.[205]  The merger would improve brands' ability to deliver relevant advertising to HCPs and patients by allowing IQVIA to offer a wider and more cost-effective range of services to brands.[206]

## II.   THE EQUITIES WEIGH AGAINST A PRELIMINARY INJUNCTION

Section 13(b) requires the reviewing court to consider "the equities" in assessing whether to issue preliminary injunctive relief.  *See* 15 U.S.C. § 53(b).  The kinds of equities that may be considered "[are] not qualified" by the statute.  *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981); *see also FTC v. Nat'l Tea Co.*, 603 F.2d 694, 697 n.4 (8th Cir. 1979) (courts may consider both public and private equities).

It has become apparent that the FTC did not conduct a thorough investigation before proceeding with this litigation.  The FTC obtained almost no documents from third parties in its investigation and undertook no discovery from social media platforms.  It has maintained all along that established firms like Google and Xandr are outside of the market, but ██████████████████████ ████████████████████████████████████  The FTC offered a haphazard account of market shares in its motion for temporary restraining order that it has now abandoned and no longer seeks

---

[204] *Id.* ¶ 69.
[205] *Id.* ¶¶ 69–71.
[206] *Id.* ¶¶ 67–72.
[207] *See* ██████████ Dep. Tr. 23:7–26:1; ██████████ Dep. Tr. 50:5–14; ██████████ Dep. Tr. 98:6–99:11; 180:19–182:12; *see also* ██████████ Dep. Tr. at 32:4–13 (██████████████████████ ██████████████).

to defend.[208]  And it has fundamentally misunderstood numerous aspects of the digital healthcare advertising industry. The hearing will showcase these shortcomings and many others.

These errors have real world consequences.  The merger would allow IQVIA to offer lower-priced and better alternatives to customers, benefiting HCPs and patients by making healthcare advertising more efficient and more cost-effective. Contrary to the FTC's unsupported speculation, the merger will be competition-enhancing.  The FTC's contrary narrative is based on complaints by a few competitors of Lasso and DeepIntent; brands and agencies have overwhelmingly spoken out in favor of the merger.[209]  Meanwhile, the FTC has failed to adequately articulate, let alone prove, what specific products or prices within the broad HCP programmatic advertising industry it thinks will be affected or what data it fears IQVIA will withhold.  The FTC also cites nothing in support of its contention that the transaction could not be later unwound if it were ultimately found to be anticompetitive. *See* PI Mot. 50. There simply is no equitable basis to prevent IQVIA and the rest of the industry from recognizing the procompetitive efficiencies of the transaction.

## CONCLUSION

The FTC's motion for a preliminary injunction should be denied.

Dated: November 9, 2023
      Washington, DC

                WEIL, GOTSHAL & MANGES LLP

                  /s/ *Chantale Fiebig*
                Chantale Fiebig
                Mark A. Perry (*pro hac vice*)
                Joshua M. Wesneski
                2001 M Street NW, Suite 600
                Washington, DC 20036
                Tel:  (202) 682-7000

---

[208] █████████████████████████████████████████████████████

[209] █████████████ Decl. ¶¶ 3–6; ██████████ Decl. ¶¶ 9–10; ████████ Decl. ¶¶ 9–10.

chantale.fiebig@weil.com
mark.perry@weil.com
joshua.wesneski@weil.com

Robert Taylor
767 Fifth Avenue
New York, NY 10153
robert.taylor@weil.com

Sarah M. Sternlieb
700 Louisiana Street, Suite 1700
Houston, TX 77002
sarah.sternlieb@weil.com

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Kenneth Reinker
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Tel:  (202) 974-1500
kreinker@cgsh.com

Rahul Mukhi
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000
rmukhi@cgsh.com

*Attorneys for Defendant IQVIA Holdings Inc.*

MORRISON & FOERSTER LLP
Alexander P. Okuliar (*pro hac vice*)
David J. Shaw (*pro hac vice*)
Alexa R. DiCunzolo (*pro hac vice*)
2100 L Street, NW, Suite 900
Washington, DC 20037
Tel: (202) 887-1500
aokuliar@mofo.com

