**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                Plaintiff,

        v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

                Defendants.

Case No. 1:23-cv-06188-ER

**REDACTED VERSION**

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO**
**PRELIMINARY INJUNCTION MOTION**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................. 1

II.   ARGUMENT .................................................................................................................... 3

   A.   The Proposed Acquisition Is an Illegal Horizontal Merger ...................................... 4

      i.    The FTC Alleged a Relevant Antitrust Market ................................................... 4

      ii.   Defendants Incorrectly Claim that Every Conceivable Digital Advertising Company Must be Included in the Relevant Market ................................................................ 5

      iii.  Defendants' Critiques of the FTC's Economic Analysis Are Unpersuasive .................. 10

   B.   The Proposed Acquisition is Presumptively Illegal Based on Market Shares .................... 11

   C.   The Proposed Acquisition Eliminates Substantial Competition between Lasso and DeepIntent ............................................................................................................... 13

   D.   The Proposed Acquisition Is an Illegal Vertical Merger ........................................ 16

      i.    IQVIA Has the Ability to Foreclose Rivals from Critical Data Products ...................... 17

      ii.   IQVIA's Incentive to Foreclose DeepIntent's Rivals ........................................... 20

   E.   Defendants Cannot Rebut the Prima Facie Case .................................................... 22

      i.    Efficiencies ................................................................................................. 22

      ii.   Entry .......................................................................................................... 24

III.  CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*FTC v. Consolidated Foods Corp.*, 380 U.S. 592 (1965) ........................................................ 17, 21

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ................................................................. 23

*FTC v. Lancaster Colony Corp.,* 434 F. Supp. 1088 (S.D.N.Y. 1977) ............................. 2, 3, 4, 22

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ...................................... 5, 6

*FTC v. Staples*, Inc., 970 F. Supp. 1066 (D.D.C. 1997) ................................................................. 9

*FTC v. Sysco*, 113 F.Supp.3d 1 (D.D.C. 2015) ....................................................................... 9, 10

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984) ..................................................... 4

*FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ....................................... 2, 4, 14

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F.Supp.3d 27 (D.D.C. 2018) .......................... 10, 23

*Geneva Pharms. Tech. Corp. v. Barr Laboratories Inc.*, 386 F.3d 485 (2d Cir. 2004) ................. 9

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ................................................................................................ 23

*United States v. Aetna, Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ............................................. 10, 14

*United States v. Am. Cyanamid Co.*, 719 F.2d 558 (2d Cir. 1983) ............................................. 16

*United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966
  (N.D. Cal. Jan. 8, 2014) .......................................................................................................... 5

*United States v. Bertelsmann SE & Co.*, 2022 WL 16949715 (D.D.C. Nov. 15, 2022) ................ 5

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ....................................................... 5, 17, 21

*United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ......................... 11, 22, 24

*United States v. Manufacturers Hanover Trust Co.*, 240 F. Supp. 867 (S.D.N.Y. 1965) ........... 14

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ............................................. 3, 12

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002) ................................................................................... 16

**Statutes**

16 C.F.R. § 803.20(c) ....................................................................................................................... 2

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
  Their Application* .................................................................................................................... 14

U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010) ("Merger Guidelines") ..... 22

## I.      INTRODUCTION

Defendants concede that the Proposed Acquisition would result in a market concentration that is presumptively illegal[1] and acknowledge documentary evidence depicting intense multi-year competition between Lasso and DeepIntent, which has led directly to lower prices and new innovative offerings. Nevertheless, Defendants ask this Court to ignore this real-world evidence—as corroborated by third parties across this industry—because they assert that the FTC's market definition is too narrow.[2] In doing so, they ignore both the robust factual record and caselaw that supports the FTC's market definition methodology in this case.

Defendants promise "a mountain of documents" showing that other companies are "fierce" competitors in the market for HCP programmatic advertising.[3] Their support is more akin to a molehill. The opposition largely relies upon attorney-drafted declarations signed in lieu of burdensome document subpoenas,[4] testimony from witnesses with minimal direct knowledge of the relevant products and competitors,[5] motivated party witness testimony,[6] and unreliable

---

[1] Opp'n at 31-32; DX0076 (Israel Report) ¶ 228, Figure 12.
[2] Defs.' Memo. Law Opp'n FTC's Mot. Prelim. Inj., ECF No. 201 ("Opp'n") at 13 (cleaned up).
[3] Opp'n at 3.
[4] Many of Defendants' declarations were received under an explicit quid pro quo arrangement, whereby Defendants would retract their broad and burdensome document subpoenas for declarations. *See, e.g.*, PX4138 ▮▮▮▮▮▮

▮▮▮▮▮▮▮ ); PX0567 ▮▮▮▮▮▮▮▮ Dep.) at 45:22-46:22; PX0562
▮▮▮▮ Dep.) at 15:16-16:22▮▮▮

▮

▮▮▮▮▮▮▮▮ . PX0544
▮▮▮▮▮▮▮ Dep.) at 41:23-42:3; 155:22-158:5; *see also* PX0563 ▮▮▮▮▮▮ Dep.) at
147:14-148:15 ▮▮▮▮

▮▮▮▮▮ PX0572 ▮▮▮▮▮▮ at 59:19–60:6 ▮▮▮▮

[6] PX0532 (Paquette (DeepIntent) Dep. at 230:18-231:3 (DeepIntent CEO testifying that he stands to receive ▮▮▮▮▮▮ if the transaction closes).

expert opinion.[7] Emblematic of Defendants' unconvincing evidence is their expert's claim that the next-largest competitor behind DeepIntent, Lasso, and ███████ is ████████ ████████[8]—a company not mentioned as an HCP advertising competitor in Defendants' written responses to the FTC's investigation subpoenas,[9] Answer,[10] or Memorandum of Law in Opposition to the Motion for Temporary Restraining Order.[11] Ultimately, Defendants' attempts to paint social media companies, healthcare-focused websites, and generalist DSPs as significant HCP programmatic advertising competitors lack evidentiary support.

