**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

                Plaintiff,

        v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

              Defendants.

Case No. 1:23-cv-06188-ER

**REDACTED VERSION**

**<u>DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FINDINGS OF FACT.............................................................................................3

    A.    Digital Healthcare Advertising ...........................................................3

        1.    Programmatic Advertising .........................................................4

        2.    A Dynamic and Growing Industry.............................................7

        3.    The Merging Parties and Deal Rationale ..................................10

    B.    Competition for Targeted HCP Advertising ........................................14

        1.    DSPs........................................................................................14

        2.    Social Media ............................................................................22

        3.    Endemic Publishers..................................................................24

        4.    Agencies..................................................................................25

        5.    Channel Allocation ..................................................................26

    C.    Competition Among Data and Data Solution Providers........................29

        1.    Audience Building and Measurement.......................................29

        2.    The TPA Program ....................................................................34

        3.    Possibility and Likelihood of Data Foreclosure........................36

    D.    The Economic Evidence ...................................................................40

        1.    Market Definition.....................................................................41

        2.    Market Shares ..........................................................................44

        3.    Horizontal Competitive Effects ...............................................46

        4.    Vertical Competitive Effects....................................................47

CONCLUSIONS OF LAW ...................................................................................48

I.    THE STATUTE IMPOSES SIGNIFICANT BURDENS ON THE FTC .......48

II.    THE FTC HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS......51

    A.    The FTC Is Not Likely to Succeed on Its Horizontal Theory...............52

        1.    The FTC Is Not Likely to Establish Its Prima Facie Case........53

        2.    Substantial Evidence Rebuts Any Weak Prima Facie Case.......72

        3.    The FTC Has Not Shown a Likelihood of Carrying Its Ultimate
            Burden of Persuasion ..............................................................87

    B.    The FTC Has Not Established a Likelihood of Success Under Its Vertical
        Theory....................................................................................88

1.  The FTC Has Not Shown That IQVIA Is Likely to Engage in Foreclosure...........................................................................................90

2.  The FTC Has Not Established That Any Foreclosure Would Substantially Lessen Competition..............................................................96

III.  THE EQUITIES WEIGH AGAINST A PRELIMINARY INJUNCTION.......................98

CONCLUSION.........................................................................................................................100

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AD/SAT v. Associated Press*,
   920 F. Supp. 1287 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216 (2d Cir. 1999) ...............................62

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ......................................................................................60, 95

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*,
   826 F.2d 1235 (3d Cir. 1987)................................................................................................89

*Allen-Myland v. Int'l Bus. Mach. Corp.*,
   33 F.3d 194 (3d Cir. 1994)....................................................................................................61

*AMG Capital Mgmt., LLC v. FTC*,
   141 S. Ct. 1341 (2021)..........................................................................................................49

*In re AMR Corp.*,
   2023 WL 2563897 (2d Cir. Mar. 20, 2023)..........................................................................52

*In re AMR Corp.*,
   625 B.R. 215 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897 (2d Cir. Mar.
   20, 2023) ..........................................................................................................................52, 74

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)........................................................................................................88, 96

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
   441 U.S. 1 (1979).................................................................................................................68

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)...................................................................................................... *passim*

*California v. Sutter Health Sys.*,
   84 F. Supp. 2d 1057 (N.D. Cal. 2000) .................................................................................60

*City of New York v. Grp. Health Inc.*,
   649 F.3d 151 (2d Cir. 2011).................................................................................................53

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
   817 F.3d 46 (2d Cir. 2016).......................................................................................53, 56, 58

*Dresses for Less, Inc. v. CIT Group/Commercial Servs., Inc.*,
   2002 WL 31164482 (S.D.N.Y. 2002)...................................................................................68

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
   612 F. Supp. 2d 330 (S.D.N.Y. 2009) ...................................................................63

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021), *partially rev'd on other grounds*, 67
   F.4th 946 (9th Cir. 2023) ...................................................................................94

*Fruehauf Corp. v. FTC*,
   603 F.2d 345 (2d Cir. 1979) ................................................................89, 90, 93

*FTC v. Advocate Health Care Network*,
   841 F.3d 460 (7th Cir. 2016) ..............................................................................56

*FTC v. Arch Coal, Inc.*,
   329 F. Supp. 2d 109 (D.D.C. 2004) ...................................................... *passim*

*FTC v. Beatrice Foods Co.*,
   587 F.2d 1225 (D.C. Cir. 1978) .........................................................................49

*FTC v. Butterworth Health Corp.*,
   946 F. Supp. 1285 (W.D. Mich. 1996), *aff'd*, 1997 WL 420543 (6th Cir. July
   8, 1997) ..............................................................................................................74

*FTC v. Cardinal Health*,
   12 F. Supp. 2d 34 (D.D.C. 1998) ................................................................54, 98

*FTC v. CCC Holdings Inc.*,
   605 F. Supp. 2d 26 (D.D.C. 2009) ........................................................ *passim*

*FTC v. Foster*,
   2007 WL 1793441 (D.N.M. May 29, 2007) .....................................................74

*FTC v. Freeman Hosp.*,
   69 F.3d 260 (8th Cir. 1995) ..........................................................................49, 55

*FTC v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ..................................................................49, 74, 78

*FTC v. IQVIA*,
   No. 23 Civ. 06188 (S.D.N.Y. Oct. 31, 2003) ECF No. 184 ..........................51, 92

*FTC v. Lab. Corp. of Am.*,
   2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) ...................................................79

*FTC v. Lancaster Colony Corp.*,
   434 F. Supp. 1088 (S.D.N.Y. 1977) .............................................................49, 50

*FTC v. Microsoft Corp.*,
  2023 WL 4443412 (N.D. Cal. July 10, 2023), *appeal filed*, No. 23-15992 (9th
  Cir.) .......................................................................................................................... *passim*

*FTC v. Nat'l Tea Co.*,
  603 F.2d 694 (8th Cir. 1979) .................................................................................77, 98

*FTC v. Pharmtech Research, Inc.*,
  576 F. Supp. 294 (D.D.C. 1983)...................................................................................49

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ........................................................................................75

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) .............................................................. *passim*

*FTC v. Southland Corp.*,
  471 F. Supp. 1 (D.D.C. 1979) .......................................................................................49

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ...........................................................................50, 69

*FTC v. Swedish Match*,
  131 F. Supp. 2d 151 (D.D.C. 2000) .............................................................................69

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) .................................................................................49

*FTC v. Tenet Health Care Corp.*,
  186 F.3d 1045 (8th Cir. 1999) ......................................................................................50

*FTC v. Tenneco, Inc.*,
  433 F. Supp. 105 (D.D.C. 1977).....................................................................................97

*FTC v. Warner Commc'ns Inc.*,
  742 F.2d 1156 (9th Cir. 1984) ......................................................................................49

*FTC v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981).................................................................................49, 98

*FTC v. Whole Foods Mkt., Inc.*,
  548 F.3d 1028 (D.C. Cir. 2008).................................................................................50, 51

*FTC v. Wilh. Wilhelmsen Holding ASA*,
  341 F. Supp. 3d 27 (D.D.C. 2018)................................................................................51

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004)..........................................................................................59

*Gianna Enterprises v. Miss World (Jersey) Ltd.*,
  551 F. Supp. 1348 (S.D.N.Y. 1982)..............................................................53, 54

*Global Disc. Travel Servs. v. Trans World Airlines*,
  960 F. Supp. 701 (S.D.N.Y. 1997) ...................................................................53

*Hack v. President & Fellows of Yale Coll.*,
  237 F.3d 81 (2d Cir. 2000)................................................................................63

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) .......................................86

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016) ............................................................................54

*Ky. Speedway, LLC v. NASCAR*,
  588 F.3d 908 (6th Cir. 2009) ............................................................................58

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)..........................................................................................64

*Lektro-Vend Corp. v. Vendo Co.*,
  660 F.2d 255 (7th Cir. 1981) ............................................................................73

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*,
  889 F.2d 524 (4th Cir. 1989) ............................................................................64

*Nat'l Fuel Gas Supply Corp. v. FERC*,
  468 F.3d 831 (D.C. Cir. 2006) ..........................................................................89

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)........................................................ *passim*

*New York v. Kraft Gen. Foods, Inc.*,
  926 F. Supp. 321 (S.D.N.Y. 1995) .............................................................62, 66

*Nimbus Therapeutics, LLC v. Celgene Corp.*,
  570 F. Supp. 3d 100 (S.D.N.Y. 2021).........................................................73, 75

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
  670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ................62

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018)......................................................................................57

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ............................................................................63

*Truck-Rail Handling Inc. v. BNSF Ry. Co.*,
  2005 WL 8178364 (N.D. Cal. Mar. 8, 2005).....................................................62

*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) .................................................................................69

*United States v. Am. Express Co.*,
  838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S.
  Ct. 2274 (2018) .............................................................................................55, 56

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) .................................................................................52

*United States v. AT&T*,
  916 F.3d 1029 (D.C. Cir. 2019) ..........................................................................89, 91

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019)................... *passim*

*United States v. Baker Hughes Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ............................................................................ *passim*

*United States v. Energy Sols., Inc.*,
  265 F. Supp. 3d 415 (D. Del. 2017) ..........................................................................61

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) ..............................................................................................82

*United States v. General Dynamics Corp*, 415 U.S. 486 (1974) ......................................... *passim*

*United States v. Google LLC*,
  1:23-cv-108 (E.D. Va. Jan. 24, 2023) ..............................................................18, 44, 47, 48

*United States v. H&R Block, Inc.*,
  833 F. Supp. 3d 36 (D.D.C. 2011) ......................................................................69, 77, 80, 92

*United States v. Long Island Jewish Medical Center*,
  983 F. Supp. 121 (E.D.N.Y. 1997) ...................................................................... *passim*

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974) ...........................................................................................51, 53

*United States v. Oracle Corp.*,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................................. *passim*

*United States v. Penn-Olin Chem. Co.*,
  378 U.S. 158 (1964) ..............................................................................................82

*United States v. Philadelphia National Bank*,
  374 U.S. 321 (1963) ...........................................................................................65, 72, 74

*United States v. Siemens Corp.*,
    621 F.2d 499 (2d Cir. 1980)............................................................................100

*United States v. Sun & Sand Imports, Ltd.*,
    725 F.2d 184 (2d Cir. 1984)............................................................................50

*United States v. Syufy Enters.*,
    712 F. Supp. 1386 (N.D. Cal. 1989), *aff'd*, 903 F.2d 659 (9th Cir. 1990) ................75, 81, 84

*United States v. U.S. Sugar Corp.*,
    73 F.4th 197 (3d Cir. 2023) ............................................................................63

*United States v. UnitedHealth Grp. Int'l*,
    630 F. Supp. 3d 118 (D.D.C. 2022) ............................................................88, 89

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984).......................................................... *passim*

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019)............................................................................57

**Statutes**

15 U.S.C. § 18 ..........................................................................................51

15 U.S.C. § 53(b) ....................................................................................49, 98

**Other Authorities**

16 C.F.R.§ 3.26 ......................................................................................100

Dennis Carlton & Mark Israel, *Proper Treatment of Buyer Power in Merger
    Review, 39 Fev. Indus. Org. 127 (2011)* ....................................................84

Ella Thackray & Matt Morthin, *Leveraging Large Language Models in
    Advertising*, WPP (Nov. 30, 2023), https://perma.cc/S664-JH8W ........................10

Herbert Hovenkamp, *The Antitrust Enterprise: Principle and Execution* vi (2005)....................84

*IQVIA, Environmental, Social and Governance Report* 22–25 (2022),
    https://perma.cc/3XRA-6B8M;..........................................................................91

*IQVIA Code of Conduct* 12–13 (2023), https://perma.cc/RUB2-EYBB ......................................91

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* ¶ 927c (2023 cum. supp.)....................................60

Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1988) ................................................68

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law*
§ 5.10[A] (4th ed. 2023 supp.) ................................................................................62

Rachel S. Tennis & Alexander Baier Schwab, *Business Model Innovation and
Antitrust Law*, 29 Yale J. Reg. 307, 319 (2012) ....................................................75

Statement of the FTC Before the U.S. Sen. Comm. on the Judiciary 13 (Oct. 7,
2015), https://perma.cc/7V4B-PLDS.......................................................................50

## INTRODUCTION

Across an eight-day evidentiary hearing, not a single witness competently testified that the proposed transaction is likely to lead to increased prices, reduced innovation or quality, or is likely to substantially lessen competition in any other way.  The few objections to the transaction— almost entirely from IQVIA's competitors—were generic and speculative.  But the antitrust laws, including the Clayton Act, do not protect competitors from having to face an improved IQVIA product offering.  Rather, they are concerned with injury to *competition*, such as higher prices or reduced output, but the Court heard no credible evidence that any such injury is probable.

This is not surprising, because digital healthcare advertising is a growing and dynamic industry, in which HCP programmatic advertising in particular is a nascent and emerging segment.  The merging parties themselves are recent entrants (Lasso having entered just in 2020), powerful firms already dominant in digital advertising are quickly moving to innovate and reposition for greater HCP programmatic advertising business, and new firms are entering as well.  This dynamic industry is noteworthy for fierce competition among well-capitalized digital advertising firms that compete for the same advertising dollars across multiple channels and therefore seek to maximize their own value proposition to customers.   IQVIA's competitors include giant healthcare publishers like Medscape, enormous demand-side platforms ("DSPs") such as The Trade Desk, and huge social media platforms like Doximity.

The FTC has not shown that it is likely to succeed in proving that its proposed market for HCP programmatic advertising is so narrow as to exclude all other digital advertising channels; nor has it shown that it is likely to succeed in proving its calculation of market shares even within its narrow market.  The FTC excluded both endemic publishers and social media websites from its proposed market based on its assumptions and a one-sided reading of the incomplete record that the agency itself compiled.   That is no substitute for the rigorous analysis of reasonable

interchangeability called for by the antitrust laws, and in any event, the qualitative evidence shows that advertisers and agencies *do* reallocate advertising spend among DSP, endemic, and social platforms for HCP programmatic advertising.  Correcting for those errors upends the FTC's entire market share analysis, as does correcting for even just some of the FTC's other analytical errors.

Even if the FTC could overcome those obstacles, however, the fundamental defect in the FTC's horizontal case is that its static snapshot of the alleged market provides an inaccurate view of existing and future competition.  Even the FTC admits that at least a dozen firms are already competing in its own proposed market.  Moreover, the industry is dynamic, barriers to entry (or expansion) are low, one of the merging parties (DeepIntent) is ███████████████████ ████████████████████████, and customers (healthcare companies and advertising agencies) are sophisticated and have substantial buying power.  These are all factors that lead courts to reject Clayton Act merger challenges, including at the preliminary injunction stage.

The FTC's alternative vertical theory posits that IQVIA may foreclose access to data used in HCP programmatic advertising in order to boost its share in the FTC's market for HCP programmatic advertising.  No evidence supports this rank speculation, and IQVIA's strategy documents and public statements consistently say the opposite.

Enjoining a merger between two freely contracting parties is a drastic step that effectively terminates the transaction.  As a result, it is one that this Court should not take without a persuasive and compelling showing from the FTC, which carries the burden of persuasion in this proceeding. Congress has required the FTC to show both that it is likely to succeed on the merits and that the equities are in its favor.  However, the FTC has fallen well short of making the required showing. Accordingly, the motion for a preliminary injunction will be denied.

**FINDINGS OF FACT**

A.      **Digital Healthcare Advertising**

1.      Companies that wish to advertise healthcare-related products or services have a variety of tools at their disposal.[1]  Digital healthcare advertising is one form of advertising, which occurs through various channels, including social media (e.g., Facebook, LinkedIn, Doximity, Sermo), connected TV (e.g., Roku, Hulu), medical-related ("endemic") websites (e.g., Medscape, *New England Journal of Medicine*), and non-medical-related ("non-endemic") websites (e.g., CNN).[2]

2.      A company wishing to digitally advertise healthcare products or services typically will hire an advertising agency, who will help allocate and adjust spend among advertising channels based on the return on investment ("ROI").[3]  When designing an advertising campaign, a brand must consider the effectiveness of each advertising channel using key performance indicators ("KPIs") and/or relative ROI, which includes cost as well as performance.[4]

3.      In many of those channels, the brand can choose to advertise directly to cohorts of patients, known as direct-to-consumer, or "DTC" advertising, or directly to individual HCPs.[5]  ███████ ████████████████████████████████████████,[6] although HCP advertising typically is more expensive because of the limited universe of HCPs.[7]  Given the much higher number of patients than HCPs, the opportunity on the DTC side is also much larger than on the HCP side.[8]



4.      Historically, the most prevalent mechanism for targeting HCPs was detailing, in which pharmaceutical brands sent sales agents to market products by physically visiting HCPs in their offices "█████████."[9]   When the COVID-19 pandemic made in-person visits difficult or impossible, advertisers and agencies shifted their advertising budgets toward digital advertising in order to reach HCPs.[10]   Advertisers and agencies also have shifted to digital advertising due to better measurement and optimization capabilities.[11]

### 1.      Programmatic Advertising

5.      In tandem with the COVID-19 pandemic and the move toward digital advertising, programmatic advertising emerged as a nascent and developing opportunity for advertising directly to HCPs.[12]   There is no uniform definition of what constitutes "programmatic advertising," but many industry participants define it as the data-driven matching of an advertising buyer and a seller in real time through the use of software technology.[13]   Put more simply, programmatic advertising is the digital delivery of a specific advertisement to a specific audience.[14]

6.      Programmatic advertising is sometimes spoken of as having three stages: (1) audience creation, (2) activation, and (3) measurement.[15]   Although the steps are often similar for both HCP and DTC programmatic advertising, this case is focused on HCP programmatic advertising.

7.      ***Audience Creation.***   Because programmatic advertising leverages the advertiser's identification of the right *audience* for the advertisements it wants to run,[16] the first step is for the

---

[9] █████████████████████.
[10] ████████; █████████████████████; TT 1216:20–1217:10 (Resnick).
[11] TT 291:5–7 (Lin); ███████████; TT 295:20–296:1 (Lin); █████████████; DX2034.
[12] TT 291:5–7 (Lin); ████████████████████████.
[13] TT 83:23–84:6 (Freid); █████; ██████████████; TT 304:7–17 (Lin); TT 603:6–19 (Paquette); TT 801:12–802:5 (Lawson); ███████████████; ████ 7:10–17.
[14] TT 1038:13–24 (Israel).
[15] TT 161:1–19 (Gerszke); TT 253:23–254:3 (Colarossi); ██████████████.
[16] ██████████████████; TT 305:5–14 (Lin); █████████████); ██████████████.

advertiser or its agency to build an audience of the HCPs to whom it wants to advertise.[17]  Most of the time, advertisers and agencies have already built an audience using their own internal or licensed data (which they can use in a variety of contexts, such as in-person visits) and do not require additional third-party services.[18]  Other times, they can use third-party platforms that operate as online marketplaces for data vendors.[19]  In a small fraction of campaigns, the advertiser builds an audience using a DSP's on-platform tools.[20]

8.    ***Activation.***   Once the audience is built, the brand must "activate" the programmatic advertising campaign, that is, actually purchase the advertisements from publishers.  This is the step in programmatic advertising on which much of the FTC's case is focused.

9.    One way to activate a campaign is through a "demand-side platform" ("DSP").  A DSP essentially provides the technical "plumbing" for making programmatic purchases of advertising inventory based on the audience the brand has elected to target.[21]  When an individual visits a website, the publisher puts up for auction the advertising space that visitor will see.[22]  DSPs can bid for that advertising space on behalf of their various customers, using the preset algorithms and preferences selected by their customers.[23]

10.    The software DSPs use to purchase advertising inventory is the software regardless whether the DSP focuses only on healthcare or real estate, auto, or consumer packaged goods.[24]  Accordingly, so-called "generalist" DSPs—such as The Trade Desk, AdTheorent, or Viant—and healthcare-specific DSPs—such as Doceree, PulsePoint, or Proclivity—can activate the same ads

---

[17] ███████████████████████████████; ███████████████████████████████.
[18] TT 161:1–4 (Gerszke); TT 523:12–21, 540:10–18 (Field); TT 569:3–6 (Evenhaim); ███████████████████████████████;  ███████ 26:5–10.
[19] ███████████████████████████████.
[20] TT 161:1–4 (Gerszke); TT 539:3–12 (Field); ███████████████████.
[21] TT 156:16–25, 161:7–15 (Gerszke); TT 307:10–13 (Lin); TT 84:20–85:8 (Freid).
[22] TT 373:10–13 (Brosso); ███████████████████.
[23] TT 373:10–13 (Brosso); ███████████████████████████████.
[24] TT 991:1–23 (Hochberg).

to the same audiences on the same websites.[25]

11.     Programmatic advertising campaigns can also be activated directly through publishers, without the use of an intermediate DSP.  Advertisers can work directly with a publisher like Medscape to target a specific audience.[26]  Social media websites like Facebook also allow the purchase of programmatic advertising using either audiences brought from off-platform or on-platform audiences.[27]  These publishers sometimes operate as a "walled garden," wherein certain advertising inventory may be purchased *only* directly through the publisher (and not through DSPs).[28]  Some of these "walled gardens" are so large and/or encompass so many websites, however, that they allow for direct access to millions of HCPs.[29]

12.     Regardless of which platform activates an HCP programmatic advertising campaign, all of these firms allow materially the same advertisement to be shown to the same HCPs.[30]

13.     ***Measurement.***     The final step is to evaluate the effectiveness of the campaign. Measurement and optimization tools link healthcare data to exposure to media from a specific marketing campaign in order to produce metrics that help customers decide how to optimize the media campaign in real-time and/or understand the ROI and impact of the campaign.[31]  DSPs sometimes provide tools for reporting on the programmatic advertising campaign run on their platforms, but brands typically prefer measurement tools that analyze the effectiveness of the *entire* advertising campaign across all channels (not just HCP programmatic advertising).[32]  That

---

[25] TT 991:1–23 (Hochberg); ███████████████ 22:20–24:6, 25:5–12, 26:9–14.
[26] TT 156:16–25 (Gerszke); ████████████████ ; ███████████ 64:4–16; ████████████████ 10:9–11:16.
[27] TT 153:23–154:8 (Gerszke); ████████████████████████████ ; TT 262:19–24 (Colarossi); ████████████ ; █████████████ 65:10–66:8; ████████████ 21:17–22:7.
[28] TT 154:9–13 (Gerszke); TT 318:17–319:8 (Lin).
[29] TT 1052:20–6 (Israel).
[30] ███████████████████ ; 318:13–16 (Lin); TT 523:12–21, 525:6–16 (Field).
[31] TT 562:13–21 (Evenhaim).
[32] TT 164:10–165:12 (Gerszke); ████████████████████ ; TT 308:22–309:4 (Lin); TT 565:18–25 (Evenhaim); ████████████ 48:16–49:14.

is because advertisers and agencies do not look at one advertising channel in isolation, but rather aim to understand how each channel performs, leading to more effective communication and fewer wasted resources.[33]  Indeed, optimization often leads advertisers or agencies to reallocate budget among channels between or even during campaigns.[34]

14.     As discussed further below, customers tend to mix and match providers for audience creation, activation, and measurement.[35]  Agencies also often use more than one DSP, social media website, and endemic publishers to maximize the reach of an HCP campaign.[36]  And many customers prefer to use different suppliers at different stages.[37]

## 2.     A Dynamic and Growing Industry

15.     In all respects, digital healthcare advertising is a dynamic and growing industry.[38]  Overall, digital healthcare advertising in both HCP and DTC grew 30% year-over-year in 2021 to nearly $14 billion in annual spend, with projections to grow to $20 billion by 2024.[39]  As Defendants' expert Professor Hochberg and many fact witnesses testified, there are numerous indicia that digital healthcare advertising is a dynamic market.

