## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

                Plaintiff,

        v.

IQVIA HOLDINGS INC.,

and

PROPEL MEDIA, INC.

                Defendants.

Case No. 1:23-cv-06188-ER

**PUBLIC**

## <u>PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ....................................................................... 1

    A.  Summary ........................................................................................... 1

    B.  Questions and Answers ..................................................................... 2

II.    THE PROPOSED ACQUISITON ...........................................................7

III.   THE RELEVANT PRODUCT MARKET IS HCP PROGRAMATTIC
    ADVERTISING............................................................................................ 9

    A.  *Brown Shoe* Indicia Establish a Distinct HCP Programmatic Advertising
        Market………......................................................................................... 13

        1.  HCP Programmatic Advertising has Distinct Characteristics........................ 13

        2.  The Industry Recognizes HCP Programmatic Advertising is Distinct .......... 15

        3.  HCP Programmatic Advertising Pricing is Distinct....................................... 16

        4.  HCP Programmatic Advertising Serves Distinct Customers ......................... 17

        5.  HCP Programmatic Advertising is Performed by Specialized Vendors ........ 17

    B.  Other Forms of Digital Marketing Are Not Reasonably Interchangeable with HCP
        Programmatic Advertising .................................................................... 18

        1.  Social Media is Not Reasonably Interchangeable............................................ 18

        2.  Advertising Direct with Publishers is not Reasonably Interchangeable with
           HCP Programmatic Advertising.................................................................... 21

        3.  Advertising on Search Engines is not Reasonably Interchangeable with HCP
           Programmatic Advertising ............................................................................ 22

    C.  HCP Programmatic Advertising as a Market Satisfies the Hypothetical Monopolist
        Test ("HMT")........................................................................................ 22

        1.  Experts Agree that Product Market Definition Should Focus on Material
           Substitution.................................................................................................... 22

        2.  Experts Agree that the HMT Is the Standard Economic Tool to Define a
           Relevant Market and that Existence of a Broader Market Does Not Disprove a
           NarrowerMarket on .................................................................................... 223

        3.  HCP Programmatic Advertising Satisfies the HMT ..................................... 24

        4.  Dr. Hatzitaskos Considered Cross-Price Elasticity of Demand in Applying the
           HMT……………..………………………………………………..……...25

IV.   THE RELEVANT GEOGRAPHIC MARKET IS WORLDWIDE ........................ 26

V.    MARKET STRUCTURE AND CONCENTRATION............................................ 26

    A.  Defendants and Other Market Participants Confirmed that the HCP Programmatic
        Advertising Market Is Dominated by Three Providers: Lasso, DeepIntent, and
        PulsePoint .......................................................................................... 26

i

1. Defendants and their Competitors Confirmed the Big Three are the Primary Providers of HCP Programmatic Advertising ............................................... 27

2. Customers Mainly Use the Big Three for HCP Programmatic Advertising .. 29

3. Both Plaintiff's and Defendants' Economic Experts Identify the Same Big Three Providers of HCP Programmatic Advertising and a Competitive Fringe ........................................................................................... 31

4. The Remaining HCP Programmatic Advertising Providers (the "Fringe") Have Substantially Smaller Presences and May Lack Key Capabilities ............... 31

5. Other Firms Identified by Defendants Do Not Actually Provide HCP Programmatic Advertising Services ............................................................... 36

B. The Proposed Acquisition Results in Presumptively Illegal Market Shares and Concentration Levels ...................................................................................... 38

1. The Acquisition Will Result in Presumptively Anticompetitive Market Shares and a Significant Increase in Market Concentration in an Already Concentrated Market ............................................................................................... 39

2. Market Structure and Concentration Remains the Same Even if Social Media Were Included in the Relevant Product Market. ........................................... 40

3. Ordinary Course Evidence Regarding High Post-Acquisition Shares ........... 40

VI. THE PROPOSED ACQUISITION WILL SUBSTANTIALLY LESSEN COMPETITION BY ELIMINATING SUBSTANTIAL HEAD-TO-HEAD COMPETITION ...................................................................................... 41

A. Defendants' Evidence that Lasso and DeepIntent are Close and Significant Competitors ....................................................................................... 41

B. Evidence from Customers that Lasso and DeepIntent are Close and Significant Competitors ....................................................................................... 45

C. Evidence from Other Market Participants that Lasso and DeepIntent are Close and Direct Competitors ........................................................................... 46

D. Defendants Compete Head-to-Head on Price ........................................... 47

E. Defendants Compete to Best Each Other on Innovation ....................................... 49

F. Dr. Hatzitaskos's Quantitative Analysis Confirms Substantial Head-to-Head Competition Between DeepIntent and Lasso and that Eliminating Such Competition Will Increase Prices ........................................................ 51

VII. THE PROPOSED ACQUISITION WILL SUBSTANTIALLY LESSEN COMPETITION BECAUSE IQVIA IS A DOMINANT PROVIDER OF KEY INPUTS TO HCP PROGRAMMATIC ADVERTISING…..…………..……………………………………...……………52

A. IQVIA is a Dominant Healthcare Data Provider Used by Nearly Every Pharmaceutical Company ...................................................................... 52

1. IQVIA is the Dominant Provider of HCP Identity and Prescribing Data for Programmatic Advertising ............................................................ 53

2.   No Other Data Competitors are Sufficient Data Alternatives to IQVIA for HCP Programmatic Advertising ................................................................. 54

3.   Nearly Every Would-Be Competitor to DeepIntent and Lasso Has Testified that they Need IQVIA's Data to compete in HCP Programmatic Advertising.... 56

B.   The Proposed Acquisition is Unlawful Under the Brown Shoe Vertical Merger Framework……………………..…………………………………………...56

1.   The Share of Market Foreclosure ................................................................. 56

2.   IQVIA's Serial Acquisitions Perpetuate a Trend Towards Vertical Integration… ................................................................................................. 57

3.   The Economic Purpose of the Acquisition is to Entrench IQVIA's Power in Healthcare Programmatic Advertising ......................................................... 58

4.   The Proposed Acquisition Increases of Barriers to Entry ............................. 58

5.   The Degree of Market Power Possessed by the Merged Firm Raises the Risk that HCP Programmatic Advertising will Cease to be Competitive ............. 60

C.   Post-acquisition IQVIA will have the Ability and Incentive to Foreclose or Disadvantage its Competitors in HCP Programmatic Advertising ....................... 60

1.   This Acquisition Increases IQVIA's Incentives to Foreclose its Rivals ........ 60

2.   IQVIA Has the Ability to Foreclose Rivals by Withholding or Delaying Access to TPAS……..………………………..……………………………………….61

3.   IQVIA Has the Ability to Disadvantage its Rivals Through its Pricing ........ 63

4.   IQVIA Could Eliminate Customer Choice By Replacing its Data Competitors or Using Its Market Position to Disadvantage Rivals ................................... 64

VIII. DEFENDANTS CANNOT REBUT THE PRESUMPTION OF ILLEGALITY OR *PRIMA FACIE* SHOWING OF LIKELY COMPETITIVE HARM ....................... 66

A.   Entry and Expansion are Unlikely to be Timely, Likely, and Sufficient............. 66

1.   Defendants Recognize Significant Barriers to Entry ..................................... 66

2.   Evidence from Market Participants Confirm that Neither Entry Nor Expansion will be Timely, Likely, and Sufficient ......................................................... 69

B.   Defendants Have Failed to Establish Verifiable, Merger-Specific Efficiencies... 70

C.   IQVIA's "Open Offers" Do Not Address the Merger's Competitive Harm ........ 71

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

I.    **EXECUTIVE SUMMARY**

    **A.  Summary**

    During the eight-day evidentiary hearing, two critical facts were conclusively established that should guide this Court to granting the FTC's preliminary injunction to prevent Defendants from immediately merging. First, head-to-head competition between DeepIntent and Lasso resulted in lower prices and increased innovation for programmatic advertising targeted toward healthcare professionals in the United States ("HCP programmatic advertising"). PX0595 (Paquette (DI) Hr'g) at 618:21-619:20, 622:13-623:15, 624:8-23; PX2578-01 (DI) ("███████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████"); ███████████████ ██████████████ Second, witness after witness and document after document established that DeepIntent, Lasso, and PulsePoint constitute the "Big Three" in a concentrated, top-heavy industry. PX1625-02 (IQV) ("[T]he Big 3 (e.g. [Lasso], PulsePoint and Deep Intent) all offer[] the same '3 in 1' story."); PX0593 (Colarossi (IQV) Hr'g) at 253:20-256:25; ██████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ Neither one of these facts can seriously be in dispute, and these facts alone are sufficient to grant the FTC a preliminary injunction. Defendants nonetheless ask this Court to ignore this evidence.

    The evidence of the close competition between Lasso and DeepIntent, including their intense focus on each other in pricing decisions and innovation efforts, is direct evidence of a validly defined HCP programmatic advertising market. U.S. Dep't of Just. & Fed. Trade Comm'n, Horizontal Merger Guidelines ("*Horizontal Merger Guidelines*"), § 4 (2010) ("Evidence of

competitive effects can inform market definition, just as market definition can be informative regarding competitive effects."). Additional evidence presented at the hearing confirmed that there is a distinct market for HCP programmatic advertising as provided by these firms; other forms of digital advertising are not reasonably interchangeable for the reach, speed, flexibility, and measurability offered by HCP programmatic advertising. PX0595 (Paquette (DI) Hr'g) at 603:16-19 (One of the purposes of HCP programmatic advertising is to reach health care providers wherever they are on the internet across multiple media properties.); ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████  ████████████████

███████████████████████████████████████

████████████████  ██████████████████████████

███████████████████████████████████████

███████  The Court should grant the preliminary injunction.

## B. Questions and Answers

The Court identified a few issues that it would be helpful for the parties to address – we address each of these in turn below: (1) standard applied; (2) brief history of the industry; (3) geographic market; (4) Google testimony; (5) case law on substitutes; and (6) assessment of ordinary course documents. *See* PX0599 (Hr'g) at 1344:1-1347:5.

The Court asked the parties to address "the standard to be applied" in this case. PX0599 (Hr'g) at 1344:15-1345:2. The FTC requests the Court grant its motion for a preliminary injunction under Section 13(b) of the FTC Act, which authorizes the FTC to obtain a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood

of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). Courts have analyzed Section 13(b) under a two-prong approach: "(1) determine that the FTC has a fair and tenable chance of ultimate success on the merits and (2) consider the equities." *FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) (footnotes omitted). The court explained in *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088 (S.D.N.Y. 1977), that that the FTC could satisfy the "likelihood of success" prong of the section 13(b) inquiry by showing "that it has a fair and tenable chance of ultimate success on the merits." 434 F. Supp. at 1090-91.

Whether the "fair and tenable" language sets a lower standard or is merely a gloss on the "serious questions" standard, it properly suggests that the FTC need not establish that it is more likely than not that it will prove a Section 7 violation, but "something less." *Id.* at 1090.

The Court has also indicated "[i]t would be helpful if the parties were to provide at least a brief history of the industry." PX0599 (Hr'g) at 1345:3-9. Programmatic advertising is hardly a novel concept, as deal documents for the proposed acquisition show that 85% of non-pharmaceutical industries already utilize this form of marketing. PX0011-35 (IQV). Even for HCP programmatic advertising, an IQV executive testified to being ███████████ to this particular space, affirming that IQVIA is "████████████████████████████████████" ████████████████████████████████ Market participants have testified that HCP programmatic advertising has been active since at least 2016. PX0011-041 (IQV) (DeepIntent was founded in 2016); PX5306-01 (explaining that PulsePoint launched its programmatic ad platform for healthcare markets in 2016). ███████████████████████████████ ███████████████████████████. ██████████████████████ ███ ██████████████████████████████████ ███████████████████████████████████████ Moreover, advertisers

do not expect the number of healthcare professionals they can target to grow dramatically. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮   The Court inquired into the geographic market definition. PX0599 (Hr'g) at 1345:10-20. The relevant geographic market is the region in "which consumers can practically turn for alternative sources of the product and in which the antitrust defendant faces competition." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997) (citations omitted). The geographic market may be based on the locations of willing suppliers or willing customers of the goods or services. *Horizontal Merger Guidelines*, §§ 4.2.1, 4.2.2. Here, while the target of the programmatic advertising are U.S.-based healthcare professionals, which is a factor in the FTC's product market, nothing requires that suppliers or customers of HCP programmatic advertising be located in the United States in order to target U.S.-based HCPs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Defendants have not disputed the FTC's geographic market.

Additionally, the Court asked for clarification concerning testimony from Google. PX0599 (Hr'g) at 1345:21-1346:1. There is no dispute that Google prohibits one-to-one targeting of any users, including HCPs, based on sensitive interest categories, which includes prescription medicines. PX0579 (Temes (Google) Dep.) at 182:03-183:05; PX4092-02-03 (Google, "Personalized Advertising"). There is also no dispute that Google's audience list targeting policy states that an advertiser "can't use audience list targeting if your line item [the actual ad a person sees] is advertising products based on… [h]ealthcare and medicines..." PX4090-02 (Google).

Consistent with these limitations, ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████; ██████████████████████████████████. Market participants have

also testified that they do not view Google as providing HCP programmatic advertising due to

these restrictions. *See* ¶¶ 123-28, *infra*.

The Court also raised "the issue of substitutes," asking what, if any, case law addresses the

ability to "substitute by reference to multiple sources." PX0599 (Hr'g) at 1346:2-11. As a legal

matter, the Supreme Court in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), rejected the

notion of "fragmentizing the types of services into lesser units" and instead concluded that "none

of [the purported substitutes] appears to operate on the same level as the [service at issue] so as to

meet the interchangeability test." 384 U.S. at 572-74; *see also Staples*, 970 F. Supp. at 1079

(finding that even though buyers could go to multiple stores to meet their consumable office

supplies needs, "that the unique combination of size, selection, depth and breadth of inventory

offered by the superstores distinguishes them from other retailers"). Thus, even if an advertising

agency or pharmaceutical firm could theoretically attempt to cobble together a cafeteria of services

from disparate sources to conduct HCP programmatic advertising, the record evidence shows that

customers value an end-to-end solution that negates the effort of cobbling services together,

particularly given the cost-advantages and efficiencies of an end-to-end solution. PX0595

(Paquette (DI) Hr'g) at 605:12-606:16; PX0593 (Colarossi (IQV) Hr'g) at 253:23-255:1. Indeed,

even IQVIA recognizes that ████████" ████████████████████████████████████



Finally, the Court inquired into how it should analyze ordinary-course documents identified in this case. PX0599 (Hr'g) at 1346:12-20. The case law is requires that "[w]hen determining the relevant product market, courts often pay close attention to the defendant['s] ordinary course of business documents." *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011); *see also FTC v. H.J. Heinz Co.*, 246 F.3d 708, 717 (D.C. Cir. 2001); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 21, 29, 57 (D.D.C. 2017); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 894-95 (E.D. Mo. 2020). As the Horizontal Merger Guidelines explain, "[d]ocuments created in the normal course are more probative than documents created as advocacy materials in merger review." *Horizontal Merger Guidelines*, § 2.2.1. In particular, courts routinely consider marketing documents in product market analysis. *See, e.g., Moore Corp. Ltd. v. Wallace Computer Services, Inc.*, 907 F. Supp. 1545, 1576 (D. Del. 1995) ("Recognized sources of evidence of industry or public recognition include (1) statements of the merging parties and their own market surveys, annual reports, marketing materials, and preacquisition reports . . . .").

The volume of ordinary-course documents supporting the FTC's position is remarkable given Defendants' apparent efforts to sanitize references to such competition. For example, IQVIA executives referred to " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " and consequently " ▮▮▮ " some slides of a deck accordingly. ▮▮▮▮▮▮ *see also* ▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████ Similarly, other IQVIA personnel "███████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ " ████████████████

## II.    THE PROPOSED ACQUISITION

1.  DeepIntent, a healthcare DSP, allows healthcare advertisers to plan audiences, target HCPs in real-time with advertisements across a variety of media platforms (e.g., cTV, banner, video, email, audio etc.), and improve and measure campaign performance. PX0018-05, -07; *see also* PX5244.

2.  The proposed acquisition is merely the latest in a series of IQVIA acquisitions in the HCP programmatic advertising space. PX1284-04 (IQV)  ("MDG + DMD + Lasso + DI"); ████████

████████████████████████████████████████████████████████████████

██████████████████████ *see also* ███████████████████████ IQVIA entered the digital healthcare advertising business in 2019 "███████████████████████ " quickly followed by acquisitions of DMD in August 2021 and Lasso in July 2022. ████████████████

███████████████████████████████████ ███████████████████

3.  IQVIA's ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

4.  In a March 10, 2022 email related to IQVIA's consideration of acquisitions of both DeepIntent and Lasso, Frank Lin explained to other IQVIA executives that "[DeepIntent] has the #1 position for [h]ealthcare platform[s] . . . and [Lasso] 3rd. We can hold that easily with IQV[IA] data." PX1026-01 (IQV); PX0593 (Lin (IQV) Hr'g) 281:8-283:23; *see also* ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

5.  In July 2022, IQVIA's President of U.S. and Canada, Jon Resnick, told other IQVIA executives "Let's buy both" Lasso and DeepIntent, with all agreeing and one executive replying "Jay, Frank and I were talking about going for three, LOL." PX1254-01 (IQV); *see also* PX1540-02-03 ██████████████████████████████████████

6.  IQVIA executives anticipated that the industry would be shocked after IQVIA entered into agreements to purchase all four companies (MDG, DMD, Lasso, and DeepIntent), exclaiming: "MDG + DMD + Lasso + DI? You are shitting me! Timing IS everything," "what we are doing is going to blow them[sic] mind," and "our team (and industry) are gonna [poop emoji] themselves." PX1284-04-05 (IQV); PX0593 (Lin (IQV) Hr'g) at 286:25-290:22.

7.  When Lasso co-founder Mike DiNorscio first learned IQVIA may be buying both DeepIntent and Lasso, he wrote to Lasso CEO Greg Field "[do] you think they are actually buying both of us?" and wondered if ████████████████████████████████████████ ████████████ PX1439-02 (IQV); PX0595 (Field (IQV) Hr'g) at 518:05-519:23.

