NBKIFED1CORRECTED

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FEDERAL TRADE COMMISSION,

4                   Plaintiff,

5           v.                          23 Civ. 6188 (ER)

6   IQVIA HOLDINGS INC., *et al.*,
                                        Conference
7
                    Defendants.
8
    ------------------------------x
9                                       New York, N.Y.
                                        November 20, 2023
10                                      9:00 a.m

11  Before:

12                      HON. EDGARDO RAMOS,

13                                      District Judge
                            APPEARANCES
14
    FEDERAL TRADE COMMISSION
15        Attorneys for Plaintiff
    BY:  JENNIFER FLEURY
16        VARNITHA SIVA
          MICHELLE SEO
17        WADE LIPPARD
          STEPHEN MOHR
18        JESSICA MOY

19  WEIL GOTSHAL & MANGES LLP
          Attorneys for Defendant IQVIA HOLDINGS INC.
20  BY:  CHANTALE FIEBIG
          MARK ANDREW PERRY
21        SARAH M. STERNLIEB
          LUKE SULLIVAN
22
    MORRISON & FOERSTER LLP
23        Attorneys for Defendant PROPEL MEDIA, INC.
    BY:  ALEXANDER P. OKULIAR
24        DAVID J. SHAW

25

NBKIFED1CORRECTED

```
1              (Case called)
2              MS. FLEURY:  Jennifer Fleury on behalf of the Federal
3      Trade Commission.
4              MR. MOHR:  Stephen Mohr on behalf of the Federal Trade
5      Commission.
6              MS. DEMARCHI SLEIGH:  Lisa Demarchi Sleigh on behalf
7      of the Federal Trade Commission.
8              MS. FLEURY:  These are our paralegals.  We can do
9      their names for the record they are wonderful.
10             THE COURT:  Since they are so wonderful, get their
11     names.
12             MS. CHEN:  Qing Yu Chen, Federal Trade Commission.
13             MR. POWELL:  Steven Powell, Federal Trade Commission.
14             THE COURT:  Back table?
15             MS. FIEBIG:  Chantale Fiebig from Weil Gotshal &
16     Manges on behalf of IQVIA.  I am joined at counsel's table by
17     Mark Perry, also on behalf of IQVIA, and by Mr. Jon Resnick who
18     is the President of IQVIA's United States and Canada business.
19             I would note for the record, I am joined by my
20     partners, Drew Tulumello, Liz Ryan, and Bambo Obaro.
21             MR. OKULIAR:  Alex Okuliar for Propel Media and
22     DeepIntent.  I am joined by David Shaw.  Next to me is Chris
23     Paquette, the CEO of DeepIntent.
24             THE COURT:  Good morning to you all.  We are here for
25     the beginning of the preliminary injunction.  We have, prior to
```

NBKIFED1                    Opening – Ms. Fleury

1    today, worked out, after a lot of lawyering, a fairly strict

2    schedule.  The parties have agreed to each have one hour for

3    openings.  So, let's get start.  Ms. Fleury.

4              MS. FLEURY:  Good morning again, your Honor.  On with

5    a behalf my colleagues, most of whom your Honor will get to

6    meet over the next two weeks, I want to thank you for setting

7    time in the Court's busy schedule for this evidentiary hearing.

8              During the first half of last year, IQVIA a dominant

9    provider of health care data was considering a particular pair

10   of acquisitions.  Having recently acquired a different pair of

11   companies, providing health care profession identity data, or

12   HCP data, in the words of IQVIA president of United States and

13   Canada Jon Resnick, who is here in the courtroom, IQVIA wanted

14   to become the leader and HCP programmatic marketing.  IQVIA was

15   simultaneously evaluating also acquiring both Lasso and

16   DeepIntent, two leading providers of HCP programmatic

17   advertising that describe the other as their biggest

18   competitor.  What did IQVIA decide?  In the words of Jon

19   Resnick, let's buy both.  We are here today because of that

20   decision by IQVIA, to acquire two direct competitors in a

21   market of three primary options.  There is no dispute that

22   defendants directly compete.  Defendant's opposition brief and

23   defendants experts concede this.  There also can be no dispute

24   that defendants have lowered prices in response to each other.

25   DeepIntent CEO and defendant's experts admit that.  If allowed

1    to proceed, IQVIA's acquisition of DeepIntent will have the

2    immediate effect of removing the head-to-head competition

3    between Lasso and DeepIntent, which, as you will see over the

4    course of the hearing, had very real impacts for customers on

5    prices, on innovation, and on product quality.

6            This morning, I will begin by laying out briefly the

7    legal standard and the FTC's three independent bases for

8    relief.  Then I will give you some background on what HPC

9    programmatic advertising is why it matters and introduce the

10   merging parties and the closeness of competition between them.

11   I will talk about IQVIA's history as an acquirer of data

12   companies and the evidence we expect to show on the vertical

13   side of the case.  I will then discuss the defendant's

14   principal complaint which is just over with whether the FTC

15   defined the market too narrowly.  Before wrapping up this

16   morning, I will discuss the defendant's arguments and evidence

17   for them or lack thereof.  There is a lot to cover, your Honor,

18   but I will do my best not to use my full time because I am

19   eager for the Court to hear from the witnesses themselves and

20   how the evidence supports our request for preliminary

21   injunction.

22           Before previewing that evidence, your Honor, I would

23   just like to touch upon the legal standard.  I am certainly not

24   going to belabor the 13(b) standard, your Honor.  You have

25   heard it from us before and I know you have applied it in some

1    of your recent rulings.  So, I will be very brief on this.  The

2    task before this Court is not to come to a final decision on

3    whether this merger violates section 7 of the Clayton Act or

4    ultimately to resolve all of the factual disputes.  Everyone

5    agrees that is the province of the FTC in the first instance

6    and ultimately the courts of appeal.  Rather, your task is to

7    use your independent judgment to assess whether the FTC has a

8    fair and tenable chance on the merits and then to weigh the

9    equities.

10         THE COURT:  Can I ask a question on the procedure,

11   because I know that there is already schedule before an ALJ a

12   merits hearing, which I believe is scheduled to start on

13   December 20.  You said that anything that I do here can be

14   appealed to the courts of appeal.  Which one?

15         MS. FLEURY:  So, your Honor, what I meant was that the

16   procedure for the merits hearing, ultimately, that is

17   reviewable by the courts of appeal.

18         THE COURT:  OK.

19         MS. FLEURY:  And so, while there are two different

20   ways in which this matter might reach a court of appeal, first

21   in the context of a 13(b) ruling, either side historically can

22   and sometimes do appeal those decisions.  There is one up right

23   now in another FTC case involving 13(b).  But also, what I was

24   referring to is that the task in terms of who makes the

25   ultimate merits decision is the province of the FTC and then

NBKIFED1                          Opening - Ms. Fleury

1    the defendants have the opportunity ultimately to appeal if

2    they do not get a favorable ruling -- the courts of appeal,

3    through the percent procedure.

4              THE COURT:  And which court of appeal?  Any one?

5              MS. FLEURY:  They determine any court of appeal they

6    would like to appeal to in that instance, if they are the ones

7    appealing.

8              THE COURT:  OK.  And will the merits hearing forward

9    on December 20 no matter what I decide?

10             MS. FLEURY:  That is true your Honor, at least from

11   the FTC's perspective.  I can't speak for defendants.

12             THE COURT:  Very well.  Go ahead.

13             MS. FLEURY:  In this hearing, we are asking the Court

14   to preserve the status quo so that a full trial can be held on

15   the merits.  And as you noted, that merits proceeding begins on

16   December 20.  Discovery is still underway.  We have further

17   depositions coming up in December including a deposition of

18   IQVIA's CEO, Ari Bousbib amongst other new deponents.  We will

19   then proceed on the trial on the merits exactly one month from

20   today.  So, this truncated hearing is really about whether we

21   have shown you enough to demonstrate that we have a fair and

22   tenable chance of meeting our burden there.  At that merits

23   trial in a month, I want to be clear about what the legal

24   standard is because I think defendants have garbled it a

25   little.  We ultimately will have to show the effect of this

NBKIFED1                        Opening – Ms. Fleury

1    acquisition maybe to substantially lessen competition.  Those

2    are the words of Clayton Act, not that it will.  The Clayton

3    Act deals with probabilities, not certainties.  At that trial,

4    we will put on a broad array of fact witness, economic

5    evidence, and submit a more voluminous set of documentary

6    evidence showing what the probable affect of this acquisition

7    will be, to lessen competition.  The FTC has three independent

8    theories of harm demonstrating that this deal may substantially

9    lessen competition in violation of Section 7.  And this Court

10   would have to rule against the FTC on all three to deny our

11   request for relief.  In other words, this Court would have to

12   find that we don't have a fair and tenable chance on any of

13   them to find against us in the context of 13(b).

14        So the first is based on the immediate and lasting

15   effect of removing the direct close competition between Lasso

16   and DeepIntent.  The evidence will show this competition

17   resulted in lower prices for customers and an innovation race

18   between DeepIntent and Lasso.  The elimination of just that

19   competition between those two parties, setting aside any

20   effects of increased consolidation in the industry apart from

21   that, is, on its own, sufficient to find this acquisition may

22   substantially lessen competition under the Clayton Act.

23        The FTC's second independent basis is the structural

24   presumption which was established by the Supreme Court in

25   *Philadelphia National Bank*.  That case set forth that mergers

NBKIFED1                         Opening - Ms. Fleury

1   which produce what the Supreme Court called an undue percentage

2   share of the relevant market are inherently likely to lessen

3   competition substantially.  So, in practice, this means that

4   rather than placing the burden on the government to provide

5   specific evidence of competitive harm, mergers above a certain

6   level are presumed to be anti-competitive and the burden would

7   fall to defendants to rebut the presumption.  In *Philadelphia*

8   *National Bank*, the Supreme Court said it wasn't going to set a

9   minimum threshold for market concentration but that certainly

10  mergers at 30 percent or higher would trigger the presumption.

11  So, I will discuss this more in a few minutes, your Honor, but

12  this is really key.  So, each side's experts disagree about the

13  market shares for DeepIntent and Lasso.  Both agree that the

14  combined firm, post-acquisition, reaches that threshold.  So

15  here, the structural presumption should apply.  The defendants

16  have failed to produce any persuasive rebuttal evidence or

17  actually any evidence of merger-specific pro-competitive

18  justifications for this merger.  That alone should be

19  sufficient to warrant a preliminary injunction.

20          Third, independent of the other two bases, your Honor,

21  the evidence will show this is an illegal vertical merger.  The

22  FTC will show the acquisition will result in ability and

23  enhanced incentive to foreclose or disadvantage competitors who

24  want to access IQVIA's data.  Defense cannot dispute that

25  IQVIA's data is sought after by customers who want HPC

NBKIFED1                    Opening – Ms. Fleury

1    programmatic advertising.  The evidence and defendant's own

2    materials is very strong on that point.

3              IQVIA has the clear ability to for close or even just

4    disadvantage it's rivals.  That mechanism is straightforward.

5    Everyone who wants access to IQVIA's data must license it

6    through IQVIA's third-party-access program or TPA program.  So,

7    the question is just, will the acquisition result in enhanced

8    incentive to foreclose.  Here, common sense is on our side as

9    is the economic evidence we will put before this Court.

10             As the purely legal matter, you don't need to reach

11   our vertical case to find for us on 13(b).  If you find for us

12   on the structural presumption, that is sufficient on its own

13   for us to win.  Same thing if you find there is direct evidence

14   of head-to-head competition that would disappear if the

15   proposed acquisition closes.  That is sufficient on its own for

16   13(b).  Or you could just find there is an ability in enhanced

17   incentive to foreclose, and that is, on its own, sufficient.

18   But we talk about all three of these in part because the

19   evidence we've collected on the way IQVIA's data works as a

20   critical input to HPC programmatic advertising means that the

21   threat to competition from just the horizontal is likely

22   understated.  IQVIA will be even more dominant in this market

23   post-acquisition, given their dominance over data and its

24   control over vertical inputs and horizontal competitors.

25             THE COURT:  So, if you have win on any of these 3

1    bases, you win?

2              MS. FLEURY:  For 13(b) purpose and beyond, we don't

3    have to allege these three bases.  You can find just on one and

4    not each the other theories as a legal matter.  Though, I do

5    think the facts support our horizontal case, for example, and

6    the vertical and the underlying facts are some of the same for

7    more than one of the theories.

8              THE COURT:  I don't want to jump ahead for your

9    argument, but it seems like how we define the relevant market

10   is going to be crucial in this regard, correct?

11             MS. FLEURY:  Absolutely.  You will see, I think, if I

12   had my table of contents, we will talk about market definition.

13   But I do want to make the point at the outset, since we are

14   talking with the law, that for 13(b) purposes, *Lancaster* and

15   other cases say you do not have to reach or formally determine

16   market definition in order to find that we have a fair and

17   tenable chance on the merits.

18             THE COURT:  OK.

19             MS. FLEURY:  So, I would like to turn to the market in

20   question, HPC programmatic advertising.  So, to explain it, I

21   want to talk about it from two perspectives:  The individual

22   Doctor who receives the advertisements and the end customer

23   pharmaceutical company who wants the doctor to receive their

24   advertisements.  So, let's take a fictional Doctor, named Dr.

25   Amy Hunt.  Dr. Hunt is an oncologist who lives in Boston,

NBKIFED1                          Opening – Ms. Fleury

1    Massachusetts and she specializes in lung cancer.  She spends
2    about three hours per day online across various devices.
3    Dr. Hunt's time online includes doing research for her patients
4    on endemic sites like the New England Journal of Medicine as
5    well as more relaxing sites like the New York Times crossword
6    puzzle.  She, like many of us, gets a huge number of emails
7    everyday, often mass deletes, and rarely reads them if they
8    doesn't personally know the sender.  She, like at least some of
9    us, tries to stay off social media entirely.  A hypothetical
10   pharmaceutical company, call them Pharmaco, knows that Dr. Hunt
11   is an HPC they want to target, specifically because they are
12   coming out with a new drug that has good clinical data compared
13   against a drug she is currently prescribing for her existing
14   patients.  They know that because some of the detailed claims
15   and prescription data they licensed through IQVIA.  Parmaco
16   wants Dr. Hunt to see their ad.  Not only do they want her to
17   see it, they want to know whether she has seen it, whether
18   she's clicked on it, whether she's engaged with it so they can
19   make changes and try something else if what they are doing to
20   reach her isn't working.  Each and every time she goes online,
21   whether on her phone or her laptop and she goes to a website,
22   there is an opportunity.
23        So, what do health care specific platforms like Lasso,
24   DeepIntent, and PulsePoint offer companies like Pharmaco?
25   Well, they refer to themselves and to each other as a

1    three-in-one solution.  You can go, in step one, to one

2    platform to plan your campaigns.  These platforms for instance

3    create custom HPC audiences for you based upon things which

4    doctors are doing research online including certain specific

5    health conditions, which doctors are scheduled to see relevant

6    patients with certain conditions.  That is how Pharmaco knew

7    they wanted to target Dr. Hunt in the first place.  She came up

8    on a list using audience building data.  Step 2:  Activation.

9    This is where the demand-side platform part comes in.  These

10   companies use a demand-side platform either in-house or

11   licensed to activate the campaigns.  Demand-side platforms, or

12   DSPs, automate bidding and buying digital advertising space for

13   their customers designed to reach specific HPCs.  Lasso,

14   DeepIntent, and PulsePoint are often referred to as health care

15   specific DSPs including by IQVIA in the slide you see before

16   you.  By the way, what you are looking at is a slide IQVIA made

17   when considering these deals.  This is how they defined the

18   market internally.

19        THE COURT:  Could I stop you for a moment?  I am not

20   seeing a slide.  Where should I be seeing that slide?

21        MS. FLEURY:  Uh-oh.

22        THE COURT:  Is there a hard copy of the slide?

23        MS. FLEURY:  Yes, there is.  We will get you a hard

24   copy, your Honor.

25        THE COURT:  I see the slide:  Step two, activation.

1          MS. FLEURY:  Thank you, your Honor.  You missed my

2     table of contents.

3          THE COURT:  You had a table of contents?

4          MS. FLEURY:  I do, so you know where I am.  You know.

5          THE COURT:  Save a lot of questions then.

6          MS. FLEURY:  So you can see, the slide before you now?

7          THE COURT:  I can.

8          MS. FLEURY:  Great.  Thank you, your Honor.

9          So, in step 2, while the DSP is really a reductive

10    term for what these companies do which really encompasses the

11    three-in-one solution I am talking about now, that programmatic

12    piece is important.  I think it is what your Honor referred to

13    on Friday as the method of delivery, both because of the scale

14    the number of websites you can reach with the click of a button

15    and because unlike the, say, advertising on social media,

16    Pharmaco can follow Dr. Hunt on a variety of websites all

17    across the internet.

18          Then comes step 3:  Measurement and optimization.  For

19    this step, these companies will use physician-level data to

20    determine whether Dr. Hunt is engaging with the ad.  If they

21    are getting no traction, it might be time to change the

22    placement.  Again, compare this to an older method of reaching

23    doctors, direct mail or even email campaigns.  With HPC

24    programmatic advertising, you can tell when Dr. Hunt sees an

25    ad, how long she spends on that page, where she goes after

that.  You can make instantaneous adjustments to your campaigns

a result to increase your chances of engaging with Dr. Hunt

specifically.  Being able to make those changes in response to

physician level data is one aspect of the step thre measurement

phase.  And the speed at which you can measure the success of

your HPC digital ad is another thing that sets HPC programmatic

advertising apart.  For instance, DeepIntent advertises they

update their campaign metrics daily.

The other aspect of measurement is what those

companies call script lift.  Companies running HPC programmatic

campaigns want to see whether prescriptions written by Dr. Hunt

for a drug increased after she was shown a targeted ad.

Measuring script lift helps companies assess the return on

investment.  You can assess whether your digital ad spend for

Dr. Hunt is worth it.  They value that not only because

companies are goal oriented about getting results, but because

targeting Dr. Hunt programmatically is expensive.  It is far

more expense than targeting her patient, and it's more

expensive than targeting her through other means online.  We'll

talk about that in a bit, because that is a clear sign there is

a distinct market for HPC programmatic advertising.

