```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   FEDERAL TRADE COMMISSION,

4                   Plaintiff,

5           v.                          23 Civ. 6188 (ER)

6   IQVIA HOLDINGS, INC. and
    PROPEL MEDIA, INC.,
7
                    Defendants.
8                                       Trial
    ------------------------------x
9                                       New York, N.Y.
                                        November 29, 2023
10                                      9:00 a.m.

11  Before:

12                      HON. EDGARDO RAMOS,

13                                      District Judge

14

15                        APPEARANCES

16

17      JENNIFER FLEURY
        VARNITHA SIVA
18      MICHELE SEO
        WADE LIPPARD
19      STEPHEN MOHR
        JESSICA MOY
20      CORY GORDON
        JORDAN ANDREW
21      STEPHANIE BOVEE
        LISA DeMARCHI SLEIGH
22      HABIN CHUNG
        WILLIAM SOHN
23      Attorneys for Plaintiff Federal Trade Commission

24

25
```

APPEARANCES
(continued)


WEIL, GOTSHAL & MANGES, LLP
        Attorneys for Defendant IQVIA Holdings, Inc.
BY:  CHANTALE FIEBIG
     MARK A. PERRY
     SARAH M. STERNLIEB
     LUKE SULLIVAN
     ELIZABETH RYAN
     ANDREW S. TULUMELLO
     JOSEPH EHRENKRANTZ

     -and-

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
BY:  RAHUL MUKHI
     CLOTILDE LE ROY
     LEAH BRANNON


MORRISON & FOERSTER, LLP
        Attorneys for Defendant Propel Media, Inc.
BY:  ALEXANDER P. OKULIAR
     DAVID J. SHAW




Also Present:

Geoffrey R. Chepiga
Joshua Soven
        Paul Weiss, Rifkind, Wharton & Garrison, LLP
        Attorneys for Interested Party Veeva Systems, Inc.


Jeane A. Thomas
        Crowell & Moring, LLP
        Attorneys for Publicis



        (Trial resumed)

1          THE COURT:  We will now proceed with the

2     cross-examination of Dr. Hatzitaskos.  It is reminded that you

3     are still under oath.

4     KOSTIS HATZITASKOS, resumed.

5     CROSS-EXAMINATION

6     BY MR. TULUMELLO:

7     Q.  Dr. Hatzitaskos, yesterday you testified that this market

8     was mature, is that right?

9     A.  I don't recall the exact words.  I think it's definitely

10     mature enough to apply economic tools.

11     Q.  And in your report you repeatedly say the market is stable,

12     correct?  It's in many places in your report.

13     A.  Yes.  I think there are a variety of ways in which if you

14     look at how things are changing or not changing year after

15     year, things are not fundamentally changing every other year.

16     Q.  We can see here on the demonstrative animating your screen

17     all kinds of statements in the report.  We can go to the

18     pullout of all of them.  The HCP programmatic advertisement is

19     more stable than rapidly evolving.  The industry has been

20     fairly stable all time.  Over time HCP programmatic revenues

21     are fairly stable year to year.  HCP programmatic is stable,

22     relatively stable.

23          Those are all your opinions expressed in your report,

24     is that right?

25     A.  That's right.

1    Q.  Let's go back 36 months ago.  Then we will pull up DX-1924.

2           I will wait for you to get to the exhibit.  But you've

3    been here the whole trial, correct?

4    A.  Yes.

5    Q.  And you've observed the testimony of all the witnesses?

6    A.  I think so.

7    Q.  Do you remember what we showed this document from WebMD

8    which is dated November of 2020.  Do you recall seeing that?

9    A.  I mean, I don't recall every single document, but I vaguely

10   recall -- you've shown some things about WebMD.

11   Q.  It didn't jump out at you or make an impression, this

12   particular document?

13   A.  You were probably jumping in and out of it, so -- it's a

14   long document.  We certainly didn't go through the whole thing.

15   Q.  Fair enough.  Let go to slide 10, please.  Here it says:

16   HCP programmatic opportunity.  We start with HCPs, while

17   Medscape has increased share against endemic print and digital,

18   programmatic buying has begun to take share, mostly in the last

19   1.5 years.

20           Do you see that?

21   A.  I see it.

22   Q.  And so Medscape is saying in November of 2020 that

23   programmatic is starting to take share from it, right?

24   A.  That's what it says.

25   Q.  And if you just do some math, 1.5 years before November

1    2020 puts you sometime around May of 2019, correct?

2    A.  Sorry.  I'm not following.

3    Q.  If this deck is produced in November 2020 and WebMD is

4    saying we started to lose programmatic in the last year and a

5    half, they were talking about the period from approximately May

6    of 2019 to November 2020.

7    A.  OK.

8    Q.  Now let's go to slide 11.

9    A.  Yes.

10   Q.  Do you see a list here of programmatic competitors?

11   A.  I do.

12   Q.  And do you recall at the time that Medscape was

13   contemplating an acquisition of PulsePoint?  Do you recall

14   that, that this deck is looking at an acquisition of

15   PulsePoint?

16   A.  I do not recall that exact name.

17   Q.  You don't recall.

18          And this is the November 2020 analysis from WebMD

19   Medscape of the programmatic market in November of 2020.

20          Do you see that?

21   A.  This is their analysis.  I am not sure what it is based on,

22   what their sources are.  They probably didn't have subpoena

23   power to put these numbers together.

24   Q.  I see.  Is this ordinary course -- this is an ordinary

25   course document?

 1  A.  It is.

 2  Q.  Is it qualitative evidence?

 3  A.  It's somewhere between qualitative and quantitative.

 4  Q.  So it's qualitative plus.

 5  A.  It's their attempt at coming up with some specific numbers,

 6  yes.

 7  Q.  In order to evaluate a possible acquisition, right?

 8  A.  It seems like it.

 9  Q.  Where is Lasso on this chart?

10  A.  Lasso is presumably within the all other.

11  Q.  You say presumably, but do you know if Lasso is part of the

12  other?

13  A.  I do not have access to the underlying data here, so I do

14  not know how they came up with these numbers.

15  Q.  This is a deck evaluating the programmatic competitive

16  space in November of 2020.  What were Lasso's revenues in 2019?

17  A.  Well, I think we heard from Mr. Field that he himself

18  already had some clients but that Lasso itself was incorporated

19  in December 2019, so I'm not really sure.

20  Q.  You are not sure.  And in fact you did not even know when

21  Lasso entered the market when you were deposed less than a

22  month ago, is that right?

23  A.  As we heard in Mr. Field's testimony and cross-examination,

24  it is relatively unclear and complicated.  They certainly

25  didn't start in 2019 or 2020 from a standstill.

1    Q.  When Lasso entered -- you say it's complicated.  It's 2019

2    or 2020, but that's your opinion now.  I want to show you your

3    answer to that question in your deposition.

4            MR. TULUMELLO:  If we could go to trial transcript

5    214, lines 17 through 23.

6            (Video played)

7    Q.  So that is November 8 of 2023 and you did not know what

8    year Lasso entered, right?

9    A.  I think as I explained in my deposition.

10   Q.  I just asked you, you didn't know, right?

11   A.  I said that it's complicated.

12   Q.  So Lasso's revenues in 2019, you are not sure.  What were

13   Lasso's revenues in 2020?

14   A.  I believe they were something like 6 million.

15   Q.  How about 2021?

16   A.  I do not recall that number.  I think -- yeah.  I do not

17   recall the exact number.

18   Q.  So you have no idea how much revenue Lasso made in 2021,

19   right?

20   A.  As I sit here today, I do not recall the exact number.

21   Q.  Now, based on your testimony that the market is stable,

22   wouldn't we expect the Lasso revenue to be very close in 2020

23   in '21 to what it is today?

24   A.  What we see in my slide 4, in my various revenues, is that

25   the big three are essentially in various ways special, right.

1   They manage to do something that the other competitors just

2   haven't managed to do.  That means that just because Lasso

3   managed to grow doesn't mean that everybody else is going to

4   manage to grow.

5   Q.  Understood.

6          MR. TULUMELLO:  Let's go back to the WebMD document.

7   Q.  Now, if we did the same analysis that you do and we just

8   took the revenue in 2020 here and we projected out market

9   shares, would we have an accurate picture of today's market?

10  A.  I mean, with the exception of DeepIntent and Lasso growing,

11  yes.  Proclivity would be a large player.  PulsePoint would be

12  a large player, Medicx has actually lost revenue.  Some of the

13  others are roughly there, so --

14  Q.  Just so I understand your testimony, this 2020 analysis is

15  reflective of your view of the market today?

16  A.  So, again, this is not my analysis, right.  This is a

17  document you've pulled from a third party that didn't have

18  subpoena power, and so on and so forth.  So I don't know where

19  these numbers are coming from.

20         But what you asked me and what I'm telling you is

21  that, yes, there are elements here in this chart where, with

22  the exception of DeepIntent and Lasso, again being somewhat

23  special in managing to grow, a bunch of these players are still

24  in the market.

25  Q.  Let me ask you, is it your view that the market was stable

1    at this period in time, November 2020?

2    A.   I haven't studied the market in that level of detail

3    earlier.

4    Q.   Was the market stable in 2021?

5    A.   What I have done an analysis on is that the market seems to

6    be stable in the period that is most recent and that we have

7    the best available data for, which is 2022 and 2023.

8    Q.   So you looked at six quarters of data, January 2022 through

9    the first two quarters of 2023, right?

10    A.   I looked at evidence in the record throughout the entire

11    time period.

12    Q.   Your exhibit with all the market shares looks at six

13    quarters, right?

14    A.   It does.

15    Q.   Thank you.

16          And would you say that an industry is stable that

17    essentially started in 2019?

18    A.   I think we have heard from multiple witnesses that some of

19    them were around in 2015 and 2017, so I'm not sure that that's

20    an accurate characterization.

21    Q.   Why don't I just ask you to assume that the market started

22    to be material, started to exist in 2019, this market.

23    A.   I am not sure how I'm supposed to assume that.

24    Q.   I know you want to fight the assumption, but I'm just

25    asking you to assume with me for at a moment that the market

1   basically didn't really exist before 2019.  If that were the

2   case, would you say that sitting here, in 2023, we can call the

3   market relatively stable and not dynamic?

4   A.   Yes.  If we examine the evidence from a recent time period

5   and we see that things are relatively stable over time,

6   antitrust tools are flexible, and we deal with changing

7   industries all the time.  The analysis I have done shows that

8   if you compared 2022 to 2023, if you looked at Lasso and

9   DeepIntent calling each other out as their primary competitors

10  and so on, it's pretty stable.

11  Q.   It's pretty stable, all right.  I think we have got your

12  opinion on that.

13       Were you here in court when the Veeva witness

14  testified that the industry is dynamic?  Do you recall that

15  testimony?

16  A.   There are many industries that people sometimes call

17  dynamic.  I mean, industries are dynamic in the sense that

18  we've heard, for example, about innovation that keeps

19  happening.  So industries don't stand still.  But that doesn't

20  mean that we can't do antitrust analysis on them.

21  Q.   I'm sorry.  I think I just asked you, were you here when

22  the Veeva witness testified that the market was dynamic?

23  A.   Yes.  And I explained what I --

24  Q.   I'm sorry.  I think I just asked you if you were here when

25  the Veeva witness testified that the market was dynamic.

1     A.   I was.

2     Q.   Thank you.

3          Do you believe -- you disagree with that statement?

4     A.   To the extent that you are trying to use the

5     characterization dynamic to say that we should just put our

6     hands up and not be able to do any antitrust analysis, I do

7     disagree, yes.

8     Q.   I'm certainly not saying that.

9          MR. TULUMELLO:  Why don't we look at what the market

10    leader has said about the state of this market.  This is

11    PulsePoint transcript 182-24 to 183-22.

12          (Video played)

13    Q.   Does that sound like a relatively stable market to you?

14    A.   So it sounds like a growing market.  That doesn't mean that

15    it's not a relatively stable market.  Every market is growing

16    quite a lot, and that doesn't mean that -- in my slide 6 I

17    believe we looked at the share of revenues from 2022 to 2023.

18    Just because the market is growing doesn't mean that the

19    biggest players aren't the same year to year.

20    Q.   You also testified yesterday that historical shares are the

21    best predictor of the future, right?

22    A.   Yes.  In general, that's how economists analyze things.

23    That's in the merger guidelines.

24    Q.   If we can look at DX-78, slide 10.

25    A.   I'm sorry.  Which one.

1    Q.  Defense Exhibit 78, slide 10.  We will also put it up on

2    the screen.

3    A.  That's my reply report?

4    Q.  This is page 233 of your reply report.  You see:

5    Historical revenues are typically the best available predictor

6    of future competitive significance.

7          That's what you said?

8    A.  Yes.

9    Q.  Would that be true of the market as you define it in 2019?

10   A.  So, again, I haven't studied -- we didn't have data for

11   revenues for everybody in 2019.

12   Q.  Doctor, you can just say I don't know.  I didn't study it.

13         Would this have been true?  Historical revenues been

14   the best predictor of future competitive significance in 2020.

15   You didn't study that, did you?

16   A.  We didn't have data back then.

17   Q.  Would historical revenues be the best future predictor of

18   competitive significance in 2021?  You didn't study that

19   either, did you?

20   A.  So if you go back one page to page 82 of my reply report,

21   as the title to section 5.3.1 says, recent realized revenues

22   are generally the best predictor of future revenues.  That's

23   what I did.  I looked at all the available data which were

24   generally for 2022 and 2023.

25   Q.  Understood.  But I asked you if you analyzed whether the

1    revenues in 2021 were the best available predictor of future

2    competitive significance in 2022, and you did not, right?

3    A.  I did not have comprehensive revenues in 2021.

4    Q.  Thank you.

5          Now I want to talk a little bit about what you call

6    the competitive fringe.  Your testimony yesterday was that

7    there are these the big three and all of these folks in the

8    fringe, correct?

9    A.  Correct.

10   Q.  Let me just ask, what does it mean to be -- a few questions

11   about what it means to be a fringe competitor.  Can fringe

12   competitors grow their business, yes or no?

13   A.  They can.

14   Q.  Can fringe competitors scale their business, yes or no?

15   A.  In theory, they can, but most of them don't.  That's the

16   whole point of being fringe.

17   Q.  In theory they can.  Why don't we then go in practice.  You

18   heard that one single customer, CMI, accounts for 50 percent of

19   Lasso's revenue, right?

20   A.  Um-hum.

21   Q.  You understand that to be true?

22   A.  I believe so, roughly.

23   Q.  And if CMI decided this year or next year to move its

24   business from Lasso to AdTheorent, what effect would that have

25   on your analysis of whether AdTheorent is fringe?

1   A.  So if it's doing a lot of work there, CMI is choosing them

2   for a reason.  If any of the other participants of the fringe

3   had the same capabilities, they would go to them.  In fact,

4   there is one particular that I discuss in my reply report that

5   Dr. Israel mentioned that they must be an important competitor

6   because CMI actually uses them.  But in fact when you look at

7   the revenues, CMI spends 450 times more, less with them than

8   they do with the merging parties.

9   Q.  Respectfully, I'm not following what you are saying because

10  my question was what happens to AdTheorent if it wins that CMI

11  business.

12  A.  If hypothetically it could win that business, it would

13  become bigger, but there is no evidence that they have the

14  capabilities to win that business.

15  Q.  We saw the AdTheorent witness yesterday.  Do you think if

16  CMI said to AdTheorent, we are going to -- we are considering

17  moving our business over to you, do you think that AdTheorent's

18  CEO would say, no, no thank you, we don't want that?

19  A.  It's not a question of them saying they don't want it.

20  It's a question of the customer, whether they believe that they

21  have the capabilities that they need or not.  And given their

22  current revenues, most customers are judging that they do not

23  currently have those capabilities.

24  Q.  Do you think AdTheorent would pull out all the stops to, do

25  a pitch book, show all their capabilities to keep for that CMI

1   business?

2   A.  Of course they would.  But the point, as I explained

3   yesterday, is that everybody can argue that they are the best.

4   Everybody can pull all the stops, as you said.  But that

5   doesn't mean that the customers are going to believe that, and

6   it doesn't mean that they will actually move their business.

7   That is why the merger guidelines are clear, that what we focus

8   on are actual realized revenues in the relevant market.

9   Q.  Got it.

10          But your opinion essentially hangs on the decision of

11  one agency deciding where to put its business.  If it moved

12  that business from Lasso to AdTheorent, that would totally

13  scramble your market shares, right?

14  A.  No.  I mean, it would change the market shares to some

15  extent, but it would not scramble it.  I have, as I explained

16  yesterday, many what-if analyses, including one where the

17  fourth bar here on your chart, I basically add ten more

18  competitors with their size, and I still find that there would

19  be a substantial lessening of competition.