Michael B. Miller
Mika M. Fitzgerald
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
mfitzgerald@mofo.com

*Attorneys for Defendant Propel Media, Inc.*

51

**Appendix**

| Fiebig Ex. # | DX/PX # | Description | Bates Number |
|---|---|---|---|
| 1 | DX0118 | Tim Cross, *Magnite Circumvents DSPs with Launch of ClearLine*, VideoWeek | |
| 2 | DX0111 | eMarketer, *US Healthcare and Pharma Digital Ad Spending: Adjusting to the New Normal in Digital Engagement* | IQVLIT-000792368 |
| 3 | DX0119 | Optimize RX Corp., *Optimize Rx Announces Agreement to Acquire Medicx Health for $95 Million to Expand its Omnichannel Reach to Consumers*, Yahoo! Finance | |
| 4 | DX0114 | Seb Joseph, *"Capture what may go to outside tech providers": WPP's Mark Read Says It Will Rival Ad Tech Buyers*, Digiday | |
| 5 | DX0081 | ███████████████ | |
| 6 | DX0082 | ████████████ | |
| 7 | DX0083 | ██████████ | |
| 8 | DX0021 | Aalderink Deposition Transcript | |
| 9 | DX0010 | ████████ Declaration | |
| 10 | DX0068 | ████████ Deposition Transcript | |
| 11 | DX0012 | ██████ Declaration | |
| 12 | DX0071 | ████████ Deposition Transcript | |
| 13 | DX0058 | ██████ Deposition Transcript | |
| 14 | DX0042 | Colarossi Deposition Transcript | |

| Fiebig Ex. # | DX/PX # | Description | Bates Number |
|---|---|---|---|
| 15 | DX0085 | DI-2R-0000972398 | DI-2R-0000972398 |
| 16 | DX0086 | DI-2R-0000998370 | DI-2R-0000998370 |
| 17 | DX0087 | DI-2R-0001289952 | DI-2R-0001289952 |
| 18 | DX0088 | DI-2R-0001343355 | DI-2R-0001343355 |
| 19 | DX0089 | DI-2R-0001822074 | DI-2R-0001822074 |
| 20 | DX0090 | DI-2R-0001947265 | DI-2R-0001947265 |
| 21 | DX0091 | DI-2R-0002225637 | DI-2R-0002225637 |
| 22 | DX0092 | DI-2R-0002680359 | DI-2R-0002680359 |
| 23 | DX0093 | DI-2R-0002753533 | DI-2R-0002753533 |
| 24 | DX0094 | DI-2R-0002940292 | DI-2R-0002940292 |
| 25 | DX0095 | DI-2R-0002945488 | DI-2R-0002945488 |
| 26 | DX0096 | DI-2R-0003749889 | DI-2R-0003749889 |
| 27 | DX0097 | DI-LIT-0000128297 | DI-LIT-0000128297 |
| 28 | DX0098 | DI-LIT-0000381875 | DI-LIT-0000381875 |
| 29 | DX0039 | DiNorscio Dep. Tr. | |
| 30 | DX0008 | ███████████ Declaration | |
| 31 | DX0035 | ███████████ Deposition Transcript | |
| 32 | DX0032 | Escalante Deposition Transcript | |
| 33 | DX0070 | ███████████ Deposition Transcript | |
| 34 | DX0030 | Field Deposition Transcript | |
| 35 | DX0025 | Fisher Deposition Transcript | |
| 36 | DX0007 | ███████████ Declaration | |