The record instead overwhelmingly demonstrates that DeepIntent, Lasso, and ████████ are the top three firms in the market and compete most closely with one another. And regardless of the precise contours of the relevant market, the elimination of the vigorous head-to-head competition between DeepIntent and Lasso is itself an independent basis to find the FTC has a "fair and tenable" chance of ultimately showing the merger "may . . . substantially lessen competition" in violation of the Clayton Act. *FTC v. Lancaster Colony Corp.,* 434 F. Supp. 1088, 1090-91 (S.D.N.Y. 1977); *FTC v. Whole Foods Mkt. Inc.*, 548 F.3d 1028, 1036-37 (D.C. Cir. 2008). But even in Defendants' proposed broader market, which includes social media companies and healthcare-related websites, Defendants' economic expert estimated that IQVIA would possess ████████ market share after absorbing DeepIntent.[12] That, itself, is sufficient

---

[7] *See, e.g.,* PX0583 (Jena Dep.) at 221:19-222:19 (Defendants' industry expert conceding that he has not spoken to HCP programmatic advertising customers and is not aware of what pharma companies are looking for when they consider which data sets to use to power their HCP programmatic advertising campaigns).

[8] *See* DX0076 (Expert Report of Mark A. Israel (Oct. 25, 2023)) ("Israel Report") ¶ 228, Figure 12.

[9] *See* PX0072 (PMI's Second Request Narrative Response); PX0509 (IQVIA's Second Request Narrative Response). After the preliminary review of a premerger filing, the FTC may issue a Request for Additional Information ("Second Request"), which, similar to a Civil Investigative Demand, requires the merging companies to produce documents, data, and written responses as part of the FTC's investigation into the likely competitive effects of the merger. *See* 16 C.F.R. § 803.20(c).

[10] *See* Answer and Defenses of Def. IQVIA Holdings, Inc., ECF No. 58; Answer and Defenses of Propel Media, Inc., ECF No. 72.

[11] Defs.' Memo. Law Opp'n Mot. TRO, ECF No. 34.

[12] *See* Opp'n at 31-32; DX0076 (Israel Report) ¶ 228, Figure 12.

grounds to find a violation of Section 7 of the Clayton Act, let alone to grant preliminary relief, because it would result in a market concentration which renders this merger presumptively illegal.[13]  *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 364 (1963). The merged firm's dominance would then be cemented by IQVIA's control over data inputs used throughout the industry.[14]

To warrant preliminary relief under Section 13(b), the FTC must only "show[] preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *Lancaster*, 434 F. Supp. at 1090. Under 13(b), courts need not "[conduct] extensive analysis of the underlying antitrust issues." *Id.* at 1091. We therefore request that the Court grant a preliminary injunction to preserve the status quo as the FTC proceeds to a merits trial, set to begin on December 20.

## II.    ARGUMENT

Defendants fail to rebut the FTC's case for several reasons. *First*, their attempts to undermine the FTC's market definition are legally flawed and factually unsupported. *Second*, Defendants' attack on the FTC's market share calculation is based on faulty assumptions rather than evidence. *Third*, Defendants' argument against the extensive evidence of head-to-head competition between DeepIntent and Lasso—that unproven market participants will rapidly emerge as competitive constraints—is speculative and legally irrelevant. *Fourth*, Defendants' criticisms of the FTC's vertical case ignore that the FTC's allegations are not merely

---

[13] A more accurate estimate of the market share that would be held by the combined firm is ▮▮▮. *See* PX6500 (Expert Report of Kostis Hatzitaskos (Oct. 11, 2023)) ("Hatzitaskos Report") § 3.3.2, Exhibit 13; PX6500 (Hatzitaskos Report) § 1.4, Exhibit 13. And Defendants' internal projections are even higher. *See, e.g.,* PX2502-01 (DeepIntent) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮).

[14] PX1026-001 (IQVIA) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; PX1962-019 (IQVIA); PX1980-011 (IQVIA) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

hypothetical: ████████████████████████████████████████████

████████████████████████████████████████████ for an

HCP identity data company that IQVIA now owns. And although beyond the scope of a 13(b)

proceeding, despite Defendants' assertions, there are no credible efficiencies attributable to this

merger, and Defendants will not be able to meet their burden of demonstrating that entry or

expansion would be sufficient to alleviate the likelihood of competitive harm at the merits trial.

### A.  The Proposed Acquisition Is an Illegal Horizontal Merger

#### i.  The FTC Alleged a Relevant Antitrust Market

Defendants do not—and could not—dispute that Lasso and DeepIntent compete in the

same relevant market given the massive evidence of close competition between them. Instead,

Defendants' primary criticism is that the FTC's proposed market is too narrow because it

allegedly excludes certain advertising methods like direct buys, advertising channels like social

media and healthcare-related websites, and generalist DSPs with no involvement in HCP

programmatic advertising. But at the Section 13(b) preliminary injunction stage, the FTC need

only "rais[e] some question of whether [the candidate market] is well-defined." *FTC v. Whole

Foods Mkt. Inc.*, 548 F.3d 1028, 1037 (D.C. Cir. 2008).[15] The FTC's burden is met by a "tenable

showing" of a proposed market, even if there is also "conflicting evidence on the relevant

product market" or "market shares." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 and

1164 (9th Cir. 1984); *Lancaster*, 434 F. Supp. at 1089. Not only are factual disputes insufficient

to justify denial of a preliminary injunction, the FTC's market definition is valid even if

competition may occur in another broader market. Further, even using Defendants' purported

---

[15] In critiquing the FTC's relevant market, Defendants consistently endeavor to raise the FTC's burden of proof by
citing cases outside the 13(b) preliminary injunction context. *See* Opp'n at 12-13.

broader market, Lasso and DeepIntent's combined market shares are still presumptively anticompetitive.[16]

> ii.  <u>Defendants Incorrectly Claim that Every Conceivable Digital Advertising Company Must be Included in the Relevant Market</u>