16.     *First*, the firms the FTC describes as the market leaders are themselves nascent and growing.  PulsePoint (███████████████████████████████) ██████████████████████████████████████ ████████████████████████████████████████████████████████████.[40]  Lasso was founded in December of 2019 with a loan of $750,000 and a handful of employees, and went live

---

[33] ███████████████████ 48:16–49:14.
[34] ███████████████████; TT 535:10–536:2 (Field); ███████████████████; DX0660.
[35] TT 268:25–269:8 (Colarossi); ███████████████████.
[36] ███████████████████; TT 309:20–310:16 (Lin); TT 525:6–16 (Field); ███████████████████; ███████████ 66:8–67:16.
[37] TT 540:24–541:9 (Field); ███████████████████; ███████████████; ███████████ 121:8–122:5.
[38] ███████████; ███████████████████████; TT 1233:13–1234:17 (Resnick) (industry "has barely started").
[39] TT 276:17–19 (Lin) ($14 billion industry); ███████████████████████████████████████ ███████); TT 1220:21–1221:7 (Resnick) (████).
[40] ███████████████████████████.

with its first activation campaign shortly thereafter.[41]   Lasso made approximately $6 million in revenue in its first year of operations and roughly $24 million in its second—by which time the FTC claims Lasso was already a dominant player.[42]

17.   This ease of entry (or expansion by current market participants) is partly a consequence of the fact that a firm does not even need to build its own DSP technology:  Like Lasso, a new entrant could simply partner with a DSP like Xandr, partner with identity providers to match physician records to digital identifiers, and use publicly available identifier data and/or partner with an audience provider.[43]   Indeed, the major sources of differentiation several years ago are less important now and can instead be sublicensed or purchased from many firms.[44]

18.   *Second*, large generalist DSPs like The Trade Desk, Google, and AdTheorent are increasing their interest and investment in healthcare advertising.[45]   Because the underlying DSP software is largely undifferentiated, it is not difficult for a generalist DSP to pivot or expand into healthcare advertising.[46]   As a result, many generalist DSPs are currently engaged in digital healthcare advertising, as indicated by the ███████████████████████████████████ ██████████ ████████████████████████████████████████████ ████████████████████████████████████████.[47]   For example, AdTheorent, a generalist DSP that ████████████████████████████████████████████████ ██████████████████████████████████████.[48]

---

[41] TT 520:12–521:11 (Field).
[42] TT 522:2–4 (Field).
[43] TT 522:15–523:2 (Field).
[44] TT 996:18–998:3 (Hochberg).
[45] ███████████████; TT 991:1–23 (Hochberg).
[46] TT 991:1–23 (Hochberg).
[47] █████████████████████; ██████████████████; ████████████████ 10:9–12:6, 22:20–27:07.
[48] ███████████████.

19. *Third*, both publishers and agencies are integrating with the "ad tech stack" (the layers of technology that sit between an advertiser and a publisher).[49]  For example, Ogilvy (an advertising agency) recently entered into a partnership with Doceree (a healthcare-specific DSP).[50]  Haymarket (a publisher) has developed a product to skip the DSP level of the ad tech stack and allow advertisers to plug directly into an SSP.[51]  And RealChemistry (an advertising agency) recently acquired TI Health and Swoop, giving it audience-building and activation capabilities.[52]

20. *Fourth*, there has been significant outside investment in digital healthcare advertising, indicating that investment firms see significant growth potential.[53]  As examples, data provider Komodo has received nearly $500 million in investment capital since 2021; data provider PurpleLab received $40 million investment capital in 2022, and healthcare-specific DSP Doceree has received $35 million in investment capital so far in 2023.[54]  Other witnesses testified that advertising technology firms ████████████████████████████████████████████ ████████████████████████████████[55]

21. *Finally*, technological changes and opportunities suggest that future growth and innovation is likely.  Digital advertising is a highly dynamic and innovative space, and cutting-edge features in one DSP are quickly replicated by other DSPs, making it difficult for any firm to maintain a competitive edge.[56]  For example, Google announced in January 2020 that it plans to deprecate third-party cookies, which is likely to destabilize the digital healthcare advertising industry and favor entities like endemic publishers.[57]

---

[49] TT 995:11–996:16 (Hochberg).
[50] TT 994:6–12 (Hochberg).
[51] TT 992:24–993:7 (Hochberg).
[52] TT 993:8–994:5 (Hochberg).
[53] TT 998:11–1000:7, 1001:1–1002:14 (Hochberg).
[54] TT 998:11–1004:14 (Hochberg); D-HOCHBERG-DEMO-25–28.
[55] ████████████████; ████████████████████.
[56] TT 261:9–21 (Colarossi).
[57] ████████████████████; ████████████████.

9

22.     The digital advertising industry is particularly subject to technological change given that it is a software and information business that leverages large datasets, and thus sensitive to the disruptive and innovative benefits of artificial intelligence in processing, measuring, and optimizing data.[58]  Most notably, large language models, such as OpenAI's ChatGPT, are poised to transform the digital advertising field by allowing customized individual advertisements.[59]

23.     The FTC's economic expert, Dr. Hatzitaskos, testified ██████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████.[60]  Dr. Hatzitaskos did not account for any of the other evidence cited above,[61] but even looking just at revenues, Dr. Hatzitaskos arbitrarily limits his analysis to this narrow window, even though Lasso *did not even exist just four years ago*. Dr. Hatzitaskos's only response to this fact was to observe that "██████████████████ ███████████████,"[62] ███████████████████████████████████████. Any other gaps in the revenue data are a consequence of *the FTC's* failure to adequately investigate the transaction or seek additional information via subpoena in the over year-and-a-half it had to do so.[63]  In any event, Dr. Hatzitaskos's testimony does not explain why the Court should defer to data from a six-month period that is directly contradicted by the complete factual record.  Dr. Hatzitaskos's testimony that the market is stable is neither credible nor supported by the evidence.

### 3.     The Merging Parties and Deal Rationale

24.     IQVIA is not principally a digital advertising company—instead, it provides a broad range of services to healthcare clients, including clinical trial services, observational studies, technology

---

[58] TT 1025:20–1026:6 (Hochberg).
[59] TT 1234:6–17 (Resnick); *see also* Ella Thackray & Matt Morthin, *Leveraging Large Language Models in Advertising*, WPP (Nov. 30, 2023), https://perma.cc/S664-JH8W.
[60] ██████████████████.
[61] TT 1005:1–15 (Hochberg).
[62] ███████████████.
[63] ████████████████.

solutions, patient support programs, scientific strategy and medical affairs services, market research services, and advanced analytics.[64]  Licensing data to healthcare companies (for a wide variety of purposes beyond digital advertising) accounts for ▮▮▮▮▮ of IQVIA's revenues.[65] Currently, digital advertising comprises ▮▮▮▮▮ of IQVIA's business.[66]

25.    In 2022, IQVIA identified two companies—DeepIntent and Lasso—whose complementary synergies would help IQVIA compete with the firms currently dominating the digital advertising space.[67]  From the outset, IQVIA's objective was to establish a presence in the $14 billion market for digital healthcare advertising in order to improve how information is communicated to doctors and patients.[68]  Contemporaneous deal documents confirm that IQVIA's Board of Directors understood that IQVIA would be competing with large, entrenched competitors like Google, The Trade Desk, Meta, Twitter, and more[69]:



26.    These documents show that a significant driver of IQVIA's acquisitions of Lasso and

[64] TT 425:15–427:13 (Margolis); TT 1204:25–1209:2 (Resnick).
[65] TT 287:3–8 (Lin); ▮▮▮▮▮▮▮▮▮▮▮; TT 1213:1–12, 1216:8–1220:2 (Resnick).
[66] TT 1208:6–19 (Resnick); *see also* ▮▮▮▮▮▮▮▮▮▮.
[67] TT 284:4–25 (Lin); ▮▮▮▮▮▮▮▮▮▮▮; TT 1225:8–22 (Resnick).
[68] ▮▮▮▮▮▮▮▮▮▮; TT 1221:13–1222:19 (Resnick).
[69] DX0082; DX0083 (listing "[c]ompanies vying for Healthcare and Pharma Brand budget," including Google, Amazon, The Trade Desk, Amobee, Viant, LinkedIn, and Snapchat").

DeepIntent was projected growth in the significantly larger *DTC* programmatic advertising segment, not HCP.[70]

27.    Although DeepIntent and Lasso compete with one another (and many others) for HCP programmatic advertising activation services, they are different and complementary in many other ways.  IQVIA identified numerous synergies contemporaneously with its initial evaluations of the transactions, including cost-savings, enhanced services, and better outcomes for patients[71]:



28.    ***Savings.***  DeepIntent was founded in 2015 and has its own DSP technology.[72]  Lasso— launched in 2020—does *not* have its own DSP technology, and instead rents space on Microsoft's DSP, Xandr.[73]  Lasso's value is as an "omnichannel" platform for coordinating advertising campaigns across multiple channels.[74]  By combining Lasso with DeepIntent, IQVIA could

---

[70] ████████████████████; TT 1225:8-22 (Resnick).
[71] TT 1227:22-1229:7 (Resnick); DX0081.
[72] ████████████████; ████████████████.
[73] ████████████████████ TT 522:18–523:2 (Field); ████████████████; TT 1224:16–1225:3 (Resnick).
[74] TT 528:13-18, 529:6-20 (Field); TT 1224:16-1225:7 (Resnick).

eliminate some of the costs and inefficiencies associated with renting from Xandr.[75]  Additionally, by providing DeepIntent and Lasso with direct access to IQVIA's data, IQVIA can offer lower priced data products.[76]

29.      ***Services.***  The merged firm will also provide a suite of complementary services to help clients efficiently execute and optimize their campaigns.[77]  DeepIntent has a focus on and a strong presence in DTC and connected TV (e.g., advertisements served through ██ or ██).[78] ███████████████████████████████████████████████████████████████ ███████████████████.[79]  Lasso, by contrast, is more focused on HCP advertising and has limited connected TV business.[80]  Moreover, ██████████████████████████████████ ██████████████████████████████████████████.[81]  Combining the two could allow IQVIA to ████████████████████████████████████████████████" for IQVIA's customers, including (in particular) DTC advertising.[82]

30.      ***Solutions.***  Finally, the merged firm's combined capabilities will allow clients to better inform consumers and their HCPs, and therefore further IQVIA's objective to enhance patient care and produce better outcomes for consumers.[83]  Defendants' healthcare economics expert, Dr. Anupam Jena, explained that synchronizing advertising for DTC and HCP campaigns—as IQVIA hopes to do through the transaction—can improve patient outcomes by keeping HCPs apprised of new developments and making patients more comfortable with unfamiliar treatments.[84]

---

[75] TT 1227:22–1228:14 (Resnick).
[76] TT 1227:22–1228:14 (Resnick).
[77] TT 1228:15–24 (Resnick).
[78] ██████████████████; *see also* ███████████████████████.
[79] ████████████████████████████████████.
[80] ████████████████; ███████████████; TT 1224:16–1225:7 (Resnick).
[81] ████████████████████████████.
[82] ████████████████; TT 1225:8–22 (Resnick); ████████████████ 214:4-25.
[83] TT 1228:25–1229:7 (Resnick).
[84] TT 1313:2–1314:20 (Jena).

## B.      Competition for Targeted HCP Advertising

31.      As set forth above, there are many ways for advertisers to perform digital targeted advertising to HCPs.[85]  Under the definition of programmatic advertising offered by Dr. Israel and the FTC's witnesses, FOF 5, all forms of technology-assisted, targeted digital advertising outlined below fall within the meaning of "programmatic advertising."  But even if they did not, all of these firms are in competition for the same digital advertising dollars, and therefore constrain pricing of one another.[86]  Some of the most key competitors are outlined below.

### 1.      DSPs

32.      One way advertisers can reach HCPs through programmatic advertising is through DSPs.[87]

33.      ***Healthcare-Specific DSPs.***  The FTC has focused on healthcare-specific DSPs, of which there are many.  The largest healthcare-specific DSP by revenue ███████████████) is PulsePoint—a subsidiary of Internet Brands, which is owned by private equity giant KKR and in turn owns both WebMD and an HCP-specific ("endemic") site called Medscape.  PulsePoint offers clients a suite of advertising services and exclusive access to desirable endemic advertising inventory.[88]  ████████████████████████████████████████

████████████████████.[89]  Since that time, ████████████████████████

████████████████████████████████████.[90]

34.      Another healthcare-specific DSP is Proclivity, which is ████████████████████

████████████████████████████████████.[91]

---

[85] TT 1039:24–1043:15 (Israel).
[86] ████████████████████; TT 1050:5–17 (Israel).
[87] TT 1041:2–1042:25 (Israel).
[88] TT 147:11–15; 169:8–170: 12 (Gerszke).
[89] ████████████████████████.
[90] ████████████████████████████; DX1852.
[91] TT 307:17–308:2 (Lin); ████████████████; TT 533:15–17 (Field).

Proclivity is a leader in endemic programmatic advertising and has been for years.[92] █████
██████████████████████████████████████████████████████████.[93]

35.    Another healthcare-specific DSP is Doceree (pronounced "Doc-Care"), which has mature
technology that allows its customers to reach a broad range of HCPs.[94]  Doceree originally focused
principally on endemic inventory (where it has consistently outperformed Lasso), but is now
launching new products to compete more for non-endemic inventory.[95] ██████████████████
███████████████████████████████████.[96]

36.    Other   healthcare-specific   DSP   platforms   include   TI   Health,   which   has   been
"████████" through its acquisition by Real Chemistry, a large healthcare advertising agency
that also acquired data provider Swoop, and ███████████████████████████████████████
██████████████[97]; Medicx, which was recently acquired by OptimizeRx[98]; and Healio,
Adfire, AdPrime Health, and MiQ.[99]

37.    ***Generalist DSPs.***   Generalist DSPs—who offer advertising services across multiple
verticals   (e.g.,   healthcare,   automotive,   etc.)—also   compete   by   offering   HCP   programmatic
advertising services.[100]  Generalist DSPs offering HCP programmatic advertising services include
AdTheorent, The Trade Desk, VideoAmp, Acuity Ads, Nativo, Viant, Yahoo, and Google.[101]  As
the   revenue   opportunity   for   digital   healthcare   advertising   continues   to   grow,   more   and   more

---

[92] TT 533:10–17 (Field).
[93] ██████████ 29:19–30:2.
[94] TT 534:1–25 (Field); DX0677; *see also* ███████████████ ¶ 8 (██████████████████████████).
[95] TT 533:18–25 (Field).
[96] ██████████.
[97] TT 257:20–25 (Colarossi); TT 533:10–17 (Field); ██████████████; ████████████; *see also*
██████████ ¶ 7.
[98] TT 257:20–25 (Colarossi); TT 536:3–7, 536:21–537:1 (Field); ██████████████████.
[99] TT 257:20–25 (Colarossi); ████████████████████.
[100] TT 538:6–540:6, 543:9–11 (Field).
[101] TT 258:1–7, 260:23–261:6 (Colarossi); TT 307:17–308:2 (Lin); TT 538:6–18, 543:25–544:25 (Field); ██████
██████████; D-LIN-DEMO-5; DX0675.

generalist DSPs are building out their healthcare expertise and functionalities.[102]   The fastest growing of these are The Trade Desk and AdTheorent.[103]   Throtle, a healthcare-focused company that provides digital identity resolution services, testified that ███████████████████████ █████████████████████████████████████████████████████.[104]

38.     There is ample evidence that advertisers and agencies in fact use these DSPs for HCP programmatic advertising.  IQVIA currently licenses its HCP identity data to over two dozen HCP programmatic advertising platforms, and all of those platforms are growing in this space.[105] ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████.[106]   Generalist DSPs have an advantage over healthcare-specific DSPs in that they can leverage their relationships from other verticals to support their healthcare business.[107]   For example, ████████████████████████████ ███████████████████████████████████.[108]

39.     The most significant generalist DSP in HCP programmatic advertising is The Trade Desk, which is one of the largest DSPs in the country with approximately ████████████████ ██████████████████████████████.[109] ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████,[110] and ████████████████████

---

[102] ███████████████████████; TT 259:2–261:8 (Colarossi); ██████████████████.
[103] TT 259:2–261:8 (Colarossi); TT 537:25–538:5 (Field).
[104] ██████████████ 22:20–23:9.
[105] TT 260:23-261:8 (Colarossi).
[106] ████████████████████.
[107] ████████████████████.
[108] ████████████████████.
[109] ████████████████████; DX2098, p. 5; DX2099, p. 17.
[110] ████████████████████; DX1604

███████████████████████████████████████████.[111]  Today, The Trade Desk appears

in numerous requests for proposal from agencies for HCP programmatic advertising,[112] witnesses

testified to its competitive presence in the market,[113] and ██████████████████████████

████████████████████████████████████████.[114]

40.     Although the trial record did not include clear evidence regarding The Trade Desk's HCP

programmatic advertising revenues, ██████████████████████████.  The FTC did

not seek revenue data from The Trade Desk in its investigation, and The Trade Desk did not

produce in this litigation data regarding its revenue from HCP programmatic advertising.[115]  At

trial, a witness from The Trade Desk ██████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████.[116]  But that same day, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████.[117]

Moreover, MDG licenses ██████████████ of HCP data to The Trade Desk, suggesting (under

Dr. Hatzitaskos's own methodology) revenues of at least ██████████ during the relevant period.[118]

████████████████████████████████████████████████████

████████████████████████████████████.[119]  Data from ████████████████████

---

[111] ██████████████████████████; DX0614.
[112] TT 160:17–24 (Gerszke).
[113] ████████████████████████████; *see also* ████████████████████████████
████████████████████████; *see also* PX1091-045; DX0103.
[114] 
[115] TT 1066:21–1067:10 (Israel).
[116] ██████████████████████████████; DX0528.
[117] ██████████████████████████████.
[118] TT 1067:11–1069:5 (Israel).
[119] DX520.

█████████████████████████████████████████████████████.[120]  And a competing

data provider testified by declaration that █████████████████████████████████

███████████████████████████████."[121]

41.     Moreover, The Trade Desk has made clear it has higher aspirations.  An internal document

from  December  2022  describes  ███████████████████████████████████████████

█████████████████████████████████.[122]  ███████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████.[123]  Externally, The Trade Desk has promised to  ███████████

███████████████████████████████████[124]  and  has  ████████████████████████

██████████████████████████████████████  including  for  HCP  programmatic

advertising.[125]  It currently ranks its HCP programmatic capabilities  ████████████████████████

████████████████████████.[126]  And The Trade Desk has a distinct advantage in this effort,

████████████████████████████████████████████████████████████████████████

████████████████████████████.[127]

42.     Another significant generalist DSP is Google, which the Department of Justice currently is

suing for its alleged "dominance over digital advertising technologies."[128]  The FTC asserted in its

opening statement that Google has "come out and said they don't compete in this market and they

---

[120] DX2021; *see also* ███████████████████████████ (████████████████████████████████████
██████████████████████).
[121] ████████████████████████ ¶ 5; *see also* ████████████████████ 20:3–9 (████████████████████████
████████).
[122] DX520.
[123] ████████████████████████; DX528 (████████████████████████████); *see also* DX0074 (Hatzitaskos Rep.) ¶¶ 459, 469.
[124] DX2097.
[125] ████████████████████████; DX2100.
[126] DX518, p. 15.
[127] ████████████████████████; DX2092; DX2094.
[128] Compl., *United States v. Google LLC*, 1:23-cv-108 (E.D. Va. Jan. 24, 2023), ¶ 4

don't plan to,"[129] but at his deposition, the Google witness testified unequivocally that Google's platform "█████████████████████████," explaining that an advertiser "█████████████████████████████████████████████████████████████████████████████████████████████████████████"[130] █████████████████████████████████████████████,[131] and even in that context, he noted that advertisers could use Google to "████████████████████" or "████████████████████" not "██████████████████████████████████"[132] Despite its opening remarks, the FTC admitted in its reply brief ██████████████████████████████████████. PI Reply 13.

43.    Other evidence corroborates that Google allows targeted HCP advertising.  IQVIA's HCP identity data is exported to Google for use in HCP programmatic advertising.[133]  In a live demonstration, Frank Lin, an IQVIA employee, showed that there are dozens of HCP programmatic advertising campaigns currently being run on Google using IQVIA's data.[134] PulsePoint confirmed that "Google has an HCP-related offering in the market since a long time."[135] One data provider testified by declaration that ████████████████████████████████████████ ████████████████████████████████[136]  And Throtle not only testified that it has █████████ ██████████████████████████████████████████"[137] but also ██████████████████████████



---

[129] TT 29:17–19 (FTC).

[130] ████████████████████████ 104:13–17, 182:3–12, 214:1–4, 214:6–7; *see also* ██████████████████ 183:6–21.

[131] ████████████████████████ 182:13–183:5.

[132] ████████████████████████ 209:13–210:5.

[133] TT 301:10–24 (Lin); *see also* D-LIN-DEMO-4.

[134] TT 323:13–324:3 (Lin).

[135] TT 160:8–16 (Gerszke).

[136] ████████████████████████ ¶ 5; *see also* ████████████████████ ¶ 14 (██████████████████████████████████████████).

[137] ████████████████████████ 2506–26:14, 26:16–27:7.