8.  DeepIntent employees were similarly ████████████ "████████" "██████" and reacted with "████████████████████████" when they learned that DeepIntent was being acquired along with its close competitor. PX2758-04-05 (DI) ("████████████████████████████████ ████████████████████████"); PX0531 (Klein (DI) Dep.) at 25:3-9.

9.  After the Lasso acquisition was announced, one executive remarked: "[I]t is profoundly obvious to everyone in the industry that IQVIA is leading a consolidation. When the Lasso news got out, I had industry friends calling to say, 'What are you guys eating over there!?' ████████████████ ████████████████████████ PX1377-01 (IQV); ████████████████████████ ██████

10.   In line with its series of acquisitions in this space, ████████████████████████



## III.   THE RELEVANT PRODUCT MARKET IS HCP PROGRAMMATIC ADVERTISING

11.   Programmatic advertising is an automated process for digital advertising that facilitates an auction process in microseconds across many digital advertising spaces, making the transaction nearly frictionless. *See* PX0502 (Lawson (AdTheorent) IH) at 18:6-19:1; PX0516 (Hutchinson (Bayer) IH) at 17:2-18:10; PX0511 (Farris (Digilant) IH) at 10:6-11:1; PX0518 (Lin (IQVIA) IH) at 12:3-14; PX0593 (Leitner (formerly Klick) Hr'g) at 212:6-9; PX0592 (Freid (CMI) Hr'g) at 83:23-84:6 (Programmatic advertising is an automated method of buying media); ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12.   Before programmatic advertising, an advertiser and publisher individually contracted and executed an ad campaign on the publisher's site (e.g., placing an advertisement in a newspaper or on a TV show) at a predetermined price over a set period. *See* PX0502 (Lawson (AdTheorent) IH) at 17:10-22. Programmatic advertising allows advertisers to place ads "across many different publishers instead of going publisher by publisher to buy those ads," which is advantageous because "it is not feasible to contract with hundreds of thousands of websites individually." PX0595 (Paquette (DI) Hr'g) at 603:6-15. Targeting advertisements to HCPs "on a publisher-by-publisher basis tends to be slow and arduous, making it taxing for both marketing and sales teams," but HCP programmatic advertising "solves this challenge by finding the audience and making

decisions informed in real-time by automated technology." PX4106-07-08 (PulsePoint).

13.    DeepIntent Executive Ross Sandler testified that DSPs run programmatic advertising campaigns by " ███████████████████████████████████████████████████████ ███████████████████████████████████████ " and then " ███████████████████████████████ ████████ " PX0593 (Sandler (DI) Hr'g) at 341:6–17; *see also* PX0008-05-11 (IQV). A healthcare advertiser, either on its own or within a DSP platform, builds an audience by determining the features or attributes of the audience to create a group that the healthcare advertiser intends to reach. PX0018-08 (DI). IQVIA's documents indicate that DSPs provide many services, such as enabling bidding processes, providing campaign tracking and reporting, managing campaign budgets, providing identity resolution and audience planning, and measuring and optimizing campaign results. PX0008-11 (IQV).

14.    A brand or agency may attempt to reach HCP audiences patient audiences, which is referred to as direct-to-consumer ("DTC") advertising, via programmatic advertising. PX0592 (Freid (CMI) Hr'g) at 86:20-87:13. Programmatic advertisers target HCPs on an individualized basis, which is different than the cohort-based advertising for DTC. PX0008-08 (IQV); ██████████ ████████████████████████████████████████████████████████████████ To target HCPs using programmatic advertising, advertisers seek to link the HCP's professional identity (i.e., NPI number) and the HCP's online identity (i.e., a list of devices or online identities). ███████ ██████████████████████████  ██████████████████████ PX0520 (Werther (DI) IH) at 37:22–38:12; PX0592 (Freid (CMI) Hr'g) at 87:17-88:10 (testifying that one way advertising to HCPs differs from DTC is that HCPs may be targeted individually, whereas there are more precautions when agencies do DTC advertising "[d]ue to privacy rules and regulations.").

15.    ████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████.

16.   ███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████ ███████████████████████████████; 91:24-92:2 (Unlike other DSPs, healthcare-focused DSPs have access to data that allows agencies to target patients and HCPs or provides access to endemic inventory).

17.   Ad agencies want to ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████. ██████████████████████████████████████; ████████████████████

████████ Healthcare advertisers choose between DSPs on a variety of metrics, including price and quality of targeting (i.e., the ability to serve advertisements to a high percentage of HCPs in an audience list, and the ability to serve those HCPs in many digital ad spaces). *See, e.g.*, ████████

█████████████████████████████ ██████████████████████████; ████████████

█████████████; ██████████████████████████████████ ████████ ████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████

18.   Once the healthcare advertiser builds the audience for its advertising campaign, it can then "activate" or "target" that audience through the DSP. PX0514 (Pine (Proclivity) IH) at 13:4-14:24. To target HCPs using programmatic advertising, advertisers seek to link the HCP's professional identity (i.e., NPI number and other identifying information) and the HCP's online identity (i.e., a list of devices or online identities). ██████████████████████████████████ ████████

████████████████████████████ PX0520 (Werther (DI) IH) at 37:22–39:9.

19.   Finally, a healthcare advertiser will measure the efficacy of its digital advertising campaign and, if needed, make changes to the campaign to optimize performance. ███████████ ███████████ PX0514 (Pine (Proclivity) IH) at 24:7-25:16; PX0520 (Werther (DI) IH) at 41:3-14. *See also* ██████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████

20.   ██████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████

21.   ████████████████████████████████ including ██████████████ ██████████████████████████████████████████████████ █████████████████████████████████ *see also* ████████████ ████████████████████████████████████████.

22.   ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████ ██████████████████████████████████████ Ross Sandler, a DeepIntent executive, testified that "██████████████████████████████████████ ███████████████" that "██████████████████████████," which is a "████████████ ████████████████████████████████" PX0593 (Sandler (DI) Hr'g) at 341:21–342:6.

23.   Healthcare advertisers often prefer "one source of truth" for HCP prescribing data, because data consistency allows for an apples-to-apples comparison of all sales and marketing activities

within an organization. *See, e.g.*, PX0500 (Gerszke (PulsePoint) IH) at 55:20–57:21, 61:11–62:10 (describing the importance of "one source of truth"). Healthcare advertisers often use IQVIA HCP data for digital advertising campaigns to achieve consistency with the pharmaceutical client's internal data. PX0500 (Gerszke (PulsePoint) IH) at 59:25–64:22; ██████████████████████ █████████ ; *see also* PX0520 (Werther (DI) IH) at 56:21-60:16 (discussing PX2528 and █████ ███████████████████████████████████ .

**A.** ***Brown Shoe*** **Indicia Establish a Distinct HCP Programmatic Advertising Market**

24. One of the purposes of HCP programmatic advertising is to reach health care providers wherever they are on the internet across multiple media properties. PX0595 (Paquette (DI) Hr'g) at 603:16-19; *see also* ███████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████

1. HCP Programmatic Advertising has Distinct Characteristics

25. Customers (i.e., advertisers) agree that no other form of HCP-focused advertising offers the combined capabilities of HCP programmatic advertising. ██████████████████████ ████████████████████████████████████████████████████ █████████ ; ████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ *see also* PX0598 (Israel Hr'g) at 1109:17-1110:23 (stating that advertising agency testimony is more informative than testimony from other market participants, including ██████████████████████████████████ ████████████████████████████████████████████████ .

26. No other form of delivering advertisements to HCPs, such as through mail, email, paid search engines, and social media, provides advertisers with the unparalleled inventory access,

transparency, efficiency, and control of HCP programmatic advertising. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ PX0595 (Evenhaim (Veeva) Hr'g)

at 573:16-25 (noting the majority of impressions in Crossix-measured advertising campaigns are

programmatic advertising impressions because customers see "significant value in terms of using

programmatic approaches to buying media").

27.    Healthcare advertisers can use HCP programmatic advertising to deliver advertisements

across thousands of different publishers, determine which providers interact with the

advertisements, and analyze whether those providers changed their prescribing behavior—all via

"a click of a button." PX0503 (Leitner (Klick) IH) at 20:3-20:24; ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

28.    HCP programmatic advertising provides the ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in addition to programmatically accessing a

▮▮▮▮▮▮▮▮▮▮ both endemic and non-endemic. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████████████

██████████

29.   Defendants regularly refer to HCP programmatic advertising as a distinct market. *See, e.g.,* PX0505 (Paquette (DI) IH) at 45:13-50:8 (█████████████████████████████████████

██████████████████████); ████████████████████████████████████████

████████████████████████████████

30.   Defendants also regularly acknowledge that there are ████████████████████████

████████████████████████████████████████████ █████████████████ ██████████

██████ █████████████ ███████████████ ████████████████████████████

████████████████ █████████████████ PX2800-02 (DI); PX2847-03 (DI); PX0521 (Sciorra (DI) IH) at 72:20-25; PX2812-05 (DI) ; PX2816-04 (DI); PX2746-01 (DI); PX2581-29 (DI); PX0054-14 (DI); *see also* PX5001-03 (DI) (DeepIntent's CEO representing to investors that "[m]ost [healthcare advertisers] have found that the capabilities of traditional programmatic DSPs like The Trade Desk or DV360 fall far short of the level of reporting, targeting, and publication access (such as medical journals) needed for their campaigns.").

2.   The Industry Recognizes HCP Programmatic Advertising is Distinct

31.   Ad agencies allocate a client's advertising budget to different lanes, "and then within these lanes the planning happens independent of the other lane." For example, "the TV buys will not compete with the digital out-of-home buy or will not compete with a social buy." PX0592 (Gerszke (PulsePoint) Hr'g) at 155:7-19; *see also* ████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████ ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████   ██████████████████████████████████

██████████████████████████████████████████████

████████████████████

33.    The term HCP programmatic advertising is "something that's all over the record . . . . It's something that we have heard many witnesses testified to [in court] . . . . It's something that's routinely used in the industry." PX0597 (Hatzitaskos Hr'g) at 924:21-925:1.

### 3.   HCP Programmatic Advertising Pricing is Distinct

34.    Programmatic advertising is generally priced on a CPM basis, which means "cost per thousand" impressions." PX0592 (Freid (CMI) Hr'g) at 88:18-22.

35.    HCP programmatic is more expensive than patient or DTC programmatic because HCP is considered by most healthcare companies to be a higher value audience and because the achievable audience size is much smaller. PX0546 (Hemann (Real Chemistry) Dep.) at 83:15-84:2; PX0592 (Freid (CMI) Hr'g) at 88:11-17; ██████████████████████████████ PX0526 (Sandler (DI) Dep.) at 28:18-21; ██████████████████████████████

36.    ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████   ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

37.    HCP programmatic advertising is priced differently and agencies still advise their clients to purchase HCP programmatic advertising even when it is more expensive than other methods such as direct buys due its advantages of flexibility and speed of getting data back agencies. PX0592

16

(Freid (CMI) Hr'g) at 90:11-91:1; *see also* ████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

### 4. HCP Programmatic Advertising Serves Distinct Customers

38.    According to DeepIntent CEO, Chris Paquette, unlike traditional advertising, which is distributed to a generalized audience, HCP programmatic advertising requires the precise delivery of advertisements to the targeted professionals on an individualized, one-to-one basis by matching their identities to their digital footprint ("activation") as well as being able to measure a campaign's effectiveness by evaluating whether a specifically targeted HCP has changed his/her prescribing behavior subsequent to viewing the ads ("measurement"). PX5001-03 ("However, the specific needs of the healthcare marketer are more nuanced and complex than the needs of the typical marketer," and they rely on healthcare-specific DSPs to provide "the level of reporting, targeting, and publication access (such as medical journals) needed for their campaigns").

39.    Pharmaceutical companies conduct advertising campaigns targeting HCPs because ████

████████████████████████████████████████████████████████████████████████

████████████ and it is important to ████████████████████████████████████████

████████████████  ████████  █████████████████████████████; *see also* PX0596 (Harper (TTD) Hr'g) at 735:5-8 (testifying that the programmatic advertising needs of pharmaceutical clients are distinct from other types of clients of programmatic advertising).

### 5. HCP Programmatic Advertising is Performed by Specialized Vendors

40.    As IQVIA executive Dave Escalante noted, █████████████████████████████████

████████████████████" ████████████  *see also* ████████████  ████████  Defendants explain that

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████" ████████

17

*see also* ████████████████████████████████████

41.     According to industry participants, generalist DSPs lack the experience, technology, and/or data necessary to compete robustly with healthcare-specific DSPs. PX0592 (Gerszke (PulsePoint) Hr'g) at 157:14-160:7, 160:17-24 ("From a capability perspective, the generalist DSP are lacking certain platform capabilities as they relate to targeting [and] optimization, that are important for executing HCP digital marketing at a competitive price and scale."); PX0546 (Hemann (Real Chemistry) Dep.) at 94:3-15; 100:12-101:18 (In addition to not having robust HCP audience graphs built from years of experience advertising to HCPs, some generalist DSPs do not have infrastructure to activate an NPI list on their platforms.); ████████ ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████; █████████████████████

█████; ████████████████████████████████████████████

████████████████████████████████; *see also* ████████████████████████

████████ ████████████████████

42.     Advertisers, or their agencies, use DSPs to buy this programmatic advertising. *See* PX0511 (Farris (Digilant) IH) at 12:21-13:1; PX0500 (Gerszke (PulsePoint) IH) at 13:16-14:7. Ad agencies, ████████████████████, testified that they are uninterested in replicating and/or unable to replicate the services of third-party DSPs in-house. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████; ████████████████████████████████████.

### B.  Other Forms of Digital Marketing Are Not Reasonably Interchangeable with HCP Programmatic Advertising

##### 1.  Social Media is Not Reasonably Interchangeable

43.     Social media consists of "walled gardens," meaning that advertisers that buy ads on

individual social media sites like Facebook, Doximity, or Sermo are confined to the users and data contained on the site, limiting an advertiser's ability to scale its budget and increase reach as compared to having access to many sources of inventory on the open web. PX0596 (Lawson (AdTheorent) Hr'g) at 801:12-802:23; ███████████████████████████████

██████████████████████████████████████████████████; ██████████

██████████████████████████; ██████████████████████████

██████████████████████████████████████████████

████████████; *see also* PX0598 (Israel Hr'g) at 1106:12-1107:17 (██████████████

██████████████████████████████████████████████

████████████); ██████████████████████████████████████.

44.    Because social media is a "walled garden," the social media sites control their data and

███████████████████████████████████████████████████

██████████████████████████████.  █████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████;

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

45.    Companies that offer HCP programmatic advertising testified that HCP programmatic advertising is not interchangeable with social media. PX0592 (Gerszke (PulsePoint) Hr'g) at 153:17-155:19 (testifying that PulsePoint does not compete with social media); ██████████████

███████████████████████████████████████████████████

██████████████████████; ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████ ; *see also* ████████████████

███████████████████████████████████████████████

█████ ; ██████████████████████████████████ .

46.    Advertising agencies do not include social media in their Requests for Information (RFIs) or Requests for Proposals (RFPs) to evaluate providers of HCP programmatic advertising. ████████

███████████████████████████████████████████████

███████████████████████████████████████ Defendants' expert Dr. Israel ████████████ ███████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

47.    Providers of HCP programmatic advertising testified that they do not compete against social media companies for programmatic advertising budgets because social media and programmatic serve different purposes. PX0592 (Gerszke (PulsePoint) Hr'g) at 154:9-155:19 (social media platforms "do not show up in RFPs" and do not compete because they are "planned at a different level, they are planned separately, similar to print, similar to television" and are "part of a different budget"); ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

48.    Advertising agencies have separate groups of people manage HCP programmatic advertising from social media. ████████████████████████████████████████

███████████████████████████████████████████████

███████████

### 2. Advertising Direct with Publishers is not Reasonably Interchangeable with HCP Programmatic Advertising

49.   HCP programmatic advertising is more efficient and cost effective than direct-buy advertising because HCP programmatic advertising gives advertisers the opportunity to buy advertisements to HCPs across websites rather than the fixed amounts of inventory limited to various specific websites. ████████████████████████████████ ████████████
████████████████████; ████████████████████████████; *see also* PX0592 (Freid (CMI) Hr'g) at 84:10-19 (programmatic is "[s]ignificantly different" from direct buys and "remove[s] a lot of th[e] back and forth" of direct buys); ███████████████
██████████████████████████████; ██████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████; ██████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████

50.   Direct-buy advertising is "labor intensive" compared to programmatic advertising. PX0546 (Hemann (Real Chemistry) Dep.) at 78:24-80:23 (programmatic advertising campaign through a DSP is "really effective and efficient," compared to direct buys, which are "labor intensive" and "require a senior strategist to negotiate those deals with publishers"); PX0558 (Quagliariello (Klick) Dep.) at 74:18-75:13 (non-programmatic purchases are a "very laborious process");

████████████████████████████████████████████████████████

███████; *see also* PX0592 (Freid (CMI) Hr'g) at 84:7-19.

51.   Programmatic advertising enables faster aggregation and analysis of campaign metrics, such

as physician level data (also called "PLD"), than direct-buy advertising. PX0592 (Freid (CMI) Hr'g) at 86:2-19; PX0559 (Freid (CMI) Dep.) at 114:7-13; ███████████████████████████████ ███████; *see also* PX0592 (Freid (CMI) Hr'g) at 85:16-86:1 (compared to direct buys, programmatic advertising offers greater flexibility to "either increase or decrease budgets depending upon performance" and the ability to get performance data back more quickly).

52.     Neither Lasso nor DeepIntent consider endemic websites to be competitors but hold them out as partners to programmatic platforms. PX5171-01-02 (Lasso, Healthcare Marketing Leader Lasso Launches New Publisher Suite, https://www.lassoplatform.io/post/new-publisher-suite (last visited Dec. 7, 2023)); PX1434-04 (IQV); *see also* PX0592 (Gerszke (PulsePoint) Hr'g) at 156:16-25 (direct buys do not compete with PulsePoint's programmatic advertising product).