So, the data you need for HPC programmatic advertising

comes into play at the beginning when planning and building

your audiences and at the end to measure the script lift.

Customers will tell you this is where not all data sources are

1    created alike.  It is important to have one source of truth in

2    your data from end to end, what they call data consistency.  A

3    data source that checks all the boxes for you in HPC

4    programmatic advertising and that has comprehensive detailed

5    opted-in data.  As for the opted-in piece, that means you need

6    a data source that is verified that Dr. Hunt has consented to

7    receive the ad.  You will hear from witnesses about how

8    important that is to them.  One witness will tell you without

9    that, you are, quote, dead in the water, the opted-in nature of

10   its HPC data is something that IQVIA specifically advertises.

11           THE COURT:  I'm sorry.  How does someone opt-in to

12   receive this data?

13           MS. FLEURY:  There are a variety of methods.  For

14   example, if you have endemic websites, specific health

15   websites, and doctors want to go on to read journals, there may

16   be an opt-in page in order to get free access to the content,

17   you opt-in to receive digital advertisements generally.  Then

18   companies can aggregate that opt-in consent to receive digital

19   advertisements.  And that opted-in piece is very important to

20   at least some of the witnesses you are going to hear from who

21   talk about what they are looking for in a data partner.

22           THE COURT:  Does Dr. Hunt have to click on a

23   particular advertisement for these companies to know whether or

24   not she has seen it or do they otherwise?

25           MS. FLEURY:  I don't believe so, your Honor.

NBKIFED1                    Opening – Ms. Fleury

1           THE COURT:  OK.

2           MS. FLEURY:  IQVIA's HPC data sets it apart and makes

3    it highly sought after by healthcare DSPs.  It is the gold

4    standard.  That is a quote, your Honor, from numerous third

5    parties in this case.  So, to stay competitive, health care

6    DSPs, Lasso, DeepIntent, and even PulsePoint have to be able to

7    access and work with IQVIA data.

8           So, let's talk about the merging parties.  On this

9    next slide, you can see a visual representation of the vertical

10   and horizontal components of IQVIA's proposed acquisition of

11   DeepIntent.  On the vertical side, you can see how IQVIA's data

12   flows to all of the horizontal competitors.  They will talk

13   about their data everywhere policy which, as we will show, has

14   specific exceptions for competitors.  But it is true IQVIA's

15   data is ubiquitous.  It is really IQVIA everywhere.  Before we

16   talk about IQVIA's dominance in data in its vertical

17   acquisition, I want to talk about the horizontal merger of

18   DeepIntent and Lasso, which was would place both under IQVIA's

19   control.  As of July, 2022, Lasso is a part of IQVIA.  And with

20   the acquisition of Lasso's direct competitor, DeepIntent, that

21   gives IQVIA control of two of of the big three in HPC

22   programmatic advertising.

23          So on the big three, would like to start with

24   DeepIntent which has branded itself a three-in-one solution.

25   DeepIntent advertises its integration with IQVIA data and its

NBKIFED1                        Opening – Ms. Fleury

explanation of its product, as you will see during the hearing,
is directly in line with its two main competitors, Lasso and
PulsePoint.

        Lasso, touts itself as a three-in-one solution that
allows advertisers to plan, activate, measure, their digital
advertising campaigns.  That brings us to PulsePoint, which was
acquired in 2021 by a company that also owns WebMD and
Medscape, PulsePoint is a three-in-one solution that provides
planning, activation, and optimization services for HCP
programmatic advertising campaigns.  You will hear from a
witness from PulsePoint later today, your Honor.

        While these big three companies refer to each other
consistently and constantly over the last few years as each
other primary competitors, they're also set of fringe players
in this market.  We will talk about those more later on.  These
companies are fringe participants because of their low revenues
in HPC programmatic advertising relative to the big three and
our expert has accounted for those participants in his market
share calculations.

        So, going back to the big three, by 2020, there was an
obvious three horse race between Lasso, DeepIntent, and
PulsePoint.  That is not my terminology.  That is how it was
referred to internally by DeepIntent.  Consistently, from 2020
on, these three companies competed vigorously for customers and
tracked each other's product offerings minutely.  Competition

1    between Lasso and DeepIntent was particularly acute, with the

2    two founders of Lasso describing the need in comparison with

3    DeepIntent to stay two steps ahead.  DeepIntent, for its part,

4    was well aware of the competitive threat that Lasso presented.

5    DeepIntent's chief marketing officer wrote that the entire

6    senior leadership team of DeepIntent feels we should definitely

7    address Lasso heads on, and noted that Lasso was not sloppy

8    like PulsePoint.  She called Lasso DeepIntent's number one

9    competitor.  And who is on DeepIntent's senior leadership team?

10   It included DeepIntent CEO Chris Paquette sitting at defense

11   counsel table.  Your Honor, we couldn't possibly show you all

12   of the examples of documentary evidence of the close

13   competition between these three firms in seven and a half days,

14   and particularly directly between Lasso and DeepIntent.  We

15   will do our best to give you a sense in the time we have.  So,

16   on this slide, I think we have a bigger -- there is a lot of

17   information on the slide.  We have a bigger visual

18   representation of it that my able assistants will do an awkward

19   reveal of right now.

20           THE COURT:  Have the IQVIA folks seen this?

21           MS. FLEURY:  This is what is directly on your screen.

22   This is a bigger version of the same content on your screen.

23   It is the exact same.

24           On this slide you can see a small sample of way Lasso

25   and DeepIntent talked about each other across time.  When Lasso

NBKIFED1                    Opening – Ms. Fleury

1   emerged in 2020, on the left-hand side, they fixated on

2   destroying DeepIntent.  Nearly a year later, they were still

3   calling DeepIntent their largest competitor.  DeepIntent –- on

4   the bottom of the slide, these are DeepIntent's comments –- had

5   similar language about Lasso, calling them a formidable threat.

6   And then, that red dotted line across the right represents when

7   it was announced that IQVIA maybe buying both Lasso and

8   DeepIntent and Lasso's co-founders found out and wrote to his

9   other co-founder in disbelief.  You think they are actually

10  buying both of us?

11          And price was not the only way Lasso and DeepIntent

12  competed, though we have voluminous examples of direct price

13  competition.  The parties also stayed abreast of each other of

14  each other's innovations.  For example, in May 2022, DeepIntent

15  executives emphasized that in light of a recent Lasso

16  announcement, DeepIntent needed to move faster with more shared

17  urgency to stay ahead of Lasso and PulsePoint.  So, they

18  decided to make the acceleration of a product feature called

19  outcomes a development priority as a result of the Lasso

20  measurement announcement.

21          As discussed, IQVIA decided to buy both companies in

22  mid 2022.  IQVIA signed an agreement to acquire DeepIntent

23  three days before its acquisition of Lasso closed.  And in the

24  period after that, specifically because the acquisition was

25  delayed so the FTC could investigate, competition between

NBKIFED1                        Opening - Ms. Fleury

DeepIntent and Lasso continued.  Defendants have repeatedly
made the argument including in their first brief before this
Court that, you know, DeepIntent and Lasso, they may have been
fierce competitors at one point, but that evidence is simply
out of date.  But what we have found is even if you just focus
on the evidence that we have collected from this year, 2023,
the competition between DeepIntent and Lasso was as fears as
ever.  It is worth dwelling on the evidence of competition from
this time period because all of that fierce competition is what
would have disappeared if IQVIA had immediately acquired
DeepIntent.  Overnight, this source of competition in the
marketplace that resulted in lower prices and important
innovations, gone.

        So, I want it talk just about 2023.  This slide, which
you also see blown up before you, reflects just a subset of our
evidence of head-to-head competition from the beginning of 2023
until discovery cuts off.  In January of 2023, a vice president
of sales at DeepIntent noted they lost five in a row to Lasso
due to rates.  In February, 2023, DeepIntent noted declining
revenues from a specific ad agency primarily due to Lasso
competition.

        THE COURT:  Let me stop you for a second.  What are
the five in the five in a row?

        MS. FLEURY:  I think that is five requests for
proposals or five customers.

1          THE COURT:  OK.

2          MS. FLEURY:  In March, a customer told DeepIntent they

3   went for another programmatic company for their campaigns due

4   to overall cheaper rates across the board.  DeepIntent

5   responded that they guess the competitor we lost to here is

6   Lasso, and compared the two companies pricing to see if they

7   could beat their rates.  In April 2023, DeepIntent told an ad

8   agency customer Lasso and PulsePoint were its direct

9   competitors for the opportunity.  In May, a DeepIntent

10  executive called Lasso DeepIntent's primary competitor.  In

11  June, an IQVIA sales executive named Michael Colarossi who you

12  will hear from this week said again, that Lasso's two key

13  competitors are PulsePoint and DeepIntent.  Finally, in

14  July 2023, the same month the FTC filed its motion for a

15  preliminary injunction in this Court, a DeepIntent vice

16  president of agency partnerships wrote about his competition

17  with Lasso and PulsePoint and talked about making a rate

18  discount to win a customer away from them.  And this 2023

19  competition is important for two reasons.  First, it is certain

20  that this head-to-head competition benefited customers.  And it

21  is certain that this competition would have been eliminated

22  with the acquisition.  That is why the case law holds that

23  head-to-head competition is sufficient.  And second, this

24  documentary evidence of the close competition between the big

25  three is what informed the FTC's market definition which was

then confirmed from third-party discovery including third-party

witnesses you will hear from today.

I will move on now to talking about why IQVIA acquired

a direct competitor carries even more weight because of its

strength vertically in data.  To do that, I would like to take

a step back and talk about the context for this proposed

acquisition and a little about IQVIA's history.

IQVIA is itself the result of a mega merger between

Quintiles and IMS Health in 2016.  IMS health was founded by

Bill Frohlich and Arthur Sackler.  If than names sounds

familiar, it's because that is also the founder of Purdue

Pharma, and he helped found INS Health as a market research

company focused specifically upon the pharmaceutical industry

and their early focus, even at that point, was on targeting

doctors.  How did IQVIA become the 800-pound gorilla of health

care data?  Through acquisitions.

IQVIA's known in the industry for its long history of

gobbling up smaller data companies.  IQVIA and its acquired

companies have formed a huge data collection operation.  They

collect sales data from drug manufacturers, wholesalers,

pharmacies, prescription and diagnosis data from doctors,

promotion data for medical journals, data from health plans,

physician and patient-level data.  The primarily target for

IQVIA's data sales is pharmaceutical companies.  In pursuing

this latest transaction, IQVIA is executing on its standard

1   playbook, one that allowed it to become a company that has,

2   according to its annual filing, one of the largest and most

3   comprehensive collections of health care information in the

4   world.  Eighty-five percent of pharmaceutical companies use

5   IQVIA to build their NPI target list, direct sales, and

6   marketing outreach.  Almost every single company that you will

7   hear from or about in this case uses IQVIA data.  Some of

8   IQVIA's competitors have seen their access to IQVIA data

9   curtailed.  You will hear from some of those as well

10  your Honor.

11          So, I would like to take you now to 2019.  That is

12  when IQVIA acquired a leading provider of health care

13  professional data in MedData Group.  But IQVIA wasn't done.  As

14  it has many times in its history, it started thinking about how

15  to expand on that acquisition and it targeted a niche area for

16  specific types of data where it oculd dominate the space.  It

17  began looking into acquiring DMD, a direct rival to MedData

18  Group that was also a leading provider of data for HPC

19  programmatic advertising.

20          It is around the same time period Frank Lin, who was

21  then general manager of DMD and who you will hear from, I

22  believe, tomorrow, and Chris Paquette, the CEO of DeepIntent

23  began talking about what would happen if they brought their two

24  companies together.  DMD, with a vertical input data, needed

25  for HPC programmatic advertising and DeepIntent the

NBKIFED1                    Opening – Ms. Fleury

1    programmatic advertising platform.  DMD general manager Frank

2    Lin wrote that a potential play would be for IQVIA to quote,

3    lockup the one-to-one programmatic market with an exclusive DI

4    DMD combination.  In 2021 DMD was officially up for sale.  Per

5    DeepIntent CEO Chris Paquette's discussion with DMD's Frank

6    Lin, DeepIntent bid on it.  Both Lasso and DeepIntent, when

7    they saw that DMD was for sale, had the same thought.  If

8    either Lasso or DeepIntent could become quote, the exclusive

9    programmatic partner of DMD, it could one, cut off data to its

10   rivals, and two, it could raise prices.  DeepIntent was

11   ultimately outbid by IQVIA who purchased DMD's HPC data

12   business in August 2021.  By March 2022, Frank Lin, now a part

13   of IQVIA, was telling other IQVIA executives like Dave

14   Escalante and Jay Margolis who you will hear from that they

15   should consider purchasing either Lasso or DeepIntent.  He

16   wrote, I would go stronger with market penetration.  Doe, which

17   was the project name for DeepIntent, has the No. 1 position for

18   health care platform.  He said PulsePoint was second and Lasso,

19   project name London, was third.  He then wrote they could hold

20   those market shares easily with IQVIA data.  That same month,

21   Mr. Lin wrote Mr. Escalante and Mr. Margolis, all IQVIA

22   executives saying, since the thinking with Jon Resnick is

23   potentially both, we identified the positives by category.  And

24   in this communication, IQVIA executive Frank Lin again repeated

25   the market penetration figures he had used previously giving

NBKIFED1                    Opening – Ms. Fleury

1  DeepIntent the No. 1 postion, PulsePoint No. 2, Lasso No. 3.

2  And these texts about the big three are particularly important,

3  because they were contemporaneous.  They show what they were

4  thinking at the time they were considering these acquisitions.

5  That same night, Dave Escalante wrote to the group, $1 million

6  here we come.  Frank Lin responded, MDG plus DMD plus Lasso

7  plus DeepIntent, you are shitting me.  Timing is everything.

8  Finally, here is where I am going to leave it to the Court to

9  interpret the emoji, Dave Escalante wrote to the group, our

10  team an industry are going to do something to themselves.

11         All of these texts show that not only was IQVIA

12  thinking about acquiring these companies as a way of at least

13  maintaining market penetration in HPC programmatic advertising.

14  You see Frank Lin talking about DeepIntent as the market

15  leader.  But you also see them acknowledging the power of the

16  combination of DeepIntent plus Lasso plus DMD plus MDG.  Frank

17  Lin said it directly back in 2020, what the goal was.  Lock up

18  the one to one programmatic market with an exclusive DI DMD

19  combination.  These texts between IQVIA executives show they

20  have the same view of the market that we do and the same view

21  of who its most powerful players are.

22         One last note on the ability and incentive framework

23  in our vertical case.  If allowed to acquire a large percentage

24  of market for HPC programmatic advertising, IQVIA will stand to

25  make more money if it favors Lasso and DeepIntent over rival

NBKIFED1                    Opening – Ms. Fleury

1    DSPs.  Importantly, your Honor, we are not alleging that they

2    have some nefarious plan.  They are a profit maximizing

3    company, they will do what profit maximizing companies do, try

4    to make as much money as possible.  IQVIA doesn't have to

5    completely foreclose to accomplish that goal.  It can, as it

6    has in the past, simply delay access, deny access to bits and

7    pieces of critical data, make it difficult for rivals to be

8    able to offer the same data consistency IQVIA's customers will

9    enjoy.

10            So now, I will address market definition.  Given all

11   of this evidence of direct competition between the same three

12   companies operating in the same space, for 13(b) purposes, as I

13   said, the Court doesn't have to engage in a formal exercise of

14   market definition.  There clearly is a market in which these

15   two defendants compete, whatever its size.  Given the closeness

16   of competition between these two entities which the evidence

17   amply demonstrates and given the effects the competition had on

18   prices which, again, is all over the documentary record, the

19   precise contours of the market are not necessary to find that

20   we have a fair and tenable chance of demonstrating this deal is

21   anti-competitive.  In fact, the relevant case law, as I

22   mentioned, said we don't need to settle on that at this stage.

23   But here, we have in fact done a thorough and reasoned market

24   definition analysis using both of the two standard methods for

25   defining a relevant market.  You can look at practical indicia

1   as set forth by the Supreme Court in *Brown Shoe* which is the

2   seminal case on market definition and specifically on defining

3   submarkets.  The other is the hypothetical monopolist test,

4   which comes from the Antitrust Agency's merger enforcement

5   guidelines.  You can think of both of these as useful tools for

6   analyzing market definition.  There is no legal rule that says

7   you have to apply both or either in a 13(b) context, but we

8   have addressed both in our papers to the Court and will provide

9   evidence and economic analysis going to both frameworks at this

10  hearing.  The FTC will call our economic expert,

11  Dr. Hatzitaskos, who will testify about the fact that he ran

12  the hypothetical monopolist test two different ways using

13  methods that have been approved by courts and used by

14  defendant's economic expert in past cases.  And each confirmed

15  that HPC programmatic advertising constitutes a relevant

16  market.  Dr. Hatzitaskos' empirical evidence is consistent with

17  the evidence you will hear from fact witness.  Considering it's

18  importance, HPC programmatic advertising is not something

19  customers would abandon lightly, even in response to a price

20  increase.

21         So, I would like to turn now to a discussion of

22  defendant's arguments in this case.  As I have already

23  discussed, your Honor, there is no dispute that defendants

24  directly compete or that this competition, which has been

25  fierce will cease if the acquisition is completed.  There is

NBKIFED1                         Opening - Ms. Fleury

1  also no dispute that the merger will result in a significant

2  increase in concentration.  Both the FTC's expert and

3  defendant's expert agree that however you design the precise

4  boundaries of the relevant market, PulsePoint, DeepIntent, and

5  Lasso, are the three largest providers of HPC programmatic

6  advertising.

7       Moreover, this shared understanding of the market

8  concentration is very consistent with the real world evidence.

9  Internal party documents suggest that the parties' own

10 estimation of the market shares this acquisition would afford

11 them was even higher than the conservative expert estimate in

12 this case.