20  Q.  We will definitely come to that.

21          But your view is that there would still be

22  anticompetitive effects from the merger if Lasso lost 50

23  percent of its business?

24  A.  That's probably true.

25  Q.  But you don't know?

 1  A.  I haven't done that specific analysis.

 2  Q.  In fact, we have heard a lot of testimony that agencies

 3  review who they are going to spend with every year, right?

 4  A.  We heard some of that, yes.

 5  Q.  Now, when you are looking at these fringe competitors and

 6  their ability to compete, did you consider if any one of these

 7  fringe competitors has $10 million of cash on hand?  Let me ask

 8  you this.  Did you consider how much cash on hand any of these

 9  fringe competitors has?

10  A.  I don't think so, no.

11  Q.  Does it make a difference to your potential future

12  competitive significance if you have a billion dollars in cash

13  on hand?

14  A.  I mean, not necessarily.

15  Q.  In your analysis of the competitive change, it doesn't

16  matter if one of these fringe players has a billion dollars in

17  cash or $2.5 million in cash, right?

18  A.  So if somebody has a good idea, if somebody can deliver on

19  a capability, then in general they may be able to go out and

20  get investors to support that.  So, yeah, we heard testimony

21  from the Trade Desk, right, about how -- as I believe you have

22  argued repeatedly, they are well capitalized and so on and so

23  forth.  But even they, with all those capabilities, they are

24  both reliant on IQVIA, as they said, and they have had many,

25  many delays, and they found entry into this space to be much

1    more challenging than they anticipated.

2    Q.  I'm sorry.  I am just asking whether you analyzed whether

3    any of these competitive fringe players, how much cash on hand

4    they have.  Did you analyze that?

5    A.  I did not.

6    Q.  Thank you.

7          Did you analyze the capabilities of these specific

8    DSPs?  Did you analyze them?

9    A.  Yes and no.  No in the sense that I'm not an industry

10   expert.  I'm an economist.  And what I do is, I certainly

11   looked at some qualitative evidence that talked about their

12   capabilities and how some were less competitive with merging

13   parties and so on.

14          But, by and large, what we do as economists, again, is

15   we look at revenues.  I may not be able to explain exactly why

16   some of these players just don't succeed, but if we see them

17   making only a tiny fraction of the revenues of the merging

18   parties, and some of them have been in the market since 2019 or

19   early on, that means that they are lacking in capabilities,

20   sort of the proof is in the pudding.

21   Q.  I think that's very helpful.

22          So your assumption is that there is something about

23   the capabilities of these fringe competitors that's lacking

24   compared to the big three, right?  That's what you just said?

25   A.  I said that at the end of the day they can't compete as

1    effectively.

2    Q.  You can't point -- that's fine.  That's fine.

3         Let's do another example.  Suppose that Pfizer wanted

4    to put out all of its HCP programmatic to bid to The Trade

5    Desk.  Do you think The Trade Desk would pull out all the stops

6    to try to compete for that business?

7    A.  Every competitor is going to try to win the business,

8    whether they have what it takes to win the business.  That's a

9    different question.

10   Q.  Do you think -- we saw the gentleman from The Trade Desk

11   yesterday, and I think you recall he showed up at Digital

12   Pharma East and said:  We are the leaders in programmatic.  He

13   has posted to his Facebook page and LinkedIn that they want to

14   offer best-in-class HCP and DTC programmatic advertising.

15        Do you think that The Trade Desk would deploy all the

16   resources it could to win that business from Pfizer?

17   A.  It will, but, as I have explained in my report, success in

18   DTC, which is where the Trade Desk is successful, is no

19   guarantee of success in HCP.  There are other examples outlined

20   in my report, your Honor, of some of the players we see in the

21   screen there that are actually quite successful in DTC, and

22   they still -- they have been around in HCP for a long time, and

23   they don't really make any meaningful revenues.  As we heard

24   from The Trade Desk, HCP is complicated.  And, as you said,

25   they are trying hard, but they have faced many challenges.

1   Q.  I think I just asked if The Trade Desk would pull out all

2   the stops to compete for that business.  Your answer is yes,

3   right?

4   A.  Yes.  But it's unclear it would be effective.

5   Q.  Do you believe The Trade Desk would say, oh, Pfizer, we are

6   not going to build out any kind of reporting capabilities or

7   other functionalities that you might want because we are just

8   not interested in your business?

9   A.  Of course they wouldn't, but -- and they explained that

10  they are trying to build all these things, and they also

11  explained that they are relying on IQVIA in order to do that.

12  Q.  Yes.  We will definitely come back to that.

13          When did Lasso leave the competitive fringe?

14  A.  I don't know.

15  Q.  How would you determine that?

16  A.  I mean, if we had similarly good revenues further back, we

17  would just look year by year to see when they grew enough.  I

18  also say, from the qualitative evidence, from the moment that

19  they entered in 2020, we see DeepIntent talking about them

20  as -- I forget the exact superlative, but their most formidable

21  competitor or something like that.  Again, there are many, many

22  documents in both of my reports about that.

23  Q.  Was Lasso in the competitive fringe in 2019?  It didn't

24  exist in 2019, right?  Was Lasso in the competitive fringe in

25  2020?

 1   A.  Again, I don't have exact revenues so I can tell you that,

 2   but probably not, given what we see in the qualitative

 3   evidence.

 4            MR. TULUMELLO:  Can we put up on the screen what the

 5   Lasso revenues were in 2020.

 6   Q.  Do you see that number?

 7   A.  I see it.

 8   Q.  Does that -- is Lasso a dominant player in 2020 in HCP

 9   programmatic?

10   A.  As I believe you showed me earlier, overall industry

11   revenues were smaller back then, so we would need to look at

12   everybody's revenues in order to answer that.

13   Q.  Let's set that aside.

14            Your analysis is designed to look at what the

15   competitive constraints are on the merging parties, right?

16   Like you testified yesterday, you have to draw a circle around

17   the competitors to get a good understanding of what the

18   competitive constraints are, right?

19   A.  I have done many, many analyses.

20   Q.  Conceptually I am just trying to get at what you did.  You

21   excluded --

22   A.  If I can clarify.

23   Q.  Sure.

24   A.  In order to -- I don't think you can answer that in total.

25   You need to -- do you mean by market definition analysis?  Do

1   you mean by competitive effects analysis?

2   Q.  We are going to come to all of that.

3          Before I get to that, what work, if anything, did you

4   do to account for the uncertainty that the industry might

5   take -- the path the industry might take in the near term?

6   A.  I examined the recent history of the industry, and I

7   determined, as you showed us earlier, that the industry is

8   relatively stable.  So, yes, I looked into that.

9   Q.  Did you try to predict the trajectory of technological

10  change in the market?

11  A.  I don't know what you mean by that exactly.

12  Q.  You testified, I think, in the credentials part of your

13  testimony that you had written many articles.  One article that

14  you wrote is called Merger Review in Technologically Dynamic

15  Industries.

16         Do you recall that?

17  A.  I do.

18         MR. TULUMELLO:  Let's just call that up.

19  Q.  This is what you wrote before you were testifying --

20  A.  I'm sorry.  Is this in my binder?

21  Q.  It should be.  DX-2069.

22         You write that the usual steps in the merger analysis,

23  defining a relevant market, assessing potential unilateral and

24  coordinated effects, and determining the likelihood of entry,

25  may require substantially more uncertainty -- may require

1    confronting substantially more uncertainty in a fluid,

2    innovation-driven industry.

3         You see that?

4    A.  Yes.

5    Q.  And do you agree with that statement?

6    A.  I do agree with that statement.

7    Q.  Then if we look at the end, you write:  This brings us back

8    to the problem of assessing mergers in innovative industries.

9    Assessing a merger in such an industry may require forecasting

10   the direction of technological change and the path of

11   competition in more than one market or industry.

12        Do you see that?

13   A.  I see that.

14   Q.  And do you agree with that?

15   A.  I agree with that.  I will also note that this article is

16   about the merger of Google AdMob.  The article explains, just

17   before the start of section 3:  The FTC abandoned that

18   challenge when Apple, a well-capitalized company, indicated

19   that it planned to enter into space.  But since then Apple

20   actually failed in that advertising endeavor and it stopped.

21        It just goes to show that just because there may be

22   well-capitalized potential interest or even people who say they

23   are actively looking to enter, until they actually succeed, it

24   can be speculative to just say we shouldn't do anything because

25   somebody is entering.

1    Q.  I thank you.

2          Again, I just want to focus on the concept, which is

3    that assessing a merger in an industry, in such an industry, a

4    dynamic industry, may require forecasting the direction of

5    technological change and the path of competition in more than

6    one market or industry.

7          You agree with that concept, right?

8    A.  I agree and, as I said, I looked at whether this market is

9    stable.

10   Q.  All I'm asking you is if you agree.

11   A.  OK.

12   Q.  Now, let's come back to what you testified yesterday, which

13   is, you were trying to look at what are the competitive

14   constraints going to be on Lasso and DeepIntent in the future,

15   right?  That's what you're looking at.  And you did a lot,

16   right?  You did all kinds of analyses.  But the idea, the big

17   conceptual idea that you are trying to convey, is that after

18   the merger there is not is going to be sufficient competitive

19   constraints on Lasso and DeepIntent to prevent them from

20   raising prices.  Is that conceptually where we are going?

21   A.  That's not quite right.

22   Q.  What am I missing?

23   A.  So it's not that there are not going to be sufficient

24   competitive constraints.  PulsePoint will be around.  There

25   will be others.  But the point is that we are reducing the

1   competitive constraints substantially because the merging

2   parties have substantial head-to-head competition.  So to the

3   extent that -- it's not about there will not be any competitive

4   constraints whatsoever, but, yes, a big important competitive

5   constraint is going away, and that means that they will be able

6   to raise prices.

7   Q.   Right.

8        So after the merger you don't think there will be

9   sufficient competitive constraints on Lasso and DeepIntent to

10  prevent them from raising prices, right?  That's what you are

11  saying?

12  A.   Yes.

13  Q.   And that analysis excludes Medscape, social media, and

14  these other providers, as you testified yesterday, right?

15  A.   Social media is entirely within the analysis.

16  Q.   We will get to that because I actually respectfully

17  disagree that social media is within your analysis.

18       But you were here when Mr. Gerszke said that

19  Medscape -- talked about Medscape's revenues.  I want to be

20  mindful of the protective order issues here.

21       Do you recall -- do you remember how much generally he

22  said that Medscape earns in HCP one-to-one marketing?

23  A.   I don't remember the exact number, but I remember that it

24  was quite large, which, again, indicates that it's probably

25  something different.

1          MR. TULUMELLO:  Do we have the slide of the revenues?

2     We do not.  We will come back to that.

3     Q.  Whatever that revenue number is, right, which was

4     substantial, that was not included in your market-share

5     analysis, right?

6     A.  It's a different product, so, no, it was not included.

7          MR. TULUMELLO:  And if we pull up DX-1929 and go to

8     slide 31.

9     Q.  You will remember that Medscape testified that on its

10    website it offers the ability to identify HCP audiences, to

11    design the HCP experience, to activate marketing, to optimize

12    and refine and to report results, right?

13    A.  Yes.

14    Q.  That's all for HCP one-to-one marketing, right?  That's

15    what he testified.

16    A.  It is.  But it is also only in their property, and we heard

17    other testimony about how with HCP programmatic one of the

18    advantages is, you can reach people even if they don't go on

19    Medscape's website on any particular day and so on.

20    Q.  Sorry.  I understand.

21         One of the advantages of programmatic is you can go a

22    bunch of places, right?  And you say Medscape, with its vast

23    amount of revenue from HCP one-to-one advertising, doesn't

24    count because it's just the Medscape properties, right?

25    A.  So the way that I have defined my market, the product that

1   I'm looking at, is HCP programmatic advertising.  So, yes.

2   This is a different product, even if it is HCP one to one.

3   Q.  It's a different product.  And because it's a different

4   product, it doesn't put a competitive constraint on the merging

5   parties, right?

6   A.  So it's a more distant substitute.  So as I explained

7   yesterday, your Honor, you can draw the circle in different

8   ways, and you can keep pulling in more and more distant

9   substitutes.  But if you do that, you're basically going to be

10  bringing in revenues, including quite substantial revenues,

11  potentially that overstate the competitive significance of

12  whoever it is.

13         So essentially, again, if I fly to Chicago and there

14  is a merger of United and American, but we start putting in all

15  modes of transportation, we will be putting in a load of

16  revenues, but that doesn't mean that those revenues are going

17  to be constraining United and American in the same way that

18  Delta's revenues are constraining it.

19  Q.  I think we get the concept of what we are talking about,

20  whether it's a competitive constraint.

21         You understand that Medscape is the leading and

22  dominant source of endemic inventory, correct?

23  A.  Yes.

24         MR. TULUMELLO:  Can we pull up the complaint, slide

25  44, see what the FTC alleges in this case.

1    Q.   Endemic inventory.   Health care advertisers can target

2    consumers on both medical sites and nonendemic sites, right?

3    Advertising on endemic sites, such as Medscape, the WebMD,

4    tends to be more valuable because the audience visiting the

5    site may be more open to considering a health care

6    advertisement.   Then there is nonendemic inventory, like the

7    New York Times or ESPN, have broader overall reach, but market

8    participants believe that HCPs are less likely to engage with a

9    health care advertising place on those sites.

10            You see that?

11   A.   I do.

12   Q.   So you are taking the leading source of endemic inventory

13   in the entire HCP digital one-to-one world that can provide

14   audience identification, activation, report, measurement, and

15   you are putting that outside of your market because, in your

16   view, it's not a competitive constraint on the merging parties,

17   right?

18   A.   No.

19   Q.   You are not doing that.

20   A.   No.   That is not what I have testified.

21   Q.   Let's take a look and see what happens if -- we reproduced

22   your Exhibit 1 as a circle chart, if we can put that up.

23            Let's take a look -- this is not going to be displayed

24   to the gallery, please.

25            If you add just the Medscape revenues over the

 1    18-month period for HCP one-to-one digital advertising.

 2              You see that?

 3    A.  I see it.

 4    Q.  That number is almost double the size of your market,

 5    right?

 6    A.  So, as I explained yesterday --

 7    Q.  Is it double the size of your market or not?

 8    A.  It is.

 9    Q.  Thank you.

10    A.  Which goes to show why this is not relevant.

11    Q.  OK.  Thank you.

12              You also testified that you didn't consider Doximity,

13    right, and you thought Doximity is out there doing something

14    different.  Different product, not a competitive constraint.

15    Is that fair?

16              MR. TULUMELLO:  I just want to pull up again a

17    document that we have seen, DX-2035.  This is what Mr. Field

18    testified to.  It is a -- I'm sorry.  DX-2035.

19    A.  I don't think this is in my binder.

20              THE COURT:  DX-2035 is not in this binder.

21              MR. TULUMELLO:  It's in the manila envelope.

22    Q.  Mr. Field of Lasso was asked about this.

23              If we go to slide 17, you will recall that the direct

24    testimony is that Lasso was analyzing for a pharma company

25    where media exposure drives the most benefit.  And what Lasso

1    reported is that AdTheorent, Doximity, and Instep Health are

2    where media exposure drives the most HCP benefit, particularly

3    in patient-level key-performance indicators.

4              Do you see that?

5    A.  I do see it.

6    Q.  If we go to slide 21, what Lasso recommends in bullet 2 is:

7    Continue investment with AdTheorent, Doximity, and Instep

8    Health.

9              Do you see that?

10   A.  I see it.

11   Q.  And so this is an example of a pharma brand evaluating how

12   its marketing digital one-to-one advertising is doing on

13   Doximity versus AdTheorent, right?

14   A.  I don't know that it's versus.  As we heard, for example,

15   from the Bayer witness, they use some of these things for

16   different reasons.

17             MS. CHUNG:  Sorry to interrupt, but the printed

18   version that we were provided ends on page 12.  You have a

19   final page that reads DX-2035, page 12 out of 12.  We wanted to

20   just make sure that we all had the correct document to follow.

21             THE COURT:  Mine also finishes at page 12.

22   Q.  Let's go back then to -- it's page 9 in your version.

23   Thank you.

24             Now, on Doximity do you recall Veeva's testimony

25   yesterday that it had observed competition between Doximity and

1    PulsePoint and Lasso and DeepIntent.  Do you recall that?

2    A.  I believe what they said was that Doximity was seeing

3    competition from DeepIntent and Lasso, not the other way

4    around.

5    Q.  If we can look at DX-2059, it says in the first line:  You

6    have probably seen the earnings report from Doximity and the

7    reduced guidance.  A big driver of the headwinds is competition

8    from programmatic HCP media like DeepIntent and Lasso.