| Fiebig Ex. # | DX/PX # | Description | Bates Number |
|---|---|---|---|
| 37 | DX0049 | ██████ Deposition Transcript | |
| 38 | DX0099 | FTC_IQVIA_00000600 | FTC_IQVIA_00000600 |
| 39 | DX0066 | ████████ Deposition Transcript | |
| 40 | DX0064 | ████████ Deposition Transcript | |
| 41 | DX0100 | ███████████ | ██████ |
| 42 | DX0101 | ███████████ | ██████ |
| 43 | DX0060 | ████████ Deposition Transcript | |
| 44 | | Kostis (Rough) Deposition Transcript | |
| 45 | DX0074 | Hatzitaskos Report | |
| 46 | DX0122 | Ex. 1, Hatzitaskos Report | |
| 47 | DX0036 | ████████ Deposition Transcript | |
| 48 | DX0077 | Hochberg Report | |
| 49 | DX0013 | ██████ Declaration | |
| 50 | DX0014 | ██████ Declaration | |
| 51 | DX0051 | ██████ Deposition Transcript | |
| 52 | DX0117 | IQVIA Amended R&Os to FTC's 2nd Set of ROGs | |
| 53 | DX0112 | IQVIA FY2022 Form 10-K | IQVLIT-000793833 |
| 54 | DX0102 | IQVIA-FTC-000118824 | IQVIA-FTC-000118824 |

| Fiebig Ex. # | DX/PX # | Description | Bates Number |
|---|---|---|---|
| 55 | DX0103 | IQVIA-FTC-001321061 | IQVIA-FTC-001321061 |
| 56 | DX0104 | IQVIA-FTC-001881702 | IQVIA-FTC-001881702 |
| 57 | DX0105 | IQVIA-FTC-002573835 | IQVIA-FTC-002573835 |
| 58 | DX0106 | IQVIA-FTC-003244637 | IQVIA-FTC-003244637 |
| 59 | DX0107 | IQVIA-FTC-100608812 | IQVIA-FTC-100608812 |
| 60 | DX0108 | IQVLIT-000125792 | IQVLIT-000125792 |
| 61 | DX0109 | IQVLIT-000792111 | IQVLIT-000792111 |
| 62 | DX0110 | IQVLIT-000792115 | IQVLIT-000792115 |
| 63 | DX0113 | TPA Licenses by Client | IQVLIT-000798670 |
| 64 | DX0115 | TPA Licenses by Vendor | IQVLIT-000798713 |
| 65 | DX0076 | Israel Report | |
| 66 | DX0011 | ████████ Declaration | |
| 67 | DX0075 | Jena Report | |
| 68 | DX0001 | ████████ Declaration | |
| 69 | DX0033 | ████████ Deposition Transcript | |
| 70 | DX0057 | ████████ Deposition Transcript | |
| 71 | DX0023 | Lin Deposition Transcript | |
| 72 | DX0029 | Mangano Deposition Transcript | |
| 73 | DX0044 | Margolis Deposition Transcript | |
| 74 | DX0020 | Miller Deposition Transcript | |
| 75 | DX0031 | O'Brien Deposition Transcript | |
| 76 | DX0002 | ████████ Declaration | |

| Fiebig Ex. # | DX/PX # | Description | Bates Number |
|---|---|---|---|
| 77 | DX0009 | ███████ Declaration | |
| 78 | DX0055 | ███████ Deposition Transcript | |
| 79 | DX0026 | Paquette Deposition Transcript | |
| 80 | PX6007 | ██████ Declaration | |
| 81 | DX0040 | Pobre Deposition Transcript | |
| 82 | DX0121 | ██████ | ██████ |
| 83 | PX0009 | PX0009 | |
| 84 | PX2511 | PX2511 | |
| 85 | PX2812 | PX2812 | |
| 86 | PX2816 | PX2816 | |
| 87 | PX2818 | PX2818 | |
| 88 | PX4167 | PX4167 | |
| 89 | DX0037 | Resnick Deposition Transcript | |
| 90 | DX0018 | Sandler Deposition Transcript | |
| 91 | DX0022 | Serfontein Deposition Transcript | |
| 92 | DX0019 | ████ Deposition Transcript | |
| 93 | DX0073 | ███████ Deposition Transcript | |
| 94 | DX0120 | ███████ | ████████ |
| 95 | DX0003 | ██████ Declaration | |
| 96 | DX0027 | Whiting Deposition Transcript | |
| 97 | DX0047 | ██████ Deposition Transcript | |
| 98 | DX0015 | ██████ Deposition Transcript | |
| 99 | DX0116 | IQVLIT-000799503 | IQVLIT-000799503 |