Defendants' assertion that HCP programmatic advertising exists in an ecosystem with other forms of digital advertising to HCPs—such as social media—does not invalidate the FTC's proposed market. "[E]ven if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, 2022 WL 16949715, at *14 (D.D.C. Nov. 15, 2022) (citing *United States v. Cont'l Can Co.*, 378 U.S. 441, 456-58 (1964)). That is because "the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *26 (N.D. Cal. Jan. 8, 2014) (citation omitted). For example, in *FTC v. Peabody Energy Corp.*, the FTC alleged that the relevant market was Southern Powder River Basin (SPRB) coal. Defendants argued that this market definition was too narrow because other forms of energy production, including natural gas, served as a competitive constraint on coal prices. 492 F. Supp. 3d 865, 901 (E.D. Mo. 2020). Although the court was "persuaded that there is meaningful competition between SPRB coal and other sources of fuel used to generate electricity, and that the cost of natural gas influences the price of SPRB coal," the court held that "[a] broad product market (e.g., American electricity production) may contain smaller markets (e.g., the markets for each of the individual sources of fuel or markets consisting of power producers in a certain region)" and

---

[16] DX0076 (Israel Report) at 126, Figure 12; PX6504-056 (Reply Expert Report of Kostis Hatzitaskos (Nov. 3, 2023)) ("Hatzitaskos Reply Report") § 4.3.3, Exhibit 3.

"the [transaction] will be illegal under the Clayton Act if it causes substantial competitive harm in *any* of those markets." *Id.* at 885, 901 (emphasis in original).

Here, the record clearly supports HCP programmatic advertising as a relevant product market. As the evidence demonstrates, HCP programmatic advertising is a proper relevant product market because it satisfies the *Brown Shoe* indicia and separately passes the hypothetical monopolist test, which itself is informed by commercial realities. It is simply the case that in this market, there is a limited set of companies that provide the full suite of capabilities for HCP programmatic advertising, which includes Lasso, DeepInt, and ███████. Other methods of advertising—even advertising that targets HCPs—have different characteristics and uses, are priced differently, are viewed as distinct by virtually all industry participants, and have different customers and vendors. The evidence supports analyzing the probable anticompetitive effects of the transaction within the market proposed by the FTC. Defendants counter that such a market is "arbitrarily narrow" because it excludes other methods of advertising—addressed below—but there is no evidence that they provide *any* competitive constraint on Lasso, DeepInt, or other HCP programmatic advertising firms.

***Direct Buys vs. Programmatic Advertising***: To the extent Defendants argue that direct buys are substitutes for programmatic advertising, the evidence indicates otherwise. The automated features, flexibility, and efficiency of programmatic advertising make it a fundamentally different product than direct-buy advertising.[17] Programmatic advertising "█

---



[17] PX0559 ███████ ) Dep.) at 123:24-124:7 ███████ ."), *id.* at 113:3-21 ███████ ); *see also* PX2983-01 (DeepInt).

6



," while "                                                    ."[18]

The reason "            " programmatic advertising, in comparison to direct buys, is that

"

            "[19] Programmatic also offers better reach because it "

            " while "

            ."[20] Finally, programmatic advertising enables faster aggregation and

analysis of campaign metrics, such as physician level data, or PLD.[21] Due to these differences,

there is no evidence that direct buys place any meaningful competitive constraint on the pricing

of HCP programmatic advertising.

    ***Social Media and Health-Care Focused Websites***: Defendants claim that brands can

"serve the exact same advertisement to the exact same HCP on both Facebook and on

CNN.com," so social media must be included in the HCP programmatic advertising market.[22]

For example, Defendants contend that DeepIntent and Lasso compete with healthcare-focused

social media platforms like            .[23] But            is a content publisher: it sells ad

inventory and tracks HCPs only on its own site, as opposed to DSPs, which build, activate, and

measure HCP programmatic advertising campaigns to track HCPs across many digital

properties.[24] Far from viewing these companies as a competitors, Defendants tout their

---

[18] PX0507                    IH) at 12:17-13:5; *see also* PX0558                    Dep.) at 74:18-75:13 (                    ).

[19] PX0503 (            ) Dep.) at 19:3–20:24; PX0563 (            ) at 17:9-18:2 (

            ).

[20] PX0559 (            Dep.) at 117:1–15; PX2983 (DeepIntent).

[21] PX0559 (            Dep.) at 114:7-13; PX0555 (            Dep.)  at 15:8-16:16.

[22] Opp'n at 12.

[23] Opp'n at 14.

[24] Defendants assert that social media sites advertise "programmatically." But social media advertising is done via direct buy, not programmatically. PX6010 ¶ 5 (            Decl.)

relationships with ███ and other similar companies as competitive differentiators.[25] Likewise,

████ is a publisher, not a substitute for the suite of HCP programmatic advertising services

provided by Defendants.[26] Other large social media platforms referenced by Defendants, like

Facebook, X (formerly Twitter), and Reddit, are similarly publishers and even farther afield

given that they lack a healthcare focus.[27]

     Documentary and testimonial evidence distinguish programmatic advertising from direct

buys and social media. IQVIA considers programmatic advertising to have "differential

value/capabilities/measurement" than social media platforms.[28] For these and other reasons,

advertising agencies and other industry participants consistently explained that HCP

programmatic advertising is fundamentally different from advertising on individual channels.[29]

     There is also minimal (if any) evidence of competition between social media platforms

and HCP programmatic advertising providers. ███████████████

████████████████████████████

---

; PX0572 (███████████ Dep.) at 35:19-21 ████████████████

█████████).

[25] For example, DeepIntent touts its integration with ████ as a differentiator from Lasso, noting that the integration grants "our buyers preferred access and better-quality reach in publications that matter." PX2984-04 (IQVIA). Similarly, ████ considers itself to be an IQVIA data customer, not a competitor. PX0572 ████████████ at 17:21–18:9

[26] PX0555 ████████ Dep.) at 44:3-9; PX0568 ████████████ Dep.) at 198:6-200:11.

[27] For the same reasons as social media platforms, endemic websites are not reasonable substitutes for programmatic platforms like DeepIntent and Lasso. Endemic websites—which are healthcare-focused websites like MedScape or GoodRx—are sources of advertising inventory. PX5171 (IQVIA). Both Lasso and DeepIntent tout their relationships with endemic suppliers, indicating that endemic publishers are partners to programmatic platforms, not competitors. PX5171 (IQVIA); PX1434-04 (IQVIA).