████████████████████████████████████████████████.[138]  Google's revenue from

advertising in the healthcare vertical in 2022 alone was over ████████, with at least some of that

derived from HCP programmatic advertising.[139]

44.    AdTheorent is another generalist DSP that ████████████████████████████████

████████████████████.[140] ████████████████████████████████████

████████████████████████████.[141] ████████████████████████████

████████████████████,[142] and plans to become "████████████████████████

████████████████████," and believes it is "████████████████████████████

████████████,"[143] Even though AdTheorent has only recently begun focusing on

healthcare, Lasso consistently encounters AdTheorent in RFPs from customers, and agencies have

shifted spend from Lasso to AdTheorent in the middle of a campaign.[144]  Similarly, DeepIntent

observed that AdTheorent has "████████████████████████████████████████"[145]

45.    The FTC has suggested that healthcare-specific DSPs may be more competitively viable

than generalist DSPs due to their access to certain endemic inventory and/or industry

experience.[146]  Access to endemic inventory is not a requirement for a DSP to compete in HCP

programmatic advertising:  Lasso, for example, was able to successfully enter the market and grow

dramatically even without access to endemic inventory,[147] and there are generalist DSPs that have

---

[138] DX0076 ¶ 195.
[139] DX0101.
[140] ████████████████████████
[141] ████████████████████████
[142] ████████████████████████
[143] ████████████████████████
[144] TT 535:1–536:2 (Field); DX0660; *see also* ████████████████ 20:14–21 (████████████
████████); ████████████ ¶ 8 (████████████).
[145] TT 678:25–679:2 (Paquette); *see also* DX0332.
[146] TT 91:24–92:3 (Freid); ████████████████████.
[147] TT 542:21–543:8 (Field).

access to the same advertising inventory as healthcare-specific DSPs.[148] ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████.[149]   And any suggestion about the need for

industry experience is belied by the fact that generalist DSPs like The Trade Desk and AdTheorent

are moving into the space at a fast pace.

46.    *DSP Capabilities.*  The FTC has suggested that some DSPs (including the merging parties)

may be uniquely situated because they offer audience-building, campaign-activation, and

measurement services all on one platform (what the FTC has called a 3-in-1 solution).  But the

evidence shows that many customers in reality prefer to mix and match different providers at

different steps in the programmatic advertising process.[150]

47.    *First*, on-platform audience-building is not a necessary or even particularly useful feature

for DSPs.  An agency can build its audience list with its own (or its client's) data off-platform

through data providers like Komodo, PurpleLab, and others (FOF 70) and then activate that

audience through any DSP of its choice.[151]   In fact, most customers do not use on-platform

audience creation tools, and instead typically build their own NPI list off-platform for use in a

media campaign across multiple channels.[152]  In "more than █ percent of spending on both Lasso

and DeepIntent[,] the buyer brings its audience rather than using an audience the DSP supplies."[153]

48.    *Second*, most customers actually prefer to use off-platform measurement solutions, because

---

[148] ████████████████████████.

[149] ████████████████████████████████████████; DX1924; DX1929.

[150] TT 265:12–14, 266:2–7, 268:25–269:8 (Colarossi); ████████████████████.

[151] TT 539:13–540:18 (Field).

[152] TT 539:7–12 (Field); TT 568:17–569:16 (Evenhaim).

[153] ████████████████████████; *see also* TT 539:7–12 (Field); ████████████████████.

advertisers want to assess the effectiveness of a campaign across all channels.[154] █████████
████████████████████████████████████████████████████████████████████████████████████.[155]
Meanwhile, Lasso's measurement tools are used by "very few" customers;[156] and DeepIntent's
"Outcomes" tool does not ████████████████████████████████████████████████████████████
██████████████████████████████████.[157] The great majority—more than ████—of campaigns
run on DeepIntent or Lasso use off-platform measurement tools.[158] Additionally, not all customers
need measurement in the form of "script lift," because there are many customers for HCP
programmatic advertising that are not tracking prescriptions (including hospitals recruiting
physicians, medical device companies, and over-the-counter pharmaceutical manufacturers).[159]

49.     In any event, there are generalist DSPs that offer this same combination of capabilities in
one platform, including The Trade Desk, AdTheorent, and VideoAmp.[160]  As the FTC's expert,
Dr. Hatzitaskos conceded, █████████████████████████████████████████████████████████████
████████████████████████████████████,"[161]

## 2.    Social Media

50.     A large amount of revenue spend on HCP programmatic advertising (or at least advertising
directed to specific HCPs) goes through social media sites, which frequently do not make their
inventory generally available on the open market but instead operate "walled gardens" that
advertisers must plug into directly in order to access a site's inventory.[162]  Some social media

---

[154] TT 308:3–6, 308:22–309:4 (Lin); ██████████████████; ██████████████████; ███████████
48:16–49:14.
[155] ██████████████████; TT 553:9–17 (Field).
[156] TT 540:19–541:9, 541:10–18 (Field).
[157] TT 512:18–513:2, 548:1–14 (Field); ██████████████████████.
[158] ████
[159] TT 305:5–14 (Lin); ████████████████████ 17:15–18:8.
[160] TT 265:6–11 (Colarossi); ██████████████ 121:8–14, 121:16–18.
[161] ████████████████████████.
[162] ████████████████████████████████; TT 318:13–319:8 (Lin); ████████████████████.

platforms offer audience creation, some offer campaign performance measurement services, and some (like Doximity and Facebook) allow for self-service campaigns.[163]

51.    General-use social media platforms—like Facebook, LinkedIn, and TikTok—allow for programmatic advertising to HCPs and offer the same services as other HCP programmatic advertising platforms.[164]  Facebook's HCP programmatic advertising capabilities were displayed in a live demonstration by Mr. Lin, showing that Facebook allows users to import an audience or build their own audience, activate a campaign, and track and measure impressions.[165]  In fact, Meta (which includes Facebook, Instagram, and WhatsApp) has the highest usage of IQVIA data for HCP programmatic advertising of any single platform.[166]

52.    Several social media platforms, including Doximity and Sermo (the Facebook and LinkedIn for HCPs, respectively), are focused specifically on HCPs and offer a prime programmatic advertising opportunity.[167]  Defendants' expert, Dr. Mark Israel, estimated that Doximity's HCP programmatic advertising revenues are ███████████████████████████████ █████████████████.[168]  The FTC's expert, Dr. Hatzitaskos, █████████████████ ████████████████████████████████████████████████████████████████ ███████.[169]  And ███████████████████████████████████████████ ████████████████████████████████████."[170]

---

[163] ███████████████████; TT 306:5–9, 317:10–318:2 (Lin); TT 1052:18–25 (Israel).
[164] █████████████████:█████████████████████████████████; TT 261:22–263:7 (Colarossi); TT 1041:2–1043:15 (Israel); ████████████████ 21:17–21, 22:2–4, 22:7.
[165] TT 311:13–319:8 (Lin).
[166] TT 262:22–24 (Colarossi); TT 1051:1–19 (Israel); D-ISRAEL-DEMO-16.
[167] TT 262:4–21, 263:17–19 (Colarossi); TT 306:5–9 (Lin); *see also* ████████████████ (███████████████).
[168] D-ISRAEL-DEMO-34.
[169] ████████████████████████.
[170] DX0007.

53.     Social media platforms with HCP targeting capabilities—including those listed above—are in direct competition with DSPs for advertising dollars.[171]  Agencies regularly shift spend away from DSPs to social media platforms like Doximity if social media websites indicate a higher ROI than DSPs.[172]  For example, in an analysis Lasso prepared for a client, Lasso compared the effectiveness of AdTheorent to Doximity during an advertising campaign, recommending how the client should allocate its advertising spending.[173]  Similarly, ████████████████████████

████████████████████████████████████████████████████████████

████████████████.[174]  In another document, ██████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████"[175]  And even publicly, Doximity has acknowledged: "[W]e've effectively lost a bunch of share there to some new market entrants, folks who have recently purchased some of these banner platforms [i.e., DSPs], and they really took our teeth, to be honest."[176]

### 3.     Endemic Publishers

54.     Advertisers can also purchase programmatic advertising—and can target HCPs—directly through endemic publishers, i.e., websites focused on healthcare issues.[177]  In fact, so-called "programmatic direct" advertising comprises approximately 75% of all programmatic digital

---

[171] TT 262:4–21, 263:17–19 (Colarossi); TT 527:23–528:6 (Field); ██████████████████.
[172] ██████████████; TT 524:9–18 (Field).
[173] TT 530:6–531:4 (Field); DX0764; *see also* TT 530:6–531:7 (Field).
[174] DX0487; *see also* TT 1055:4–21 (Israel).
[175] DX2059.
[176] D-HATZITASKOS-DEMO-17 (citing Q1 2024 Doximity Inc. Earnings Call, p. 12).
[177] ██████████████████████████████; TT 263:8–16 (Colarossi); ██████████████████████; TT 1041:2–1042:25 (Israel).

display ad spending,[178] and programmatic advertising across multiple websites was developed ███
███████████████████████████████████████████████████.[179]

55.     Endemic publisher Medscape (under the same ownership as PulsePoint) has annual revenues of ███████████████████████████████████████████████████
███████████████████████████████████.[180]   Medscape itself has touted its ability to ██████████████████████████████████████████████████████
███████████.[181]   In an internal document, Medscape observed ████████████████████
████████████████████████████████████████.[182]

56.     Endemic publishers, including Medscape, compete with DeepIntent and Lasso.[183]   Again, agencies will reallocate budget to endemic if it indicates a higher ROI than another channel (including DSP programmatic).[184]   Other endemic publishers of a similar size and scale to Medscape include ███████████████████████████.[185]

### 4.     Agencies

57.     Agencies also compete for advertising dollars and are increasingly building in-house technology for audience building, campaign activation, and measurement.[186]   Agencies also are seeking ways to ████████████████████████████████████████████████████
█████████████████████████████.[187]

58.     There are many examples of this trend.   Advertising agency ███████ for example, ███████



---

[178] TT 1043:16–1044:6 (Israel); DX2109
[179] ████████████████████.
[180] ████████████████████.
[181] ████████████████████; TT 1053:1–1054:21 (Israel); DX1929, at 31.
[182] ████████████████████; DX1924_10.
[183] TT 262:4–14, 263:8–16 (Colarossi); TT 523:25–524:2, 526:21–527:20 (Field); ████████████████; *see also* PX1625-001 (internal Lasso document referring to "Medscape" as "the competition").
[184] ████████████████████.
[185] ████████████████████.
[186] TT 161:20–162:4 (Gerszke); ████████████████; ████████████████; ████████████ 43:17–44:18.
[187] ████████████████████.



59.     All of these advancements are a trend toward "disintermediation," through which the "DSP can be left out and then you negotiate with the SSP or maybe you negotiate directly with [the publisher]."[194]   Sophisticated firms like PulsePoint and Haymarket are developing ways to "effectively skip[] the DSP and go[] straight to" the SSP or ad exchange, leaving firms like DeepIntent and Lasso out of the process entirely.[195]   This disintermediation can allow an agency to offer far more than the "3-in-1" capabilities of DSPs the FTC touts.[196]

### 5.     Channel Allocation

60.     The evidence shows that all of these channels—DSP programmatic, social, and endemic— are competing with each other, as evidenced in an April 2022 IQVIA deal deck[197]:



---

[188] ████████████████.

[189] ████████████████ 24:04–24:22.

[190] TT 537:7–13, 539:16–24 (Field).

[191] ████████████████ ; *see also* ████████████████ 43:3–44:8 (████████ ).

[192] ████████████████.

[193] ████████████████.

[194] TT 1043:1–15 (Israel).

[195] TT 992:24–993:7 (Hochberg).

[196] TT 991:24–992:23 (Hochberg).

[197] *See* DX0083, p. 17.



61.    This competition arises because the goal of advertising agencies is to achieve the highest relative ROI for a given advertising channel or campaign.[198]   This means serving as many impressions (or selling as many products) as possible at the lowest cost.[199]   Agencies evaluate (and often use) all available digital advertising channels for a campaign, including by using sophisticated modeling tools to evaluate ROI.[200]   All of these platforms and channels are competing for the same advertising dollars and are "████████████████████████" and if a particular channel is offering a more favorable ROI than others, an agency will reallocate advertising dollars to maximize the client's ROI.[201]

62.    The ultimate customers of programmatic platforms—healthcare companies and agencies—are "████████████████" ████████████████████████████████████.[202]



[198] ████████████; *see also* ████████████ 100:10–19; *see also* DX0063 (Karlova Dep.) 52:14–53:7, 53:17–54:2; ████████████ 64:24–65:15.
[199] ████████████
[200] ████████████; TT 1049:9–20, 1050:18–25 (Israel).
[201] ████████████; ████████████; TT 527:17–20 (Field); ████████████; ████ ████ 52:9–13.
[202] ████████████; ████████████.

Agencies have many options available to them and many existing relationships they can leverage to extract more favorable pricing.[203]  That is particularly true with respect to Lasso, who receives about half of its revenue from a single agency client (CMI).[204]

63.     Many customers use multiple DSPs for a single campaign to maximize reach.[205]  If an agency determines a different allocation of spending would improve ROI, it is not difficult to reallocate advertising spend between DSPs or to onboard a new DSP,[206] and agencies routinely reallocate advertising dollars among platforms between or even during campaigns.[207]

64.     Documents confirm this inter-channel competition.  For example, a campaign strategy document ███████████████████████████████████████████████████████ ██████.[208]  An internal document at Doximity ███████████████████████████████████ ████████████████████████████████.[209]  A DeepIntent document showing the investment flow for a campaign identifies ███████████████████████████████████████ ████████c and observes that ██████████████████████████████████████████████████ ██████████████████████"[210]  An analysis prepared by Lasso compares advertising across open-web programmatic, social, and endemic using the same metrics.[211]  And finally, there is data showing that when ███ began spending more money on social media advertising in a campaign, it diverted that money from Lasso's DSP spending.[212]

* * *

---

[203] ████████████████████████████.

[204] TT 550:12–17 (Field); *see also* ████████████████████████████.

[205] TT 1060:8–1062:5 (Israel).

[206] ████████████████████████████.

[207] TT 535:10–536:2 (Field); ███████████████████████████████████; DX0660.

[208] DX1893; *see also* TT 1047:1–16 (Israel).

[209] DX0487.

[210] DX2034; *see also* TT 1047:17–1048:13 (Israel).

[211] DX2035; *see also* TT 529:6–531:7 (Field).

[212] D-ISRAEL-DEMO-14; *see also* TT 1049:21–1050:4 (Israel).

65.     Based on the multitude of competitors, the emergence and expansion of new entrants, and the sophistication and power of the customers, it is not likely that a merged DeepIntent and Lasso will have the power to raise prices above competitive levels post-merger or stop innovating.[213] Such a price increase would lower the value proposition of the firm's advertising services relative to all other DSPs as well as all other digital advertising channels, driving revenue to competitors.[214] Customers are price sensitive and thus would not tolerate such an increase.[215]   Indeed, healthcare companies and agencies testified that if a merged firm attempted to raise prices, they could and/or would simply shift their spend to other DSPs and/or platforms, including social and endemic.[216]

## C.     Competition Among Data and Data Solution Providers

### 1.     Audience Building and Measurement

66.     There are two broad categories of data that can be relevant to programmatic advertising: identity data (sometimes called audience data or reference data) and claims and prescription data (which are two distinct datasets, but are referred to together here as "claims data" for ease).[217]

67.     Identity data consists of basic demographic information (e.g., name, email, address, specialty).[218]   At its core, much of what identity data consists of derives from publicly available information tied to an HCP's NPI.[219]   CMS.gov contains a complete, downloadable NPI file that can itself be used to create an audience list for an HCP programmatic advertising campaign.[220] That public information is a starting point for audience-building.[221]

---

[213] ███████████████████; TT 553:18–23 (Field); ██████████████████.
[214] TT 526:7–14 (Field).
[215] TT 526:15–16 (Field); ███████████████; ████████████████; ████████ 30:18–31:10; ██████ 68:17–69:1.
[216] ████████████; ██████████ 30:18–31:10; ████████████ ¶ 10; █████████████ ██████ ¶¶ 9–10.
[217] TT 375:2–12 (Brosso); TT 1296:20–24, 1301:12-21 (Jena).
[218] TT 295:9–17 (Lin); TT 1296:20–24.
[219] TT 296:6–298:5 (Lin); TT 1296:25–1297:14 (Jena).
[220] TT 296:6–298:25 (Lin); D-LIN-DEMO-2.
[221] TT 1297:25–1299:3 (Jena).

68.     Claims data consists of information about the number and type of prescriptions an HCP has written, the number of patients she has diagnosed, and the number and types of procedures performed, among other things.[222]  Claims data is "███████████████████████████,"[223] and has become "███████████████" in recent years.[224]

69.     Audience and claims data can be used in connection with HCP programmatic advertising in two principal ways:  audience building and measurement.  Audience building consists of the use of data about HCPs to create a list of NPIs that an advertiser would like to target for an advertising campaign.[225]  Advertisers can build audiences using data licensed directly from a data provider, or, less frequently, can use data licensed by a DSP to build an audience "on platform."[226]  Claims data can also sometimes be used to perform measurement services for a campaign, by analyzing the "script lift" for a prescription during or after a campaign.[227]  Such measurement typically occurs "off-platform," i.e., not on the campaign activation platform.[228]

70.     There are myriad alternative providers for both audience and claims data.  Many firms compete with IQVIA to offer audience-building services (both directly to advertisers and to DSPs) using audience and claims data, including ███████, Veeva (Crossix), ███████ ████████, Symphony Health, Optimize, and HealthVerity.[229]  In measurement, competitors include Komodo, PurpleLab, Ipsos, Veeva (Crossix), Healio, Optimize, and HealthVerity.[230]  This multiplicity of

[222] TT 375:2–12 (Brosso); TT 1301:12–21 (Jena).
[223] ██████████████.
[224] ████████████.
[225] TT 266:14–21 (Colarossi); TT 1304:21–1305:11 (Jena).
[226] TT 162:5–19 (Gerszke).
[227] TT 376:15–377:1 (Brosso); TT 1304:21–1305:17 (Jena).
[228] ███████████; TT 539:13–15 (Field); ██████████████.
[229] TT 267:6–11 (Colarossi); TT 305:15–306:9 (Lin); ████████████████; TT 563:6–19 (Evenhaim); TT 1175:18–21, 1176:14–1177:1 (Kress); TT 1299:4–1301:1 (Jena); ████████████ 24:4–26:10; █████████████ 41:23–42:6; D-LIN-DEMO-5; D-MB-3; ████████ ¶ 4; ███████████ ¶¶ 3–4; ████████ ¶¶ 3–4; ████████ ¶ 6; ███████ ¶ 4.
[230] ████████ TT 268:11–17 (Colarossi); TT 309:5–19 (Lin); ██████████████; TT 561:10–13, 562:5–21 (Evenhaim); TT 1175:22–25 (Kress); ███████████████ 42:12–43:6; D-LIN-DEMO-5; D-MB-3; see also TT 1309:19–1310:8 (Jena).

options exists because data providers do not generate the actual data themselves, but instead obtain and organize that data from third-party sources like insurance companies and pharmacies.[231]  The underlying data itself is not proprietary to any one data provider; rather, it is the way in which a provider is able to organize and curate data that creates value for customers.[232]

71.     Agencies and platforms are increasingly offering their own audience and measurement capabilities.[233]  For example, ███████████████████████████████████ ███████████████████████████████.[234]  ████████ another agency, is developing an audience-building solution powered by ████████.[235] ███████████████████ █████████████████████████████[236]

72.     IQVIA's data, while "████████████████████,"[237] is not uniquely valuable to advertisers. ████████ one of IQVIA's main data competitors, testified that it is able to offer data that are "█ ████████████████,"[238] and agreed that ██████████████████████████████ ████████████████.[239] ████████████████████████████ ████████,[240] ████████████████████████ ████████████████████████████████████████████ ████,[241] and ████████████████████████████████████████ ████████.[242]  Veeva already offers many data products in competition with IQVIA, and also

[231] TT 1167:25–1168:16 (Kress); TT 1301:22–1304:15 (Jena).
[232] TT 372:5–17 (Brosso); TT 561:10–562:9 (Evenhaim).
[233] TT 309:10–19 (Lin).
[234] ████████████████████
[235] ████████████████ 24:4–16.
[236] ████████████████████████.
[237] ████████████████.
[238] ████████████████.
[239] ████████████████; *see also* ████████████.
[240] ████████████████.
[241] ████████████████.
[242] ████████████████.

testified that it is seeking to "build[] a better alternative to IQVIA" and hopes to offer a "direct replacement" for IQVIA data products it does not already replicate.[243] ███████ testified that it "███████████████████████████," which are in some cases "██████████████."[244]  And Health Verity testified that its data is "as good or better than any other provider in the market."[245]

73.     Advertisers, agencies, and publishers in fact widely use these alternative data sources.  One of Lasso's customers, Klick, licenses its data from Symphony Health.[246]  CMI, which accounts for over *half* of Lasso's revenue, █████████████████████████████████████████████ ██████████.[247]  Publicis, a large healthcare advertising agency, █████████████████ █████████████████████████████.[248] ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████.[249]  Medscape, an endemic publisher with ████████████████████ ██████████████████████.[250]  The FTC stated in opening that 85% "of pharmaceutical companies use IQVIA to build their NPI target list, direct sales, and marketing outreach,"[251] but never introduced any evidence to support that claim beyond admitted speculation by DeepIntent.[252]

74.     DSPs and other firms do not need direct access to IQVIA's data to effectively compete. ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████,[253] and even Lasso uses

---

[243] TT 595:4–8; 596:3–10 (Evenhaim); DX2042.
[244] ████████████████ 49:20–50:4, 64:19–65:21.
[245] TT 1174:10–20 (Kress).
[246] TT 526:24–527:16 (Field).
[247] DX0076 (Israel Rep.) ¶ 325.
[248] ████████████████████.
[249] █████████████████████████████████.
[250] ███████████████████████.
[251] TT 23:4–6 (FTC).
[252] TT 608:12–17 (Paquette).
[253] ████████████████; ███████████████; ████████████████.

other data providers (such as PurpleLab).[254]  PulsePoint, the market share leader by the FTC's account, does not itself license *any* IQVIA data, and pays only about ███████████████ to upload NPI lists submitted by advertisers.[255]  Many other DSPs use little, if any, IQVIA data.[256] And finally, Veeva, ████████████████████████████████████████████, does not purchase or license any data from IQVIA whatsoever.[257]

75.     Although some of IQVIA's data is "opted-in" by HCPs, the FTC offered no evidence or legal authority that opt-in data is legally required for HCP programmatic advertising, and in fact, it is not:  IQVIA sometimes mentions this feature for some of its data products (namely those related to DMD, whose data is only marginally used in programmatic advertising) to show that it goes "above the standard" for data.[258] ████████████████████████████████████████ ██████████████████████████████████.[259]  Some clients prefer opted-in data, but others do not.[260]  In any event, there are many other firms that offer opted-in healthcare data, including PulsePoint, Everyday Health, Data360, Haymarket, AdPrime, Medscape, and Medicx.[261]

76.     Additionally, a prospective new entrant for data services would face relatively low barriers to entry.[262]  DMD, for example, started out as a data provider for circulation of print advertising materials and pivoted to digital advertising at the suggestion of a partner (PulsePoint).[263] PurpleLab, one of IQVIA's main competitors for data, ████████████████████████████████ ██████████████████████████████████.[264] ████████████████████████████████████

---

[254] TT 541:22–24 (Field); ███████████████████████████████████;
[255] ████████████████████████;
[256] ████████████████.
[257] TT 592:25–593:16 (Evenhaim).
[258] TT 248:16–249:17 (Colarossi); TT 1179:24–1180:4 (Kress).
[259] ██████████████████████; PX1973.
[260] TT 269:9–270:4 (Colarossi); TT 328:6–17, 329:4–8 (Lin); ███████████████████████; ███████████████████.
[261] TT 322:17–323:3 (Lin); ██████████████████████████; D-LIN-DEMO-7.
[262] TT 1182:7–19 (Kress).
[263] TT 294:19–295:17, 298:6–19 (Lin).
[264] ████████████████████████████.