53.     Dr. Hatzitaskos found that evidence shows that inventory suppliers like Medscape are not meaningful competitive constraints. PX0596 (Hatzitaskos Hr'g) at 847:9-848:3.

> 3.   <u>Advertising on Search Engines is not Reasonably Interchangeable with HCP Programmatic Advertising</u>

54.     Search engines are different than programmatic advertising and focused just on the search experience and functions like a walled garden, providing content and opportunity, only within a particular search provider's space. ██████████████████████████████████; █████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████; PX0546 (Hemann (Real Chemistry) Dep.) at 35:9-11) (Ad agencies cannot target HCPs on an individualized basis through search advertising).

> **C.  HCP Programmatic Advertising as a Market Satisfies the Hypothetical Monopolist Test ("HMT")**

> 1.   <u>Experts Agree that Product Market Definition Should Focus on Material Substitution</u>

55.    Expert economist Dr. Hatzitaskos explained that market definition "isn't an exercise in just listing every single last potential competitor[;] it's an exercise in [asking] do we have enough[.]" PX0596 (Hatzitaskos Hr'g) at 844:6-845:10. "[I]t's not enough to just say that there could be many competitors or that there is a large number of competitors" but that one must "actually look at how effective this potential competitors are going to be." *Id.* at 830:16-831:6 ("[F]or example, there are thousands and thousands of musicians, but there is only one Taylor Swift.").

56.    Defendants' expert Dr. Israel ██████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████." PX0598 (Israel Hr'g) at 1108:2-7. He further ██████████████████████████████████████ ██████████████████████████████████████████████████████████████████.

*Id.* at 1107:18-1108:1.

57.    Dr. Hatzitaskos testified that "market definition is a customer-centric exercise," focusing on the advertiser and ad agencies. PX0597 (Hatzitaskos Hr'g) at 927-9:928:2. The key is not to think about the doctor and what ads he/she may see, but to focus on the advertiser. *Id.* Customers may shift budgets across different types of advertising channels does not affect market definition, because customers may value a particular product even with an overall budget. PX0596 (Hatzitaskos Hr'g) at 854:1-25.

58.    Defendants' expert Dr. Israel ████████████████████████████████████ ████████████████████████████████████████████████████████████████████.

PX0598 (Israel Hr'g) at 1114:12-19.

      2.    <u>Experts Agree that the HMT Is the Standard Economic Tool to Define a Relevant Market and that Existence of a Broader Market Does Not Disprove a Narrower Market</u>

59.    Both Dr. Hatzitaskos and Dr. Israel testified that the HMT is the standard economic tool to

define relevant antitrust markets. PX0596 (Hatzitaskos Hr'g) at 837:25-838:8; PX0598 (Israel Hr'g) at 1114:20-1115:5; ████████████████████ .

60.    The HMT asks if every product that is in the relevant market is merged together and owned by a hypothetical monopolist, whether that hypothetical monopolist would have an incentive to raise prices of at least one product sold by one of the merging firms by five percent. PX0596 (Hatzitaskos Hr'g) at 838:9-839:4; ████████████████████ . In this context, it means that a hypothetical monopolist that controlled every HCP programmatic advertising option–the big three as well as all identified fringe players– would raise the price of DeepIntent *or* Lasso by at least five percent. *See e.g.*, ████████████████ ; ██████████████████████████

██████████████████████ .

61.    Both Dr. Hatzitaskos and Dr. Israel acknowledged that there could be multiple markets, and the existence of a broader market does not disprove a narrower market that satisfies the HMT. PX0596 (Hatzitaskos Hr'g) at 844:6-845:10; PX0598 (Israel Hr'g) at 1115:14-23; PX0582 (Israel Dep.) at 89:13-18; ████████████████████████████████

██████████████ . Both experts acknowledge that the HMT identifies the narrowest antitrust market. ████████████████████████ ; DX0076-51 (Israel Rpt) ¶ 81; *see also* PX0596 (Hatzitaskos Hr'g) at 844:6-845:10 ("a better prediction about competition [when] looking at, everything equal, a narrower market. So what the hypothetical monopolist test does is it confirms that you haven't drawn it too narrowly . . . .").

### 3.   HCP Programmatic Advertising Satisfies the HMT

62.    Dr. Hatzitaskos found that ████████████████████████████████████

██████████████████████████████████ . ██████████████████ . The

████████████████████████████████████████ . ██████████████

████████████████████████████ . For example, the ██████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████. ██████████

███████████. Dr. Hatzitaskos is "very confident" in his HMT results because they are "well above

the threshold," and "even if [he] use[s] the inputs that Dr. Israel puts forth, the test is still satisfied."

PX0596 (Hatzitaskos Hr'g) at 843:25-844:5.

63.    Dr. Hatzitaskos testified that the market for HCP programmatic advertising is sufficiently

mature for standard antitrust analysis. PX0596 (Hatzitaskos Hr'g) at 850:2-23. Regardless of

whether the market is dynamic or stable, "tools are flexible and . . . are designed to work across

industries." PX0597 (Hatzitaskos Hr'g) at 935:13-22; ████████████████████.

64.    Dr. Hatzitaskos ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████ He included all fringe

competitors, "[a]nybody that [he] could find evidence offers HCP programmatic advertising" in

his market definition and market share calculation, including the equivalent of a People Airline.

PX0597 (Hatzitaskos Hr'g) at 931:9-18. Dr. Hatzitaskos included companies referred to as

generalist DSPs that offer HCP programmatic advertising, such as The Trade Desk and

AdTheorent. PX0596 (Hatzitaskos Hr'g) at 832:23-833:5.

65.    Accounting for advertising on social networks does not affect the bottom-line conclusions

for horizontal competitive harm. PX0596 (Hatzitaskos Hr'g) at 848:4-12. Further, Dr. Hatzitaskos

found that shares of revenues are consistent across providers of HCP programmatic advertising

between 2022 and 2023. PX0596 (Hatzitaskos Hr'g) at 848:21-849:9.

    4.    Dr. Hatzitaskos Considered Cross-Price Elasticity of Demand in Applying the
          HMT

66.    Dr. Hatzitaskos considered the cross-price elasticity of demand for HCP programmatic

advertising. PX0596 (Hatzitaskos Hr'g) at 843:14-17. For example, he calculated ███████████

███████████████████████████████████████████████████████

███████████████. He further testified that cross-price elasticity of demand is a measure

of how much is lost to some other substitute when a price increases, and that "a key part of [his

critical loss analysis] is estimating how much is actually going to go outside of the candidate

market." PX0596 (Hatzitaskos Hr'g) at 843:18-24.

## IV.   THE RELEVANT GEOGRAPHIC MARKET IS WORLDWIDE

67.   Dr. Hatzitaskos found that ████████████████████████████████

████████████████████████████████████.

68.   Dr. Hatzitaskos opined that ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████. For example, ████████████████████

████████████████████████████████

69.   Healthcare DSPs build audiences focused on U.S.-based HCPs because these are the

healthcare professionals who can prescribe U.S. Food & Drug Administration-approved drugs to

U.S. consumers (as opposed to advertisements to end-customers). ████████.

70.   Relevant antitrust geographic markets are ████████████████████████████

█████, and because it is █████████████████████████████████

██████, the relevant geographic market is worldwide. *See* ████████████████.

## V.   MARKET STRUCTURE AND CONCENTRATION

   **A. Defendants and Other Market Participants Confirmed that the HCP
   Programmatic Advertising Market Is Dominated by Three Providers: Lasso,
   DeepIntent, and PulsePoint**

1. <u>Defendants and their Competitors Confirmed the Big Three are the Primary Providers of HCP Programmatic Advertising</u>

71.    As recently as June 2023, IQVIA viewed DeepIntent, Lasso, and PulsePoint as the "Big 3" in HCP programmatic advertising. PX1625-02 (IQV) ("With the Big 3 (e.g. [Lasso], PulsePoint and Deep Intent) all offering the same '3 in 1' story"); PX0593 (Colarossi (IQV) Hr'g) at 253:20-256:25.

72.    As a DeepIntent employee remarked in October 2022, the HCP programmatic advertising market is a "███████" between ███████████████████████ PX2570-01 (DI).

73.    One March 11, 2022 analysis sent by IQVIA's Dave Escalante and Frank Lin to Jay Margolis described the market as "[DeepIntent] is #1 and [PulsePoint] #2" and "[Lasso] is #3 position." PX1121-01 (IQV).

74.    In numerous ordinary course documents since 2021, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████. PX2571-01 (DI); PX2511-05; PX2880-01 (DI); PX2506-01 (DI); PX2843-04 (DI); PX2812 (DI) (Tab: "Overview"); PX2816 (DI) (Tab: "Video RFI"); PX2818 (DI) (Tab: "RFI").

75.    DeepIntent's Chief Strategy Officer explained that ████████████████████████████

████████████████████████████████ PX2574-01 (DI).

76.    In response to numerous RFIs and RFPs, DeepIntent consistently identifies Lasso and PulsePoint as its primary competitors for HCP programmatic advertising opportunities. *See infra* Section VI. For example, in response to a February 2023 customer RFI that asked ████████████

█████████████████████████████████████" DeepIntent responded "███████

█████████████████ ” PX2812 (DI) (Tab: "Overview") (DI).

77.    Ross Sandler, DeepIntent's Head of Agency Partnerships, testified that as of 2022, he

"█████████████████████████████████" as DeepIntent's competitors. PX0593 (Sandler

(DI) Hr'g) at 353:13–17.

78.    Lasso  has  likewise  identified  DeepIntent  as  its  ███████████████   ████████████

████████████████████████████████████ "primary competitor[ ]" (2022), ███████████

███████████████████████████████████████████████████████████████████████

█████████████████████████ PX1628-02 (IQV).

79.    In response to numerous RFIs and RFPs, Lasso consistently identified DeepIntent and

PulsePoint as its primary competitors for HCP programmatic advertising opportunities. *See infra*

Section VI. █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████

80.    The head of PulsePoint testified that its "biggest competitors for digital ad campaigns to

healthcare practitioners" and "key competitor[s]" are DeepIntent and Lasso. Based on PulsePoint's

ordinary-course tracking of wins and losses, PulsePoint's executive testified that "in the vast

majority of cases [PulsePoint] either lose[s], or fail[s] to win, business from or to DeepIntent and

Lasso." PX0592 (Gerszke (PulsePoint) Hr'g) at 149:5–151:23. PX0500 (Gerszke (PulsePoint) IH)

at 51:17–23; PX0568 (Gerszke (PulsePoint) Dep.) at 116:19-24, 177:19–178:1, 194:19–196:16.

81.    Fringe  competitors,  including  ████████████████████████████████████

████, all consider Lasso, DeepIntent, and PulsePoint to be their primary competitors for HCP

programmatic advertising. █████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

82.     Data provider Crossix testified that DeepIntent, Lasso, and PulsePoint have emerged as the three significant players in HCP programmatic advertising. PX0595 (Evenhaim (Veeva) Hr'g) at 575:2-5. *See also* ███████████████████████████████████████████

████████████████████████████████████████████████████

83.     ██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████ . ██████████████ ; ██████ █████████████████████████████

█████████████

84.     ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ ██████ █████████████████

████████████████████████████████████

      2.   <u>Customers Mainly Use the Big Three for HCP Programmatic Advertising</u>

85.     CMI, one of the largest healthcare advertising agencies, ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

86.     ██████████████████████████████████████████████



87. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Healthcare DSPs are more specialized than generalist DSPs, which work with clients that represent a variety of different "verticals or categories" in many different industries. PX0596 (Harper (TTD) Hr'g) at 733:12-17, 733:22-734:7.

92. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

93. A representative from EMD Serono, a pharmaceutical firm, testified that EMD Serono has evaluated DeepIntent and PulsePoint for programmatic campaigns. PX0569 (Karlova (EMD Serono) Dep.) at 56:3-61:19.

94.    In an email discussing Lasso's top clients, Lasso cofounder Mike DiNorscio stated that one client, ███ was ████████████████████████████████████████████████████ ████████████████████████

95.    As DeepIntent acknowledged, Lasso and PulsePoint are its "███████████████," with ████ ████████████████████████████████████████████████████. PX2506-01 (DI).

96.    ████████████████████████████████████████████████████ ████████████████████ ████████████████████████████████████ ████████████

3.    <u>Both Plaintiff's and Defendants' Economic Experts Identify the Same Big Three Providers of HCP Programmatic Advertising and a Competitive Fringe</u>

97.    Dr. Hatzitaskos found ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

98.    ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████

4.    <u>The Remaining HCP Programmatic Advertising Providers (the "Fringe") Have Substantially Smaller Presences and May Lack Key Capabilities</u>

99.    ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ ██████ ██████████████████████████; ████████████████████████ ████████; ████████████████████████████████████████

31

100.  As DeepIntent acknowledged, Lasso and PulsePoint are their "███████████," with

███████████████████████████████████████████████████████████████████████ .

PX2506-01 (DI).

101.  ███████████████████████████████████████████████████████████████

███████ ████████████████████████████████████ ; ████████████████████████

██████████████████ ; ████████ ████████████████████████████████████ ; *see also*

████████ ████████████████████████████████████████ .

102.  The next largest competitor after Defendants and PulsePoint, ████████████████

███████████████████████████████████████████████████████████████████████

████████████ █████ ████████████████████████████ ; ██████████████████████ .

103.  ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ .

███████ ████████████████████████████████ ; ███████ ████████████████████████

██████████ .

104.  According to multiple advertising agencies, ████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████ ████████████████████████████████ ; █████████████ ; ██████████████████

█████████████████████ ; *see also* PX2732-01 (DI); PX2767-04 (DI); PX0524 (Sherry (DI)

Dep.) at 83:5–84:15; PX0526 (Sandler (DI) Dep.) at 65:7–66:4.

105.  At least one ad agency moved spend from ████████████████████████ because ████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

      a. The Trade Desk

106.  ███████████████████████████████████████████

████████████████████████████████████████████████████

████ . █████ █████████████████████████████ ; █████ █████████████████████

████████ ; ███████████████████████████████ . █████████████████████████

█████████████████████████████████████████

107.  In the view of one ad agency, ████████████████████████████

██████████████████████████ █████ ██████████████████████ *see also*

██████████████████████████████████████████████████

██████████████████████████████████████████████

108.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

109.  The Trade Desk chose ██████████████████████████████████

partly because ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████; *see also generally* ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████. Further, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

110.   The majority of The Trade Desk's programmatic advertising for pharmaceutical clients has

been direct-to-consumer, or DTC, advertising. PX0596 (Harper (TTD) Hr'g) at 735:9-16; *see also*

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

111.   The Trade Desk's ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

112.   Dr. Hatzitaskos credited $2 million for The Trade Desk's 2022 and first half 2023 revenue,

a   conservative   estimate   that   exceeds   actual   revenue   reported   by   the   company.   PX0596

(Hatzitaskos Hr'g) at 836:10-837:4. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████   The   Trade   Desk   further

testified that ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

113.   Defendants' expert Dr. Israel ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████   PX0598 (Israel Hr'g) at 1159:12-17. ████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████

### b. AdTheorent

114. ██████████████████, AdTheorent is a generalist DSP whose healthcare revenue is

███████████████████████████████████████████████████████████

██████████. ██████ making significant investment and development efforts to offer "AdTheorent

Health" since 2020, ████████████████████████████████████████

████████████████████████. █████████████████████████████████████

██████████████.

115. In the view of ██████████████ AdTheorent is a █████████████████████████

██████████████████████ AdTheorent testified that it is not surprising that there are "some

smaller" healthcare DSPs because it is "easy to put up a website and say you have all these

capabilities, but it's much harder to do it." PX0570 (Lawson (AdTheorent) Dep.) at 82:4-83:5.

### c. TI Health/Swoop

116. According to ████████████████████████████████████████

████████████████████████████████████████. █████ █████████████████████

██████████████████; █████ ██████████████████████████████████████. Instead,

its service is "complementary" and an "add-on" to the HCP programmatic advertising services

offered by firms like DeepIntent. PX0542 (Elwell (TI Health/Swoop) Dep.) at 93:20–94:2, 101:2–

102:8.

117. ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██

### d. Other Fringe Competitors

118.  When one fringe competitor, Doceree, announced a strategic partnership in 2021, DeepIntent's internal assessment was that it did "not see this as a threat" because "Doceree is a joke," PX2808-004 (PMI), and its ████████████████████████████████████ ████████████████████████████████ ██████ ███████████████████████; ████████████████████████████.

119.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████

120.  Fringe competitor Medicx's business ██████████████████████

████████████████████████████████████████████

████████████████████████████████ *see also* ██████████████

████████████████████████████████████████████

████████████████████████

### 5.  Other Firms Identified by Defendants Do Not Actually Provide HCP Programmatic Advertising Services

121.  ████████████████████████████████████████

████████████████████████████████. ██████████████████████████;

████████████████████████████████████████ ██████

████████████████████████████ *see also* ██████ ████████████████

████████████████████

122.  ████████████████████████████████████████

██████████████ ██████ ████████████████████████

123.  Google has strict policies that "do[] not allow personalized advertising of healthcare

providers with prescription medicine advertisements." PX0579 (Temes (Google) Dep.) at 182:20-

183:05; PX4090 (Google, "Audience Targeting list"); PX4092 (Google, "Personalized

Advertising"); ███████████████████████████; *see also* ████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ PX0592

(Gerszke (PulsePoint) Hr'g) at 160:8-16 (PulsePoint "do[es] not consider Google as a key

competitor" because "they tend to be very hesitant in the HCP set of the market for a number of

reasons"); ███████████████████████████████████████████

████████████████; ████████████████████████████

████████████████████████████████████

124.   For example, Google's "Personalized advertising" policy prohibits "targeting users based on

sensitive interest categories," as well as uploading "advertiser-curated audiences"—a list of

specific users—for the purposes of advertising in sensitive interest categories. PX4092-02

(Google, "Personalized advertising"); PX0579 (Temes (Google) Dep.) at 81:09-82:08, 100:07-

101:14, 155:2-14, 170:15-171:19, 206:21-207:04 (stating the policy "appl[ies] when audiences are

uploaded through third parties"). One sensitive interest category is prescription medications.