13      Finally, there is no dispute, that with the merger,

14 the combined firm controls an important input to HPC

15 programmatic advertising.  Defendants admit that the data they

16 acquired from MedData Group and DMD is used as an input for HPC

17 programmatic advertising.  As IQVIA's own security filings make

18 clear, nearly all the top 100 pharma firms use IQVIA data.

19 Third parties consistently testify that they'd have a hard time

20 competing without IQVIA data.

21      So, if all that is not in dispute, what are defendants

22 contending?  The principle dispute in this case is ultimately

23 over whether the FTC defined the market too narrowly.  Are they

24 more contenders we should have taken account of to assess the

25 competitive effects of this transaction?  Notably, defendants

NBKIFED1                          Opening – Ms. Fleury

don't stick to one group of purported competitors and say, look

here, you missed this in the documentary record.  Instead, they

try this kitchen sink approach.  Is it generalist DSPs, social

media companies, medical websites, customers themselves?  They

are thrown spaghetti at the wall to see what sticks.

Nonetheless, we will show evidence supporting our market

definition methodology and all of the real-world evidence that

is consistent with it.

So, I would like to spend a moment on each one of

these companies of companies we are alleged to have left out.

Let's start with generalist DSPs.  So, to the extent they have

HPC programmatic advertise revenue such as AdTheorent and Trade

Desk, two companies specifically invested in that specific

offering and are both reliant on IQVIA, we included them in our

market definition and shares analysis.  That is also true of

fringe health care VSPs like Proclivity that reported low and

declining revenues HCP programmatic advertising.  For Google,

Zander, and Yahoo, they have come out and said they don't

compete in this market and they don't plan to.

Now social media companies.  Defendants economic

expert, Dr. Mark Israel, is likely to testify based upon his

report that social media companies like Facebook and Sermo

should have been included in our market.  Based upon his view

that social media companies compete, he claims that Sermo the

is the fourth largest competitor, though even according to him,

1     still behind the big three.  First, if social media companies

2     were in the thick of the fierce competition in this market, one

3     would think they would have been mentioned when defendants told

4     the FTC who their competitive set was during the investigation.

5     And subsequently, in its TRO papers were their answers to the

6     complaint.  One would also think they would be reflected in the

7     documentary record and that DeepIntent would have battle cards

8     and kill sheets like it does for Lasso.  Neither of those

9     companies is on either party's witness list, initial or final,

10    because they are not players in this space and there is no

11    evidence they act as a competitive constraint on the big three,

12    certainly not, on the way they do with each other.

13              THE COURT:  May I ask what may be an embarrassing

14    question.  What is Sermo?

15              MS. FLEURY:  I am glad you asked, your Honor.  I also

16    had that question when I read the defendants expert report.

17              Sermo is a social media company that is health care

18    specific.  Beyond that, I cannot provide a ton more detail.  As

19    I have mentioned, I didn't see a lot of reflection of them in

20    the parties' documents anywhere until I read the defendant's

21    expert report.

22              THE COURT:  OK.

23              MS. FLEURY:  In essence, defendant's main gripe is

24    that our market definition is too narrow.  Defendants argued in

25    their first brief in this Court in, July that the FTC has

NBKIFED1                    Opening – Ms. Fleury

1    transparently drawn its proposed market as narrowly as

2    possible.  But that is how market definition works.  The case

3    law, the merger guidelines, both side's economic experts, they

4    all say that's how it works.  You start with a narrow market

5    based upon the evidence, HPC programmatic advertising in this

6    case, and you only expand it if there is sufficient evidence

7    companies outside the market actually operate as competitive

8    constraints on the companies inside the market.  That evidence

9    is lacking here.  And defendants also argue that if there is

10   something out there that achieves basically the same function

11   in their view, it is in the market.  The case law is not with

12   them on that.  This chart shows just some of the holdings in

13   which defendants made very similar arguments to the defendants

14   here.  There is a broader market that also acts as a

15   competitive constraint on a small group of competitors,

16   sometimes in the cases shown here, the defendants had actual

17   clear evidence of those competitive constraints from the

18   broader group such as in *Peabody*.  Not so here.  Regardless, in

19   each of these cases, the court found the existence of a broader

20   category of competitors did not affect the fact that a narrow

21   or specific market was a properly defined relevant market.

22          In *Cisco*, for example a case in which the defendants

23   expert testified in support of the narrow market that the FTC

24   had alleged, the court found that the fact that defendants

25   sometimes compete against other channels of distribution in the

1    larger marketplace does not mean that those alternative

2    channels belong in the relevant product market for purposes of

3    merger analysis.

4         So, let's just say, for the sake of argument, that

5    despite the lack of evidence in support of defendant's

6    alternative view of the relevant market, we should credit it.

7    Even if you do that, even if you put aside the case law and the

8    evidence supporting our approach to market definition, that is

9    where the structural presumption comes in.  Defendant's

10   economic expert, Dr. Mark Israel, did his own analysis of

11   market shares including social media companies assuming high

12   revenues for fringe participants that are not supported by the

13   evidence.  He still wound up with a combined market share for

14   DeepIntent and Lasso that triggers the structural presumption.

15        As I said at the outset, the Supreme Court has held

16   that a significant change in concentration that results in a

17   combined market share of at least 30 percent is sufficient to

18   establish a legal presumption that a merger violates the law.

19   So, let's take a look at the market shares in this case.

20        First, here is FTC expert Dr. Hatzitaskos' calculation

21   of the market shares in this case, preacquisition.  He

22   calculates that the combined market shares if IQVIA were

23   permitted to acquire DeepIntent would increase to 46 percent.

24   After the acquisition, you see what happens to the market

25   shares.  On the next slide, by contrast, is defendant's

NBKIFED1                    Opening — Ms. Fleury

economic expert, Dr. Mark Israel's chart.  Even the defense
expert has IQVIA post-acquisition owning over 30 percent of the
market.

            Defendants accuse the FTC of saying that big is bad,
but in a case of structural presumption, the law says that a
certain level of bigness entitles to you a presumption.  A
certain level of bigness in terms of increased market
concentration is presumed bad for competition.  Here, we will
see that sentiment echoed in the testimony you will hear from
witnesses, your Honor, who will talk about their concerns about
consolidation in this industry.

            I will briefly touch on the equities before
concluding, your Honor.  In assessing whether we have a fair
and tenable chance on the merits, section 13(b) asks this Court
to balance the equities.  The genesis of 13(b) and the FTC Act
was the public interest in effective enforcement of the
antitrust laws by antitrust agencies.  Allowing an acquisition
to close where, as here, the parties are direct competitors
would be difficult to unwind and cause immediate harm to
competition.  In a competitive market, companies act zealously
to protect their confidential information, their prices, their
discounts, their customer lists, their innovation that are in
development.  We have seen that in this case, your Honor,
expressed through the confidentiality claims of the parties and
third parties.  The immediate harm then of allowing an

NBKIFED1                    Opening – Ms. Fleury

acquisition to go forward on December 30 is that you can't

unwind that decision.  And as the *Lancaster* court noted,

divestiture is a cumbersome difficult, disruptive and complex

remedy.  Defense have offered no countervailing considerations

that can outweigh that public equity.

        Given the strength of the FTC's case on the first

prong of 13(b), considering the equities only cements the

arguments for a preliminary injunction.  In closing,

your Honor, I want to note that based on defendant's arguments

in their opposition brief and their expert report, it seems

they are going to spend some of their time at this hearing

telling you that their documents don't mean what they appear to

mean, and instead to believe what their executives are telling

you now.  For instance, based upon their briefing, you may here

IQVIA's executives tell you they don't think Lasso and

DeepIntent really compete in the same space, that they're

compliments more than direct competitors.  You may hear them

describe their current motivation for the acquisition and say

those motivations are beneficial and sincere.  Well, first of

all, regardless of why they're telling you they want to buy it

now, what matters the potential effect on competition once they

own DeepIntent.  And second of all, the FTC's case is based

upon a deep documentary record.  We will ask the Court again

and again over the next few days to pay attention to what

defendants said in their own documents.

NBKIFED1                          Opening – Ms. Fiebig

1              I began today, by talking about IQVIA's decision to

2     buy both, not to buy 2 different things, but rather as buy both

3     employs to buy 2 of a kind, when they discussed buying both it

4     was clear in the contemporaneous documents that they thought

5     the double purchase would give them a leg up in terms of market

6     share.  Also clear, how much they valued HPC programmatic

7     advertising as a high-margin business where they could, as it

8     says here in this document, lock up the one-to-one programmatic

9     market.

10             HPC programmatic advertising may be a relatively new

11    and narrow market, your Honor, but it is an important one.  It

12    shouldn't be controlled by two primarily companies.  We should

13    have more competition in this market, not less.  We look

14    forward to showing you our evidence.

15             THE COURT:  Thank you, Ms. Fluery.

16             Rather than go an hour and a half -- I don't want to

17    break in the middle of opening presentations.  So, we will do

18    the defense openings until you are done; OK?  So he will with

19    go longer than an hour and a half if need be.

20             MS. FIEBIG:  Thank you, your Honor.

21             May it, please the court.  Your Honor, on behalf of

22    defendants, we would also like to start by thank the Court and

23    your law clerks and your courtroom staff for hearing us in this

24    evidentiary hearing on an already busy docket, particularly

25    over the holiday.

NBKIFED1                         Opening – Ms. Fiebig

1              Your honor, advertisers today have many choices on how
2      they deliver the right ad to the right audience at the right
3      time, and that includes in digital health care advertising
4      which is expanding at an explosive rate.  Now, we all know the
5      digital ads are ubiquitous today because we are all consumers
6      of digital media.  And there is no denying how much and how
7      quickly technology in advertising has advanced.  We all receive
8      digital ads while browsing the web on our laptops, through
9      social media sites on our Ipads, even through connected TV.
10     Today, you might search on your phone through Google for a
11     veterinarian, and tonight, when you are streaming at home, you
12     might see a dog food ad for the first time ever.  And if you
13     just think about the pace of that innovation in delivering that
14     targeted digital ad to you and your household, there has been a
15     remarkable level of growth and innovation and sophistication in
16     digital advertising in just the last few years.

17             Now, programmatic advertising is just one form of
18     digital advertising.  We and the FTC have two different
19     definitions of programmatic advertising, which is unsurprising
20     because it means different things to different people in the
21     industry.  The FTC has defined it to mean the automated buying
22     and selling of digital advertising.  Now, that automated buying
23     and selling is one way that programmatic advertising can
24     happen.  But really, in its simplest form, programmatic
25     advertising refers to digital advertising that advertisers

1    engage in when they use technology to ensure that a particular

2    ad reaches a particular audience.

3            So, any of these kinds of advertisers that you see on

4    your screen can target a particular ad to this particular

5    audience member.  Now, that's in contrast to other forms of

6    digital advertising, regular advertising, where everyone sees

7    the same thing.  If you think about the Budweiser ad that

8    everyone sees when they are watching the superbowl or the

9    digital ads that play in the back of cab that everyone sees no

10    matter what, those are other forms of digital advertising.

11    What makes programmatic advertising program advertising is the

12    technology delivers a specific ad to a specific audience.

13            Now, the delivery of those ads can happen in multiple

14    ways using different kinds of technology and there are what I

15    like to call multiple points of connectivity between an

16    advertiser, those on the left, who wants to serve the ad, and a

17    publisher like on the right who ultimately displays it to the

18    reader.  Now, all of these different paths fall within the

19    industry's definition of programmatic advertising.  Now,

20    sometimes advertisers like the company that wants to sell their

21    stethoscope to this doctor, sometimes they work directly with

22    publishers to do that.  Just as an example, we have listed a

23    few publishers here.  One of them is called Doximity.  Doximity

24    is like the LinkedIn for doctors in the same way that Sermo, as

25    you asked about earlier, is like the Facebook for doctors.

NBKIFED1                    Opening - Ms. Fiebig

1  Advertisers can work directly with those sorts of publishers or

2  the New York Times or the Wall Street Journal, to make sure

3  their ad gets delivered to their audience.  Sometimes,

4  advertisers prefer to work with an advertising agency.  Those

5  advertising agencies can work directly with the publishers or

6  advertising agencies sometimes choose to make purchases through

7  what are called demand-side platforms.  Demand-side platforms

8  bid on advertising that's made available through supply-side

9  platforms.  That is one way it can happen.  Other times,

10  advertisers or their agencies skip that step altogether, and

11  they just engage directly with what is called an advertising

12  exchange so that they can deliver the ad for the stethoscope

13  directly to the doctor they are targeting, and if she is not

14  being targeted as a doctor for example, if she is being

15  targeted because she's a woman with curly hair, and the shampoo

16  manufacturer thinks that they can help improve its shine, all

17  of those forms of programmatic advertising can travel down any

18  of these paths in order to deliver their ad to her.

19          Programmatic advertising has been used for a long

20  time, particularly for consumer goods.  There is nothing

21  particularly new or novel about it.  But it only recently

22  caught on in the health care industry.  A big reason for that

23  was Covid.  Because historically, advertisers reached doctors

24  in particular by setting pharmaceutical sales reps to meet with

25  them in person.

NBKIFED1                    Opening – Ms. Fiebig

1          So, during the pandemic, advertisers embraced new ways

2     of marketing health care products to doctors and to their

3     patients and even though it had been happening before, it

4     reached orders of magnitude higher levels of use during Covid.

5     Now programmatic advertising lets those advertisers choose

6     whether to target just the doctors or just the patients or

7     both.  And it also allows them to choose whether to serve that

8     ad on a social media site, embedded during a podcast, or as a

9     video in an article that you might otherwise be reading online.

10    All of those forms of digital advertising for a particular

11    audience can be delivered programmatically.  It also allowed

12    the advertisers to choose whether to serve that ad on any

13    particular website and they can serve it on all sorts.  They

14    could serve it on news sites, they could serve it on LinkedIn

15    and other social media sites.  They could serve it on medically

16    related sites like Medsacpe or they could serve it on the

17    sports page.  All of those reflected the customers choice of

18    where their programmatic ads would show up to find their

19    audience.  As advertisers really began to embrace this and

20    other forms of digital advertising during the pandemic, the

21    market for digital health care advertising exploded.  We have

22    seen tremendous growth over the course of the last few years.

23          Now the FTC has told this Court this case is about HPC

24    programmatic advertising.  But the only difference between any

25    other kind of programmatic advertising and HPC programmatic

NBKIFED1                        Opening - Ms. Fiebig

1    advertising is that the target audience is compromised of

2    health care professionals.  So how is that advertisers can

3    target these health dare professionals as opposed to anyone

4    else they might already be targeting like lawyers or students

5    or airline pilots.  All of those communities get targeted

6    through programmatic advertising.  Health care providers in

7    America actually receive what is called an NPI number, a

8    national prescriber number, and it is assigned by the United

9    States government and it is publicly available on CMS.gov.

10        There are lots of companies, as your Honor will hear,

11   that take that information and assign to it a digital ID so

12   those doctors can receive targeted digital advertising when

13   they show up online.  Lots of companies do that and you will

14   hear testimony about that.  Even though the government has

15   focused here on HPC programmatic advertising, it is important

16   to recognize the lion's share of programmatic advertising,

17   including by health care companies, is actually directed to

18   patients.  It is direct-to-consumer.

19        Now, to be sure, well before the pandemic, large

20   advertising companies like Google and meta and others were

21   providing programmatic advertising to health care companies.  A

22   lot of that was direct-to-consumer which remains the lion's

23   share of advertising today.  There wasn't as much direct

24   targeting to health care providers happening then.  You will

25   hear testimony about all that.  And that has increased these

NBKIFED1                        Opening – Ms. Fiebig

1    companies have increased the amount that they are doing.  But

2    Google and Meta obviously don't just serve as health care

3    companies, they service companies in all sorts of verticals.

4    And, in fact, they are so big and so ubiquitous in providing

5    digital advertising services, the federal government, as

6    your Honor may know, is currently suing Google right now in the

7    Eastern District of Virginia for dominating all of the tools

8    that advertisers use to buy digital advertising space.

9              Now, in addition to the Google and the Metas of the

10   world, there are other companies still large digital

11   advertising companies, but that maybe less well known.  Those

12   include companies like the Trade Desk, and AdTheorent.  Trade

13   Desk, for example, is a $32 billion company, a $32 billion

14   company.  They have been providing programmatic advertising

15   service to health care companies since well before the

16   pandemic.  Like Google, they service all sorts of companies too

17   because they are huge digital advertising companies.

18             THE COURT:  Do they do anything else, Trade Desk?

19             MS. FIEBIG:  Yes.  They provide all sorts of digital

20   advertising services including programmatic advertising

21   services to health care systems, to automotive companies, to

22   travel companies.  They provide the full suite of services.

23             THE COURT:  OK.

24             MS. FIEBIG:  In addition to those major players, there

25   are a bunch of smaller players too.  One of those is DeepIntent

which was founded by a young enterprising tech entrepreneur before the pandemic.  DeepIntent had one of those demand-side platforms you have heard us to us refer to.  That is one way of the buying and selling digital advertising and they are very common in the market.  Hundreds of companies have them.  The Trade Desk has them.  There's nothing particularly special about the demand side platform itself.

So, DeepIntent needed to find a way to break into what was a very crowded and competitive market.  He needed ad angle.  So he decided to brand DeepIntent as focusing on the health care industry, and focusing on delivering advertising to health care professionals.  As a result of that branding, especially during the pandemic, DeepIntent was in the right place at the right time.  And his business really took off.

Now after seeing that, and the growth in the industry and in the market, other companies poured into this space.  The big players had had already been providing programmatic advertising services had a renewed focus.  We saw all sorts of startups starting to sprout.

Now today, there are dozens of companies, that specifically provide programmatic advertising to HCPs.  So much so, that DeepIntent has already pivoted out of focusing on HPC programmatic advertising and now, much more of their business, over half, focuses on programmatic advertising that is direct-to-consumer.  Now another one of the startups was

NBKIFED1                        Opening – Ms. Fiebig

1    launched during a pandemic is a company called Lasso.  Lasso

2    was started by a couple of young entrepreneurs who bought some

3    software that had been used in a different industry and they

4    used that to enter this market.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MS. FIEBIG:  (Continuing)

2           And they were able to enter the market and to grow

3     extremely quickly.