9            You see that?

10   A.  I see it.  As I just said, and as -- I believe earlier you

11   showed me a chart where HCP programmatic advertising was

12   increasing.  So it can be the case that Doximity is saying

13   competition from DeepIntent and Lasso even if they are not

14   feeling them as a particular competitive constraint.

15           Your Honor, as digital advertising has bloomed, I am

16   sure the New York Times is looking at digital advertising as a

17   competitive constraint to its print advertising.  That doesn't

18   mean that the tech companies are staying up at night worrying

19   about losing business to the print edition.

20   Q.  Just to go with your analogy then, you don't think that --

21   you think Doximity could be losing sleep about the merging

22   parties, but you don't think the merging parties are losing

23   sleep about Doximity.  Is that right?

24   A.  I mean, that's -- this email, that's what it's saying.

25   Q.  Let's go to the earnings call to which this slide is

1    referring.  This is very recent.  This is the Q1 2024 Doximity

2    earnings call.  This is where they reduce earnings guidance,

3    their future forecast.  Do you know who Jeff Tagney is?

4    A.  I do not.

5    Q.  He is the CEO of Doximity.

6         In explaining why they have lowered their projections

7    for the year he says:  I think, as we drill into it, we think

8    that we've effectively lost a bunch of share there to some new

9    market entrants, folks who have recently purchased some of

10   these banner platforms, and they really took our teeth, to be

11   honest.

12        Then he goes on to say:  During upsell season, our

13   clients increasingly prefer to deploy incremental budgets

14   swiftly, and they want to expand and adjust their programs onto

15   Doximity with the click of a button, just like they would on

16   LinkedIn, Facebook, Amazon, or Google.

17        You see that?

18   A.  I see it.

19   Q.  You do not believe that Doximity is a competitor -- a

20   meaningful -- let me put it this way.

21        Your analysis does not attribute a single dollar of

22   revenue from Doximity as being a competitive constraint on the

23   merging parties, right?

24   A.  I mean, this entirely consistent with what I just

25   explained.

 1   Q.  Again, back to your pie chart.  And show what happens if we

 2   just add Doximity revenues over the same time period.

 3        You see that?

 4   A.  I see it.

 5   Q.  That, again, is multiple -- nearly a multiple double of the

 6   market you calculated, right?

 7   A.  Again, it goes to show why this is not relevant.

 8   Q.  I'm with you.

 9        Then you said to the Court yesterday you did a very

10   conservative analysis and you considered social media, right?

11   If we can pull up your slide.  You see way over there in the

12   right, this is your chart, right?

13   A.  Yes.

14   Q.  This is your effort -- it's a conservative thought

15   experiment, including broader industry participants, right?

16   A.  Yes.

17   Q.  You're telling the Court that you are giving the merging

18   parties the benefit of the doubt, and you are going to consider

19   social media, and you attribute into your shares here XXXXXXXX

20   from LinkedIn, right?

21   A.  Yes.

22   Q.  But you do not include the XXXXXXXXXXXX for the LinkedIn

23   for doctors, correct?  You did not do that, correct?

24   A.  I did not.

25   Q.  Meta.  Meta, in your reply report, you grudgingly gave

1   about XXXXXXXXXXXX of share to, is that right?

2   A.  That's right.

3   Q.  That was based on the fact that MedData group sells most of

4   its HCP audiences to Facebook, right?  Let's please pull that

5   chart up.  MedData Group -- this is a chart in Dr. Israel's

6   report that shows the sales of audience data, HCP audience

7   data, to various parties, and Facebook is XXXXXXXXXX and the

8   next are underneath it, right?

9   A.  Yes.

10  Q.  You believe that social media should be excluded from the

11  HCP programmatic market, right?

12  A.  Yes.  It's a different product.  We have heard lots of

13  testimony to that effect.

14  Q.  And your analysis, going back to your pie chart of the

15  XXXXXXXXXXXX for Facebook or Meta, that's just based on IQVIA

16  selling to HCP audiences, right?

17  A.  Yes.

18  Q.  And you remember the testimony of Mr. Lin where he showed

19  you the hundreds and hundreds and hundreds of HCP -- I think he

20  said 300 different HCP audiences.  Do you remember that?

21  A.  I don't remember that he counted them, but --

22  Q.  There were so many he couldn't count them, right?  You

23  remember he said that?

24  A.  I don't remember that.  But, again, it's not about

25  counting.  It's about revenues.

 1    Q.  I understand.  But this analysis would not include any

 2    revenue Facebook got from any HCP audience offered from any of

 3    those hundred providers, right?

 4    A.  Well, to the extent that any of the other participants in

 5    the fringe that I used to do this estimation use others, it

 6    would.  But, yeah.

 7    Q.  We have a lot to cover.

 8           One question I wanted to ask you.  I won't go into

 9    detail on the Trade Desk, but your market does include

10    over-the-counter drug sales, right?

11    A.  Yes.  I believe the vast majority of the revenue of HCP

12    programmatic tends to be from pharma.  Again, we heard the

13    Bayer testimony and all of that.  If they are making revenues

14    on over-the-counter, it's included.

15    Q.  Thank you.

16           I don't want to dwell on that because I think there is

17    a factual dispute, right.  But you were here when XXXXX

18    testified that it gives XXXXXXXXXX a year to The Trade Desk for

19    HCP programmatic, right?

20    A.  I was.

21    Q.  And that's just one customer.  And your total attribution

22    to The Trade Desk is -- it was XXXXXXX, but then you bumped it

23    up to XXXXXXXXXX, right?

24    A.  Yes.

25    Q.  If we are looking at 18 months and XXXXX says, it gets

1   XXXXXXXX a year for OTC, essentially over 18 months that's

2   XXXXXXXXXXX?

3   A.   Yes.

4          MR. TULUMELLO:  Your Honor, I think we are going to

5   have to seal because I believe I have perhaps strayed

6   unintentionally into some information covered by the protective

7   order.  I am not sure where I did that.  If we could seal the

8   courtroom, I think that would be appropriate.

9          THE COURT:  Any objection?

10         MS. FLEURY:  No.  We would prefer that because I think

11  there has been a number of revenue information from third

12  parties, and obviously their counsel is not here.

13         THE COURT:  We will need to empty the courtroom of

14  anyone that is not a member of the litigation teams.

15         MR. TULUMELLO:  I would ask that we seal the

16  transcript, any discussion of revenue figures that I may have

17  uttered, as well as the witness.

18         THE COURT:  Very well.  I will need to rely on the

19  parties to do an after-the-fact assessment of what needs to be

20  sealed.

21         MR. TULUMELLO:  May I proceed?

22         (Continued on next page)

23

24

25

```
1              MR. TULUMELLO:  May I proceed?

2              THE COURT:  You may.  Actually, let me just make sure.

3              Yes, you may proceed.

4              MS. CHUNG:  Sorry to interrupt, but one additional

5    thing, while we are on the kind of cleaning up sealing and

6    documents, there are a number of documents that were mentioned

7    in the slides and the questioning where I didn't see them in

8    the binder or saw a reference in realtime to a specific

9    DX number.  If we could ask that, so that we can follow the

10   full source, that whenever we refer to especially a third-party

11   document, that we have notice on what tab we have in the

12   binder?

13             THE COURT:  I think you may have referred to certain

14   documents that were used yesterday and in previous days that

15   are not in the doctor's binder.

16             MR. TULUMELLO:  They should be, and I will try to do a

17   better job of tying them; and if they are not, we will

18   certainly correct that.

19             MS. CHUNG:  Thank you.

20             MR. TULUMELLO:  You're welcome, you're welcome.

21   BY MR. TULUMELLO:

22   Q.  So XXXXX testified XXXXXXXXXX of HCP programmatic sent to

23   the Trade Desk and if you do that over your 18-month period,

24   that would be XXXXXXXXXXX, right?

25   A.  Yes.
```

1  Q.  And that is in fact the total amount that you attribute to

2  The Trade Desk in your market share analysis, correct?

3  A.  In that analysis, yes.  I also have the "what if" analysis

4  with the 10 proclivities that, you know, you can think of

5  them -- if you want to credit them for more revenues, you can

6  think of them as one of those 10.

7  Q.  I'm just asking you've got XXX.  So do you think that XXXXX

8  HCP programmatic is the only HCP programmatic customer

9  The Trade Desk has?

10  A.  Given the testimony that we heard from The Trade Desk, it

11  sounds like they are possibly the biggest.

12  Q.  You think they are the only?

13  A.  I didn't say they are the only.  I said that The Trade Desk

14  testified that they had about XXXXXXXXXX in total.  So I don't

15  know what to do with that.  There is a bit of a conflict there.

16  But even if the Trade Desk wasn't thinking of the XXXXX

17  revenue, their testimony indicates that they don't have a lot

18  more.

19  Q.  Right.

20        If we could look at DX 2020.

21        Do you recall, this was the presentation that Veeva

22  gave to XXXXXXXXXXXXXX.  Do you recall seeing that?

23  A.  Yes.

24  Q.  And if we go to slide 7 -- sorry, let's go to slide 2.  The

25  Veeva Crossix contact here is listed as Baron Harper as the

1  gentleman who testified yesterday, right?

2  A.  Yes.

3  Q.  And then if we go to slide 7, this is the HCP chart that

4  Veeva ran on 2023 impressions to -- let's back out and just

5  look at the -- okay.  XXX dominates programmatic impression

6  share.  DeepIntent, Lasso only significant in HCP.  And if we

7  look then at HCP, we see that at least on impressions The Trade

8  Desk is very close to PulsePoint and Lasso.  Do you see that?

9  A.  So, first of all, let me just note that this slide that

10  dominates refers to including DTC, right?  So I think the Veeva

11  witness talked about this.

12          But, yes, if we focus on the HCP part, you know, I'm

13  not sure what their sample is.  I will note that this is

14  inconsistent with the revenue data that we have, right.  So,

15  for example, we see here that DeepIntent is -- seems more than

16  twice the size of PulsePoint and Lasso seems bigger than

17  PulsePoint.  So, again, this isn't information they gathered on

18  revenues with subpoenas, and I'm not sure exactly where they

19  are getting it, what their sample is, but their sample doesn't

20  seem to be representative.

21  Q.  Okay.  What Veeva did, Veeva testified that it tracked all

22  HCP programmatic impressions to be able to report this to XXX

23  XXXXX XXXX, and this is what they found from actual impressions

24  in the market in 2023, right?

25  A.  I believe they said it was impressions that they did

1    measurement for.

2    Q.  Correct.  Okay.  So this -- exactly.  Agreed.  Okay?

3    A.  So this is not necessarily representative and, in fact,

4    this chart is inconsistent with the revenues.

5    Q.  Okay.  So but this is just 2023, and Veeva, we know, is not

6    measuring -- it's not measuring every HCP programmatic campaign

7    in the market, it's just measuring some of them, whatever their

8    share is, right?

9    A.  Yes.

10   Q.  And in that share, XXXXXXXXXXXXXXX is neck and neck with

11   PulsePoint and Lasso, right?

12   A.  Yes.

13   Q.  Okay.  All right.

14   A.  In impressions, not revenue.

15   Q.  Understood.

16        And what we have from XXXXXXXXXXXXXX is we never

17   actually got revenue, documentary evidence from The Trade Desk

18   on HCP revenue because they told us they didn't have it and

19   instead we got cost information.  That's the spreadsheet that

20   we saw, right?

21   A.  That -- there was a different spreadsheet with revenue,

22   which is what I relied upon.

23   Q.  I see.  Okay.

24        So let's then turn to what I think is kind of the

25   heart of your analysis.  If we can go to your slide 8.  And

 1   this is where you are talking about critical loss analysis of a

 2   SSNIP on DeepIntent and it says, "Based on actual customer

 3   choice data; division inside candidate market more than three

 4   times the critical loss threshold, HMT satisfied even under

 5   Dr. Israel's own inputs."  Do you see that?

 6   A.  I do.

 7   Q.  It all sounds very robust and scientific, and I want the

 8   Court to really understand exactly what it is you did when you

 9   looked at customer choice data.  Okay?

10         So you tell me -- what I understand you did is you

11   looked at a document from DeepIntent that recorded win/loss

12   data, right?

13   A.  I looked at a database from DeepIntent, yes.

14   Q.  All right.  So we have a win/loss database and what you did

15   there is then you looked at things in that database that said

16   loss, right?

17   A.  Yes.

18   Q.  And then you tried to figure out where did that -- does

19   that loss show up in the transaction documents for PulsePoint

20   and for Lasso?

21   A.  In the ordinary course transaction data.

22   Q.  Right.  Okay?  So a win/loss spreadsheet for -- or database

23   for DeepIntent, if there was a loss, you then said, if -- I can

24   match this to PulsePoint or Lasso.  That's the basic concept.

25   A.  Yes.

1   Q.  And what you found is I think you basically -- 80 -- you

2   said 80 percent or so of the losses went over to DeepIntent and

3   Lasso that's --

4   A.  PulsePoint or Lasso.

5   Q.  Okay.  All right.

6           And so let's just look at a couple top line numbers

7   because I think it's very important for the Court to understand

8   this is like the guts of this analysis.

9           DeepIntent testified that it runs about 3500 campaigns

10  a year, which would be about 10,000 total campaigns.  And you

11  recall that PulsePoint testified that it's run about 16,000

12  campaigns, right?  And this database had 2,432 total

13  opportunities, right, in total over the time period.  And of

14  that, 1,565 were for HCP advertising, right?

15  A.  Um-hmm, yes.

16  Q.  All right.  And of those, DeepIntent won 1,067 of them,

17  right?

18  A.  Yes.

19  Q.  And then 388 were lost, right?

20  A.  Yes.  And this are looking at the entire time period in the

21  data or just 2022 and 2023?

22  Q.  I'm looking at what you analyzed in your data set.  So you

23  found 388 lost opportunities, right?

24  A.  I believe over the entire time period in the data, yes.

25  Q.  And then you did your win/loss analysis based on 33?

1    A.   Only in the opening report.

2    Q.   I agree.   But your opening report coming to the Court to

3    enjoin the merger was based on 33 observations where you found

4    an opportunity listed in the DeepIntent document that you

5    thought could be matched to Lasso and PulsePoint, right?

6    That's 33.   That was the original number, right?

7    A.   No.   So the 388 is the number over the entire time period

8    that they lost, so DeepIntent, they are successful, they

9    generally win when somebody comes and considers them.

10        And this is a pretty time-consuming exercise, as you

11   might imagine, just looking through the different data sets and

12   trying to match them.   So in my opening report, I only had time

13   to focus in -- on 2023.   So these are all of the opportunities

14   that DeepIntent, in the ordinary course of business, classified

15   as being lost to competition in 2023.   You know, there is

16   evidence in the record of Mr. Paquette, for example, asking to

17   review this data to understand composition.

18   Q.   We are just -- and I think we are just trying to clarify,

19   make sure the Court understands, there are 2432 in the data set

20   you reviewed, there were 388 lost opportunities and you looked

21   at 33, is that right?

22   A.   There is 388 over the entire time period.

23   Q.   Okay.

24   A.   So the 33 are in 2023.

25   Q.   Okay.

1   A.  For my reply report, I had more time and I extended the

2   analysis to 2022 as well.  So there is a hundred-something in

3   the final analysis.

4   Q.  Okay.  And I just wanted to, if we can go to the next

5   slide, I think it's important -- so what you literally did is

6   there are these spreadsheets and databases for DeepIntent, and

7   then you said you went and you tried to identify what the

8   campaign was in the transaction data.  And I just want to give

9   the Court a sense of what these documents actually looked like.

10  So these are the win/loss data, DX 2083 and DX 1703.  And what

11  you tried to do is you look at the win/loss data from

12  DeepIntent.  You found an entry, and then I tried to match it

13  to transaction data on PulsePoint, right?

14  A.  That's right.

15  Q.  Okay.  And that's all the data you had available to you,

16  right, is the spreadsheet descriptions, correct?

17  A.  That's right.

18  Q.  All right.  And then you -- and then if you made the

19  judgment that these were similar, you said -- we can go to the

20  next slide.  You said these were a match, right?

21  A.  Yes.

22  Q.  And in fact, you understand that this particular example is

23  drawn from a match you found?

24  A.  I don't recall every match, but --

25  Q.  Okay.  And would it surprise you if the data actually

1    showed that this is not a match and that these are for

2    completely different brands and in the spreadsheet one said

3    Qelbree and in the spreadsheet one says Gocovri, and Qelbree is

4    an ADHD medication and Gocovri is an antiviral.