[28] PX1945-11 (IQVIA). For example, programmatic advertising allows for the automated purchase of ad space across many publishers and multiple channels simultaneously, eliminating the need to individually negotiate the purchase of advertisements on a site-by-site basis. *Id.* Programmatic advertising also allows for better measurement, including physician level data reporting, and the ability to "automatically update custom . . . audience segments on a weekly basis with the latest clinical data." *Id.*

[29] PX0559 ████████ Dep.) at114:7-13; PX0555 (████████████ Dep.) at 15:8-16:16; PX0563 ████████ Dep.) at 17:9-18:2.

[30] PX0518 (Lin (IQVIA) Dep.) at 14:8-14.



[33] And in responding to the FTC's Request for Additional Information during the investigation, IQVIA did not identify ███████, or any other social media company as a provider of HCP programmatic advertising.[34] Defendants' insistence that social media platforms are competitors appears to be a new development.

The FTC has properly excluded these forms of advertising from the relevant market because they are not reasonably interchangeable substitutes.[35] The Second Circuit's decision in *Geneva Pharms. Tech. Corp. v. Barr Laboratories Inc.*, 386 F.3d 485, 496-500 (2d Cir. 2004), is instructive on that score. There, the Court held that the branded version of a pharmaceutical drug (warfarin sodium) did not compete in the narrower product market of generic versions, even though the two products were "therapeutically equivalent"—i.e., chemically *identical*—because they were not competitive constraints on each other. *Id.* Here, not only are Defendants' purported sources of competition functionally distinct from HCP programmatic adverting, there is no

---

[31] PX1779-05 ███████████████████████████████████ .

[32] *See* PX0518 (Lin (IQVIA) IH) at 14:8-14; PX6504 (Hatzitaskos Reply Report) ¶ 59.

[33] *See* Opening Br. at 31-32 (listing Defendants' RFI and RFP responses).

[34] *See* PX0509, (IQVIA's Second Request Narrative Response) Exhibit 3-1.xlsx, Tab "IQVIA HCP Activation" (IQVIA); PX6504 (Hatzitaskos Reply Report) ¶ 60.

[35] Courts have rejected similar arguments from merging parties in other analogous contexts. *See FTC v. Sysco*, 113 F.Supp.3d 1 (D.D.C. 2015) (excluding other channels of purchasing food distribution services from the relevant market); *FTC v. Staples*, Inc., 970 F. Supp. 1066 (D.D.C. 1997) (excluding other channels of purchasing office supplies from the relevant market).

evidence they are reasonably interchangeable or competitive constraints.  Accordingly, there is

no basis to conclude that only a broad relevant market that includes them is valid.

    iii.   <u>Defendants' Critiques of the FTC's Economic Analysis Are Unpersuasive</u>

      Having failed to demonstrate that the FTC's market definition is too narrow, Defendants

have no other serious arguments against the FTC's proposed market. Defendants claim that Dr.

Hatzitaskos did not perform a proper hypothetical monopolist test, but that is incorrect.[36] Dr.

Hatzitaskos performed two different models of the hypothetical monopolist test, each of which

have been found persuasive by courts.[37] *See e.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341

F.Supp.3d 27, 57-58 (D.D.C. 2018) (adopting market definition based on the critical loss

analysis); *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 36-37 (D.D.C. 2017) (adopting critical

loss analysis and merger simulation). In fact, Defendants' own expert, Dr. Israel, used similar

methods in *FTC v. Sysco*, 113 F.Supp.3d 1, 34-35, 66-67 (D.D.C. 2015).

      Defendants next assert that generalist DSPs act as a competitive check on healthcare-

specific platforms like DeepIntent, Lasso, and ██████ .[38] While generalist DSPs ██████

██████████████ are active in the direct-to-consumer segment of programmatic

advertising, their footprint in HCP programmatic advertising is negligible.[39] There are many

reasons for this. One is customer preference: as an IQVIA Vice President succinctly stated: "██

████████████████████████[40] Healthcare-specific platforms

offer a suite of services that generalists lack, making generalists less attractive options for

---

[36] Opp'n at 16-17.
[37] PX6500 (Hatzitaskos Report) ¶¶ 238-45 (critical loss analysis); PX6500 (Hatzitaskos Report) ¶¶ 246-51 (merger simulation).
[38] Opp'n at 13-15.
[39] *See* Opening Br. at 48.
[40] PX1124-02 (IQVIA); *see also* PX0503 ██████ Dep. at 29:13-16 ██████ .

pharmaceutical companies and their ad agencies.[41] Nonetheless, to the extent *any* generalist DSP, such as ▉▉▉▉▉▉▉, reported *any* revenue for HCP programmatic advertising, the FTC has *included* the firm in the market share estimates for the relevant antitrust market.

Finally, Defendants argue that documents depicting Lasso's and DeepIntent's intense rivalry "do little to help determine which firms should be *excluded* from the market."[42] But the documents do not merely identify Lasso and DeepIntent as competitors—they identify each other as the ▉▉▉▉▉▉▉▉▉ competitors[43]—and notably *do not* identify firms in other advertising channels as meaningful competitors. Defendants also assert that "references to a 'market' for HCP programmatic advertising in internal (and informal) communications are [in]sufficient to establish the relevant antitrust market or its contours."[44] Not so. "When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011).