██████████████████████████████████████████████████████████████████.[265]

77.     Although licensing data can sometimes be costly, even startups like ██████ (along with the other companies identified above) have been able to do it.[266]   And data costs can be substantially mitigated through a data "broker" model—like that which ██████ uses—which does not require the data provider to actually purchase or license the data itself.[267]

78.     The Court heard testimony regarding "physician level data," or "PLD," which refers to data showing which doctors viewed which advertisements in a campaign at which times.[268]   PLD is not a separate data product generated or sold by data providers, but instead is an output from an advertising campaign.[269]   IQVIA, for example, offers PLD reporting for free when its data is used to build an audience, regardless of the platform on which the campaign is run.[270]

79.     The Court also heard testimony regarding "data consistency," which has various definitions, but generally refers to using the same data provider at different steps in a campaign. The evidence shows that many advertisers and agencies actually do not want "data consistency" across an entire campaign, ██████████████████████████████████████████████████ ████████████████████████████████████.[271]   Additionally, different datasets may be better suited for different uses.[272]   Moreover, there are many non-IQVIA data sources that advertisers and agencies can use for "████████████████" when analyzing a campaign's efficacy, including PurpleLab and Veeva.[273]

## 2.     The TPA Program



80.     Much of the FTC's vertical theory has focused on IQVIA's "Third Party Access" ("TPA")

program, under which ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████ .[274]  IQVIA's TPA program is not unique—it is the kind of third-party licensing

program ███████████████████████[275]  IQVIA's competitor for data, Veeva, has its own

TPA program,[276] as does every data provider (including ██████████████████████████

█████████████████████ .[277]

81.     ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ .[278]

That policy is reflected in internal documents ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████"[279] ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████[280]

82.     Between January 2018 and September 2023, IQVIA granted ██████ of all TPA requests

and ██████ of TPA requests with a DSP listed as the third-party vendor.[281] ████████████████

---

[274] ██████████████████████ .

[275] ████████████████████████████ ; *see also* TT 1185:18–20 (Kress).

[276] TT 570:25–571:1, 596:11–16 (Evenhaim).

[277] ██████████████████████ .

[278] ██████████████████████████ .

[279] PX1785-018.

[280] ██████████████████████ .

[281] ████████████████████████████ .





. [283]   PulsePoint in particular testified that it does not "

" [284]

83.   One of IQVIA's data competitors, Veeva,

. [287]

### 3.   Possibility and Likelihood of Data Foreclosure

84.   There is no persuasive evidence that IQVIA intends to foreclose its competitors from using IQVIA data post-transaction.  Multiple IQVIA witnesses credibly testified that IQVIA has no plans to foreclose its data from customers and that there is no reason to believe IQVIA will behave otherwise in the future. [288]

---

[282] TT                              ; *see also*                              .
[283]
[284]
[285] DX0115.
[286] DX0942; *see also*                              .
[287]
[288] TT 267:12–18 (Colarossi); TT 329:13–331:7 (Lin); TT 542:12–20 (Field); TT 1231:23–1232:9 (Resnick).

85.     IQVIA is publicly committed to a "Data Everywhere" strategy, with the goal of making its data widely available to clients.[289]  Since acquiring data firms DMD and MDG, IQVIA has made those firms' identity data more widely available, expanding by several fold the HCP programmatic advertising platforms on which that identity data is available.[290]  IQVIA allows audiences built from its identity data to be used on any platform, and it allows audiences built from other providers' data to be used on Lasso.[291]  Even after acquiring *Lasso*, IQVIA has not altered its business practices to foreclose or delay delivery of its data— ███████████████████████████ ███████████████████████████████████—and instead continues to actively *expand* its data partnerships, including with its competitor, The Trade Desk.[292]  Most of these efforts long predate the FTC's investigation into the transaction, and the FTC introduced no evidence that IQVIA plans to change its strategy following the acquisition.[293]

86.     To put the FTC's allegations to rest, however—and in response to the uncertainty caused in large part by the FTC's allegations in this case—IQVIA has reached out to many current and prospective DSP partners to discuss long-term contracts or extensions of longstanding contracts for licensing IQVIA's data.[294]  Those contract offers include (1) standard DSP licensing and service terms, (2) a minimum three-year term with options for renewal, and (3) an acceptance deadline of December 31, 2024.[295]

87.     The FTC suggested in its cross-examination of IQVIA's President of U.S. and Canada Operations, Jon Resnick, that IQVIA previously "shut down" PulsePoint's access to IQVIA

---

[289] TT 329:13–331:2 (Lin); TT 1226:6–14 (Resnick); *see also* PX1026 (IQVIA employee observing that Lasso was "in verbal agreement of our Data Everywhere strategy").
[290] TT 300:23–301:24 (Lin); TT 468:19–469:9 (Lin); *see also* D-LIN-DEMO-4.
[291] TT 266:14–267:2 (Colarossi).
[292] ████████████████; ████████████████████████; ██████████████.
[293] TT 267:3–5 (Colarossi); TT 1231:23–1232:9 (Resnick).
[294] TT 1229:18–1230:18 (Resnick).
[295] TT 1230:23–1231:22 (Resnick); DX0807; DX0809; *see also* TT 1235:2–1235:22 (Resnick).

data,[296] but that contention is belied by the facts.  PulsePoint █████████████████████

███████████████████████████████████████████████████████████████████████████

█████████.[297]  Moreover, the author of the document in question (who the FTC did not call at

trial) explained in sworn testimony that the statement referred to a request by WebMD to *expand*

additional IQVIA data products to PulsePoint after it was acquired by WebMD, but the parties did

not reach agreement.[298]  PulsePoint, however, today has access to the same IQVIA data it had

received prior to the acquisition, and it has licensed MDG identity data since 2018.  There is no

evidence in the record that IQVIA ever "shut down" access to any data product it was licensing to

PulsePoint.  As Mr. Resnick testified, "not a single one of PulsePoint's requests for access to

[IQVIA's] data have been refused."[299]

88.     It would not make business or economic sense for IQVIA to foreclose access to its data,

█████████████████████████████████████████████.[300]  IQVIA cannot feasibly

be the primary platform for every healthcare campaign, and so instead the more economically

sensible option is to "████████████████████████████████" by "███████████████

████"[301]  IQVIA "████████████████████████████████████████████████

██████"[302]  Additionally, because IQVIA's clients often work with IQVIA across a range of

business segments, disadvantaging a client in one business segment (e.g., digital advertising) may

have negative repercussions for the larger business relationship (e.g., full-service clinical trials).[303]

89.     If IQVIA sought to foreclose competitors from its data, customers would simply obtain

---

[296] TT 1255:12–1256:3 (Resnick); PX1100.
[297] ██████████████████████.
[298] PX0522, at 138:1–22.
[299] TT 1255:12–1256:3 (Resnick); *see also* █████████████████████.
[300] ███████████████████; *see also* ████████████22:11–23:6, 23:14–24:3.
[301] █████████████████████████.
[302] ███████████████████████.
[303] TT 1209:3–8 (Resnick).

their data from other providers, and some of IQVIA's competitors (including ███████ and HealthVerity) confirmed they would be able to and very willing to replace IQVIA as a data provider for any firms IQVIA attempted to foreclose.[304]  Even today, IQVIA accounts for less than ███ of the data used on DSPs other than DeepIntent and Lasso.[305]

90.     The documents the FTC emphasized at trial do not suggest IQVIA is planning foreclosure. For example, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████." [306]  In another example cited by the FTC, ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.[307]  Adversarial posturing in a bar during negotiations does not suggest that IQVIA has an enterprise-wide conspiracy to foreclose data in contravention of its strategic imperatives and own economic interests following the transaction.

91.     The FTC focused also on a ████████████████████████████████, during which it was hypothesized that ████████████████████████████████████[308] ████████████████████████████, however,[309] and its CEO will have no power post-merger to force IQVIA into an irrational business model that would alienate its customers and jeopardize much larger parts of IQVIA's business.  Moreover, ████████████████████████

---

[304] ████████████████; ████████████████████; TT 1181:19–1182:1, 1183:1–8, 1184:22–1185:15 (Kress); *see also* ████████████████ ¶ 4 (████████████████████████████████ ██████████████).
[305] ████████████████████; ████████████████████.
[306] PX1126-001.
[307] ████████████████; PX1349.
[308] PX2519.
[309] ████████████████.



█████████.[310]

92.     No fact witness testified that the transaction is likely to result in higher prices for data or data-related services.  The principal objections from fact witnesses regarding the FTC's vertical theory were related to the theoretical possibility that IQVIA may reduce the amount of data it purchases from other data providers,[311] or could otherwise increase its share of some indeterminate market for data.[312]  But not even these witnesses claimed that such foreclosure would harm *competition* in any market.  One remaining witness—one of IQVIA's direct competitors for HCP programmatic advertising—offered █████████████████████████████

██████████████████████████████████████████████

████████.[313]  A competitor of Lasso's and DeepIntent's testified to ████████████████

█████████, but did not point to any facts or evidence suggesting such foreclosure was likely (or even possible).[314]  Not one witness offered actual evidence that IQVIA plans to, or is even likely to, foreclose any category of data products.

### D.     The Economic Evidence

93.     The parties each offered economic experts—Dr. Hatzitaskos for the FTC and Dr. Israel for Defendants—to support their respective theories of market definition, market shares, and the likely



310 ████████.
311 ████████████████: ████████████ 233:3–24.
312 ████████.
313 ████████████.
314 ████████████.

40

effect of the merger on horizontal and/or vertical competition.  Overall, the testimony offered by Dr. Hatzitaskos was high-level and conclusory, and lacked economic or analytical rigor.  Dr. Israel, by contrast, explained the market dynamics with reference to both economic theory and digital market analyses.  He also scrutinized the assumptions and methodologies underlying Dr. Hatzitaskos's conclusions.  Although not necessary for the Court's ultimate conclusion on this motion, the Court finds Dr. Israel's testimony to be more credible and reliable.

### 1.    Market Definition

94.    Dr. Hatzitaskos's proposed market of "HCP programmatic advertising" is limited to those DSPs capable of activating HCP programmatic advertising campaigns who "shared revenue through discovery."[315]  Dr. Hatzitaskos purported to also include "anybody that IQVIA reported as [a] top customer of their HCP data,"[316] but that is inaccurate, because his market excluded Meta, which is the *number one* customer for IQVIA's HCP data.[317]

95.    Dr. Hatzitaskos excluded social media platforms (like Meta and Doximity) and endemic publishers (like Medscape and Haymarket) from his market, but did not justify that exclusion on economic grounds.  Dr. Hatzitaskos excluded social media websites because "they just didn't seem to be a reasonable substitute,"[318] and excluded endemic publishers for "similar" reasons.[319]  As set forth above, the evidence shows that in fact social media websites and endemic publishers are competing for the same advertising dollars as DSPs, and buyers in fact switch between them.

96.    Dr. Hatzitaskos did attempt to offer an economic analysis of his proposed market through the hypothetical monopolist test ("HMT"), which asks whether a monopolist of all the firms in a

---

[315] TT 832:7–19 (Hatzitaskos).
[316] TT 832:7–19 (Hatzitaskos),
[317] TT 262:22–24 (Colarossi); TT 1051:1–19 (Israel); D-ISRAEL-DEMO-16.
[318] TT 845:20–24 (Hatzitaskos).
[319] TT 847:9–848:3 (Hatzitaskos)

proposed market would be able to profitably impose a small but significant nontransitory increase in price ("SSNIP"), typically assumed to be 5–10%.[320]  Dr. Hatzitaskos used two analyses to implement the HMT: a critical loss analysis and a merger simulation.[321]  The three overlapping inputs into those tests are (1) market shares, (2) win-loss data from DeepIntent, and (3) profit margin.  Dr. Israel persuasively explained how economic and analytical errors in each of those inputs fatally undermine Dr. Hatzitaskos's conclusions under each test.

97.     *First*, Dr. Hatzitaskos's use of market shares to conduct an HMT is circular.  Dr. Hatzitaskos assumes that the market shares of competitors outside the candidate market are zero, and then assumes that substitution occurs as determined by revenue shares within the candidate market.[322]  Thus, Dr. Hatzitaskos never even attempts to measure substitution outside the candidate market of DSPs to competing channels—the fundamental question that underlies the HMT.[323]  Dr. Hatzitaskos's HMT is thus circular, self-serving, and unreliable.

98.     *Second*, Dr. Hatzitaskos's analysis of win-loss data is so deeply flawed as to render it unreliable and unusable.  At the outset, both Lasso and DeepIntent explained that it is practically impossible to identify which competing vendors service a campaign, particularly given that many campaigns employ multiple platforms.[324]  Moreover, Dr. Hatzitaskos's win-loss data comprises an incredibly small sample:  DeepIntent ran approximately ███ campaigns during the relevant period, yet Dr. Hatzitaskos's opening report evaluated win-loss data from just ██ campaigns (████), and his reply report evaluated only ██ campaigns (████).[325]  And that data include *only* RFPs (not campaigns more generally) issued to DeepIntent, and thus excludes data showing an

---

[320] TT 837:25–839:4 (Hatzitaskos).
[321] TT 841:14–21 (Hatzitaskos).
[322] TT 1059:2–1060:7 (Israel).
[323] TT 1057:19–1058:3 (Israel).
[324] TT 552:3–20 (Field); ███████████████.
[325] ████████████████████; ███████████████.

agency's decision not to issue an RFP to DeepIntent at all and/or to reduce the amount of HCP programmatic spend based on other advertising opportunities (such as endemic or social).[326]  The insufficiency of this dataset is made apparent by Dr. Hatzitaskos's observation that ███████

███████████████████████████████████████████████████████████████████████████

███████████████[327]

99.     Even setting aside the limitations of the dataset, Dr. Hatzitaskos's analysis was highly suspect.  As demonstrated during cross-examination, Dr. Hatzitaskos's ████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███.[328]  Moreover, when evaluating diversion of revenue, Dr. Hatzitaskos ███████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███—with the rest presumably being diverted to other channels not tracked by Dr. Hatzitaskos, including those he excluded from his market definition.[329]

100.    *Third*, Dr. Hatzitaskos's overstated profit margins are unreliable.  Dr. Hatzitaskos uses profit margins of approximately ██████  but those profit margins account *only* for data and media costs, and did not account for *any* of the other costs of running an advertising platform.[330]  This results in an inflated profit margin that infects most of Dr. Hatzitaskos's economic models.  The

---

[326] TT 1061:2–22 (Israel); *see also* DX0076 (Israel Rep.) ¶¶ 158–171.
[327] ████████████████████████; PX6500 ¶ 113.
[328] █████████████████████████.
[329] ██████████████████████████████; *see also* DX0076 (Israel Rep.) ¶ 173 ████████████████████████████████████████████████████).
[330] TT 1062:16–1063:19 (Israel).

43

inaccuracy of Dr. Hatzitaskos's numbers is confirmed ███████████████████████

██████ .[331]

101.    These three factors are the inputs into both of Dr. Hatzitaskos's market definition models, and a close analysis shows that none of them are reliable indicators of the actual question for market definition:  the reasonable substitutability of other alternatives.  Dr. Hatzitaskos's analysis does not sufficiently establish the relevant antitrust market.

### 2.    Market Shares

102.    Dr. Hatzitaskos's unsupported exclusion of social media websites and endemic publishers from his market definition is critical to—and indeed, dispositive of—the FTC's horizontal case, because if those firms were included in the market, the merged firm would not meet any pertinent concentration threshold.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ .[333]  Notably, Dr. Hatzitaskos purported to conduct a "what if" analysis of how some of his analyses would be affected if social media companies were included in his market, but did not account for Doximity at all and did not accurately calculate the revenues of the small number of firms he did model.[334]  In no analysis did Dr. Hatzitaskos account for Medscape or any other endemic publishers.[335]

103.    Even setting aside Dr. Hatzitaskos's erroneous exclusion of some of the most significant firms engaged in HCP programmatic advertising, Dr. Hatzitaskos's shares are unreliable.  For example, Dr. Hatzitaskos ████████████████████████████████████████████████

---

[331] *Id.*

[332] ███████████████████████████████████████████ .

[333] ███████████████████████████ ; ██ ████████████████████ ;  *see also* ███████████████████ ;

███████████████████████████████████ .

[334] TT 846:10–847:16 (Hatzitaskos), TT 1045:24–1046:12, 1070:20–1071:7 (Israel).

[335] ███████████████████ .

█████████████████████████████████,[336] but as set forth above, ███████████████████

████████████████████████████████████ FOF 40.  When confronted with this

inconsistency, Dr. Hatzitaskos admitted he did not "████████████████."[337]  Moreover, ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████.  FOF 42–43.

104.    The inaccuracy of Dr. Hatzitaskos's numbers is confirmed by the fact that almost a third

of the largest healthcare advertising agencies do not spend any money on PulsePoint, DeepIntent,

or Lasso at all.[338]  And IQVIA's data confirms that advertisers use IQVIA-built audiences for HCP

programmatic advertising on many other platforms.[339]  In fact, Throtle testified that ████████

████████████████████████████████████████████████████████████████████████████

██████████████r.[340]  And another identity graph, LiveRamp, ████████████████████████

████████████████████████████████████.[341]  Dr. Hatzitaskos simply did not have

the data to conduct a reliable market share analysis.[342]

105.    Finally, Dr. Hatzitaskos ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████.[343]  Had Dr. Hatzitaskos extended his market share analysis back even just one year,

he would have obtained dramatically different results—owing in part to the significant growth of

PulsePoint and Lasso in that timeframe.   Moreover, by looking backward, Dr. Hatzitaskos failed

to capture the fact that the industry is dynamic and changing, with new entrants arriving regularly

---

[336] █████████████████████████; ███████████████.
[337] ████████████.
[338] TT 1065:18–1066:10 (Israel); D-ISRAEL-DEMO-33.
[339] D-ISRAEL-DEMO-16.
[340] ████████████████ 22:20–23:9.
[341] DX0076 ¶ 191.
[342] █████████████████████.
[343] ███████████████████████.

and capturing market share, while ███████████████████████████████████

███████. [344]  Dr. Hatzitaskos offered no principled reason why ███████—as opposed to some

other window—is the appropriate timeframe in which to evaluate market shares in this fast-moving

market.

### 3.    Horizontal Competitive Effects

106.    Outside of his market definition and market shares analysis, Dr. Hatzitaskos opines that

other quantitative evidence shows that the transaction will have an anticompetitive effect on prices.

Dr. Hatzitaskos provided the Court virtually no explanation of how he conducted these analyses

or what they entailed, [345] but a close examination reveals that both of them again are based on

flawed inputs or assumptions.

107.    *First*, Dr. Hatzitaskos offers a "GUPPI" analysis (the "Gross Upward Pricing Pressure

Index"). [346]  As an initial matter, GUPPI analyses typically are used for consumer products, not

business-to-business settings where prices are individually negotiated. [347]  In any event, GUPPI

consists simply of multiplying numbers taken from Dr. Hatzitaskos's win-loss and profit margin

analyses, both of which suffer from numerous flaws.  *See supra* __.  Dr. Hatzitaskos's GUPPI

analysis thus proves nothing.

108.    *Second*, Dr. Hatzitaskos uses a "second-score" auction model. [348]  In doing so, however,

Dr. Hatzitaskos assumed that █████████████████████████████████████████████

██████████████████████, even though the FTC acknowledges that ███████ is a reasonably

interchangeable alternative, and even though the evidence shows that other firms like ███████

---

[344] ██████████████████████; ██████████████████.
[345] TT 860:1–21 (Hatzitaskos).
[346] TT 860:1–21 (Hatzitaskos).
[347] ████████████████████.
[348] TT 860:1–21 (Hatzitaskos).

and ███████ are suitable alternatives too.[349]  And again, Dr. Hatzitaskos's calculation of market shares and profit margins are in error, as is the exclusion of benefits from the transaction, like lower data costs.[350]  Once those errors are corrected, ████████████████████████ ████████████████████████████████[351]

109.  The errors in both of these models are further exposed by Dr. Israel's observation of actual marketplace outcomes.  ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████.[352]

110.  As a result, the Court concludes that Dr. Hatzitaskos has not credibly shown that the transaction is likely to substantially lessen competition, irrespective of the Court's conclusions on market definition.

### 4.  Vertical Competitive Effects

111.  Dr. Hatzitaskos offered little in terms of quantitative analysis of the alleged vertical effects from the transaction.  The two points he did offer are unpersuasive.

112.  *First*, Dr. Hatzitaskos speculated that IQVIA data accounts for 60% of all revenue "supporting the merging parties and the competitive fringe," supposedly indicating an ability to foreclose.[353]  This analysis is unclear and confusing to begin with, because Dr. Hatzitaskos did not explain what it means for revenue to "support[] the merging parties and the competitive fringe," nor did he outline his methodology for coming to these conclusions.  In any event, the relevant question for foreclosure is not the extent to which the *merging* parties use IQVIA data, but rather

---



349 ████████████████
350 ████████████████
351 ████████
352 ████████████████
353 TT 869:1–870:20 (Hatzitaskos); P-HATZITASKOS-DEMO-16.

to the extent the *non-merging* parties use such data and thus could at least conceivably be foreclosed post-transaction.[354]  As Dr. Israel explained, outside of the merging parties—and using Dr. Hatzitaskos's own model and assumptions— ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████.[355]  Such a small number is not indicative of an ability to foreclose.