PX4092-03; PX0579 (Temes (Google) Dep.) at 159:09-160:17, 151:06-18; ████████████

████████████████

125.   Similarly, Google's "Audience List Targeting" policy, which works in tandem with its

personalized advertising policy, states that an advertiser "can't use audience list targeting if your

line item [the actual ad] is advertising products based on [h]ealthcare and medicines." PX4090-02

(Google, "Audience list targeting"). This restriction means that Google would not allow an ad to

be purchased and shown to users if it is based on a sensitive category, such as prescription

medications. PX0579 (Temes (Google) Dep.) at 106:16-107:04, 167:09-168:11; ███████████

███████████

126.   Google allows targeting of HCPs for "brand awareness" advertising, which is a generalized "campaign on the good deeds the pharmaceutical company does" or for non-sensitive category products. PX0579 (Temes (Google) Dep.) at 101:19-102:16, 182:03-183:05. However, because of its policies, Google's does not allow for campaigns that mention or advertise a specific pharmaceutical product. *Id*. at 149:15-150:02 ("They would be able to target an individual who is a healthcare provider; however, they wouldn't be able to target them with any advertising that is in a restricted or sensitive category.").

127.   Google enforces these policies by scanning the content or data uploaded by advertisers for potential violations. PX4095 (Google, "What happens if you violate our policies"); PX0579 (Temes (Google) Dep.) at 102:17-103:19, 176:07-20, 177:10-20; PX5288-03 (Google, "2022 Ads Safety Report").

128.   ███████████████████████████████

███████████████████████████████

███████████  ███████████████████████

129.   ███████████████████████████████

███████████████████████████████

███████████████████████████████  Others in the

industry noted that they do not believe ███████████████████████

███████████████████████████████

███████████████████████

**B.  The Proposed Acquisition Results in Presumptively Illegal Market Shares and Concentration Levels**

38

1. <u>The Acquisition Will Result in Presumptively Anticompetitive Market Shares and a Significant Increase in Market Concentration in an Already Concentrated Market</u>

130.  As stated by Jay Margolis, former SVP for IQVIA's Information Solutions, ███████

███████████████████████████████████████████████████████

███████████████████████████████████

131.  Dr. Hatzitaskos testified that actual revenues should be used to weigh competitive significance. PX0596 (Hatzitaskos Hr'g) at 852:2-12.

132.  Dr. Hatzitaskos calculated that the post-merger combined share of DeepIntent and Lasso for HCP programmatic advertising will be ███████ PX0596 (Hatzitaskos Hr'g) at 831:25-832:2; ██████████████████

133.  Dr. Hatzitaskos found that the ████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Specifically, ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████; *see*

PX0596 (Hatzitaskos Hr'g) at 852:21-853:6.

134.  Dr. Hatzitaskos included all possible fringe competitors, meaning "[a]nybody that [he] could find evidence offers HCP programmatic advertising" in his market definition and share calculation, including the equivalent of a People Airline. PX0597 (Hatzitaskos Hr'g) at 931:9-18.

135.  ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████; ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

### 2. Market Structure and Concentration Remains the Same Even if Social Media Were Included in the Relevant Product Market.

136.  Even using Defendants' purported ███████████████████████████

██████████████████████ among others, ████████████████████████

are still presumptively anticompetitive. █████████████████████ ████████

█████████████ ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

137.  Defendants' expert Dr. Israel calculated shares including numerous firms outside the

relevant market but still estimated that ██████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

### 3. Ordinary Course Evidence Regarding High Post-Acquisition Shares

138.  As one IQVIA executive noted during due diligence for the proposed transaction, "I would

go stronger with market penetration – [DeepIntent] has the #1 position for Healthcare platform –

[PulsePoint] 2nd and [Lasso] 3rd [sic] We can hold that easily with IQV data." PX1026-01 (IQV);

PX0593 (Lin (IQV) Hr'g) 281:8-283:23; *see also* PX1115-03 (IQV).

139.  In an internal market share analysis, DeepIntent ████████████████████████

██████████████████████████████████████████████. PX2567 (DI, Tab:

DI Summary Income Statement, Row 72).

140.  In an internal market share analysis, DeepIntent █████████████████████████
████████████████████████████████████████████████. PX2567 (DI, Tab:

DI Summary Income Statement, Row 72).

141.  DeepIntent's internal projections for percent share of ████████████████████████
████████████████████. PX2502-05 (DI, Tab: DI Summary Income Statement, Row 69).

## VI.   THE PROPOSED ACQUISITION WILL SUBSTANTIALLY LESSEN COMPETITION BY ELIMINATING SUBSTANTIAL HEAD-TO-HEAD COMPETITION

142.  Dr. Hatzitaskos stated most economic models analyzing competitive effects do not depend

on market definition. PX0596 (Hatzitaskos Hr'g) at 855:1-8.  His report uses methodologies

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

143.  Dr. Hatzitaskos ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████; *see also* PX0598 (Israel Hr'g) at 1142:6-1143:6. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

### A.  Defendants' Evidence that Lasso and DeepIntent are Close and Significant Competitors

144.  Multiple executives from both DeepIntent and Lasso have consistently testified that █████

████████████████████████████████████████████████████████████

██████████████████████████████. PX0595 (Paquette (DI) Hr'g) at 618:9-11; PX0595 (Field

(IQV) Hr'g) at 504:6-10 (identifying DeepIntent and Lasso as competitors); PX0593 (Colarossi

(IQV) Hr'g) at 253:5-21; PX0505 (Paquette (DI) IH) at 38:20–39:22, 86:6–87:24, 90:17–91:9;

██████████████████████████████████ PX0524 (Sherry (DI) Dep.) at 67:3–6; ████████

██████████████████████ PX0526 (Sandler (DI) Dep.) at 67:2–8, 146:1–20, 149:17–150:2;

██████████████████████████████ PX0531 (Klein (DI) Dep.) at 11:5–14.

145.   This competitive dynamic is also seen in ordinary course documents from executives and

line employees at both DeepIntent and Lasso, who repeatedly describe the other as their primary

competitor in the HCP programmatic advertising market. For example, ████████████████

██████████████████████████████████████████████████████████████████

████████████████" PX2571-01 (DI); PX2506-01 (DI); PX2843-04 (DI); PX2511-05 (DI); *see also*

PX2880-01 (DI, Feb. 2022 "████████████████████████████████████████

████████"); PX2736-04 (DI, Mar. 2022 ("██████████████████████████████████"));

PX2804-01 (DI, May 2022 ("████████████████████")); PX2570-01 (DI, Oct. 2022 ("████████

██████████████████████████")); PX2847 (DI, Dec. 2022 ("████████████████

██████████████████████████")).

146.   In March 2021, DeepIntent's "entire Senior Leadership Team"—including DeepIntent CEO

Chris Paquette—██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████" PX2571-01 (DI); *see also* PX0532 (Paquette (DI) Dep.) at 11:6-16.

147.   A group chat between DeepIntent's senior executives in March 2022 noted that "████████

██████████████████████████████████████████████████████████████████

██████████████████████████" PX2564-03-04 (DI); PX0521 (Sciorra (DI) IH) at 159:8–

161:7. A DeepIntent executive wrote in March 2022 that DeepIntent was "██████████" with

██████████████████████████████████████████ PX2736-04 (DI); PX0593 (Sandler

(DI) Hr'g) at 349:9-352:13. DeepIntent's Chief Marketing Officer also told her team in September

of 2022 that "████████████████████████████████████████." PX2554-01

(DI); PX0521 (Sciorra (DI) IH) at 126:5–127:6.

148.  Members of DeepIntent's sales team also understand Lasso to be one of their primary

competitors. In a January 2023 survey, DeepIntent's sales team identified both Lasso and

PulsePoint as a "███████████████." PX2847 (DI, Tab: Sheet1, Row 7). "█████████████

████████████████████████████████████████ PX2538

(█████████████████████████"); PX0521 (Sciorra (DI) IH) at 72:20–25. When Lasso

announced its new product, "Visions," DeepIntent senior executives responded by ████████

████████████████████████████████. PX2885 (DI), PX2876 (DI); *see*

*also* PX2804-01 (DI); PX0535 (Mangano (DI) Dep.) at 32:24–33:21; PX2557 (DI); PX2749 (DI).

149.  █████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████. PX2812 (DI) (Tab: "Overview") (Feb.

2023 ████ RFI); PX2816 (DI) (Tab: "Video RFI") (April 2023 █████ Video RFI); PX2818

(DI) (Tab: "RFI") (Feb. 2023 █████ RFI); PX2746-01 (DI).

150.  IQVIA and Lasso have also described DeepIntent ██████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████

151.  █████████████████████████████████████████████████

██████████████████████████████

152.   Lasso's co-founder Mike DiNorscio stated in June of 2021, ███████████████
███████████████████████████████████████████████████████████

153.   In October of 2021, IQVIA's Head of Digital Media Partnerships ████████████
████████████████████████████████████████████

154.   In March of 2022, when evaluating the acquisition of both DeepIntent and Lasso by IQVIA, Dave Escalante and Frank Lin prepared side-by-side messaging which described DeepIntent as having the "#1" market position, followed by PulsePoint at "#2" and Lasso at "#3." █████████
████████████████████████████████ PX1026-01 (IQV); ████████████████

155.   Also in March 2022, consistent with head-to-head competition between DeepIntent and Lasso, IQVIA that █████████████████████████████████████████████
█████████████████████████████████████████████████████████████
██████████████████████████████████████████

156.   After announcing a new product in May 2022, Lasso Vision, Lasso CEO Greg Field wrote to Mr. DiNorscio "can't wait to see what DeepIntent posts ;)" and said that DeepIntent would respond by making its Outcomes product free, writing "oh shit, Outcomes is free now!" Lasso Vision is an HCP programmatic advertising tool that offers gross metrics reporting to help clients understand how HCPs prescribe drugs. DeepIntent Outcomes is a similar product providing script reporting. █████████████████████████████████████████████████
█████████████████████

157.   In August 2022, when Lasso cofounder Mike DiNorscio first learned IQVIA may be buying both DeepIntent and Lasso, he wrote to Greg Field "do you think they are actually buying both of us?" and wondered if ██████████████████████████████████████
████████████████████████████████████████████████████

158.  Lasso cofounder Mike DiNorscio wrote in September 2022 that Lasso had an opportunity to

█████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Lasso also identified

DeepIntent and PulsePoint as ████████████████████████ "primary competitors." ████

████████████████ PX1735 (IQV); ███████████████████████████

159.  In June of 2023, Michael Colarossi, IQVIA's Team Lead for Digital Media Sales, referred

to IQVIA (Lasso), DeepIntent, and PulsePoint, as the "big three." PX1628-02 (IQV); PX0593

(Colarossi (IQV) Hr'g) at 256:10-25.

160.  In June 2023, after IQVIA acquired Lasso, the IQVIA sales team was "heavily focused" on

distinguishing Lasso from its "two key competitors (PulsePoint and DeepIntent)." PX0593

(Colarossi (IQV) Hr'g) at 253:5-12 (quoting PX1628).

**B. Evidence from Customers that Lasso and DeepIntent are Close and Significant Competitors**

161.  Pharmaceutical clients and their advertising agencies also view DeepIntent and Lasso as

head-to-head competitors. For example, ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████ ████████████████████████████████; ███████████████████

███████; ████████████████████████████████.

162.  ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

163.  ███████████████████████████████████████████████████████████

███████████████████████████████████. ███████████; nerPX0526 (Sandler (DI) Dep.) at

146:1-23.



. Likewise, ███, a large advertising agency, only considered ██████████████████████████████████████████████████ ████████████████████████████████████

164. ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████

165. ████████████████████████████████████████████ █████████████████████████████████████████████████

166. And although advertising agency Digilant selected Lasso for its HCP programmatic advertising, Digilant considered DeepIntent and PulsePoint as alternatives, and believed the services provided by DeepIntent and Lasso "were very, very similar," as were their prices. PX0511 (Farris (Digilant) IH) at 18:10–19:21.

### C. Evidence from Other Market Participants that Lasso and DeepIntent are Close and Direct Competitors

167. DSP competitors consistently identified DeepIntent, Lasso, and PulsePoint to be direct competitors in the market for HCP programmatic advertising. The head of PulsePoint testified that its "key competitor[s]" are DeepIntent and Lasso. PX0592 (Gerszke (PulsePoint) Hr'g) at 149:5–150:5; PX0568 (Gerszke (PulsePoint) Dep.) at 116:19-24 (DeepIntent and Lasso are "main competitors" HCP programmatic advertising), 177:19-178:1 (most significant competitors); PX0500 (Gerszke (PulsePoint) IH) at 51:17–23 (biggest competitors for digital ad campaigns to HCPs). Based on PulsePoint's ordinary-course tracking of wins and losses, PulsePoint's executive testified that "in the vast majority of cases [PulsePoint] we either lose, or fail to win, business from or to DeepIntent and Lasso." PX0592 (Gerszke (PulsePoint) Hr'g) at 151:18-22; PX0568 (Gerszke

(PulsePoint) Dep.) at 194:19–196:16.

168. ███████████, ███████, AdTheorent, TI Health, and ███ also all consider Lasso, DeepIntent, and PulsePoint as primary providers for HCP programmatic advertising. ████████ ████████████████████; ███████ ██████████████████████████; ███████ ████████; PX0570 (Lawson (AdTheorent) Dep.) at 76:21–77:5; PX0542 (Elwell (TI Health/Swoop) Dep.) at 118:22-119:5; ██████████████████████.

### D. Defendants Compete Head-to-Head on Price

169. ████████████████████████████████████████ ████████████████████████. ████████████████████ █████████████████████████████████████ see also PX0596 (Hatzitaskos Hr'g) at 861:16-862:6. ████████████ ████████████████████████████████████████████████ ██ DeepIntent's CEO Chris Paquette testified ██████████████████████ ████████████████████████████████. PX0595 (Paquette (DI) Hr'g) at 617:20-23; 618:21-619:7; see also PX2507-01 (PMI).

170. In May 2021, Lasso co-founder Mike DiNorscio wrote that █████████████████ ████████████████████████████████████████████ ███████████████████████████████

171. Lasso's competitive efforts led DeepIntent's CEO Chris Paquette to caution that ██████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████" PX2573-01.

172. Accordingly, halfway through 2021, DeepIntent was ███████████████████████. PX2501-06. On June 2, 2021, DeepIntent's CEO stated that "███████████████████████

47

█████ and ████████████████████████████ PX2508-01. By June 19, 2021, DeepIntent

had "████████████████████████████████████

████████████████████████. PX2509-01. On June 21, 2021, Chris Paquette wrote that "████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████" PX2509-01.

173.  In April 2022, before IQVIA's acquisition of Lasso closed, Chris Paquette wrote, ████████

████████████████████████████████████████

███████████████████████████████████████████"

PX2510-01; PX0505 (Paquette (DI) IH) at 107:10-110:18.

174.  In May 2022, DeepIntent's CEO ████████████████████████████████

████████████████████. PX2772-01–03 (DI); *see* PX2564-04 (DI); PX2573-01 (DI).

175.  In October 2022, while the FTC's investigation was ongoing, ████████████████████

████████████████████████████████████████

████████████████████████████████████

176.  In January 2023, DeepIntent's Group Vice President of Sales & Solutions, sought to "████

████████████████████████████████████████

████████████████████" PX2771-02 (DI). ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

177.  When DeepIntent was preparing an RFP for an ████████ campaign in July 2023, a

DeepIntent executive expected "████████████████████████████████" and discussed

"███████████████████████████████████████████████." PX2838-01 (DI).

178.  Conversely, █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

**E.  Defendants Compete to Best Each Other on Innovation**

179.  DeepIntent competes with Lasso on product capabilities and must "███████████

████████████████████████". PX2578 (DI); PX2538 (DI); PX2880-01); *see also* PX0595

(Paquette (DI) Hr'g) at 618:24-619:1 (discussing ███████ As early as 2020, Lasso's founder and

CEO discussed the striking similarities between DeepIntent's and Lasso's products and remarked

it was "annoying as hell to see [DeepIntent] doing as well as they are." PX1064-02 (IQV); PX0595

(Field (IQV) Hr'g) at 506:11-508:18.

180.  ████████████████████████████████████████████████

███████████████████████████████████████

181.  In December 2020, ████████████████████████████████████

████████████████████████████████████████████████████████

███████ and instructed that Lasso ██████████████████████████████

███████████████████████████████████████

182.  On April 19, 2021, DeepIntent's Senior Vice President of Product Management, Steve Klein,

wrote that DeepIntent needed to "██████████████████████████████████████

████████████████████████████████████████████████████████

PX2797-01 (DI).

183.  On June 8, 2021, DeepIntent's CEO commented that Lasso's introduction of new product

features meant "████████████████████" and asked his DeepIntent team "██████████████

49

██████████" PX2512-01 (DI).

184.   In May 2022, Lasso debuted its measurement product Vision, which DeepIntent interpreted

as "████████████████████████████████ PX0593 Sander (DI) Hr'g at 343:1-

346:25; PX0526 (Sandler (DI) Dep.) at 72:24-73:15; PX2731-01–02 (DI). Thereafter, Steve Klein

followed up with his engineering team, noting that "██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████" PX2578-01 (DI).

185.   Lasso CEO Greg Field messaged Lasso cofounder Mike DiNorscio about "making sure

DeepIntent goes fucking upside down." Mr. DiNorscio responded, "I want to destroy [DeepIntent]

so bad dude. Copycats." Mr. Field continued, "they are amateurs, and it's annoying as hell to see

[DeepIntent] doing as well as they are, even more frustrating to see them copying and now playing

dirty." PX1064-02 (IQV); PX0595 (Field (IQV) Hr'g) at 506:11-508:15.