4           Now, Lasso is what we call a user interface.  It

5     allows advertisers or their advertising agencies to manage

6     their campaigns, their advertising campaigns across social

7     media sites or medically-related sites or any other avenue for

8     which the advertiser might want to display their advertising.

9     But Lasso, unlike DeepIntent, does not have a demand-side

10    platform.  It has always been reliant on renting one from

11    Microsoft, which it has done, which any other company could do.

12    Now, despite that, Lasso was still a successful new entrant.

13          There is another also relatively new entrant the FTC

14    plans to call as a witness this afternoon, and that is a

15    company called PulsePoint.  Now, PulsePoint is also a

16    demand-side platform, and they were acquired in 2021 by the

17    same company that owns WebMD, and WebMD is a medically-related

18    website that has more visitors to it than any other

19    healthcare-related website in the world.  And in fact,

20    PulsePoint seems to be one of the main objectors to this

21    transaction and that's why you will hear from them today, but

22    it is important to remember that the antitrust laws protect

23    competition, not competitors, when receiving that testimony.

24          Now, in any event, DeepIntent, Lasso, PulsePoint and

25    others, were all able to successfully enter this market and

NBK5fed2                        Opening – Ms. Fiebig

1    their entry was swift and it was penetrating.  And they weren't

2    the only ones.  Even the large companies, like The Trade Desk

3    and AdTheorent, who had already provided these services,

4    doubled down on their efforts and in the last year have

5    publicly announced that they have lunched entire divisions just

6    to focus on healthcare programmatic advertising, digital

7    advertising health care companies which includes healthcare

8    programmatic advertising.

9          Now, they didn't just start doing it.  Others have

10   been doing it for a long time.  And what we have seen is sort

11   of a swing in both directions.  Some of the companies that had

12   historically been providing programmatic advertising that

13   focused on direct-to-consumer, have swung into the space that

14   focuses on -- that also provides services for

15   healthcare-specific programmatic advertising and vice versa.

16   We have seen companies that launched, like DeepIntent, focusing

17   on programmatic advertising to healthcare professionals, and

18   they have also swung to start providing, offering for direct to

19   consumer.

20         Now there is a much larger market for

21   direct-to-consumer programmatic advertising but the trend in

22   the industry is that customers are moving towards preferring

23   the optionality of having advertising services both direct to

24   consumer and targeting healthcare professionals within one

25   platform.  That is the trending preference in the industry.

NBK5fed2                    Opening – Ms. Fiebig

1          Now, your Honor, however you define programmatic

2     advertising, all of these companies are doing it, and any that

3     aren't, quite easily could.  This is a market that is marked by

4     dynamism, growth, and innovation, and the Supreme Court has

5     told us that the antitrust laws champion this kind of

6     competition.

7          Now, allow me to introduce my client, IQVIA, which is

8     not a digital advertising company at all.  IQVIA is a

9     healthcare company that provides innovative solutions to life

10    sciences customers with a goal of improving patient care

11    outcomes.  Many of its employees work directly in hospitals or

12    clinics and most of its business focuses on clinical trials.

13    In fact, one of the things that IQVIA is best known for is

14    partnering with the pharmaceutical companies that developed the

15    COVID-19 vaccines alongside or within Operation Warp Speed.

16         During the pandemic, executives at IQVIA, including

17    Mr. Resnick, who you will hear from this week, realized that

18    the healthcare digital advertising market was growing but it

19    was still full of potential inefficiencies, and IQVIA

20    recognized that even though it was a very competitive market,

21    it might be able to better serve its life sciences customers by

22    helping to improve upon the healthcare digital advertising

23    options that were available in the market.  And, to be clear,

24    your Honor, that is the driving force behind this transaction.

25    IQVIA is trying to be responsive to changing trends in patient

NBK5fed2                    Opening - Ms. Fiebig

1    care and decision making and they are trying to provide the

2    services that their customers need in the market.  This

3    transaction was not about and has never been about HCP

4    programmatic advertising.  IQVIA has recognized that when you

5    get the right information to the right doctors and to their

6    patients, that improves care outcomes and that is the strategic

7    vision.

8              Now, when IQVIA began to understand that there might

9    be an opportunity to better serve their customers they assessed

10   the competitive landscape and they saw that there were major

11   competitors already there and they made the determination that

12   in order to enter the market successfully in any way, they

13   would need capabilities for both healthcare programmatic

14   advertising as well as direct to consumer.  They identified

15   DeepIntent and Lasso as two companies that had complementary

16   capabilities.  Lasso is the user interface and it has the

17   ability to manage campaigns across the omni channel platform

18   including through social but they don't have a DSP.  DeepIntent

19   does.  And it has very advanced direct-to-consumer capability

20   and it has very advanced capability in connected TV.

21             Now, these two very small companies were competitors

22   at a time, sure, but they have very complementary capabilities,

23   and bringing them together will allow IQVIA to meaningfully

24   complete in this space.

25             Now, the FTC has sought the extraordinary remedy of a

NBK5fed2                    Opening – Ms. Fiebig

preliminary injunction to block this transaction, and as you

heard from Ms. Fleury, they have advanced two separate theories

which we will discuss but before I turn to those, there is a

couple of points that I want to be very clear on.  The first is

that the FTC has not alleged, not once, that this transaction

would harm doctors or their patients at their local drug store.

They have never made that claim.  As far as we can tell, the

only customers who could be harmed by this transaction and that

the FTC seems concerned with are large global pharmaceutical

brands and their large global advertising agencies.  But these

pharmaceutical companies and these advertising agencies are

among the most sophisticated customers in the world.  They have

hundreds of millions and billions of dollars in buying power

and those are the customers that the FTC is referring to

throughout this case.

        The second point that I want to emphasize for the

Court is that the FTC is asking the Court to step well beyond

the precedent in this circuit to grant a preliminary injunction

under the standards that the FTC has advanced in this case.

        Now, we all know that the law says that competition is

good and that antitrust law is intended to protect the

competition, not the competitors, and that private parties are

free to engage in business and the government's intervention

should be modest.  And, the leading antitrust scholar in the

world reminds us that at all times we must remember that if we

NBK5fed2                        Opening - Ms. Fiebig

believe that markets generally work well when left alone, that

intervention is justified only in the relatively few cases

where the judiciary can fix the problem more reliably, more

cheaply, or more than the market can fix itself.

          Now, the FTC wants to lower their burden just as much

as they possibly can because they know that their case fails on

the law and on the facts, so the government has suggested to

you that this Court does not even need to do any analysis of

even the most basic facts related to their claims.  You don't

need to look at the market definition, you don't need to

consider the reliability of their market shares, they told you

you don't need to consider new entrants.  I mean, that is a

lower standard than the Courts in this Circuit could tolerate.

And, as this Court has recognized, there is an obligation to

exercise your independent judgment in considering the merits of

the FTC's position.

          Now, all of this makes sense because in the end, your

Honor, this trial is the only trial that this case will ever

see.  If the Court grants the preliminary injunction, the deal

will die because parties can't wait the two or three years that

it would take for the government's administrative proceeding to

play out.  Now, on the other hand, if the Court doesn't grant

the preliminary injunction, the FTC will probably abandon their

challenge and they will move on to the next case.  That's how

these merger challenges have played out for the last 30 years.

NBK5fed2                    Opening – Ms. Fiebig

1    And just to answer your earlier question, the decision that

2    your Honor issues in this case can be appealed to the Second

3    Circuit.

4            Now, if there were to be an administrative proceeding,

5    the decision issued by the administrative law judge would then

6    be appealed to the Commission itself and it could then be

7    appealed to a federal court of appeals.  You can imagine how

8    long that process takes to play out, which is why this trial is

9    the one that matters.

10           Now, the FTC has suggested that the preliminary

11   injunction would just protect the status quo so that they could

12   continue with their administrative proceedings, but the real

13   status quo, your Honor, is that two companies and their boards

14   of directors have entered into a contract that provides that

15   this transaction will close in just a few weeks before the end

16   of this year.  That's the status quo.  And what the government

17   is asking you to do is to insert the Court into that contract,

18   upend that status quo, and stop this transaction.  That is a

19   remarkable level of intervention into a contract between two

20   private parties in a highly competitive market.

21           Now, the FTC has now investigated this case for over a

22   year.  They have taken over 50 depositions already.  They have

23   received over 2 million documents and they now have an

24   eight-day hearing to present their evidence and your Honor will

25   have all of the information it needs in order to make its

NBK5fed2                        Opening – Ms. Fiebig

1    determination as to whether or not the FTC has met its burden,

2    so let's turn to the law.

3          Now, the FTC seeks a preliminary injunction under

4    Section 13(b) on the grounds that this transaction violates

5    Section 7 of the Clayton Act.  Now, to grant that request for

6    that extraordinary relief, the FTC must prove that they're

7    likely to succeed on the merits of their claim and that the

8    equities favor the injunction.  They've advanced the two

9    theories that Mrs. Fleury previewed for you:  The horizontal

10   and vertical theory.

11         Now their first theory is based on a claim that this

12   transaction would take the serious competitors and their

13   proposed relevant market down from three to two.  And their

14   second theory is that if IQVIA acquires its own demand-side

15   platform, that it may refuse to allow its life science

16   customers to use IQVIA's data on any other DSPs.

17         Now, both of those theories reflect a fundamental

18   misunderstanding of this market but the ultimate question for

19   your Honor is whether this transaction is likely to

20   substantially lessen competition under either of those theories

21   in the federal government's proposed market.

22         Now, the FTC's original sin lies in their market

23   definition which is why they probably left it for the end and

24   she told you that you don't really need to assess their market

25   definition, you don't need to assess whether or not those

NBK5fed2                    Opening - Ms. Fiebig

1    shares are likely to hold.  But the Supreme Court told us in

2    *Marine Bank Corp.* that the government's market definition is an

3    element of their case and if they cannot prevail on their

4    market definition, then they lose.

5         Now, the government has claimed that the antitrust

6    market is HCP programmatic advertising, your Honor, but all of

7    the companies that we have already discussed today are doing

8    HCP programmatic advertising including Google, which the FTC

9    excludes from their market, which is precisely what makes their

10   market so arbitrary.  And just as an illustration, your Honor,

11   let's consider again the HCP programmatic advertising.

12        Advertisers put the exact same ad in front of the

13   exact same doctor on different websites.  Now, the FTC's

14   position is that if it is published on CNN, it's in the market.

15   But if it is published on LinkedIn or Doximity, it's out.  And

16   if it is published on Medscape or some other medically-related

17   website, the exact same ad, it's out.  But if they publish the

18   ad on the sports page -- good news -- it's in.  It could not be

19   more arbitrary.

20        Now, the government has gerrymandered their market

21   definition because they had to in order to find a way to

22   preserve their position that Lasso, DeepIntent, and PulsePoint,

23   could even conceivably be the top three in what is such a

24   crowded market of providers of HCP programmatic advertising

25   services.

1          THE COURT:  Can I ask you a question just on what's on

2     the slide that's before me?

3          As I understand HCP programmatic advertising it

4     provides an additional feature that allows you to see whether

5     the recipient reacted to the ad; correct?

6          MS. FIEBIG:  Programmatic advertising can do that and

7     lots of other forms of digital advertising can do that as well.

8          THE COURT:  But they can't do that on CNN or ESPN;

9     correct?  They would be able to do it if it were directly

10    targeted to someone's phone, for example.

11         MS. FIEBIG:  Well, there are some platforms that can

12    allow for reporting of whether or not a particular person

13    interacts with an ad on CNN or on ESPN.

14         THE COURT:  OK.

15         MS. FIEBIG:  And, frankly, that is one of the things

16    that lots of companies are contending with, is how much of the

17    tracking of who does what online will remain permissible in the

18    future.  That's one component and it is great that you

19    mentioned that, because what we have seen in the government's

20    case that they're not actually just talking about HCP

21    programmatic advertising.  What they're talking about is

22    something much, much more narrow than that and the measurement

23    that they have put forward is sort of an essential element of

24    HCP programmatic advertising, it is just an example of the many

25    limiting factors that they have placed upon the potential

NBK5fed2                    Opening – Ms. Fiebig

1    competitors in this market so that they could keep them out

2    even though they're clearly providing HCP programmatic

3    advertising services.

4            I will just show you on the next slide that what the

5    government has told you is that the combined entities in this

6    transaction would control nearly half of the HCP programmatic

7    advertising market.  That's the market they've enhanced.  But

8    they have also said that is only true if HCP programmatic

9    advertising has to be done on an individualized and one-to-one

10   basis.  And that's actually only true if it has to be

11   accompanied by the sort of individual-level impression

12   reporting, and is only HCP programmatic advertising if the

13   company is providing planning and activation, and optimization,

14   and measurement.  And, it's only HCP programmatic advertising

15   if it is being done for pharmaceutical marketers.  Right?

16   Whoever is trying to sell that doctor the stethoscope, the FTC

17   is not including the advertising services being provided to

18   that medical device manufacturer because they only care about

19   pharmaceutical manufacturers.  How do we know that?  Because

20   they have also said it is only HCP programmatic advertising if

21   it relates to prescriptions.  And how do we know that?  Because

22   they have also said that it is only HCP programmatic

23   advertising if it allows a company to measure ScriptList.

24           I would like to pause on that for a moment because

25   there can be no question that over-the-counter drugs like

NBK5fed2                        Opening – Ms. Fiebig

1     aspirin or Claritin, are being advertised through HCP

2     programmatic advertising every day but they don't require a

3     prescription.  ScriptList does not matter, that is an

4     artificial construct of the FTC's position in order to try to

5     derive a market that would allow them to pursue this case.  But

6     they have ignored all of the companies that we know are

7     providing these services.

8           Now, your Honor, of course the government doesn't want

9     to talk about whether or not there are other companies that

10    could be reasonably interchangeable and provide similar

11    services to the customers that we discussed before.  Instead,

12    they want to talk about the practical indicia from the *Brown*

13    *Shoe* case that Ms. Fleury mentioned to you.  That is not the

14    appropriate test.

15          I'm glad I just clicked because I just remembered that

16    just last week, actually, the FTC added in their reply brief

17    that it is also only HCP programmatic advertising if it can be

18    delivered across many different websites.  All of these are

19    ornaments that they have hung on their market definition that

20    they have asked you not to seriously assess.

21          You will see from the testimony and evidence in this

22    case that they cannot prove their market definition based on

23    the appropriate evaluation of reasonable interchangeability and

24    you will also see from the evidence in this case that they

25    cannot support their market definition, even on their fallback

1  position under *Brown Shoe*.  So, I would just like to briefly

2  walk through both of their theories.

3          We have provided for the Court here case names.  I

4  mean, it is striking that the government did not identify a

5  single Second Circuit decision in their presentation to the

6  Court but there are Second Circuit decisions that should and

7  will guide the Court's analysis for the horizontal case that we

8  will discuss first, the most relevant is probably United States

9  v. *Waste Management*, but before we get to that, let me share

10 that the Courts have laid out a burden-shifting framework for

11 courts to apply when they're analyzing a horizontal merger and,

12 as Ms. Fleury suggested, in the first instance the government

13 has the burden of proving that this transaction would lead to

14 undue concentration in the market.  If they're able to do that,

15 then the burden shifts to the defendants who can rebut the

16 government's presumption through what the Courts have

17 recognized considers sort of a multiplicity of factors.  It can

18 be new entrants, it is can be sophistication of customers.

19 There is a variety of ways that this Court can assess and

20 should assess whether or not the government's presumption, if

21 they get one, has been rebutted.

22         If the government's presumption has been rebutted,

23 then the burden shifts back to the FTC and they still have to

24 convince this Court that this transaction is likely to

25 substantially lessen competition in their proposed market.  At

NBK5fed2                    Opening - Ms. Fiebig

1    all times in that analysis the burden of persuasion remains

2    with the FTC.

3            Now, your Honor, the government stood up here and said

4    that we don't contest that it's a highly concentrated market if

5    this transaction occurs.  I hope it is quite evident that we do

6    because we do not even agree with the market definition, so the

7    suggestion that we have conceded that it is a

8    highly-concentrated market upon this transaction is just a

9    plain misrepresentation.

10           Now, the market shares that the government has put

11   forward are themselves totally unreliable.  The government

12   investigated this case for over nine months, and at the end of

13   those nine months they came to this Court and they asked for a

14   temporary restraining order and they told your Honor that there

15   were three primary competitors and three who they called

16   "fringe."  By the time we deposed their economic analyst, they

17   maintained the position that this were three primary

18   competitors but now there were five fringe.  And two days after

19   that deposition, during this case, the FTC's hired economic

20   expert filed his report and told us for the first time that

21   there are still only three primary competitors but now there

22   are 10 fringe in a matter of weeks.  And one of those includes

23   the $32 billion dollar Trade Desk.

24           Now I just want to spend a moment on this notion of

25   fringe competitors in the first place.  In the antitrust law, a

NBK5fed2                        Opening - Ms. Fiebig

fringe competitor is a competitor who cannot scale up quickly

like a steel mill that cannot increase its steel production

because it would need to build a new plant.  The government has

given us no basis to apply the notion of fringe competitors in

this case and they've identified no facts that would suggest

that these companies could not scale quickly.  And we know from

*New York v. Deutsche Telekom* that a well-capitalized fringe

competitor is not fringe at all.

           Now, to avoid looking at the dynamism of this market

the FTC says you should trust their market shares and take a

snapshot and that's what you should assess but the seminal

cases in this area, including *Baker Hughes*, tells you that the

Court has to do a forward-looking assessment of whether those

market shares are remotely representative of what might happen

in the future and the Supreme Court told us the same thing in

*United States v. General Dynamics* -- this is a forward-looking

assessment we can't just snapshot and trust them that what they

say is the case today will be the case forever more.