5    A.   Okay.

6    Q.   Then what you did is you said that's a match and you said

7    you assumed that $150,000, all of it went from DeepIntent to

8    PulsePoint?

9    A.   I have done it two ways.  Both just counting opportunities

10   and counts budgets.

11   Q.   Okay.  But one of the things you did was counting budgets,

12   right?

13   A.   One of the things.

14   Q.   And so let's just do another example.  Okay?  This is

15   another match, Heartbeat Grail Galleri on the end HCP and you

16   matched this as an example.  Would it surprise you that

17   actually when you look at your transaction data these are for

18   two separate advertising companies with campaigns run on

19   totally separate times and yet you called that a match, right?

20   A.   I looked at campaigns within the same year --

21   Q.   Okay.

22   A.   -- but yes.

23   Q.   Okay.  And then in some cases, you see Heartbeat Grail

24   Galleri HCP MS, in some cases it wasn't clear to you whether

25   that was close enough to the language in the spreadsheet on the

1   PulsePoint or Lasso transaction data that you actually went to

2   a website and typed in the descriptions that we see of the

3   names and had the website algorithm tell you which one it

4   resembled most closely, right?

5   A.   I'm not sure I follow.

6   Q.   Okay.  Can we just pull up that footnote real quick?

7            In a small number of cases, a DeepIntent loss could

8   plausibly be matched to both and in those cases you select the

9   match based on the similarity score between the two pairs of

10  strings.  And if you go to this website, that's a website that

11  will tell you sort of which words in the string from one

12  spreadsheet are -- sort of more closely resemble -- no, that's

13  not what it does?

14  A.   No.  Let me explain.

15           This is not a website that does that.  This is

16  documentation for a string-matching algorithm.  So it's

17  documentation that explains, you know, how you can look for the

18  similarity of text strings.

19  Q.   Okay.  But basically when you found entries in these

20  spreadsheets that to the human eye you could not decide, you

21  used some algorithm to figure out if it was a match, right?

22  A.   I -- yes, I looked at --

23  Q.   All right.

24  A.   -- the similarity of the strings.

25  Q.   Let's get to the budget versus spend piece.  Keep going.

1   So when you found matches, one of your methodologies, the one

2   that finds 80 percent of all of the business going from the

3   merged -- sorry, from DeepIntent to Lasso or PulsePoint used

4   budget, right, so the budget number that was presented to

5   DeepIntent in like the RFP exercise, correct?

6   A.  Correct, I --

7   Q.  And then --

8   A.  My counts also find broadly similar results, but yes.

9   Q.  All right.

10  A.  One of my analyses did it that way.

11  Q.  But, again, I just want the Court to understand what you

12  did.

13          So when you actually go to the transaction documents,

14  the budget that you attributed to Lasso and PulsePoint was far

15  in excess of the actual spend, correct?

16  A.  So sometimes it was higher, sometimes it was lower.

17  Q.  Oh, sometimes it was?  Okay.  For on these examples, I just

18  want to walk through -- take the first example.  I know I am

19  getting short on time.

20          With the first example you have a campaign that you

21  said was $250,000 and then your -- and when $2,000 was actually

22  spent.  And what you say in your analysis is $250,000 went to

23  Lasso and PulsePoint.  Right?  Is that right?  That's right?

24  A.  Yes.

25  Q.  Let me just put up your teeter-totter.  And the reason

1    this is so important is because, post merger, what you are

2    analyzing in that win/loss data is how much of that money

3    that's going -- that budget that's going to Lasso and

4    PulsePoint would be captured, recaptured by Lasso, right?  So

5    in your analysis, if a million dollars is -- was in the

6    DeepIntent win/loss data and the spend for Lasso was $2,000,

7    you would have a million dollars retained on the Lasso side

8    because you counted budget, not spend, right?

9    A.  Yes.

10   Q.  Okay.

11   A.  By that methodology, yes.

12   Q.  Thank you.

13        I just have a few further questions on the vertical

14   opinion.

15        You have testified there will be foreclosure in the

16   market by IQVIA.  And do you --

17   A.  No, I testified that they would have incentives to

18   foreclose.

19   Q.  And you are familiar with the TPA data.  Since the

20   acquisition of Lasso, has IQVIA ever denied a TPA to a DSP?

21   A.  So as I explained, I wouldn't expect them to deny a TPA to

22   a DSP while this merger is pending.

23   Q.  And so you think that the -- that the sort of policeman is

24   at the elbow and that is why none of -- that is why there

25   hasn't been the denials of TPAs, right?

1    A.  That's a good analogy.

2    Q.  Okay.  And then you recall the Lasso recommendation

3    document that we looked at.  That was March of this year, and

4    you recall -- March of 2023, where Lasso is recommending, hey,

5    keep your spend with AdTheorent and Doximity, right?  And

6    there, the Lasso guys didn't say, hey, you are getting terrible

7    returns.  We have better data.  You should use Lasso.  Right?

8    They said, no, keep your spend on AdTheorent and Doximity.

9    That's what that document reflects in the recommendations,

10   right?

11   A.  So I don't know exactly what the context of that document

12   is, but, yes, that's what I was saying.

13   Q.  And so -- and I take it the way you think this actually is

14   working in practice is that those line employees at Lasso got

15   an instruction that we are under FTC merger review and we

16   should not tell this pharma company that they can only use us,

17   right?  That's the whole theory is that we are all under

18   scrutiny, so we are not -- we are going -- we are going to do

19   things normal course but change direction fundamentally

20   afterward, right?

21   A.  Well, I wouldn't expect the line employees to be changing

22   direction and sort of having this broader visibility about the

23   company strategy.

24   Q.  Okay.  I would not either.

25              You -- do you -- are you aware that there has never

1  been a section 13(b) injunction of a merger on a vertical

2  theory in the history of the United States?  Do you know that?

3  A.  I'm not a lawyer.  I don't know that.

4  Q.  You don't know that.  Okay.  This -- okay.

5        And do you believe your vertical opinions reflect the

6  same amount of rigor and reliability as your opinions on the

7  horizontal case?

8  A.  I mean, I'm using the standard economic framework in the

9  vertical framework.

10  Q.  But would you say your opinions on the vertical side are

11  just as reliable, just as rigorous, just as robust as they are

12  on the horizontal side?

13  A.  I think they are reliable vertical opinions, yeah.

14  Q.  And then one thing I want to --

15  A.  I try to use the best data available in both.

16  Q.  Okay.  And then I believe that when you testified -- this

17  is my last couple questions.  I believe when you testified on

18  direct, you didn't say that this was the first time you are

19  actually serving as the testifying expert in court, right?

20  A.  I did not.

21  Q.  Right.

22        And you work at Cornerstone Research, right?

23  A.  I do.

24  Q.  And for years and years, you have been in the support

25  role, doing the economic analysis for the testifying expert.

```
 1  A.  I have.

 2  Q.  And this is your debut as a testifying expert, right?

 3  A.  Correct.

 4  Q.  And you agree, as an economist that incentives matter

 5  right?

 6  A.  Yes.

 7  Q.  And is it credentializing to be able to say to future

 8  clients that you have testified on behalf of the FTC?

 9  A.  Sure.

10          MR. TULUMELLO:  I have no further questions.

11          THE COURT:  We are right at 10:30, so we will take our

12  break.  20 minutes.  Don't be late.

13          I take it there is going to be some direct?

14          MS. CHUNG:  Yes, your Honor.

15          (Recess)

16

17

18

19

20

21

22

23

24

25
```

```
 1                (In open court)
 2                THE COURT:  Good morning.  Be seated.
 3                Ms. Chung.
 4                MS. CHUNG:  Good morning, your Honor.
 5                I think we can proceed first with an open session, and
 6   I would at one point, when we start turning to portions that I
 7   think may reveal confidential third-party and party
 8   information, I will request.
 9                THE COURT:  Very well.  Are we still sealed?  Are
10   there people --
11                MS. CHUNG:  No, we are not.  We can be public.
12                THE COURT:  I mean but is there anyone who is waiting
13   outside?  No?  Okay.
14                You may proceed, Ms. Chung.
15                MS. CHUNG:  Thank you, your Honor.
16   REDIRECT EXAMINATION
17   BY MS. CHUNG:
18   Q.  Dr. Hatzitaskos, your relevant product market is HCP
19   programmatic advertising, is that right?
20   A.  That's right.
21   Q.  And where did you get the term or the concept HCP
22   programmatic advertising?
23   A.  So it's something that's all over the record, your Honor.
24   It's something that we have heard many witnesses testify to
25   here.  Nobody seems confused about what we are talking about.
```

1     It's something that's routinely used in the industry.

2     Q.  And when sitting in the hearing last week and this week,

3     you have heard various witnesses testify about HCP programmatic

4     advertising.  Who are the top competitors that are consistently

5     identified in testimony?

6     A.  So I think we've consistently seen the big three, right?

7     So if you recall, yesterday there was testimony by two

8     aspiring entrants, members of the fringe, that we have heard

9     are well-capitalized and so on, and really the three, when they

10    talk about the market, HCP programmatic advertising, they are

11    really talking about the big three.

12    Q.  Today we heard a series of questions from defense counsel

13    asking you why you haven't accounted for or included endemic

14    industry and social media in your product definition, is that

15    right?

16    A.  That's right.

17    Q.  And your opinion or your statement was that they were

18    irrelevant.  Did I get that right?

19    A.  That's right.

20    Q.  Okay.  So to illustrate a little bit that more clearly, I

21    would like to try an analogy, so bear with me.

22         I think one of the analogies that you have used in

23    responding to that question was the idea that if you go from

24    New York to Chicago, you can take a plane, you can take a bus,

25    you can take a train, but if you are looking at a merger

1    between United and American, Delta revenues and United revenues

2    and American revenues would be relevant, but others would be

3    irrelevant, other modes of transportation would be irrelevant.

4    Did I understand that right?

5    A.   Yes, you could account for them as a competitive

6    constraint, but if you just blindly pull in the revenues, it's

7    really going to overstate the competitive significance, right?

8    A dollar of Delta is a much stronger competitive constraint

9    than a dollar of Amtrak.

10   Q.   So if you are looking at airline mergers, is the size of,

11   for example, Amtrak revenues and total Amtrak revenues

12   relevant to you in analyzing market definition or competitive

13   effects?

14   A.   So certainly when you are defining the market, I don't

15   think you would include it, no.

16   Q.   How about the revenue of Megabus?

17   A.   No.

18   Q.   Okay.   Then applying that to this case, is it your position

19   that the revenue of endemic inventory in and of itself is not

20   relevant to understanding market definition for HCP

21   programmatic advertising?

22   A.   Yes.

23   Q.   And why is that?

24   A.   Just, again, you know, it's a different product, it's a

25   different functionality.   We have heard testimony and there

1    are many ordinary course documents about how it's a more

2    distant substitute, that people use it for different things,

3    that it has different features, less flexibility, and so on and

4    so forth.  And so at the end of the day, whether or not the

5    add that it delivers is the same, and we heard some testimony

6    that even that may not be true, but at the end of the day, the

7    purpose of it and the way in which you engage with it is

8    different.

9         THE COURT:  Well, I guess I'm not understanding that.

10   If I'm a doctor and I'm holding my cell phone and I'm on

11   TheNewYorkTimes.com, and I get an ad and then I go to WebMD or

12   some other walled garden and I get an ad, how am I interacting

13   with it differently?

14        THE WITNESS:  Yeah, so the key, your Honor, is that

15   you shouldn't be thinking about the doctor, you should be

16   thinking about the advertiser.  Right?  So if you look at the

17   merger guidelines, we say that market definition is a

18   customer-centric exercise.  So really it's about what is the

19   customer need.  And the advertiser, you know, you heard from

20   ad agencies and so on that they look for -- it offers different

21   things to them.  Right?  So ultimately it delivers an ad to the

22   doctor.  From the doctor's perspective it may be the same, but

23   the ability to reach the doctor, whether or not they go to

24   Medscape or Facebook or whatever on that day, the ability to

25   have a flexible budget that they can increase or decrease, all

1   of those things are advantages of HCP programmatic advertising

2   that are not offered by some of these competing products.

3          THE COURT:  But some do offer it, some that are not

4   the big three.

5          THE WITNESS:  Yes.  So there are other providers of

6   HCP programmatic advertising, right, so the long tail that we

7   saw in the two charts that I showed you yesterday.  They are

8   just not as effective.

9   BY MS. CHUNG:

10  Q.  Maybe building on the Court's question, let me ask you

11  kind of a more conceptual question.

12         Is your opinion that HCP programmatic advertising is

13  the only, or even the relevant product market?

14  A.  So it is a relevant product market in which we can analyze

15  the effects of the merger.  As I mentioned yesterday, you could

16  define multiple markets.  There is no such thing as a single

17  market.  All you need to do is define the relevant antitrust

18  market that meets the hypothetical monopolist test, and that

19  is what we used to, for market definition and market

20  concentration purposes, determine that it's appropriate to

21  analyze the competitive effects of the merger.

22         THE COURT:  Well, to go back to your Chicago analogy,

23  would all airlines that fly from New York to Chicago be

24  included in the circle?

25         THE WITNESS:  You could certainly do it that way, and

1    frequently that is how we do it, right, because -- so, yes, if

2    you think about the two bar charts that I had yesterday, you

3    could include the blue bars on both of them.  And the key

4    thing is that, at the end of the day, the conclusion doesn't

5    actually change, right?

6              THE COURT:  I don't understand that.

7              So, for example, and I will use an example of an

8    airline that no longer exists but used to, People Airlines.

9    It existed when I was in college and it was the cheapest, and

10   so I would fly People Airlines, and they literally herded you

11   as a group on and off the plane.  They didn't assign a seat.

12   It was just sort of --

13             THE WITNESS:  Okay.

14             THE COURT:  -- catch as catch can.

15             And arguably, using the words that you use——and this

16   is what I am trying to suss out——People Airlines was not as

17   effective as other airlines in providing an experience of -- a

18   pleasant experience of flying from New York to Chicago.

19             So when you say, well, yeah, there were others in the

20   fringe, in the tail, but they are not as effective, why would

21   their inability to compete with the big three necessarily push

22   them out of the circle?

23             THE WITNESS:  So the term that we use is relevant

24   antitrust market, right?  So I think the question is what is

25   relevant.  If you are looking at a merger of United and

1   American, then you are thinking mostly about the customers of

2   United and American and what do they see as reasonable

3   substitutes.  And then I think we can probably agree that

4   maybe most of them would turn to Delta or, I don't know, some

5   other, Jetblue, Southwest.  The -- if you were looking at a

6   merger of People Airlines with somebody else, then, yes, you

7   would probably actually define a different market that would

8   be relevant to that transaction that, you know, may look more

9   at the low-cost carriers and so on and so forth.

10          So, for example, right now there is a different trial

11   in Boston with Spirit Airways and they probably have defined a

12   market that certainly wouldn't leave People Airlines out of it

13   if it still existed.

14          The point here is that we are looking at a merger

15   between two of the big three, right?  So the question is, what

16   do the customers of those companies, what are reasonable

17   substitutes for them?

18   BY MS. CHUNG:

19   Q.  So to follow the Court's analogy and to build on it, I do

20   want to ask you one question about how we approach market

21   definition, and market definition 101, if you may.

22          So when you define a relevant product market, do you

23   look at the product?  So in this case flights from New York to

24   Chicago?  Or do you look at each provider when you just start

25   at that basic stage of defining a relevant market?

1    A.   Yes, the market definition itself is more about the

2    product, right, so it would be flights from New York to

3    Chicago, it would be HCP programmatic advertising, it would be

4    that conceptual what is the product.

5    Q.   And when you then derive market shares under that market

6    definition, that's when you start counting providers.  Did I

7    get that right?

8    A.   That's right.

9    Q.   And in your analysis, did you exclude anyone, say, like the

10   equivalent of a People Airline, in the fringe competitor that

11   does offer HCP programmatic advertising from your analysis of

12   market shares and concentration?

13   A.   No.  Anybody that I could find evidence offers HCP

14   programmatic advertising I included.  If I didn't have revenues

15   for them, I tried to estimate them.

16   Q.   So is it fair to say that in this analogy People's Airline

17   would be accounted for in your share calculations?

18   A.   Yes.

19   Q.   So returning to the current market HCP programmatic

20   advertising -- actually, let me move to a different topic and

21   shift gears.

22        So in defense counsel's questions, he's asked you

23   certain questions about your analysis of actual competitive

24   effects, the customer choice data.  Did I remember that right?

25   A.   Yes.

1   Q.  And I remember, when you talked about the number of

2   samples that you analyzed to derive that effect, you had

3   mentioned that, for your reply report, you had gone to a

4   larger sample set?