### B. The Proposed Acquisition is Presumptively Illegal Based on Market Shares

Defendants do not dispute that mergers are presumed to be unlawful if they create undue concentration within a relevant market. For that reason alone, the Court should grant a preliminary injunction: at the merits trial, the FTC will be entitled to the presumption of illegality *even under the market shares calculated by Defendants' expert*. Indeed, even using his own

---

[41] *See* Opening Br. at 48. The prospect of generalist DSPs overcoming these handicaps is even lower in the current environment, where IQVIA tightly controls the data inputs that power HCP programmatic advertising. Both ▉▉▉▉▉▉▉▉▉▉▉▉▉▉—two of the main generalist DSPs IQVIA relies on as competitive checks— ▉▉▉▉▉▉ PX0501 (▉▉▉▉▉▉▉▉ IH) at 35:17-36:3; PX0565 (▉▉▉ ▉▉▉▉▉▉▉▉ Dep.) at 259:3–260:6; PX0502 (▉▉▉▉▉▉▉▉ IH) at 59:22-60:12; PX0570 (▉▉▉▉▉▉▉) Dep.) at 141:15-144:20. As Lasso's co-founder remarked, ▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉," PX1431-03 (IQVIA). Likewise, an ad agency stated ▉▉▉▉▉▉▉▉▉ X0506 (▉▉▉▉▉▉▉▉ IH) at 33:17-34:5.
[42] Opp'n at 20 (emphasis in original).
[43] PX1612 (IQVIA) (Tab: "RFI"); PX1628-02 (IQVIA); PX2501-06 (DeepIntent); PX2511-05-06 (DeepIntent).
[44] Opp'n at 20.

(methodologically flawed) analysis, Dr. Israel calculated a combined share of the market held by the merging firms as ██████,[45] which courts have found to be sufficient to trigger the presumption. *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 364 (1963) ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."). With the presumption of illegality conceded, at the merits trial, Defendants will be required to provide "evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Id.* at 363. Although beyond the scope of the 13(b) proceedings, the evidence shows that Defendants will fail to do so.

Defendants first accuse the FTC of miscalculating market shares, particularly with regard



to ████████.[46] However, Defendants' theory that ██████████████████████

███████████████████████████████████████████

█████████████████████████████████████[47] ██████████

███████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████[48]

This figure makes sense given that ██████████████████████████

████████████████████████████████████████████

████████████████████.[49]

---

[45] DX0076 (Israel Report) ¶ 228 ███████████████████████████████████████
███████████████████████████████). Dr. Hatzitaskos, employing conservative inputs, estimates the combined firm would possess a ████ market share. PX6500 (Hatzitaskos Report) ¶ 260, Exhibit 13.
[46] Opp'n at 15-16.
[47] Opp'n at 16 (emphasis added). ████████████████████████████████████
████████████ (FTC_IQVIA_00000601).
████████████████.
[48] PX6500 (Hatzitaskos Report) ¶ 469 (citing PX4020 (FTC_IQVIA_00000601)).
[49] PX0501 (████████████████████ IH) at 59:4-61:22; PX0506 ████████████ IH) at 33:17-34:5.



Nor is ███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████[50] Since advertising healthcare products and medicines is the

primary use case of HCP programmatic advertising,[51] ██████████████████████

██████████████. Defendants also reference ██████████████, despite providing no

revenue figures purporting to derive from HCP programmatic advertising.[52]

In addition, Defendants claim that "almost a third of the largest healthcare agencies spend

no money on ██████, DeepIntent, or Lasso at all," so—they reason—those brands must be

spending money on other programmatic firms.[53] Notably, some of the agencies identified are

owned by larger companies that do, in fact, work with DeepIntent, Lasso, and ██████.[54]

Defendants make no effort to explain the interrelation and division of advertising spend among

these agencies, instead asking the Court to surmise that these agencies are using unidentified

programmatic advertising platforms. Speculation is not a substitute for rebuttal evidence.

### C. The Proposed Acquisition Eliminates Substantial Competition between Lasso and DeepIntent

---

[50] PX0579 ███████████ Dep.) at 212:5-213-22. *See also Id*. at 100:7-101:14 (██████████████████████████████████████); 149:15-150:2 ██████████████████████████████████

[51] PX2582-01-02 (DeepIntent); PX2919-04, 08-12 (IQVIA).

[52] Opp'n at 15; *see also* PX0010 ¶ 3 ██████████████████████████████████████
██████████.

[53] Opp'n at 26-27 (emphasis removed).

[54] For example, Area 23, which Dr. Israel contends does not use the big three, is owned by IPG, which does. PX5274-01 (IPG Health, Full-Service Agencies, https://ipghealth.com/capabilities/full-service-agencies (last visited Nov. 15, 2023)). Likewise, Merkle Health is owned by Dentsu, which works with DeepIntent and Lasso, PX0566 ███████████████ Dep.) at 15:9-16, and Digitas Health is owned by Publicis, which works with DeepIntent and ██████, PX5276-01 (Publicis Health, Our Companies, https://publicishealth.com/companies (last visited Nov. 15, 2023)).

Defendants' attempts to downplay the vigorous competition between DeepIntent and Lasso are meritless.[55] Rather than engage with the robust evidence of pricing and innovation competition between DeepIntent and Lasso, Defendants assert that the FTC is relying on "cherry-picked quotes and anecdotal evidence."[56] That is incorrect. The evidence the FTC collected is consistent across time (2020 through 2023), witnesses (party and non-party), and formats (chats, emails, presentations, internal discussions, RFPs, sales documents, external communications). Where, as here, two merging parties are close competitors, the elimination of that vigorous competition is itself a basis to conclude that the merger is unlawful.[57]

Unable to refute the evidence of direct head-to-head competition, Defendants fall back on their unsupported argument that the existence of other market participants will "be more than sufficient to constrain pricing."[58] But according to Defendants, almost all of these market participants have been in the market for at least a year,[59] yet Defendants put forth no evidence that they are current competitive constraints to Defendants for HCP programmatic advertising.

---

[55] *See* Opp'n at 28-31. Contrary to Defendants representations, "the elimination of substantial competition previously existing between the parties to [a] merger . . . itself constitutes an unreasonable restraint of trade, violative of § 1 of the Sherman Act, and, *a fortiori*, establishes a reasonable probability of a substantial lessening of competition, violative of § 7 of the Clayton Act." *United States v. Manufacturers Hanover Trust Co.*, 240 F. Supp. 867, 950, 955 (S.D.N.Y. 1965).

[56] Opp'n at 29.