113.    *Second*, Dr. Hatzitaskos opined that post-transaction, it would be profitable for IQVIA to foreclose access to its "data."[356]  Like the FTC, however, Dr. Hatzitaskos never articulates what "data" he actually is talking about—as set forth above, IQVIA provides many kinds of datasets and there are many types of data used for HCP programmatic advertising.  Moreover, as Dr. Israel explained, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████.[357]

PulsePoint in particular uses very little IQVIA data, and testified that at worst, foreclosure of data from IQVIA could introduce "friction" in PulsePoint's "work flow," not eliminate half of its business.[358]  Indeed, if the FTC's model were correct (and it plainly is not), that would suggest it would be more profitable for IQVIA to have purchased only Lasso and foreclosed its competitors, rather than pursue this multi-million-dollar transaction.[359]

## CONCLUSIONS OF LAW

## I.    THE STATUTE IMPOSES SIGNIFICANT BURDENS ON THE FTC

114.    Section 13(b) of the FTC Act permits a court to preliminarily enjoin a proposed merger "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood

---

[354] ███████████████████████████████.

[355] ██████.

[356] TT 867:24–868:25 (Hatzitaskos); P-HATZITASKOS-DEMO-17.

[357] ████████████████████████.

[358] TT 167:22–168:15 (Gerszke).

[359] *Id.*

of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).  Section 13(b) "mean[s] what it says." *AMG Capital Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1349 (2021).  A court must evaluate whether the FTC is likely to ultimately succeed on its Clayton Act challenge, and whether in view of the equities a preliminary injunction would be in the public interest.

115.    Appellate courts have framed the Section 13(b) standard as asking whether the FTC has raised "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995) (quotation marks omitted); *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714–15 (D.C. Cir. 2001); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984).

116.    The FTC has asked this Court to instead assess only whether it has shown a "fair and tenable" chance of success on the merits.  PI Mot. 11 (quoting *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977)).  But *Lancaster Colony* is an outlier decision that has not been adopted more broadly:  No court has relied on the "fair and tenable" standard in a merger case since 1979, and even those cases have since been overruled.  *Compare FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978) (mem.); *FTC v. Southland Corp.*, 471 F. Supp. 1, 3 (D.D.C. 1979), *with FTC v. Pharmtech Research, Inc.*, 576 F. Supp. 294, 299 (D.D.C. 1983) (indicating that the D.C. Circuit has since rejected the "fair and tenable" standard in *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981)).

117.    The "fair and tenable" formulation has been squarely rejected by numerous courts.  *See, e.g.*, *Freeman Hosp.*, 69 F.3d at 267 (noting that "[s]uch a standard runs contrary to congressional intent and reduces the judicial function to a mere 'rubber stamp' of the FTC's decisions"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015); *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109,

116 (D.D.C. 2004); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997).  No academic authority supports application of the "fair and tenable" standard today.

118.     The Second Circuit has not adopted the "fair and tenable" standard.  In a case not arising under Section 13(b), it indicated in dicta that the "fair and tenable" standard is largely "interchangeable" with the "serious questions" standard, although it also observed that courts distinguishing between the two have said that the "serious questions" standard places "a *higher* burden on the government."  *United States v. Sun & Sand Imports, Ltd.*, 725 F.2d 184, 188 & n.5 (2d Cir. 1984).  The "serious questions" standard, as set forth above, is now the prevailing standard and is fully consistent with Second Circuit precedent.  The *Lancaster Colony* standard is consistent with nothing.  Indeed, the FTC itself has acknowledged in a congressional hearing that under Section 13(b), it "is required to make a robust evidentiary and legal showing that the transaction would likely be anticompetitive in order to obtain a preliminary injunction."[360]

119.     The FTC suggests that the Court may not evaluate the strength of Defendants' evidence or resolve factual disputes in these proceedings.  PI Reply 3–4.  Again, the overwhelming weight of authority is against the FTC.  *See, e.g.*, *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1035 (D.C. Cir. 2008) ("[T]he district court must evaluate the FTC's chance of success on the basis of all the evidence before it, from the defendants as well as from the FTC."); *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) (reversing order enjoining merger in part because the district court relied on testimony favorable to the FTC "in the face of contrary evidence"); *Staples*, 970 F. Supp. at 1074 (defining the product market "[a]fter considering the arguments on both sides and all of the evidence in this case and making evaluations of each witness's credibility as well as the weight that the Court should give certain evidence and testimony").

---

[360] Prepared Statement of the FTC Before the U.S. Sen. Comm. on the Judiciary 13 (Oct. 7, 2015), https://perma.cc/7V4B-PLDS.

120.     At bottom, Section 13(b) does not permit courts to "rubber-stamp" a Section 13(b) application "whenever the FTC provides some threshold evidence." *Whole Foods*, 548 F.3d at 1035. Instead, the Court must "exercise independent judgment about the questions [Section 13(b) commits to it." *Id.* (quotation marks omitted); *see also* Opinion and Order, *FTC v. IQVIA,* No. 23 Civ. 06188 (S.D.N.Y. Oct. 31, 2003) ECF No. 184 at 10 (courts must "exercis[e] their independent judgment and evaluat[e] the FTC's case and evidence on the merits" (quotation marks omitted)). That is because a Section 13(b) preliminary injunction "remains an extraordinarily drastic remedy, especially since . . . the issuance of a preliminary injunction blocking an acquisition or merger may prevent the transaction from ever being consummated." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 44 (D.D.C. 2018) (citation and quotation marks omitted); *see also FTC v. Microsoft Corp.*, 2023 WL 4443412, at *8 (N.D. Cal. July 10, 2023) (similar), *appeal filed*, No. 23-15992 (9th Cir.).

121.     Under any formulation of the standard, the FTC's motion must be denied because the FTC cannot establish either (1) a likelihood of ultimate success or (2) that the equities or public interest favor the extraordinary relief it seeks. Those are the statutory inquiries.

## II.     THE FTC HAS NOT ESTABLISHED A LIKELIHOOD OF SUCCESS

122.     A merger is unlawful under Section 7 of the Clayton Act only if the FTC establishes that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly" in a relevant market. 15 U.S.C. § 18. The focus is on what is likely to happen *after* the transaction closes, and the statute "deals in probabilities, not ephemeral possibilities." *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622–23 (1974) (citation and quotation marks omitted). Section 7 thus "requires a finding of a reasonable probability of a substantial impairment of competition, rather than a mere possibility." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y. 2020).

123.    The FTC challenges the merger under both a horizontal theory (i.e., effects arising from the combination of two firms competing in the same market) and a vertical theory (i.e., effects arising from the combination of firms at different levels of the supply chain).  The FTC failed to show it is likely to succeed on either.

### A.    The FTC Is Not Likely to Succeed on Its Horizontal Theory

124.    In the context of a horizontal merger, courts follow a three-step burden-shifting framework. *See United States v. Baker Hughes Inc.*, 908 F.2d 981, 982–83 (D.C. Cir. 1990); *see also In re AMR Corp.*, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023) (citing this framework with approval).

125.    The burden first falls to the FTC to show "that a transaction will lead to undue concentration in the market for a particular product in a particular geographic area," which establishes "a presumption that the transaction will substantially lessen competition."  *Baker Hughes*, 908 F.2d at 982–83.  "The most common way to make this showing is through a formula called the Herfindahl-Hirschman Index ('HHI'), which compares a market's concentration before and after the proposed merger."  *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017).

126.    If the FTC makes a prima facie case, the defendant may rebut that case by "producing evidence to cast doubt on the accuracy of the plaintiff's evidence as predictive of future anti-competitive effects."  *Deutsche Telekom*, 439 F. Supp. 3d at 199 (alteration omitted).  The weaker the FTC's prima facie case, the lower the defendant's burden of rebuttal.  *See In re AMR Corp.*, 625 B.R. 215, 252 (Bankr. S.D.N.Y. 2021), *aff'd*, 2023 WL 2563897; *Arch Coal*, 329 F. Supp. 2d at 158.  Importantly for Defendants, this is a "burden of production," *not* a "burden of persuasion."  *Baker Hughes*, 908 F.2d at 991.

127.    If the defendant carries its burden of rebuttal, "the burden of production shifts back to the plaintiff and merges with the ultimate burden of persuasion, which is incumbent on the [FTC] at

all times." *Deutsche Telekom*, 439 F. Supp. 3d at 199 (alteration omitted).

### 1. The FTC Is Not Likely to Establish Its Prima Facie Case

128.   The FTC's prima facie case is based on Dr. Hatzitaskos's calculation of market shares, but fails both because the FTC has not established the relevant product market and because it has not shown undue concentration.   The FTC's alternative theory regarding the elimination of direct competition also fails.

### a. The FTC Has Not Established a Relevant Antitrust Market

129.   Market definition is a required element of the FTC's case, *see Marine Bancorporation*, 418 U.S. at 618, on which the FTC bears the burden of proof, *see United States v. Long Island Jewish Medical Center*, 983 F. Supp. 121, 137 (E.D.N.Y. 1997).   An accurate market definition is necessary, because "without a definition of that market, there is no way to measure the defendant's ability to lessen or destroy competition." *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (quotation marks omitted); *see also City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("[A] plaintiff must allege a plausible relevant market in which competition will be impaired.").   The FTC's "failure to [properly] define its market . . . is, standing alone, valid grounds for dismissal." *Global Disc. Travel Servs. v. Trans World Airlines*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997); *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) ("The absence of an adequate market definition makes it impossible even to approximate the market effect of defendants' allegedly anticompetitive agreement.").

130.   The FTC must prove that Defendants have "a dominant market share in a *well-defined* relevant market." *Long Island Jewish Medical Center*, 983 F. Supp. at 136.   A "relevant market" consists of a product market and a geographic market. *Marine Bancorporation*, 418 U.S. at 618; *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962).

131.    The FTC's proposed geographic market is worldwide, PI Mot. 21, but the FTC did not

offer any evidence at trial of competition outside of the United States, *cf. FTC v. Cardinal Health*,

12 F. Supp. 2d 34, 50 (D.D.C. 1998) (rejecting FTC geographic market for lack of evidence).  In

any event, because there is no evidence of international competition, whether the relevant market

is the United States or global is not dispositive of the Court's analysis.

132.    More crucially, the FTC failed to prove its proposed *product* market, as explained below.

The boundaries of a product market are determined by the "reasonable interchangeability of use

or the cross-elasticity of demand" between the product and its substitutes.  *Brown Shoe*, 370 U.S.

at 325.  "A properly defined market includes potential suppliers who can readily offer consumers

a suitable alternative to the defendants' services."  *Long Island Jewish Med. Ctr.*, 983 F. Supp. at

136 (quotation marks omitted).

(1)    The FTC Has Failed to Define a Product Market With
Respect to Reasonable Interchangeability

133.    The FTC proposes a product market that it calls "HCP programmatic advertising," PI Mot.

13; *see also* Compl. ¶ 51, but its presentation at the evidentiary hearing revealed that it narrows

and qualifies this proposal in arbitrary ways.  A brand may programmatically serve the exact same

advertisement to the exact same HCP through different means (e.g., DSP vs. social vs. direct

endemic), yet the FTC would divide those offerings into separate markets.  Indeed, an advertiser

may show the same advertisement to the same HCP *on the same website*, and the FTC would put

those offerings into separate markets if one were purchased via a healthcare-specific DSP and the

other were purchased through a direct relationship with the publisher (or through Google).  Such

arbitrary delineation violates the rule that the FTC may not "gerrymander its way to an antitrust

victory without due regard for market realities."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d

676, 683 (4th Cir. 2016); *see also Gianna Enters.*, 551 F. Supp. at 1354 ("[A] 'court cannot accept

the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [alternatives].'").  The FTC's overly narrow view of the market cannot form the basis for a reliable competitive analysis.

134.    The evidence firmly establishes that there are numerous ways in which advertisers can put a specific digital advertisement in front of a particular HCP.  FOF 32–64.  As detailed above, agencies evaluate and seek to maximize the ROI of all digital channels for a given client, and in doing so, they deploy a variety of economic modeling tools to determine which channels are providing the greatest ROI.  FOF 61.  Agencies use the results of that analysis to allocate and reallocate advertising dollars among various channels, bringing all channels that allow for the targeting of digital display ads to HCPs in competition with each other for the same advertising dollars.  FOF 61, 63–64.

135.    The FTC does not dispute the basic point that advertising is optimized across channels, but instead urges that any such competition is too minimal to be included in the relevant product market.[361]  Having admitted that channels like social media and endemic publishers are alternatives for targeted HCP advertising, the burden is thus on the FTC to establish that such firms are *not* in the relevant market.  *See Long Island Jewish Med. Ctr.*, 983 F. Supp. at 137.  It has not done so.

136.    The FTC must analyze (with evidence) where customers of programmatic advertising would turn if faced with a price increase.  *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 143 (citing *Freeman Hosp.*, 69 F.3d at 268).  The most common way to perform that analysis in the merger context is through the "hypothetical monopolist test" ("HMT"), which asks whether a hypothetical monopolist of the proposed market "would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers."  *United States v. Am. Express Co.*, 838

---

[361] ███████████████████████.

F.3d 179, 198 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018); *see also Concord Assocs.*, 817 F.3d at 52 (similar).

137.    Dr. Hatzitaskos purported to perform an HMT, but as described above, both versions of his analysis wither under scrutiny.  FOF 96–101.  There is a threshold legal defect, moreover, with his analyses.  The FTC and Dr. Hatzitaskos have both claimed that it is enough to show that a hypothetical monopolist of all firms in the candidate market could profitably increase the price of *one* of the merged firms, rather than increasing the price across the market.[362]  But the relevant question for the HMT is whether "customers would defeat the attempted price increase by buying *from outside*" the proposed market.  *FTC v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (emphasis added).  It makes no sense to evaluate substitutability *within* the candidate market, because the whole point of the HMT is to determine whether firms outside the candidate market competitively constrain pricing.  Dr. Hatzitaskos never answers that question, and "by arbitrarily excising those alternative options and essentially arguing that there are no comparable competitors, [the FTC] exempt[s] [itself] from the requirement of defining the market according to the rules of interchangeability and cross-elasticity."  *Concord Assocs.*, 817 F.3d at 55 (quotation marks omitted).

138.    In fact, Dr. Hatzitaskos never even identifies what "price" he is purporting to analyze in his HMT.  Whereas Dr. Israel explained that ███████████████████████████████ ████████████████████████████████████,[363] Dr. Hatzitaskos refers to "price" more generally, without explaining what that actually entails.  Without a definition of what "price" is being analyzed, the Court cannot assess Dr. Hatzitaskos's application of the HMT.  *See Am. Express*, 838 F.3d at 199–200 (HMT results are not useful if the inputs are inaccurate).

---

362 ████████████████████████.
363 ██████████████████████.

139.    Another legal defect in Dr. Hatzitaskos's analysis is his failure to analyze the two-sided nature of HCP programmatic advertising.  A two-sided transaction market is one in which a firm connects buyers and sellers through a simultaneous transaction, such as a credit card transaction. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280–81 (2018).  Two-sided transaction platforms are different from ordinary markets because they experience "indirect network effects," which means they "cannot raise prices on one side without risking a feedback loop of declining demand." *Id.* at 2285.  "[C]ourts must include both sides of the platform . . . when defining" a two-sided transaction market.  *Id.* at 2286.

140.    DSPs are two-sided transaction platforms because they facilitate the real-time purchase of advertising space by an advertiser from a publisher.[364]  PulsePoint's witness agreed, observing that PulsePoint's parent company, Internet Brands, is specifically geared at providing "digital marketing service in two sided marketplaces."[365]  And because they are two-sided transaction platforms, DSPs experience indirect network effects:  If a DSP were to raise prices to advertisers and lose customer volume in hopes of increasing profit, that departure of customers would affect that DSPs' ability to attract publishers, thereby reducing the value of the DSP and causing a further departure of advertiser customers.[366]  But Dr. Hatzitaskos does not account for the two-sided nature of DSPs *at all*, much less assess the competitive significance of indirect network effects in this context.  That failure is alone sufficient to reject his analysis.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 57 (2d Cir. 2019) ("In cases involving two-sided *transaction* platforms, the relevant market must, as a matter of law, include both sides of the platform.").

---

[364] *See* DX0076 (Israel Rep.) ¶¶ 137–42.
[365] TT 169:11–17 (Gerszke).
[366] *See* DX0076 (Israel Rep.) ¶ 140.

141.    As cataloged above, there are also numerous economic errors in Dr. Hatzitaskos's HMT analyses that render them unreliable.  FOF 96–101.

142.    The FTC has thus given the Court no economic basis to conclude that other channels or platforms that are used for targeted HCP advertising are not reasonably interchangeable with DSPs, including the merging parties.  Not only can advertisers go to endemic publishers and social media websites, but increasingly, agencies are developing ways to skip the intermediary steps in the "ad tech stack" and box out DSPs altogether while still getting access to the exact same inventory.  FOF 57–59.  Nonetheless, Dr. Hatzitaskos excludes these alternatives based on his observation that "they just didn't seem to be a reasonable substitute."[367]  The mere fact that two products are "different" does not mean they are not in the same antitrust market—even Lasso and DeepIntent offer different products.[368]  "[M]erely asserting that a commodity is in some way unique is insufficient to plead a relevant market."  *Concord Assocs.*, 817 F.3d at 54 (quotation marks omitted).  Dr. Hatzitaskos's intuition about what ought to be in the market is not a sufficient basis for finding reasonable interchangeability or lack thereof.

(2)    The *Brown Shoe* Practical Indicia Undermine the FTC's Proposed Market

143.    Because the FTC offers no economically sound analysis of which products are reasonably interchangeable for the products the merging parties offer, it has failed to prove its market definition.  Instead, the FTC relies on what it calls "ordinary course" documents and the *Brown Shoe* "practical indicia" of market definition.  But mere "lay testimony and internal [party] marketing documents" are not sufficient to "provide a sound economic basis for assessing the market . . . the way that a proper interchangeability test would."  *Ky. Speedway, LLC v. NASCAR,*

---

[367] TT 845:20–24 (Hatzitaskos); *see also* TT 847:9–848:3 (Hatzitaskos).
[368] TT 1044:25–1045:11 (Israel).

588 F.3d 908, 919 (6th Cir. 2009).  As the Second Circuit has emphasized, "[r]easonable interchangeability sketches the boundaries of a market," and practical indicia are used only to "clarif[y] whether two products are in fact 'reasonable' substitutes and are therefore part of the same market."  *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  Here, the *Brown Shoe* indicia defeat the FTC's proposed market.

144.  Dr. Hatzitaskos claims to have included in his market all DSPs that engage in any form of HCP programmatic advertising.[369]  Yet most of the FTC's *Brown Shoe* arguments rely on capabilities and features that are not required by this market definition.  For example:

- The FTC contends that HCP programmatic advertising has "peculiar characteristics" insofar as it offers "combined capabilities" for audience-building, campaign activation, and measurement, PI Mot. 15, but Dr. Hatzitaskos does not require that firms provide all three of those services to be included in his market.[370]

- The FTC contends that customers for HCP programmatic advertising have a unique need for data to analyze changes in "prescribing behavior," PI Mot. 19, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[371]

- The FTC urges that HCP programmatic advertising has "distinct customers" in the form of "healthcare companies and their advertising agencies," PI Mot. 19, but Dr. Hatzitaskos did not limit the market based on the identity of the advertiser, and the evidence shows that in fact many types of companies (including insurance companies) use HCP programmatic advertising, FOF 48.

- And finally, the FTC urges that HCP programmatic advertising is serviced by "specialized vendors" in the form of "healthcare DSPs," PI Mot. 19, but Dr. Hatzitaskos explicitly did not limit his market to healthcare-specific DSPs.[372]

145.  The FTC labels generalist DSPs "fringe" competitors, seeking to downplay their competitive importance while still including them in the market.  In no sense can a firm like The

---

[369] TT 832:7–19 (Hatzitaskos).
[370] TT 832:20–22 (Hatzitaskos); P-HATZITASKOS-DEMO-4.
[371] ▮▮▮▮▮▮▮▮▮▮▮▮.
[372] TT 832:23–833:5 (Hatzitaskos).

Trade Desk— █████████████████████████████████████████████████████

████████████████████████████████████████, FOF 39—be characterized as "fringe."

Moreover, labeling a firm as "fringe" is relevant only insofar as the firm's output is limited by its

capacity and costs (e.g., a steel mill with limited output). *See* Phillip E. Areeda & Herbert

Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 927c

(2023 cum. supp.). The FTC provided no evidence that well-capitalized technology platforms like

The Trade Desk, ██████████████████████████████████████████████████████

████████████████████████.[373]   Merely labeling these firms "fringe" has no impact on market

definition or the prospective Section 7 analysis.

146.    When the FTC claims to define its market by reference to so-called "practical indicia,"

what it really relies on is mentions of PulsePoint, DeepIntent, and Lasso alongside each other as

DSP candidates in various communications.  That is not a sufficient basis for narrowing the market

as the FTC seeks.

147.    Much of what the FTC has cited are informal chat transcripts and emails among employees

at IQVIA, DeepIntent, and/or Lasso.  Courts are skeptical of such "anecdotal speculation and

supposition" as basis for finding harm to competition.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,

836 F.3d 1171, 1175 (9th Cir. 2016).  Accordingly, "[i]nformal, off-the-cuff remarks and anecdotal

evidence concerning the marketplace are no substitute for solid economic evidence." *California*

*v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1080 (N.D. Cal. 2000) (quotation marks omitted).  That

is particularly the case here, where many documents are from a year or more ago and/or predate

those companies' affiliation with IQVIA.  But even those documents debunk the notion that

---

[373] ████████████████████.

DeepIntent and Lasso competed only—or even primarily—with each other, as catalogued in detail below. *See infra __*.

148.    The FTC also relies on certain RFPs—both who received them and how those recipients responded—as further evidence of its alleged market.  RFPs, however, are not a reliable source of evidence where they do "not best reflect market realities." *United States v. Energy Sols., Inc.*, 265 F. Supp. 3d 415, 440 n.16 (D. Del. 2017).  And here, market realities show that even though DSPs compete with one another for business via RFPs, they *also* compete with other advertising platforms and channels.  The fact that two products are "different" in some immaterial way does not mean they occupy different antitrust markets.[374]  In any event, there are many examples of RFPs in which generalist DSPs, publishers, and social media platforms are discussed.[375]

149.    More informative are what decisionmakers at IQVIA actually considered in analyzing the competitive landscape in formal deal documents and presentations—corroborated by third-party documents from competitors.  *See Allen-Myland v. Int'l Bus. Mach. Corp.*, 33 F.3d 194, 208–09 (3d Cir. 1994) (noting that documents "prepared" for and "used by" a party's "top management" can "be powerful evidence in an antitrust case").  And what those documents show time and again is that IQVIA has long understood the market to be much broader than the three healthcare-specific DSPs on which the FTC has focused, with many players all competing for the same dollars.[376]

150.    The Court is also cautious about relying on internal documents to fully define the scope of competition.  A firm's internal documents can be useful for assessing which other firms should be *included* within the market, but they are less helpful in determining which firms should be *excluded* from the market. As the leading treatise explains:

---

[374] TT 1044:25–1045:11 (Israel).
[375] *E.g.*, DX0182; DX0212.
[376] DX0805; DX0079; DX0083; DX0737; DX0800.