186.   Lasso CEO Greg Field wrote to the then-head of Lasso product management that he had a

"game changing idea": that Lasso will offer its own gross metrics product, Lasso Vision, for free

and referenced DeepIntent Outcomes, stating "we are going to offer gross metrics (Outcomes) for

free on everything." Part of the strategy, Mr. Field wrote, was to "say a huge fuck you to

DeepIntent." PX1433-03 (IQV); PX0595 (Field (IQV) Hr'g) at 515:11-517:10. After announcing

Lasso Vision, Mr. Field Field wrote to Mr. DiNorscio "can't wait to see what DeepIntent posts ;)"

and joked that DeepIntent would respond by making its Outcomes product free, writing "oh shit,

Outcomes is free now!" PX1606-02 (IQV); PX0595 (Field (IQV) Hr'g) at 511:21-513:23. Lasso

Vision is an HCP programmatic advertising tool that offers gross metrics reporting to help clients

understand how HCPs prescribe drugs. DeepIntent Outcomes is a similar product providing script

reporting. PX0538 (Field (IQV) Dep.) at 52:12-54:15; PX0595 (Field (IQV) Hr'g) at 508:16-515:2; *see also* PX0593 (Sandler (DI) Hr'g) at 341:21-342:25. DeepIntent responded as Mr. Field predicted.  DeepIntent ███████████████████████████████████████████████████████████"

PX2750-01 (DI); PX0593 (Sander (DI) Hr'g) at 343:1-346:25.

187.  However, Lasso's founder expressed frustration that Lasso had missed the opportunity to market its own measurement product before DeepIntent announced theirs, remarking DeepIntent "beat us to the punch." PX1063-02 (IQV).

### F. Dr. Hatzitaskos's Quantitative Analysis Confirms Substantial Head-to-Head Competition Between DeepIntent and Lasso and that Eliminating Such Competition Will Increase Prices

188.  Dr. Hatzitaskos found that "DeepIntent and Lasso are strong competitive constraints on one another. So essentially if you remove that head-to-head competition . . . even if they are facing other constraints, there will be a substantial lessening of competition that will lead to harm to customers that may take several forms, higher prices, lower quality, lower innovation." PX0596 (Hatzitaskos Hr'g) at 856:9-18.

189. In  his  analysis  of  actual  customer  choices,  Dr.  Hatzitaskos  found  that  ████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

190.  ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

191.  This analysis is significant because "making no assumptions, again, about who is in or who is out" of the market, it confirms that the vast majority of customers are contained within the big three and that the competitive fringe or other alternatives are represented by a small slice of unknown. PX0596 (Hatzitaskos Hr'g) at 858:7-20.

192.  Dr. Hatzitaskos conducted an expanded analysis of actual customer choices and confirmed that they are robust against any isolated errors. PX0596 (Hatzitaskos Hr'g) at 932:1-934:15

193.  Dr. Hatzitaskos found that post-merger, the combined company would have an incentive to raise prices using two different standard economic models used in prior antitrust cases, the gross upward pricing pressure index ("GUPPI") and merger simulation. PX0596 (Hatzitaskos Hr'g.) at 860:1-21; ███████████████████ For example, in a GUPPI that does not rely on any assumptions from market definition, Dr. Hatzitaskos found that "the merged firm[] would have an incentive to raise DeepIntent's prices ███████████████ PX0596 (Hatzitaskos Hr'g) at 860:10-21; ██████████.

194.  Dr. Hatzitaskos's quantitative analysis of horizontal competitive harm is consistent with what is "see[n] again and again in the ordinary course of business documents where DeepIntent identifies Lasso as a close competitor[,] Lasso identifies DeepIntent as a close competitive, where they essentially view other providers to be less competitive and missing some features. Third parties identified them as close competitors." PX0596 (Hatzitaskos Hr'g) at 861:16-861:6.

## VII.  THE PROPOSED ACQUISITION WILL SUBSTANTIALLY LESSEN COMPETITION BECAUSE IQVIA IS A DOMINANT PROVIDER OF KEY INPUTS TO HCP PROGRAMMATIC ADVERTISING

### A.  IQVIA is a Dominant Healthcare Data Provider Used by Nearly Every Pharmaceutical Company

195.  With $11 billion in sales, IQVIA is the clear market leader in many categories of healthcare data and self-identifies ████████████████████████████ *see also*

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

196.   Investment analysts described IQVIA as ████████████████████████████

because ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████   In particular, IQVIA's HCP

identity and prescribing data is commonly described as the "gold standard." PX4164-11 (DI);

PX1739-02 (IQV); PX1740-03 (IQV); PX1741-05 (IQV); PX1170-05 (IQV); PX0531 (Klein (DI)

Dep.) at 29:5–20; PX2788-03 (DI); PX0542 (Elwell (TI Health/Swoop) Dep.) at 103:15–104:5;

PX0569 (Karlova (EMD Serono) Dep.) at 51:6–12; 106:14–22 (stating she was not even familiar

with other healthcare data vendors "[b]ecause in every single company I worked with [AbbVie,

EMD Serono, Takeda], we worked with IQVIA.").

1.   <u>IQVIA is the Dominant Provider of HCP Identity and Prescribing Data for
Programmatic Advertising</u>

197.  IQVIA is the ███████████████████████████████████████████████████

██████████████████████████████████   ████████████████████████████

███████████████████████; ████████████████████████████; ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ *See also* ████████████████████████████

████████████████████████████████████████████.

198.   IQVIA acknowledges that it provides the ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

199.   IQVIA describes its HCP identity data as "the ONLY 100% first-party, opted-in,

deterministic healthcare professional (HCP) data in the industry." PX1032-01 (IQV); ████████

████████████████████████████████████████████████████

███████████████████████████

200.   DeepIntent estimated that IQVIA's data are used in advertising campaigns "████████

████████████████████████████████████████████" PX2544 (DI).

201.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

2.   <u>No Other Data Competitors are Sufficient Data Alternatives to IQVIA for
     HCP Programmatic Advertising</u>

202.   DeepIntent recognizes the value of IQVIA's HCP data describing its competitive advantage

as ████████████████████████████████████████████████████

████   PX2800-04 (DI); *see also* PX3028-03 (DI) (████████████████████

████████████████████████);  ████████████████████████████

███████████████████████████████

203.   While generalist and fringe DSPs may try to match HCPs with their online identities (such as email addresses) using publicly available information, Defendants' proprietary NPI databases and IQVIA's HCP identity data allow them to reach much greater percentages of HCPs. PX0520 (Werther (DI) IH) at 74:15–19 (stating that ████████████████████████"); PX0534 (Craigmyle (DI) Dep.) at 62:17–63:9 (stating that █████████████████████ ██); ███████████████████████████████████████ ███████████████████████ *see also* ████████████ PX2860-05 (DI).

204.   IQVIA executive Jay Margolis ██████████████████████████ ████████████████  ████████████████████████  ██████████ ██████████████████████████████████████████ █████████████████████████████████████.

205.   IQVIA also has the most accurate measurement solution available. PX0593 (Colarossi (IQV) Hr'g) at 254:14–17. For example, ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████.

206.   Other companies cannot provide the same measurement capabilities. For example, Crossix's measurement services for HCP programmatic are not comprehensive for HCP programmatic advertising because they lack the capability to provide 1:1 PLD reporting, a capability HCP programmatic advertising customers value. PX0595 (Evenhaim (Veeva) Hr'g) at 600:5–13. ██ ████████████████████████████████████████████ ████████████████████████████████████████████

███████████████████████████.

207.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████  *see infra* ¶ 217.

208.  Defendants' expert, Dr. Jena, testified that data providers compete on quality and "offer a product that is different than what you could get for free." PX0599 (Jena Hr'g) at 1339:5-10.

> 3.  <u>Nearly Every Would-Be Competitor to DeepIntent and Lasso Has Testified that they Need IQVIA's Data to compete in HCP Programmatic Advertising.</u>

209.  ████████████████████████████████████████████████████████

████████████████████████████████████.  █████  █████████████████████████;

████████████████████████████████████████████████████████████

████████████████████████;  ████████████████████████████████████

██████████████████████████████████████████████████████████;  *see*

*also*  ███████████████████████;  █████  ████████████████████████████

████████████████████████████████████████████████;  █████  █████████

███████████████████████████████;  ████████████████████████████████

██████████████████████████████████████████████.

210.  Due to IQVIA's data quality and ubiquity,  █████████████████████████████

████████████████████████████████████████████████████████  █████████████

████████████████████████████████████;  █████  ██████████████████████████

████████████████████████;  █████  ████████████████████████████████████

**B.  The Proposed Acquisition is Unlawful Under the Brown Shoe Vertical Merger Framework**

> 1.  <u>The Share of Market Foreclosure</u>

211.  Having acquired both MedData Group and DMD, DeepIntent's CEO stated that  ████████████

█████████████████████████████████████████.” PX2575-01 (DI).

212.  IQVIA controls HCP prescribing data that ████████████████████████

████████████████████████████████████████████████.

213.  Due to IQVIA's data quality and ubiquity within pharmaceutical companies, ████████

███████████████████████████████████████████ ██████

███████████████████████; █████ ████████████████████████

214.  IQVIA's dominant position as a data provider to pharmaceutical companies generally is

███████████████████ because ██████████████████████████

████████████████████████████████████████████.

215.  DeepIntent's CEO Chris Paquette thought ████████████████████████

████████████████████████████████████████████████.

████. PX0595 (Paquette Hr'g) at 613:8–616:21.

2.  <u>IQVIA's Serial Acquisitions Perpetuate a Trend Towards Vertical Integration</u>

216.  At the downstream level, IQVIA already acquired Lasso and now seeks to acquire the

"industry leader" among healthcare DSPs, leaving just one other significant competitor. PX2576-

17 (DI). ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

217.  ████████████████████████████████████████████

█████████████████ █████ ████████████████████████████; █████

███████████████████████████████████████████████████████████

██████; █████████████████████████████

218.  IQVIA executive David Reim commented to fellow executive Jay Margolis, that "IQVIA has made a HUGE investment in this [HCP programmatic advertising] space over the last couple of years and it is profoundly obvious to everyone in the industry that IQVIA is leading a consolidation." PX1377-01 (IQV).

### 3. The Economic Purpose of the Acquisition is to Entrench IQVIA's Power in Healthcare Programmatic Advertising

219.  The primary objective of this transaction is to establish IQVIA as a market leader in HCP programmatic advertising. IQVIA recognized that being ██████████████████ would shift its economic incentives in a way that conflicted with its █████████████████ approach as a data provider. ████████████████████████████████████████

████████████████████████████

220.  In a May 2023 email , IQVIA Executive Frank Lin stated "I would go stronger with the market penetration – Doe [DeepIntent] has the #1 position for Healthcare platform – PP 2nd, and London {Lasso} 3rd We can hold that easily with IQV data." PX1026 (IQV).

221.  DeepIntent's CEO Chris Paquette █████████████████████████████████

████████████████████████████████████████████████████████████

█████████ PX0595 (Paquette (DI) Hr'g) at 612:13-613:21.

222.  In 2021, DeepIntent evaluated █████████████████████████████████

██████████████████████████████████████████████

### 4. The Proposed Acquisition Increases of Barriers to Entry

223.  █████████████████████████████████████████████████████████████



" PX2579-02-03 (DI); *see*

PX0595 (Paquette (DI) Hr'g) at 612:13-22.

224.  DeepIntent reasoned that

" PX2696-17 (DI); *see also* PX2580-08 (DI) ("

'").

225.  Additionally, IQVIA executive Frank Lin acknowledged

226.  DMD internal documents

*see also*

227.

228.

229. █████████████████████████████████████████████████████

████████████████████████████████

     5.  <u>The Degree of Market Power Possessed by the Merged Firm Raises the Risk that HCP Programmatic Advertising will Cease to be Competitive</u>

230.  When DeepIntent's CEO Chris Paquette ████████████████████████████

████████████████████████████████████████████████

████████████ PX0595 (Paquette (DI) Hr'g) at 612:24–613:7.

231.  Frank Lin wrote to other IQVIA executives: "I would go stronger with market penetration – [DeepIntent] has the #1 position for Healthcare platform – [Pulsepoint] 2nd and [Lasso] 3rd We can hold that easily with IQV data." PX1026 (IQV); PX0593 (Lin (IQV) Hr'g) 281:8–283:23.

**C. Post-acquisition IQVIA will have the Ability and Incentive to Foreclose or Disadvantage its Competitors in HCP Programmatic Advertising**

     1.  <u>This Acquisition Increases IQVIA's Incentives to Foreclose its Rivals</u>

232.  In analyzing the Proposed Acquisition, ████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

233.  Former IQVIA senior executive Jay Margolis ██████████████████████

████████████████████████████████████████████████

████████████████████████████

234.  Frank Lin explained to other IQVIA executives the change in incentives once IQVIA owned DMD: "I would go stronger with market penetration – [DeepIntent] has the #1 position for Healthcare platform – [PulsePoint] 2nd and [Lasso] 3rd We can hold that easily with IQV data." PX1026 (IQV); PX0593 (Lin (IQV) Hr'g) 281:8-283:23; *see also* ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

235. ████████████████████████████████████

2. IQVIA Has the Ability to Foreclose Rivals by Withholding or Delaying Access to TPAS

237.   DSPs need access to HCP target lists that its clients generate with IQVIA's OneKey data and to connect to clients' IQVIA measurement platform to service its customers because IQVIA is "probably the largest provider of . . . reference data" and part of pharmaceutical companies' "data fabric." PX0592 (Gerszke (PulsePoint) Hr'g) at 162:5–164:5, 166:2–167:14; ████████ ████████; PX0533 (Fisher (IQV) Dep.) at 32:22–33:5; 37:3–12.

238.   When a pharmaceutical customer with a license for IQVIA data used for audience creation or measurement seeks to run that data through a DSP, the DSP must seek its own license from IQVIA pursuant to IQVIA's Third-Party Access ("TPA") program. *See, e.g.,* ████████

Third Party Access Program, https://www.iqvia.com/about-us/third-party-access-program/ (last visited Dec 7, 2023)); PX1785-18 (IQV) ("[b]y way of the TPA program, we each have additional insights into our Client's activities for the purpose of permitting IQVIA Data to their Third Party for a specific purpose / use on their behalf."); PX0542 (Elwell (TI Health/Swoop) Dep.) at 104:19–105:21; PX0595 (Evenhaim (Veeva) Hr'g) at 571:4-12.

239.  IQVIA's TPA policy requires consideration of whether the "[v]endor is a direct competitor" to IQVIA and whether the "vendor is a competitor to IQVIA but not directly" of the IQVIA offering. PX1785-20 (IQV); *see also* ███████████████████████████████████

███████ PX1785-18 (IQV); PX1785-23 (IQV) (IQVIA instructs manual review of a TPA if the "[v]endor has a commercially competitive offering in the marketplace that could gain value by obtaining access to the requested IQVIA information offering."); *see also* ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

240.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  *see also*  ████████████████

███████████████████████  ███████████████  ███████████████; ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████  *see also* PX1295 (IQV) (there are "few use cases where we would send info to anyone with competitive information assets.").

241.  Delays in processing TPAs can influence a customer's choice because ████████████████



██████████████████████████ ████████ ████████████████████████████; PX0595

(Evenhaim (Veeva) Hr'g) at 597:12-23 (testifying that "[w]hen a TPA is not granted, it is extremely disruptive for that customer and that engagement creates a huge amount of uncertainty in terms of being able to complete the analysis and being able to renew that part of the business."); PX0592 (Gerszke (PulsePoint) Hr'g) at 167:15–168:15 ("If IQVIA withheld access to its data, it would make PulsePoint "go backwards" and make it more difficult for PulsePoint to win HCP programmatic advertising business.").

242.  IQVIA instructs manual review of a TPA if the "[v]endor has a commercially competitive offering in the marketplace that could gain value by obtaining access to the requested IQVIA information offering." PX1785-23 (IQV); *see also* ████████████

243.  ███████████████████████████████████████████████████. ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████; ████

████████████████████████████; PX0595 (Evenhaim (Veeva) Hr'g) at 571:15–572:2

(By denying or delaying TPA agreements, IQVIA can "reduce the value of [Crossix's] measurement offering because that input cannot be incorporated into the analysis.").

   3.  IQVIA Has the Ability to Disadvantage its Rivals Through its Pricing

244.  ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████. As a result, ████████████████████████████████

████████████████████████████████ PX2510-01 (DI) ████████████████████

██████████████████████"); PX2509-01 (DI) ██████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████").

245.  It is not uncommon for a DSP participating in a competitive RFP to ask IQVIA to lower its

contracted data prices for the opportunity to help the DSP win; ████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ PX2509-01 (DI);

██████████████████; ██████; ████████████████████████████; *see also* ████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

   4.  IQVIA Could Eliminate Customer Choice By Replacing its Data Competitors
       or Using Its Market Position to Disadvantage Rivals

246.  ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████.  ████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████; ██████████████████████████████████████████████

*see also*

247. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ PX2737-03 (DI); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## VIII.   DEFENDANTS CANNOT REBUT THE PRESUMPTION OF ILLEGALITY OR *PRIMA FACIE* SHOWING OF LIKELY COMPETITIVE HARM

### A.   Entry and Expansion are Unlikely to be Timely, Likely, and Sufficient

248.  Entry into the HCP programmatic advertising market is financially risky, expensive, time-consuming, and logistically challenging. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

250.   Dr. Hochberg admitted that her opinion that the HCP programmatic market is a dynamic market is not based on any qualitative analysis of the competitive field or quantitative analysis of market shares and revenues. PX0597 (Hochberg Hr'g) at 1006:2-13. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

#### 1.   Defendants Recognize Significant Barriers to Entry

66

251.  DeepIntent  identified  several  "█████████████," including  the  "███████ ████████████████████████████████" a "█████████," its "█████████████████████████████" and its █████ PX2581-24 (DI) (capitalization removed); *see also* PX2504-18 (DI).

252.  Internal Lasso documents explain that ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████ and ████████████████████████████████████████

253.  In addition to infrastructure and regulatory barriers, IQVIA's unrivaled healthcare data collection "would be difficult and costly for another party to replicate," according to the company's annual report. PX1137-05 (IQV).

254.  IQVIA recognizes that HCP opt-in and consent are important points of differentiation for its data products. PX0599 (Resnick (IQV) Hr'g) at 1251:3-23; PX1100-04 (IQV).