           Now there are many aspects about the industry --

digital advertising -- that no one can predict including impact

that technological innovations like AI might have on digital

advertising.  But there are many things from this case and the

evidence in this case that we do know.  We know that even if

back in 2019 and 2020 there were specific capabilities that

healthcare specific DSPs could offer the market, that time has

NBK5fed2                         Opening – Ms. Fiebig

1    come and gone, it's been totally overtaken by market realities

2    where these generalist DSPs are doing the exact same things in

3    the market.  And we also know that in addition to the new

4    entrants which include PulsePoint, Lasso, and DeepIntent, those

5    are new entrants.  In addition to them, there have been a bunch

6    of others over the course of the last six months, 12 months, 18

7    months.  You will hear about many of those new entrants.  And

8    we know that there will be more.  I just want to give the Court

9    one example of a company called IQM.

10           Now, IQM has historically focused on programmatic

11   advertising that delivers political ad campaigns to desired

12   target audiences and in this case they told the FTC, and us,

13   that they are currently in the process of entering this market

14   specifically to provide HCP programmatic advertising.  Now,

15   your Honor, under the Second Circuit's decision in *Waste*

16   *Management*, these facts alone that there could be entry into

17   this market, is dispositive of the FTC's horizontal claim.

18           Now the other argument is that the FTC asserts in its

19   horizontal claim is that this transaction will eliminate this

20   head-to-head competition that they contend exists between

21   DeepIntent and Lasso.  now Whether or not there is that direct

22   head-to-head competition does not resolve this case.  The

23   question is whether there will be a substantial lessening of

24   competition, that is likely to be substantial competition on

25   this transaction.

NBK5fed2                           Opening – Ms. Fiebig

1          Your Honor, DeepIntent and Lasso talked about one

2     another.  Sure.  And sometimes they used colorful and

3     aggressive language.  But it is totally unremarkable that two

4     new entrants into a crowded market were taking a similarly

5     narrow approach to focus on one another.

6          In any event, these documents don't control the

7     Court's determination.  What the Court should really be focused

8     on are the IQVIA documents and the other senior executive

9     documents that tell the Court the purpose of this deal and how

10    they assessed the competitive landscape.  And when you receive

11    those documents and review them you will see, your Honor, that

12    IQVIA's executives, board of directors, and senior leaders,

13    always knew that this was a very competitive market.  They knew

14    that they were going to have to have innovative strategies to

15    compete with all of these competitors that are listed in their

16    decks.  They knew that they were going to have to have

17    capabilities across platforms.  They knew that they were going

18    to have to be able to offer HCP and DTC capabilities because of

19    the sophistication of the others that were already in the

20    market.  You will see this in their deal decks, you will see

21    this in their senior most documents.  And you won't just have

22    to rely on these documents because you know Mr. Resnick is here

23    to talk with you about his understanding of the strategy, and

24    you will also hear from his former colleague Jay Margolis, who

25    is now the CEO of a separate health and wellness company and

1    has 20 years of experience, and he will also tell you how

2    crowded this market was when IQVIA made the decision to enter

3    to try to better serve their life sciences customers.

4            So, your Honor, you will hear from the witnesses and

5    you will see in the evidence that the notion that this

6    transaction would take this market down from three to two is

7    flat wrong and that the government cannot meet their burden of

8    showing that this transaction is likely to substantially lessen

9    competition in this market.

10            Now, the government also advances a horizontal claim.

11    Now, the analytical framework for their vertical claim is a

12    little bit different from the horizontal claim, and the reason

13    for that is because vertical mergers don't eliminate a

14    competitor at all so they're typically presumed to be

15    pro-competitive and we know that from the Second Circuit

16    decision in *Freuhauf*, which should also guide the Court's

17    analysis.

18            Because vertical mergers are typically presumed to be

19    pro-competitive, no court has ever granted a 13(b) preliminary

20    injunction on a vertical theory of harm, your Honor.  This

21    Court would be the first ever to do so if it grants the

22    government's request.

23            Now, the FTC's case boils down to the implausible idea

24    that IQVIA would stop making data available to the programmatic

25    advertising industry if it had its own DSP.  That's factually

NBK5fed2                        Opening – Ms. Fiebig

1     and economically irrational on many levels and you will hear

2     directly from the witnesses on that, but there is also just a

3     fundamental consensual tension between these two theories.

4            If there are only three competitors in the market for

5     the horizontal claim, then withholding data from any of the

6     fringe competitors would have no effect on competition.  But,

7     if withholding data from these other competitors would

8     substantially lessen competition, that means that those

9     competitors can be serious competitors in this market so the

10    horizontal case must fail.

11           Now, even if we set aside sort of the conceptual

12    inconsistency in their positions and the tension between the

13    positions that they've taken, there is still just a lot to

14    unpack in the problems with their vertical case.  I think it

15    would be helpful if I can address precisely what data is even

16    used in programmatic advertising because the government

17    obviously wants to avoid it.

18           Now, the first is what's called HCP identity data.

19    That is the data based on the NPI numbers that we discussed

20    before that helps advertisers identify when a doctor shows up

21    online.  Now, there are lots of companies that take the public

22    information about that NPI number and make it available in the

23    marketplace.  IQVIA is one of those companies but it is only

24    one of many and there are others listed here, many of whom you

25    will hear about during this hearing.

1          The second is what is referred to as claims data.

2     That tells advertisers which doctors prescribe which

3     medications.  That information is generated by the healthcare

4     system itself, not by IQVIA; it is generated by the healthcare

5     system itself and that data is also ubiquitous.  There are many

6     companies that make that data available and IQVIA is just one

7     of them.

8          Now, you will hear that some companies view IQVIA's

9     data offerings as being very quality products.  And when you

10    hear that, your Honor, we would contend that that is the result

11    of IQVIA's hard work and excellent scient service, and we know

12    from the Second Circuit that that is not an indication that

13    there is a lack of competition, rather it is a natural result

14    of precisely the kind of competition that we would hope to see.

15         THE COURT:  But just so I understand that, that is

16    simply harvesting information that's available to the public,

17    correct?

18         MS. FIEBIG:  Correct.  That is correct, your Honor.

19         THE COURT:  So what makes IQVIA's resulting product

20    better?

21         MS. FIEBIG:  Well, I think that there are some

22    companies that would say that it is better in some instances

23    and some companies would say that it is not.  Many of the

24    competitors that we saw on this slide would tell you that their

25    products are better.

1          Now, IQVIA obviously works very hard to provide

2     quality product to the market that can be useful to its

3     customers but you will hear from some of the witnesses, you

4     will hear from PurpleLab later this week that they're striving

5     to do precisely the same thing, and you will hear from Veeva

6     who we will discuss momentarily as well that they are actually

7     currently undertaking to replace IQVIA's data altogether

8     because they think that they will produce a superior product.

9          The take-away, your Honor, is that IQVIA is not a

10    critical source of supply for this data, it comes from the

11    healthcare company, many companies have access to it, many

12    companies make it available to the market, generally, and IQVIA

13    is just one of them.

14         Now, one of the things that you have heard from the

15    government multiple times in this case is that the way that

16    IQVIA might withhold its data is through what is called the

17    third-party access program which Ms. Fleury referred to in her

18    opening as well.  The third-party access program, your Honor,

19    is an industry-standard program and the point of that program

20    is to allow IQVIA's customers to extend their use of the data

21    that they receive from IQVIA.  So if a pharmaceutical company

22    or any other one of IQVIA's life sciences customers wants to

23    use data that they've licensed from IQVIA with another vendor,

24    the customer can do so.  And because we are talking about such

25    sophisticated customers, they choose the vendors that they work

NBK5fed2                    Opening – Ms. Fiebig

1    with.

2            Now, IQVIA established this program through its legal

3    department 30 years ago to protect IQVIA's own IP, and since

4    then they have consistently granted TPAs, and what you can see

5    on your screen is that just in the last five years alone, IQVIA

6    has received almost 250,000 requests for TPAs.  And IQVIA has

7    granted 99.9 percent of them.  Now, the government wants to

8    talk about a small handful of denials; they don't want to talk

9    about the blue, they want to talk about the small handful of

10   denials to suggest that the TPA program is somehow a tool for

11   inflicting pain on the industry.  But that is ludicrous.  And

12   of the small handful of denials that are reflected in this very

13   thin line, most of those relate to Veeva who I just mentioned

14   is working very hard to replace IQVIA's data altogether, and

15   claiming that they have.

16           Now, Veeva is also notable because their TPAs are

17   denied for a particular reason and that is a former federal

18   court judge, serving in a capacity as a special master, has

19   found that Veeva stole IQVIA's data, misappropriated their IP,

20   and then the judge sanctioned Veeva for destroying evidence to

21   cover it up.  That is the reason that Veeva's TPAs are denied.

22   Veeva might appear at this hearing and testify in front of your

23   Honor and we can talk more about that when they do.

24           Now, rather than restricting data as the FTC suggests

25   that IQVIA might do, IQVIA has, year after year, made

1   significant efforts to extend their data to the market.  This

2   is an image of Frank Lin, who you will hear from tomorrow, and

3   this is him speaking at a large conference where he made the

4   same representations that IQVIA has consistently -- that they

5   will share data in an open ecosystem.

6           Now, the government brought this case and suggested to

7   industry participants that IQVIA is going to do a dramatic and

8   abrupt about face and stop sharing data.  So, IQVIA has

9   undertaken to extend open offers to other DSPs in the market,

10  committing that it will make its data available for at least

11  another 10 years on all of those DSPs.  And you will hear from

12  Robert Whiting, who is an IQVIA employee, about how hard he and

13  his partners have worked to extend these offers which is just

14  memorializing the way that IQVIA does business.

15          Now, those are the facts, your Honor, and you will

16  hear more about all of them from the witnesses, and the Second

17  Circuit's decision in *Freuhauf* will set forth the legal

18  analysis that your Honor should undertake.  I will explain why

19  the kind of speculative foreclosure theory that the FTC has

20  advanced is inadequate under the law.

21          Now, the FTC today has presented to this Court an

22  incomplete picture of a huge and highly competitive market and,

23  as a consequence of that, they are asking this Court to block a

24  pro-competitive transaction but the Second Circuit precedent

25  that this Court must apply will warrant denial of that

NBK5fed2                         Opening – Mr. Okuliar

1    preliminary injunction.  Both *Waste Management* and *Freuhauf* are

2    dispositive of the FTC's positions.  And, as the Court

3    explained, the Second Circuit explained in *Waste Management* the

4    task for this Court is to assess the market as it will look

5    eight, five, two years into the future, not eight, five, or two

6    years ago; the forward-looking assessment that we would ask

7    this Court to take.  And *Waste Management* tells us when we turn

8    to the evidence in this case, you can come to the conclusion

9    that entry into the relevant product market that the FTC has

10   alleged by new firms or existing firms, is so easy that any

11   anti-competitive impact from this transaction will be

12   eliminated more quickly by allowing the markets to do what they

13   will, than through litigation in a court like this.

14            So, at the end of this hearing, your Honor, we will

15   ask the Court to deny the FTC's request for preliminary

16   injunction.

17            THE COURT:  Thank you, Ms. Fiebig.

18            Mr. Okuliar?

19            MR. OKULIAR:  May it please the Court, your Honor,

20   Alexander Okuliar for Propel Media and DeepIntent.

21            Your Honor, I echo Ms. Fiebig's words and plan to take

22   just a few minutes to offer the DeepIntent story and

23   perspective on this matter.

24            DeepIntent is a young company, and its story starts

25   with a young man.  In his mid20s after graduating from SUNY

NBK5fed2                      Opening – Mr. Okuliar

1   Binghamton, Christopher Paquette became a data scientist at

2   Memorial Sloan-Kettering.  While working there, Mr. Paquette

3   and a colleague realized that there was an opportunity to use

4   the data techniques that they had mastered to deliver better

5   targeted, relevant advertising to consumers.  They had a dream

6   to start a company, so they rented WeWork space and began

7   building a demand-side platform on nights and weekends.

8            Mr. Paquette then took a big chance and left

9   Sloan-Kettering in 2015 to start DeepIntent.  Initially, he and

10  his co-founder were unsure of the direction of the company.

11  Mr. Paquette's father had struggled with misdiagnosed health

12  issues, so Mr. Paquette wanted to find a way to use his new DSP

13  to help patients and doctors get the right information at the

14  right time so patients could get better treatments faster.

15           He decided the company's mission should be to

16  measurably improve patient lives and health outcomes by

17  delivering information in a timely way that enables patients

18  and providers to make more informed decisions.  That remains

19  the company's mission to this day.  The company officially

20  opened its doors in April 2016.

21           Upon its debut, DeepIntent was just a small fish in an

22  ocean of DSPs.  And in many ways, that is still true today.

23  The incumbent DSPs had huge brand names, deep pockets, and

24  established representations in the industry.  These include

25  household names like Google and Yahoo, as well as major

1    industry players like The Trade Desk, which is the largest

2    independent DSP in the nation.

3            Since DeepIntent lacked a big brand or money, it

4    needed a clever way to differentiate itself and to draw the

5    interest of major advertising agencies, pharmaceutical

6    companies, and website publishers.  After initially struggling

7    to find strategic direction, Mr. Paquette ultimately figured

8    out that the large DSPs and other advertising platforms were

9    not focused on targeting healthcare professionals

10   programmatically because it was just too small a business at

11   that time for them.  A few healthcare-focused players existed

12   including PulsePoint, Proclivity and eHealthcare Solutions, but

13   the demand for pharmaceutical companies and other healthcare

14   companies simply wasn't there yet to support a broader

15   ecosystem.  As Ms. Fiebig noted, the main reason was that

16   pharmaceutical companies spent most of their HCP marketing

17   dollars sending representatives directly to doctors' offices in

18   a process known as "detailing" or by running digital campaigns

19   directly with publications that are tailored for HCP audiences.

20   Only a relatively small amount of money was actually spent on

21   programmatic advertising to HCPs at that time.

22           So Mr. Paquette saw an opportunity.  Since most DSPs

23   did not focus on HCPs, his early vision was to build a platform

24   specifically for healthcare and offer these advertiser-managed

25   services where the client would pay DeepIntent and the

NBK5fed2                    Opening - Mr. Okuliar

DeepIntent team would take care of everything, from helping to identifying audience, placing ads, and then measuring the success of ads. With the combination of high-touch service and technology, he could help these advertisers connect with doctors in new ways and expand their access to information potentially helpful to patients.

Mr. Paquette spent 2018 and 2019, and into 2020 evangelizing the benefits of DSPs focus on healthcare advertising. Although his company was growing initially, not many people were paying attention to his pitch and DeepIntent remained a small business with 2019 revenues around $10 million. But, then came COVID-19 and, your Honor, like in so many other things, the pandemic fundamentally changed pharmaceutical advertising. It made it mostly impossible for pharma sales reps to make in-person visits to doctors' offices. This caused a major shift in advertising spending to digital channels including programmatic advertising. Digital healthcare advertising spend grew nearly 30 percent year over year from 2020, 2021 to more than $14 billion a year.

DeepIntent and a handful of other companies were in the right place at the right time and saw even more explosive growth. In fact, DeepIntent's HCP business grew several hundred percent across 2020 and 2021.

Now that the pandemic has passed, digital ad spending is again normalizing with industry growth slowing in 2022 to

NBK5fed2                          Opening – Mr. Okuliar

1    around 14 percent, and to around 12 percent expected for 2023.

2    Pharmaceutical companies are also reducing some of the

3    marketing spend because of a challenging economy, and in part

4    have shifted money back to detailing and other advertising

5    approaches.  The growth and DeepIntent's HCP business has also

6    flattened out.

7            The explosive growth of HCP programmatic advertising

8    caused the big DSPs and others to take notice.  Nearly a dozen

9    players have entered or expanded in the space including The

10   Trade Desk, Doceree, TI Health, Ad Prime, Viant and many

11   others.  These new entrants compete aggressively with

12   DeepIntent and the Court will hear examples from DeepIntent has

13   lost business to them.  Their entry is, in part, what has

14   caused DeepIntent's business in HCP to flatten out.  The FTC

15   has tried to assume away all of these competitors as well as

16   entry and repositioning and has referred incorrectly to these

17   companies, many of them publicly traded, multi-billion-dollar

18   companies as fringe players.  We think the agency is mistaken

19   in its narrow view of the competition.

20           As a result of this trend and other changes in the

21   industry, DeepIntent decided to focus more aggressively on

22   building out its direct to consumer or DTC business to capture

23   share of this established but growing area and connected TV,

24   which is the next frontier of digital advertising.

25           The Court will hear testimony and see evidence of this

strategic shift by the company starting in mid-2021 during the

height of the boom in HCP programmatic spending.  The result of

this strategic shift is DeepIntent's original HCP targeting

business, which represented nearly 90 percent of its business

in 2020 has now declined to less than half of its business and

will continue to decline.  Its HCP managed services business,

the original offering, is even smaller.  The balance is now its

growing DTC business.

           DeepIntent has had to change its strategy and

trajectory multiple times to stay ahead of the curve in

programmatic advertising, given how dynamic and fluid the

industry currently is but Lasso -- the company that the FTC

says DeepIntent is so focused on -- continues to provide mostly

HCP managed services.  DeepIntent does not come across Lasso

very often in other advertising areas.

           So, while DeepIntent continues to compete with Lasso

to a limited extent, Lasso is not meaningful competitive focus

or driver for DeepIntent.  And even if it was a serious

competitor years ago, it was always just one among several and

now is one among many, most of which competitors are larger,

more profitable, and better resourced than DeepIntent.  In many

respects, Lasso is a feature of DeepIntent's past, not its

present.

           What DeepIntent's forward-looking focus means is that

it has now squarely up against the biggest players in the

NBK5fed2                    Opening – Mr. Okuliar

industry trying to take business in areas where they have long

dominated.  This list includes The Trade Desk, Google, Yahoo,

Microsoft, Xandr, Amazon and WebMD/PulsePoint among many

others.

These competitors have not only reputation and money,

but long-standing relationships across numerous touchpoints and

interconnections with ad agencies, pharmaceutical companies,

and others in digital advertising that will be tough to

dislodge.  Some have even purchased large healthcare companies

and are spending billions of dollars building out their

healthcare-focused businesses.

DeepIntent, by comparison, does not have the brand,

contacts, international scope, or financial resources needed to

compete directly with these giants but it needs to find a way

to compete with them and this is the next step for the company;

it must once again adapt and grow, or die.