5   A.  Yes.  In my reply report, I had more time.  I analyzed 2022

6   as well, and I analyzed, yeah, more opportunities.  It's a

7   majority of all the opportunities that were flagged as lost by

8   DeepIntent in those two years.

9   Q.  And am I remembering right that in your report when you

10  account for both 2022 and 2023 opportunities, you actually bump

11  over like a hundred samples or a hundred matches in your

12  analysis?

13  A.  Yes.

14  Q.  And what was the result of that expanded analysis?  Was it

15  consistent or inconsistent with the initial picture?

16  A.  It's very consistent.

17  Q.  And so today, when you were introduced with a few examples

18  of -- a few questions on I think a handful of matches in your

19  analysis, does that effect the level of confidence that you

20  have in the overall picture that you had?

21  A.  It does not.

22  Q.  And why not?

23  A.  So your Honor, I don't know if you still have my binder

24  from yesterday.  If -- you do.  So if you go to my reply report

25  on page 88, it's the very last tab.  On page 88, a few pages

 1    before that.

 2                THE COURT:  I'm there.

 3                THE WITNESS:  So there should be a table, Exhibit R12.

 4    So this is the critical loss analysis that they asked me

 5    about, and the number that we were talking about is what is

 6    here, the ADR estimate.  So really this is the estimate of how

 7    much is going to Lasso and PulsePoint.  And the number that we

 8    need to be over for the market definition to be satisfied for

 9    the hypothetical monopolist test is the critical loss that you

10    see on the left.  So, you know, I had it in my slides, but for

11    the result to actually change, you know, it doesn't matter if a

12    few of the opportunities that are matched even if they are

13    wrong, like basically, you know, the vast majority of what I

14    have matched would need to be wrong because, again, as I

15    mentioned yesterday, there is a threshold and we are not just

16    over the threshold by a little bit, we are well, well, well

17    above that.

18    Q.  Because I find it sometimes hard to follow these very

19    number heavy charts, let me try showing a distilled version of

20    that in yesterday's demonstratives.  Would that be okay?

21    A.  Sure.

22    Q.  So when you were explaining just now that you would need

23    to be wrong by a magnitude, a significant portion to be wrong

24    in your bottom line, is that essentially -- how is that

25    captured in the bullet points that we have here?

A.   Yes.  If you look at the second sample, it's under the first one, that's where I mention in words what I was showing in that table.  So the critical loss is more than three times smaller than my estimate of the aggregate diversion ratio.  So essentially I -- for me to have gotten the bottom line conclusion wrong, I must have overestimated the diversion to Lasso and PulsePoint not just by a little bit but by three times as much.

Q.   And so a couple of examples here and there would not alter your confidence level in your results?

A.   They would not.

THE COURT:  So in another context is what engineers might call an error budget, so you can be wrong by a little bit, but you would still get the engine to work.

THE WITNESS:  Yes, yeah.

THE COURT:  Who determines the error budget?

THE WITNESS:  It's really the data, right?  So but the methodology gives you what is the threshold, and then the data gives you how far above the threshold you are, so . . .

THE COURT:  Okay.

BY MS. CHUNG:

Q.   Dr. Hatzitaskos, in response to defense counsel's questions, you offered opinion that in your opinion the market is stable enough.  Do you recall that?

A.   I do.

1   Q.  And when you said that the market is stable, what were you

2   talking about?  Were you talking about the overall size of the

3   market?

4   A.  No.

5   Q.  Then what were you referring to when you said that in your

6   opinion the market is stable enough?

7   A.  I was referring to the competitive dynamics of the market,

8   you know, how it's structured, how it operates, and, you know,

9   the analysis that I showed, for example, that the shares, even

10  if the overall market is growing like most markets, most

11  markets are growing, even if the overall market is growing, the

12  shares from year to year are fairly stable.

13  Q.  And I am going to play devil's advocate again here.  Even

14  if the market were to be dynamic rather than stable, does that

15  mean that the standard economic tools that you use are no

16  longer applicable?

17  A.  No.  The tools are flexible and, as I mentioned, are

18  designed to work across industries.  You know, in a different

19  industry maybe I wouldn't have done the check of how much does

20  it vary year to year.  You know, we essentially just do more

21  things to determine that we are getting reasonable results, and

22  that's one of them here.

23  Q.  As part of the question defense counsel showed you an

24  article that you authored titled "Merger Review in Technology

25  Dynamic Industries" that was marked as DX 2069.  Do you

1    recall?

2    A.   Yes.

3    Q.   Let me show you the paragraph that the defendant excerpted

4    from, and this can be showed to the public galley.

5         So I am here on page 2 of DX 2069 and I'm going to

6    focus on the first paragraph on the top.

7         So in the second sentence I see the sentence that

8    defense counsel has shown you in an excerpt form.  Do you see

9    that?

10   A.   I see that.

11   Q.   Is your opinion that standard economic tools cannot be

12   applied to markets that are rapidly evolving?

13   A.   No.  We just need to think more about them as I have done

14   here.

15   Q.   And I have highlighted the next sentence which was not

16   included in defense counsel's excerpt of your article.  Could

17   you read it out for the record?

18   A.   Sure.  "At the same time, there are large and potentially

19   durable welfare effects from failing to prevent mergers that

20   would reduce the incentive to innovate."

21   Q.   And what did you mean from this sentence?

22   A.   So I meant that just because an industry is evolving, just

23   because it's growing, there is continued innovation, that

24   doesn't mean that we need to sort of put our hands up and not

25   do antitrust.  The innovation is coming from the competition,

1    and, you know, it's not going to stop entirely.  Nobody is

2    saying that.  But that doesn't mean that if you take out

3    competition innovation isn't going to slow down relative to

4    what we would have seen.

5              And, your Honor, as I mentioned previously, this

6    article is actually about Google buying at a relatively early

7    stage another -- a more general advertising company, online

8    advertising company; and, as I mentioned, the FTC stopped its

9    investigation because at the very end, Apple declared that it

10   was going to enter.  But since then, Apple failed; and, in

11   general, while obviously this is still an industry that is

12   growing a lot, as we all know there are a lot of antitrust

13   concerns about Google and concerns that maybe this merger

14   should not have been allowed.

15             THE COURT:  Yesterday, Ms. Chung used a term, I don't

16   remember exactly, an explosive entrant into a market.  What

17   does that look like?

18             THE WITNESS:  Sorry, I don't remember.  Who said

19   that?

20             THE COURT:  Ms. Chung.

21             Did I misquote you?

22             MS. CHUNG:  I would love to be able to recall the

23   exact quote, but maybe I can guide the conversation in a way

24   that that would answer your, I think, underlying question which

25   I understand is that when you look at an entrant, like how do

1    you evaluate whether it's going to make a lasting and

2    meaningful impact on the competitive dynamic?  Was that where

3    your Honor was going with the question?

4              THE COURT:  Sure.  We can ask that.

5              MS. CHUNG:  Okay.  I will try my best to address the

6    Court's question in our conversation.

7    BY MS. CHUNG:

8    Q.  So Dr. Hatzitaskos, to answer that question, let me step

9    back.  Is there a standard economic framework in analyzing

10   whether an entrant or an expansion should be credited or how it

11   should be evaluated?

12   A.  Yes.  Yes.

13             So, your Honor, the merger guidelines they walk

14   through market definition, they walk through competitive

15   effects, and then they go through a series of what we typically

16   call mitigating factors, or potential mitigating factors and

17   one of them is the potential for entry.  So in my original

18   report, in section 5.1 and 5.2, I walk through the framework in

19   my analysis of the potential for entry to undo the competitive

20   harm that I have found.

21   Q.  And when you look at entrants, is there a standard, perhaps

22   in my own words from yesterday, of evaluating whether an

23   entrant is explosive enough or impactful enough?

24   A.  Yes, so in the guidelines we look at whether entry will be

25   timely, likely, and sufficient.  So it needs to be all three in

1   order to really undo the competitive harm.  So timely is easy

2   to understand.  You know, if it's going to take ten years, then

3   there is going to be harm in the interim, right?  Likely do we

4   think that we do expect them to succeed or is there a lot of

5   risk involved and so on and so forth.

6          So, for example, again, we spent a lot of my cross

7   with a chart of the competitive fringe in front of me, and a

8   lot of the members there, as I mentioned previously, have lost

9   revenue over the years or they are growing very, very slowly

10   relative to the big three, right, so there is no evidence -- I

11   think it's speculative to say that those are likely to become

12   as big as the big three or bigger.

13          And then they are sufficient.  So, again, this goes

14   back to the idea that we need to look at revenues and how

15   effective a competitor is.  Right?  There could be ten more

16   members of the competitive fringe that are sort of in that low,

17   like not really making much meaningful revenue relative to the

18   big three, and that isn't really going to do anything.  It's

19   not going to be sufficient to take us back to the premerger

20   levels of competition.

21          (Continued on next page)

22

23

24

25

1    Q.  And do you have an opinion in this case on whether entry or

2    expansion is going to be timely, likely, and sufficient to

3    counteract the anticipated anticompetitive effects from the

4    proposed merger?

5    A.  Yes.  I have looked as best I can at the question and my

6    conclusion is that it is highly unlikely.

7            MS. CHUNG:  At this point, your Honor, I would like to

8    request to seal the courtroom so we can discuss specific

9    examples.

10           THE COURT:  Very well.

11           Please leave the courtroom if you're not part of the

12   litigating teams.

13           (Pages 941-944 SEALED)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  FTC have another witness?

 2              MS. FLEURY:  We have spoken to defendants about

 3    calling one witness out of order.  I think we are not formally

 4    resting in that sense, but we are passing for the defendant's

 5    case.

 6              THE COURT:  Very well.

 7              Ms. Fiebig.

 8              MS. FIEBIG:  Thank you, your Honor.

 9              We are prepared to call our first witness.

10              Just before we do, we wanted to provide one update to

11    the Court, because you had previously asked about the

12    administrative proceeding that was scheduled to begin on

13    December 20.

14              Just yesterday the parties heard from the

15    administrative law judge that he does not intend to proceed

16    with the part 3 hearing until he receives a ruling from this

17    Court.  He invited the parties to file a motion for a

18    continuance, which he noted is routinely granted in these

19    circumstances.  Even without a continuance he indicated that he

20    will not hear any evidence until January 4, 2024.

21              We wanted to share that information with the Court

22    before we call our first witness, which we are prepared to do

23    now.

24              MS. FLEURY:  Your Honor, just to correct the record,

25    we will proceed with opening statements on December 20.  He
```

1    indicated that he would wait until after.  Given that it's

2    December 20, he would begin with evidence on January 4.

3         He did, after defendants communicated to him that they

4    would prefer to wait for the Court's ruling before beginning

5    that proceeding, the court in the administrative proceeding

6    said the parties could decide to collectively file a motion.

7    The FTC declined that request.  We will not be filing a motion,

8    and we will be proceeding with trial on December 20.

9         THE COURT:  Is IQVIA going to file a motion?

10        MS. FIEBIG:  We certainly will, your Honor, but our

11   understanding is that for the last decades of practice, the

12   parties have typically stipulated that the part 3 proceeding

13   would be stayed.

14        The judge specifically noted in his message to the

15   parties yesterday that the purpose of the continuance would be

16   to conserve the resources of the parties and nonparties and

17   promote efficient judicial administration.  I think, as we have

18   represented to the Court before, truly in the last 30 years

19   there has not been a part 3 merits proceeding that has happened

20   before the administrative law judge after there has been a

21   ruling on a preliminary injunction in a federal court like

22   this.

23        MS. FLEURY:  Your Honor, there is one happening

24   shortly.  There are historically -- there is right now a part 3

25   proceeding happening after a preliminary injunction ruling.

          1   And in this case we are happy to submit the
          2   documentation.  We are proceeding on December 20 with opening
          3   arguments.  I am 100 percent confident that we will proceed
          4   with the evidence in January, after the Christmas break.
          5          THE COURT:  This is all very interesting, but it
          6   doesn't sound like there is anything that I need to determine
          7   in that regard, so I will leave it to you and to the ALJ, whose
          8   name I do not know, and ask that IQVIA call its first witness.
          9          MS. FIEBIG:  Thank you, your Honor.
         10          As our first witness, we call Ms. Andrea Palmer.  She
         11   is the president of Publicis Health Media.
         12          MR. OBARO:  Good morning, your Honor.
         13          THE COURT:  Mr. Obaro?
         14          MR. OBARO:  Correct.  I'd like to introduce counsel
         15   for Publicis Health Media as well, Jeane Thomas, who is here
         16   from Crowell & Moring.
         17   ANDREA PALMER,
         18      called as a witness by the Defendants,
         19      having been duly sworn, testified as follows:
         20          THE COURT:  Mr. Obaro.
         21          MR. OBARO:  Thank you, your Honor.
         22          May we approach?
         23          THE COURT:  You may.
         24   DIRECT EXAMINATION
         25   BY MR. OBARO:

1   Q.  Good morning, Ms. Palmer.

2   A.  Good morning.

3   Q.  Thank you for joining us today.

4           Ms. Palmer, where are you currently employed?

5   A.  Publicis Health Media.

6   Q.  Is it OK if I refer to Publicis Health Media as PHM?

7   A.  Yes.

8   Q.  What kind of company is PHM?

9   A.  We are a media advertising agency.

10  Q.  What is your currently position at PHM?

11  A.  I'm the president.

12  Q.  How long have you been the president at PHM?

13  A.  Five years.

14  Q.  Can you briefly describe your responsibilities as the

15  president at PHM?

16  A.  I run the company, so I oversee all of the talent, client

17  relationships, key vendor relationships and negotiations,

18  oversee all operations.

19  Q.  In your role as the president, how knowledgeable are you

20  about the programmatic advertising services that PHM provides

21  to its clients?

22  A.  I am knowledgeable, but I am not a detailed technical

23  expert.

24  Q.  Do you recall that the FTC and IQVIA served you with a

25  subpoena, PHM with a subpoena in this litigation?

1   A.  I do.

2   Q.  You ultimately signed a declaration in response to the

3   subpoena in this litigation?

4   A.  I did.

5   Q.  How did you decide that you should be the one to submit the

6   declaration?

7   A.  It was simply a decision.  It was my words, my statements.

8   The declaration was to the extent of my knowledge versus

9   anything deeper, so it was most appropriate for me to be the

10  signatory.

11  Q.  Do you agree with everything that is contained in the

12  declaration?

13  A.  I do.

14  Q.  Can you please explain to the Court the services, the types

15  of services that PHM provides to its clients.

16  A.  Sure.  We -- predominantly we are responsible for the

17  strategy and working with our clients on how to best use

18  advertising and media across all channels to reach the target

19  audiences, both health care professionals and consumers, how to

20  use different types of tactics, both online and analogue, to

21  serve ads to reach the consumers, so that's the strategy.  Then

22  we are responsible for executing, and in the digital space, so

23  that we are executing the buys and managing the buys, and we

24  are responsible for stewarding the buys throughout the course

25  of the campaigns, analyzing, optimizing, post buying, making

1     sure everything ran as appropriate.

2              MR. OBARO:  Your Honor, the remainder of my testimony

3     is going to touch on subjects that the witness and the company

4     has indicated includes confidential information, so at this

5     time I would ask that the court be sealed.

6              THE COURT:  Very well.  If you are not a member of the

7     litigating teams, please exit the courtroom.

8              (Pages 951-982 SEALED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)

 2                    MS. FIEBIG:  That concludes the video, and IQVIA is

 3       ready to call its next witness.

 4                    THE COURT:  Very well.

 5                    MS. FIEBIG:  IQVIA calls Dr. Yael Hochberg.

 6                    THE COURT:  And can we reopen the courtroom?

 7                    MS. FIEBIG:  Yes, your Honor.

 8        YAEL HOCHBERG,

 9            called as a witness by the defendants,

10            having been duly sworn, testified as follows:

11                    THE COURT:  Mr. Tulumello.

12                    MR. TULUMELLO:  Thank you, your Honor.  Drew Tulumello

13       for IQVIA.

14       DIRECT EXAMINATION

15       BY MR. TULUMELLO:

16       Q.  Professor Hochberg, can you please summarize your

17       educational background.

18       A.  Yes.  I hold a bachelor's degree in industrial engineering

19       and management from the Technion-Israel Institute of

20       Technology, a master's degree in economics from Stanford

21       University, and a Ph.D. in business administration in financial

22       economics from the Stanford University Graduate School of

23       Business.

24       Q.  Who is your current employer?

25       A.  I am a professor at Rice University in Houston, Texas.
```

1   Q.  What is your job at Rice University?

2   A.  So I am the Ralph S. O'Connor professor in entrepreneurship

3   and professor of finance at the Jones Graduate School of

4   Business at Rice University.  I am also head of Rice's

5   Entrepreneurship Initiative and the Liu Idea Lab for Innovation

6   and Entrepreneurship at Rice.  I sit on the leadership council

7   of Rice's Biotech Launchpad, that's our cancer drug

8   accelerator.  And I am codirector of the Certificate in

9   Commercialization for Medical Innovation, which is our

10  healthcare innovation and entrepreneurship program, as well.