[57] *See* Opening Br. at 25, 32-33; *see also Whole Foods Mkt.*, 548 F.3d at 1037; Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 901b ("Merging . . . two proximate firms eliminates the closest competition that each had faced and may enable them to raise prices to customers with a particular preference for their products, whether or not other firms [in the market] raise their prices."). Defendants cite cases for the proposition that mergers of direct competitors are not "per se illegal," Opp'n 28, but that is a non-sequitur. The FTC does not contend that a merger of *any* two competitors is necessarily unlawful. Rather, where two merging parties are *close* competitors and exhibit vigorous head-to-head competition, the elimination of that competition is sufficient to conclude that the merger "*may* substantially lessen competition" in violation of the Clayton Act. *See* Opening Br. at 25, 32-33 (collecting cases). Common sense confirms that principle: if two companies routinely reduce prices and innovate to win business away from each other, a merger "that eliminate[s] [that] head-to-head competition . . . often results in a lessening of competition." *Aetna*, 240 F. Supp. at 43.

[58] Opp'n at 32.

[59] *See* Opp'n at 34.

To fill that gap, Defendants point to snippets of ordinary course documents to argue that these other market participants are on equal footing with DeepIntent, Lasso, and ███████.[60] For several of those documents, it is unclear whether they are referring to HCP or direct-to-consumer ("DTC") advertising.[61] The few documents Defendants cite that appear to refer to HCP programmatic advertising are consistent with the FTC's view that Lasso, DeepIntent, and ██████████ are the primary options for HCP programmatic advertising.[62]

Defendants also claim that they could not exercise pricing power post-merger, contending that advertising clients would switch to other platforms if Lasso and DeepIntent raised prices.[63] The evidence supporting Defendants' claims is thin, and much of it comes from declarations Defendants extracted from third parties in exchange for retracting burdensome document subpoenas.[64] There is no evidence that small firms like ████████████████████████ could replace Lasso and DeepIntent's market share or constrain Defendants' pricing. And Defendants ignore the most important factor undergirding a combined Lasso/DeepIntent's potential market

---

[60] Opp'n at 30-31.

[61] *See, e.g.*, Opp'n at 30 n.123 █████████████████████████
████ ); Opp'n at 30 n.126 (█████████████████████████████████████
█████████████████████████ )

[62] For example, Defendants allege that a document ███████████████
█████████████████████ Opp'n at 30 n.122, ████████████████████████
██████████."

[63] Opp'n at 31-35. Defendants also make cursory and unsupported references to the "two-sided nature of advertising platforms" as constraints on pricing, Opp'n at 17-18, which is suspect considering *demand-side* platforms transact with separate entities (*supply-side* platforms or publishers) to buy ad space. Tellingly, Defendants cite no IQVIA, Lasso, or DeepIntent documents supporting the claim that their pricing is affected by publisher relationships. And Defendants' real-world behavior refutes this assertion. ████████████████████████████ For example, when ██████████████████████████████████████████████████ " PX1127-04 (IQVIA). Likewise, █████████████████████████████████████████ PX2576-17 (DeepIntent).

[64] Opp'n at 32-33 ██████████████████████████████████████. *See* PX6015 ¶ 5 (██████████ Decl.).

power: the ability of IQVIA to restrict or degrade its critical data inputs on other platforms. For

example, ███████████████,[65] ███████████,[66] ████████████,[67] and others rely on IQVIA.

### D. The Proposed Acquisition Is an Illegal Vertical Merger[68]

Defendants attempt to defend against the vertical harms of the Proposed Acquisition by

rewriting the law. But it is well-settled that a vertical merger violates section 7 of the Clayton

Act if it increases barriers to entry or may substantially lessen competition by foreclosing or

disadvantaging competitors of the downstream firm in the merger (here, DeepIntent) from access

to a source of supply (IQVIA's data), either entirely or on competitive terms. *See Yankees Ent. &*

*Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002).

General claims that vertical mergers can be "efficient," like those made by Defendants,[69] do not

immunize them from scrutiny. *See United States v. Am. Cyanamid Co.*, 719 F.2d 558, 566-67 (2d

Cir. 1983) (reversing district court that declined to engage in standard vertical merger analysis

because "contemporary economic theory recognizes that vertical integration may foster corporate

efficiency and enhance competition") (internal quotations omitted).[70]

---

[65] PX0561 (███████████Dep.) at 34:9-35:15.

[66] *See* PX0502 (███████ IH) at 35:14-36:3.

[67] PX0501 (█████████ IH) at 35:23-36:3; PX0565 (███████████) Dep.) at 259:3-260:6).

[68] At the eleventh hour, in a tacit admission that Defendants possess a chokehold over critical data inputs, Defendants purport to have made an "open offer" to select unidentified platforms promising not to foreclose its HCP data "for up to ten years." Opp'n at 36. The Court should give no consideration to this so-called "open offer," which appears to be a proposed remedy that was never presented to the FTC. Many of the documents depicting these open offers were produced after the close of party discovery, rendering them inadmissible in this proceeding. *See, e.g.*, DX1610 (E. Miceli (IQVIA) letter to █████████████) (dated October 19, eight days after the close of party discovery). The FTC has had no opportunity to probe the makers or recipients of these offers. In any event, IQVIA's open offers have no place in this proceeding. The narrow purpose of a §13(b) proceeding does not extend even to the initial question of liability, *Warner Commc'ns*, 742 F.2d at 1164, let alone to the subsequent question of what remedy might be appropriate if the administrative proceeding ultimately yields a finding of liability. *See FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1345 (4th Cir. 1976) (holding FTC was "entitled to preserve the status quo pending adjudication" regardless of what "ultimate remedy" might eventually be deemed appropriate).

[69] Opp'n at 35.