> [S]eparate markets are not indicated by documents within *A* firms that are preoccupied with other *A* firms.  After all, a given producer of *A* cannot charge more than other *A* firms and thus may focus entirely on them even though a hypothetical monopolist of product *A* would focus entirely on the price of a close substitute *B*.

Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 5.10[A] (4th ed. 2023 supp.) (emphasis added); *see also FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 42 n.18 (D.D.C. 2009) (same).  This makes good sense:  Firms are most likely to focus their marketing efforts on "brands perceived to have similar benefits and characteristics," but they "also compete by striving constantly to introduce new products, to include consumers to try [different products], and to change consumer preferences," all in competition with firms who provide similar services.  *New York v. Kraft Gen. Foods, Inc.*, 926 F. Supp. 321, 360 (S.D.N.Y. 1995).

151.   Courts therefore recognize that documents reflecting "laymen's comments made in a competitive business environment" carry little value in defining an *antitrust* market.  *AD/SAT v. Associated Press*, 920 F. Supp. 1287, 1297 n.7 (S.D.N.Y. 1996), *aff'd*, 181 F.3d 216 (2d Cir. 1999); *see also Truck-Rail Handling Inc. v. BNSF Ry. Co.*, 2005 WL 8178364, at *8 (N.D. Cal. Mar. 8, 2005) (same).  This principle holds even if internal documents specifically invoke the term "market" when describing the firm's products.  *See AD/SAT*, 920 F. Supp. at 1297 n.7 (internal documents referencing a firm's "hope[s] to 'capture' the market" were not probative of market definition); *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1318–19 (D. Md. 1986) ("[T]he fact that a company may refer to a 'market' does not necessarily mean that its reference will be to a market for purposes of the Sherman Act."), *aff'd*, 831 F.2d 537 (4th Cir. 1987).

152.   The FTC is wrong that so-called "ordinary course" documents support its market definition.  The existence of competition between two firms is not dispositive:  That Yale and Harvard are rivals with one another does not mean they constitute their own antitrust market. *Cf.*

*Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000) (rejecting narrow market that excluded "many institutions of higher learning").  Advertisers and their agencies take account of a DSP's price when evaluating ROI and, accordingly, whether to allocate advertising dollars across other platforms or channels.  FOF 61.  A price increase by a DSP necessarily diminishes its ROI relative to those other platforms or channels, and agencies do not hesitate to reallocate advertising spending when appropriate.  FOF 61, 63–64.

> (3)     The FTC Has Not Established a "Cluster" Market for
>         Combined HCP Programmatic Advertising Services

153.   At various points in the proceeding, the FTC appeared to suggest that PulsePoint, DeepIntent, and Lasso may be different than other DSPs in their ability to offer "3-in-1" capabilities, that is, audience-building, campaign activation, and measurement on one platform. Although courts sometimes "cluster" noninterchangeable products or services together to reflect market realities, the FTC has not even invoked that legal framework, its own expert does not embrace it, and the facts do not support clustering in any event.

154.   Products can be clustered under the "package-deal" theory, which holds that "if most customers would be willing to pay monopoly prices for the convenience of receiving certain products as a package, then the relevant market for those products is the market for the package as a whole." *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 567 (6th Cir. 2014) (quotation marks omitted); *see also Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 354–55 (S.D.N.Y. 2009) (no cluster market where the plaintiff failed to show higher prices for clustering).  But here, there is no evidence suggesting that a firm could charge monopoly prices by offering combined services on one platform.  *See United States v. U.S. Sugar Corp.*, 73 F.4th 197, 205 (3d Cir. 2023) (rejecting proposed market because "defining the product market to include production *and* sale is irrelevant to consumer welfare and a purely self-serving description

63

by the government").  Instead, the evidence points in the opposite direction: customers routinely "mix" and "match" data providers and advertising platforms, and that Lasso's and DeepIntent's audience-building and measurement tools are hardly used by customers at all.  FOF 47–48.

155.    To be sure, the merging parties and others have sought to differentiate themselves by offering a broader suite of products.  But product differentiation is an essential element of competition—it is a way in which firms distinguish their brands from others based on attributes other than price.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007). The unremarkable fact that DeepIntent and Lasso (among others) offer different features than other market participants does not render those firms a market unto themselves:  These firms are simply seeking to persuade consumers to "make tradeoffs on some of the very factors the [FTC] attempt[s] to use to define [its] market."  *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989).

* * *

156.    Market definition is an essential and, in this case, dispositive element of a plaintiff's antitrust case.  Here, the FTC has failed to account for significant alternatives to which advertisers can turn for HCP programmatic advertising.  The FTC therefore did not prove its proposed geographic or product markets, and therefore cannot establish a reasonable likelihood of success. Because the FTC's horizontal theory depends on its market definition—and because establishing the market is an element of the FTC's case—its horizontal case is rejected on this theory alone.

        b.    The FTC Has Not Proven a Likelihood of Establishing Undue Market Concentration

157.    Even in its own proposed market, the FTC has not established its prima facie case because it has failed to show that the merger will result in market shares that are presumptively likely to substantially lessen competition.

158.    In its motion for a preliminary injunction and in the testimony of Dr. Hatzitaskos, the FTC

invoked the HHI for its prima facie case.  PI Mot. 22–23.  In its reply brief, however, the FTC

made no mention of HHI at all, instead relying entirely on *United States v. Philadelphia National*

*Bank*, 374 U.S. 321, 364 (1963), to argue undue concentration based on its calculation that the

merged firm will have over a 30% share of the FTC's proposed market.  PI Reply 11–13.  But

intervening precedent has "cut . . . back sharply" on *Philadelphia National Bank*, *Baker Hughes*,

908 F.2d at 990, and as a matter of economics, "nothing says above or below 30 percent tells you

anything in particular."[377]  In fact, the current Merger Guidelines do not discuss this 30% threshold

at all, instead focusing exclusively on HHI.  Under either "threshold" approach, however,

Defendants have identified numerous "dispositive" deficiencies in the FTC's assessment of market

shares.  *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 310 (D.D.C. 2020).

159.    *First*, the FTC's concentration arguments depend on its erroneous market definition—

which, among other things, excludes the vast revenues major social media companies and endemic

publishers derive from HCP targeted programmatic advertising—and are defective for that reason

alone.  Dr. Hatzitaskos purportedly ran an alternative analysis to test the effect inclusion of social

media platforms would have on one of his models, but in doing so he omitted many relevant social

media platforms (including, egregiously, healthcare-specific ones like Sermo and Doximity) and

undercounted the revenues of those platforms he did include.  *See* FOF 102.  And Dr. Hatzitaskos's

contention that including endemic publishers in market share would constitute "double counting"

rests on a misunderstanding of the industry, because ██████████████████████████████

████████████████████████████.[378]  Accordingly, if the FTC's market definition is

---

[377] TT 1070:16–19 (Israel).

[378] ██████████████████████████.  ████████████████.

wrong, then so are its market shares and the FTC's prima facie case fails.  *See RAG-Stiftung*, 436 F. Supp. 3d at 310–12 (prima facie case failed for failure to prove relevant market).

160.     *Second*, the FTC's market shares rest on numerous miscalculations.  Dr. Hatzitaskos admitted he did not have reliable revenues for most of the firms in his alleged market, and the testimony bears that out.  For example, The Trade Desk testified █████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████

██████████████████████.  FOF 40.  Additionally, Dr. Hatzitaskos limited his market share analysis to

██████████████████████, even though the industry is dynamic and changing.  FOF 105.  As another example, Dr. Hatzitaskos ████████████████████████████████████████████

███████████████████████████████████████████████████████.  FOF 103.

161.     As described above, it is clear that the FTC's market shares are erroneous because many of the largest healthcare advertising agencies do no business with PulsePoint, DeepIntent, or Lasso at all.  FOF 104.  IQVIA's internal data confirms that advertisers use IQVIA-built audiences for HCP programmatic advertising on many other platforms.  FOF 104.  And there are numerous other firms involved in providing services related to HCP programmatic advertising that the FTC overlooks, including self-service DSPs that do not track how customers are using their platform

(████████████████████████████████████████████████).  FOF 42–43, 50.

162.     *Third*, the FTC's HHI calculations fail to account for the swell of new competitors.  Market share must account for "any firms and production capacity that, in response to a small but significant and nontransi[t]ory price increase, are likely to be devoted rapidly to production or sale of a market product without incurring significant sunk costs of entry and exit."  *Kraft Gen. Foods*, 926 F. Supp. at 360.  That is particularly true in the context of the Clayton Act, which seeks to

predict future competitive conditions:  Even "a substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect."  *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982 (2d Cir. 1984).

163.   The evidence indicates there are numerous such firms here.  Many generalist DSPs are already providing HCP programmatic advertising services, and some are successfully moving into or expanding in the HCP programmatic advertising space and growing rapidly.  FOF 37–45.



FOF 33.                                                                                    . FOF 39–41, 44.

, FOF 42–43,                                              .  Winning just *one* client's business— like Lasso did with CMI—could transform any of these firms into a market leader overnight.  The FTC's market shares account for none of that.

164.   The FTC contends that Defendants have conceded that the transaction will result in a presumptively anticompetitive combined market share of ████ PI Reply 11,[379] but that is not true, even were it relevant.  In his analysis, Dr. Israel "███████████████" the shares of the FTC's expert and produced a "██████████" estimate of market share that was "█████████████ ██████████" and that "████████████████████████████████."[380]  Plainly, Dr. Israel did not concede a ██████ post-merger market share, but rather showed that even correcting just *some* of the FTC's errors—while still not fully accounting for revenues from some of the largest players— undermined the FTC's arguments for market concentration.

---

[379] TT 8:12–14 (FTC).
[380] DX0076 (Israel Rep.) ¶¶ 228–29 & fig. 12; *see also* TT 1070:3–15 (Israel).

c.    The FTC's Direct Competition Theory Is Legally and Factually
Flawed

165.    There is not "a single case in which a court has enjoined a merger, even at this preliminary

stage, where the Government failed to show undue concentration in a relevant market as its prima

facie case requires, almost always through an HHI or similar metric." *RAG Stiftung*, 436 F. Supp.

3d at 310.   Nonetheless, the FTC argues that it may establish its prima facie case—and in fact,

contends that the merger is categorically unlawful—based solely on the fact that the transaction

will purportedly eliminate direct competition between DeepIntent and Lasso.  PI Mot. 24–32; PI

Reply 13–16.  The FTC is wrong as a matter of law, and there is no factual basis for its theory in

any event:  Not a single fact witness testified that they expected prices to increase or innovation to

decrease as a result of the transaction.

166.    "[T]he mere fact that a merger eliminates competition between the firms concerned has

never been a sufficient basis for illegality."  *Dresses for Less, Inc. v. CIT Group/Commercial

Servs., Inc.*, 2002 WL 31164482 at *12 (S.D.N.Y. 2002) (quoting IV Phillip E. Areeda et al.,

*Antitrust Law* ¶ 901a (1988)).  "Simply because [the parties to the proposed merger] often meet on

the battlefield and fight aggressively does not lead to the conclusion that they do so in the absence

of [another competitor]."  *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1169 (N.D. Cal.

2004).  That makes intuitive sense:  Competition can come from multiple firms and on multiple

levels, and consolidating two competitors does not necessarily mean prices can be raised without

consequence.

167.    As the Supreme Court has made clear, although "[m]ergers among competitors eliminate

competition," they "are not per se illegal, and many of them withstand attack under any existing

antitrust standard."  *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979).

Indeed, in *Brown Shoe*, the Court explained that any horizontal merger necessarily eliminates

"whatever competition previously may have existed . . . between the parties to the merger," but that the Clayton Act makes clear "that the validity of such combinations was to be gauged on a broader scale: their effect on competition generally in an economically significant market."  370 U.S. at 335.  Even if the merging parties together constitute a large market share, the court must nonetheless determine, "with reasonable probability, [if] the merged entity [will] have enough market power to enable it to profitably increase prices above competitive levels for a substantial period of time[.]"  *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 142.

168.    The cases the FTC cites do not suggest that the alleged elimination of direct competition is itself sufficient to enjoin a merger.  In *Staples*, the court identified direct competition as one "factor" when analyzing anticompetitive effects, after having found high "concentration statistics and HHIs within the geographic markets."  970 F. Supp. at 1081–83; *see also United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 43–47 (D.D.C. 2017) (same).  The court in *FTC v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000), discussed direct competition only briefly, and in the context of a lengthy discussion of pricing behavior in the relevant market.  *See id.* at 169–70.  Likewise, the court in *United States v. H&R Block, Inc.*, 833 F. Supp. 3d 36 (D.D.C. 2011), evaluated direct competition in the context of a four-factor test used to determine whether unilateral anticompetitive behavior would be profitable—not as a dispositive factor of its own.  *Id.* at 81–82.  These cases overwhelmingly show that the proper way to evaluate direct competition is in the context of an appropriately defined market with high concentration and as part of a rigorous study of the totality of the evidence.

169.    Under any framework, the evidence rebuts any conclusion that removing competition between DeepIntent and Lasso is likely to substantially lessen competition.  The FTC emphasizes the alleged "closeness" of the competition between DeepIntent and Lasso, PI Reply 14 n.57, but

provides no economic measure for how "close" that competition must be before a merger is unlawful. There are, however, economic tools for evaluating the anticipated effects of a merger, and as discussed below and elsewhere, those tools show that the merger is not likely to substantially lessen competition, and in fact may enhance it.

170. There is no economic evidence that ███████████████████████ ███. FOF 109. The FTC thus pins its prediction of anticompetitive effects on Dr. Hatzitaskos's economic analysis, but that analysis itself is based on his improper calculation of market shares and profit margins, and excludes benefits from the transaction (like cost savings from data fees). FOF 108. Once those errors are corrected, Dr. Hatzitaskos's own model shows that ██████



██████████████. FOF 108.

171. Nor does the testimony or documentary evidence support a freestanding assumption of competitive harm.[381] Much of the competition between DeepIntent and Lasso was focused on a ███████████████,[382] but even in that respect, ███████████████████████ ████████████████████████████████████████ ████████████.[383] The only concrete example of innovation through competition the FTC offered—DeepIntent's "Outcomes" and Lasso's "Vision" features, which provide measurement services—is not supported by the trial testimony.[384]

172. Meanwhile, the evidence shows many instances in which DeepIntent and Lasso competed with many other firms. For example, Lasso improved its user interface based on learnings from

---

[381] TT 545:20–22 (Field) (testifying that Lasso has not "launched any innovation based upon learnings from DeepIntent"); █████████████████████ (█████████████████████████████ ███)); *see also* ██████████████; DX0373 (██████████████████████).
[382] █████████████████████; PX2809.
[383] ██████████████████.
[384] TT 545:23–547:5 (Field); █████████████████████.

the Trade Desk, and developed endemic capabilities to compete with Proclivity and Doceree, including an e-newsletter specifically inspired by Proclivity.[385] ███████████████████████

███████████████████████████,[386] and ███████████████████████████

███████████████████████████.[387]  And there are numerous documents showing competition with myriad firms, including:

- A Lasso email indicating ████████████████████████████ ████████████████[388];

- An email ████████████████████████████████████ ████████[389];

- An internal Lasso chat expressing concern about competition from Doceree and suggesting Lasso gather more competitive intelligence[390];

- An internal Lasso chat showing head-to-head competition between Lasso and AdTheorent for a client's HCP campaign[391];

- An internal Lasso chat showing that competitors for an RFP call for a HCP campaign included DeepIntent, TI Health, Dynamic, AdTheorent, Programmatic Mechanics, Ovary, Doceree, Haymarket, PulsePoint, and Medicx[392];

- An internal Lasso chat expressing the firm's concern about competition from The Trade Desk and suggesting employees gather information about The Trade Desk's user interface, as well as about Verizon[393];

- A DeepIntent slide deck ████████████████████████████████ ████████████████████████████████████████████[394];

---

[385] TT 545:11–16, 548:24–549:15 (Field).
[386] ████████████████████████.
[387] ████████████████████████.
[388] DX0103.
[389] DX0091.
[390] DX0677; TT 534:1–25 (Field).
[391] DX0660; TT 535:6–536:2 (Field).
[392] TT 536:8–537:13 (Field); DX2033.
[393] TT 543:25–544:25 (Field); DX0675.
[394] ████████████████████; DX0332.

- An internal DeepIntent chat ████████████████████████████████
  ██████████.[395]

173.    In fact, although DeepIntent and Lasso compete in some respects (along with many other firms), they also are complementary.  Lasso is an omnichannel platform, not a DSP—it licenses that technology from Microsoft's Xandr.  FOF 28.  DeepIntent, meanwhile, is a DSP and has a far more robust DTC and connected TV offering than Lasso.  FOF 28–29.  And Lasso earns (some) revenue from its omnichannel measurement tool, which does not compete with DeepIntent's ██████████ measurement tool.  FOF 28.

174.    The FTC's theory of direct competition also fails to account for the forward-looking nature of the Section 7 analysis.  Whatever the competitive dynamic in the past may have been, the evidence shows that The Trade Desk is an existential threat to both DeepIntent and Lasso.  FOF 39–41.  Moreover, DeepIntent ██████████████████████████████████████ ███████████████████████████████████████████.  FOF 29.  And in all events, PulsePoint will continue to be a powerful competitive constraint in the future, and there is no evidence that the merged firm will stop competing with PulsePoint on price or innovation.

175.    The FTC's alternative "direct competition" theory thus is legally insufficient to establish a prima facie case and is unsupported by the facts.

### 2.    Substantial Evidence Rebuts Any Weak Prima Facie Case

176.    Even if the FTC could make out a prima facie case—it cannot—that would not entitle the FTC to a preliminary injunction.  Although the Supreme Court in *Philadelphia National Bank* posited a 30% threshold for prima facie market concentration, 374 U.S. at 364 , the Supreme Court later made clear in *United States v. General Dynamics Corp.* that market share calculations are not "conclusive indicators of anticompetitive effects," and must accompany "a further examination of

---

[395] ██████████████████████; DX0271.

the particular market—its structure, history and probable future—[to] provide the appropriate setting for judging the probable anticompetitive effect of the merger," 415 U.S. 486, 498 (1974) (quotation marks omitted). "Evidence of past production does not, as a matter of logic, necessarily give a proper picture of a company's future ability to compete." *Id.* at 501. As the D.C. Circuit has explained, this subsequent precedent "cut . . . back sharply" on *Philadelphia National Bank*'s standard. *Baker Hughes*, 908 F.2d at 990.

177. Since *General Dynamics*, "the Supreme Court and lower courts have found section 7 defendants to have successfully rebutted the government's prima facie case by presenting evidence on a variety of factors." *Baker Hughes*, 908 F.2d at 985. The D.C. Circuit has cataloged a "multiplicity of relevant factors"—no fewer than 39—that cases, scholars, and the government itself have all agreed are appropriate to consider in a rebuttal case. *See id.* at 985–86. Most relevant here, those factors include the following, which may be grouped into four buckets:

- (1) changing market dynamics, *see Gen. Dynamics*, 415 U.S. at 501; *Baker Hughes*, 908 F.2d at 985–86, including the waning competitive presence of one of the merging parties, *see Gen. Dynamics*, 415 U.S. at 507–08; *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981); *Deutsche Telekom*, 439 F. Supp. 3d at 217, competitive threats from inside or outside the market, *see Gen. Dynamics*, 415 U.S. at 501; *CCC Holdings*, 605 F. Supp. 2d at 68; and the likelihood of coordinated conduct post-merger, *see Oracle*, 331 F. Supp. 2d at 1122;

- (2) ease of entry or expansion and/or the threat of new entry or repositioning by current market participants, *see Waste Mgmt.*, 743 F.2d at 983; *CCC Holdings Inc.*, 605 F. Supp. 2d at 68; *Deutsche Telekom AG*, 439 F. Supp. 3d at 225–26;

- (3) the presence of sophisticated customers, *see Baker Hughes*, 908 F.2d at 984, 986; *RAG-Stiftung*, 436 F. Supp. 3d at 321; and

- (4) efficiencies from the merger, *Baker Hughes*, 908 F.2d at 985; *Deutsche Telekom AG*, 439 F. Supp. 3d at 208.

The ultimate question is whether the totality of the evidence "undermin[es] the prediction of future anticompetitive effect." *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 125 (S.D.N.Y. 2021); *see also Baker Hughes*, 908 F.2d at 984 ("The Supreme Court has adopted a

totality-of-the-circumstances approach to the statute."). And again, the weaker the FTC's prima facie case, the lower the defendant's burden on rebuttal. *See In re AMR Corp.*, 625 B.R. at 252.

178.    "Although *Baker Hughes* was decided at the merits stage as opposed to preliminary injunctive relief stage, we can nonetheless use its analytical approach in evaluating the Commission's showing of likelihood of success." *H.J. Heinz*, 246 F.3d at 715. Accordingly, courts "look at the FTC's prima facie case *and the defendants' rebuttal evidence*." *Id.* (emphasis added). Courts in Section 13(b) cases consider rebuttal arguments and have rejected Section 13(b) applications on that basis. *See, e.g.*, *FTC v. Foster*, 2007 WL 1793441, at *57 (D.N.M. May 29, 2007); *Arch Coal*, 329 F. Supp. 2d at 129–30; *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1294, 1302–03 (W.D. Mich. 1996), *aff'd*, 1997 WL 420543 (6th Cir. July 8, 1997).

179.    Here, if the FTC made out a prima facie case at all, it is weak. The FTC's HHI calculations are based on admittedly incomplete information and revenue estimates derived by inference. FOF 102–104. Those calculations are not reliable, and certainly do not give rise to a strong prima facie case. The FTC's (inaccurate) backup claim that Defendants have conceded a █████ post-merger market concentration poses a market share that ██████████████████████████████████ ████████████. Thus, if other factors in the market—such as the growth of competing firms or the entry of new competitors—reduce or disrupt that estimate even just on the margins, the FTC's supposed prima facie case crumbles and the preliminary injunction must be denied.

180.    As set forth below, the evidence rebuts in numerous ways any prima facie case the FTC could make.

        a.    <u>Market Shares Are Not Indicative of Future Competition In This Market</u>

181.    The FTC's prima facie is rebutted first and foremost by the fact that current market shares (even if accurately calculated) are not indicative of future competition in this dynamic and

competitive industry. *See Nimbus Therapeutics*, 570 F. Supp. 3d at 125. There are several factors relevant to this analysis that apply here.