255.  IQVIA also estimated that ████████████████████████████████ ██████████████████████ *See also* ███████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████

256.  DeepIntent reasoned that ████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████" PX2696-17 (DI); *see also* PX2580-08 (DI).

257.  ████████████████████████████████████████████████████████ ████████████████████████████████████████████████

258.  ████████████████████████████████████████████████████████



259.

260.

261.

262.

██████ ███ █████████████████████

    2.  <u>Evidence from Market Participants Confirm that Neither Entry Nor Expansion will be Timely, Likely, and Sufficient</u>

263.   The history of failed entry in the HCP programmatic advertising market confirms the high barriers and shows why Defendants' claims regarding entry amount to no more than speculation. By way of example, Digilant, a media company, spent five years attempting to build a DSP, but after a year of operation decided to shut the DSP down because "[i]t was too expensive, and [its] technology wasn't good enough in comparison to what was out there," and the capabilities "couldn't compete." PX0511 (Farris (Digilant) IH) at 44:13–45:12.

264.   MediaMath was a DSP that operated in the healthcare vertical; but like Digilant, MediaMath has also exited—in its case via bankruptcy in June 2023. PX4170.

265.  █████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

266.  Dr. Hatzitaskos found that ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ ███████████████████████

267.  █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

B.      **Defendants Have Failed to Establish Verifiable, Merger-Specific Efficiencies**

268.   Defendants' executives admitted their efficiency claims were not independently verified.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████   Dr. Hatzitaskos evaluated the parties' synergy claims and ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████ .

270.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

271.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

272. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

273. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

274. ███████████████████████████████████████

███████████████████████████  ████████████████████

███████████████████████████████████████

███████████████████████████████████████

C.     **IQVIA's "Open Offers" Do Not Address the Merger's Competitive Harm**

275. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ Those purported offers were not

produced to the FTC until 9:59 p.m. the night before the 8:30 a.m. deposition of IQVIA executive

Bob Whiting, copied on some of the offers. ██████████████

276. ███████████████████████████████████████

████████████████████████████████ October 20 was the deadline for completing non-party discovery. ECF No. 104, Ex. A. ███████████████████████████████

███ Contrary to its representation to the Court, IQVIA did not send an offer to AdTheorent. Defs.' Opening Stmt. at 67 (neither did Defendants produce to the FTC any open offers for TTD, Amobee, or Viant). ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████ ; *see also* ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

278. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████ ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

279. ████████████████████████████████████████████

████████████████████████████████

280. However, IQVIA touts itself as the "leader in far-reaching categories of healthcare data including Rx, Tx, and reference" and how its "rich database" enables the creation of "advanced

audiences" while its competitors "use other, substandard, data sets to provide their advanced targeting which limits their effectiveness." PX1973-006 (IQV).

281. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

283. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

284. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

# TABLE OF CONTENTS

A.   The FTC Has a Fair and Tenable Chance of Ultimate Success on the Merits.................... 1

B.   Burden-Shifting Framework ................................................................................. 2

C.   HCP Programmatic Advertising Is a Relevant Market........................................... 5

    1.   The Relevant Market Satisfy the *Brown Shoe* Practical Indicia ......................... 11

    2.   The Relevant Market Satisfies the Hypothetical Monopolist Test ...................... 12

D.   IQVIA Data Is a Related Product to the Relevant Markets ................................... 13

E.   There is a Fair and Tenable Chance that the Proposed Acquisition May
Substantially Lessen Competition in the Relevant Market................................... 14

    1.   Substantial Competition Between the Parties Will be Eliminated....................... 14

    2.   Post-Acquisition Shares and Concentration Are Presumptively Unlawful .......... 15

    3.   Vertical Foreclosure Will Increase Barriers to Entry and Reduce Competition in
the Relevant Market..................................................................................... 16

    4.   Harm to Innovation in the Relevant Markets.................................................. 20

F.   At the Merits Trial Defendants Will Fail to Meet their Burden to Show Entry
Will Be Timely, Likely, and Sufficient to Counteract the Competitive Harm
from the Proposed Acquisition ........................................................................... 21

G.   At the Merits Trial Defendants Will Fail to Meet their Burden to
Demonstrate That Their Proposed Efficiencies and Any Other Alleged
Procompetitive Benefit Offset the Competitive Harm........................................... 23

H.   Proposed Remedies Are Irrelevant in a § 13(b) Proceeding................................. 25

I.   Temporary Relief to Preserve the Status Quo is in the Public Interest................... 26

## PROPOSED CONCLUSIONS OF LAW

**A.**     **The FTC Has a Fair and Tenable Chance of Ultimate Success on the Merits**

1.     Section 13(b) of the FTC Act authorizes the FTC to obtain a preliminary injunction "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).

2.     At this preliminary stage, Section 13(b) requires the Court to consider the FTC's likelihood of ultimate success and exercise its independent judgment. However, "it does not require the FTC to prove, or [the court] to find, probable success on the merits *but something less*" and the FTC can satisfy the "likelihood of success" prong by showing "that it has a fair and tenable chance of ultimate success on the merits." *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977) (emphasis added).

3.     The "fair and tenable chance" standard is largely interchangeable with "serious question." *United States v. Sun and Sand Imports, Ltd., Inc.*, 725 F.2d 184, 188 n.5 (2d Cir. 1984); *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1164 (9th Cir. 1984).

4.     In a 13(b) proceeding it is not the role of the court at this stage "to embark upon a detailed analysis" of the factual record or "resolve these factual issues on this motion." *Lancaster*, 434 F. Supp. at 1094; *id.* at 1091 ("Congress intended that on applications under Section 13(b), the district court be guided by preliminary and tentative findings of fact without attempting to resolve the underlying antitrust issues of fact."); *Warner Commc'ns Inc.*, 742 F.2d at 1164 ("Because the issue in this action for preliminary relief is a narrow one, [courts] do not resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." (relying on *Lancaster*, 434 F. Supp. at 1094)).

5.     Accordingly, "the central issue for us is not whether respondents have violated, or are about to violate, the antitrust laws, for adjudication of those issues is vested in the FTC in the first

1

instance." *Lancaster*, 434 F. Supp. at 1090 (*citing FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976)).

6.      In enacting Section 7, Congress provided "authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.,* 597 F.2d 814, 816 (2d Cir. 1979) (per curiam) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 317 (1962)).

7.      This incipiency standard entails that "wherever possible, without doing violence to the legislative objectives underlying the antitrust laws, we should 'lighten the burden of proof,' 'simplify the test of illegality' and 'dispense with elaborate proof of market structure, market behavior or probable anticompetitive effects.'" *Lancaster,* 434 F. Supp. at 1094 (citing *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362-63 (1963)).

8.      Thus, even as to the *ultimate merits* "any 'doubts are to be resolved against the transaction.'" *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3rd Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

9.      At the merits trial, which is the administrative proceeding starting on December 20, 2023, "the ultimate question is whether the effect of the acquisition may be substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the country" in violation of Section 7 of the Clayton Act. *Lancaster*, 434 F. Supp. at 1091. An acquisition that violates Section 7, by definition, is a violation of Section 5 of the FTC Act. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986); *Lancaster*, 434 F. Supp. at 1096.

   **B.      Burden-Shifting Framework**

10.     At the merits trial, courts and the FTC have traditionally analyzed Section 7 claims under a burden-shifting framework. The plaintiff first establishes its *prima facie* case or presumption of illegality, and then the burden shifts to defendants to produce evidence rebutting the *prima facie*

case or countervailing procompetitive benefits. "[U]nless defendants meet their burden of rebutting this presumption [of illegality], the merger must be enjoined." *R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 108 (2d Cir. 1989); *In the Matter of Polypore Int'l, Inc.*, No. 9327, 2010 WL 9549988, at *9 (F.T.C. Nov. 5, 2010). The same burden-shifting framework applies to both horizontal and vertical claims. *See Fruehauf Corp. v. FTC*, 603 F.2d 345, 352-53 (2d Cir. 1979); *see also United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019).

11.     The FTC's *ultimate burden* at the merits trial will be to show a "reasonable probability" that the Proposed Acquisition may substantially lessen competition. *Brown Shoe Co.*, 370 U.S. at 325; *R.C. Bigelow, Inc*., 867 F.2d at 107-08; *Brown Shoe Co.*, 370 U.S. at 323 ("Congress used the words '*may* be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." (emphasis original)).

12.     At the merits trial, Defendants will be allowed to rebut the presumption by introducing evidence demonstrating that the merger "will not have anticompetitive effects." *United States v. Waste Management, Inc*., 743 F.2d 976, 981 (2d Cir. 1984); *see also In re Illumina, Inc., & Grail, Inc.*, No. 9401, 2023 WL 2823393, at *19 (F.T.C. Mar. 31, 2023).

13.     Rebuttal arguments concerning entry and efficiencies are beyond the scope of a 13(b) proceeding. *Lancaster*, 434 F. Supp. at 1094-96 (stating that, in a 13(b) proceeding, the district court's "function is simply to consider the FTC's chances of success on those issues. We, therefore, will explore whether the market share obtained by this acquisition is presumptively illegal or decisive *without regard to other factors*") (emphasis added).

14.     Moreover, even under the *more exacting* standard afforded to private litigants seeking to preliminarily enjoin a merger under 15 U.S.C. § 26, this Circuit has affirmed the issuance of injunctions based solely on Plaintiff's prima facie case and deemed rebuttal arguments beyond the scope of the proceeding. *Consol. Gold Fields PLC v. Minorco, S.A*., 871 F.2d 252, 260-61,

*amended by* 890 F.2d 569 (2d Cir. 1989); *see R.C. Bigelow*, 867 F.2d at 110-11 (citing *Waste Management*, 743 F.2d at 984).

15.     The FTC has more than met its burden of establishing a likelihood of success on the merits. Although finding for the FTC even on a *single* theory of probable competitive harm it has put forward here warrants the issuance of a preliminary injunction, the FTC has amply demonstrated likelihood of success on the merits under *all three* theories of harm. *Infra* Conclusions of Law at § E.

16.     First, the FTC has demonstrated that it has a fair and tenable chance of demonstrating at the merits trial that the Proposed Acquisition has a reasonable probability of substantially lessening competition by unduly concentrating the market for programmatic advertising to U.S. healthcare professionals ("HCP Programmatic Advertising" or the "Relevant Market") warranting temporary relief under § 13(b). *Infra* Conclusions of Law at §§ E.1, E.2; *supra* Plaintiff's Proposed Findings of Fact ("PPFF") § V.

17.     Second, at the trial on the merits the FTC has a fair and tenable chance of proving that the Proposed Acquisition may substantially lessen competition by eliminating intense, head-to-head competition currently existing between the merging parties in the Relevant Market. *Infra* Conclusions of Law § E.1.

18.     Third, the FTC has a fair and tenable chance of proving at the merits trial that the vertical aspect of the Proposed Acquisition could give IQVIA the ability and incentive to foreclose its competitors from a segment of the Relevant Market currently open to them and may act to deprive rivals of a fair opportunity to compete. *Infra* Conclusions of Law § E.3.

19.     The vertical aspects of the merger bolster the FTC's horizontal case by showing, for the purposes of this motion, that the Proposed Acquisition will further raise the already high barriers to entry into the Relevant Market, and hence overall increase the FTC's chances of prevailing at

the merits trial.  *Infra* Conclusions of Law § E.3.

20.     Although beyond the scope of the 13(b) proceeding the FTC has shown, for purposes of this motion, that new entry or expansion is unlikely to offset the competitive harm of the Proposed Acquisition. *Infra* Conclusions of Law § F.

21.     Although beyond the scope of the 13(b) proceeding the FTC has shown, for purposes of this motion, that any proposed efficiencies or alleged procompetitive benefits are unlikely to offset the competitive harm in the Relevant Markets. *Infra* Conclusions of Law § G.

22.     The open offer floated by IQVIA in this case, a proposed remedy, is beyond the scope of a § 13(b) proceeding. *Infra* Conclusions of Law § H.

23.     As for the equities, in this district at a 13(b) proceeding the Court must disregard private equities and focus solely on public ones. *Infra* Conclusions of Law § I.

24.      At this preliminary phase all the FTC must demonstrate is that it has a "fair chance of ultimate success on the merits" and "that the weight of the equities and the public interest favor maintaining the status quo during the pendency of the administrative proceedings and any judicial review." *Lancaster*, 434 F. Supp. at 1096-97.

### C.     HCP Programmatic Advertising Is a Relevant Market

25.     The Supreme Court has recognized that Section 7 prohibits acquisitions that may "substantially lessen competition within the area of effective competition." *Brown Shoe*, 370 U.S. at 324 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (internal quotations omitted)).

26.     The "relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.,* 386 F.3d 485, 496 (2d Cir. 2004) (citations omitted).

27.     At the 13(b) stage "the FTC assume[s] the burden of raising some question of whether [HCP programmatic advertising] is a well-defined market," but "[t]his is not to say the FTC has in fact proved such a market, which is not necessary at this point."  *FTC v. Whole Foods Mkt., Inc*., 548 F.3d 1028, 1037, 1041 (D.C. Cir. 2008); *Lancaster*, 434 F. Supp. at 1093-94 ("it is not our function, nor can we hope to resolve these factual issues on this motion").

28.     A product market's "outer boundaries" are determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.  However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."  *Brown Shoe*, 370 U.S. at 325.

29.     In this Circuit, a relevant market is defined by identifying "the market participants and competitive pressures that restrain *an individual firm's ability* to raise prices or restrict output." *Geneva Pharms.*, 386 F.3d at 496 (emphasis added).

30.     For purposes of Section 7 analysis, a relevant market is not defined by answering the question "where the parties to the merger do business or even where they compete" but by determining "where, *within the area of competitive overlap*, the effect of the merger on competition *will be direct and immediate*." *F. & M. Schaefer Corp*., 597 F.2d at 817 (citing *Phila. Nat'l Bank*, 374 U.S. at 357) (emphasis added).

31.     The existence of arguable functional substitutes to HCP Programmatic Advertising such as advertising through direct buys on endemic websites does not affect the existence of a relevant market or submarket for the specialized versions of advertising. *See, e.g., Hayden Pub. Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 66-67 & n.4 (endorsing viability of submarket for "advertising in electronics catalog-directories" that consisted of only two competitors and were targeted primarily at "electronic design engineers" and excludes other electronics directories that "do not contain as much product information"); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S.

242, 252 (1959) ("[C]hampionship boxing is the 'cream' of the boxing business, and . . . is a sufficiently separate part of the trade or commerce to constitute the relevant market . . ."); *Whole Foods*, 548 F.3d at 1032 (endorsing viability of submarket for "premium, natural, and organic supermarkets").

32.    In specialized markets such as HCP Programmatic Advertising "core customers can be a proper subject of antitrust concern," and the existence of such valid antitrust markets that addresses unique customer needs can be determined by identifying "particularly dedicated, distinct customers, paying distinct prices" either because their "particular circumstances dictate that a product is the only realistic choice . . . or because they find a particular product *uniquely attractive*." *Whole Foods*, 548 F.3d at 1039 (cleaned up) (emphasis added); *see also Geneva Pharms*., 386 F.3d at 497-98 (finding a distinct submarket of customers with greater "risk-sensitivity" who are "concerned about the potential for dosage problems may be especially unlikely to switch from a known entity even though they have to pay a higher price.").

33.    The fact that some customers might theoretically be flexible and may seek to cobble together a piecemeal alternative to 3-in-1 HCP Programmatic Advertising products outside the market does not undermine the existence of a submarket as a matter of law.  *United States v. Grinnell Corp.*, 384 U.S. 563, 572, 574 (1966) (finding a market for central station protection despite the fact that "they face competition from [] other modes of protections" because "to compete effectively, [central station companies] must offer all or nearly all types of service" in a single package and competition on individual components was not a sufficient competitive restraint); *FTC v. Staples, Inc.,* 970 F. Supp. 1066, 1079 (D.D.C. 1997) (finding that even though buyers could go to multiple stores to meet their consumable office supplies needs, "that the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers"); *Whole Foods*, 548 F.3d at 1039 ("In sum, the district

court believed the antitrust laws are addressed only to marginal consumers. This was an error of law, because in some situations core consumers, demanding exclusively a particular product or package of products, distinguish a submarket.").

34.     HCP Programmatic Advertising is a relevant market even if some customers might consider other forms of advertising a reasonable substitute. In fact, this Circuit found a valid submarket even when a *significant* set of customers switched away from the relevant market because it *also* identified a *subset of customers that did not find the alternative product a reasonable substitute*. *Geneva Pharms*., 386 F.3d at 497-98 ("Customers that have remained with Coumadin clearly do not perceive generics to be a reasonable substitute for it. Conversely, *price-sensitive customers have flocked to the cheaper generic* and are likely to view another inexpensive generic as a reasonable substitute." (emphasis added)).

35.     Similarly, HCP Programmatic Advertising is a distinct market even if certain customers "cross-shop" between it and other forms of advertising when allocating their budgets across various methods of Advertising. *Whole Foods*, 548 F.3d at 1040 ("The fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean there is no definable groceries market . . . cross-shopping is entirely consistent with the existence of a core group of [] customers . . . Whole Foods competes actively with conventional supermarkets for dry groceries sales, even though it ignores their prices for high-quality perishables."); *see also Hayden Pub. Co*., 730 F.2d at 67 n.4 ("The point is that precise market analysis would require close examination of each of the publications; it is not enough that, as the district court found, 'suppliers of [electronic] products utilize all the publications cited . . . for the purpose of advertising their products.'").

36.     The fact that identical advertisements for a given drug may appear on endemic websites, social media and non-endemic websites does not indicate that they are substitutes in the eyes of customers, which are in this case *advertisers*, not *doctors*. *See Geneva Pharms*., 386 F.3d at 496-

97. This Circuit has reversed a district court that held that "functional interchangeability" foreclosed the existence of a submarket, despite evidence regarding actual customer substitution and cross-elasticity of demand pointing towards the existence of such submarket. *Id.* at 496 ("It may seem paradoxical to believe that Coumadin and generic warfarin -- which have been certified by the FDA as therapeutically equivalent – are nevertheless in separate markets for antitrust analysis . . . Yet, in examining the competitive pressures that affect the ability of a lone generic manufacturer to raise prices or reduce output, we are persuaded that competition among generics creates those restraints.").