DeepIntent sees a combination with IQVIA as the way to

become more competitive against its many new larger rivals, to

gain additional credibility and access to more major clients,

and to innovate with new AI-powered products, and to realize

its vision to help as many patients as possible.  The future of

this small company and its employees hang on this Court's

decision.

When Ms. Fiebig discussed the burden shifting analysis

under *Baker Hughes*, and the weighing of evidence the Court will

NBK5fed2                    Opening – Mr. Okuliar

1     have to undertake to evaluate whether or not the government has

2     carried its burden and is entitled to a preliminary injunction

3     here.  From DeepIntent's perspective, the government's case

4     does not reflect reality or a proper understanding of the

5     industry.  We are confident that any balancing of the evidence

6     here will tip heavily in defendant's favor.

7           For instance, DeepIntent was able to gather and submit

8     22 letters of support from the industry supporting its view of

9     the market or this deal.  This support came from a range of

10    advertising agencies, pharmaceutical companies, and industry

11    veterans that live and breathe this business.  DeepIntent and

12    the defendants have received 14 declarations corroborating our

13    views of the market and we have elicited supportive deposition

14    testimony from many others in the industry.

15          By comparison, the government rests its case on a

16    slender read offering the Court testimony from a few companies

17    and selected documents related to competition for a handful of

18    ad agencies and campaigns out of the nearly million documents

19    that DeepIntent produced as well as stale or out-of-context

20    documents that ignore the many changes that have occurred in

21    the industry and within DeepIntent as it has pivoted to DTC to

22    remain relevant and to grow.

23          Your Honor, I close with an observation as a former

24    antitrust enforcer.  I was often called on to decide whether or

25    not to challenge a deal.  In addition to thinking about the

NBK5fed2

1    law, the merits of the case, and the interests of the people, I

2    always asked whether the case seemed credible at a gut level.

3    In answering that question here and in applying the relevant

4    *Baker Hughes* analysis, we believe the weight of evidence will

5    show clearly that the FTC cannot carry its burden and should

6    not be granted a preliminary injunction.

7            We look forward to presenting our case to the Court,

8    your Honor.  Thank you for the time and attention.

9            THE COURT:  Thank you, Mr. Okuliar.

10           So, ladies and gentlemen, we will take our break.  It

11   will be 20 minutes, so we will be back at 11:15.  Please be on

12   time.

13           (Recess)

14           THE COURT:  OK.  FTC, do you want to call your first

15   witness?

16           MS. FLEURY:  Yes, your Honor; but before I do, I just

17   wanted to pass up, I know you didn't get to see my beautiful

18   table of contents.

19           THE COURT:  I did not.

20           MS. FLEURY:  So I was going to pass up courtesy copies

21   of the opening slide for the Court and your clerk, and we will

22   call our first witness.

23           MR. ANDREW:  Good morning, your Honor.  Jordan Andrew

24   on behalf of the Federal Trade Commission.  At this time, the

25   FTC calls Justin Freid, chief media and innovations officer at

NBK5fed2

1    CMI Media Group.

2    JUSTIN FREID,

3         called as a witness by the Plaintiff,

4         having been duly sworn, testified as follows:

5              (Continued next page)

NBKIFED3                            Freid - Direct

1              THE COURT:  Mr. Andrew?

2              MR. ANDREW:  Thank you, your honor.

3    DIRECT EXAMINATION

4    BY MR. ANDREW:

5    Q.  Good morning.

6    A.  Good morning.

7    Q.  Before we proceed further, I want to inform you are in a

8    public session.  I will do my best to stick to questions that

9    relate to information that is not confidential.  However, if I

10   ask a question for which a response would touch upon

11   confidential information, let me know I will try to rephrase it

12   and save it for a closed session.  Is that OK?

13   A.  Yes.

14   Q.  Great.  Mr. Freid, who is your current employer?

15   A.  CMI media group.

16   Q.  What is your current position at CMI media group?

17   A.  Chief media and innovation officer.

18   Q.  For the rest of my examination, I will refer to CMI Media

19   Group as CMI.  Is that OK?

20   A.  Yes.

21   Q.  When did you join CMI?

22   A.  I believe January of 2013.

23   Q.  How long have you been in your current position?

24   A.  Right around two years.

25   Q.  What are your responsibilities as chief media and

NBKIFED3                      Freid - Direct

1    innovation officer?

2    A.  I oversee our media planning organization which consists

3    of, you know, general media planning across prints, digital,

4    social, and search advertising.

5    Q.  Are you also involved in evaluating strategic partners for

6    CMI?

7    A.  Yes.

8    Q.  In what way are you involved?

9    A.  As a senior executive in the organization, I often help

10   guide the strategy and conversations with some of our most

11   important partners.

12   Q.  Very briefly describe the positions you have had at CMI

13   prior to your current post and generally what you did in those

14   roles?

15   A.  Sure.  When I started, my first position was the director

16   of our search engine marketing team saw where I primarily

17   oversaw our search practice which advertises on Google and

18   Microsoft search engines.  From there, I moved into a VP of SEM

19   role which was a direct promotion.  I continued to grow within

20   the organization after launching our social team, our paid

21   social team, our programmatic team, as well as our SCO team.

22   Eventually became an SVP of innovation, then a EVP managing

23   director which is a more general client management role.  And

24   then after that, became the EVP chief growth and innovation

25   officer where my position focused on managing clients but as

NBKIFED3                         Freid - Direct

1   well as leading our new business efforts.  I then became a

2   chief growth and innovation officer and now my current role.

3   Q.  Great.  Thank you.  So, just wanted to get a couple of

4   acronyms straight.  You mentioned SEM.  What does that stand

5   for?

6   A.  Search engine marketing.

7   Q.  What about SEO?

8   A.  Search engine optimization.

9   Q.  You also mentioned there are a few teams within CMI.  Can

10  you tell me what teams there are?

11  A.  We could be here for quite some time with that.  But we

12  generally have our core media planning team, they are the media

13  strategists that are more generalist but have a good idea of

14  how media -- different channels work together to market to

15  different audiences.  We have a BI, business intelligence, BI

16  and analytics team which is focused on insights, analytics and

17  reporting.  Then the teams I mentioned specifically were SEM,

18  SEO, our programmatic team which focuses on programmatic

19  advertising, our paid social which focusing on advertising

20  across social networks.  We have lots of additional teams such

21  as a market research team, an audience intelligence team, a

22  social listening team, creative, a myriad of different teams.

23  Q.  So, just so I understand, you have a separate team that is

24  dedicated to SEM and SEO, right?

25  A.  They are two separate teams, yes.  One is focused on SEM

NBKIFED3                          Freid - Direct

1   and the other is focused on SEO.  Yes.

2   Q.  And then a separate team for paid social?

3   A.  Yes.

4   Q.  And a different team that is dedicated to programmatic

5   advertising?

6   A.  Yes.

7   Q.  OK.  Where did you work immediately prior to CMI?

8   A.  I worked at a company called TPG.  It was an Omnicom

9   agency.

10  Q.  What was your role there?

11  A.  I held two roles.  I was hired as a paid search manager and

12  then was promoted to basically director of digital where I

13  oversaw the digital marketing department.

14  Q.  Have you ever worked directly with clients to manage and

15  execute ad campaigns?

16  A.  Yes.

17  Q.  About how much of your career has been spent working in

18  digital advertising in one form or another?

19  A.  Probably about, I think, 90, 95 percent.

20  Q.  Great.  Thank you.  Now, I would like to turn to some

21  questions about CMI.  At a high level, describe CMI's business.

22  A.  Sure.  We are a media planning agency that focuses on the

23  pharmaceutical marketing space.

24  Q.  Is all of CMI's business in health care advertising?

25  A.  Yes.

1  Q.  What types of companies are clients of CMI?

2  A.  Large and midsize pharmaceutical companies.

3  Q.  And just to be clear, are all your clients pharmaceutical

4  companies?

5  A.  We have had companies that are technically health care

6  companies that may not be exactly pharma.  But again, I would

7  say, 95 percent of our clients are pharmaceutical companies.

8  Q.  Can you describe in a bit more detail the services that CMI

9  provides for its clients?

10  A.  Sure.  The primary one media planning.  So, it is where we

11  are getting a deep understanding of the brand, their audiences,

12  understanding what the brand -- how the brand would like to

13  influence and potentially market to those.  We then after we do

14  our upfront analysis of the audiences, we will find

15  opportunities to engage those audiences through media.  Those

16  are some of the channels I mentioned before, whether those are

17  direct buys, digital partners, print partners, mobile partners,

18  programmatic partners, search, social partners, etc.  We pick

19  the best partners and then negotiate potential buys on their

20  platforms or directly with them, launch them, optimize them on

21  an ongoing basis, and then report and analyze their

22  performance.

23  Q.  You mentioned different types of advertising channels.

24  What are some of the factors that go into deciding which types

25  of advertising channels would be best for a given campaign?

NBKIFED3                        Freid - Direct

A.  I would say the primary factor is reach.  Can we actually
find the patients, caregivers or health care professionals who
we want to reach.  Pricing, innovation, relationships, I would
say those are kind of -- excuse me, the ability to provide data
back to report on the performance as well.
Q.  Earlier you had also mentioned that CMI sometimes does
print advertising; is that right?
A.  Yes.
Q.  Can you describe just the main differences between print
advertising and digital advertising?
A.  Absolutely.  So print advertising is something that is a
physical printed, you know, piece of, I am going to say
equipment, something tangible you can hold.  I will say in the
pharmaceutical space, that primarily consists of journal
advertising in medical journals.  That is done in direct
negotiation with the print publisher.  Where digital
advertising is obviously significantly larger umbrella term
that includes many types of advertising that we have spoken
about today such as search, social, programmatic, direct buys,
mobile buys, video buys, etc.
Q.  In general, are digital advertising and print advertising
priced differently from each other?
A.  In general, yes.
Q.  Would you say that CMI has been shifting it's advertising
spend away from print advertising and more towards digital

NBKIFED3                        Freid – Direct

1    advertising?

2    A.   That one maybe a little bit confidential to how we

3    strategically approach work with our clients.

4    Q.   Understood.  I can ask more about that later.

5         Do you believe effective health care advertising is

6    important?

7    A.   Yes.

8    Q.   Why?

9    A.   I do feel, and having gone through -- yes.  I feel we are

10   getting information in the hands of patients and caregivers

11   that can potentially influence people's health.  To me, that is

12   an extremely important cause.

13   Q.   Do you believe that innovation among health care

14   advertisers is also important?

15   A.   Yes.

16   Q.   Why do you believe that?

17   A.   The media consumption behaviors change rapidly, especially

18   with younger generations.  And the ability to stay ahead of

19   that and to make sure that we are getting that information the

20   ways that are most relevant to again patients, caregivers,

21   health care professionals, we need to continuously evolve and

22   adopt to get that information to them.

23   Q.   Thank you.  So, now I would like it to turn to some general

24   questions related to one of the channels that you talked about

25   which is programmatic advertising.  At a high level, what is

NBKIFED3                        Freid - Direct

1    programmatic advertising?

2    A.   Programmatic advertising is an automated fashion of buying

3    media space.

4    Q.   So I guess, do you consider programmatic advertising a

5    method of buying media?

6    A.   Yes.

7    Q.   You mentioned direct buys also.  Are direct buys another

8    way of buying media?

9    A.   Yes.

10   Q.   How is programmatic advertising different from direct buys?

11   A.   Significantly different.  Direct buys -- again, in most

12   cases, we are having conversations with our supplier partners,

13   their sales reps, and doing RFPing them, getting a response

14   back, and then negotiating and placing an advertisement

15   directly through an ad serving platform if its digital to run

16   on their platform whereas programmatic advertising, we are

17   using an interface or a DSP to basically remove a lot of that

18   back and forth and buy direct -- excuse me, that is not

19   correct.  To buy the inventory through the DSP platform.

20   Q.   Can you explain a little bit more about how inventory is

21   purchased through a DSP platform?

22   A.   Yes.  So, to make it a -- essentially what happens, if you

23   are a website and you have additional inventory that you have

24   not been able to sell, you usually put that up and make it

25   available through an SSP, a supply-side platform.  Those

1    supply-side platforms bring that inventory and make it

2    available to ad netsworks or Des.  It's kind of a connection

3    point to the DSP to the SSP.  We, as an advertising agency and

4    our programmatic team utilize a DSP.  Different things to

5    basically decide the audiences we want to target through the

6    platform, and when those individuals or the people that match

7    we are trying to buy become available through the DSP, we are

8    able to buy the impressions through that platform.

9    Q.   Thanks.  That is helpful.  Can you explain what you mean by

10   impressions?

11   A.   Sure.  A simplest thing is when you pull up a website on

12   your phone or on your desktop and you load that screen and that

13   ad appears at the top of a page, that is considered an

14   impression.

15   BY THE COURT:

16   Q.   Does programmatic advertising have any advantages over

17   direct buys?

18   A.   Yes.

19   Q.   What are those?

20   A.   In certain industries, cost can be a factor, though that is

21   not always the case in the pharmaceutical industry.  The other

22   is the ability to be flexible with budgets which is a big

23   trend, to being able to either increase or decrease budgets

24   depending upon performance.  I would also say that data and the

25   speed of getting data back is another primary factor and

NBKIFED3                         Freid - Direct

1    advantage.

2    Q.  Can you get physician-level data through programmatic

3    advertising?

4    A.  Yes.

5    Q.  And is that sometimes referred to as PLD?

6    A.  Yes.

7    Q.  Describe at a high level, what is PLD?

8    A.  Essentially, what we want and what it is used for in the

9    industry is when a physician, let's call Dr. Smith, Dr. Jane

10   Smith pulls up on to Medscape.com and sees an impression.  We

11   can get data back that allows us to ID No. 123 received an

12   impression.  And in terms of judging performance, we do want to

13   understand what doctors we have exposed to advertising to be

14   able to understand the ROI for the programs.

15   Q.  Is getting PLD back quickly important to CMI?

16   A.  Yes.

17   Q.  Why is that?

18   A.  It allows us to, as mentioned before, be more flexible and

19   optimize our campaigns faster.

20   Q.  Now you touched upon different audiences.  When CMI's

21   clients use programmatic advertising, in general, what are the

22   audiences that they are trying to reach?

23   A.  Patients, caregivers, and health care professionals.

24   Q.  In the context of digital advertising, what does the

25   acronym HCP mean?

NBKIFED3                          Freid - Direct

1   A.   Health care professional.

2   Q.   What kinds of jobs are included in that category?

3   A.   Sure.  Your primary-care physicians, endocrinologists, you

4   know, neurologists etc, but as well as physicians assistants

5   and nurse practitioners.  Basically anyone with a NPI -- I am

6   going to forget what NPI stands for, but NPI.

7   Q.   Regardless of what it stands for, what is NPI?

8   A.   It is a unique identifier provided by the government that

9   signifies someone has a certain level of accreditation and

10  agree.

11  Q.   In the context of digital advertising, what does the

12  acronym DTC stand for?

13  A.   Direct-to-consumer.

14  Q.   Are these acronyms, HPC and DTC, ones you regularly use in

15  your line of business?

16  A.   Yes.

17  Q.   OK.  So, going forward, I will refer to health care

18  professionals as HPC and direct-to-consumer as DTC; OK?  Is

19  there a difference between the way advertisers target -- I am

20  speaking generally -- a difference between the advertisers

21  target HPC audiences and DTC audiences?

22  A.   Yes.

23  Q.   What is the difference?

24  A.   Due to privacy rules and regulations, there are a lot more

25  precautions and things put in place when we do

NBKIFED3                    Freid - Direct

direct-to-consumer advertising to ensure privacy is people who

are inflicted on certain diseases where on health care

professionals, because of the NPI number and the information

about their practice is public, we have ability to be

significantly more direct and ability to deliver one-to-one

messaging.

Q.  When you say one-to-one messaging does that mean you are

able to target on the HPC side specifically health care

professionals individually?

A.  Yes.

Q.  How does the cost for placing an HPC advertisement compare

to the cost of placing a DTC advertisement?

A.  It is more expensive on the HPC side.

Q.  Why ask that?

A.  Due to the limit, the amount of total health care

professionals available and the limited amount of impressions

available to market to them.

Q.  Are these generally priced on a CPM basis?

A.  Yes.

Q.  Can you explain what CPM means?

A.  Cost per thousand.  We buy a thousand impressions for an

agreed upon dollar figure.

Q.  On the HPC side, are your clients only targeting doctors

that are located or health care professionals located in the

United States?

NBKIFED3                         Freid - Direct

A.  We do global as well.  But our U.S.-based clients are only

targeting in U.S.  But we do have global engagements as well.

Q.  To your understanding, why do your U.S. clients just target

HPCs located in the United States?

A.  There are different rules and regulations and privacy in

each local market, each country.

Q.  So now, I would like to get a sense of the cost of

programmatic advertising versus direct buys.  First, I want to

start on the DTC side.  For DTC programmatic advertising, how

does the cost generally compare to direct buys?

A.  Repeat that question so I answer it correctly.

Q.  Of course.  I want to get a sense of the cost generally of

programmatic ads versus direct buys.  I want to do it for both

DTC and HCP.  Let's start with DTC.  For DTC programmatic

advertising, how does the cost generally compare to buying ads

through direct buys?

A.  Generally, due to the amount of inventory available, it is

more cost-effective and cheaper than direct.  That is because

it depends upon also if you are on an endemic or nonendemic

website.  Nonendemic is cheaper and more cost-effective.

Everything from an ESPN.com to, you know, just general news

website, it could be more cost-effective.  When you go onto the

endemic side, something health-care specific, it does get more

expensive.  Where additional cost comes in you are appending

some type of data that would be utilized to model an audience

NBKIFED3                        Freid - Direct

1   to say, this is potentially someone who is in the market for an

2   allergy medication, etc.

3        THE COURT:  Can I ask a question, because I heard this

4   phrase for the first time today?  What is an endemic versus a

5   nonendemic website?

6        THE WITNESS:  We use endemic meaning a health-focused

7   website.  Nonendemic is anything else in general.  So, if you

8   are thinking like everyday health, Medscape, WebMD, we consider

9   those endemic.  Nonendemic would be ESPN.com.