11  Q.  Have you or do you currently teach at any business

12  schools?

13  A.  I do.  So I teach at the Jones School at Rice.  I also

14  teach at the Kellogg School of Management at Northwestern

15  University.  I used to be a faculty member there on the tenured

16  track.  I was there for eight years.  And I continue to teach

17  for them in their Silicon Valley program in San Francisco.

18          I have also taught in the past at the Johnson School

19  of Management at Cornell University, where I was a faculty

20  member and at MIT Sloan School of Management, and the

21  University of Chicago's Booth School of Business.

22  Q.  Thank you.

23          How would you describe your scholarly area of

24  expertise?

25  A.  So for the last 25 years, I have been studying the

1    economics of innovation and entrepreneurship.  So I

2    effectively study new entry into markets and an understanding

3    of how companies enter, where there are opportunities for

4    companies to enter, which includes market dynamics, how they

5    are financed and how they compete in the market with

6    incumbents.

7    Q.  Have you published scholarly work in peer-reviewed

8    journals?

9    A.  Yes, quite a bit.

10   Q.  And can you describe some of that work?

11   A.  Sure.  So I publish in primarily in journals in financial

12   economics, but also journals in the innovation space, and the

13   work is primarily focused on, again, the economics of

14   entrepreneurship, so venture capital, private equity, the

15   patterns of entrepreneurship across the United States and

16   across markets.  Those would be some examples.

17   Q.  Okay.  And were you asked, through us, by IQVIA to offer

18   any opinions in this case?

19   A.  I was, yes.

20   Q.  And what were you asked to evaluate?

21   A.  I was asked to use my scholarly expertise in the area of

22   innovation and entrepreneurship to look at Dr. Hatzitaskos's

23   assessment of the market for HCP programmatic advertising as

24   being a stable market with stable revenues, that is, not

25   changing over time.

1          MR. TULUMELLO:  Your Honor, IQVIA would like to offer

2     Dr. Hochberg's opinion on this matter in the field of

3     economics, entrepreneurial innovation and strategy, and private

4     equity.

5          THE COURT:  Any objection?

6          MR. SOHN:  Your Honor, may we have a brief sidebar?

7          THE COURT:  Certainly.

8          (At the sidebar)

9          MR. SOHN:  So to be clear, we are not opposing

10    Dr. Hochberg testifying today in this matter, but we want to

11    make clear that we are objecting to her being proffered as an

12    expert into certain areas that her testimony may stray.  One

13    of those areas may be about how the competitive effects of

14    merger review should be analyzed.  She is not an expert on how

15    to analyze the competitive effects of a merger for antitrust

16    cases, and she has not been proffered in that sense.  So we

17    want to note our objection on the record.

18         THE COURT:  Someone either testifies as an expert or

19    not.  Are you proffering her as an expert in those areas that

20    you described?

21         MR. TULUMELLO:  No, I am not, no.

22         MS. FIEBIG:  In the areas he described he is

23    proffering her as an expert.

24         MR. TULUMELLO:  Yes.

25         THE COURT:  In the areas that you described.

1                MR. TULUMELLO:  Yes, your Honor.

2                THE COURT:  Okay.  And you understand -- I take it

3       there have been conversations between the parties --

4                MR. TULUMELLO:  Yes.

5                THE COURT:  -- concerning other areas in which she

6       will not --

7                MR. TULUMELLO:  Correct.

8                THE COURT:  -- be testifying as an expert?

9                MR. TULUMELLO:  Correct.

10               MS. FLEURY:  There haven't been any discussions

11      between us about what areas she was testifying at all, no.

12               THE COURT:  Well, is there agreement as we stand here

13      that Professor Hochberg will be testifying as an expert in

14      those three areas that you mentioned?

15               MR. TULUMELLO:  Yes.  She is not going to offer an

16      opinion in the areas that counsel for the FTC identified.

17               MR. SOHN:  And there is one other area we want to

18      discuss.  We also want to note our objection to the extent she

19      offers expert testimony on the HCP programmatic advertising

20      industry.  She has not been qualified as an expert there, and

21      we want to make clear that we would -- for the record that we

22      would object to any expert testimony on, you know, the

23      specifics of this industry and how it works.

24               THE COURT:  Is she --

25               MR. TULUMELLO:  She is not being offered in that area,

1   your Honor.

2          THE COURT:  Okay.

3          COUNSEL:  Thank you, your Honor.

4          (In open court)

5          MR. TULUMELLO:  Your Honor, at this time IQVIA would

6   like to offer the testimony of Professor Hochberg as an expert

7   in the areas of private equity, entrepreneurial strategy, and

8   economics.

9          THE COURT:  Very well.  She will be allowed to testify

10   as an expert in the areas of economics, entrepreneurial

11   innovation, and private equity.

12          Mr. Tulumello.

13          MR. TULUMELLO:  Thank you, your Honor.

14   BY MR. TULUMELLO:

15   Q.  Can you remind the Court what your assignment was in this

16   case?

17   A.  Yes, absolutely.

18          So I was asked to evaluate Dr. Hatzitaskos's

19   assessment of the competitive dynamics in this market and his

20   conclusion that this is a stable industry over time that is not

21   changing.

22   Q.  Okay.  And I believe earlier this morning Dr. Hatzitaskos

23   testified that the competitive dynamics in the market are

24   stable.  Do you recall that?

25   A.  I do.

1    Q.  And do you agree with that conclusion?

2    A.  I do not.

3    Q.  Can you explain what you look at from -- or how you

4    evaluate the state of competitive dynamics in a market?

5    A.  Sure.

6         So one of the important things in understanding

7    whether a market is stable in its competitive dynamics, is

8    stable over time, is whether it is undergoing significant

9    change and whether it has forces at work in it that change how

10   people are going to -- how entities are going to compete.

11        So we look in economics and strategy at indicia that

12   indicate evolution and types of evolution in market.  That

13   includes things like pressures from regulatory change, it

14   includes technological changes, and it includes whether there

15   is a presence of changing customer needs or tastes in the

16   market.

17        So those are three big indicia that, when present,

18   suggest that a market is going to be rapidly evolving.

19   Q.  Okay.  And when you see those types of indicators of a

20   rapidly evolving market, what else do you need to evaluate to

21   determine whether the competitive dynamics in the market are

22   stable or not?

23   A.  So we look at things like entry into the market by new

24   players or by players from adjacent areas.  We look at how

25   people are competing, so business model experimentation,

1   experimentation with different combinations of technology,

2   different types of partnerships.  And we look at things like

3   whether funding is flowing to this market and whether

4   investors view it as a good investment opportunity.

5   Q.   Okay.  So why don't we -- you have reached some

6   conclusions about whether there are different business

7   strategies or experimental business strategies in this market,

8   correct?

9   A.   Correct.

10  Q.   Let's go to some of them.  We have a demonstrative that

11  calls them out.

12          You identified four, correct?

13  A.   Yes.  So recall that the indicia that I mentioned are

14  things like regulatory pressures, technological change, and

15  changing customer needs, all three of which are present in this

16  market.  There are pressures from privacy, there are changing

17  technologies in the market, and there are changing needs on the

18  parts of customers who are increasingly interested in

19  optimizing across multichannels and are looking for omni

20  channel-type solutions.

21          All of these things have some interaction with them,

22  but as we look at what corollary from that, which is things

23  like entry and experimentation, we see, four basic groups of

24  experimentation that I have put on this demonstrative in front

25  of us.

Q.  And the first one we have had a decent amount of testimony
about.  That's generalist DSPs' increasing interest in
healthcare.  Can you briefly explain that.

A.  Yes.  So the DSP software itself, the act of the
data-driven, software-driven delivery of ads to a specific
targeted individual or cohort, that's sort of -- I think
someone in the record called that uninteresting and
undifferentiated.  It is the same software whether you are
doing healthcare, whether you are doing real estate, whether
you are doing consumer packaged goods.  And there are very
large companies out there in the ad tech industry that are DSPs
that serve multiple industry verticals, such as, The Trade
Desk, Viant, Google, Yahoo!, and so forth.  And in the last
recent past, these generalist DSPs—some selection of
them—have looked at the HCP programmatic and the healthcare
programmatic advertising industry in general and seen
opportunity for entry into that market and in some cases, such
as The Trade Desk, not just opportunity for entry, but risk to
their existing revenue if they did not enter into the market.
So The Trade Desk has turned to offering HCP programmatic,
AdTheorent recently branded an AdTheorent Health with an eye
towards this market, Viant is active in this market, and so
forth.

Q.  Let's go to the second business strategy that you have
observed, and this would be publishers integrating with ad

1   tech.  Can you please explain what that means.

2   A.  Yes.  So as part of this. business model experimentation,

3   it's not just that generalists are turning to specialty

4   verticals, but also that across the value chain of digital

5   advertising, you know, from the advertisers on one end to the

6   publishers, we are getting -- we are getting vertical

7   integration of different components of the value chain.  One of

8   those is that publishers themselves——the people with the ad

9   inventory that is being sold——are integrating ad tech into

10  their technology stack and into their offerings so as to have

11  the ability to integrate the data from their publishing

12  inventory with various parts of the service of programmatic

13  advertising.

14           So a great example of this, which we have heard

15  plenty about over the last week and a half, is PulsePoint.

16  PulsePoint was purchased by Medscape.  It's part of Internet

17  Brands, owns WebMD as well.  So these are big, endemic

18  publishers with first-party data.  As part of Internet Brands,

19  PulsePoint not only has access to that endemic inventory and

20  the data that comes from that, but also access to one of the

21  two big ad exchanges and the data that comes off of that and,

22  as a result, is able to offer a larger portion of the stack

23  than a standalone three-in-one.

24  Q.  What about Haymarket and Haylo?

25  A.  So Haymarket is another big publisher with a large

1    inventory of websites that HCPs use, and in this particular

2    case they launched a product called Haylo, which it's not quite

3    a DSP.  It effectively skips the DSP and goes straight to the

4    supply-side platform, to the SSP, to effectively offer

5    programmatic on their inventory so, again, integrating part of

6    the stack into what they are doing and, again, differentiating

7    from just having the component by itself.

8    Q.  Okay.  And then if we go back to the third business

9    strategy that you have observed, it's ad agencies integrating

10   with the tech stack and the formation of partnerships.  Do you

11   see that?

12   A.  I do.

13   Q.  Can you explain what you mean by ad agencies integrating

14   with the tech stack first?

15   A.  Yes.  So a great example of this is what's been happening

16   with Real Chemistry.  So if we were -- on the previous slide,

17   we were, you know, over here with the ad inventory from the

18   publishers.  Now we are over here with the advertisers, the

19   pharmaceutical companies and the agencies that represent them.

20   And those agencies are integrating parts of the programmatic

21   value chain into their stack so that, in part, they get to keep

22   more margin, but also so that they have better offerings for

23   their clients.

24        Real Chemistry bought Swoop and recently acquired

25   TI Health.  TI Health is one of the healthcare DSPs, although

1    actually a white-labeler of Xandr.  Swoop provides audience

2    data and other data.  And they are -- it's sort of taking a

3    look at this as an opportunity to integrate these aspects

4    directly into their offerings instead of then going out and

5    contracting with a third-party.

6    Q.  Okay.  And what about the formation of partnerships?

7    A.  Yeah.  So partnerships are another way that ad agencies are

8    getting into this consolidation of the tech stack.  So the

9    second example you see here on the slide is Ogilvy.  That's

10   another ad agency.  I believe they belong to William Morris.

11   Maybe they call themselves WM now.  But they have partnered

12   with Doceree.

13          And Doceree is another really interesting DSP entrant

14   here, relatively new entrant, that offers programmatic that's

15   delivered at the point of care.  So on electronic health

16   records, as the doctor is entering information into Epic while

17   you are in the office, you might have, you know, John, who is

18   overweight and prediabetic, and the doctor will then see ads

19   for Wegovy or Ozempic, and the partnership with Ogilvy takes

20   that to another point of care, which is telehealth and

21   basically delivers programmatic on telehealth, virtual doctor,

22   video doctor appointments.

23   Q.  Can we pull up the press release of the Doceree and Ogilvy

24   strategic partnership which is demonstrative slide 23.  This is

25   dated June 30, 2021, and it announces in the first line that

1   Doceree, the first global network of physician-only platforms

2   for programmatic marketing announced today the company has

3   entered a strategic partnership with Ogilvy Health to enhance

4   the point of care campaign offerings available to Ogilvy

5   Health's clients.  Do you see that?

6   A.   I do.

7   Q.   And that's what you are referring to.

8   A.   Correct.

9   Q.   Okay.  Let's step back again and look at the business

10  strategies you see in the market.

11          THE COURT:  Could I ask what is a tech stack?

12          THE WITNESS:  So think about this as all of the

13  components of the technology that are involved in the delivery

14  of the ad, from the creative that comes from the agency all

15  the way to the actual digital advertising inventory.  So, you

16  know, we have to -- there is tech that's involved in creating

17  the audiences, right, all of this is data manipulation and data

18  science.  There is tech that's involved in identifying the

19  appropriate audience for us to deliver our ad to and then

20  taking that to someone who is an identity provider who maps

21  that to these digital IDs that track us all and then sends

22  that to the DSP who is the demand-side platform that

23  effectively activates that campaign and bids on inventory.  And

24  then that effect bidding is actually on an ad exchange that

25  sits in the middle, and then the inventory itself is coming to

1    the ad exchange from a supply-side platform, SSP, and then

2    surrounding that there are data management platforms that offer

3    some of the data on, say, the NPIs that offer data for the

4    measurement both in campaign and post campaign.  And then, you

5    know, past the SSPs, we get into ad networks that are

6    aggregating up all of the inventory from a lot of smaller

7    websites, and then the publishers.  It's kind of a simplified

8    version of it.

9            But each piece of this has some technology.  Some of

10   it is offered individually as components by companies, but in

11   many cases——and this is true in software in general——there is a

12   tendency now to try and integrate parts of that stack so that

13   you can offer what we would call full-stack solution.  It's

14   maybe a fancier way to say integrating -- vertically

15   integrating the technology portion of the value chain.

16           THE COURT:  Got it.  Thank you.

17   BY MR. TULUMELLO:

18   Q.  The last example that you identify is increasing

19   accessibility?

20   A.  Yes.

21   Q.  Can you please explain to the Court what that means.

22   A.  Yeah.  So a lot of the elements that were major sources of

23   differentiation in this market when it first started out have

24   become less meaningful in recent years because there is

25   increasing access to a lot of the underlying components.  So,

1   for example, you know, Lasso itself when it started out didn't

2   build DSP software.  It white labels Xandr software.  So the

3   customer sees a Lasso-branded DSP but the actual programmatic

4   is happening on Xandr in the background.  Lasso is renting a

5   seat effectively.  And there are others who do this, like

6   TI Health and E Healthcare Solutions.  But you can go get a

7   self-service seat on one of these generalist DSPs and use that

8   to reach the publishing inventory that you wish to reach.  So

9   that is one aspect of it.

10          But then many of these other components that used to

11  be differentiators, the ability to identify those HCPs and

12  target them and build the audiences that you wanted, those have

13  now become available for purchase.  There's been investment in

14  companies that are providing those services.  They are easier

15  to access.  Measurement data has become easier to access from

16  multiple sources.  And then the ability to connect between

17  those national provider identifiers, those NPIs that identify

18  the healthcare providers and these general identifiers that

19  track us all over the web, those are the identity graphs, those

20  have become more available.  So companies like LiveRamp and

21  Throtle that have general identification systems are

22  connecting -- are now connecting to NPIs to allow you to reach

23  healthcare audiences.  And this means that generalists can

24  access this data——the audience data, identity data, measurement

25  data——in the same way that in sort of a DeepIntent with its

three-in-one solution did, you know, early on and does today,

and it also enables new entrants to easily access components

they don't want to build themselves.

Q.  Thank you.

Stepping back, you have identified as one measure of

competitive dynamics experimental or different business

strategies.  Did you identify or look at any other factors to

assess the competitive dynamics in the market?

A.  Yes.  So I mentioned two——entry and then investment capital

that's flowing into the industry.

Q.  Why don't we turn to investment first.

You have studied the private equity and venture

capital flowing into the industry, is that right?

A.  Yes.

Q.  Can you tell me what work you have done?

A.  So, first of all, I did not just look at the private

equity that was flowing into this, but also looking at the

public markets' investment in some of these companies.