[70] Notably, the Second Circuit rejected identical legal arguments, from some of the same academic sources, that the Chamber of Commerce relied upon in its amicus brief. Brief of the Chamber of Commerce of the United States of America (Nov. 13, 2023), ECF No. 208; *Am. Cyanamid*, 719 F.2d at 567. And, because the Chamber of Commerce

Here, there is abundant evidence that IQVIA can leverage its control of key data to bottleneck HCP programmatic advertising competition. While IQVIA markets itself as making its "data widely available,"[71] ███████████████████████████████████████████

████████████████████████████████████.[72] ████████████████████████████████████████

████████████████████████.[73] Defendants' argument that IQVIA has not yet foreclosed DSP competition during the pendency of this litigation is unavailing. *United States v. Cont'l Can Co.*, 378 U.S. 441 at 463 (1974) ("We think the District Court erred in placing heavy reliance on [the merged company's conduct] while [it] was under some pressure because of the pending government anti-trust suit."); *FTC v. Consolidated Foods Corp.*, 380 U.S. 592, 598 (1965). IQVIA's conduct in the midst of an antitrust investigation is not probative of its post-acquisition conduct. IQVIA is more likely to foreclose downstream competition if it is allowed to acquire DeepIntent because its market-leading status would allow it to recoup more diverted sales.[74]

        i.   <u>IQVIA Has the Ability to Foreclose Rivals from Critical Data Products</u>

Defendants argue that "IQVIA's data is not a critical input and is available from other sources," and that those companies would prevent IQVIA from profiting from a foreclosure strategy.[75] The words of DeepIntent's CEO belie these claims. ██████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

---

cannot view the voluminous evidence presented by the FTC, its assessment about the merits of this case is of little value.

[71] Opp'n at 36 (emphasis omitted).
[72] PX1785-18 (IQVIA).
████████████████████████████████████████████████████████████
███████████████████████████████████████████████. ████████████
[73] PX1100-01 (IQVIA) ██████████████████████████████████████
[74] Opening Br. at 43-44.
[75] Opp'n at 36-37.



IQVIA has proclaimed itself '███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████.'"[79] Dr. Hatzitaskos calculated that

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████.[80] For example,

███████████████,[81] ██████████,[82] and █████████████,[83] all rely on IQVIA data.[84]

---

[76] PX2520-02 (DeepIntent) (brackets surrounding ████████████ in original).
[77] ████████." PX1126-01 (IQVIA).
[78] PX2520-01 (DeepIntent).
[79] PX1032-01 (IQVIA).
[80] PX6504 (Hatzitaskos Reply Report) ¶ 271.
[81] PX0561 (██████████████ Dep.) at 34:9-35:1-15,
[82] PX0502 (████████████ IH) at 59:22-60:12; PX0570 (████████████████ Dep.) at 141:15-144:20; *see also* PX6500 (Hatzitaskos Report) ¶ 309.
[83] PX0501 (██████████████████ IH) at 35:23-36:3; PX0565 ███████████████████████ at 259:3-260:6)
[84] Defendants point to rival data provider companies to contend that if IQVIA foreclosed access to its data, rivals and clients could get the same data elsewhere. Opp'n at 37. None of the companies referenced by Defendants can replicate the scale and quality of IQVIA's HCP identity and prescription data. *See* Opening Br. at 35-39. Defendants identify █████████ as the ██████████████ for measurement data, but neglect to mention that ██████████████████████████████████ PX0576 (████████████ Dep.) at 17:4-10, 22:7-12; PX6504 (Hatzitaskos Reply Report) ¶ 75a. ██████████████████████████████████████████ ████████████). PX0567 (████████████████ Dep.) at 16:14-17; 35:19-36:4; PX1137-05 (IQVIA). █████████████████████████████ PX6500 (Hatzitaskos Report) § 2.3.4, Exhibit 3.

The direct data partnerships between IQVIA and other platforms understate the extent IQVIA data permeates the HCP programmatic advertising market. Ad agencies often purchase HCP audiences directly from IQVIA, rather than through a programmatic platform.[85] Those agencies can then take the audiences to a platform—provided IQVIA approves the data transfer via Third Party Access ("TPA") agreement. The TPA program is a ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

How does this work in practice? In some cases, IQVIA simply ████████████████

████████████████████████████████[89] In other cases, IQVIA ████████████

[85] *See* Opp'n at 37.
[86] PX1785-18 (IQVIA).
[87] PX1785-18 (IQVIA).
[88] PX1785-23 (IQVIA); *see also* PX1923-02 (IQVIA).
[89] Defendants assert that "████████████████████████████████
████ Opp'n at 43. That assertion is belied by the record. *See* PX1915 (IQVIA) (
████████████████████████████████████████████████



[92] Accordingly, IQVIA has already

Defendants argue that it would harm IQVIA's business to anger clients by restricting

their use of data.[93]

,,[94]

### ii.   IQVIA's Incentive to Foreclose DeepIntent's Rivals

IQVIA argues it has no incentive to foreclose rivals from access to its data. Dr.

Hatzitaskos calculated that upstream profits IQVIA would forego from such a strategy (i.e.,

foregone sales of relevant IQVIA data to DeepIntent rivals) would be significantly outweighed

---

[90] PX1916-01 (IQVIA) (capitalization in original).
[91] PX1924-06 (IQVIA).
[92] PX1924-06-07 (IQVIA).
[93] Opp'n at 42-43.
[94] PX1835-06 (IQVIA).

by downstream gains (i.e., sales from disadvantaged rivals that are diverted to DeepIntent or

Lasso), making foreclosure profitable.[95]

Defendants state that "there is no evidence that IQVIA has ever contemplated

withholding data from rival DSPs or from brands that do business with rival DSPs . . . ."[96] While

such evidence is not a prerequisite, *Cont'l Can Co.*, 378 U.S. at 463; *Consolidated Foods*, 380

U.S. at 598, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████. In 2020 and 2021, IQVIA "████████████████████████████████

████████████████████████."[97] ████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████."[98]

DeepIntent—which publicly touts its full integration with IQVIA data[99]—██████████

█████████████████████████████████████████.[100] ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

The Court need not rely solely on these ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[95] PX6500 (Hatzitaskos Report) ¶¶ 344-360.
[96] Opp'n at 40.
[97] PX2737-03 (DeepIntent).
[98] PX1002-02 (IQVIA).
[99] PX2957-02 (DeepIntent).
[100] PX2736-03 (DeepIntent) ("███████████████████████████████████████████
████████████████████).
[101] PX2774-01 (DeepIntent).



IQVIA's ability and incentive to disadvantage rivals will only increase if it completes the merger and possesses the dominant programmatic platform in the industry.