182.    *First*, market share concentration is most useful in markets where "market distribution systems and brand recognition are such significant factors that one may reasonably suppose that a company which has attracted a given number of sales will retain that competitive strength." *Gen. Dynamics*, 415 U.S. at 501. Where, however, a market is experiencing "changing market conditions," such change "can overcome a presumption of illegality established by market share statistics." *Baker Hughes*, 908 F.2d at 985–86. Analyzing effects in such a dynamic market "warrants more particularized consideration than courts accord under traditional economic analysis, to that extent counseling greater caution in judicial intervention." *Deutsche Telekom*, 439 F. Supp. at 241. The FTC's own expert recognizes this, observing in prior scholarly work that "[t]he usual steps in merger analysis—defining a relevant market, assessing potential unilateral and coordinated effects, and determining the likelihood of entry—may require confronting substantially more uncertainty in a fluid, innovation-driven industry."[396]

183.    Attention to changing market dynamics is particularly important where "novel business practices" are at issue. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020). That is in part because innovation in such markets "is essential to economic growth and social welfare," and therefore "an erroneous decision will deny large consumer benefits." Rachel S. Tennis & Alexander Baier Schwab, *Business Model Innovation and Antitrust Law*, 29 Yale J. Reg. 307, 319 (2012); *see also United States v. Syufy Enters.*, 712 F. Supp. 1386, 1397 (N.D. Cal. 1989) (observing that "[t]he advent of vast and rapid technological changes in the industry" required special consideration), *aff'd*, 903 F.2d 659 (9th Cir. 1990).

---

[396] DX2069, p. 2.

184.    Digital healthcare advertising is a dynamic and fast-moving industry.  FOF 15–22.  HCP programmatic advertising did not even exist ten years ago, and was still in its infancy when COVID-19 upended traditional business practices.  FOF 4.  Since then, the industry has grown explosively.  FOF 16–19.  Firms that already offer products and services for HCP programmatic advertising are responding with their own innovations, including new audience planning tools (███████), and more comprehensive data offerings (███████).[397]  Even the market presence of the merging parties is not stable:  Lasso has grown rapidly but remains heavily dependent on a single client (CMI) for approximately half of its revenue, while ██████████████████████ ████████████████████████████████████.[398]  And agencies are already working on ways to disintermediate and exclude DSPs altogether.  FOF 57–59.

185.    The FTC's expert opined that the ████████████████████████████████ ████████████████████████.  *See* FOF 23.  ████████████████████ ████████████████████████████████████████████████ ████████████████████, and expanding that dataset out even a couple of years (when Lasso was not even *in* the market) drastically changes the competitive picture.  FOF 16.  Where "[m]arket share statistics are 'volatile and shifting'"—and thus "easily skewed"—such statistics can be "misleading."  *Baker Hughes*, 908 F.2d at 986.

186.    The consequence of this evidence is that a static snapshot of market shares is not an accurate predictor of what the market will look like even just one year from now.  Defendants' experts explained the dynamism in the market, as evidenced by rapid entry, substantial investment, technological advancement, and changing customer needs.  FOF 15–22.  All of that was corroborated by numerous factual witnesses, including those called by the FTC.  FOF 15–22.  ██

---

[397] DX0076 (Israel Rep.) ¶ 240.
[398] *Id.* ¶ 237; *see also* ████████████ 87:9–12.

███████████████████████████████████████████████████

███ [399] The Trade Desk's mission ████████████████████████████

points up the error in the FTC's reliance on current market shares.  FOF 41.

187.     *Second*, evidence that a merging party is unlikely to "compete effectively in the future may serve to rebut a presumption that the merger would have anticompetitive effects," *Deutsche Telekom*, 439 F. Supp. 3d at 217.  This is not a "failing-company defense," but rather a recognition that historical market shares may not be indicative of the future success of a firm.  *Gen. Dynamics*, 415 U.S. at 507–08; *see also FTC v. Nat'l Tea Co.*, 603 F.2d 694, 700 (8th Cir. 1979) ("The prospective loss of [a merging party] from the relevant market if the merger is enjoined is a relevant factor in this comparison.").

188.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████.  FOF 29.  Indeed, DeepIntent's DTC services are one of the key reasons why IQVIA believes DeepIntent would complement Lasso's more HCP-focused advertising services.  FOF 29.  ████████████████████████

████████████████████████████████████████████

████████.  [400]  In light of ████████████████████ it is unlikely that the post-merger market share the FTC alleges will persist into 2024.

189.     *Third*, this predictive analysis must also account for whether there are substitutes for the merging firms' products such that prices are constrained.  *See CCC Holdings*, 605 F. Supp. 2d at 68; *see also H&R Block*, 833 F. Supp. 2d at 81 (same); *Oracle*, 331 F. Supp. 2d at 1117–18 (same).

---

[399] ███████████████████████████
[400] ████████████████████; *see also* ████████████████████; DX0078 (Hatzitaskos Reply Rep.) at 56, Exhibit R-3 (███████████████████████████████████████).

190.    Within this industry, DeepIntent and Lasso are hemmed in on all sides by competition—
by new and emerging DSPs, publishers, from social media websites, data providers offering
audience-building and measurement capabilities, and advertising agencies themselves.  *See* FOF
31–65.   Even if those firms are excluded from the FTC's market, they nonetheless exert
competitive pressure on those firms in the market.   For example, in *General Dynamics*, the
Supreme Court validated the district court's consideration of the fact that coal companies—the
relevant market—were "fac[ing] increasingly stiffer competition from oil and natural gas as
sources of energy for industrial and residential uses."  415 U.S. at 499.  The same is true here,
where firms like DeepIntent and Lasso face a wide range of "stiff[] competition" even from firms
beyond the FTC's narrow market.

191.    That competitive reality is confirmed by the fact that advertisers and agencies allocate
advertising dollars across a variety of channels based on ROI, and can easily shift between
channels if a particular channel becomes too costly.   FOF 61, 63–64.   All of these firms are
competing for the same advertising budget, and if the value proposition of a particular firm's
offering drops—including because a firm has raised prices or has stopped innovating—agencies
will not hesitate to reallocate.  FOF 61, 63–64.  In fact, developing technology from agencies that
internalizes the ad-buying process could give advertisers access to the exact same inventory as a
DSP, but with lower costs.  FOF 59.  This competition from outside the FTC's alleged market is
an independent constraint on pricing entirely ignored by the FTC's expert.

192.    *Fourth*, market concentration evidence is most probative when there is a "likelihood of
interdependent anticompetitive conduct," i.e., where the FTC alleges that post-merger firms are
likely to engage in collusive conduct.  *H.J. Heinz*, 246 F.3d at 715–716 (quotation marks omitted).
Where, however, the FTC's case is premised on the alleged "tendency of a horizontal merger to

lead to higher prices simply by virtue of the fact that the merger will eliminate direct competition between the two merging firms," "a strong presumption of anticompetitive effects based on market concentration is especially problematic." *Oracle*, 331 F. Supp. 2d at 1113, 1122; *see also FTC v. Lab. Corp. of Am.*, 2011 WL 3100372, at *19 (C.D. Cal. Mar. 11, 2011) (similar).

193.    Here, the FTC has not alleged that the merger is likely to lead to increased coordination among the remaining post-merger firms.  Nor could it, since the evidence shows that agencies solicit competitive bids from advertising platforms and have substantial negotiating power.  FOF 62.  Accordingly, evidence of market concentration is of limited probative value in this context.

194.    Importantly, the FTC never actually analyzes how brands and agencies would respond to a price increase.  But third-party witnesses, including from ██████████████████████████ ████████████████████████ testified that if the merged firm sought to raise prices, they would simply shift spending to other DSPs or advertising channels.  FOF 65.[401]  The dynamic and competitive nature of the alleged market thus rebuts any prima facie case the FTC could make out.

<h3 style="text-align:center">b.    <u>Ease of Entry</u></h3>

195.    Evidence that entry into the market is possible—whether for smaller companies or by larger, more sophisticated companies—is sufficient on its own to rebut a prima facie case.  *See Waste Mgmt.*, 743 F.2d at 983.  That is because "a market definition artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists."  *Id.* at 982.  "In the absence of significant barriers, a company probably cannot maintain supracompetitive pricing for any length of time."  *Baker Hughes*, 908 F.2d at 987.

196.    Even the *potential* for just one significant new entrant can "contribute substantially to

---

[401] ██████████ 27:3–9; ██████████ ¶¶ 14, 18; ██████████ ¶ 10; ██████████ ¶¶ 9–10; *see also* ██████████ 73:16–74:21; ██████████ ¶ 4.

rebutting [a plaintiff's] prima facie case." *Deutsche Telekom AG*, 439 F. Supp. 3d at 225–26 (relying in part on potential for entry by a single entrant to hold prima facie case rebutted). Ease of entry can be established by "examples in the record of [existing] entrepreneurs entering and prospering" in the market. *Waste Mgmt.*, 743 F.2d at 983.

197.   The Court must also consider whether other firms in adjacent product markets are likely to expand or reposition if prices in the relevant market increase. *CCC Holdings*, 605 F. Supp. 2d at 68; *see also H&R Block*, 833 F. Supp. 2d at 81 (same); *Oracle*, 331 F. Supp. 2d at 1117–18 (same).

198.   Here, there is no factual question that entry into (or expansion within) the FTC's alleged market is both possible and likely, and the starkest example of this is Lasso itself.  Lasso did not begin offering HCP programmatic advertising services until 2020.  FOF 16.  At that time, it had no endemic inventory and no on-platform measurement services.  FOF 45.  Yet just three years later, the FTC now claims Lasso is a market leader.  Lasso's revenues went from literally \$0 in 2019 to ███████ in 2023.  FOF 16.  Tellingly, the FTC's expert ████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████. FOF 23.

199.   Lasso's success story is alone reason to deny the preliminary injunction.  In *Baker Hughes*, the court observed that the target's own "growth"—going from a non-participant to a "market leader" in five years—"suggest[ed] that competitors not only can, but probably will, enter or expand if this acquisition leads to higher prices."  908 F.2d at 989.  Lasso's rapid ascent in roughly half that time is likewise persuasive evidence here.  In fact, even PulsePoint and DeepIntent—who each entered the market in 2018—qualify as new entrants under this standard, having allegedly obtained dominant market positions in just five years.  FOF 28, 33.

200.   The threat of entry or expansion is not hypothetical:  Dr. Hatzitaskos himself agrees that

there are no fewer than *eleven* other firms in the market.[402]  Leading the pack is The Trade Desk, a multi-billion-dollar company with an established dominance in programmatic advertising, including DTC.  FOF 39.  Even if the Court were to credit to testimony ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████.  FOF 41.  In fact, the FTC's expert ██████████████████████████ ████████████████████████████████████████████████"  FOF 49.

201.   Other firms are close behind.  AdTheorent, for example, is a generalist DSP that has shifted substantial focus toward HCP programmatic advertising and is growing by leaps and bounds.  FOF 44.  And like The Trade Desk, AdTheorent aspires to become "████████████████████████ ████████████████████████"  FOF 44.  Testimony from Throttle—████████████████ ████████████████████████████████████—confirmed the rapid growth in this industry.  FOF 18.  Other firms, including advertising agencies themselves, are developing new alternatives to DSPs for programmatic advertising.  FOF 59.

202.   Again, in *Baker Hughes*, the court noted that the recent entrance of "at least two companies" who were "poised for future expansion" was sufficient to rebut a prima facie case.  908 F.2d at 988–89.  The Ninth Circuit has observed that entry or expansion within two years is sufficiently imminent under the burden-shifting framework.  *See Syufy Enters.*, 903 F.2d at 666 n.11.  And while The Trade Desk's witness ██████████████████████████████████████, that is unsurprising and unpersuasive, as "potential competitors have a strong interest in downplaying any likelihood that they will enter a given market."  *Baker Hughes*, 908 F.2d at 988.

---

[402] P-HATZITASKOS-DEMO-4.

203.    In addition to firms that have already entered the market, the mere *threat* of further entry

or repositioning by others (including further expansion by current market participants) is itself a

competitive restraint.  *Waste Mgmt.*, 743 F.2d at 983.  It is legal error for a court to "fail[] to give

separate consideration to whether [a firm] was a potential competitor in the sense that it was so

positioned on the edge of the market that it exerted beneficial influence on competitive conditions

in that market."  *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–33 (1973).

204.    The evidence shows that firms like ███████ Yahoo, and Microsoft are already involved in

HCP programmatic advertising to varying degrees, FOF 37, 42–43, but even if they were not—or

even if they were on the "competitive fringe" of the market—the threat of entry or repositioning

by those firms is itself a price-disciplining force.  Indeed, in *United States v. Waste Management,*

*Inc.*, the Second Circuit reversed a merger injunction based on ease of entry even though there was

no evidence that *even a single firm* actually contemplated future entry—the mere *possibility* of

new entrants was alone sufficient.  743 F.2d 976, 983–84 (2d Cir. 1984).  The Court cannot credit

the FTC's theory that these established firms would not seek to seize a revenue opportunity if a

merged firm were to attempt to raise prices, and the FTC's own expert admitted ████████

████████████████████████████████████████.  FOF 49; *see also Baker*

*Hughes*, 908 F.2d at 987 (defendant need not "produce[] evidence regarding specific competitors

and their plans").

205.    Dr. Hatzitaskos urged ████████████████████████████████████████

████████████████████,[403] but that is contrary to law.  "The existence of an aggressive,

*well equipped* and *well financed* corporation engaged in the same or related lines of commerce

waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition

---

[403] ████████████████.

*which cannot be underestimated*."  *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 174

(1964) (emphases added); *see also Deutsche Telekom*, 439 F. Supp. 3d at 226 (observing that

potential entrant "has clearly been financially sound over the past decade").  Where, as here,

well-resourced firms pose even a threat of entry, that alone is sufficient to rebut a prima facie case.

206.    Finally, the FTC's expert referred to the Merger Guidelines' non-binding statement that

entry must be "███████████████████" in order to rebut a prima facie case.[404]  As Dr. Israel

clarified, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████.[405]  Moreover, "timely, likely, and sufficient" is not the law in the Second Circuit, as made

clear by *Waste Management*, which did not impose such a standard and in fact found that even the

*potential* for entry was sufficient.  743 F.2d at 983–84; *see also Baker Hughes*, 908 F.2d at 987

(rejecting "quick and effective" standard because "it would require of defendants a degree of

clairvoyance alien to section 7").

207.    In any event, though, there can be no serious question that entry here is timely, likely, and

sufficient.  Large generalist DSPs already have the capability to do HCP programmatic advertising,

and many of them are armed with substantial resources to build out any healthcare-specific

capabilities customers may request, and numerous firms are *already* entering the industry.  FOF

18, 37–45.  Professor Hochberg demonstrated that there has been and continues to be substantial

investment in this industry, FOF 20, establishing the likelihood of further entry.  And as for

sufficiency, this factor again is established by Dr. Hatzitaskos's concession ████████████████

████████████████████████████████████████████████████████████."  FOF 49.

---

[404] ████████████████████████.

[405] ████████████████████████.

208.    The Court cannot say at this juncture whether or which of these companies will be the next Lasso, building a competitive product and capturing market share in the span of a few years.  "At all times," courts "must remember that if we believe that markets generally work well when left alone, then intervention is justified only in the relatively few cases where the judiciary can fix the problem more reliably, more cheaply, or more quickly than the market can fix itself."  Herbert Hovenkamp, *The Antitrust Enterprise: Principle and Execution* vi, 368 (2005); *accord Syufy Enters.*, 903 F.2d at 663 ("[U]ltimately the court must resolve a practical question in every monopolization case: Is this the type of situation where market forces are likely to cure the perceived problem within a reasonable period of time?").  That maxim applies with full force here, where an injunction would risk unduly impairing IQVIA's ability to deliver maximum value for its customers even while other firms are poised to seize their share of the market.

### c.    Sophisticated and Powerful Customers

209.    The sophistication of a market's customer base can "significantly affect[] the probability that [an] acquisition would have anticompetitive effects," and the existence of a sophisticated customer base can "provide compelling support" for the conclusion that a transaction is "not likely to lessen competition substantially."  *Baker Hughes*, 908 F.2d at 984, 986.   Sophisticated customers, particularly those who receive "multiple, confidential bids for each order," do not suffer from the same "imperfect information and limited bargaining power" that small consumers do.  *Id.* at 986; *see also RAG-Stiftung*, 436 F. Supp. 3d at 321 (no anticompetitive effects where there was "aggressive competition for sophisticated customers").

210.    The Merger Guidelines recognize that "[p]owerful buyers are often able to negotiate favorable terms with their suppliers," and accordingly antitrust enforcers should "consider the possibility that powerful buyers may constrain the ability of the merging parties to raise prices."  Horizontal Merger Guidelines § 8.  This is especially true where "powerful buyers have the ability

and incentive to vertically integrate upstream or sponsor entry." *Id.*; *see also* Dennis Carlton & Mark Israel, *Proper Treatment of Buyer Power in Merger Review*, 39 Rev. Indus. Org. 127, 133 (2011) (similar).

211.    Here, the evidence firmly establishes that the customers of programmatic advertising platforms—including healthcare companies and advertising agencies—are sophisticated customers with extensive knowledge and experience in the industry. *See* FOF 62.  Those customers have substantial pricing power in negotiations with advertising platforms and testified that they would expect to negotiate rigorously on price regardless of how many DSPs were offering HCP programmatic advertising services.  FOF 62, 65.  The fact that Lasso itself depends on a single agency (CMI) for half of its revenue (and half the market share the FTC attributes to it) further demonstrates the enormous power buyers have.  Moreover, advertisers and agencies are increasingly moving toward vertical integration, including by bypassing DSPs altogether and purchasing advertising inventory through ad exchanges.  FOF 59.  There is no indication the FTC analyzed any of this evidence, all of which confirms that even a hypothetical monopolist DSP could not raise prices without accounting for the buying power of agencies and advertisers.

d.    Efficiencies

212.    Any presumption is also rebutted by the efficiencies that will result from the transaction. Efficiencies are cognizable under Section 7 so long as they are both "merger-specific and verifiable." *Deutsche Telekom AG*, 439 F. Supp. 3d at 208.  "Even where evidence of efficiencies in the relevant market will not support an outright defense . . . , such evidence is relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition." *Arch Coal*, 329 F. Supp. 2d at 151.

213.    Courts have credited efficiency claims that are substantiated by "analogous past experience" and "could follow the same basic organizational structure and strategy" of past

integrations.  *Deutsche Telekom AG*, 439 F. Supp. 3d at 216–17 (observing that a firm "has already overdelivered on its projected efficiencies in an analogous past merger").  Even so, courts do not demand quantitatively precise and predictive efficiencies.  *Id.* at 216 (recognizing the Supreme Court has noted the predictive exercises demanded by Section 7 are not "susceptible of a ready and precise answer in most cases.").  "To expect otherwise in [a] dynamic and rapidly changing [market] is to invite almost certain disappointment.  Section 7 calls for '[a] predictive judgment, necessarily probabilistic and judgmental rather than demonstrable.'"  *Id.* (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)).

214.    Here, IQVIA anticipates several efficiencies from the merger that the FTC overlooks or erroneously discounts.

215.    *First*, the merger will reduce costs for the merged firm.  *See Deutsche Telekom AG*, 439 F. Supp. 2d at 210 (savings of "operational expenditures" cognizable as an efficiency).  As explained above, Lasso is not a DSP, and instead pays Xandr to provide DSP functionalities.  Combining Lasso's omnichannel advertising platform with DeepIntent's DSP technology would reduce the need for that licensing arrangement and save costs, which could be passed on to customers.  FOF 28; *Long Island Jewish Med. Ctr.*, 983 F. Supp. at 149 (finding evidence that "cost savings would ultimately enure to the benefit of the consumers"); *Microsoft*, 2023 WL 4443412, at *19 (expanded access to merged firm's content would "lower costs for many game consumers").  Additionally, DeepIntent pays fees to license data, which could be lessened or eliminated post-merger.  FOF 28.  Taking into account both of these savings, prices for the combined firm ███████████████[406]

216.    *Second*, the merger would expand the combined firm's capabilities, benefitting customers.  IQVIA's customers act to optimize their campaigns; as such, the merged firm will be able to

---

[406] ██████████████ ¶ 393.

provide a "suite" of services that competes with existing players and helps clients execute more efficient campaigns. FOF 29. Past evidence shows that this efficiency is likely to materialize—since acquiring DMD and MDG, IQVIA has made those firms' identity data more widely available, expanding by several fold the HCP programmatic advertising platforms on which that identity data is available, including its direct competitors like The Trade Desk. FOF 85.

217.    IQVIA's mission is to compete with larger firms (including Google and The Trade Desk) by improving the quality and efficiency of healthcare advertising, and the merger would help IQVIA do so by combining Lasso's omnichannel marketing platform with DeepIntent's DTC capabilities and DSP technology. FOF 28–29. Documents presented to IQVIA's Board of Directors in connection with the transaction confirm this goal. FOF 25–27. The transaction will help IQVIA compete on a more level field.

218.    *Third*, by enhancing IQVIA's ability to offer better and lower-cost services to brands and agencies, and the ability to reach both consumers and their HCPs, the merger would further IQVIA's objective of enhancing patient care and producing better health outcomes for consumers who can more easily and affordably find relevant information about a needed medication or medical device. FOF 30. By providing better and more efficient advertising, advertisers can synchronize information to patients and HCPs, driving better patient outcomes. FOF 30.

### 3.    The FTC Has Not Shown a Likelihood of Carrying Its Ultimate Burden of Persuasion

219.    The rebuttal burden is only a burden of "production"; the burden of persuasion remains with the FTC "at all times." *Deutsche Telekom*, 439 F. Supp. 3d at 199 (alteration omitted); *see also Baker Hughes*, 908 F.2d at 991. Defendants have plainly carried their burden, putting the burden back on the FTC to persuade the Court that it is likely to succeed on the merits in proving that the transaction may substantially lessen competition. The FTC has not carried that burden.

220.    Despite asserting in its opening statement that the transaction is likely to result in higher prices or reduced innovation,[407] the FTC failed to offer "real-world evidence that the specific merger under review is likely to substantially lessen competition."  *United States v. UnitedHealth Grp. Int'l*, 630 F. Supp. 3d 118, 129 (D.D.C. 2022); *see also Deutsche Telekom*, 439 F. Supp. 3d at 245 (anticompetitive results "are not self-executing outcomes spontaneously set in motion upon the creation of a presumed level of market concentration").  As set forth above, Dr. Hatzitaskos's analysis of post-merger prices is unreliable and, when corrected, actually shows that the transaction is likely to result in *lower* prices.  The FTC's arguments for reduced innovation are unsupported by evidence and in fact are contradicted by the unrebutted testimony that the transaction will generate efficiencies in the form of better services and improved patient outcomes.  A few competitors testified about general "concerns" arising from the transaction, but the antitrust laws were "enacted for the protection of *competition*, not *competitors*."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (quotation marks omitted).