37.     Whether the HCP Programmatic Advertising market can be characterized as "nascent" or "emerging" bears "limited weight" on whether it constitutes a relevant market. *See FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 924 (N.D. Cal. 2023).

38.     Even if weight were given to whether the Relevant Market is emerging or dynamic, that only serves to *strengthen* the FTC's argument for a preliminary injunction.  A preliminary injunction is especially warranted when the merger occurs in an emerging but concentrated market – such as here, where the top three players control 80% of the market – that might deconcentrate absent the merger if allowed to further develop and mature. *Stanley Works v. FTC*, 469 F.2d 498, 504, 507-08 (2d Cir. 1972), *cert. denied*, 412 U.S. 928 (1973); *see also Grumman Corp. v. LTV Corp.*, 665 F.2d 10, 12, 15 (2d Cir. 1981).

39.     The Second Circuit has applied antitrust laws to "nascent" and "emerging" markets.  For example, it held that Apple's 2009 ebooks price-fixing conduct was an "unreasonable restraint of trade" in violation of the Sherman Act despite e-books only "emerging" as a market after Amazon released the Kindle two years prior.  *United States v. Apple, Inc.*, 791 F.3d 290, 299, 329-330 (2d Cir. 2015), *cert. denied*, 577 U.S. 1193 (2016).

40.     Similarly, even when analyzing nascent, "high technology," or "emerging" markets courts

rely upon evidence of market concentration to determine whether the merger is presumptively unlawful. *FTC v. PPG Indus., Inc*., 798 F.2d 1500, 1503 (D.C. Cir. 1986) (Bork J.) ("[T]he fact that there appear to be only three fully capable firms in that market indicates that the HHI will be very high. Even if one or two other firms were thought capable of expanding or entering, the HHI would still put the market in the highly concentrated range, and the acquisition would cause a great increase in the HHI.").

41.     As to a broader advertising market "even if alternative submarkets exist . . . or if there are broader markets that might be analyzed, the viability of such additional markets does not render the one identified by the government unusable." *United States v. Bertelsmann SE & Co.*, 646 F. Supp. 3d 1, 28 (D.D.C. 2022); *see also Grumman Corp. v. LTV Corp.,* 527 F. Supp. 86, 89-90 (E.D.N.Y.)*, aff'd,* 665 F.2d 10 (2d Cir. 1981). "[E]numerating other markets or submarkets in which competition would *not* be harmed by the merger" is a non sequitur. *Bertelsmann SE & Co.*, 646 F. Supp. 3d at 27 (emphasis added).

42.     At any rate, Defendants' arguments regarding the viability of such alternative markets are beyond the scope of preliminary injunction proceedings. *R.C. Bigelow*, 867 F.2d at 110-11 (declaring that defendants could argue their market definition at a merits trial and that market definition is "a judgment to be made by the district court following a full trial on the merits").

43.     To determine the validity of a relevant antitrust market definition, courts generally look to two types of evidence – the "practical indicia" set forth by the Supreme Court in *Brown Shoe* and testimony from experts in the field of economics regarding the Hypothetical Monopolist Test ("HMT"). *FTC v. Shkreli,* 581 F. Supp. 3d 579, 626-27 (S.D.N.Y. 2022).

44.     There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021). As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* indicia,

or a combination of the *Brown Shoe* indicia and the HMT. *See, e.g.*, *Geneva Pharms.,* 386 F.3d at 496 (relying on *Brown Shoe* factors alone in review of district court's determination of relevant market); *Shkreli*, 581 F. Supp. at 626-27, 630-31 (using HMT and *Brown Shoe* factors to analyze relevant market).

45.    In a 13(b) proceeding, the Government's burden is only to "rais[e] some question of whether" a market is "well-defined." *Whole Foods*, 548 F.3d at 1037; *see also Lancaster,* 434 F. Supp. at 1093-94. Here, under both the *Brown Shoe* practical indicia and the HMT, the relevant market is HCP Programmatic Advertising although harm may also occur in broader relevant product markets. *Infra* Conclusions of Law §§ F.1 & F.2.

### 1.    The Relevant Market Satisfies the *Brown Shoe* Practical Indicia

46.    The Supreme Court identified a series of "practical indicia" courts may consider in determining the relevant product market. The indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325; *see also Geneva Pharms.,* 386 F.3d at 496 ("The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market. The emphasis always is on the actual dynamics of the market rather than rote application of any formula.").

47.    Relevant markets "can exist even if only some of these [*Brown Shoe*] factors are present." *Staples*, 970 F. Supp. at 1075; *Beatrice Foods Co. v. FTC*, 540 F.2d 303, 308-309 (7th Cir. 1976); *see Grumman Corp.,* 527 F. Supp. at 92 (finding an aircraft nacelle market without analyzing the pricing indicia).

48.    The market for HCP Programmatic Advertising satisfies sufficient *Brown Shoe* indicia

factors, including industry and public recognition (PPFF § III.A.2); characteristics and uses (PPFF § III.A.1); sensitivity to price changes (PPFF §§III.A & C), distinct prices (PPFF § III.A.3); distinct customers (PPFF § III.A.4); and services performed by specialized vendors (PPFF § III.A.5).

### 2. The Relevant Market Satisfies the Hypothetical Monopolist Test

49.     This Circuit and the Commission may, alternatively or in addition, use the Hypothetical Monopolist Test ("HMT") to assess the relevant market. *See Shkreli,* 581 F. Supp. at 626-27, 630-31; *see also Penn State Hershey*, 838 F.3d at 338; *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022); United States Dep't of Justice and Fed. Trade Comm'n, Horizontal Merger Guidelines § 4.1.1 (2010) [hereinafter *Horizontal Merger Guidelines*].

50.     Under the HMT, a candidate market constitutes a relevant antitrust market if a hypothetical monopolist that owned all products in the candidate market could profitably impose a "small but significant and non-transitory increase in price" ("SSNIP") of 5% or more, or a reduction in product quality or service, on at least one product of the merging parties in the candidate market. The candidate market does not satisfy the HMT if customers switching to alternative products would make the price increase unprofitable. *See Horizontal Merger Guidelines* §§ 4, 4.1.1; *Consol. Gold Fields*, 871 F.2d at 260-261 (evaluating whether "sales of a 'substitute' rise significantly in response to a non-temporary increase of 5% or more in prices of the primary product" was an "accepted economic benchmark for identifying substitute goods within a given market").

51.     In conducting an HMT, economists calculate two key components: (1) the critical loss ratio, the point at which a hypothetical monopolist would lose too many customers for a SSNIP to be profitable, and (2) the aggregate diversion ratio, the proportion of lost sales recaptured by other firms (i.e., not the hypothetical monopolist) in the market as a result of the price increase.  *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 204-06 (D.D.C. 2018); *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 41-42 (S.D.N.Y. 2016); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 34-36 (D.D.C. 2017).

If aggregate diversion exceeds critical loss, then a SSNIP would be profitable for a hypothetical monopolist. *See e.g. FTC v. Swedish Match*, 131 F. Supp. 2d 151, 160 (D.D.C.2000).

52.   The market for HCP Programmatic Advertising satisfies the HMT. *See* PPFF § III.C.3.

### D.   IQVIA Data Is a Related Product to the Relevant Markets

53.   In vertical transactions, upstream inputs to downstream products in a relevant product market are referred to as "related products." *Illumina*, 2023 WL 2823393, at *28.

54.   The FTC need not prove that the related product constitutes a relevant antitrust market. *See Brown Shoe*, 370 U.S. at 325-26, 344  (finding a vertical Section 7 violation when only a relevant product market was shown); *du Pont de Nemours & Co.*, 353 U.S. at 593-97, 607 (same). No court has held that the government must prove monopoly power in a related product market to prove that a merger violates the Clayton Act. The proper inquiry here is whether IQVIA supplies related products on which Deep Intent rivals rely. *See AT&T*, 916 F.3d at 1032-33 (requiring no showing of an antitrust market around the related product of upstream programming). IQVIA's HCP identity and prescribing data are related products to HCP programmatic advertising.  *See* PPFF §§ III, VII.

55.   IQVIA's HCP identity and prescribing data are important inputs for the firms currently competing or those who will seek to compete in the Relevant Market. *See* PPFF §§ III, VII.

56.   The competitive significance of firms in the Relevant Market or those seeking to enter the market would be diminished if their access to IQVIA's data was limited. *See* PPFF § VII. The Supreme Court has recognized that certifications or accreditations, such as consented data in this case can be competitively important where customers consider non-consented data inferior.  *See* PPFF § III, V.  *See Grinnell Corp*., 384 U.S. at 575 (distinguishing between "accredited, as distinguished from nonaccredited service" where "standards are important" and "*customers consider the unaccredited service as inferior*" (emphasis added)).

E.   **There is a Fair and Tenable Chance that the Proposed Acquisition May Substantially Lessen Competition in the Relevant Market**

1.   **Substantial Competition Between the Parties Will Be Eliminated**

57.   At the 13(b) stage "a district court's assessment of the FTC's chances will not depend, in every case, on a threshold matter of market definition." *Whole Foods*, 548 F.3d at 1036-37.  One such case is when the Proposed Acquisition involves the elimination of head-to-head competitors. *Id.* at 1036 n.1 (citations omitted) ("[A] merger between two close competitors can sometimes raise antitrust concerns due to unilateral effects in highly differentiated markets . . . .  In such a situation, it might not be necessary to understand the market definition to conclude a preliminary injunction should issue.").

58.   A merger that eliminates head-to-head competition between two companies *alone* "may substantially lessen competition" in violation of the Clayton Act, and be sufficient grounds for a preliminary injunction. *United States v. Mfrs. Hanover Trust Co.*, 240 F. Supp. 867, 955 (S.D.N.Y. 1965) ("We hold, therefore, that the elimination of substantial competition previously existing between the parties to this merger in the national market *itself* . . . establishes a reasonable probability of a substantial lessening of competition, violative of § 7 of the Clayton Act." (emphasis added)); *Bowl America Inc. v. Fair Lanes, Inc*., 299 F. Supp. 1080, 1091(D. Md. 1969); *Horizontal Merger Guidelines* §§ 2.1.4, 6.

59.   Courts routinely find that the elimination of head-to-head competition between the merging parties may result in anticompetitive effects. *United States v. H&R Block, Inc*., 833 F. Supp. 2d 36, 81-82 (D.D.C. 2011) (noting defendants' ordinary course documents indicate anticompetitive effects are likely to flow from the elimination of strong head-to-head competition between the merging parties); *see FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 66 (D.D.C. 20115) (court affirming the use of a merger simulation model ran by Dr. Israel to detmine the harm to custmomers that

will occur due to the elimination of head-to-head competition between the merging firms); *Staples*, 970 F. Supp. at 1082-83 (blocking the deal, in part, because the "merger would eliminate significant head-to-head competition between the two lowest cost and lowest priced firms").

60.     The elimination of the substantial head-to-head competition between IQVIA and Deep Intent violates Section 7 of the Clayton Act irrespective of the relevant market in which the two compete. *See* PPFF §§ III.C, VI;  *Mfrs. Hanover*, 240 F. Supp. at 955; *United States v. Blue Bell, Inc.*, 395 F. Supp. 538, 548-549 (M.D. Tenn. 1975) (citations omitted) (recognizing that *Mfrs. Hanover* held "that the merging banks were vigorous, substantial and major factors in competition generally and that the elimination of competition between them violated the Clayton Act.").

## 2.   Post-Acquisition Shares and Concentration Are Presumptively Unlawful

61.     The Supreme Court views mergers creating a combined market share of more than 30% as presumptively illegal.  *Phila. Nat'l Bank*, 374 U.S. at 364.  The Second Circuit agrees and has held that simply showing that a post-merger firm would have more than 30% market share is "certainly sufficient to satisfy [their] burden of showing likelihood of success on the merits." *Consol. Gold Fields*, 871 F.2d at 260; *see Lancaster*, 434 F. Supp. at 1095, 1095 n.4 (finding that because the post-merger shares "so nearly approach[] the presumptively-illegal line that we can conclude the FTC has a good chance of ultimate success" (collecting cases)).

62.     Based on the proposed relevant market, Dr. Hatzitaskos calculated a ███████████ ████████████  and, despite expanding the number of firms in his analysis, Dr. Israel calculated a post-merger share of █████ .  *See* ████████████████████████████ ; Israel Rept. ¶ 228 & Fig. 12. Given these calculations, the merger is presumed to be illegal.

63.     The "most common way" for the FTC to meet its burden to establish a presumption of anticompetitive effects of the proposed acquisition "is through a formula called the Herfindahl-Hirschman Index ('HHI'), which compares a market's concentration before and after the

proposed merger." *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017); *see Hackensack Meridian Health*, 30 F.4th at 172 (endorsing use of HHIs while affirming the PI).

64.     Under the 2010 Horizontal Merger Guidelines, if the post-merger HHI is above 2500 and increases by more than 200, then it "will be presumed to be likely to enhance market power" in violation of Section 7 of the Clayton Act. *Anthem*, 855 F.3d at 349 (quoting *Horizontal Merger Guidelines* § 5.3); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716-17 (D.C. Cir. 2001) ("Market concentration, or the lack thereof, is often measured by the Herfindahl-Hirschmann Index (HHI)."); *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 570 (6th Cir. 2014) (finding post-merger HHIs were "multiples of the numbers necessary for the presumption of illegality").

65.     In the Second Circuit, highly concentrated markets may be considered a "tight oligopoly" in "which it is important to prevent 'even slight increases in concentration.'" *Grumman*, 665 F.2d at 12 (quoting *Stanley Works*, 469 F.2d at 504; *United States v. Continental Can Co.*, 378 U.S. 441, 462 (1964)); *see PPG Indus.*, 798 F.2d at 1503.

66.     Based on the proposed relevant market, Dr. Hatzitaskos used ███████████████████

█████████████████████████████████████████. *See* ███████████████

███████████████ Given these calculations, the merger is presumed to be illegal.

### 3. Vertical Foreclosure Will Increase Barriers to Entry and Reduce Competition in the Relevant Market

67.     As the Supreme Court has explained, "[t]he primary vice of a vertical merger . . . is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe*, 370 U.S. at 323–24 (quotations and citations omitted).

68.     Foreclosure in a vertical merger can mean "foreclosing competitors of [one party] from access to a potential source of supply, or from access on competitive terms." *Yankees Entm't &*

*Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002).

69.     Importantly, the Clayton Act does not require complete foreclosure to run afoul of antitrust laws.  *See Brown Shoe*, 370 U.S. at 323 n.39 (citing S. Rep. No. 81-1775, at 4298 (1950)) (explaining that the goal of Section 7 is "to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act").

70.     "Such foreclosure may be achieved by increasing prices, withholding or degrading access, reducing service or support, or otherwise increasing the costs or reducing the efficiency or efficacy" of rival products. *Illumina*, 2023 WL 2823393, at *32; *du Pont de Nemours & Co.*, 353 U.S. at 605 (finding unlawful vertical foreclosure though competitors "did obtain higher percentages of the General Motors business in later years").

71.     "Case law provides two different . . . standards for evaluating the likely effect of a vertical transaction." *Illumina*, 2023 WL 2823393, at *32. Harm can be proven through a showing that the combined firm would have the ability and incentive to foreclose competition and/or through a *Brown Shoe* vertical multifactor analysis.  *Brown Shoe* , 370 U.S. at 328-29; *see United States v. AT&T*, 310 F. Supp. 3d 161, 243-45 (conducting analysis under an ability-and-incentive framework). Satisfying either the *Brown Shoe* framework or the ability and incentive standard is enough for a plaintiff to carry its initial burden on liability. *Illumina*, 2023 WL 2823393, at *33.

72.     The Supreme Court in *Brown Shoe* set forth a multifactor analysis for assessing liability in vertical mergers, including: "the size of the share of the market foreclosed," the "nature and purpose of the arrangement," any "trend toward concentration in the industry," and entry barriers, among others. *Brown Shoe*, 370 U.S. at 328-34; *see Ford Motor Co. v. United States*, 405 U.S. 562, 566–71 (1972); *Illumina*, 2023 WL 2823393, at *32-33.

73.     The *Brown Shoe* analysis is not a "precise formula[]," and not every factor must be present or even considered to support a finding of liability. *Illumina*, 2023 WL 2823393, at *32 (quoting

*Brown Shoe*, 370 U.S. at 321-22) (finding liability when four *Brown Shoe* factors were met).  In *Ford Motor*, the Supreme Court affirmed that a vertical merger was illegal after considering only "the effect of raising barriers to entry," "the number of competitors" in the industry," and the amount of foreclosure.  405 U.S. at 566–71.

74.    The ability and incentive analysis focuses "on whether a transaction is likely to increase the ability and/or incentive of the merged firm to foreclose rivals." *Illumina*, 2023 WL 2823393, at *33; *In re Union Carbide Corp.*, 59 F.T.C. 614, 1961 WL 65409, at *34–35 (F.T.C. Sept. 25, 1961) (finding anticompetitive harm where the merged firm has the power to exclude competing producers from a segment of the market).

75.    While "it is the power [to harm competitors] that counts, not its exercise," *Union Carbide*, 1961 WL 65409, at *19, courts may examine a merged firm's incentives to foreclose the relevant market when considering whether there is the potential for competitive harm. *See, e.g.*, *Ford Motor*, 405 U.S. at 571 (finding that because Ford "made the acquisition in order to obtain a foothold in the aftermarket" for spark plugs, "it would have every incentive to . . . maintain the virtually insurmountable barriers to entry" in that market through foreclosure); *see also AT&T*, 310 F. Supp. 3d at 243-45 (conducting analysis using an ability-and-incentive framework).

76.    But here, Plaintiff has satisfied its burden as required for a 13(b) preliminary injunction and has shown a likelihood of success in the administrative proceeding under both the *Brown Shoe* and the ability and incentive standards. *See* Conclusions of Law at § E.3.

77.    Plaintiff has established *Brown Shoe* functional liability factors sufficient to warrant temporary § 13(b) relief. *See* PPFF § III.