10       THE COURT:  Thank you.

11  Q.  So we just talked about DTC programmatic advertising.  On

12  the HPC side, how does the cost of programmatic advertising

13  generally compare to the cost of direct buys?

14  A.  Sure.  So, on the endemic websites, so the health focused

15  websites, it is often more expensive.  On the nonendemic

16  websites, you are able to get a more cost-effective again with

17  that additional dataset to verify that it's a health care

18  professional.

19  Q.  You said on the endemic side at least, HCP programmatic ad

20  buys are more expensive than direct buys.

21  A.  Yes.

22  Q.  So if that is the case, why does CMI advise its clients,

23  generally, to purchase programmatic advertising on the HPC side

24  even when it is more expensive than direct buys?

25  A.  Due to the benefits I stated earlier, due to the speed of

1   data, flexibility, etc.

2   Q.  Over the last few years, Mr. Freid, has programmatic

3   advertising become a larger portion of your client's media

4   plans?

5   A.  Yes.

6   Q.  Do you think that programmatic advertising will continue to

7   be an even more important part of your client's media plans

8   going forward?

9   A.  Yes.

10  Q.  Why do you think so?

11  A.  Interest in the marketplace, advances in technology of the

12  partners in the space, as well as the continued need to be more

13  flexible and have data come quicker and faster.

14  Q.  Now, I have a few questions about DSPs.  These are general

15  questions.  For anything more specific, we will move to a

16  nonpublic session OK?

17  A.  Uh-huh.

18  Q.  At a high level again, explain what is a DSP?

19  A.  A DSP say platform, that allows an agency or a client

20  access to an interface to buy inventory programmatically.

21  Q.  Are there certain DSPs that have more of a health care

22  focus?

23  A.  Yes.

24  Q.  Whats distinguishes a health care DSP from other DSPs?

25  A.  Access to data that allows us to target patients, care

1    gives, and health care professionals or access to inventory

2    that would be, you know, considered endemic.

3    Q.  Thank you Mr. Freid.

4           MR. ANDREW:  Your Honor, that concludes the public

5    portion of my questioning.  The remainder of my questions touch

6    upon topics for which CMI requested confidential treatment

7    which the parties have agreed to grant confidential treatment.

8           So, at this time, I would ask that the courtroom be

9    sealed so we can continue or questioning without publicly

10   divulging confidential information.

11          THE COURT:  That is fine.  We seal it with all the

12   people that are here still in the room?

13          MR. ANDREW:  Well, to the extent that anyone is in the

14   room who is a member of the public or is not otherwise with the

15   parties, it would be anyone beyond the three designated

16   in-house designated.

17          THE COURT:  OK.  So, all those people who don't

18   qualify under the definition that Mr. Andrew indicated, please

19   leave the courtroom.  I take it we do this on a honor basis.

20   So, do you folks know everyone that is here?

21          MR. ANDREW:  I do not know everyone that's here.  I am

22   going to do this on the honor basis as well.  If the parties

23   can represent that no one is here on their side that shouldn't

24   be here, then that is fine with me.

25          MS. RYAN:  We don't know everyone who is here, but we

NBKIFED3                          Freid - Direct

1    can represent we have removed those individuals which we are

2    certain who should not be here.

3              (Pages 93 through 145 SEALED)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NBK5fed4b

```
 1              (In open court)

 2              THE COURT:  This can be off the record.

 3              (Discussion off record)

 4              (Recess)

 5              THE COURT:  Does the FTC want to call your next

 6  witness?

 7              MR. LIPPARD:  Your Honor, the FTC calls Konrad Gerszke

 8  of PulsePoint.

 9              THE COURT:  Please step up into the witness stand and

10  remain standing.

11  KONRAD GERSZKE,

12       called as a witness by the Plaintiff,

13       having been duly sworn, testified as follows:

14              THE COURT:  Sir, you may be seated.  Please pull your

15  seat up to the microphone and please begin by stating and

16  spelling your first name and your last name.

17              THE WITNESS:  Konrad Gerszke.  K-O-N-R-A-D,

18  G-E-R-S-Z-K-E.

19              THE COURT:  I'm sorry.  And your name?

20              MR. LIPPARD:  Your Honor, Wade Lippard, on behalf of

21  the Federal Trade Commission.

22              THE COURT:  I'm sorry.  Your last name?

23              MR. LIPPARD:  L-I-P-P-A-R-D.  Lippard.

24              THE COURT:  Mr. Lippard.

25  DIRECT EXAMINATION
```

NBK5fed4b                     Gerszke – Direct

1   BY MR. LIPPARD:

2   Q.  Mr. Gerszke, thank you for joining us today.  Who is your

3   employer?

4   A.  Internet Brands.

5   Q.  What is your current title?

6   A.  Executive vice president growth platforms and new markets.

7   Q.  What is the relationship between Internet Brands and

8   PulsePoint?

9   A.  PulsePoint is a subsidiary of WebMD, and WebMD is a

10  subsidiary of Internet Brands.

11  Q.  At a very high level, what is PulsePoint?

12  A.  PulsePoint is a healthcare-specific demand-side platform,

13  so it is a company that facilitates the transaction of digital

14  media buying in the context of pharmaceutical digital

15  advertising.

16  Q.  Is one of PulsePoint's offerings HCP programmatic

17  advertising?

18  A.  That's correct.  Yes.

19  Q.  What is HCP programmatic advertising?

20  A.  HCP programmatic advertising is the ability to reach a

21  healthcare professional -- could be a physician, could be a

22  nurse, could be doctor's office staff -- via digital media in

23  various digital environments.

24  Q.  Is HCP programmatic advertising different than advertising

25  to patients?

1   A.  It is.

2   Q.  How is HCP programmatic advertising different than

3   advertising to patients?

4   A.  The target object of digital HCP advertising is the

5   healthcare practitioner is the physician, the doctor, and that

6   is a very different target group or population compared to the

7   patient population.

8   Q.  Can you provide a little more detail as to what the

9   differences are in terms of how the programmatic advertising

10  varies?

11  A.  Yes.  Sure.

12          The nuances around HCP digital advertising are on the

13  one side very specific to specialities that the physicians are

14  practicing, so for example, you would not want to have a

15  diabetes-related ad show up with an oncologist so you have to

16  have certain capabilities and certain specifications under

17  their specialities.  You also need to understand the

18  physician's prescribing behavior in terms of what the

19  specialization of their practice or the hospital affiliation

20  is, and so on and so forth.  So you have a series of

21  characteristics of HCP digital advertising that make it pretty

22  unique compared to general digital advertising, as well as

23  patient digital advertising.

24  Q.  Who are PulsePoint's customers for HCP programmatic

25  advertising?

NBK5fed4b                    Gerszke - Direct

A.   These are either pharmaceutical agencies or pharmaceutical
manufacturers that are advertising.

Q.   What are your responsibilities with respect to PulsePoint?

A.   I oversee the company.

Q.   I would like to talk to you about PulsePoint's competition
for HCP programmatic advertising.  Does PulsePoint compete with
DeepIntent for HCP programmatic advertising?

A.   Yes.  DeepIntent is one of our key competitors.

Q.   Does PulsePoint compete with Lasso for HCP programmatic
advertising?

A.   Yes, Lasso is one of our key competitors.

Q.   Why is Lasso one of PulsePoint's key competitors for HCP
programmatic advertising?

A.   I think there are a couple of reasons.  On the one side,
Lasso entered the market at a similar point in time compared to
PulsePoint and have built a similar digital advertising
platform.  They have access to a certain set of underlying data
assets that are required for HCP advertising, for example to
reach HCPs in their relevant environment to understand their
prescribing behavior, to understand the factors around their
practice or hospital affiliations.

        So I think there are a number of platform
characteristics that Lasso has that have made them special on
the HCP side, which is what PulsePoint specializes in as well.

Q.   And you mentioned DeepIntent is one of PulsePoint's key

1    competitors for HCP programmatic advertising.  Why is that?

2    A.  It is for very similar reasons.  DeepIntent entered the

3    market at a very similar time compared to PulsePoint and

4    DeepIntent also focused and specializes in the healthcare

5    professional side of the business.

6    Q.  Are you aware of any other companies that have similar

7    capabilities to PulsePoint, DeepIntent, and Lasso for HCP

8    programmatic advertising?

9    A.  I would describe it in sort of two ways.  Yes, there are

10   companies who are offering capabilities in that space.  One

11   example could be a company that is called Doceree.  However, in

12   the big scheme of things, those companies play a very small,

13   minor role in the space because they are either lacking certain

14   components of their capabilities or they have focused on

15   certain niche segments.

16   Q.  I would like to talk a bit about how PulsePoint sells is

17   HCP programmatic advertising offering.  Are you familiar with

18   the term request for proposal or RFP?

19   A.  Yes, I am.

20   Q.  What is an RFP?

21   A.  A request for proposal is usually issued by either a brand

22   or an agency on behalf of their client, and it is a request

23   that is usually going to two or more companies for advertising

24   budgets or for specific campaigns.

25   Q.  Does PulsePoint compete for HCP programmatic business by

NBK5fed4b                        Gerszke - Direct

1  responding to customer RFPs?

2  A.  Yes, we do.  That's how we win business.

3  Q.  What companies does PulsePoint typically encounter when it

4  is competing for an RFP for HCP programmatic advertising?

5  A.  In the most cases we are encountering either DeepIntent or

6  Lasso, or both.

7  Q.  Does PulsePoint consider Lasso's pricing when it prices its

8  own HCP programmatic advertising in response to RFPs?

9  A.  I will answer this question in two ways.  Step number one

10 is we have our own rate cards and our own pricing architecture.

11 This is how we are entering the market and entering the RFP

12 process.  However, step two is in certain situations throughout

13 the RFP process, we might get guidance from either the agency

14 or the brand that we are either too high or need to lower

15 prices to have a chance to win, and then we will obviously take

16 it into consideration.  Sometimes we do change it, sometimes we

17 don't.

18 Q.  Does PulsePoint routinely track losses of HCP programmatic

19 advertising business?

20 A.  Yes, we do track wins and losses.

21 Q.  What companies does PulsePoint lose business to?

22 A.  In the vast majority of cases we either lose, or fail to

23 win, business from or to DeepIntent and Lasso.

24 Q.  Let's step back and talk about HCP programmatic advertising

25 more generally.  Is HCP programmatic advertising distinct from

NBK5fed4b                    Gerszke - Direct

1    other digital advertising to HCPs?

2    A.  Yes, I would say it is a distinct category across a range

3    of different advertising channels.

4    Q.  Could you explain why it is a distinct category across

5    different channels?

6    A.  There are a couple of reasons.  The most important

7    structural reason is the way agencies are doing media planning.

8    Media planning, at the highest level, is conducted by channel.

9    A channel is considered something like social, search, print,

10   digital out-of-home, etc., and those channels are planned for

11   as stand-alone units.  The reason behind that is that usually

12   advertisers connect different objectives to each of these

13   channels and often times the creative execution in a given

14   marketing campaign within a channel is different.

15   Q.  Would you give an example of how the objectives might

16   differ across different channels?

17   A.  Yes.  Sure.

18        So, I will give you two examples.  If you have a

19   marketing campaign that aims at reaching HCPs and inform them

20   about either a new drug that is coming to market or a new

21   indication for that drug, then a marketer or agency or brand

22   might select social channels and programmatic advertising as

23   channels to reach as many physicians as possible.

24        Another example, if you have a brand where you have

25   certain changes in the regulatory environment or certain

1    competitive activity in that brand, or certain reimbursement

2    status changes, you might choose different channels, channels

3    that are, for example, more targeted around certain sets of

4    prescribers like electronic health records, for example, who

5    are more prevalent at point of care.  So different channels

6    depending on awareness or engagement or influence and different

7    brand goals play different roles in the media plan.

8    Q.  What is the value of HCP programmatic advertising platforms

9    like PulsePoints?

10   A.  You refer to the value to clients?

11   Q.  Yes.

12   A.  We help clients execute a part of their media plan.  We

13   help clients reach physicians and communicate and engage with

14   them according to their campaign strategies, and we provide a

15   work flow to do that in an effective and efficient way,

16   supported by technology.

17   Q.  I would like to talk about social media for a moment.  Do

18   ad agencies sometimes advertise to HCPs on social media?

19   A.  Yes, they do.  There are two classes of social media.

20   There is, I would say, general social media, the social media

21   we all know, Facebook, LinkedIn, Pintrest, and then there is

22   HCP-focused social media channels such as Doximity.  So on.

23   Q.  Does PulsePoint consider social media advertising to be

24   programmatic advertising?

25   A.  We -- I am using a distinction here that might help explain

NBK5fed4b                        Gerszke – Direct

1    that we would generally not consider social programmatic

2    channel.  However, from a technology execution perspective,

3    both of those are executed in a similar way like all digital

4    advertising; it is data-driven supported by technology.  The

5    way social is executed specifically is different because the ad

6    formats are different.  Programmatic usually is a term that is

7    used to summarize open internet and social is not considered

8    open internet.

9    Q.  You said social is not considered open internet.  Why is

10   social not considered open internet?

11   A.  Because most of the social networks are walled gardens,

12   they are closed off environments that you cannot reach from the

13   open internet.

14   Q.  So does PulsePoint consider social media platforms to be

15   competitors?

16   A.  No, we don't.  They do not show up in RFPs because they are

17   planned at a different level, they are planned separately,

18   similar to print, similar to television.

19   Q.  I would like to ask you about a couple social media

20   platforms.  So, does PulsePoint view Sermo as a competitor?

21   A.  No, we don't, for similar reasons.

22   Q.  And what about Doximity?  Does PulsePoint view Doximity as

23   a competitor?

24   A.  No, we don't.  We put -- categorize Doximity as a social

25   HCP platform.

NBK5fed4b                    Gerszke - Direct

1    Q.  I want to ask about a couple, I think as you put it,

2    general social media platforms.  Does PulsePoint view Facebook

3    as a competitor?

4    A.  No, we don't.  They do not appear in RFPs.

5    Q.  Does PulsePoint view LinkedIn as a competitor?

6    A.  No, we don't.  They do not appear in RFPs.

7    Q.  Could you explain a bit more about why you don't view those

8    companies as competitors?

9    A.  We do not consider them as competitors because they are

10   part of a different budget.  You can look at the media plan and

11   the media plan has certain segments, they all play in a

12   different segment compared to us.  At certain points in time,

13   usually near the end of planning, the agency or the brand will

14   establish those lanes and will allocate a certain share of

15   their budgets into those lanes, and then within these lanes the

16   planning happens independent of the other lane.  So, to give

17   another example, usually if you plan your TV buys, the TV buys

18   will not compete with the digital out-of-home buy or will not

19   compete with a social buy.

20   Q.  Do ad agencies sometimes purchase ad space directly with a

21   publisher?

22   A.  Yes.  In some channels in and some environments they do

23   that.  One example is connected television.

24   Q.  Are those sometimes referred to as direct buys on endemic

25   sites?

NBK5fed4b                          Gerszke - Direct

1   A.  Yes; that's correct.

2              THE COURT:  I just want to ask you a question just so

3   that I am clear.

4              Connected television has also come up a couple times

5   today.  Is that like Netflix?  Is that like streaming services?

6   Sir, do you know?

7              THE WITNESS:  It's not.  It's not Netflix.  Connected

8   television is all the TV consumption that you are consuming on

9   devices other than your TV but that is ad supported.  And so,

10  connected television could be Hulu, Disney Plus.  Netflix is

11  not considered connected television, Netflix is considered

12  ATV -- advanced television.

13             THE COURT:  I'm going to make believe I understand

14  that and we can go forward.

15  BY MR. LIPPARD:

16  Q.  So we were talking about direct purchasing or direct buys.

17  Does PulsePoint view direct buys as competition?

18  A.  We do not consider that a competition.  In fact, the way I

19  would describe programmatic advertising platform is three

20  buying modalities in general; one is commonly referred

21  real-time bidding or opening auction, the second one is called

22  PMP -- programmatic market places, private market places; and

23  the third one is PG, programmatic guaranteed, and direct deals

24  would fall into that category.  So it is a buying modality that

25  gets transacted on the platform.

1    Q.  I want to talk about generalist DSPs.  Are you familiar

2    with the term generalist DSP?

3    A.  Yes, I am.

4    Q.  What is a generalist DSP?

5    A.  I would describe a generalist DSP as a DSP that serves a

6    range of industries, a range of industry verticals.  Examples

7    include DV 360, The Trade Desk, Xandr.

8    Q.  You said a range of industry verticals.  Could you explain

9    what you mean by that?

10   A.  Yes, sure.

11           A generalist DSP would play in banking, would serve

12   clients in financial services, would serve retailers, consumer

13   packaged goods companies.

14   Q.  Does PulsePoint consider generalist DSPs to have

15   competitive HCP programmatic advertising offerings?

16   A.  There are some generalist DSPs who either in the past have

17   ventured into that space and stopped and then some players who

18   are active in that space right now.  They usually play a small

19   role in the entire space.

20   Q.  Why do you say they play a small role in the entire space?

21   A.  We rarely see them in many RFPs so I would characterize the

22   number of RFPs where we see generalist DSPs probably around the

23   15 percent range, 10 to 20 percent.  From a capability

24   perspective, the generalist DSPs are lacking certain platform

25   capabilities as they relate to targeting, optimization, that

NBK5fed4b                    Gerszke - Direct

1  are important for executing HCP digital marketing at a

2  competitive price and scale.

3  Q.  So, you mentioned a couple of platform capabilities that

4  they are lacking, I think you mentioned targeting first.  Could

5  you explain more about what they lack in terms of targeting?

6  A.  Sure.  Targeting, at a simplistic level, relies on two

7  things; on the one side it relies on information and data that

8  describe the audience that you are targeting, in this situation

9  the HCP.  The highest level of example is you do not want to

10  have a dermatologist exposed to an oncology ad.  If you want to

11  become more granular, you then will try to understand hospital

12  affiliations as an example, prescribing behaviors.  All of that

13  relies on a set of data and relies on a set of information

14  about audiences.  That's one thing that is HCP-specific.