But what you see here is data from Pitchbook that is

nicely laid out for us on a timeline that shows investment by

private equity firms, venture capitalists, and private equity

funds into many of the participants in various parts of the

value chain.

Q.  All right.  Let's just look at a couple of examples.  First

Doceree.

1              Now, can you explain what this slide is showing?

2    A.   Yeah.  So as I mentioned, Doceree is a healthcare-specific

3    DSP that has entered in a different way than some of the

4    existing competitors in the space.  They are not a generalist,

5    but they are also not targeting the same kind of inventory.

6    They are going straight to point of care.  And this is

7    basically -- this is showing their funding over the last two

8    years or so, their series A funding, which is sort of the

9    initial round of funding in the company, and then very recently

10   their series B funding, which was $35 million of investment

11   from, you know, some well-known venture capitalists like Eight

12   Roads, which is Fidelity's corporate venture capital arm and

13   F-Prime, which is a well-known venture capitalist in Boston.

14   Q.   And what conclusions do you draw from the investment by

15   private equity firms in a company like Doceree?

16   A.   So what it says is that private equity firms are seeing an

17   opportunity in this market.  They are seeing an opportunity

18   for new entrants to compete in new ways with new technologies

19   and new approaches with an opportunity to potentially be very

20   successful.

21              So an investor in a series A will often look for a

22   10X return on their investment and a series B maybe for a 7-8X

23   return, so looking to turn that 35 million into $250 million

24   when they eventually exit.  So they look at opportunities that

25   have large upside, and this is an indication the money flowing

1    in is an indication that there is interest and people believe

2    you can compete successfully in this market.

3            If the market had three players, three players alone,

4    and that was who was going to dominate the market going

5    forward, you wouldn't see investors continuing, not just back

6    in 2022, but even now in 2023, investing large amounts of money

7    in competitors -- in competing in this marketplace.

8            (Continue on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  We don't just see private equity and venture funds flowing

2    into the DSP part of the market.  We also see it on the data

3    side, correct?

4    A.  Correct.

5    Q.  Let's look at Komodo Health.  Again, this is all public

6    information from PitchBook, correct?

7    A.  It's commercially available information from PitchBook,

8    publicly available via press releases.

9    Q.  Let me discuss just ask you a few foundational questions.

10   Why does a capital venture firm put out news or make public

11   whatever company it is investing in?

12   A.  It's not just the venture capitalists to do this.  It's the

13   companies that receive investment who want to show that they

14   have the backing of a very well-known and marquee firm, like

15   Andreessen Horowitz or Tiger Global.  But the venture

16   capitalists advertise their portfolios as well because they

17   believe they have identified great opportunities, and they want

18   to indicate that they believe there is opportunity here, and

19   they have an interest in having other entrepreneurs know what

20   kinds of companies and what kind of spaces they are interested

21   in investing in.

22   Q.  Both the private equity fund and the company itself have an

23   interest in promoting and publicizing the investment?

24   A.  Typically, yes.

25   Q.  You talked a little bit about some of these firms.  But can

1  you just add a few -- a little bit of color about Andreessen

2  Horowitz and Tiger Global?

3  A.  Tiger Global is one of the big later-stage investors in

4  some of the big tech company names that you have heard plenty

5  about, like Meta and others.  Andreessen is one of the biggest

6  Silicon Valley venture capitalists out there, certainly one of

7  the most well known, if not the most well known.  You can --

8  you often hear it referred to as A16z.  But these are marquee

9  firms that invest in some of the major tech successes that we

10 have seen in the last decade, two decades.

11 Q.  The fact that you see more than $400 million pouring into

12 Komodo since 2021, what conclusions do you draw about that?

13 A.  It says that someone sees a great future in selling

14 measurement data into the advertising tech industry.

15 Q.  Now, did you also look at acquisitions in the market?

16 A.  I did.

17 Q.  Maybe we can put up the demonstrative on that.

18      Why did you look at acquisitions in the market?

19 A.  I think this is just one more data point in the many data

20 points of how much this industry is changing, how much

21 adjustment is happening in this industry, which, to begin with,

22 was a fairly nascent industry, and where everyone is still

23 experimenting to figure out what the winning model is.  And

24 acquisitions are part of that.

25 Q.  You've listed Microsoft and Xandr here.

1           When did Microsoft acquire Xandr?

2   A.  In 2022.

3   Q.  What was the public price of that acquisition?

4   A.  I believe it was over $1 billion.

5   Q.  You have also listed:  Optimize RX here.

6           What are you referring to?

7   A.  So Optimize RX is an ad tech company.  They very much focus

8   themselves on the idea of providing AI powered services, so

9   really integrating some of the major advancements we have seen

10  in artificial intelligence to build better models for targeting

11  of physicians, and they have recently acquired Medicx's Health,

12  which is a health care DSP.

13  Q.  Did you also analyze the amount of cash on hand that some

14  participants in the market have?

15  A.  Yes, I did.

16          MR. TULUMELLO:  Can we please put up that slide.

17  Q.  This would be a reflection of the cash on hand that the

18  companies across the bottom have, is that correct?

19  A.  That is correct.

20  Q.  This is in millions of dollars, correct?

21  A.  Correct.

22  Q.  Why did you analyze cash on hand for these participants in

23  the market?

24  A.  One of the things that you want to understand is what kinds

25  of resources are available for these entrants to be able to

1  invest in competing in this vertical that they have chosen to

2  express interest in, what is going to be their ability to

3  innovate to become competitive in these areas and what is the

4  ability of companies like DeepIntent or Medicx Health, who

5  focus only on health care, to compete and innovate in the face

6  of big entrants like The Trade Desk or Viant or AdTheorent.

7  Q.  For the Trade Desk this information is publicly available,

8  correct?

9  A.  Yes.  For I believe most of these, these are companies with

10 publicly traded parents where you can get this information as

11 reported to the SEC.

12 Q.  On the Trade Desk, if we can look at their growth, please.

13 Did you look at that?

14 A.  Yes.

15 Q.  Does this slide reflect your analysis of the revenues of

16 the Trade Desk since 2015?

17 A.  Yes.  This reflects the growth in the Trade Desk's revenues

18 since 2015.

19 Q.  So pulling back out, we have talked about the innovative

20 business strategies, we have talked private equity and venture

21 funding.  We have talked about recent acquisitions and we have

22 looked at cash on hand.  Your report said that in order to

23 understand whether the competitive dynamics in the market were

24 stable, it's important to look at all of these things, correct?

25 A.  Correct.

1  Q.  And did Dr. Hatzitaskos analyze whether industry

2  participants are receiving private equity funding?

3  A.  Not to my knowledge.

4  Q.  Did Dr. Hatzitaskos analyze recent acquisitions in the

5  industry?

6  A.  Not to my knowledge.

7  Q.  Did Dr. Hatzitaskos analyze the implications of publishers

8  integrating ad tech in their stack?

9  A.  No.

10 Q.  Did Dr. Hatzitaskos analyze whether advertising agencies

11 are integrating with the tech stack?

12 A.  No.

13 Q.  Did Dr. Hatzitaskos analyze whether there are trends

14 towards increasing accessibility in the marketplace?

15 A.  No.  Excuse me.  Sorry.  No.

16 Q.  I know you predicted what I was going --

17 A.  I thought you had finished.  I apologize.

18 Q.  Now, I am going to pass you over, but I want to ask you a

19 few questions to clarify for the Court what you are and aren't

20 doing.

21          You are not saying today that -- which business

22 strategy is going to be the most successful, are you?

23 A.  No, I am not.

24 Q.  You are not saying which of the competitive set is going to

25 be the market leader, correct?

1   A.  No, I am not.

2   Q.  And you have not done a detailed analysis of all the

3   various capabilities and functionalities that the market

4   participants we talked about just went through?

5   A.  No, I have not.  It's not necessary in order to be able to

6   assess that this market is not stable.

7   Q.  You have not looked at revenues or analyzed revenues for --

8   around the various industry participants we have talked about,

9   right?

10  A.  No, I haven't looked at revenues or market shares.  It

11  wasn't necessary in order for me to reach my conclusions

12  regarding Dr. Hatzitaskos' assessment of this industry as a

13  stable industry.

14  Q.  Can you just explain why it wasn't necessary.

15  A.  Yeah.  So I think if you move to the -- I believe -- there

16  was a slide that you showed with all of the various different

17  pieces of what we were talking about a little earlier.

18          That's the one.  Thank you.

19          There is so much happening in this industry.  We don't

20  need to look at market shares, and I don't think that they

21  would be informative, given the forces that are at play in the

22  market.  We see so much happening here.  There is so much new

23  entry.  There is new entry from its agencies, from the

24  generalists.  There is a new entry of new health care focused

25  DSPs.  There is all kind of consolidation happening, be it

1  through acquisition or partnership.  There is vertical

2  integration.  How this is going to look in two years is

3  anyone's guess.  There is so much happening.  And we can see

4  that without having to look at the market shares.  And a

5  snapshot of market shares is not going to be informative in any

6  event, particularly not when the market is evolving like this.

7  Q.  When we first met and you said your expertise was in

8  entrepreneurship, I said, well, what exactly is that?  You

9  laughed, as you did now.  You're the head of the Rice

10  entrepreneurship initiative, and you teach entrepreneurship at

11  Rice and these business schools.  Can you tell me, what is

12  entrepreneurship?

13  A.  Entrepreneurship is the entry of new firms into the market.

14  Big part of antitrust, obviously.  But from a teaching of

15  entrepreneurship and the study of entrepreneurship, it's

16  understanding how now entrants can be successful, where are

17  opportunities for them, what are the market dynamics that offer

18  opportunities for new entrants.

19       We have frameworks that we have developed that allow

20  us to look across industries and help students, would-be

21  entrepreneurs, alumni, our faculty assess whether there are

22  opportunities for profit and entry and ways to compete with

23  incumbent and find the places where incumbents may have less

24  advantage and identify precisely the kinds of forces that we

25  have been talking about today and look at those as

1   opportunities for entry into markets and a place where

2   incumbents often don't have advantages over the entrants.

3   Q.   You have taught many business school students who are

4   interested in doing startups, is that right?

5   A.   That's all I do.

6   Q.   And these are the tools that you use to help teach those

7   students about how to evaluate innovation and entry into

8   markets?

9   A.   Yes.   These are the frameworks and the approaches that I

10  use and teach in my classes every year, and not just me.

11  Q.   Last question.   I understand you won a medal and that your

12  initiative institute has won a prize.   Could you please explain

13  those.

14  A.   Sure.   So I was the 2016 recipient of the Ewing Marion

15  Kauffman Medal for Distinguished Research in Entrepreneurship.

16  This is one of those medals they give to somebody who is about

17  to turn 40 who has had, I guess, significant influence on the

18  field, they tell me, but it is the equivalent of the Fields

19  Medal in mathematics, the Clark Medal in economics, the Fischer

20  Black Medal in finance.

21        It's a nice recognition of how the rest of the field

22  feels about my contributions to the bases and frameworks that

23  we use to think about entrepreneurship every day.   The program

24  I'm much more proud of.   We have been ranked for five years

25  running as the number one graduate program in the United States

1   by Princeton Review and entrepreneur magazine, and we are

2   ranked in the top five or ten by pretty much every other

3   entrepreneurship ranking out there, and that's been my life's

4   work for the past ten years, so I'm very proud of it.

5   Q.   Thank you, Professor Hochberg.   No further questions.

6          THE COURT:   Can I ask a question.   You testified about

7   a particular generalist DSP that was looking to get into HCP

8   programmatic advertising that has a substantial war chest, a

9   lot of money on hand.   There has actually been testimony

10   yesterday and today concerning the difficulties that that

11   particular entity has had in developing its HCP programmatic

12   advertising capabilities.   I know that the industry itself is

13   not part of your expertise, but how do you analyze, in

14   determining whether there is a dynamic, evolving market, there

15   may be players that are so far ahead in terms of technology and

16   innovation that they have to be considered separately?

17          THE WITNESS:   Yeah.   That's a fair question.   I

18   think -- I don't want to answer that question in general, and I

19   also want to be clear that this was not an opinion I offered in

20   my report.   I think you realized that.

21          THE COURT:   Yes.

22          THE WITNESS:   But I think when we consider this

23   industry and we consider the components that go into it, the

24   DSP software itself is not necessarily distinguishing.   The

25   other components, yes, you have to figure out how to integrate

1  them.  But if you have considerable resources behind you and

2  enough incentive to do so, a big company, like the one I

3  believe we all know who you're alluding to, has the ability or

4  the resources behind it to invest in making that progress.

5         And if you look at The Trade Desk and how it's grown

6  over time, I think that's indicative of the fact that they have

7  figured out how to create good products in the areas that they

8  have competed, and that -- the substantial resources they have

9  behind them gives them a shot.

10        I can't predict with any certainty that they

11 necessarily will overcome anything, but there is enough change

12 happening here in the market and enough accessibility in terms

13 of being able to access the audience data and the identifiers

14 and so much change that's happening because of privacy

15 considerations and the technology -- I mean, we didn't really

16 talking about AI here, but just everything that's going to

17 change because of what AI enables you to do in terms of

18 producing computer code on the fly and analyzing data,

19 collecting data, merging data to get that consistency,

20 optimization.  All that is going to have massive exchange as

21 well, and that's all going to require companies to have war

22 chests to invest.

23        If somebody has that war chest on hand, that gives

24 them a good fighting chance in this world that is really

25 changing so much.  This is an industry where Lasso entered and

1    became what it was in three years.  They didn't exist in it --

2    I believe they incorporated in December of 2019, and look where

3    they are today.  As technology changes here, I think anything

4    goes.

5             THE COURT:  Thank you.

6             MR. TULUMELLO:  Thank you.

7             THE COURT:  Cross-examination.

8    CROSS-EXAMINATION

9    BY MR. SOHN:

10   Q.  Dr. Hochberg, you have been proffered as an expert only in

11   entrepreneurship, innovation, and private equity, is that

12   correct?

13   A.  I believe it said entrepreneurial strategy and economics on

14   there as well, but I refer to the court reporter as to what it

15   was.

16   Q.  You are not an expert on analyzing how mergers affect

17   competition, is that correct?

18   A.  I study entry into markets and now entrants compete with

19   incumbents.  I would say that I have expertise on that.  So --

20   in that sense I think my expertise is extremely relevant to it.

21   Nobody has preferred me as an expert on mergers specifically,

22   but mergers are part of what happens in the competitive

23   dynamics in companies, and mergers are the primary way that

24   startups exit in markets.

25   Q.  You are not an expert on HCP programmatic advertising,

1  correct?

2  A.   No.   I would not say I'm an expert on HCP programmatic

3  advertising any more than I'm an expert on any particular one

4  of the industries that I advise startups and students on

5  through the lens of my expertise every day.

6  Q.   When you testified earlier about various subjects, like DSP

7  software and HCP targeting and measurement data, that's not

8  based on any professional experience you have working in HCP

9  programmatic advertising, correct?

10  A.   Correct, it is not.

11  Q.   You reviewed Dr. Hatzitaskos' expert report as part of your

12  work on this matter, correct?

13  A.   I did.

14  Q.   Would you please turn to the first slide in the tab in your

15  binder labeled demo.   This is a demonstrative with the heading

16  post merger 2022-first half 2023 gross revenues in relevant

17  antitrust market.

18            Let me know when you are there.

19            THE COURT:   I'm sorry.   What binder are we looking at?

20            MR. SOHN:   This is the binder of the FTC's exhibits.

21            THE COURT:   The FTC's exhibits?

22            MR. SOHN:   Yes.   It is the white binder.

23            THE COURT:   The one that says demo.

24            MR. SOHN:   Yes, the tab that says demo.

25            THE COURT:   That's the last one.

1          THE WITNESS:  Thank you.

2    A.  OK.

3          MR. SOHN:  Because of confidential revenue information

4    on this, we request that this not be displayed on the screen in

5    the audience.

6    Q.  You recognize this chart from Dr. Hatzitaskos' initial

7    report, right?

8    A.  I do.

9    Q.  And this chart shows his market-share calculations in HCP

10   programmatic advertising, is that correct?

11   A.  Yes.

12   Q.  And those market shares are based on his analysis of the

13   HCP programmatic advertising revenues of the companies listed

14   here, is that right?

15   A.  That is my understanding, yes.

16   Q.  You're aware that the FTC's expert calculated that IQVIA

17   and DeepIntent have a combined market share of 46 percent?

18   A.  Based on a snapshot of six quarters of revenue from 2022,

19   2023, without accounting for any of the changes that I was

20   talking about in the market, yes.