### E. Defendants Cannot Rebut the Prima Facie Case

Defendants' purported merger-specific efficiencies and potential new entrants fail to rebut the FTC's prima facie case.[106]

#### i.   Efficiencies

Defendants asserts that the merger will result in two categories of efficiencies: (1) cost savings related to DSP and data expenses; and (2) alleged quality improvements from combining capabilities.[107] Defendants fail to satisfy their burden of establishing that these proffered efficiencies are independently verified, including "the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), [and] how each would enhance the merged firm's ability and incentive to compete," as required under the caselaw. *H & R Block*, 833 F. Supp. 2d at 89 (quoting U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010) § 10 ("Merger Guidelines")). As courts have recognized, efficiency

---

[102] PX2576-17 (DeepIntent)

[103] PX2831-31 (DeepIntent).

[104] Opp'n at 41.

[105] PX0551 (Yang (DeepIntent) Dep.) at 12:1-13:14; 25:1-13.

[106] Opp'n at 45-49. As a threshold matter, these issues are beyond the scope of this proceeding. Under Section 13(b), it is "unnecessary" to consider entry or potential efficiencies from a proposed acquisition, including whether "the acquisition will enable the resulting firm to compete more vigorously" in the market. *Lancaster*, 434 F. Supp. at 1096. Instead, the question in this proceeding is limited to whether "the FTC has a fair chance of showing that [the Proposed Acquisition] threatens to reach anticompetitive proportions." *Id.*

[107] Opp'n at 47-49.

claims must "represent more than mere speculation and promises about post-merger behavior" to be credited, *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001); *see also Wilh. Wilhelmsen Holding*, 341 F. Supp. 3d at 83-85, and must flow from an increase in competition rather than an anticompetitive effect of the proposed acquisition. *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 791 (9th Cir. 2015).

First, Defendants fail to establish the verifiability and merger specificity of their claims that the proposed acquisition will result in two categories of cost savings: (1) lower DSP costs for Lasso by using DeepIntent's DSP technology, and (2) reducing the price DeepIntent pays for IQVIA's HCP data.[108] With respect to the DSP-related savings, ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████.[109] With respect to the

claim regarding lowered data costs, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████[112]

---

[108] Opp'n at 48.
[109] PX0509-131 (IQVIA's Second Request Narrative Response); PX0508 (DiNorscio (IQVIA) IH) 35:4-12; PX0540 (DiNorscio (IQVIA) Dep.) 182:6-16; PX0548 (Margolis (IQVIA) Dep.) at 104:22-105:7.
[110] PX0548 (Margolis (IQVIA) Dep.) at 48:18-50:19, 88:5-90:8; 116:10-15 ██████████████████
████████████████████); PX0530 (Lin (IQVIA) Dep.) at 154:4-155:12.
[111] PX1542 (IQVIA); PX0552 (Resnick (IQVIA) Dep.) at 174:2:180:6, 195:19-196:7.
[112] PX0548 (Margolis (IQVIA) Dep.) at 120:17-25.

Second, Defendants fail to verify and demonstrate the merger-specificity of any quality improvements which will allegedly result from the proposed acquisition. In support of this alleged efficiency, Defendants rely on the report of Dr. Anupam B. Jena, a purported industry expert. But Dr. Jena admitted in his deposition that he did not attempt to quantify the potential value created by the Proposed Transaction, and he testified that he was not asked to do so.[113] Nor did Dr. Jena assess whether the quality savings are merger-specific: ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[116]

### ii.  Entry

Although, under *Lancaster*, entry defenses are beyond the scope of a 13(b) proceeding, Defendants nonetheless fail to "carry [their] burden to show" that entry or expansion is sufficient "to fill the competitive void" that would result from the merger. *H & R Block*, 833 F. Supp. 2d at 73 (citations omitted). As a baseline, evidence indicates that the competitive fringe is losing ground to the big three rather than expanding.[117] ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[113] PX0583 (Jena Dep.) at 116:23-117:10.
[114] DX0075 (Expert Report of Anupam B. Jena (Oct. 25, 2023)) ("Jena Report") ¶¶63-66.
[115] PX0583 (Jena Dep.) at 65:24-66:2, 129:20-130:22.
[116] PX4001-26 (▮▮▮▮▮).
[117] PX6504 (Hatzitaskos Reply Report) ¶136.



Other firms cited by Defendants lack the plans, capabilities, or both to offer sufficiently competitive HCP programmatic advertising services in a timely manner to offset the significant competitive harm of the Proposed Acquisition. ████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████[125]

## III.   CONCLUSION

For the foregoing reasons, the FTC requests that the Court grant a preliminary injunction.

---

[118] PX6504 (Hatzitaskos Reply Report) ¶136a.
[119] PX6504 (Hatzitaskos Reply Report) ¶136a.
[120] PX6504 (Hatzitaskos Reply Report) ¶136c.
[121] PX6504 (Hatzitaskos Reply Report) ¶136d.
[122] PX6504 (Hatzitaskos Reply Report) ¶136e.
[123] PX6504 (Hatzitaskos Reply Report) ¶ 345.
[124] PX0010 ¶ 3 (████████████).
[125] PX0007 ¶ 7 (████████████); PX0550 (████████████) at 96:4-97:9.

Dated: November 16, 2023                    Respectfully submitted,

                                            /s/ *Jennifer Fleury*

                                            Jennifer Fleury
                                            Stephen A. Mohr
                                            Jordan Andrew
                                            Stephanie Bovee
                                            Habin Chung
                                            Lisa DeMarchi Sleigh
                                            Yan Gao
                                            Cory Gordon
                                            Christopher Lamar
                                            Wade Lippard
                                            Jessica Moy
                                            Christina Perez
                                            Anjelica Sarmiento
                                            Michelle Seo
                                            Varnitha Siva
                                            William Sohn
                                            Jay Tymkovich
                                            Lily Verbeck

                                            Federal Trade Commission
                                            600 Pennsylvania Avenue, NW
                                            Washington, DC 20580
                                            jfleury@ftc.gov
                                            Tel: (202) 326-3805