221.    Instead, the FTC's case was premised almost entirely on alleged concentration in an arbitrarily narrow market and the FTC's apparent contention that consolidation is bad.  That is wrong as a matter of law, and it is not borne out by the facts.  The FTC has not shown a likelihood of success on its horizontal theory.

### B.    The FTC Has Not Established a Likelihood of Success Under Its Vertical Theory

222.    The FTC has never once obtained a Section 13(b) preliminary injunction on a vertical merger theory.  This case will not be the first.

223.    It is well recognized that "[v]ertical mergers often generate efficiencies and other procompetitive effects."  *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018),

---

[407] TT 3:23–4:5 (FTC).

*aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *see also Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("[V]ertical integration creates efficiencies for consumers."). "Indeed, respected scholars question the anticompetitive effects of vertical mergers in general." *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987).

224.    Unlike a horizontal theory—under which the FTC can establish a prima facie case through reference to market concentration—"there are no precise formulas for determining whether a vertical merger may probably lessen competition." *Fruehauf Corp. v. FTC*, 603 F.2d 345, 353 (2d Cir. 1979); *see also UnitedHealth*, 630 F. Supp. 3d at 141 (the FTC must make "a fact-specific showing as to the proposed merger's likely effect on competition" (quotation marks omitted)). Accordingly, "[i]n vertical merger cases, the government cannot use 'statistics about the change in market concentration' as a 'short cut' to trigger a presumption of harm." Chamber Amicus Br. 10 (quoting *United States v. AT&T*, 916 F.3d 1029, 1032 (D.C. Cir. 2019)).

225.    Instead, the FTC must satisfy "its burden of proof of establishing, through case-specific evidence, that the merger . . . is likely to substantially lessen competition in the manner it predicts." *AT&T*, 310 F. Supp. 3d at 194.  These are independent elements:  The FTC must show *both* that (1) IQVIA is likely to engage in foreclosure *and* (2) that such foreclosure "would be likely to *substantially* lessen competition in the relevant market." *UnitedHealth*, 630 F. Supp. 3d at 152. "[A]ntitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future." *Arch Coal.*, 329 F. Supp. 2d at 116–17.[408]

---

[408] The law is unsettled as to whether the three-part burden shifting approach used for horizontal mergers applies also to vertical mergers, but this debate is "somewhat academic," because the "ultimate burden of proving a Section 7 violation rests with the plaintiff." *AT&T*, 310 F. Supp. 3d at 191 n.17 (quotation marks omitted).

226.     The FTC's vertical theory is based on its speculation that IQVIA might withhold some unspecified subsets of its healthcare data from other DSPs in order to coerce clients into using Lasso and/or DeepIntent.[409]   The FTC has not substantiated this theory with evidence.

### 1.     The FTC Has Not Shown That IQVIA Is Likely to Engage in Foreclosure

227.     The FTC has failed to make a "fact-specific" showing that IQVIA is likely to engage in the kind of foreclosure speculated by the FTC.

#### a.     The FTC Misstates the Controlling Legal Framework

228.     The FTC urges that the relevant test is only whether IQVIA will have the "incentive" and "ability" to engage in foreclosure, but that is an incomplete articulation of the standard.  The case the FTC cites (PI Mot. 41) did not hold that mere ability and incentive were sufficient, instead ruling against the DOJ because it had not proven the *factual* predicate for the theory.  *See AT&T*, 310 F. Supp. 3d at 243–46.

229.     Controlling Second Circuit precedent clearly holds that a vertical merger may not be condemned as anticompetitive merely because of the *potential* for foreclosure.  In *Fruehauf*, the Second Circuit agreed with the FTC that foreclosure was "possible," 603 F.2d at 355, but nevertheless rejected this theory due to the lack of "appreciable evidentiary support," *id.* at 354. The Court pointed out that (1) there was no evidence that the acquiring company "contemplated such a stratagem when it entered the merger," (2) during past product shortages, the upstream company had "allocated its production pro rata among its customers," and (3) the "risk" of "retaliati[on]" in the event of preferencing and the ensuing "economic harm" made foreclosure unlikely.  *Id.* at 354–55.  These same factors all cut against the FTC here.

---

[409] ███████████████ .

230.    *First*, there is no evidence that IQVIA has ever contemplated withholding data from rival DSPs or their customers.  IQVIA already competes with other companies providing services to pharmaceutical brands in a variety of spaces, including HCP programmatic advertising, yet the FTC offers no evidence that IQVIA leadership has ever even contemplated withholding data from brands that work with those competitors.  FOF 85.  Multiple IQVIA witnesses credibly testified under oath that they had no intention of engaging in the FTC's speculated foreclosure.  FOF 85, 88; *see also Microsoft*, 2023 WL 4443412, at *13 (crediting testimony that merging party would not foreclose competition); *Deutsche Telekom*, 439 F. Supp. 3d at 245 (similar).  ████████

████████████████████████████████████

████████████████████████.[410]

231.    In light of the turmoil caused by the FTC's public speculations regarding IQVIA's intentions, IQVIA recently reached out to a number of DSP partners—including many who already have longstanding relationships with IQVIA—and offered long-term contracts for the provision of various data offerings.  FOF 86.  Courts have relied upon these kinds of long-term, irrevocable offers to rebut allegations of post-merger foreclosure.  *See, e.g.*, *Microsoft*, 2023 WL 4443412, at *15; *AT&T*, 916 F.3d at 1041.  Likewise, here IQVIA's contractual commitments to the continued availability of its data not only show that IQVIA has no intentions of foreclosure, but also rebut any claim that IQVIA would have the "ability" to foreclose post-merger.  *See infra* pp. __.  These are on top of the many contractual commitments IQVIA has with its data licensees.

232.    The FTC's reference to pre-merger documents at DeepIntent and DMD regarding the possibility of making their relationship exclusive is not persuasive.  None of those proposals were

---

[410] ████████████████████████; *see also, e.g.*, IQVIA, *Environmental, Social and Governance Report* 22–25 (2022), https://perma.cc/3XRA-6B8M; IQVIA, *IQVIA Code of Conduct* 12–13 (2023), https://perma.cc/RUB2-EYBB.

suggested by *IQVIA* or advanced by individuals who now or will have final decisionmaking power at IQVIA, and courts have repeatedly rejected "predictions that were generated by individuals who had no decision-making role or authority in relation to the merger."  *AT&T*, 310 F. Supp. 3d at 209 (quotation marks omitted); *see also H&R Block*, 833 F. Supp. 2d at 77 n.30 (declining to rely on evidence from "a data analyst who had no decision-making role or authority in relation to the merger" and whose comments on the merger were "informal speculation").  Moreover, none of those proposals came to fruition or have been endorsed by IQVIA, and the evidence shows that such foreclosure would not succeed in any event.  FOF 88–91.

233.    *Second*, IQVIA's historical conduct undermines any speculation about future foreclosure. Since it entered the digital advertising space, IQVIA has actively sought to increase the availability of its data offerings, including by building connections with numerous competing DSPs to supply audiences.  FOF 85.  There is no evidence that since IQVIA's acquisition of Lasso—during which it presumably would have the same foreclosure incentive as the FTC posits it will after this transaction—IQVIA has in any way changed its behavior to disadvantage competing DSPs or advertising platforms.  FOF 85.  Just the opposite:  IQVIA is currently partnering with The Trade Desk to *enhance* that firm's HCP programmatic advertising capabilities.  FOF 85.

234.    *Third*, withholding its data from customers of rival DSPs would be affirmatively harmful to IQVIA's overall business.  It would make no economic sense for IQVIA to jeopardize its overall business relationships with healthcare companies in order to gain a hypothetical advantage in the nascent digital advertising business.  FOF 88–89.

235.    Accordingly, under the Second Circuit's established framework for a vertical foreclosure theory, the FTC's case fails.

> b.    <u>The FTC Has Not Established Ability or Incentive to Foreclose</u>

236.    In any event, the FTC has established neither "ability" nor "incentive" for IQVIA to foreclose a substantial amount of competition by withholding its data for competitive purposes.

237.    *First*, IQVIA will have no ability to foreclose competition by withholding its data.  At the outset, the FTC has never articulated exactly what "data" it contends IQVIA will withhold. Ordinarily, cases at this stage are focused on the foreclosure of a specific and identifiable product. *See, e.g.*, *Fruehauf*, 603 F.2d at 347–48 ("heavy duty wheels"); *Microsoft*, 2023 WL 4443412, at *1 ("*Call of Duty*" video game).  That is not the situation here.  IQVIA provides a host of other data offerings that are not used for HCP programmatic advertising (which comprises a tiny percentage of its business).  FOF 24.  Various witnesses testified broadly to using IQVIA "data" in connection with their own products or services, but few of them explained to what data they were referring.  The Court thus cannot even assess the extent of IQVIA's ability to foreclose "data," because it does not know what data is supposedly being withheld.

238.    The opacity of the FTC's vertical theory may in part be a consequence of the substantial evidence contradicting it.  The FTC cannot prove that IQVIA could foreclose competition by refusing to license its data *directly* to competing DSPs, because PulsePoint has thrived even without such licenses.  FOF 74.  Nor can the FTC prove that IQVIA will have any ability to foreclose data used for measurement, because ███████████████████████████████████ ███████████ .  FOF 74.  What that leaves the FTC with is its theory that IQVIA could harm competing DSPs by refusing to execute Third-Party Access ("TPA") agreements with healthcare companies that build audiences using (unspecified) IQVIA data to allow those companies to upload their audiences to competing DSPs.[411]

---

[411] TT 9:3–9 (FTC) (describing TPA as the "mechanism" of foreclosure).

239.    The TPA program is a standard practice—similar to that used by virtually every data provider in the industry, *see* FOF 80—that allows licensees of IQVIA's data (typically, brands) to share that licensed data with third parties (including many competitors to IQVIA) for certain purposes and for a specified time in accordance.  FOF 80.  Between January 2018 and September 2023, IQVIA granted ███████████████████ TPA license requests received globally through the TPA portal.  FOF 82.  ████████████████████████████████████████████ ██████████████████████.  FOF 82.  That is partly because part of the value of IQVIA's data comes in brands' ability to use that data broadly, expanding client choice.  FOF 85.  Moreover, ████████████████████████████████████████████████████████████ ███████████████████████████.  FOF 81.

240.    Even if IQVIA could *try* to use the TPA program to foreclose competition, however, the evidence shows that there are many alternative data providers customers could turn to instead. FOF 70–71.  The FTC does not dispute that there are other such providers, but argues that IQVIA data are uniquely valuable and cannot be replaced by other, supposedly substandard products.  Yet numerous firms (including sophisticated healthcare companies and agencies) in fact *do use* the very data providers the FTC contends could not be adequate substitutes.  FOF 72–74.  And those other data providers uniformly testified that they believed their data products are strong and that they would be happy to supply customers with data if IQVIA cut them off.  FOF 72.

241.    IQVIA's data is good—because IQVIA has invested in it and works hard to keep it competitive in a dynamic environment—but IQVIA's "[s]uccess is not illegal."  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 922 (N.D. Cal. 2021), *partially rev'd on other grounds*, 67 F.4th 946 (9th Cir. 2023).  The fact that some customers may prefer IQVIA's data does not mean its products could be used as a tool of foreclosure.  That is especially true because as noted above,

IQVIA is not the *source* of any healthcare data—it *organizes* and *curates* data from upstream sources, and competes with many others in that respect. FOF 67–69. IQVIA thus has no control over a "bottleneck" that would oblige it to make its data widely available to competitors, *see Aerotec*, 836 F.3d at 1185, although it has in fact done so as a matter of prudent business.

242. *Second*, IQVIA has no incentive to withhold its data from any DSPs. As set forth above, it would be economically irrational for IQVIA to withhold data from its clients in the hope of obtaining an incremental competitive advantage in a business segment that accounts for ████████ ████████. FOF 24, 88–89. Indeed, ████████████████████████████████████ ████████████████ confirms that any conceivable economic advantage to foreclosure would be slight, while presenting substantial risk to IQVIA of disrupting client relationships that span multiple segments of IQVIA's business. FOF 88-89; *see* Chamber Amicus Br. 6 ("[M]erging firms are aware of 'financial and reputational costs' should they attempt to manipulate the market by using any advantages gained from vertical integration.").

243. The FTC's expert offered an economic analysis of IQVIA's supposed incentive to foreclose data post-merger, but that analysis rested on the assumption that ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████. FOF 113. He offered no factual basis for any of his assumptions, all of which are contrary to the record evidence.

244. The evidentiary hearing established that part of IQVIA's core strategy for years has been to make its data offerings ubiquitous within the healthcare industry. FOF 85. Well before the FTC's investigation, IQVIA promoted and continues to promote widespread (not restricted) use of its data for its digital advertising business—through its "Data Everywhere" mission—thus seeking to do the exact *opposite* of what the FTC claims IQVIA will do post-merger. FOF 85.

The TPA program is designed only for the protection of IQVIA's intellectual property, and not for obtaining a competitive edge. FOF 81. There is no business, economic, or commercial motivation within IQVIA to engage in the kind of foreclosure the FTC speculates.

245.    A number of witnesses—many of whom are competitors of IQVIA—aired ██████ ███████████████████████████████████████████████████████████ FOF 92. At the outset, competitor testimony in "a vertical merger case where, as here, upstream customers are downstream competitors" presents "a threat that such testimony reflects self-interest rather than genuine concerns about harm to competition." *AT&T*, 310 F. Supp. 3d at 211. Moreover, this testimony consisted uniformly of "speculative concerns regarding how the witnesses thought" IQVIA might act following the merger, "without any supporting analysis or data." *Id.* at 212. Vague statements that consolidation may reduce competition are "little more than [] truism[s] of economics." *Arch Coal*, 329 F. Supp. 2d at 146.

246.    Separate from the FTC's theory of foreclosure, some competitors of IQVIA testified that following the transaction, IQVIA may cease *buying* data from them or may increase its market share. *See* FOF 92. Neither of those complaints, however, raises concerns under the antitrust laws, which were "enacted for the protection of *competition*, not *competitors*." *Atl. Richfield*, 495 U.S. at 338. Accordingly, these "concerns raised by the third-party competitors were not particularly germane to the [FTC's] Section 7 allegations in this case" and are thus "not especially probative" of the FTC's actual theory. *AT&T*, 310 F. Supp. 3d at 214.

### 2.    The FTC Has Not Established That Any Foreclosure Would Substantially Lessen Competition

247.    Even if, as the FTC speculates, IQVIA altered its business practice and began serially denying TPAs for HCP programmatic advertising campaigns not run on IQVIA's platform, and even if, contrary to the evidence, the customers seeking those TPAs would have no alternatives

for data, the FTC's case would still fail because it has not shown that such foreclosure would "substantially lessen competition."

248.    PulsePoint— ███████████████████████████████████████████████████████████

███████████████████████████████████████. Yet in its *entire* four-and-a-half year history, ███████████████████████████████████████████████. FOF 82.

Thus, ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

249.    Moreover, the evidence shows that under Dr. Hatzitaskos's own methodology, ████████████

████████████████████████████████████████████████. FOF __.

Thus, even if IQVIA foreclosed every other DSP from its data, and even if every customer seeking to use IQVIA on those other DSPs migrated to the merged firm (neither of which is supported by the evidence), ████████████████████████████████████. Even that extreme scenario does not suggest anything beyond a "borderline percentage" of foreclosure insufficient under the Clayton Act. *FTC v. Tenneco, Inc.*, 433 F. Supp. 105, 114 n.21 (D.D.C. 1977).

\* \* \*

250.    At bottom, the FTC's vertical theory is premised on speculation and supposition. There is no actual *evidence* that IQVIA could or would foreclose competition post-merger, nor any *evidence* that doing so would substantially lessen competition. All the FTC has mustered are vague "concerns" from market competitors, not one of whom testified that they expected prices would increase or innovation would decrease. The FTC's vertical theory fails several times over.

### III.   THE EQUITIES WEIGH AGAINST A PRELIMINARY INJUNCTION

251.    Section 13(b) requires the reviewing court to consider "the equities" in assessing whether to issue preliminary injunctive relief.  *See* 15 U.S.C. § 53(b).  The kinds of equities that may be considered "[are] not qualified" by the statute.  *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981); *see also FTC v. Nat'l Tea Co.*, 603 F.2d 694, 697 n.4 (8th Cir. 1979) (courts may consider both public and private equities).  If the FTC has not shown a likelihood of success on the merits, "the Court need not proceed to the balance of equities question" and may deny the preliminary injunction.  *Microsoft*, 2023 WL 4443412, at *21; *see also FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 44 (D.D.C. 1998) ("Where the FTC has not established a likelihood of success on the merits, the Court cannot rely on the equities alone to justify the issuance of a preliminary injunction.").

252.    The equities favor denying injunctive relief here.  It has become apparent that the FTC did not conduct a thorough investigation before proceeding with this litigation.  The FTC obtained almost no documents from third parties in its investigation and undertook no discovery from social media platforms.  It has maintained all along that established firms like ███ are outside of the market, but third-party testimony has now proven that assumption incorrect.  FOF 37, 42–43.  The FTC offered a haphazard account of market shares in its motion for temporary restraining order that it has now abandoned and no longer seeks to defend.[412]   And it has fundamentally misunderstood numerous aspects of the digital healthcare advertising industry.

253.    The merger would allow IQVIA to offer lower-priced and better alternatives to customers, benefiting HCPs and patients by making healthcare advertising more efficient and more

---

[412] *Compare* Compl. ¶ 62 (identifying three other "market participants" outside of PulsePoint, DeepIntent, and Lasso), *with* DX0041 (Syms Dep.) 23:5–25:5 (explaining "instructions given to [him] by counsel was to add five fringe players to make up for other players that might be in the market").

cost-effective.   Contrary to the FTC's unsupported speculation, the merger will be competition-enhancing.  The FTC's contrary narrative is based on complaints by a few competitors of Lasso and DeepIntent; brands and agencies have overwhelmingly spoken out in favor of the merger.[413]  Meanwhile, the FTC has failed to adequately articulate, let alone prove, what specific products or prices within the broad HCP programmatic advertising industry it even believes will be affected or what data it fears IQVIA will withhold.

254.   The only equitable consideration the FTC has identified is the possibility that the transaction could be difficult to unwind if it were allowed to go through now but later found to be anticompetitive.  PI Mot. 50.  But the FTC has offered no evidence to support this contention, and IQVIA presented testimony to the contrary.  IQVIA's President of U.S. and Canada Operations testified that integrating DeepIntent would be involved and would "take[] time to work through."[414]  He further explained that it would *not* be difficult to unwind the transaction if necessary, pointing to a relatively recent IQVIA divestiture that took place *five years* after the acquisition.[415]  The FTC offered no response, and in fact, did not appear to put in any evidence on the equities whatsoever.  *See Microsoft*, 2023 WL 4443412, at *22 ("What exactly about the merger would make it difficult to order an effective divestiture?  The FTC does not say.").

255.   In similar circumstances, courts have repeatedly noted the practical harms that arise when a merger is enjoined.  "If the court issues a preliminary injunction . . . [the parties] will abandon the transaction rather than undergo an administrative proceeding, and any cost savings and output enhancements that the transactions will create will be lost."  *Arch Coal*, 329 F. Supp. 2d at 160; *see also CCC Holdings*, 605 F. Supp. 2d at 75–76 ("[C]redible evidence that the merged company

---

[413] ██████████████ ¶¶ 3–6; ████████████████████ ¶¶ 9–10; ████████████████ ¶¶ 9–10.
[414] TT 1232:10–24 (Resnick).
[415] TT 1232:25–1233:12 (Resnick).

will lower consumer prices . . . might outweigh the FTC's likelihood of success on the merits."). The loss of the procompetitive benefits that will flow from the transaction is a public equity entitled to great weight in balancing the equities.

256.   Litigation counsel for the FTC has maintained that the administrative challenge to the transaction will go forward even if the PI is denied.[416]   That is a matter for the FTC—not this Court—to decide.  *See* 16 C.F.R. § 3.26.  Conversely, litigation counsel for IQVIA represented that if the PI is granted, the transaction will die on the vine.[417]   In that scenario, customers will lose out on the efficiencies generated by the merger, and HCPs and patients alike will be deprived of more accurate, higher-quality advertising.  Where, as here, "the harm to defendants is great and there is little likelihood that consummation of the merger would jeopardize ultimate relief, the court clearly may deny injunctive relief."  *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980).

257.   The equities weigh decidedly against the FTC's proposed relief.

## CONCLUSION

258.   The FTC's motion for a preliminary injunction is denied.

Dated: December 7, 2023
        Washington, DC

WEIL, GOTSHAL & MANGES LLP

 /s/ *Chantale Fiebig*
Chantale Fiebig
Mark A. Perry (*pro hac vice*)
Andrew S. Tulumello (*pro hac vice*)
Mike Moiseyev (*pro hac vice*)
Joshua M. Wesneski
Luke M. Sullivan (*pro hac vice*)
Daniel J. Nadratowski (*pro hac vice*)
Joe Ehrenkrantz
Christina Swiatowy
2001 M Street NW, Suite 600
Washington, DC 20036
Tel:  (202) 682-7000

---

[416] TT 6:8–11; 947:1–4 (FTC).
[417] TT 49:17–22 (IQVIA).

chantale.fiebig@weil.com

Elizabeth Ryan (*pro hac vice*)
200 Crescent Court
Dallas, TX 75201
Tel: (214) 746-7777
liz.ryan@weil.com

Bambo Obaro (*pro hac vice*)
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3083
bambo.obaro@weil.com

Camilla Brandfield-Harvey
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8109
camilla.brandfield-harvey@weil.com

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Kenneth Reinker
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Tel:  (202) 974-1500
kreinker@cgsh.com

Rahul Mukhi
One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000
rmukhi@cgsh.com

*Attorneys for Defendant IQVIA Holdings Inc.*

MORRISON & FOERSTER LLP

/s/ *Alexander P. Okuliar*
Alexander P. Okuliar (*pro hac vice*)
David J. Shaw (*pro hac vice*)
Alexa R. DiCunzolo (*pro hac vice*)
2100 L Street, NW, Suite 900
Washington, DC 20037
Tel: (202) 887-1500
aokuliar@mofo.com

101

Michael B. Miller
Mika M. Fitzgerald
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
mfitzgerald@mofo.com

*Attorneys for Defendant Propel Media, Inc.*