78.    Here, there is also a "trend toward [further] concentration in the industry."  *Brown Shoe*, 370 U.S. at 332–33; *Warner Commc'ns*, 742 F.2d at 1162–63 (identifying "industry trends toward concentration" as one of the "[f]actors to consider when determining the impact on

competition").” *See* PPFF §§ II, VII.B. A post-merger trend to concentration may accelerate as future entrants must either “ante up the additional capital to vertically integrate or face a number of increased market perils.” *U.S. Steel Corp. v. FTC*, 426 F.2d 592, 605 (6th Cir. 1970).

79.     The Proposed Acquisition would also increase entry barriers in the Relevant Market—yet another factor that weighs against it. *See Ford Motor Co.*, 405 U.S. at 568–72 (explaining that, after Ford made its vertical acquisition, “it would have every incentive to . . . maintain the virtually insurmountable barriers to entry to the aftermarket”). *See* PPFF §§ VII.B.4, VIII.A.1.

80.     Courts—including the Supreme Court—have held that the creation or increase of entry barriers militates in favor of prohibiting a vertical merger. *See Ford Motor* , 405 U.S. at 568–72; *U.S. Steel*, 426 F.2d at 605; *Apple*, 791 F.3d at 330-34 (assessing barriers to entry in a non-merger case finding that Apple’s vertical agreements orchestrated a conspiracy to raise ebook prices). Such barriers can include “possible reliance on suppliers from a vertically integrated firm with whom [a new entrant] is also competing” and “the psychological ‘fears’ of smaller rivals competing with large integrated concerns.” *U.S. Steel Corp.*, 426 F.2d at 605 (citing *FTC v. Procter & Gamble Co*. 386 U.S. 568, 578 (1967)).

81.     IQVIA’s past foreclosure efforts against competitors indicates it is likely to engage in similar behavior in the Relevant Market post-merger.  PPFF §§ VII.C.2-4; *Brown Shoe,* 370 US. at 332 (“[I]t is apparent both from past behavior of Brown and from the testimony of Brown’s President, that Brown would use its ownership of Kinney to force Brown shoes into Kinney stores.”); *Illumina*, 2023 WL 2823393, at *41-42 (“Real-world evidence of Illumina's past behavior reinforces the likelihood of a substantial lessening of competition here.”).

82.     Despite claims that HCP Programmatic Advertising is small relative to IQVIA’s overall business, the Clayton Act prohibits transactions that may substantially lessen competition regardless of size.  *Crown Zellerbach Corp. v. FTC*, 296 F.2d 800, 812 (9th Cir. 1961) (“In the

statutory phrase 'in any line of commerce,' the word entitled to emphasis is 'any.' . . . The line of commerce need not even be a large part of the business of any of the corporations involved.").

83.     IQVIA has the ability to control access to its HCP identity and prescribing data in many ways.  *See* PPFF § VII.  In addition, IQVIA has the ability and incentive to use control of its data to weaken its rivals in the Relevant Market.  *See* PPFF § VII.

84.     The Government will be able to carry its burden in the merits proceeding without necessarily specifying the precise actions IQVIA would take to weaken competitors in the Relevant Market.  *See United States v. Sybron Corp.*, 329 F. Supp. 919, 928–29 (E.D. Pa. 1971) (observing that even if "absolute foreclosure" would be unlikely, "there are many more subtle avenues available").

85.     The evidence, including IQVIA's past behavior toward competitors, demonstrates it has incentive to foreclose its HCP programmatic advertising competitors from access to its data.  *See* PPFF § VII.

### 4.   Harm to Innovation in the Relevant Markets

86.     Cognizable anticompetitive harm under Section 7 includes harm to innovation. *FTC v. PPG Industries, Inc.*, 798 F.2d at 1505 (instructing the district court to enter a preliminary injunction in a horizontal merger in part to protect an "*emerging* high technology market" which was "*growing rapidly*" with "*major portions* of it [laying] in the *immediate future*" since it depended "almost entirely upon innovation in development of new materials" (emphasis added)); *Polypore Int'l, Inc.*, 2010 WL 9434806, at *211 (F.T.C. Mar. 1, 2010) (finding that in one market "innovation competition has been eliminated post-acquisition" and that innovation had been impacted in another). In fact, in *United States v. AT&T, Inc.*, the D.C. Circuit made clear that it "d[id] not hold that quantitative evidence of price increase is required in order to prevail on a Section 7 challenge. Vertical mergers can create harms beyond higher prices for consumers,

including decreased product quality and reduced innovation." 916 F.3d 1029, at 1045.

87.     As the Commission has long recognized, "it is of particular importance that [monopolies] be arrested" because "[a]ny lessening of competition is therefore doubly harmful" in a growing industry "since [concentration's] inevitable effect is to slow down the growth rate of the industry." *Union Carbide Corp.*, 1961 WL 65409, at *35.

88.     That the market may be an emerging one poised for rapid growth can make it particularly susceptible to antitrust harm. *United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *76 (N.D. Cal. Jan. 8, 2014) ("[R]apid technological progress may provide a climate favorable to increased concentration of market power rather than the opposite.").

89.     The Proposed Acquisition has a reasonable probability of harming innovation competition in the Relevant Market. *See* PPFF § VI.E.

> ### F.    At the Merits Trial Defendants Will Fail to Meet their Burden to Show Entry Will Be Timely, Likely, and Sufficient to Counteract the Competitive Harm from the Proposed Acquisition

90.     Even under the more exacting standard for private litigants seeking to preliminarily enjoin a merger under 15 U.S.C. § 26, this Circuit observed that rebuttal arguments which assert that "market share data [ ] does not accurately reflect probable market power" inherently rely on evidence concerning "capacity to absorb the market shares of rival competitors"and "barriers to entry" and therefore should be reserved to the "full trial on the merits". *R.C. Bigelow, Inc.*, 867 F.2d at 110-11 (citing *Waste Management*, 743 F.2d at 984 (concluding ease of entry means "the 48.8% market share attributed to [defendants] does not accurately reflect future market power.")).

91.     Nonetheless, at the administrative merits hearing, Defendants will not establish that ease of entry rebuts FTC's *prima facie* case because potential entrants would not be of a sufficient scale to compete on the "same playing field" as IQVIA and "thus would be unable to constrain the likely anti-competitive effects." *Chi. Bridge & Iron*, 534 F.3d at 430.

92.     At the administrative hearing Defendants will have to show that entry or expansion will be "timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints." *United States v. Visa USA,* 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001); *see also Horizontal Merger Guidelines* § 9 (same).

93.     The "mere existence of potential entrants does not by itself rebut the anti-competitive nature of an acquisition." *Chi. Bridge & Iron*, 534 F.3d at 436. The potential for meaningful entry is only viable when the potential entrants "face low enough barriers for a threat of potential entry to be likely." *Id.* ("Therefore assertions that potential entry may meaningfully constrain market power turns on the existence of low or no entry barriers.").

94.     Thus the question is not whether *any* form of entry is "likely" by rather whether Defendants met their burden is showing that likely entrants are of "sufficient scale capable of competing" with IQVIA and therefore "piercing the barriers to entry." *Id* at 430.

95.     At this hearing, Defendants failed to produce evidence that entrants are likely to surmount existing high barriers to entry that stem from the "reputation for expertise and experience" in the relevant market, and thus Defendants' evidence regarding "potential entrants'" reputation in *other markets* is inapposite. *See, e.g., Chi. Bridge & Iron*, 534 F.3d at 436-37.

96.     At this hearing, the FTC produced substantial evidence that expertise in building successful HCP programmatic DSPs is a substantial barrier to entry similar to "other technical prerequisites to doing business in a market that are considered barriers to entry." *See* PPFF § VIII.A.1-2; *Chi. Bridge & Iron*, 534 F.3d at 439. *Chi. Bridge & Iron*, 534 F.3d at 438-39 (noting Defendants presented evidence of one firm outside the relevant market that successfully won a bid but concluding "that this single instance" was not "sufficient evidence to rebut the Commission's finding on this issue.").

97.     Not only are barriers to entry currently high, the Proposed Transaction itself would raise

those barriers even higher since IQVIA has delayed or limited access to its data to others perceived to be potential rivals. *See* PPFF §§ VIII.A, VII; *U.S. Steel*, 426 F.2d at 605 (noting that a potential "entrant must either ante up the additional capital to vertically integrate or face a number of increased market perils. These include a possible reliance on suppliers from a vertically integrated firm with whom he is also competing at the [relevant market]" and finding that "the acquisition will tend to unduly raise barriers to entry in certain markets").

98.     Defendants have failed to produce rebuttal evidence that sophisticated customers will actually enter the market and self-serve their HCP programmatic advertising needs. *See* PPFF **§** VIII.A; *Chi. Bridge & Iron*, 534 F.3d at 439 ("[T]here is no history nor other indication that customers who formerly relied on CB&I and PDM for tank design, engineering, and construction services will undertake to perform them on their own.").

99.     Defendants have not shown that entry is timely, likely, and sufficient. *See* PPFF § VIII.A.

**G.     At the Merits Trial Defendants Will Fail to Meet their Burden to Demonstrate That Their Proposed Efficiencies and Any Other Alleged Procompetitive Benefit Offset the Competitive Harm**

100.    "The Supreme Court has never expressly approved an efficiencies defense to a § 7 claim." *Saint-Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788-89 (9th Cir. 2015); *see Procter & Gamble*, 386 U.S. at 580 (cautioning that "[p]ossible economies cannot be used as a defense to illegality"). To the contrary, the Court has repeatedly "cast doubt" on such a defense. *Saint-Alphonsus*, 778 F.3d at 789.  And courts "remain skeptical about the efficiencies defense in general and about its scope in particular." *Saint-Alphonsus*, 778 F.3d at 790; *Penn State Hershey*, 838 F.3d at 348 (same); Areeda & Hovenkamp, Antitrust Law ¶ 970 (same).

101.    No court has held that efficiencies could immunize an otherwise unlawful merger. *See Otto Bock Healthcare North America, Inc.*, No. 9378, 2019 WL 2118886, at *50 (F.T.C. May 6, 2019) (observing that "[r]esearch does not reveal a case that permitted an otherwise unlawful

transaction to proceed based on claimed efficiencies.").

102.     Defendants bear the heavy burden to show that their efficiencies claims are cognizable –

meaning they are verifiable, non-speculative, merger-specific, offset the anticompetitive effects,

and are not derived from anticompetitive reductions in output or service. *Horizontal Merger*

*Guidelines* § 10; *Hackensack Meridian Health*, 30 F.4th at 176; *H.J. Heinz Co.*, 246 F.3d at 720.

103.     To the extent valid at all, efficiencies cannot be based on self-serving testimony or

estimates of business executives but must be "reasonably verifiable by an independent party."

*Illumina*, 2023 WL 2823393, at *59 (quoting *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp.

3d 27, 72-73 (D.D.C. 2018)); *Bertelsmann SE & Co.*, 646 F. Supp. 3d at 55.

104.     To demonstrate merger specificity, Defendants need to show that the claimed efficiencies

"represent a type of cost saving that could not be achieved without the merger." *Wilhelmsen*, 341

F. Supp. 3d at 72; *see also Hackensack*, 30 F.4th at 176 ("*i.e.*, the efficiencies cannot be achieved

by either party alone").

105.     In addition, efficiencies must be in the same relevant market as the anticompetitive harms.

*See Phila. Nat'l Bank*, 374 U.S. at 370.

106.     Courts have repeatedly rejected the argument that unlawful transactions should be

permitted because it better enables them to compete against a larger rival within the market.

*Lancaster*, 434 F. Supp. at 1096 (finding no merit in the claim that the merger will allow the

parties to compete more vigorously) (citing *Phila. Nat'l Bank,* 374 U.S. at 370).

107.     The purported efficiencies defense collapses where, as here, Defendants fail to produce

evidence that merger-specific, verifiable efficiencies will "neutralize if not outweigh the harm

caused by the loss of competition and innovation," *Anthem*, 855 F.3d at 369 (Millett, J.,

concurring). *See* PPFF § VIII.B.

24

### H.    Proposed Remedies Are Irrelevant in a § 13(b) Proceeding

108.    Because a 13(b) proceeding does not reach the ultimate merits of the transaction, this Court cannot resolve what the appropriate remedy would be if the Commission ultimately finds a violation. *Whole Foods,* 548 F.3d at 1034 ("Of course, neither court nor agency has found [Defendant's] acquisition [] unlawful. Therefore, the FTC may not yet claim the right to have any remedy necessary to undo the effects of the merger, as it could after such a determination."); *see also Food Town*, 539 F.2d at 1345 (finding the FTC is entitled to Section 13(b) relief regardless of any "ultimate remedy" in an administrative trial).

109.    IQVIA's purported "open" offers to certain third parties in an attempt to allay antitrust concerns in this matter constitute a proposed remedy. *See Illumina*, 2023 WL 2823393, at *48–51 (finding an open offer "cobbled together well after the Acquisition was announced," contingent on the Proposed Acquisition closing and unimplemented when the merger was consummated, to be a proposed remedy "crafted in anticipation of legal concerns about the Acquisition"); *see also Hosp. Corp. of Am.*, 807 F.2d at 1384.

110.    Even assuming Defendants' preferred remedy is relevant to analyzing "likelihood of success" in a 13(b) proceeding, it would be as part of Defendants' rebuttal burden, not part of the FTC's initial burden.  *Illumina*, 2023 WL 2823393, at *51 (analyzing a proposed remedy at the rebuttal stage). As such, the proposed remedy would need to dispel any substantial doubts and serious questions about the transaction's legality. *See Staples*, 190 F. Supp. 3d at 137 n.15; *Ford Motor*, 405 U.S. at 573; *Sysco*, 113 F. Supp. 3d at 72; *see* PPFF § VIII.C; *see also United States v. E. I. du Pont de Nemours*, 366 U.S. 316, 334 (1961) (instructing that "all doubts as to the remedy are to be resolved in [the government's] favor").

111.    At the merits trial proposed remedies and their purported benefits that rely upon speculation or self-serving evidence proffered by defendants are subject to increased scrutiny. *See*

*FTC v. Meta Platforms Inc.*, 2023 WL 2346238, *29 (N.D. Cal. Feb. 3, 2023) (stating that "subjective corporate testimony is generally deemed self-serving and entitled to low weight").

112.    IQVIA's purported open offers to certain third parties do not alleviate any concerns of vertical foreclosure because the open offer: (1) only provides HCP audiences and not prescription lift measurement data, (2) only offers HCP audiences through reference data, not clinical behavior data or online behavior data, which offer more precise targeting and improved reach, (3) only provides on-platform HCP audiences which are infrequently used and significantly limit the reach of HCP programmatic ads, and (4) does not provide any guaranteed pricing or otherwise limit IQVIA's ability to unilaterally raise prices post-merger.  *See* PPFF § VIII.C.

113.    IQVIA's purported open offers, even if credited, only attempt to resolve the FTC's vertical theory of harm and fails to even attempt to resolve the FTC's horizontal concerns – the elimination of head-to-head competition wrought by the transaction.  *See* PPFF § VIII.C.

**I.      Temporary Relief to Preserve the Status Quo is in the Public Interest**

114.    In a 13(b) proceeding, the "equities to be weighed here are not the usual equities of private litigation but public equities." *Lancaster*, 434 F. Supp. at 1096 ("It is axiomatic among economists that the public interest is best served by a market of many sellers . . . that was the principal thesis of the Clayton Act"); *Warner Commc'ns, Inc.*, 742 F.2d at 1165 ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities alone does not justify denial of a preliminary injunction.").

115.    In weighing the equities under 13(b), "public equities receive far greater weight." *Warner Commc'ns*, 742 F.2d at 1165. Public equities include "effective enforcement of the antitrust laws" and ensuring the Commission's ability to obtain adequate relief if it prevails on the merits. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991).

116.    As there are "substantial doubts" regarding the Proposed Acquisition's legality, *Whole*

*Foods*, 548 F.3d at 1036, the Government has demonstrated a likelihood of ultimate success. As a result, the public interest favors granting temporary relief under § 13(b) to preserve the status quo pending the administrative adjudication. *Lancaster,* 434 F. Supp. at 1097.

117.    To the extent private equities are considered, the court "must afford such concerns little weight," to avoid "undermin[ing] section 13(b)'s purpose of protecting the 'public-at-large, rather than individual private competitors.'" *Univ. Health, Inc.*, 938 F.2d at 1225

118.    The merger does not terminate unless one of the Defendants chooses to terminate it. Thus, the dissolution of the deal would be entirely the result of Defendants' own choice. Such a choice cannot be the basis for a private equity. *Lancaster*, 434 F. Supp. at 1096-97; *Wilhelmsen*, 341 F. Supp. 3d at 73-74 (finding the intention to abandon the deal if a preliminary injunction issues to be a private equity that "cannot on its own overcome the public equities that favor the FTC"); *Warner Commc'ns, Inc.*, 742 F.2d at 1165 (same); *Whole Foods*, 548 F. 3d at 1041-42 (remanding and instructing the court to "remember that a 'risk that the transaction will not occur at all,' by itself, is a private consideration that cannot alone defeat the preliminary injunction").

119.    Congress intended temporary relief under § 13(b) to be "readily available to preserve the status quo while the FTC develops its ultimate case." *Whole Foods*, 548 F.3d at 1036; *see also Lancaster*, 434 F. Supp. at 1090 (finding a 13(b) preliminary injunction is "to preserve the status quo until the FTC can perform its adjudicatory function"). It is appropriate here.

Dated: December 18, 2023                    Respectfully submitted,


                                            /s/ *Jennifer Fleury*

                                            Jennifer Fleury
                                            Stephen A. Mohr
                                            Jordan Andrew
                                            Stephanie Bovee
                                            Habin Chung
                                            Lisa DeMarchi Sleigh

Yan Gao
Cory Gordon
Christopher Lamar
Wade Lippard
Jessica Moy
Christina Perez
Anjelica Sarmiento
Michelle Seo
Varnitha Siva
William Sohn
Jay Tymkovich
Lily Verbeck

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
jfleury@ftc.gov
Tel: (202) 326-3805