15       The second component of targeting is the bidding

16  algorithm that finds those HCPs in the channels you are looking

17  for so, for example, in the open internet, and that then

18  connects the price that the advertiser is willing to pay to the

19  price that the publisher is demanding for a given ad slot in

20  their inventory.  That bidding algorithm is usually being

21  trained on a certain set of characteristics and vectors and

22  those vectors are pretty HCP specific, they are industry

23  specific, because we are looking for a very small number of

24  people in a very large overall set of people.

25  Q.  I had trouble following one part.  You mentioned about the

NBK5fed4b                        Gerszke – Direct

algorithms being trained.  So could you explain that sort of at

a higher level of how that translates into a better product?

A.  Yes, sure.

        The effectiveness of HCP programmatic advertising is

judged on our ability to find a person that is in the target

audience at a given price.  In order to do that, we have to

build an understanding, a predictive understanding of the

prices for certain advertising slots in certain media products,

for example, ESPN or the New York Times.  That predictive

understanding is a result of a number of factors, it's about a

hundred factors but I tried to keep it simple, and those

factors are partially driven by the audience you are looking

for.  You need to understand where HCP is likely consuming

content online so that you can then compare the different

alternatives of where they consume content online, to then

understand where you find the HCP at a given price point that

is effective and meets the advertiser's goals.

Q.  You also mention that they lacked optimization capability.

Could you explain, at a very high level, what that means?

A.  Generalist DSPs have generalist optimization capabilities.

What I was referring to is the granularity of optimization that

is required to learn throughout the course of a programmatic

HCP campaign.  A programmatic HCP campaign might run throughout

a month, it might run six months, it might run longer.  And

what the platforms are doing is during the course of that time,

1  they are continuously learning from the bidding behavior and

2  the won and lost bids throughout that campaign.  That

3  optimization is crucial to produce outcomes that are considered

4  efficient or effective from an advertiser perspective.  That

5  optimization engine is tuned and trained in a very specific way

6  on the HCP side and it is different compared to how algorithms

7  are trained and tuned on the generalist side of the market.

8  Q.  I want to talk briefly about a couple specific companies.

9  Does PulsePoint view Google as a competitor for HCP

10  programmatic advertising?

11  A.  We do not consider Google as a key competitor.  Google has

12  an HCP-related offering in the market since a long time.  They

13  generally do not show up in many RFPs.  They are -- they tend

14  to be very hesitant in the HCP set of the market for a number

15  of reasons.  We see them more on the patient and consumer side

16  but also in very few situations.

17  Q.  And what about The Trade Desk?  Does PulsePoint view The

18  Trade Desk as a significant competitor in HCP programmatic

19  advertising?

20  A.  We do encounter The Trade Desk in a number of RFPs.  I

21  would not characterize it as a significant competitor.  The

22  Trade Desk has capabilities specifically on the

23  direct-to-patient side.  They are lacking a set of capabilities

24  on the HCP side but we have seen them in RFPs.

25  Q.  I want to ask some questions about PulsePoint's platform.

NBK5fed4b                    Gerszke - Direct

Does PulsePoint offer HCP audience building in its platform?

A.  Yes.  We allow clients, either brands or agencies, to

ingest their own audiences or construct audiences based on our

data sets.

Q.  Does PulsePoint offer activation on its platform?

A.  Yes.  That's the core offering on our platform.

Q.  And what is activation?

A.  Activation is the process of connecting the audience to an

ad in a context as defined by the advertiser.  What that means,

in practice, is the advertiser defines the target audience that

they want to reach and the environment in which they want to

reach that audience, the platform finds that environment -- for

example, the home page of the New York Times -- and places the

ad at a certain time in a given ad slot to that specific

audience at a given price.

Q.  Does PulsePoint offer measurement on its platform?

A.  Yes.  We offer two sorts of measurements.  We offer our own

measurement product and we offer third-party measurement that

is connected in the platform.

Q.  And can customers replicate these capabilities themselves;

the planning, activation, measurement capabilities?

A.  I would answer the question in two ways.  Generally, it is

possible that a customer is doing that.  It is highly unlikely

that a brand is doing that.  The reason why I say it is highly

unlikely is I look back to the 2015 to '17 time frame when

NBK5fed4b                        Gerszke - Direct

1    Procter & Gamble was trying to set up a programmatic
2    advertising platform called Hawkeye, internally.  I think it
3    took them five years to try and then they dismantled it very
4    quickly.
5    Q.  I want to talk about data now.  Does PulsePoint need access
6    to IQVIA data to run its HCP programmatic advertising
7    campaigns?
8    A.  For most of our clients we need access to a sort of target
9    list of HCPs that the client is trying to reach, and in many
10   situations that target is provided by the client relying on
11   IQVIA as a target list or IQVIA as one key data.
12   Q.  How is IQVIA's one key data used by PulsePoint for HCP
13   programmatic advertising?
14   A.  We do not use the data directly, we use it indirectly by
15   the client entering that target list, it's kind of the list of
16   HCPs -- the client's -- considered target customers it wants to
17   reach and we are ingesting that in the platform as an input
18   into the activation, as an input into finding those NPIs in the
19   context of the open web.
20            THE COURT:  So PulsePoint doesn't have a business
21   relationship directly with IQVIA for those target lists?
22            THE WITNESS:  That's correct.  We usually sign a
23   third-party access agreement so that we are allowed to access
24   that data that the client has licensed from IQVIA.
25            THE COURT:  Thank you.

NBK5fed4b                    Gerszke - Direct

1    BY MR. LIPPARD:

2    Q.   And you said third-party access agreement, is that also

3    known as a TPA agreement?

4    A.   That is a TPA, correct.

5    Q.   Could you explain a little bit more about the process

6    through which PulsePoint accesses IQVIA key data through the

7    TPA agreement?

8    A.   Usually the process is that a -- we have a relationship

9    with the advertiser or the agency.  The agency is setting up a

10   campaign.  As part of that campaign they hand us a list of

11   doctors they want to reach.  We can do that if we have an

12   existing third-party access agreement in place.  If we don't

13   have that in place, we are trying to put some in place together

14   with IQVIA and then the list is getting either emailed to us or

15   is directly uploaded in the user interface in the platform.

16                 (Continued on next page)

17

18

19

20

21

22

23

24

25

NBKIFED5                         Gerszke – Direct

1    DIRECT EXAMINATION

2    BY MR. LIPPARD:

3    Q.  So did I understand correctly that you need a TPA agreement

4    in place to access the target list of HCPs?

5    A.  Yes.  We do because it is not our data.

6    Q.  Do your pharmaceutical customers also use IQVIA data for

7    measurement?

8    A.  Yes.  IQVIA data is also used for measurement by some

9    companies.

10   Q.  How do pharmaceutical customers use IQVIA data for

11   measurement?

12   A.  The most common form is to measure the impact of a given

13   marketing campaign on the prescribing behavior of the

14   physicians that are in the target list.  In other words,

15   usually, a pharmaceutical company wants to see a change in

16   prescribing behavior after a set of HPCs has been exposed to

17   the advertising campaign.  The measurement that happens, in a

18   simplistic way, is that you have a test and control group.  The

19   doctors that have been exposed, the doctors that have not been

20   exposed, and compare the different prescribe behaviors of those

21   two controls groups.

22   Q.  So you mentioned comparing different groups for measuring

23   prescribing behavior.  Is it your understanding that you want

24   to determine whether the HPC that have actually been exposed to

25   the ad are actually prescribing more of the drug that you are

NBKIFED5                          Gerszke - Direct

1    advertising?

2    A.   Yes.  The ultimate component -- the ultimate goal of the

3    measurement is to understand whether the campaign has changed

4    behavior.  You could have campaigns where behavior change is

5    not the objective.  There are certain campaigns that are

6    focused on creating awareness.  For example, if you have a drug

7    in the late stage of clinical trials and about to be launching,

8    then you want to create awareness in the market.  But the

9    majority of campaigns is that is connected to an objective that

10   is changing prescribing behavior.  Ideally, either taking share

11   from a competitor drug or increasing prescribed behavior of

12   your own drug in a new launch situation.

13   Q.   Are you familiar with the term data consistency as it

14   relates to measurement?

15   A.   Yes, I am.

16   Q.   What is data consistency?

17   A.   There is data consistency or data connectivity or data

18   synchronization all describe the phenomena that if you are

19   comparing a connecting different datasets, there will be drop

20   off rates.  What that actually means is if you graphically

21   picture a very, very big Excel spreadsheet with lots of rows of

22   data and you are connecting two of those sheets together, then

23   very oftentimes not all rows matching.  So, whenever you are

24   stitching together two datasets, you will lose some.  That is

25   the sort of value of data consistency, because you are

NBKIFED5                        Gerszke - Direct

1  operating out of one dataset, you do not have that drop off.

2  Q.  Are pharmaceutical companies using IQVIA consistency across

3  their organization?

4  A.  I would describe that in a way that IQVIA certainly is part

5  of a lot of different parts of the pharmaceutical companies,

6  sort of data fabric.  IQVIA is probably the largest provider of

7  SP reference data and clinical reference data, they use it

8  across a lot of decision making moments in their advertising.

9  Q.  If IQVIA chose not to allow PulsePoint access to its data,

10 would that impact your ability to serve your HPC programmatic

11 advertising customers?

12 A.  This would impact us in two or three ways.  Firstly, it

13 would make it harder to receive the target list from the brand

14 or agency.  In other words, it would make it harder for

15 PulsePoint to understand the audience that our clients are

16 targeting.  Number two, it would impact our ability to connect

17 measurement to the way IQVIA defines certain metrics in the

18 client environment provided the client is working with IQVIA.

19 And those would probably be the most important ones, there are

20 probably some optimization related issues but inbound, the

21 target list at the outbound, the measurements are the more

22 important ones.

23 Q.  So, I might attempt to summarize what you said.  Let me

24 know if this seems incorrect.  On the front end, you need

25 access to IQVIA data to the extent customers are using IQVIA

NBKIFED5                          Gerszke - Direct

1    data to generate their target list of HPCs.  Did I understand

2    that right?

3    A.   That's correct.

4    Q.   And I think you mentioned on the back end, PulsePoint needs

5    to connect to IQVIA measurement to the extent customers are

6    using IQVIA for measurement within their organization.  Does

7    that sound right?

8    A.   I would describe it with a small nuance here.  Because we

9    provide measurement in our platform that doesn't rely on IQVIA,

10   we can continue to do that.  Certain customers prefer to

11   connect measurement back into their own ecosystem that then is

12   powered by IQVIA platforms such as IQVIA navigator.  And in

13   that situation, the clients prefer not to use the PulsePoint

14   management but would like to connect to IQVIA management.

15   Q.   If IQVIA chose not to allow PulsePoint to access that data,

16   what percentage of your customers would that affect your

17   ability to service?

18   A.   I would describe it as, like, specifically on the receiving

19   the target list, it is a large amount of our clients.  Maybe

20   70, 80 percent relies on IQVIA's target lists to then define

21   the target they want to reach on our platform.

22   Q.   So, if IQVIA chose not to allow PulsePoint to access its

23   data, how would that affect PulsePoint's HPC programmatic

24   advertising business?

25   A.   It would make it harder for us to provide clients a

1    solution that is efficient from a workflow perspective because

2    it introduces friction along that work flow and it requires us

3    to establish a different capability, a different technology

4    solution, to receive target lists.  And it requires us to build

5    more intelligence around those target lists because those

6    target lists are not simple names and numbers of HPCs or

7    doctors, but they are also connected to a range of contextual

8    behaviors and attributes.

9    Q.  So, I guess, if IQVIA did that, and that created those

10   frictions, how would that effect PulsePoint?

11   A.  I would say it would make it harder for us to win business

12   and make it harder to retain business because for a main reason

13   for clients to work with programmatic platforms such as

14   PulsePoint and Lasso is to remove friction from the workflow

15   and automate workflows.  And this would go backwards.

16          MR. LIPPARD:  Thank you.  No further questions at this

17   time.

18          THE COURT:  Mr. Tulumello?

19          MR. TULUMELLO:  Good afternoon.  Drew Tulumello for

20   IQVIA.  Your Honor, I should address some of the sealing

21   issues.  The cross-examination will very quickly move into

22   information that PulsePoint has requested to be treated

23   confidential.  In light of the agreement we reached with our

24   counsel, we think the courtroom does need to do be sealed for

25   this aspect?

1           THE COURT:  Beginning now?

2           MR. TULUMELLO:  After about three or four questions.

3           THE COURT:  Why don't you ask those questions?

4   CROSS-EXAMINATION

5   BY MR. TULUMELLO:

6   Q.  Good afternoon, Mr. Gerszke.

7   A.  Good afternoon.

8   Q.  I am going to start by just putting the PulsePoint business

9   into context.  PulsePoint is owned by WebMD; is that right?

10  A.  PulsePoint is owned by WebMD, the internet brand.

11  Q.  OK.  And can you describe what Internet Brands is?

12  A.  Internet Brands is a company that provides digital

13  marketing service in two sided marketplaces where professionals

14  and consumers have complicated journeys.  Usually, it is in

15  three or four verticals, one is health care, the other one is

16  legal, the third one is dental, the fourth one is a

17  agglomeration of automotive travel.

18  Q.  OK.  Two of the companies that Internet Brands owns, in

19  addition to PulsePoint, are WebMD and Medscape, is that

20  correct?

21  A.  That's correct.

22  Q.  And WebMD, by its own website, describes itself as the

23  leading destination for health information for consumers, is

24  that right?

25  A.  I assume that that's correct when they say that.

NBKIFED5                           Gerske - Cross

1   Q.  And Medscape is the leading source of clinical news,

2   medical information, and point of care tools for physicians,

3   nurse practitioners, and other health care professionals.  Do

4   you agree with that?

5   A.  I think that is how they are describing their business,

6   yes.

7   Q.  So, we will come back to both of those in a minute.  But

8   Internet Brands also has an owner, is that right?

9   A.  Internet Brands is privately owned.

10  Q.  Yes.  That is owned by KKR, a giant private equity firm,

11  correct?

12  A.  KKR is one of the owners of Internet Brands.

13  Q.  KKR is a Fortune 500 company, right?

14  A.  I don't know that.

15  Q.  OK.  All right.  Now, I would like to ask you some

16  questions about the aspects of the Internet Brands business

17  that the FTC didn't ask you anything with about.  So, what I

18  would like to do is start with Medscape.  Now, Medscape

19  generates revenue by selling ad space to advertisers and

20  pharmaceutical companies who want to advertise to HPCs; is that

21  right?

22  A.  That is one of the sources of the Medscape revenue, yes.

23          MR. TULUMELLO:  At this point, your Honor, I do think

24  we would need to seal.

25          THE COURT:  So let's seal the courtroom.  I did want

NBKIFED5                         Gerske - Cross

1    to put something on the record about the sealing obviously.

2    Public policy requires that these proceedings, these types of

3    proceedings be open to the greatest extent possible.  There are

4    certain times when it is appropriate to seal the courtroom.

5    And this case provides one of those situations where there is

6    exceedingly sensitive competitive financial information that

7    will be discussed and it is necessary for the Court and the

8    parties to hear but not the general public.  Sealing for

9    limited periods of time is being done in a very limited way.

10   So, the courtroom is only being sealed for those limited

11   occasions when that type of highly sensitive confidential

12   financial information will be discussed.  And the parties have

13   advised to the extent subsequent review of the record indicates

14   that it need not have been sealed for particular purposes, then

15   those portions of the record will be discussed in a more public

16   setting.  With that, I would ask all of those members who are

17   not members of the FTC, Morrison & Foerster, Weil Gotshal &

18   Manges or corporate representatives to please leave the

19   courtroom.

20              (Pages 172through 201 SEALED)

21

22

23

24

25

NBK5fed6b

1          (In open court)

2          THE COURT:  That brings us to the end of the day.  So,

3    for future planning I think that we can give you a little bit

4    more time during the course of each day, so plan on rather than

5    stopping at 1:10 or whatever that time would have been, we stop

6    at 2:00 tomorrow and going forward.  OK?

7          MR. TULUMELLO:  Your Honor, one housekeeping?

8          THE COURT:  Yes.

9          MR. TULUMELLO:  I neglected to move those defendant's

10   exhibits that I used into evidence which we would like to do.

11         THE COURT:  So each of the ones that you mentioned?

12         MR. TULUMELLO:  Yes, sir.

13         THE COURT:  Any objection?

14         MS. FLEURY:  Your Honor, I'm uncertain which exhibits.

15   I know there have been a lot of exhibits including documents

16   from web pages, and it was also my understanding from our prior

17   conversation that both exhibit lists were going to be, come in

18   and be cited in findings so we weren't intending to move

19   individually on exhibits but rather to cite liberally from

20   findings because that will also be the standard in the part 3

21   merits proceeding and that you should be able to consider the

22   full record, unless there are specific objections to documents

23   off of the exhibit list.

24         THE COURT:  I am happy to proceed in any fashion.

25   Whether there is agreement or whether you want me to make a

NBK5fed6b

1    finding with respect to particular exhibits, just let me know.

2              MS. FLEURY:  OK, your Honor.  We are happy to meet and

3    confer.

4              THE COURT:  OK.

5              MR. PERRY:  We will talk to them and come back to you

6    tomorrow, your Honor.

7              THE COURT:  OK.  Anything else today, Ms. Fleury?

8              MS. FLEURY:  Nothing from me, your Honor.

9              THE COURT:  Ms. Fiebig?

10             MS. FIEBIG:  Nothing further from defendants.  Thank

11   you, your Honor, for the time.

12             THE COURT:  In that event, we adjourned for today.

13   Please be ready to proceed at 9:00 a.m.

14             (Adjourned to November 21, 2023 at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

JUSTIN FREID

Direct By Mr. Andrew . . . . . . . . . . . . . .77

Cross By Ms. Ryan  . . . . . . . . . . . . . 107

Redirect By Mr. Andrew . . . . . . . . . . . 135

Recross By Ms. Ryan  . . . . . . . . . . . . 138

KONRAD GERSZKE

Direct By Mr. Lippard  . . . . . . . . . . . 147

Cross By Mr. Tulumello . . . . . . . . . . . 169