21   Q.  You never attempted to define a relevant antitrust market

22   as part of your work on this case, is that correct?

23   A.  I was not asked to opine on the market definition, no.

24   Q.  So you are not offering any opinion on the proper market

25   definition?

1    A.  I am not.

2    Q.  And you have no opinion on whether Dr. Hatzitaskos' market

3    definition is right or wrong, is that correct?

4    A.  I am not offering any opinion on the market definition.

5    Q.  You also didn't calculate any market shares as part of your

6    work on this matter, is that correct?

7    A.  No.  It was not necessary in order to reach my conclusions

8    regarding the lack of stability in this math.

9    Q.  Your view is that market shares aren't informative in an

10   antitrust case such as this one, is that correct?

11   A.  My viewpoint is that in a market that is experiencing this

12   much change and this much evolution, the market shares are not

13   informative for a forward-looking exercise of the sort that Dr.

14   Hatzitaskos says he's doing.  Certainly a snapshot of market

15   shares, just based on the last year or so, is not going to

16   necessarily tell us a lot about what the forward competitive

17   dynamics will be in a market that's characterized by this much

18   change.

19   Q.  Would you turn to the next slide, please.  It has the

20   heading:  Speculation that the competitive fringe will grow is

21   inconsistent with the data.

22           Do you see that?

23   A.  I do.

24   Q.  This chart is from Dr. Hatzitaskos' reply before, is that

25   correct?

1   A.  Yes, it is.

2   Q.  And this chart shows his market share calculations using

3   revenue data from both 2022 and the first half of 2023 shown

4   separately, is that correct?

5   A.  Yes.  He splits the six quarters that were on the previous

6   slide into four and two.

7   Q.  Is it fair to say that according to this chart no company

8   had significant market share growth between 2022 and the first

9   half of 2023?

10  A.  As a snapshot the chart says what it says.

11  Q.  Your view is that these changes in market shares aren't

12  informative in this particular antitrust case, is that correct?

13  A.  In a situation where you have a rapidly evolving market

14  like this, market that is not stable, we can do these

15  exercises.  They are standard in antitrust.  But they are not

16  going to give us a reliable picture of what is likely to be

17  happening going forward if what we want to do is really get a

18  sense of what competition is going to look like in this market

19  after a merger.

20          If we did this same snapshot for 2019, we did the

21  snapshot that Dr. Hatzitaskos did on the previous slide, Lasso

22  wouldn't be there.  If we did it in 2020, they'd have 6.7

23  million of revenue and AdTheorent and Proclivity -- I think

24  there was one more on the previous slide -- already had more

25  revenue than that in 2022, first half of 2023.

1    The snapshot obscures trends and the snapshot doesn't

2    capture the effect of forces that are at play in the market.

3    If we had looked at shares in the media market as the Internet

4    was launching, if we had ignored the fact that the Internet was

5    launching, we would probably come to incorrect conclusions

6    about the future of the media industry was going to be.  If we

7    looked at the taxi industry right before Uber launched, right

8    before we got -- right as we got mobile handhelds with GPS on

9    them, and we ignored the fact that technological change was

10   coming, we would have an incorrect snapshot of what the

11   competition in that market was going to look like.

12   My point is that we have to account for the fact that

13   there is this much change happening in the market, and Dr.

14   Hatzitaskos does not account for that in any way in these

15   analyses.  This is just a snapshot of six quarters of revenue.

16   And in a market with this much change, I don't believe that

17   this is going to help us understand what the going-forward

18   competitive dynamics are.  The merger guidelines tell us to

19   think about ongoing and reasonably foreseeable change and how

20   that might affect the reliability of the market shares.  My

21   point is, simply, there is change happening here.  Dr.

22   Hatzitaskos does not account for it.

23   Q.  Please flip to the next slide.  It has the heading:  Four

24   out of five customers who engaged with but did not choose

25   DeepIntent; instead, chose Lasso or PulsePoint.

1       Do you see that?

2  A.  I do.

3  Q.  And this chart is used in both his initial report and his

4  reply report, is that correct?

5  A.  I believe so, yes.

6  Q.  It's based on analysis of win/loss data and other data

7  showing actual customer choices, is that correct?

8  A.  For five customers, yes.

9  Q.  You didn't analyze win/loss data as part of your work on

10  this matter, correct?

11  A.  No.  Again, my assignment was to assess whether this market

12  was, as Dr. Hatzitaskos said, stable.  It was not to do a

13  win/loss analysis and it's not necessary for my conclusions.

14  Q.  Sir, your view is that win/loss data isn't informative in

15  this particular antitrust case, is that correct?

16  A.  I didn't say that.

17  Q.  You didn't analyze any other data showing actual customer

18  choices for HCP programmatic advertising, is that correct?

19  A.  No.  It wasn't necessary in order for me to reach the

20  conclusions for the assignment I was given.

21  Q.  Please flip to the next slide.  It's about the

22  ordinary-course documents from DeepIntent and Lasso.

23       Do you see that?

24  A.  I do.

25  Q.  This slide summarizes Dr. Hatzitaskos' conclusions about

1    the defendant's ordinary-course documents, correct?

2    A.   I believe so.

3    Q.   You would agree that one of the main subjects of this

4    hearing in court is how IQVIA's proposed acquisition of

5    DeepIntent will affect competition, right?

6    A.   Yes.

7    Q.   And we have just discussed the FTC's analysis of market

8    shares, market share changes over time, win/loss data, and the

9    defendant's ordinary-course documents, right?

10   A.   Yes.

11   Q.   Is it your opinion that none of this evidence is

12   informative to the question of how this acquisition would

13   affect competition?

14   A.   It is my opinion that Dr. Hatzitaskos, in doing this

15   analysis, did not account for the fact that there is

16   considerable change in this market and that his conclusion that

17   this market is stable and that, therefore, the market share

18   analysis is going to be informative of future competitive

19   dynamics is, in my opinion, incorrect.  It's not -- and that

20   analysis is unlikely to be informative because there is so much

21   change happening.

22   Q.   So it sounds like you are saying that that type of analysis

23   is not informative based on the specific characteristics of

24   this particular market, is that right?

25   A.   I was asked to opine regarding this market.  That is what

1    I'm opining on, yes.

2    Q.   You have never been employed by a company that does any

3    form of programmatic advertising, right?

4    A.   Not that I'm aware of, no.

5    Q.   You have never --

6    A.   Although, to be honest, I don't know that Rice University

7    doesn't do programmatic advertising.  I get served banner ads

8    for my own MBA program all the time, and for that matter for

9    most of the universities I've been employed at.  I apologize.

10   In my deposition I said no, but maybe the answer to that

11   question is yes.

12   Q.   With the exception of universities that advertise --

13   A.   Those are who my employers primarily have been other than

14   the time when I worked at Oracle.  But that predated the

15   existence of programmatic advertising, so I'm pretty sure they

16   weren't doing it then.

17   Q.   You have never published any articles about programmatic

18   advertising, correct?

19   A.   Correct.  As I have said, I am not an industry expert in

20   programmatic advertising.  I am an economist who looks at

21   industries, a variety of industries, through the lens of

22   frameworks that we develop, not for any one specific industry,

23   but for the purpose of being able to apply them to any

24   industry.

25   Q.   One of the reasons you claim that HCP programmatic

1   advertising is rapidly evolving is due to evolving regulations,

2   is that right?

3   A.  It's due to the pressure that is coming from the debates

4   around privacy regulation and privacy regulation that has been

5   happening, and that is overall affecting how the advertising

6   industry is innovating and responding going forward.

7           THE COURT:  I'm sorry.  Do you mean that generally or

8   with respect to the health care field in particular?

9           THE WITNESS:  Generally.

10  Q.  You are not a privacy regulatory specialist, correct?

11  A.  I am not.

12  Q.  You have never advised a programmatic advertising company

13  on how to respond to new privacy regulations, right?

14  A.  I have not.

15  Q.  You also discuss changing customer needs in your report, is

16  that correct?

17  A.  I do.

18  Q.  The customers in HCP programmatic advertising typically are

19  advertising agencies and pharmaceutical companies, correct?

20  A.  Correct.

21  Q.  You have never been employed by an advertising agency,

22  correct?

23  A.  No, I have not.

24  Q.  You have never been employed by a pharmaceutical company,

25  correct?

1  A.  No, I have not.

2  Q.  So when you say that customer needs are evolving, that's

3  not based on any professional experience you have working for

4  one of those customers, correct?

5  A.  I probably should clarify here as well.  I sit on the

6  leadership council of our cancer drug accelerator at Rice.  I

7  teach health care classes in my -- health care cases in my

8  class, and I teach a year-long sequence on health care

9  innovation and entrepreneurship.  It is, among other things, my

10  job to make sure that I study and understand what is happening

11  in the pharma industry.

12       So, no, I have not been employed by a pharma company,

13  but that does not mean that I am not able, as a professional

14  scholar, to study what is happening in an industry.

15  Q.  I want to turn to your discussion of the defendant's

16  ordinary-course documents in your report.  Your report claims

17  that they are outdated and unreliable, is that correct?

18  A.  My report, I believe -- why don't we pull it up so that we

19  can be consistent with what I said.  But I refer to some of

20  them as being outdated and -- certainly outdated in the sense

21  that many of them come from 2020, 2021, 2022, which, in a

22  rapidly evolving industry, is eons ago and, in some cases,

23  unreliable in the sense that you have to remember to think

24  about the context in which they are created when looking at

25  them, in that sense.  I'll save you from loading the report.

1    Q.  You would agree that ordinary-course documents have at

2    least some relevance for understanding competition in HCP

3    programmatic advertising, correct?

4    A.  Absolutely.  The key, as always, with any document in any

5    case is to consider the context in which it is created.

6    Q.  Ordinary-course documents can show who a company perceives

7    as its competitors, correct?

8    A.  If they are created specifically for the purpose of mapping

9    out the entire competitive landscape, potentially.

10   Q.  Ordinary-course documents can show how other competitors

11   influence a company's decision making, correct?

12   A.  Potentially.

13   Q.  You have not personally reviewed every document used as an

14   exhibit by the FTC in this case, correct?

15   A.  I highly doubt so.

16   Q.  You are not offering an opinion on the reliability of

17   documents that you have not personally reviewed, is that

18   correct?

19   A.  That is correct.

20   Q.  Some of the documents you reviewed were authored by

21   DeepIntent's executives, is that correct?

22   A.  Yes.

23   Q.  DeepIntent's executives are responsible for growing the

24   company's market share, correct?

25   A.  Correct.

1    Q.  DeepIntent's executives are also responsible for planning

2    for the future, isn't that correct?

3    A.  Correct.

4    Q.  Some of the documents were also written by salespeople for

5    DeepIntent and IQVIA, correct?

6    A.  Correct.

7    Q.  Salespeople are responsible for understanding who their

8    competing against, correct?

9    A.  Hopefully.

10   Q.  Salespeople are responsible for trying to beat other

11   competitors for different opportunities, correct?

12   A.  Correct.

13   Q.  As part of your work on this matter you never spoke with

14   anyone from either of the defendants, correct?

15   A.  That is correct.

16   Q.  So you have never spoken with any of the individuals who

17   authored the various documents you reviewed, is that correct?

18   A.  I have not.  I have read their declarations.  I have read

19   their depositions, but, no, I have not spoken to them.

20   Q.  Outside of the evidence you reviewed in this matter, you

21   don't have any independent knowledge about competition in HCP

22   programmatic advertising, is that correct?

23   A.  That is correct.

24   Q.  Would you please turn to the slide in the demonstrative

25   section.  I believe it is the second-to-last slide with the

heading PulsePoint testimony.

A.  Is it going to come up?  Thank you.

Q.  Were you in attendance at this hearing during the testimony

from PulsePoint's executive vice-president, Konrad Gerszke?

A.  I was.

Q.  If you look at the excerpt from page 151 of the hearing

transcript, Mr. Gerszke testified that the vast majority of

PulsePoint's losses are to DeepIntent and Lasso.

        Do you see that?

A.  I do.

Q.  Please turn to the next slide, which has the heading

AdTheorent testimony.  Let me know when you are there.

A.  OK.

Q.  Were you in attendance at this hearing during the testimony

from AdTheorent's CEO, James Lawson?

A.  No, I do not believe I was.

Q.  If you look at the second prompt from pages 808 and 809, do

you see that Mr. Lawson testified that he's not aware of any

new entrants that AdTheorent comes up against other than

PulsePoint, DeepIntent, and Lasso?

A.  That is what I see here.

Q.  Is it your opinion that this evidence is not informative in

this particular antitrust case?

A.  So I'm offering no opinion on the trial testimony here, but

these are small excerpts of a massive, massive record.  I'm not

1    arguing -- not opining or speculating that anything is not --

2    sorry.  I think it is -- I see where you are showing me some

3    excerpts from a very large amount of evidence in the case.  I'm

4    not saying that these aren't relevant, but I will say that

5    everything else is relevant too and that everything needs to be

6    analyzed with an eye towards what the context was in which

7    conversations were happening, documents were created, and what

8    the incentives of the people are.

9    Q.  It's the job of these companies to understand the market

10   and predict how it will develop, correct?

11   A.  Presumably.

12              MR. SOHN:  We have no further questions, your Honor.

13              THE COURT:  Can I ask a question.  One of the factors

14   that you mentioned in determining whether or not a particular

15   industry is dynamic or changing is technological changes.  I

16   note that oftentimes, to my great chagrin, there is

17   technological changes all about my life, all around my life.

18              Is there anything in particular about what you studied

19   in this case that makes the technological changes different?

20              THE WITNESS:  Yeah.  You're a hundred percent correct,

21   technological change is all over.  This is a software business

22   that is highly dependent on data.  And our ability to process

23   data, to work with big amounts of data, to optimize data, that

24   has been changing and improving by leaps and bounds over recent

25   years, and with AI it moves forward by leaps and bounds again.

 1              This is true for the advertising industry writ large,

 2    not just for health care, and it's true for any data-driven

 3    industry right now in terms of what the effects of these kinds

 4    of technology -- these technological advancements and our

 5    ability to work with data really do to the industry and to the

 6    competitors and to the innovation and the space.

 7              THE COURT:  Thank you.

 8              Mr. Tulumello.

 9              MR. TULUMELLO:  Nothing further.

10              THE COURT:  Dr. Hochberg, you may step down.

11              (Witness excused)

12              THE COURT:  Is there another witness?

13              MS. FIEBIG:  We were hoping to present our final

14    witness of today by deposition designation.

15              THE COURT:  Very well.

16              MS. FIEBIG:  We would call Paul Chachko.

17              I am going to invite one of my colleagues up just to

18    display the demonstrative that you first saw last week.

19              Mr. Chachko is the founder and chief executive officer

20    of a company called Throtle.

21              THE COURT:  How do you spell the last name?

22              MS. FIEBIG:  It's C-h-a-c-h-k-o.

23              This video will run approximately 22 minutes.  I think

24    Mr. Sullivan can indicate where Throtle falls within that

25    demonstrative, and then we can play the video.

```
 1                THE COURT:  Very well.

 2                MS. FIEBIG:  Before we begin, apologies.  We will need

 3      to seal the courtroom for this portion of the testimony.

 4                THE COURT:  If you are not part of the litigation

 5      teams, please leave the courtroom.

 6                MS. FIEBIG:  Thank you.

 7      PAUL CHACHKO, by video.

 8                (Video played).

 9                THE COURT:  That concludes Mr. Chachko's testimony?

10                MS. FIEBIG:  Yes, your Honor.

11                THE COURT:  We have no other witnesses today?

12                MS. FIEBIG:  That's right, your Honor.

13                THE COURT:  Is there anything that any side wish to

14      raise?

15                MS. FLEURY:  Not from the FTC, your Honor.

16                MS. FIEBIG:  Nothing further today, your Honor.  Thank

17      you.

18                THE COURT:  In that event, we are adjourned.  Have a

19      good night, everyone.  See you tomorrow.

20                You can go about your business.

21                (Adjourned to November 30, 2023, at 9:00 a.m.)

22

23

24

25
```

INDEX OF EXAMINATION

Examination of:                                    Page

KOSTIS HATZITASKOS

Cross By Mr. Tulumello . . . . . . . . . . . 876
Redirect By Ms. Chung . . . . . . . . . . . 924
ANDREA PALMER

Direct By Mr. Obaro . . . . . . . . . . . . 947
Cross By Mr. Andrew . . . . . . . . . . . . 966
Redirect By Mr. Obaro . . . . . . . . . . . 980

 JUSTIN CHASE

 YAEL HOCHBERG

Direct By Mr. Tulumello . . . . . . . . . . 983
Cross By Mr. Sohn . . . . . . . . . . . . .1011
PAUL CHACHKO